JS 44   (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

JOSEPH S. AUTERI, M.D.

**(b)** County of Residence of First Listed Plaintiff   **Bucks County**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Kimberly L. Russell, Esquire
Kaplin Stewart Meloff Reiter & Stein, P.C.
Union Meeting Corporate Center, 910 Harvest Drive, P.O. Box 3037, Blue Bell, PA 19422
Telephone (610) 941-2541

## DEFENDANTS

VIA AFFILIATES d/b/a DOYLESTOWN HEALTH PHYSICIANS

County of Residence of First Listed Defendant   **Bucks County**
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government
Plaintiff
- [X] 3  Federal Question
*(U.S. Government Not a Party)*
- [ ] 2  U.S. Government
Defendant
- [ ] 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |

**PERSONAL INJURY**
[ ] 310 Airplane
[ ] 315 Airplane Product Liability
[ ] 320 Assault, Libel & Slander
[ ] 330 Federal Employers' Liability
[ ] 340 Marine
[ ] 345 Marine Product Liability
[ ] 350 Motor Vehicle
[ ] 355 Motor Vehicle Product Liability
[ ] 360 Other Personal Injury
[ ] 362 Personal Injury - Medical Malpractice

[ ] 120 Marine
[ ] 130 Miller Act
[ ] 140 Negotiable Instrument
[ ] 150 Recovery of Overpayment & Enforcement of Judgment
[ ] 151 Medicare Act
[ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
[ ] 153 Recovery of Overpayment of Veteran's Benefits
[X] 160 Stockholders' Suits
[ ] 190 Other Contract
[ ] 195 Contract Product Liability
[ ] 196 Franchise

**PERSONAL INJURY**
[ ] 365 Personal Injury - Product Liability
[ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
[ ] 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
[ ] 370 Other Fraud
[ ] 371 Truth in Lending
[ ] 380 Other Personal Property Damage
[ ] 385 Property Damage Product Liability

**REAL PROPERTY**
[ ] 210 Land Condemnation
[ ] 220 Foreclosure
[ ] 230 Rent Lease & Ejectment
[ ] 240 Torts to Land
[ ] 245 Tort Product Liability
[ ] 290 All Other Real Property

**CIVIL RIGHTS**
[ ] 440 Other Civil Rights
[X] 441 Voting
[X] 442 Employment
[ ] 443 Housing/ Accommodations
[ ] 445 Amer. w/Disabilities - Employment
[ ] 446 Amer. w/Disabilities - Other
[ ] 448 Education

**PRISONER PETITIONS**
**Habeas Corpus:**
[ ] 463 Alien Detainee
[ ] 510 Motions to Vacate Sentence
[ ] 530 General
[ ] 535 Death Penalty
**Other:**
[ ] 540 Mandamus & Other
[ ] 550 Civil Rights
[ ] 555 Prison Condition
[ ] 560 Civil Detainee - Conditions of Confinement

**LABOR**
[ ] 710 Fair Labor Standards Act
[ ] 720 Labor/Management Relations
[ ] 740 Railway Labor Act
[ ] 751 Family and Medical Leave Act
[ ] 790 Other Labor Litigation
[ ] 791 Employee Retirement Income Security Act

**IMMIGRATION**
[ ] 462 Naturalization Application
[ ] 465 Other Immigration Actions

[ ] 690 Other

[ ] 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
[ ] 820 Copyrights
[ ] 830 Patent
[ ] 835 Patent - Abbreviated New Drug Application
[ ] 840 Trademark
[ ] 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
[ ] 861 HIA (1395ff)
[ ] 862 Black Lung (923)
[ ] 863 DIWC/DIWW (405(g))
[ ] 864 SSID Title XVI
[ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
[ ] 870 Taxes (U.S. Plaintiff or Defendant)
[ ] 871 IRS—Third Party 26 USC 7609

[ ] 376 Qui Tam (31 USC 3729(a))
[ ] 400 State Reapportionment
[ ] 410 Antitrust
[ ] 430 Banks and Banking
[ ] 450 Commerce
[ ] 460 Deportation
[ ] 470 Racketeer Influenced and Corrupt Organizations
[ ] 480 Consumer Credit (15 USC 1681 or 1692)
[ ] 485 Telephone Consumer Protection Act
[ ] 490 Cable/Sat TV
[ ] 850 Securities/Commodities/ Exchange
[ ] 890 Other Statutory Actions
[ ] 891 Agricultural Acts
[ ] 893 Environmental Matters
[ ] 895 Freedom of Information Act
[ ] 896 Arbitration
[ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
[ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. and Americans with Disabilities Act, as Amended, 42 U.S.C. § 12101, et seq.
Brief description of cause:
Employee Civil Rights Violated; Breach of Employment Contract

## VII. REQUESTED IN COMPLAINT:

[ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $   in excess of $150,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:   [X] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE   8/24/2022

SIGNATURE OF ATTORNEY OF RECORD   *Kimberly L. Russell*

**FOR OFFICE USE ONLY**

RECEIPT #   AMOUNT   APPLYING IFP   JUDGE   MAG. JUDGE

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: 3007 Holicong Road, Doylestown, PA 18901

Address of Defendant: 595 West State Street, Doylestown, PA 18901

Place of Accident, Incident or Transaction: Bucks County, PA

---

*RELATED CASE, IF ANY:*

Case Number: _____    Judge: _____    Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?    Yes ☐    No ☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?    Yes ☐    No ☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?    Yes ☐    No ☐

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?    Yes ☐    No ☐

I certify that, to my knowledge, the within case ☐ is / ☒ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: August 24, 2022 _____    *Kimberly L. Russell* (signature)    74057
                                        *Attorney-at-Law / Pro Se Plaintiff*    *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.    *Federal Question Cases:***

☒ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Patent
☐ 6. Labor-Management Relations
☒ 7. Civil Rights
☐ 8. Habeas Corpus
☐ 9. Securities Act(s) Cases
☐ 10. Social Security Review Cases
☐ 11. All other Federal Question Cases
       *(Please specify):* _____

**B.    *Diversity Jurisdiction Cases:***

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify):* _____
☐ 7. Products Liability
☐ 8. Products Liability – Asbestos
☐ 9. All other Diversity Cases
       *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, Kimberly L. Russell, Esquire, counsel of record *or* pro se plaintiff, do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

DATE: August 24, 2022 _____    *Kimberly L. Russell* (signature)    74057
                                        *Attorney-at-Law / Pro Se Plaintiff*    *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

JOSEPH S. AUTERI, M.D.                         :                    CIVIL ACTION
                                                              :
                              v.                              :
VIA AFFILIATES, d/b/a DOYLESTOWN   :
HEALTH PHYSICIANS                            :        NO.

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                    ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
   and Human Services denying plaintiff Social Security Benefits.                                      ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.    ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
   exposure to asbestos.                                                                                               ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
   commonly referred to as complex and that need special or intense management by
   the court. (See reverse side of this form for a detailed explanation of special
   management cases.)                                                                                              ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.        (X)


August 24, 2022              Kimberly L. Russell, Esquire    Plaintiff
**Date**                           **Attorney-at-law**                        **Attorney for**

(610) 941-2541              (610) 684-2026                    krussell@kaplaw.com

**Telephone**                    **FAX Number**                       **E-Mail Address**


(Civ. 660) 10/02


American LegalNet, Inc.
www.FormsWorkFlow.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOSEPH S. AUTERI, M.D.** | : | |
| Plaintiff, | : | No. |
| | : | |
| v. | : | |
| | : | |
| **VIA AFFILIATES, d/b/a** | : | JURY TRIAL DEMANDED |
| **DOYLESTOWN HEALTH** | : | |
| **PHYSICIANS** | : | |
| Defendant. | : | |

### COMPLAINT

Plaintiff Joseph S. Auteri, M.D. (**"Dr. Auteri"**), by and through his undersigned counsel, brings this Complaint against Doylestown Health VIA Affiliates d/b/a, Doylestown Health Physicians (**"Doylestown Health"**), and in support thereof avers as follows:

### PREFACE

The instant action stems from Doylestown Health's failure to grant Dr. Auteri's requests for a religious and medical exemption from Doylestown Health's COVID-19 vaccine mandate, including Doylestown Health's failure to engage in the interactive process to discuss Dr. Auteri's proposed reasonable accommodation, failure to grant Dr. Auteri's accommodation request, Doylestown Health's creation of a hostile work environment, and Doylestown Health's retaliation against Dr. Auteri, culminating in Doylestown Health's termination of Dr. Auteri's employment and breach of Dr. Auteri's employment agreement, all of which has resulted in grievous and substantial harm to Dr. Auteri. After terminating Dr. Auteri's employment without any effort to engage in the interactive process to accommodate Dr. Auteri's exemption request, Doylestown Health began engaging in the same COVID-19 testing process which Dr. Auteri sought as a reasonable accommodation and required employees to work when infected with COVID-19, yet Doylestown Health refused to reinstate Dr. Auteri, demonstrating Doylestown Health's

discrimination and retaliation against Dr. Auteri. As set forth in detail below, Doylestown Health engaged in systemic and purposeful discrimination, harassment, and retaliation against Dr. Auteri in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. (**"Title VII"**), the Americans with Disabilities Act, as Amended, 42 U.S.C. § 12101, et seq. (**"ADA"**), and the Pennsylvania Human Relations Act (**"PHRA"**)[1]. Doylestown Health's discriminatory, harassing conduct must be eradicated and Doylestown Health must be made to reinstate Dr. Auteri and remedy all such discrimination, harassment, and retaliation in full.

## PARTIES

1.      Dr. Auteri is an adult individual who is a resident of the Commonwealth of Pennsylvania.

2.      Doylestown Health is Pennsylvania nonprofit corporation existing under the laws of Pennsylvania.

3.      At all times material hereto, Doylestown Health was headquartered at 595 West State Street, Doylestown, PA 18901.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because the action arises under the laws of the United States and seeks redress under federal laws. This Court has supplemental jurisdiction over Dr. Auteri's state

---

[1] Dr. Auteri's claim under the PHRA is referenced herein for notice purposes. Dr. Auteri is required to wait one year from the date of dual filing with the EEOC before initiating a lawsuit under the PHRA. However, Dr. Auteri must file the instant federal lawsuit in advance of that one year date because of the date of the EEOC's issuance of a federal "right to sue" letter under Title VII and the ADA. Dr. Auteri's PHRA claims and the underlying facts thereof mirror Dr. Auteri's Title VII and ADA claims set forth herein. Dr. Auteri will seek leave to amend the instant Complaint as soon as he can do so in compliance with the PHRA.

law claims because those claims arise out of the same common nucleus of operative facts as Dr. Auteri's federal claims asserted herein.

5.     The exact number of Doylestown Health employees is unknown but upon information and belief, there are thousands of Doylestown Health employees.

6.     At all times material hereto, Dr. Auteri performed the duties of his employment with Doylestown Health in Bucks County, Pennsylvania.

7.     This Court has personal jurisdiction over Doylestown Health because at all times material hereto, Doylestown Health operated its business in the Commonwealth of Pennsylvania and within the judicial district of the United States District Court for the Eastern District of Pennsylvania.

8.     Venue is proper in this Court because all of the acts and/or omissions giving rise to the claims set forth herein occurred in the judicial district of the United States District Court for the Eastern District of Pennsylvania.

9.     Dr. Auteri exhausted his administrative remedies as the EEOC issued to Dr. Auteri a Notice of Dr. Auteri's Right to Sue on August 17, 2022.

**FACTUAL BACKGROUND**

10.     Dr. Auteri is a cardiac surgeon licensed to practice medicine in the Commonwealth of Pennsylvania and until his wrongful termination was the Chief of Cardiovascular Surgery at Doylestown Health and the Medical Director of the Doylestown Heart Institute.

11.     Dr. Auteri had been on staff at Doylestown Health since May 2007 and in the process thereof built the cardiac program into one of the top cardiac programs in the

Commonwealth. Dr. Auteri led the fundraising and logistical efforts to build and create state of the art cardiac facilities at Doylestown Hospital, for which Doylestown Health provides staffing.

12.    Dr. Auteri is considered a leader and expert in his field and was singlehandedly responsible for the prominence enjoyed by the cardiac program at Doylestown Health at the time of Dr. Auteri's termination.

13.    Doylestown Health employed Dr. Auteri pursuant to an Employment Agreement effective April 1, 2012, which Employment Agreement was extended and amended during Dr. Auteri's employment. A true and correct copy of the pertinent portions of the Employment Agreement is attached hereto as **Exhibit "1."**

14.    In recognition of Dr. Auteri's talents and work on behalf of Doylestown Health, on or about December 17, 2019, Doylestown Health and Dr. Auteri executed an "Amendment of Employment Agreement Between VIA Affiliates, Inc. and Joseph S. Auteri, M.D.," pursuant to which Doylestown Health extended the term of Dr. Auteri's employment through December 31, 2024 (as amended, the **"Employment Agreement"**). A true and correct copy of the pertinent portions of the Employment Agreement is attached hereto as **Exhibit "2."**

15.    Pursuant to the Employment Agreement, Dr. Auteri was required to maintain privileges at Doylestown Hospital, but those privileges could be revoked directly or indirectly by Doylestown Health.

16.    If Dr. Auteri's privileges at Doylestown Hospital were revoked, Doylestown Health then would be able to terminate the Employment Agreement.

17.    As set forth below, Doylestown Health used its influence to revoke Dr. Auteri's privileges at Doylestown Hospital to perpetrate Doylestown Health's discrimination and retaliation against Dr. Auteri.

18.    As set forth below, Doylestown Health's representatives, including Scott Levy, M.D., the Chief Medical Officer of Doylestown Health, engaged in a pattern of harassing conduct which resulted in a hostile work environment and the total disregard of Dr. Auteri's civil rights.

19.    Dr. Auteri performed services according to the terms of the Employment Agreement throughout the entirety of the COVID-19 pandemic.

20.    During the COVID-19 pandemic, Doylestown Health implemented a health screening program, including daily temperature checks and health questions, to screen its employees for COVID-19.

21.    Dr. Auteri participated in that screening program.

22.    Dr. Auteri continued to treat patients throughout the COVID-19 pandemic regardless of the patients' COVID-19 status, and whether or not Dr. Auteri was aware of the patients' COVID-19 status.

23.    Dr. Auteri contracted COVID-19 in May 2021 while in the course of treating patients and followed the isolation requirements of Doylestown Health before returning to work.

**Doylestown Health Imposes a COVID-19 Vaccine Mandate and Harasses Dr. Auteri Over His Study of Vaccine Effectiveness and Health Impacts**

24.    In early 2021, the COVID-19 "vaccines" became available and ultimately were made available for administration to Doylestown Health employees.

25.    After the vaccines became widely available in the summer of 2021, Doylestown Health began to consider the imposition of a COVID-19 vaccine mandate.

26.    As a member of Doylestown Health's Medical Executive Committee and as a licensed physician who studied health data as part of his daily duties at Doylestown Health, Dr. Auteri studied the data regarding the efficacy of the COVID-19 vaccines and the side effects thereof, as well as statistics surrounding the duration and efficacy of those who had natural immunity from a prior COVID-19 infection.

27.    By January 2021, a leading immunologist (who supported COVID-19 vaccination) warned lead Food and Drug Administration (**"FDA"**) regulators about the potential danger from COVID-19 vaccination to the health of persons with SARS-CoV-2 antigens in their system due in part to the antigen specific immune response triggered by the vaccine and the vaccine's targeting of tissues which were damaged from prior or current COVID-19 infection, and urged the FDA to delay COVID-19 vaccination in those with SARS-CoV-2 antigens by using antibody screening.

28.    On July 30, 2021, the Director of the Centers for Disease Control (**"CDC"**) admitted in an official statement that persons vaccinated for COVID-19 could transmit the virus and had viral loads similar to those of unvaccinated persons. www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html.

29.    By August of 2021, the CDC published data on its website showing that the COVID-19 viral load was essentially the same in the vaccinated and unvaccinated, and the CDC Director admitted that both vaccinated and unvaccinated persons could transmit the COVID-19 virus.    https://www.cdc.gov/library/covid19/08132021_covidupdate.html    and https://www.cdc.gov/library/covid19/08132021_covidupdate.html .

30.     After studying that data, Dr. Auteri voiced his clinical concerns to the Medical Executive Committee about the imposition of a COVID-19 vaccine mandate and instead supported voluntary vaccination and enhanced safety precautions for <u>all</u> employees as Doylestown Health had done throughout the pandemic.

31.     Dr. Auteri expressed concern that the COVID-19 vaccines were not preventing individuals from becoming infected and transmitting the virus.

32.     After studying available data, Dr. Auteri was concerned about the effect of the COVID-19 vaccine on those who had recovered from a prior infection.

33.     After studying available data, including the CDC's own data and admissions, Dr. Auteri was concerned that the COVID-19 vaccines were not protecting patients and staff from transmitting the virus, and that Doylestown Health should consider safety measures other than a COVID-19 vaccine mandate.

34.     Dr. Auteri also expressed concern that there was insufficient data to ensure that the vaccines were safe for administration to a broad group of people as part of a mandate.

35.     After Dr. Auteri voiced his concerns about the vaccines following his study of the COVID-19 vaccines, representatives of Doylestown Health, including Dr. Levy, refused to engage in any scientific study of available data and discussion of vaccines, and refused to have any professional, non-hostile discussion with Dr. Auteri regarding the COVID-19 vaccines.

36.     After Dr. Auteri voiced his concerns about the vaccines following his study of the COVID-19 vaccines, Dr. Levy began to harass Dr. Auteri about the vaccines and Dr. Auteri's continued efforts to study the vaccines as a clinician and to protect the health of Doylestown Heath's employees and patients.

37.     On multiple occasions, Dr. Levy screamed at Dr. Auteri in front of staff members and refused to review data with Dr. Auteri in order to evaluate Doylestown Hospital's policies related to a possible COVID-19 vaccine mandate.

38.     Despite Dr. Auteri's concerns, Doylestown Health, through the Medical Executive Committee, decided to impose a COVID-19 vaccine mandate on all Doylestown Health employees (the **"Mandate"**)[2].

39.     In imposing the Mandate, Doylestown Health set an artificial deadline of September 10, 2021 for employees to seek an exemption to the Mandate on the basis of a medical condition or religious affiliation, ahead of an October 11, 2021 vaccination deadline.

40.     Dr. Auteri did not submit a request for an exemption from the Mandate by the September 10, 2021 artificial deadline, nor did Doylestown Health have any legal authority to set a deadline after which employees could no longer seek exemptions from a workplace requirement or rule.

41.     Dr. Auteri continued to research the vaccines, the effects of the vaccine on those who already recovered from the virus, and the effect of the mRNA vaccines on the systems of the body.

**Dr. Auteri Is Harassed Over COVID-19 Shots and Submits Exemption Requests**

42.     Dr. Auteri is a follower of Christ and is known to Doylestown Health to be a man of faith.

---

[2] Ultimately, the Centers for Medicare and Medicaid Services imposed a COVID-19 vaccine mandate for all healthcare providers receiving Medicare/Medicaid funds (the **"CMS Mandate"**), which included Doylestown Health and Doylestown Hospital. The CMS Mandate required the provision of religious and medical exemptions such as those Dr. Auteri sought. The CMS Mandate does not alter Doylestown Health's obligations as set forth herein.

43.     Prior to joining Doylestown Health in 2007, Dr. Auteri told Doylestown Health that he would have to pray on the decision of whether to accept the employment offer from Doylestown Health.

44.     Dr. Auteri has expressed his sincerely held religious beliefs to others at Doylestown Health and led a former colleague to Christ.

45.     As the deadline for the Mandate loomed closer, Dr. Auteri expressed his concerns about the workings of the vaccine, particularly the research showing that the vaccines caused harm to the immune systems of those who had recovered from the virus, and the manner in which the vaccines impact the overall functioning of the human body as designed by God.

46.     Doylestown Health, including through its Chief Medical Officer Dr. Levy, began to harass and intimidate Dr. Auteri as Dr. Auteri continued to express his concerns.

47.     Doylestown Health requested multiple large donors to the hospital, including donors to the cardiac program which Dr. Auteri was continuing to build, to meet with Dr. Auteri in an effort to "persuade" Dr. Auteri to comply with the Mandate.

48.     Dr. Auteri continued to express his concerns about the effect of the vaccine on Dr. Auteri's medical condition (i.e. his altered immune system after contracting COVID-19) and the functioning of his body as designed by God.

49.     As Dr. Auteri continued to express his concerns about the effects of the vaccine, Doylestown Health acknowledged Dr. Auteri's research indicating that the vaccine could severely impact Dr. Auteri's medical condition and Dr. Levy offered to have Doylestown Health make certain payments to Dr. Auteri if Dr. Auteri complied with the Mandate and suffered an adverse condition which impacted Dr. Auteri's ability to perform surgery.

50.     Dr. Auteri's desire was to continue to perform surgery using his gifts from God, and not to get a payoff in the event that the vaccine harmed Dr. Auteri.

51.     Prior to the Mandate vaccination deadline, the CDC acknowledged following April 2021 reports that there was a connection between the COVID-19 vaccines and a cardiac condition known as myocarditis, which involves the killing of heart cells, particularly in adolescent and young males, after the administration of the second dose of the Pfizer and Moderna COVID-19 vaccines.  See https://www.cdc.gov/vaccines/covid-19/clinical-considerations/myocarditis.html.

52.     Multiple peer reviewed studies published before the Mandate vaccination deadline also demonstrated the link between the COVID-19 vaccines and myocarditis.

53.     Dr. Auteri was aware of the link between the COVID-19 vaccines and myocarditis and was attempting to study how such a link would impact Dr. Auteri's cardiac patients and the population generally.

54.     At a Medical Executive Committee meeting at which Dr. Auteri again raised his concerns about the medical effects of the vaccines based upon the data he compiled, Dr. Levy became agitated at Dr. Auteri and in a very heated and angry tone told Dr. Auteri in front of their peers that Dr. Levy did not dispute Dr. Auteri's research but disagreed that the data compiled was a "fact" and belittled Dr. Auteri's concerns.

55.     Dr. Auteri sent an email dated September 10, 2021 to Dr. Levy and multiple other hospital officials, including Human Resources Officer Barbara Hebel, about Dr. Levy's improper behavior, but no one on behalf of Doylestown Hospital contacted Dr. Auteri to investigate and address timely Dr. Levy's conduct toward Dr. Auteri and prevent further harassment, discrimination, and retaliation against Dr. Auteri.

56.     As a result of Dr. Auteri's expression of his legitimate, well researched, and sincerely held concerns about the medical effects of the vaccine on his own medical condition and Dr. Auteri's sincerely held religious beliefs about the vaccine's effects upon the functioning of Dr. Auteri's body as designed by God, Dr. Levy as the Chief Medical Officer of Doylestown Health engaged in a pattern of abusive behavior, discrimination, and harassment of Dr. Auteri and after Dr. Auteri reported that behavior, Doylestown Health did nothing to stop Dr. Levy's behavior.

57.     Doylestown Health and its representatives created, promoted, and forced Dr. Auteri to work in a hostile work environment and did nothing to remedy that environment when Dr. Auteri protested his work conditions.

58.     On October 11, 2021, Dr. Auteri submitted two written requests for an exemption from the Mandate, one on the basis of a medical exemption and one on the basis of a religious exemption (the **"Exemption Requests"**).  True and correct copies of the Exemption Requests are attached hereto as **Exhibit "3."**

59.     The Exemption Requests memorialized in writing the verbal exemption requests which Dr. Auteri had made as set forth above when Dr. Auteri expressed his sincerely held concerns and beliefs related to the Mandate.

60.     In the Exemption Requests, Dr. Auteri submitted again the medical and religious reasons for seeking the exemptions.

61.     Both before and after Dr. Auteri submitted the Exemption Requests, Doylestown Health through Dr. Levy engaged in additional harassment and egregious behavior in retaliation for Dr. Auteri's protected activity of seeking lawful exemptions to the Mandate and reasonable accommodations.

62.     On October 10, 2021, the day before the Mandate was to take effect, Dr. Levy texted and emailed Dr. Auteri while Dr. Auteri was in Church and asked that they meet. Dr. Auteri replied that because of Dr. Levy's prior hostility to Dr. Auteri when discussing the Mandate, Dr. Auteri was not sure that they should meet. Ultimately, Dr. Auteri agreed to meet with Dr. Levy in a public restaurant in Doylestown in order to hopefully keep Dr. Levy from becoming abusive and threatening.

63.     During the October 10, 2021 meeting, Dr. Levy again demanded that Dr. Auteri comply with the Mandate and told Dr. Auteri that if Dr. Auteri did not get the vaccine by 4:59 p.m. the next day, Dr. Auteri would be terminated at 5:00 p.m.

64.     Dr. Levy told Dr. Auteri that the Medical Executive Committee would remove Dr. Auteri from Doylestown Health's medical staff at 5:00 p.m., Dr. Auteri would be deemed to have breached the Employment Agreement, and Dr. Auteri would be terminated immediately, and without the 30 day cure period mandated by the Employment Agreement.

65.     Dr. Levy did not discuss Dr. Auteri's prior verbal requests for exemption from the Mandate due to Dr. Auteri's religion and the effects of the COVID-19 shot on Dr. Auteri's medical condition; to the contrary, Dr. Levy threatened Dr. Auteri with immediate termination without any regard for Dr. Auteri's protected rights.

66.     After threatening Dr. Auteri, Dr. Levy then engaged in further harassing, berating conduct by telling Dr. Auteri that if Dr. Auteri did not comply with the Mandate, Dr. Auteri's legacy would be that of a "loser."

67.     Dr. Levy analogized Dr. Auteri's invocation of Dr. Auteri's legally protected rights to that of a Major League Baseball player who committed an error in the World Series (Bill

Buckner) and said that if Dr. Auteri did not comply with the Mandate, Dr. Auteri would be "forever a loser" and would never get a job as a cardiac surgeon in the United States ever again.

68.    Dr. Levy then violated the protected HIPAA rights of other Doylestown Health employees and told Dr. Auteri that Dr. Auteri was one of four Doylestown Health physicians who refused to comply with the Mandate, and Dr. Levy listed the other three physicians by name.

69.    Dr. Levy then defamed those three physicians by stating that in refusing the Mandate like those physicians, Dr. Auteri "was not in very good company."

70.    Dr. Levy's conduct is a quintessential example of the threats, harassment, discrimination, and retaliation which Title VII, the ADA, and the PHRA are meant to prevent and eliminate.

71.    Dr. Levy's conduct was outrageous, unlawful, and meant to threaten Dr. Auteri into abandoning Dr. Auteri's legal rights in order to meet Doylestown Health's improper demand that Dr. Auteri comply with the Mandate without seeking an exemption.

**Doylestown Health Retaliates Against Dr. Auteri for Seeking Exemptions to the Mandate and Fails to Participate in the Interactive Process After Dr. Auteri Sought an Accommodation**

72.    The day after Dr. Auteri refused to submit to Dr. Levy's demands, harassment, and condescending behavior, Doylestown Health retaliated against Dr. Auteri.

73.    On October 11, 2021, the same day that Dr. Auteri submitted the Exemption Requests, Doylestown Health suspended Dr. Auteri for 30 days because Dr. Auteri had not submitted proof that Dr. Auteri had complied with the Mandate (the **"Suspension Letter"**). A true and correct copy of the Suspension Letter is attached hereto as **Exhibit "4."**

74.     Doylestown Health did nothing to investigate Dr. Levy's conduct prior to Dr. Auteri's suspension, failed to investigate Dr. Auteri's prior report of Dr. Levy's harassing behavior, and instead aided and abetted Dr. Levy's violation of Dr. Auteri's civil rights and retaliation by suspending Dr. Auteri.

75.     In the Suspension Letter, Doylestown Health did not address at all Dr. Auteri's Exemption Requests and did not engage in the interactive process to determine whether any reasonable accommodation could be reached in response to the Exemption Requests.

76.     In the Suspension Letter, Doylestown Health suspended Dr. Auteri without pay and told Dr. Auteri that if he did not submit proof of compliance with the Mandate in thirty days, Dr. Auteri would be terminated.

77.     After Doylestown Health received Dr. Auteri's Exemption Requests, rather than comply with the law and protect Dr. Auteri's rights by properly evaluating those Requests and engaging in the interactive process of discussing a reasonable accommodation, Doylestown Health summarily suspended Dr. Auteri without pay, threatened Dr. Auteri with termination, and simply told Dr. Auteri to comply with the Mandate without further discussion.

78.     Two days after summarily suspending Dr. Auteri, on October 13, 2021, Doylestown Health denied both Exemption Requests (the **"Exemption Denial"**) without engaging in the interactive process and without requesting that Dr. Auteri meet or otherwise discuss with Doylestown Health how Doylestown Health could accommodate Dr. Auteri's Exemption Requests. A true and correct copy of the Exemption Denial is attached hereto as **Exhibit "5."**

79.     In an October 13, 2021 letter authored by Ms. Hebel, the Human Resources official who failed to investigate Dr. Levy's improper conduct against Dr. Auteri, Ms. Hebel denied the

Exemption Requests because (1) the Requests were "untimely" pursuant to Doylestown Health's unlawful artificial exemption request deadline, (2) Doylestown Hospital substituted its own judgment on the effect of the vaccine upon those who had a prior COVID-19 infection and refused to consider the altered state of Dr. Auteri's immune system on the propriety of vaccination, and (3) even if Doylestown Health would grant Dr. Auteri "special treatment" and grant a religious exemption, there is no accommodation available because any accommodation would be an "undue burden" without having literally ANY discussion with Dr. Auteri about possible accommodations.

80. The Exemption Denial is absolutely unlawful, as the law does not permit an employer to impose any deadline on a request for accommodation; to the contrary, an employee is permitted to request an accommodation when the need for one becomes apparent to either the employee or the employer.

81. The Exemption Denial is absolutely unlawful in considering a religious exemption to be "special treatment"; to the contrary, the granting of exemptions and reasonable accommodations due to sincerely held religious beliefs is a legal right of employees and obligation of employers protected under Title VII.

82. Doylestown Health's denial of the Exemption Requests and complete and total failure to engage in the interactive process with Dr. Auteri regarding possible reasonable accommodations is a violation of Dr. Auteri's rights protected under Title VII and the ADA.

83. Doylestown Health's attempts to pressure and harass Dr. Auteri into complying with the Mandate, despite Dr. Auteri's sincerely held religious beliefs and Dr. Auteri's concern about the alteration of his immune system by his prior COVID-19 infection and effects of the COVID-19 vaccine on those with that altered immune system, created a hostile work environment

in which Doylestown Health representatives repeatedly harassed and discriminated against Dr. Auteri.

**Dr. Auteri Reinstates His Exemption Requests and Proposes Reasonable Accommodations Which are More Protective than Doylestown Health Procedures, But Doylestown Health Will Not Engage in the Interactive Process**

84.     In an effort to engage in the interactive process with Doylestown Health, following the Exemption Denial, Dr. Auteri submitted another Exemption Request and also proposed a reasonable accommodation to address the alleged health and safety concerns which Doylestown Health used to deny the Exemption Requests without engaging in the interactive process required by law.

85.     By letter dated October 22, 2021, Dr. Auteri through his legal counsel submitted to Doylestown Health another request for a medical exemption, repeated the request for a religious accommodation, and proposed specific reasonable accommodations (the **"Second Exemption Request"**).  A true and correct copy of the Second Exemption Request without enclosures are attached hereto as **Exhibit "6."**

86.     With the Second Exemption Request, Dr. Auteri submitted a letter from his treating physician dated 10/21/21 in which the physician stated that based upon Dr. Auteri's medical condition, the physician did not recommend that Dr. Auteri be vaccinated against COVID-19.

87.     In the Second Exemption Request, Dr. Auteri proposed as a reasonable accommodation that Dr. Auteri be tested weekly for COVID-19 and submit to daily health screenings to ensure that Dr. Auteri did not have COVID-19 and did not pose a risk to patient safety.

88.     Dr. Auteri's proposed reasonable accommodation was "reasonable" and did not pose a risk to patient safety because under Dr. Auteri's protocol, Doylestown Health would have actual knowledge that Dr. Auteri did not have COVID-19 while Dr. Auteri was treating patients.

89.     Dr. Auteri's proposed accommodation was reasonable because prior to the Mandate and in an email dated January 8, 2021, Doylestown Health official Dr. Levy instructed staff to treat patients who had already been infected with COVID-19 as being "immunized" and not in need of testing, in recognition of the natural immunity resulting from COVID-19 infection in persons such as Dr. Auteri.

90.     Dr. Auteri's proposed accommodation was reasonable because prior to the Mandate deadline, Doylestown Health official Dr. Levy admitted in a publicly available email to the Bucks County Health Director, as the CDC also had admitted, that persons vaccinated against COVID-19 could catch AND TRANSMIT COVID-19.

91.     Dr. Auteri's proposed accommodation was reasonable because Doylestown Health's stated purpose of the Mandate was to protect patients and employees from catching the virus, the CDC and Doylestown Health official Dr. Levy admitted that the COVID-19 vaccines did not stop transmission of the virus, and Dr. Auteri's accommodation would provide Doylestown Health and its patients with actual knowledge that Dr. Auteri was not infected.

92.     Prior to the meeting at a Doylestown restaurant at which Dr. Levy retaliated against Dr. Auteri and told Dr. Auteri that Dr. Auteri would be known as a "loser" and threatened Dr. Auteri's immediate termination, Dr. Levy told Dr. Auteri that Dr. Levy caught COVID-19 despite being vaccinated against COVID-19 ("twice plus a booster" according to Dr. Levy).

93.     At the time of the Mandate, Doylestown Health was not performing regular testing of vaccinated employees, leaving patients exposed to COVID-19 from staff who were vaccinated yet infected and spreading the disease.

94.     Prior to the Mandate, Doylestown Health had been permitting Dr. Auteri to treat patients provided that Dr. Auteri submit to daily health screenings.

95.     Under Dr. Auteri's proposed reasonable accommodation, Dr. Auteri would be tested and screened on a regular basis to ensure that he did not have COVID-19, whereas "vaccinated" employees could be catching and transmitting COVID-19 to patients but those employees would not be tested regularly.

96.     The reasonable accommodation which Dr. Auteri proposed maintained a higher level of patient safety than that which Doylestown Health had in place pursuant to the Mandate.

97.     Shortly after Dr. Auteri's termination, Doylestown Health began performing weekly testing of employees to screen for COVID-19.

98.     Approximately one month after Dr. Auteri's termination, Doylestown Health began a testing program which was the precise accommodation which Dr. Auteri requested but was denied as a pretext for Dr. Auteri's termination.

99.     Dr. Auteri's proposed reasonable accommodation did not pose any more than a de minimis burden, if any burden at all, because Dr. Auteri simply was proposing a regular health screening regimen which Doylestown Health had been conducting throughout the pandemic and weekly testing which Doylestown implemented shortly after Dr. Auteri's termination.

100.    Doylestown Health cannot claim an undue burden by Dr. Auteri's proposed accommodation when Doylestown Health engaged in different components of the proposed accommodation before and after Dr. Auteri's termination.

101.    By engaging in the same testing regimen shortly after Dr. Auteri's termination which Dr. Auteri proposed prior to his termination, Doylestown Health has admitted that Dr. Auteri's proposed accommodation was sufficient to meet patient safety needs.

102.    In response to Dr. Auteri's Second Exemption Request, rather than engage in the interactive process as required by law, by letter dated November 9, 2021, Doylestown Health through its counsel summarily denied Dr. Auteri's Request (the **"Second Exemption Denial"**). A true and correct copy of the Second Exemption Denial is attached hereto as **Exhibit "7."**

103.    In the Second Exemption Denial, Doylestown Health rejected Dr. Auteri's physician's letter because that letter allegedly did not give sufficient information about Dr. Auteri's underlying condition which formed the basis of the medical exemption request.

104.    In considering a disability accommodation request, employers are not permitted to request detailed information about an underlying medical condition but may ask only for information about the condition as needed to engage in the interactive process so as to determine a reasonable accommodation.

105.    Dr. Auteri's physician's letter stated that vaccination was not appropriate for Dr. Auteri and no additional medical information was necessary, as compared to a situation wherein information about an employee's condition is necessary to determine an employee's physical capabilities to perform essential job functions, such as lifting restrictions and other physical requirements.

7782638v1

106.    Doylestown Health's Second Exemption Denial demanded an improper level of inquiry regarding Dr. Auteri's medical condition and sought to substitute Doylestown Health's assessment of Dr. Auteri's medical condition for that of Dr. Auteri's treating physician.

107.    Doylestown Health did not engage in the interactive process after receipt of the Dr. Auteri's Second Exemption Request for a medical exemption.

108.    Doylestown Health violated Dr. Auteri's civil rights in its denial of Dr. Auteri's medical exemption.

109.    Doylestown Health's summary Second Exemption Denial of Dr. Auteri's request for a medical exemption and reasonable accommodation violated Title VII and the Americans with Disabilities Act.

110.    In the Second Exemption Denial, Doylestown Health again rejected Dr. Auteri's request for a religious exemption.

111.    In the Second Exemption Denial, Doylestown Health stated that because Dr. Auteri had studied and discussed the statistics surrounding COVID-19 vaccination, Dr. Auteri's request for a religious exemption was a pretext for a political objection.

112.    Part of Dr. Auteri's duties as a physician is to study data and statistics of treatment methods, medical devices, and drugs used in the care of patients, and such study and discussion is not political but medically necessary.

113.    As a heart surgeon, it would be professionally ignorant and amount to medical malpractice if Dr. Auteri did not study data and information about the COVID-19 vaccine which was to be injected into the patients and staff at Doylestown Health.[3]

114.    Dr. Auteri's study of COVID-19 vaccines and the effects thereof on patients suffering from cardiac distress and disease was a critical part of treating patients during the COVID-19 pandemic and in doing so, Dr. Auteri was meeting his professional obligation to his patients and to Doylestown Health.

115.    Study of medical data is NOT political, and Doylestown Health's deliberate mischaracterization of Dr. Auteri's medical and professional study of the vaccines is a pretext to continue Doylestown Health's harassment of and discrimination against Dr. Auteri.

116.    As stated above, Doylestown Health knows that Dr. Auteri is a follower of Christ and Dr. Auteri's religious beliefs are sincerely held.

117.    Employers are not to question an employee's sincerely held religious beliefs absent strong evidence that the belief is not held and is not sincere.

118.    Employers are NOT permitted to dismiss the sincerely held and articulated religious beliefs of an employee simply because the employee has discussed the underlying subject of an exemption or workplace rule in the course of performing the employee's duties, and particularly not in this instance where Dr. Auteri had a professional, medical obligation to study the underlying basis of that rule.

---

[3] There are no less than 100 peer-reviewed medical papers from all over the world showing a link between the mRNA vaccines and myocarditis (inflammation of the heart and the killing of heart cells) in adults and adolescents who took the COVID-19 vaccines being mandated by Doylestown Health, many of which were published before Dr. Auteri's Exemption Requests and Second Exemption Request. Dr. Auteri studied that link prior to his termination as being acutely relevant to Dr. Auteri's cardiac patients.

119.    Doylestown Health knew that Dr. Auteri's religious belief as articulated in the Exemption Requests and Second Exemption Request was sincerely held, but Doylestown Health summarily rejected those Requests and refused to engage in the interactive process with Dr. Auteri as required by law.

120.    In the Second Exemption Denial, Doylestown Health refused to engage in the interactive process in any manner and refused to propose alternative accommodations which would permit Dr. Auteri to treat patients.

121.    Doylestown Health refused to engage in the interactive process and propose alternatives to the accommodations which Dr. Auteri proposed, such as more frequent testing, testing offsite as opposed to testing at Doylestown Hospital, etc. as required by law.

122.    Doylestown Health simply stated that Dr. Auteri could not be "safe" treating patients without vaccination and terminated Dr. Auteri without following the law.

123.    Doylestown Health purported to be following the CDC but as set forth in detail above, by the time of the Second Exemption Denial (and before the Mandate deadline), the CDC already had admitted that the COVID-19 vaccines did not stop the transmission of the virus.

124.    Doylestown Health failed and refused to follow well established law which mandates the interactive process and implementation of reasonable accommodations where possible.

125.    Dr. Auteri at all times was ready, willing, and able to engage in the interactive process as required by law and never refused an effort to determine an appropriate accommodation.

126.    Doylestown Health literally made no effort to engage in the interactive process with Dr. Auteri.

127.    To the contrary, as Dr. Auteri sought exemptions and reasonable accommodations from the Mandate, Doylestown Health dispatched its Chief Medical Officer Dr. Levy to harass and threaten Dr. Auteri, calling Dr. Auteri a "loser" and threatening Dr. Auteri with immediate termination.

**Doylestown Health Terminates Dr. Auteri's Employment and Shortly Thereafter Implements the Same Testing Procedure Which Dr. Auteri Proposed as a Reasonable Accommodation**

128.    Following the Second Exemption Denial, Doylestown Health caused Doylestown Hospital to terminate Dr. Auteri's medical privileges at Doylestown Hospital by letter dated November 11, 2021 authored by Elinor Pernitsky, Director, Medical Staff Services.  A true and correct copy of Ms. Pernitsky's November 11, 2021 letter is attached hereto as **Exhibit "8."**

129.    The termination of Dr. Auteri's medical privileges was unlawful and based upon Doylestown Health's unlawful refusal to engage in the interactive process as set forth above.

130.    Following the Second Exemption Denial and unlawful revocation of Dr. Auteri's medical privileges, Doylestown Health terminated Dr. Auteri's employment because Dr. Auteri no longer had medical privileges at Doylestown Hospital, which privileges were unlawfully terminated.

131.    Doylestown Health unlawfully terminated Dr. Auteri's employment by letter dated November 18, 2021 authored by John B. Reiss, Vice President, General Counsel, and Chief Compliance Officer of Doylestown Health.  A true and correct copy of Mr. Reiss' November 18, 2021 letter is attached hereto as **Exhibit "9."**

132.    Doylestown Health's termination of Dr. Auteri's employment is the culmination and direct result of Doylestown Health's concerted pattern of harassment, discrimination, and

retaliation against Dr. Auteri and Doylestown Health's refusal to engage in the interactive process as required by law.

133.    Doylestown Health's subsequent conduct and policies after Dr. Auteri's termination evidence that Doylestown Health's invocation of "patient safety" and "undue burden" of testing as the basis for the Exemption Denial and Second Exemption Denial was pretext for Doylestown Health's discrimination, harassment, and retaliation against Dr. Auteri on the basis of Dr. Auteri's medical condition and religious beliefs.

134.    By January 2022, Doylestown Health was permitting COVID-19 infected physicians and staff to treat patients, directly exposing patients to COVID-19.

135.    By email dated January 26, 2022, Doylestown Health was permitting COVID-19 infected, symptomatic employees to return to work AND treat patients after five days as long as their symptoms were resolving and employees could treat patients WITHOUT testing to determine whether the employee still had a sufficient viral load so as to be infectious.

136.    In that same email, Doylestown Health was permitting COVID-19 infected employees who were asymptomatic to return to work after five days as long as no symptoms developed and could do so WITHOUT testing to determine whether the employee still had a sufficient viral load so as to be infectious.

137.    By December 2021/January 2022, Doylestown Health was conducting a regular COVID-19 testing program for its employees, the same testing program which Doylestown Health denied to Dr. Auteri as being an "undue burden" when Dr. Auteri sought a religious and medical exemption from the Mandate not even two months earlier.

138.     By December 2021/January 2022, Doylestown Health was conducting an ON SITE COVID-19 testing program for its employees by which Doylestown Health was testing employees for COVID-19 two times per week.

139.     By a later point in January 2022, Doylestown Health reduced the on site COVID-19 testing program for its employees to a once a week testing protocol.

140.     Doylestown Health never offered Dr. Auteri an exemption with the accommodation of twice weekly testing, but Doylestown Health offered its remaining employees a twice weekly testing program.

141.     Doylestown Health told Dr. Auteri that weekly on site COVID-19 testing of Dr. Auteri was more than a "de minimis" burden on Doylestown Health, yet less than two months later Doylestown Health was testing its employees on site and twice a week.

142.     Doylestown Health made the exact accommodations to its employees which Dr. Auteri sought in the Exemption Requests and Second Exemption Request, yet Doylestown Health refused to offer those accommodations to Dr. Auteri.

143.     Doylestown Health terminated Dr. Auteri on the basis of Dr. Auteri's request for the same accommodations that Doylestown Health was making for its employees approximately one to two months later.

144.     After implementing its testing program, Doylestown Health never contacted Dr. Auteri to offer Dr. Auteri reinstatement with the accommodation of the testing program which Doylestown Health then offered to its remaining employees.

145.     Doylestown Health's refusal to grant Dr. Auteri's Exemption Requests and Second Exemption Request and later implementation of the exact accommodation requested by Dr. Auteri

demonstrates that Doylestown Health's exemption and accommodation denial was pretext for Doylestown Health's discriminatory animus against Dr. Auteri for his sincerely held religious beliefs and medical condition.

146.    On August 11, 2022, the CDC updated its COVID-19 guidance to effectively eliminate any distinction between the vaccinated and unvaccinated in terms of quarantine, isolation, and preventative measures.    https://www.cdc.gov/coronavirus/2019-ncov/your-health/isolation.html .

147.    After the issuance of the CDC's August 11, 2022 COVID-19 guidance, Doylestown Health never contacted Dr. Auteri to offer Dr. Auteri reinstatement.

148.    Doylestown Health discriminated against Dr. Auteri on the basis of Dr. Auteri's sincerely held religious beliefs.

149.    Doylestown Health discriminated against Dr. Auteri on the basis of Dr. Auteri's medical condition.

150.    Doylestown Health discriminated against Dr. Auteri when Doylestown Health refused to engage in the interactive process with Dr. Auteri and discuss a reasonable accommodation for Dr. Auteri's exemption requests.

151.    Doylestown Health discriminated against Dr. Auteri when Doylestown Health implemented a testing program which mirrors the accommodation request which Dr. Auteri made, but Doylestown Health refused to offer the same testing program to Dr. Auteri and failed to offer Dr. Auteri reinstatement subject to Dr. Auteri's compliance with the same testing program offered to other employees.

152.    Doylestown Health violated Dr. Auteri's civil rights in denying the Exemption Requests and Second Exemption Request and refusing to offer Dr. Auteri reinstatement subject to Dr. Auteri's compliance with the same testing program offered to other employees.

153.    Doylestown Health was permitting sick, COVID-19 infected employees to treat patients but refused to permit Dr. Auteri to treat patients even though Dr. Auteri proposed a testing program which was safer than Doylestown Health's protocols.

154.    Doylestown Health's claim that it denied Dr. Auteri's Exemption Requests in the name of "patient safety" is pretext for discriminatory animus as evidenced by Doylestown Health's use of COVID-19 infected employees to treat patients.

155.    Dr. Auteri's proposed reasonable accommodation would meet or exceed Doylestown Health's safety standards in place at the time of the Mandate, yet Doylestown Health refused to grant Dr. Auteri's Exemption Requests, refused to engage in the interactive process, and has refused to offer Dr. Auteri reinstatement.

156.    Doylestown Health's use of COVID-19 infected employees to treat patients and other unlawful conduct described herein demonstrates that Doylestown Health's refusal of Dr. Auteri's accommodation requests is not about patient safety but instead is motivated by Doylestown Health's discriminatory animus against Dr. Auteri for Dr. Auteri's legally protected invocation of his right to exercise his sincerely held religious beliefs.

157.    Doylestown Health's use of COVID-19 infected employees to treat patients and other unlawful conduct described herein demonstrates that Doylestown Health's refusal of Dr. Auteri's accommodation requests is not about patient safety but instead is motivated by Doylestown Health's discriminatory animus against Dr. Auteri for Dr. Auteri's legally protected

invocation of his right to accommodations of his medical condition, including the altered status of Dr. Auteri's immune system.

158.    Doylestown Health discriminated against Dr. Auteri on the basis of his sincerely held religious beliefs.

159.    Doylestown Health harassed Dr. Auteri on the basis of his sincerely held religious beliefs.

160.    Doylestown Health retaliated against Dr. Auteri on the basis of his sincerely held religious beliefs.

161.    Doylestown Health engaged in a pattern and practice of discriminating and retaliating against Dr. Auteri who asserted his Constitutionally-protected right to religious freedom.

162.    As a result of Doylestown Health's unlawful, discriminatory, threatening, harassing, and retaliatory conduct set forth above, Dr. Auteri has suffered and will continue to suffer the loss of salary and other compensation and other benefits which his employment entailed, and Dr. Auteri also suffered future pecuniary losses, emotional pain and distress, suffering, inconvenience, loss of enjoyment of life, loss of standing in the community, loss of professional reputation, and other non-pecuniary losses.

163.    Doylestown Health engaged in a continuous practice of discrimination, and Dr. Auteri pursues the claims asserted herein under the continuing violations doctrine.

164.    Doylestown Health has exhibited a pattern and practice of discrimination and retaliation.

165.    Dr. Auteri has taken reasonable steps to mitigate and has mitigated some of his damages to the best of his ability, including by the performance of temporary work for other hospital systems in other parts of the Commonwealth and other States, each of which has granted an exemption to any existing COVID-19 vaccine mandate on the same bases for which Dr. Auteri sought an exemption from the Mandate from Doylestown Health.

166.    Dr. Auteri requests a jury trial on all issues triable by a jury.

**COUNT I**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT – DISCRIMINATION**
**BASED UPON RELIGIOUS AFFILIATION AND RETALIATION**

167.    All paragraphs above are incorporated herein by reference.

168.    Dr. Auteri requested an exemption from a workplace rule, the Mandate, on the basis of a sincerely held religious belief.

169.    Doylestown Health had no legitimate, nondiscriminatory basis upon which to question or dispute Dr. Auteri's sincerely held religious beliefs.

170.    Dr. Auteri sought a reasonable accommodation of the Mandate requirements.

171.    Doylestown Health refused to engage in the interactive process in an effort to reach a reasonable accommodation of the Mandate requirements with Dr. Auteri.

172.    Dr. Auteri proposed a reasonable accommodation of the Mandate requirements which was more protective of patient safety than the COVID-19 protocols which Doylestown Health had in place at the time of Dr. Auteri's Exemption Requests and Second Exemption Request.

173.    In response to the Exemption Requests and Second Exemption Request and Dr. Auteri's assertion of his right to religious liberties therein, Doylestown Health retaliated against

Dr. Auteri by harassing him, suspending him without pay, and thereafter terminating Dr. Auteri's employment.

174.    Dr. Auteri's need for an accommodation of his sincerely held religious beliefs was a motivating factor in Doylestown Health's decision to terminate Dr. Auteri's employment.

175.    Shortly after Doylestown Health terminated Dr. Auteri's employment, Doylestown Health implemented the same COVID-19 testing and/or health screening protocols which Dr. Auteri sought as a reasonable accommodation following his request for a religious exemption from the Mandate.

176.    After implementing the same protocols which Dr. Auteri sought as a reasonable accommodation, Doylestown Health never offered to reinstate Dr. Auteri's employment subject to that accommodation or otherwise.

177.    Doylestown Health cannot claim that Dr. Auteri's proposed reasonable accommodation is an undue burden or imposes more than a de minimis cost to Doylestown Health. At the time of the Exemption Requests or the Second Exemption Request, Doylestown Health could have required Dr. Auteri to cover the costs of COVID-19 testing had it engaged in the interactive process and shortly after Dr. Auteri's termination, Doylestown Health assumed the cost of regular COVID-19 testing of employees.

178.    Doylestown Health violated Title VII by denying the Exemption Requests and Second Exemption Request and/or refusing to engage in the interactive process to determine a reasonable accommodation of the Mandate requirements as to Dr. Auteri.

179.    Doylestown Health engaged in unlawful retaliation against Dr. Auteri by suspending Dr. Auteri without pay and thereafter terminating Dr. Auteri for Dr. Auteri's assertion

of his right to religious freedom and request for a reasonable accommodation as protected by Title VII.

180.    Doylestown Health intentionally discriminated against Dr. Auteri by acting with malice and/or reckless indifference toward Dr. Auteri such that an award of punitive damages is appropriate.

181.    As a result of Doylestown Health's unlawful conduct, Dr. Auteri suffered damages as set forth above.

182.    Dr. Auteri has taken reasonable steps to mitigate and has mitigated some of his damages as set forth above.

**WHEREFORE,** Dr. Auteri demands judgment in Dr. Auteri's favor and against Doylestown Health in an amount in excess of $150,000.00 plus punitive damages, attorney's fees, and costs.

## COUNT II
## DISABILITY DISCRIMINATION AND RETALIATION UNDER THE ADA

183.    All paragraphs above are incorporated herein by reference.

184.    Dr. Auteri was harassed, discriminated against, and retaliated against because of Doylestown Health's discriminatory animus against Dr. Auteri due to Dr. Auteri's request for an accommodation of his medical condition.

185.    Dr. Auteri is a qualified individual with a disability, as the functioning of his immune system has been impaired by Dr. Auteri's infection with COVID-19 while performing services on behalf of Doylestown Health.

186.    Dr. Auteri is otherwise qualified to perform the essential functions of his job as a cardiac surgeon subject to his need for a reasonable accommodation from the Mandate.

187.    Dr. Auteri sought an exemption from the Mandate and a reasonable accommodation due to Dr. Auteri's and Dr. Auteri's doctor's concern about the impact of the COVID-19 vaccine on Dr. Auteri's altered immune system.

188.    Dr. Auteri proposed a reasonable accommodation which would protect the safety of Doylestown Health's patients and not impose an undue burden on Doylestown Health.

189.    Dr. Auteri's proposed accommodation was entirely plausible as that accommodation contained protocols which Doylestown Health implemented for Doylestown Health's employees both before and shortly after Dr. Auteri's termination.

190.    Doylestown Health denied Dr. Auteri's exemption request on the basis of Dr. Auteri's medical condition as verified by Dr. Auteri's physician.

191.    Doylestown Health refused to engage in the interactive process and refused to consider Dr. Auteri's request for a reasonable accommodation.

192.    Doylestown Health permitted its representatives, including Dr. Levy, to harass, discriminate against, and retaliate against Dr. Auteri because Dr. Auteri sought an exemption from the Mandate and a reasonable accommodation.

193.    Doylestown Health's and Doylestown Health's representatives' harassment of Dr. Auteri was sufficiently severe and pervasive as to alter the condition of Dr. Auteri's employment.

194.    Doylestown Health was aware of the harassment of Dr. Auteri and failed to take remedial action.

195.    Dr. Auteri's request for a reasonable accommodation due to his medical condition was the motivating factor in Doylestown Health's discriminatory, harassing, and retaliatory conduct against Dr. Auteri, all of which culminated in Dr. Auteri's termination.

196.    Dr. Auteri's request for a reasonable accommodation due to his medical condition was a motivating factor in Doylestown Health's termination of Dr. Auteri.

197.    As a result of Doylestown Health's unlawful conduct, Dr. Auteri suffered damages as set forth above.

198.    Dr. Auteri has taken reasonable steps to mitigate and has mitigated some of his damages as set forth above.

**WHEREFORE,** Dr. Auteri demands judgment in Dr. Auteri's favor and against Doylestown Health in an amount in excess of $150,000.00 plus attorney's fees and costs.

## COUNT III
### BREACH OF CONTRACT

199.    All paragraphs above are incorporated herein by reference.

200.    Pursuant to Paragraph 2.1.8 of the Employment Agreement, Dr. Auteri was and was required to be a member of the medical staff at Doylestown Hospital as a condition of his employment.

201.    Doylestown Health illegally refused to engage in the interactive process with Dr. Auteri in response to the Exemption Requests and the Second Exemption Request and simply declared that Dr. Auteri refused to comply with the Mandate.

202.    Doylestown Health caused Doylestown Hospital to rescind Dr. Auteri's medical staff privileges at Doylestown Hospital so that Doylestown Health could use that rescission of medical staff privileges as a pretext for Dr. Auteri's termination.

203.    As part of Doylestown Health's harassment, discrimination, and retaliation against Dr. Auteri, on November 11, 2021 Doylestown Hospital, at the direction and/or influence of

Doylestown Health, unlawfully rescinded Dr. Auteri's medical staff privileges at Doylestown Hospital.

204.    Dr. Auteri's medical staff privileges were rescinded under the false pretense that Dr. Auteri was "deemed" to have voluntarily surrendered those privileges by Dr. Auteri's alleged refusal to comply with the Mandate.

205.    Dr. Auteri never refused to comply with the Mandate but to the contrary exercised his legally protected civil rights to be granted an exemption from the Mandate.

206.    Doylestown Health used that unlawful termination of Dr. Auteri's medical staff privileges as a pretext to terminate Dr. Auteri's employment with Doylestown Health on November 18, 2021.

207.    Doylestown Health breached the Employment Agreement by terminating Dr. Auteri on the basis of Dr. Auteri's loss of medical staff privileges at Doylestown Hospital, which loss was unlawfully created by Doylestown Health.

208.    As a result of Doylestown Health's breach of the Employment Agreement, Dr. Auteri suffered substantial damages including but not limited to the loss of all salary, bonus, and benefits due to Dr. Auteri through the end of the Employment Agreement term on December 31, 2024.

209.    Dr. Auteri has taken reasonable steps to mitigate and has mitigated some of his damages as set forth above.

**WHEREFORE,** Dr. Auteri demands judgment in Dr. Auteri's favor and against Doylestown Health in an amount in excess of $150,000.00 plus attorney's fees and costs.

Respectfully submitted,

KAPLIN STEWART MELOFF REITER & STEIN, P.C.

By: _____
Kimberly L. Russell, Esquire
910 Harvest Drive
P.O. Box 3037
Blue Bell, PA  19422
(610) 941-2541 (phone)
(610) 684-2026 (fax)
krussell@kaplaw.com

Attorneys for Plaintiff

**Dated:** August 24, 2022

7782638v1

EXHIBIT "1"

EMPLOYMENT AGREEMENT

BETWEEN

VIA AFFILIATES, INC.

AND

JOSEPH S. AUTERI, M.D.

## Table of Contents

Page

1.  Employment ................................................................................................................................. 3
2.  Responsibilities of Physician ....................................................................................................... 3
    2.1.    Duties of Physician ........................................................................................................... 3
        2.1.1.    *Full-time Employment/Professional Medical Services* ....................................... 3
        2.1.2.    *Reporting Responsibility* ................................................................................... 4
        2.1.3.    *Medical Director Responsibilities* ..................................................................... 4
        2.1.4.    *Participation in the Programs* ............................................................................ 4
        2.1.5.    *Quality of Care* .................................................................................................. 4
        2.1.6.    *Continuing Medical Education* ........................................................................... 4
        2.1.7.    *License and DEA Number* .................................................................................. 4
        2.1.8.    *Medical Staff Membership* ................................................................................. 5
        2.1.9.    *Abide by Rules and Regulation* .......................................................................... 5
        2.1.10.    *Assignment of Billing Rights* ........................................................................... 5
        2.1.11.    *Record of Patient and Administrative Services* ................................................ 5
        2.1.12.    *Completion of Medical Records* ....................................................................... 5
        2.1.13.    *Third-Party Payors* ........................................................................................... 5
        2.1.14.    *Managed Care Organizations* ........................................................................... 5
        2.1.15.    *SERVE* ............................................................................................................. 6
        2.1.16.    *Consultations* ................................................................................................... 6
        2.1.17.    *Relations with Hospital's Medical Staff* ........................................................... 6
        2.1.18.    *Inservice Education* .......................................................................................... 6
        2.1.19.    *Marketing* ......................................................................................................... 6
        2.1.20.    *Assist Hospital with Licensure and Accreditation* ............................................ 6
        2.1.21.    *Additional Services* .......................................................................................... 6
        2.1.22.    *Membership in the Affiliates of Hospital* .......................................................... 7
    2.2.    Representations of Physician ............................................................................................ 7
        2.2.1.    *Licensure* .......................................................................................................... 7
        2.2.2.    *Pennsylvania Drug Enforcement Administration* ............................................... 7
        2.2.3.    *Board Certification* ........................................................................................... 7
        2.2.4.    *Medical Staff Privileges and Payor Participation* ............................................. 7
        2.2.5.    *Criminal Convictions* ........................................................................................ 7
        2.2.6.    *Litigation or Investigation* ................................................................................ 7
    2.3.    Outside Activities ............................................................................................................ 8
3.  Physician's Compensation ........................................................................................................... 8
    3.1.    Physician's Salary ............................................................................................................ 8
    3.2.    Payment Schedule for Physician ...................................................................................... 8
    3.3.    Limit on Compensation ................................................................................................... 8
    3.4.    Benefits ........................................................................................................................... 8
    3.5.    Insurance ......................................................................................................................... 9
    3.6.    Paid-Time-Off ................................................................................................................. 9
    3.7.    Reimbursement for Continuing Medical Education ......................................................... 9
    3.8.    Disability ......................................................................................................................... 9
4.  Responsibilities of VIAA ........................................................................................................... 10
    4.1.    Space .............................................................................................................................. 10
    4.2.    Equipment ...................................................................................................................... 10
    4.3.    Staff Support .................................................................................................................. 10
    4.4.    Utilities and Services ...................................................................................................... 10
    4.5.    Monitoring and Evaluation ............................................................................................. 10

5.   Confidential Information ..................................................................................................... 10

6.   Medical Records, Papers and Other Information ................................................................. 11

7.   Noncompetition ................................................................................................................... 11

8.   Solicitation of Patients and Employees .............................................................................. 11

9.   Term and Termination ......................................................................................................... 11

  9.1.      Term .......................................................................................................................... 11
  9.2.      Termination ............................................................................................................... 12
    9.2.1.   *General Termination* ............................................................................................ 12
    9.2.2.   *Termination for Cause by VIAA* ......................................................................... 12
    9.2.3.   *Termination for Cause by Physician* .................................................................. 13
  9.3.      Consequences of Nonrenewal or Termination by VIAA for Cause ......................... 13
  9.4.      Cooperation after Termination .................................................................................. 14

10.  Government Regulations ..................................................................................................... 14

11.  Remedies ............................................................................................................................ 14

12.  Notices ............................................................................................................................... 15

13.  Severability ........................................................................................................................ 15

14.  Waiver ................................................................................................................................ 15

15.  Amendment ........................................................................................................................ 15

16.  Assignment ......................................................................................................................... 16

17.  Complete Agreement .......................................................................................................... 16

18.  Governing Law ................................................................................................................... 16

APPENDIX A .............................................................................................................................. 18

APPENDIX B .............................................................................................................................. 20

APPENDIX C .............................................................................................................................. 21

THIS EMPLOYMENT AGREEMENT ("Agreement"), effective April 13th, 2012, ("the Effective Date") is made by and between VIA Affiliates ("VIAA") a Pennsylvania nonprofit corporation, and Joseph S. Auteri, M.D. ("Physician"), sometimes called individually "Party", and together "Parties" on the date set forth beside the signatories' names.

PURPOSES

WHEREAS, VIAA, an affiliate of Doylestown Hospital ("Hospital"), controlled by the Village Improvement Association ("VIA Health System"), provides and supports the provision of health care services to the residents of communities in Hospital's service area; and

WHEREAS, Physician is qualified to provide cardiovascular and thoracic surgery and appropriate consultations ("Services") to patients, and is licensed to practice medicine by the Commonwealth of Pennsylvania and holds a current Drug Enforcement Administration Number ("DEA Number") in Pennsylvania; and

WHEREAS, VIAA and Physician entered into a Relocation and Employment Agreement (the "Original Agreement") dated November 7, 2006, as amended by that certain First Amendment to the Original Agreement dated February 6, 2008 (together with the Original Agreement, the "Amended Agreement") to provide the Services to VIAA; and

WHEREAS, the Parties desire to enter into a new Employment Agreement to make certain adjustments to Physician's compensation, bonus structure and other fees to reflect the fair market value of Physician's services and productivity; and

NOW THEREFORE, intending to be legally bound hereby, and in consideration of the mutual promises stated herein, including the Purposes set forth above, VIAA and Physician agree as follow:

**1.     Employment**

VIAA employs Physician, and Physician accepts employment, to provide Services to patients at Hospital, to be Medical Director of Cardiovascular Surgery and Cardiology ("Medical Director"), to participate in Hospital's Community Care, Outreach and Education Programs (the "Programs") and to undertake such other duties as shall be assigned by VIAA in consultation with Hospital, all in accordance with the terms and conditions of this Agreement.

**2.     Responsibilities of Physician**

2.1.    Duties of Physician

Physician shall:

2.1.1.    Full-time Employment/Professional Medical Services

provide Services as a full-time employee and as Medical Director (as more fully described in Attachment A, attached hereto and made part hereof), participating fully in the Programs (as described in Section 2.1.4.) and providing inpatient and outpatient Services,

3

including hospital rounds, and Emergency Department call coverage as required by VIAA and Hospital Chief Medical Officer(s)or his designee(s);

### 2.1.2. Reporting Responsibility

be subject to the supervision and control of the Chief Medical Officer and the President and CEO of Hospital with respect to his provision of Services, activities as Medical Director, participation in the Programs and any other activities performed at or on behalf of VIAA or Hospital;

### 2.1.3. Medical Director Responsibilities

be responsible for managing all aspects of the clinical programs and activities provided by and through the Department including, but not limited to, developing the Department budget, including formulating projected growth plans, and equipment and staffing requirements related to the provision of Services. As Medical Director, Physician shall have control over all aspects of the clinical affairs of the Department, including staffing in cooperation with Hospital management, in accordance with Hospital's policies and procedures;

### 2.1.4. Participation in the Programs

participate in the Programs which may include, but are not limited to, Physician's provision of care to indigent patients, on-call services in Hospital's Emergency Department, and presentations to community groups, employers, potential donors and schools, all as requested by VIAA or Hospital;

### 2.1.5. Quality of Care

provide quality and appropriate care to patients, and monitor and evaluate the quality and appropriateness of Services provided by physicians in the Department, it being understood by the Parties that the goal of Physician and Hospital is for the annual clinical performance of Services at Hospital to be comparable to or better than national standards for mortality and morbidity, on a risk-stratified basis, and that Services rendered shall be at least commensurate with the prevailing professional standard of care;

### 2.1.6. Continuing Medical Education

take continuing medical education courses required by the VIAA, Hospital and the American Board of Thoracic Surgery in order to maintain full Board certification, and a high level of expertise for the provision of Services;

### 2.1.7. License and DEA Number

maintain Physician's medical license and DEA Number in Pennsylvania while this Agreement remains in effect. If Physician's medical license or DEA Number is terminated, revoked, suspended or limited in any jurisdiction, Physician shall immediately notify VIAA;

### 2.1.8.  Medical Staff Membership

remain a member in good standing of the Active Medical Staff of Hospital and of any other hospital at which Physician obtains staff membership and privileges.  Physician shall notify VIAA of any restriction, suspension, revocation or termination of Physician's privileges or staff membership imposed by Hospital or any other hospital immediately;

### 2.1.9.  Abide by Rules and Regulation

conduct his medical practice in conformity with all (i) applicable federal, state and local laws, rules, regulations and policies, including those relating to the licensure and regulation of physicians and health care providers for which Physician provides services; and (ii) policies, rules and regulations of VIAA and Hospital (with the exception of any provisions governing appeals of termination of privileges or medical staff membership upon termination of this Agreement) and any hospital or other provider at which Physician has staff membership and privileges;

### 2.1.10. Assignment of Billing Rights

assign to VIAA Physician's rights to bill and collect all patient charges generated by Physician's provisions of Services, regardless of the location where the Services are provided.  Physician agrees that VIAA shall set any and all charges to patients for any professional services rendered by Physician during the term of this Agreement.  Physician may bill and collect payment for Outside Activities as defined in Section 2.3.;

### 2.1.11. Record of Patient and Administrative Services

file promptly with Hospital, on forms designed by Hospital, a record of all Services provided to patients, including sufficient clinical information for the services to be billed appropriately by Hospital, and a record of his time providing administrative services;

### 2.1.12. Completion of Medical Records

maintain to the satisfaction of VIAA and Hospital and in compliance with all legal, VIAA and Hospital requirements, adequate, timely and complete medical records.  Physician also shall maintain records of Physician's inpatient admissions and outpatient referrals, specifying the patient's name, the admitting hospital and the date of admission or referral.

### 2.1.13. Third-Party Payors

participate in Medicare and Blue Shield and shall take assignment from Medicaid and other third-party payor or insurance Programs that offer assignment arrangements to physicians.  While this Agreement continues in effect, Physician shall not contract independently with any third-party payors for the provision of Services during the term of this Agreement;

### 2.1.14. Managed Care Organizations

provide Services to any patient who is a member of any health maintenance, preferred provider or similar managed care organization with which VIAA or Hospital has an agreement;

### 2.1.15. SERVE

support the goals, objectives and programs of Hospital and Hospital's medical staff, including adherence to Hospital's values (Service, Enthusiasm, Respect, Value, Excellence (SERVE)) in dealing with patients, referring physicians and Hospital Associates, including being available for periodic and regular meetings regarding patient and physician satisfaction and care issues related to Services furnished hereunder and cooperating with Hospital in maintaining and evaluating measures of patient and referring physician satisfaction at Hospital;

### 2.1.16. Consultations

ensure Physician, or another physician in the Department, is available to consult promptly with other members of Hospital medical staff or Associates when such consultation is reasonably requested or required;

### 2.1.17. Relations with Hospital's Medical Staff

maintain a professional liaison with Hospital's medical staff in order to promote the efficient utilization of Services at Hospital;

### 2.1.18. Inservice Education

develop and participate in programs of education for Hospital's medical staff and in-service programs for nursing, technical and other non-physician personnel;

### 2.1.19. Marketing

cooperate with VIAA and Hospital on marketing activities regarding Services and Programs;

### 2.1.20. Assist Hospital with Licensure and Accreditation

Cooperate with and assist Hospital in obtaining and maintaining all relevant Hospital and Hospital-related licenses and accreditations; and

### 2.1.21. Additional Services

perform such other services reasonably requested by VIAA and Hospital including, but not limited to those customarily rendered in a hospital furnishing cardiovascular and thoracic surgical services and cardiology and services necessary to maintain Hospital's accreditation and license, and its right to offer cardiovascular and thoracic surgical services and cardiology, and otherwise ensure that patients in the community served by Hospital shall have

prompt and ongoing access to quality cardiovascular and thoracic surgical services and cardiology.

2.1.22. Membership in the Affiliates of Hospital.

join and continue to maintain membership in good standing in the Bucks County Physician Hospital Alliance and in the Hospital Independent Practice Association, and shall participate in agreements with third-party payors entered into by such organizations.

2.2.    Representations of Physician

Physician represents that:

2.2.1.    Licensure

As of the date of providing Services under this Agreement, Physician possesses a valid and unlimited license to practice medicine under the laws of the Commonwealth of Pennsylvania, which license has never been revoked, terminated, suspended or limited. Physician's license to practice in any other state or territory has never been terminated, revoked, suspended, restricted or limited nor has Physician been placed on probation by any medical licensing board, except as disclosed in Exhibit B.

2.2.2.    Pennsylvania Drug Enforcement Administration

As of the date of providing Services under this Agreement, Physician possesses a valid DEA Number in Pennsylvania which has never been revoked, terminated, suspended or limited. Physician's right to prescribe controlled substances in any other state or territory has never been terminated, revoked, suspended, restricted or limited including by probation, except as disclosed in Exhibit B;

2.2.3.    Board Certification

Physician is board certified by the American Board of Thoracic Surgery;

2.2.4.    Medical Staff Privileges and Payor Participation

Physician's medical staff privileges at any hospital or health care provider, and participation with any third-party payor including, but not limited to, Blue Shield, Medicare and Medicaid have never been and are not in the process of being curtailed, suspended, revoked, terminated, or otherwise made the subject of any proceedings, except as disclosed in Exhibit B;

2.2.5.    Criminal Convictions

Physician has not been convicted of a criminal offense, nor is the subject of any proceedings which could have such results, except as disclosed in Exhibit B;

2.2.6.    Litigation or Investigation

To the best of Physician's knowledge and belief, Physician is not now and has not in the past been a party to or subject of any litigation, including professional liability litigation, or investigation, whether civil, criminal or administrative in nature, nor the subject of any investigation relevant to Physician's practice other than those conducted by a state licensing board in the usual course of obtaining and renewing a license, except as disclosed in Exhibit B.

2.3.  Outside Activities

Physician may participate in reasonable health care related activities other than Services, including speaking engagements, expert witness services in a legal or administrative proceeding, program consultation (but not within the non-compete geographic area set out in Section 7) or teaching (collectively, the "Outside Activities") only to the extent such activities do not interfere with Physician's performance of Services, as Medical Director or of Programs under this Agreement, as determined by the Medical Director of VIAA or Chief Medical Officer of Hospital. Physician may bill for and retain the collections from Outside Activities.

3.  **Physician's Compensation**

3.1.  Physician's Salary



3.2.  Payment Schedule for Physician

3.3.  Limit on Compensation

3.4.  Benefits

8

Physician shall receive VIAA's standard employee benefits including, but not limited to, hospitalization and major medical, dental assistance, life and accident insurance, long term disability (meaning the inability to perform in accordance with the terms of this Agreement for a period of six (6) months) and a pension plan provided, when relevant, against Base Compensation only. Physician shall be reimbursed for prior-approved expenses incurred by Physician for publications and business activities, membership on Hospital's medical staff and Physician's Pennsylvania medical license.

3.5.    Insurance

VIAA shall provide Physician with professional liability coverage on a claims made basis in compliance with all legal requirements. VIAA shall provide tail coverage, if such coverage is necessary, upon Nonrenewal or Termination of this Agreement, so long as VIAA does not terminate or not renew this Agreement for cause.

3.6.    Paid-Time-Off

Physician shall have time-off as outlined in Schedule "A" of the "Services Provided by Provider Section of the Temple Cardiac Surgeon Agreement, unless approved by the CMO. Physician will not be entitled to be "paid out" or "roll over" any unused time as outline in Schedule "A" of the Temple Cardiac Surgeon Agreement.

3.7.    Reimbursement for Continuing Medical Education

VIAA shall pay Physician for the reasonable expenses he incurs in attending appropriate Continuing Medical Education ("CME") programs, to be taken in accordance with VIAA's employee policies for CME not to exceed $2,500 per year. In addition, Doylestown Hospital will reimburse Physician for reasonable expenses incurred for participating in any mutually agreed upon program, attending any course, or visiting any facility associated with program or service line development or quality initiative at Doylestown Hospital for which Physician's participation is determined to be of value.

3.8.    Disability

Physician shall be considered "disabled" and "on disability" if Physician becomes unable to perform his or her essential duties hereunder, with or without reasonable accommodation, for a period in excess of ten (10) days due to partial or total disability or incapacity resulting from a mental or physical illness or any similar cause. Subject to timely receipt of documentation reasonably acceptable to VIAA from Physician's treating physician that appropriately documents the extent and anticipated duration of Physician's disability, and after the waiting period of ten (10) days, during which Physician shall be required to use accrued paid time off or unpaid leave, if accrued paid time off is insufficient to cover the waiting period, VIAA shall continue the payment of the VIAA's portion of the Physician's health benefits premiums and payment of Physician's base salary, at its then current rate, for a period of up to ninety (90) days. Thereafter, VIAA shall have no obligation for base salary or other compensation payments to Physician during the continuance of such disability or incapacity, and VIAA shall have the right to terminate Physician's employment in accordance with Section 9.2.2.6 of this Agreement. VIAA reserves the right to require Physician to submit to an

9

independent medical evaluation by an appropriate physician specialist selected and mutually agreed upon by VIAA and Physician for the purpose of determining Physician's ability to continue to substantially perform his duties under this Agreement. The disability coverage described herein is subject to modification from time to time in the sole discretion of VIAA.

**4.      Responsibilities of VIAA**

At its sole discretion, VIAA shall:

4.1.    Space

provide appropriate Offices at Hospital with examination space for Physician, including space to house the medical and other records. The parties agree that it is VIAA's intention, if the Department grows as set out elsewhere in this Agreement, to arrange for the provision of up to two thousand five hundred square feet (2,500 sq. ft.) of office space at the hospital;

4.2.    Equipment

provide equipment at the Offices necessary for Physician to provide Services, when such equipment is not provided customarily by Physician;

4.3.    Staff Support

provide support staff, including clinical staff as determined by VIAA or Hospital;

4.4.    Utilities and Services

utility, laundry, housekeeping, and other services, including medical waste disposal, telephone answering and paging services; and

4.5.    Monitoring and Evaluation

monitor and evaluate the quality and appropriateness of Services provided by Physicians, it being understood by the Parties that one of their goals is that the annual clinical performance in the provision of Services at Hospital is to be comparable to or better than national standards for mortality and morbidity, on a risk-stratified basis.

**5.      Confidential Information**

Physician agrees that he shall not, at any time, use for Physician or others, or disclose to others, trade secrets, patient information, marketing plans, know-how, or other private or confidential information of or about VIAA or Hospital which is not already available to the public, without VIAA's or Hospital's prior written permission. Physician may release such information if clearly required by law, or if such release is required for Physician to defend a lawsuit, or other action, claim, enquiry or investigation related to Physician's practice under this Agreement, either during or following termination or nonrenewal of this Agreement.

6.    **Medical Records, Papers and Other Information**

All medical records of patients, and correspondence, memoranda, notes, reports, plans of care, patient lists, tapes, discs, and other papers or any other medium on or by which information is maintained by Physician in connection with Physician's employment by VIAA shall be, as between the Physician and VIAA or Hospital, the property of VIAA or Hospital. Physician shall not make any copies of any patient's medical record at any time without VIAA's or Hospital's prior written permission. Upon Nonrenewal or Termination of this Agreement, if any patient subsequently requests her medical records be transferred to Physician, VIAA or Hospital shall honor that request.

7.    **Noncompetition**

Physician shall not, while this Agreement continues in effect and for two (2) years following its Nonrenewal by VIAA for cause or Termination by VIAA for cause or by Physician without cause, directly or indirectly engage in the practice of medicine within a twenty (20) mile radius of Hospital as the crow flies.  In particular, and without limiting the application of this Section in any way, Physician shall not provide Services at Abington Memorial Hospital, Holy Redeemer Hospital, St. Mary Hospital, Langhorne, Grandview Hospital or Central Montgomery Hospital.

Notwithstanding the forgoing, if Physician has not met the Quality Indicators and VIAA does not renew this Agreement as a result, or Physician terminates for cause pursuant to Section 10.2.3 of this Agreement, or the compensation upon renewal of this agreement is lowered due to regulatory issues or fair market value adjustments; then in any of these circumstances this Section 7 shall not apply.

8.    **Solicitation of Patients and Employees**

Physician shall not, while this Agreement continues in effect and for two (2) years following its Nonrenewal or Termination, directly or indirectly solicit by any means whatsoever any patients being provided Services by any physician employee of VIAA or Hospital or any employee of VIAA or Hospital. Notwithstanding the preceding sentence, this Section shall not apply to any individual recruited by Physician from Virginia or Arizona. Further, this Section 9 shall not apply if this Agreement is terminated for cause by Physician pursuant to Section 10.2.3 of this Agreement.

9.    **Term and Termination**

9.1.    Term

This Agreement shall take effect on May 1, 2012 and shall continue in effect for an initial term of five (5) years through and including April 30, 2017 (the "Term"), unless otherwise terminated as provided herein. Thereafter, this Agreement shall be renewed for one additional five (5) year period (an "Additional Term) on the following conditions; the Agreement shall become effective for the Additional Term so long as Physician meets the Quality Indicators set forth in Exhibit C and so long as this Agreement continues to be in effect. Notwithstanding the foregoing, if the Parties agree to change the Quality Indicators set forth in Exhibit C in

11

writing, said new Quality Indicators shall be used in evaluating whether this Agreement will continue in effect and not the Quality Indicators currently set forth in Exhibit C.

Provided that the criteria outlined in Exhibit C have been met prior to January 1, 2016, then the Physician will receive a draft contract by no later than July 1, 2016.

9.2.    Termination

9.2.1.    General Termination

Either Party may give the other Party written notice (in accordance with Section 10 of this Agreement) at least one hundred and eighty (180) days prior to the end of the Term or any Additional Term that said Party will not renew this Agreement ("Nonrenewal").

9.2.2.    Termination for Cause by VIAA

VIAA may terminate this Agreement for cause immediately (except as to Section 10.2.2.5) at any time as follows:

9.2.2.1. Death

Upon Physician's death.

9.2.2.2. Criminal or Civil Offenses

If Physician is convicted, pleads guilty, enters a plea of *nolo contendere* or enters a first offenders program for any crime involving fraud, dishonesty, embezzlement, assault or any felony under Pennsylvania law;

9.2.2.3. Limits on Professional Certification

Upon the revocation, termination, suspension or limitation of Physician's license to practice medicine in any jurisdiction, Physician's DEA Number, or Physician's controlled substances license or registration in any jurisdiction, or revocation, termination, suspension or limitation of Physician's privileges at any hospital or facility, or the termination, cancellation or inability to renew appropriate professional liability insurance coverage;

9.2.2.4. Limits on Payments

Upon the suspension, termination or imposition of other sanctions by Medicare, Medicaid or other government program, or the inability to participate in any third party health insurance program material to Hospital in which Hospital participates;

9.2.2.5. Exclusion

Upon disbarment or exclusion by any federal or state agency;

12

9.2.2.6. Disability

Upon any disability which renders Physician unable to perform the essential functions of his position with a requested reasonable accommodation, provided Physician shall be entitled to such paid and unpaid leave as would be available for such disability pursuant to applicable law and VIAA's Human Resources policies then in effect;

9.2.2.7. Ineligibility for Malpractice Insurance

Upon Physician becoming ineligible for malpractice liability insurance;

9.2.2.8. Inadequate Patient Care

If VIAA or Hospital determine, in good faith after a reasonable investigation, that Physician is not providing adequate patient care or that the safety of patients is jeopardized by his continued services;

9.2.2.9. Breach

Upon the breach of or failure to perform any material term, condition or responsibility contained in this Agreement by Physician and Physician's failure to cure, to the sole satisfaction of VIAA, such breach or failure to perform within thirty (30) days of the date of the written notice.

9.2.2.10.     Safety

If Physician uses or abuses alcohol or controlled substances in a manner that, in VIAA's reasonable judgment, affects or may affect the medical care or safety of Patients.

9.2.3.   Termination for Cause by Physician

Physician may terminate this Agreement for cause as follows:

9.2.3.1. Nonpayment

If VIAA does not make the payments called for by this Agreement on the dates specified in this Agreement, and after Physician has given VIAA five (5) days written notice to cure in accordance with Section 10 of this Agreement;

9.2.3.2. Bankruptcy

Immediately if VIA Health System is adjudicated bankrupt, becomes insolvent, institutes or consents to any voluntary bankruptcy or other similar arrangement, or if a receiver or trustee is appointed for VIA Health System for any similar reason.

9.3.    Consequences of Nonrenewal or Termination by VIAA for Cause

13

Notwithstanding any provisions of the Hospital's Bylaws or its Medical Staff Bylaws, Rules and Regulations, Physician shall surrender all privileges and resign from the Hospital's Medical Staff immediately upon the effective date of the Nonrenewal or Termination of this Agreement in the event that VIAA does not renew for cause or terminates this Agreement for cause. UNDER THESE FOR CAUSE CIRCUMSTANCES, PHYSICIAN WAIVES ANY AND ALL RIGHTS OF APPEAL SET FORTH IN THE HOSPITAL'S DOCUMENTS CITED HEREIN. This Section shall not apply in the event Physician terminates for cause or VIAA terminates for Physician's disability.

    9.4.   Cooperation after Termination

In the event this Agreement is not renewed or is terminated by either Party, Physician shall cooperate with VIAA in the orderly transfer of patients and patients' records to another provider of similar Services associated with VIAA.

## 10.   **Government Regulations**

Should any law, regulation or procedure of the government or any governmental agency, or the Parties reasonable interpretation thereof, effect a change which materially affects the ability of a Party to satisfy any provision of this Agreement, the Parties shall forthwith and in good faith renegotiate the affected provision so that such provision can be satisfied in accordance with such law, regulation or procedure. If the Parties are unable, within ninety (90) days, to agree on an acceptable change to the affected provision, either Party may terminate this Agreement upon no less than thirty (30) days' prior written notice to the other Party.

## 11.   **Remedies**

The Parties acknowledge VIAA's legitimate concern regarding potential future competition by Physician and that any violation of the restrictions described in this Sections 5, 7 or 9, would result in irreparable injury to VIAA, it business and its property. The Parties agree that if a court of competent jurisdiction determines that any restriction contained in this Sections 5, 7 or 9 is invalid or unenforceable by reason of the duration or geographical scope of such restriction, or otherwise, such restriction shall be reduced to the least extent necessary to render it valid and enforceable. Physician acknowledges that, in addition to all other remedies available to VIAA under law or equity, VIAA shall be entitled to injunctive relief in any court of competent jurisdiction for any breach or threatened breach of any of the covenants contained in this Sections 5, 7 or 9 as well as damages and an equitable accounting of all earnings, profits and other benefits arising from any such breach or threatened breach. VIAA also shall be entitled to recover its attorneys' fees and costs incurred in connection with any breach of Sections 5, 7 or 9 as written or any breach of any restriction as modified under this Section to render it enforceable. Physician hereby waives any objection on the grounds of improper jurisdiction or venue to the commencement of an action in the Commonwealth of Pennsylvania and agrees that effective service of process may be made upon Physician by mail in accordance with the notice provisions set forth in Section 13 below. PHYSICIAN ACKNOWLEDGES THAT THE TERMS OF THIS SECTION 12 HAVE BEEN NEGOTIATED AT ARM'S LENGTH. PHYSICIAN FULLY UNDERSTANDS THE TERMS OF THIS SECTION 12 AND AGREES TO BE BOUND HEREBY.

14

12.    **Notices**

For purposes of this Agreement, notices and all other communications provided for in this Agreement shall be in writing and shall be deemed to have been duly given when delivered or mailed by United States certified or registered mail, return receipt requested, postage prepaid, or by a recognized courier service, addressed as follows:

If to the Physician:



If to VIAA:

VIAA Affiliates, Inc,.
595 West State Street
Doylestown, PA 18901
Attn: Barbara A. Hebel, VP, Human Resources

or to such other addresses as either Party may have furnished to the other in writing in accordance herewith, except that notices of change of address shall be effective only upon notice given in accordance with the Section.

13.    **Severability**

In the event that any section, Section or term of this Agreement shall be determined to be invalid or enforceable by any competent tribunal for any reason, the remainder of this Agreement shall be unaffected thereby and shall remain in full force and effect, and if any section, Section or term of this Agreement be adjudged to any extent invalid or unenforceable by any competent tribunal, such section, Section or term will be deem modified to the extent necessary to make it valid and enforceable.

14.    **Waiver**

The waiver by either Party of any breach or violation of any provision of this Agreement shall not operate as, or be construed to constitute a waiver of any subsequent breach of the same or any provision hereof.

15.    **Amendment**

This Agreement may be amended only by mutual agreement of the Parties in writing.

16.    **Assignment**

This Agreement shall inure to the benefit of and shall be binding upon the respective successors and assigns of the Parties, but it may not be assigned in whole or in part by either Party without the consent of the other Party. in whole or in part.

17.    **Complete Agreement**

This Agreement is the complete and exclusive statement of the entire agreement between the Parties, which supersedes any prior or contemporaneous agreements, oral or written and all other communications between the Parties relating to the subject matter of this Agreement.

18.    **Governing Law**

The interpretation and enforcement of this Agreement shall be governed by the law of the Commonwealth of Pennsylvania without application of its conflicts of laws provisions, and the Parties hereby consent to jurisdiction of the federal or state courts in the Commonwealth of Pennsylvania.

*[Signature page follows]*

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the dates written below, to be effective on the date first given above:

VIA AFFILIATES, INC.

Dated: _4/17/12_

By:_____
Scott Levy, MD, VIAA Administrator

JOSEPH S. AUTERI, M.D.

Dated: _13 - APRIL - 2012_

By:_____
Joseph S. Auteri, M.D.

**EXHIBIT A**

**Doylestown Hospital**

**Position Description**
**Medical Director, Cardiovascular Surgery**

Position Summary

The Director of the cardiac surgery program at Doylestown Hospital is responsible for providing clinical direction and leadership in the planning, development and implementation of the open heart program.   These responsibilities are carried out in keeping with the overall goals and objectives for the cardiac program.

Duties and Responsibilities

A.    The Medical Director of Cardiac Surgery will collaborate with the other members of the medical staff, with the Administration of Doylestown Hospital, and with the management team of the cardiac program to plan, develop, implement, and enhance a well-coordinated cardiac surgery program of high clinical quality that is responsive to market needs.

B.    The Medical Director shall oversee and provide direction to all cardiovascular surgery services provided at Doylestown Hospital to ensure the services are provided efficiently and result in high quality care, ensuring patients have access to a comprehensive array of cardiology services.

C.    The Medical Director of Cardiac Surgery will provide clinical direction and leadership to promote interdepartmental and interdisciplinary communications and systems that enhance the quality and cost effectiveness of patient care.

D.    The Medical Director of Cardiac Surgery will assist with the design, evaluation and planning of facilities, equipment, supplies and new products and services intended for the cardiac surgery patient.

E.    The Medical Director of Cardiac Surgery will assist with the needs assessment, recruitment, and selection of personnel and/or contracted specialty and medical services to assure high quality, cost effective care for the cardiac surgery patient from pre-admission to home.

F.    The Medical Director of Cardiac Surgery will assist management in evaluating the performance and competency of the Cardiac OR team, the Perfusion service, and Cardiac Anesthesia.

G.    The Medical Director of Cardiac Surgery will provide leadership for, and participate in, performance improvement initiatives organized for the cardiac surgery program, including participating in developing and ensuring compliance with evidence-based protocols and pathways of care.

H.    The Medical Director of Cardiac Surgery will contribute clinical knowledge, insight and leadership in the development of marketing and business plans for the cardiac program, in order to foster continued program development, and integrate market information and research that can enhance the program's value and effectiveness.

I.    The Medical Director of Cardiac Surgery will collaborate with the Chief Medical Officer and the Chairman of Surgery at Doylestown Hospital to assure collegial relations and communications between and among medical staff members.

J.    The Medical Director of Cardiac Surgery shall report to the Chief Medical Officer and shall comply with the Rules and Regulations of the Doylestown Hospital medical staff as defined in the Medical Staff Bylaws.

K.    The Medical Director shall participate in the community outreach and public functions provided by Doylestown Hospital, such as lectures, and be available to assist with fundraising activities and media interviews with an emphasis on, but not exclusively for, cardiovascular surgery.

Doylestown Hospital Commitments

A.    DOYLESTOWN HOSPITAL makes the following commitments to assure that the cardiac surgery program's primary goal for quality care and service is achieved:

B.    DOYLESTOWN HOSPITAL will work with the Medical Director of Cardiac Surgery to plan and implement the open heart surgery program and will collaborate to foster enhancements and initiate corrective actions as identified.

C.    DOYLESTOWN HOSPITAL will recruit and, as necessary, will train qualified personnel for the Cardiac OR, Perfusion Services, and CRU to assure clinical competency, continuity of care, and staff commitment.

D.    DOYLESTOWN HOSPITAL will provide financial support for continuous after hours medical coverage for the cardiac surgery patient in keeping with the identified needs for patient safety, program outcomes, and cost effectiveness.

E.    DOYLESTOWN HOSPITAL will provide case management support for the cardiac surgical patient by assigning a case manager to the cardiac surgery program.

F.    DOYLESTOWN HOSPITAL will assure that medical staff expertise is identified and obtained to address the critical care and recovery needs of the cardiac patient and nursing staff.

## EXHIBIT B

## DISCLOSURES FOR SECTION 2.2.

NONE

**EXHIBIT C**
**QUALITY INDICATORS**
**(TO BE DETERMINED WITH AGREEMENT BY ALL INVOLVED PARTIES)**

Department shall achieve the Quality Indicator Criteria improvements listed below. If any one of the Quality Indicators below is met, then this contract will be renewed (as per the terms of Paragraph 9.1 and other relevant sections of this Agreement):

1. Implement a TAVR (Trans Aortic Valve Replacement) program, defined as doing our first case.
2. Collaborate with Electrophysiologists to implement an Atrial Fibrillation Center (defined as doing our first case).
3. Collaborate with multidisciplinary task force to implement Lung Cancer Initiative.
4. Maintain Blue Distinction Center for Cardiac Care as designated by Independence Blue Cross in 2 of the next 5 years, or once in the 4th year.
5. Achieve one of the top 3 results (including ties) in the DVSTS Database for either Operative Mortality or In-Hospital Mortality, or Observed/Expected Mortality twice in the next 5 years (or once in the 4th year).
6. Achieve Philadelphia Magazine's 'Top Docs' distinction in 3 of the next 5 years.

EXHIBIT "2"

<u>Amendment of Employment Agreement between VIA Affiliates, Inc. and Joseph S. Auteri, MD</u>

The employment agreement between VIA Affiliates, Inc. and Joseph Auteri, MD effective April 2012, subsequently extended through April 2022 (as the result of Dr Auteri meeting quality criterion as stated in 9.1)(EXTENSION), and revised in February 2019 (agreement for Dr Auteri to increase days worked in exchange for increased compensation) (REVISION) is now further amended as follows:

> Item 1: All previous contract terms will remain unchanged from the original contract excepting for those items outlined above in the previously executed EXTENSION and REVISION

> Item 2: Compensation

> > • Section 3.1 is revised such that the following compensation table will determine the salary for Joseph Auteri, MD:
> > > ▪ REDACTED
> > > ▪ REDACTED
> > > ▪ REDACTED
> > • REDACTED
> > ▪ Section 3.2 and 3.3 is eliminated from the agreement

> Item 3: Term

> > • Section 9.1 of the existing document will be replaced with 9.1 as it appears directly below:

This Agreement shall take effect on January 1, 2020 and shall continue in effect for an initial term of five (5) years through and including December 31, 2024 (the "Term"), unless otherwise terminated as provided herein.  Thereafter, this Agreement shall be renewed for one additional two (2) year period (an "Additional Term) provided neither party provides notice to terminate before June 30, 2024.

Scott Levy, MD

Administrator VIA Affiliates

Date: 12/17/19

*DATE of*
*Ribbon Cutting*

Joseph Auteri, MD

Date: 12.17.2019

EXHIBIT "3"

October 6, 2021

Ms. Barb Hebel
VP, Human Resources
Doylestown Health
595 West State Street
Doylestown PA 18901

Dear Ms. Hebel:

This letter is to request a religious exemption to Doylestown Hospital's Covid Vaccination Mandate.  I have a personal, deeply held and sincere religious conviction against this vaccine mandate.

I have been at Doylestown Hospital since May 2007.  As you know we have grown the program from 166 cardiac cases the calendar year before I arrived, to our record volume of 396 cardiac cases in 2019 before Covid hit.  Our volume dipped last year during Covid, but is back up this year and we are currently on pace to perform over 400 cases in 2021, surpassing our previous high water mark in terms of cardiac volume, **making 2021 the highest volume of cardiac cases in the history of the program**.  We have hired one Cardiac Surgeon and have another Cardiac Surgeon on the way next July to meet this increased volume.

In addition, before I arrived, we were performing less than 50 vascular cases per year, and our vascular volume has greatly increased, and is now consistently between 450 and 500 cases per year. In addition, we have hired the equivalent of 2.5 Vascular Surgeons to accommodate this tremendous growth in the Vascular volume.

During my time as Chief of Cardiovascular Surgery, we began a multidisciplinary TAVR program (Transcatheter Aortic Valve Replacement) and have now performed over 550 TAVRs **with only 2 deaths**, a mortality rate of less than 0.2%, when the expected mortality from a TAVR is 5-8% (putting our expected mortality at 27-44 deaths, again, we've had 2 deaths out of 550).

In addition to this, during my time as Chief we implemented a multidisciplinary Watchman Program, also a Lead Extraction Program, and more recently a Mitral Clip program, all of which have been very successful.  I believe the entire administration has been very happy with the volume trajectory over the past 14 years.

In addition to all of this volume growth in the program, we are well on our way to achieving our very ambitious goal of raising $100 million dollars (currently sitting at $80.1 million raised) for our new Cardiac Wing in our 5-year capital campaign entitled One Vision-The Campaign for Doylestown Health, when the previous philanthropic high before I arrived raised $12 million for the ER expansion.

I have been recently contacted by a much larger hospital system in our region to ask if we could partner with them to create a new cardiac program at their facility and bring all of the tremendous success and quality outcomes that we have achieved at Doylestown to their area as well.  (I immediately came to our administration, and we are currently working on this project).  Just this past week, the Chief of Thoracic Surgery at a major University Hospital Program in our area reached out to me to see if we could partner with them on Thoracic (Lung) surgery.  We have many exciting projects going on at Doylestown Health, and I am excited and proud to be part of them.

As you no doubt remember, in the Fall of 2006 when I was offered the job of Director of the Heart Institute and Chief of Cardiovascular Surgery by Dr. Scott Levy, my response at that time was that my wife and I would enter a season of prayer and fasting to see where the Holy Spirit was leading us in taking this job. Ultimately we were led by the Spirit to take the job in Doylestown, and I have been very happy with that decision. I believe that God has blessed that obedience to His leading.

I have recently been through a similar season of prayer and fasting regarding the vaccine mandate. I am being led by the Holy Spirit to respectfully decline the Covid vaccine. I believe my body belongs to God and is the temple of his Holy Spirit. As it says in 1 Corinthians 6:19-20 "do you not know that your body is a temple of the Holy Spirit who is in you, whom you have from God, and that you are not your own? For you have been bought with a price: therefore glorify God in your body." I believe that for me to ingest this vaccine is a violation of the Holy Spirit's leading, and therefore would be sin.

When considering whether to obey all the various laws of mankind or not to obey them relies on whether or not those same laws would cause me to disobey my understanding of God's Word if I were to follow Man's rules. In a situation where, in order to obey Man's rules or laws I would have to disobey God's Word, I must obey God and His Word. Therefore I am unable to submit to this vaccine mandate imposed by Doylestown Hospital.

To deny the clear leading of the Spirit would be sinful on my part, and I have no desire to do that. I have a peace about this decision, which I believe the Holy Spirit gives when one is being led by the Spirit.

Title VII of the Civil Rights Act of 1964 says that by law, reasonable accommodation should be given for someone with a personal, deeply held and sincere religious conviction, and I look forward to accepting your reasonable accommodation so that we can together continue this wonderful work we are doing at Doylestown Health.


Sincerely,



Joseph S. Auteri, MD

October 6, 2021

Ms. Barb Hebel
VP, Human Resources
Doylestown Health
595 West State Street
Doylestown PA 18901

Dear Ms. Hebel:

This letter is to request a medical exemption to the Hospital's Covid Vaccination Mandate. I was infected with Covid in May 2021, and was out for 14 days while I recovered. I had a positive antigen test in May, and recently have been tested for both antibody as well as T-Cell immunity and based on these results my physician describes me as having "robust immunity".

I have been at Doylestown Hospital since May 2007. As you know we have grown the program from 166 cardiac cases the calendar year before I arrived, to our record volume of 396 cardiac cases in 2019 before Covid hit. Our volume dipped last year during Covid, but is back up this year and we are currently on pace to perform over 400 cases in 2021, surpassing our previous high water mark in terms of cardiac volume, **making 2021 the highest volume of cardiac cases in the history of the program**. We have hired one Cardiac Surgeon and have another Cardiac Surgeon on the way next July to meet this increased volume.

In addition, before I arrived, we were performing less than 50 vascular cases per year, and our vascular volume has greatly increased, and is now consistently between 450 and 500 cases per year. In addition, we have hired the equivalent of 2.5 Vascular Surgeons to accommodate this tremendous growth in the Vascular volume.

During my time as Chief of Cardiovascular Surgery, we began a multidisciplinary TAVR program (Transcatheter Aortic Valve Replacement) and have now performed over 550 TAVRs **with only 2 deaths**, a mortality rate of less than 0.2%, when the expected mortality from a TAVR is 5-8% (putting our expected mortality at 27-44 deaths, again, we've had 2 deaths out of 550).

In addition to this, during my time as Chief we implemented a multidisciplinary Watchman Program, also a Lead Extraction Program, and more recently a Mitral Clip program, all of which have been very successful. I believe the entire administration has been very happy with the volume trajectory over the past 14 years.

In addition to all of this volume growth in the program, we are well on our way to achieving our very ambitious goal of raising $100 million dollars (currently sitting at $80.1 million raised) for our new Cardiac Wing in our 5-year capital campaign entitled One Vision-The Campaign for Doylestown Health, when the previous philanthropic high before I arrived raised $12 million for the ER expansion.

I have been recently contacted by a much larger hospital system in our region to ask if we could partner with them to create a new cardiac program at their facility and bring all of the tremendous success and quality outcomes that we have achieved at Doylestown to their area as well. (I immediately came to our administration, and we are currently working on this project). Just this past week, the Chief of Thoracic Surgery at a major University Hospital Program in our area reached out to me to see if we could partner with them on Thoracic (Lung) surgery. We have many exciting projects going on at Doylestown Health, and I am excited and proud to be part of them.

I believe the natural God-given immunity that one gets from having been infected previously with Covid confers as good and in some cases better protection from a future Covid infection than any vaccination could (see the three enclosed articles).  In the Lancet article "the authors suggest that infection and the development of an antibody response provides protection **similar to or even better** than currently used SARS-CoV-2 vaccines."   The Nature article states "our results indicate that mild infection with SARS-CoV-2 induces robust antigen-specific, **long-lived humoral immune memory** in humans."  And finally, the Israeli article states that "our analysis demonstrates that SARS-CoV-2-naïve vaccines had a 13.06-fold increased risk for breakthrough infection with the Delta variant compared to those previously infected…"

I am therefore requesting this medical exemption since I believe I am better protected than many others currently working at the hospital.

Title VII of the Civil Rights Act of 1964 says that by law, reasonable accommodation should be given for someone with a medical exemption, and I look forward to accepting your reasonable accommodation so that we can together continue this wonderful work we are doing at Doylestown Health.

Sincerely,


Joseph S. Auteri, MD

EXHIBIT "4"

 **Doylestown Health**

**Doylestown Hospital**

October 11, 2021

Dr. Joseph Auteri
3007 Holicong Road
Doylestown, PA 18902

Dear Dr. Auteri,

On August 6, 2021, Doylestown Health System announced its decision to require COVID-19 vaccinations for all members of the Doylestown Health System family. The Medical Executive Committee voted to endorse this same requirement for all Medical Staff members and Advanced Practice Professionals.

Your compliance with the Doylestown Hospital Medical Staff vaccination requirement was due by today, October 11, 2021. As we have not received your proof of vaccination, you are being placed on a 30 day precautionary suspension from the medical staff, effective at midnight tonight. This form of suspension is not reportable to the Data Bank.

If you do not send Doylestown Hospital proof of your receipt of a COVID vaccination by Wednesday November 10th, before 5:00 p.m., the Medical Staff will accept that you have voluntarily resigned your privileges and Medical Staff membership at Doylestown Hospital, effective November 10th, 2021.

We sincerely hope that you will forward your proof of vaccination and avoid separation from the Doylestown Hospital Medical Staff.

*Brenda Foley, M.D.*

Brenda Foley, MD
Medical Staff President
Doylestown Hospital

EXHIBIT "5"



## Doylestown Health

Doylestown Hospital

October 13, 2021

*UPS Next Day Air*

Joseph S. Auteri, M.D.
3007 Holicong Road
Doylestown, PA 18902

Dear Dr. Auteri:

I am writing to you on behalf of Doylestown Hospital ("DH") and VIA Affiliates ("VIAA"), as a follow-up to my October 12, 2021 email to you and our two meetings (September 15 and October 11, 2021), in which you requested an exemption from DH and VIAA' COVID-19 vaccination requirement notwithstanding your untimely request for an exemption and your acknowledgment that such an exemption would result in you receiving more favorable treatment than your fellow DH and VIAA Associates.

<u>Denial of Untimely Exemption Request</u>

As I informed you, because you neither received your COVID-19 vaccination by October 11, 2021, nor requested a medical or religious exemption from DHS' COVID-19 vaccination requirement by the September 10, 2021 deadline, you would be placed on a 30-day leave of absence effective October 12, 2021. I confirmed this information in an e-mail dated October 12, 2021.

Although you requested an exemption, you only did so after the September 10, 2021 deadline, by way of two letters to me dated October 6, 2021, which set forth two different grounds for your exemption request. In one of those letters, you base your exemption request on your May 2021 COVID-19 infection, which you assert "made you better protected than many others currently working at the hospital." Your letter further states: "I had a positive antigen test in May, and recently have been tested for both antibody and as well as T-Cell immunity and based on these results my physician describes me as having 'robust immunity.'" However, prior COVID-19 infection is not a basis for an exemption from DH's or VIAA's COVID-19 vaccination requirement.[1]

---

[1] Your assertions also are inconsistent with current CDC guidance, which specifically states that "None of the currently authorized SARS-CoV-2 antibody tests have been validated to evaluate specific immunity or protection from SARS-CoV-2 infection" and that "Antibody testing is NOT currently recommended to assess . . . Immunity to COVID-19 following COVID-19 vaccination [or] [t]he need for vaccination in an unvaccinated person." Furthermore, the CDC currently recommends that healthcare providers "Offer vaccination regardless of history of prior symptomatic or asymptomatic SARS-CoV-2 infection" and that "[w]hile there is no recommended minimum interval between infection and vaccination, current evidence suggests that the risk of SARS-CoV-2 reinfection is low in the months after initial infection but may increase with time due to waning immunity." *See* https://www.cdc.gov/vaccines/covid-19/hcp/faq.html.

With respect to your request for a religious exemption in your second letter dated October 6, 2021, your request was rejected because you did not submit it until well after the September 10, 2021 deadline. However, even if DH and VIAA were to afford you special treatment and grant your request for an *exemption* from the vaccination requirement, DH and the VIAA would not be able to provide you with an *accommodation* that would enable you to continue performing heart surgery, as this would impose an undue hardship on DH and VIAA because the safety of the vulnerable and high-risk patient population for whom you care would be jeopardized by your performing heart surgery without being vaccinated for COVID-19, as determined by DH Infection Control.

Notice of Breach of Employment Agreement and Opportunity to Cure

As you further are aware, your medical staff membership and privileges at Doylestown Hospital were suspended by the Medical Executive Committee effective October 12, 2021, due to your failure to become vaccinated for COVID-19.

Your Employment Agreement with VIAA, as amended (the "Employment Agreement"), provides that VIAA may terminate your employment for cause immediately "[u]pon the . . . revocation, termination, suspension or limitation of [your] privileges at any hospital or facility" (Section 9.2.2.3) and/or "[i]f VIAA or [Doylestown] Hospital determine, in good faith after a reasonable investigation, that . . . the safety of patients is jeopardized by [your] continued services." (Section 9.2.2.8)

Furthermore, the Employment Agreement requires that you "remain a member in good standing of the Active Medical Staff of [Doylestown] Hospital and of any other hospital at which [you] obtain[] staff membership and privileges." (Section 2.1.8). If you breach this obligation, and fail to cure such breach within 30 days of receiving written notice of the breach, VIAA may terminate your employment for cause. (Section 9.2.2.9)

VIAA and DH value your significant contributions to the Heart Institute and DH patients over the years, and we want you to remain employed by VIAA and continue serving as the Medical Director of the Heart Institute and the Chief of Cardiovascular Surgery. Accordingly, although VIAA has multiple grounds for cause to terminate your employment immediately pursuant to Sections 9.2.2.3 and 9.2.2.8, it is electing not to do so at this time, without prejudice to VIAA's right to terminate your employment for cause in the future for your current, or any future, violation of Section 9.2.2.3, Section 9.2.2.8 or any other provision of the Employment Agreement, which right is not waived and hereby expressly is reserved.

Instead, this letter constitutes thirty (30) days' notice of your breach of Section 2.1.8 of the Employment Agreement, pursuant to Section 9.2.2.9 and Section 12 of the Employment Agreement.

You may cure such breach by:

1.  Receiving at least the first dose in a two-dose COVID-19 vaccination series (or a single dose vaccine) during the 30-day notice period and submitting proof of such vaccination to Occupational Health by November 11, 2021.
2.  If you elect to receive the first dose in a two-dose COVID-19 vaccination series (as opposed to a single dose vaccine), you will be required to receive the second dose and submit proof of same to Occupational Health on or before December 11, 2021.

<u>Communications with Third Parties Regarding Employment Status</u>

We are aware that you have been informing third parties, including DH and VIAA patients and referring physician practices, that your employment has been terminated. However, we have not informed you that your employment has been terminated and this letter affirms that your employment has not been terminated.

While you are free to communicate truthfully with third parties regarding your employment status, knowingly making false statements to third parties with whom DH and VIAA have a business relationship (*e.g.*, DH and VIAA patients and referring physician practices) regarding your employment status potentially has the effect of interfering with DH's and VIAA's business relationship with those third parties.

We expect that moving forward, to the extent, you communicate with third parties regarding your employment status; particularly third parties with whom DH and VIAA has a business relationship, such communications will be truthful in nature.

\*     \*     \*     \*     \*     \*     \*

It is our hope that you will become fully vaccinated for COVID-19 as soon as possible so that your staff membership and privileges can be reinstated and you can return to work.

However, if you do not cure your breach of the Employment Agreement by taking the steps set forth above, VIAA will terminate your employment for cause pursuant to Section 9.2.2.9 of the Employment Agreement.

Please do not hesitate to contact me if you have any questions.

Sincerely,

Barbara Hebel
VP Human Resources

3

EXHIBIT "6"



Kimberly L. Russell, Esquire
Direct Dial: (610) 941-2541
Direct Fax: (610) 684-2026
Email: krussell@kaplaw.com
www.kaplaw.com

October 22, 2021

**EMAIL AND REGULAR MAIL**

Barbara Hebel, VP, Human Resources
Doylestown Health
595 West State Street
Doylestown, PA 18901

RE:     **Joseph S. Auteri, M.D.**

Dear Ms. Hebel:

Kaplin Stewart Meloff Reiter & Stein, P.C. represents Joseph S. Auteri, M.D. This is in response to your letter dated October 13, 2021 which improperly denied Dr. Auteri's requests for an exemption from Doylestown Health System's and VIA Affiliates' (collectively, **"DH"**) COVID-19 vaccination requirement and memorialized DH's refusal to engage in the interactive process to establish a reasonable accommodation for Dr. Auteri. The purpose of this letter is to provide DH with the opportunity to reconsider its legal violations of Dr. Auteri's rights, provide Dr. Auteri with reasonable accommodations, cease DH's breach of Dr. Auteri's contractual rights and slander of Dr. Auteri, and remedy the retaliation Dr. Auteri suffered following Dr. Auteri's report of harassment and a hostile work environment.

**Timing of Dr. Auteri's Exemption Requests**

Your October 13, 2021 letter denies Dr. Auteri's medical and religious exemption requests in part because those requests allegedly were received after DH's alleged "deadline" of September 10, 2021. That establishment of an arbitrary deadline and apparent adherence to such a deadline is a violation of state and federal law. Title VII of the Civil Rights Act of 1964 (**"Title VII"**), the Americans with Disabilities Act (**"ADA"**), and the Pennsylvania Human Relations Act (**"PHRA"**) do not permit employers to establish "deadlines" beyond which an employee is not permitted to seek an exemption from a workplace standard and resulting reasonable accommodation request. To the extent that DH denied Dr. Auteri's exemption requests in whole or in part due to Dr. Auteri's alleged failure to meet DH's "deadline" for such requests, DH must reconsider those requests immediately in order to avoid a claim for a violation of Dr. Auteri's civil rights.

**Kaplin Stewart**
Union Meeting Corporate Center
910 Harvest Drive, P.O. Box 3037
Blue Bell, PA 19422-0765
610-260-6000 tel

*Offices in*
*Pennsylvania*
*New Jersey*

7331287v1

Barbara Hebel, VP, Human Resources
October 22, 2021
Page 2

### Dr. Auteri's Request for Medical Exemption and Reasonable Accommodation

Dr. Auteri submitted a valid request for medical exemption to DH's COVID-19 vaccine mandate on October 6, 2021 and enclosed with this letter is another request for medical exemption. The enclosed exemption request is a certification by Dr. Auteri's treating physician that Dr. Auteri should not receive the COVID-19 vaccine. Dr. Auteri's request meets the requirements to obtain a reasonable accommodation under the ADA and PHRA. DH's refusal of Dr. Auteri's prior request for medical exemption based upon CDC guidance is improper under the ADA and PHRA.[1] CDC guidance is just that – guidance – and not law which supersedes the ADA and PHRA. CDC guidance does NOT permit the violation of an employee's civil rights. Even the CDC guidance as cited in your October 13, 2021 letter merely "recommends" that health care providers "offer" vaccination regardless of prior infection. CDC guidance is not a lawful basis to deny a valid request for medical exemption. Dr. Auteri expects that DH will grant his medical exemption request and grant the reasonable accommodation requested below, which accommodation is consistent with DH's past and current practices to mitigate the risk of COVID-19 exposure and transmission in DH facilities.

### Dr. Auteri's Request for Religious Exemption and Reasonable Accommodation

Dr. Auteri submitted a valid request for a religious exemption to DH's COVID-19 vaccine mandate on October 6, 2021. In that request, Dr. Auteri articulated a sincerely held religious belief which exceeds the requirements to grant such an exemption. Dr. Auteri articulated that as a person of faith and follower of Jesus Christ, his sincerely held religious beliefs do not permit him to take the COVID-19 vaccine. DH is not permitted as a matter of law under Title VII or the PHRA to deny such an exemption request, and certainly cannot deny that request because of the request's "untimeliness" as discussed above. Your statement that the grant of a legally protected exemption from a workplace standard on the basis of a sincerely held religious belief would be "special treatment" is a violation of Dr. Auteri's civil rights which DH must cure immediately to avoid legal action. Dr. Auteri expects that DH will grant his religious exemption request and grant the reasonable accommodation requested below, which accommodation is consistent with DH's past and current practices to mitigate the risk of COVID-19 exposure and transmission in DH facilities.

### Dr. Auteri's Reasonable Accommodation Request

In your October 13, 2021 letter denying Dr. Auteri's exemption requests, after denying those valid requests in violation of Dr. Auteri's civil rights, you summarily state that no accommodation would be available which would enable Dr. Auteri to perform his work and not impose an "undue hardship" on DH "because the safety of the vulnerable and high-risk patient population" which Dr. Auteri treats would be "jeopardized" by Dr. Auteri's vaccine exemption,

---

[1] DH also has acknowledged the potential for the COVID-19 "vaccine" to cause harmful side effects, as DH offered to compensate Dr. Auteri if the vaccine resulted in a side effect which would preclude Dr. Auteri from performing surgery. Dr. Auteri's proposed reasonable accommodation described in this letter addresses patient safety, Dr. Auteri's medical condition, and potential adverse side effects from the vaccine.

Barbara Hebel, VP, Human Resources
October 22, 2021
Page 3

as determined by "DH Infection Control." Leaving aside the qualifications of those involved in "DH Infection Control" as it relates to COVID-19 matters, your statement that no accommodation is available is false and a violation of Dr. Auteri's civil rights.

When an employee is entitled to an exemption from a workplace standard on the basis of a medical or religious reason, the employer must engage in an interactive process with the employee to determine, in joint consultation, whether a reasonable accommodation is available. Employers who claim that they cannot grant a reasonable accommodation due to an "undue hardship" have an exceedingly high burden to meet. Your letter fails entirely to articulate that hardship and violates Dr. Auteri's civil rights. Contrary to your statement, a reasonable accommodation is available and is readily achievable by DH as a healthcare provider and facility.

Dr. Auteri requests that his exemption requests be granted and that as a reasonable accommodation, Dr. Auteri submit to (1) a daily healthcare screening in which Dr. Auteri's temperature is taken and Dr. Auteri certifies that he has not been exposed to or experiencing any symptoms of COVID-19, and (2) weekly COVID-19 testing. DH certainly can conduct such basic screenings and the additional time and/or expense required to do so does not meet the high burden to demonstrate an "undue hardship." DH has conducted health screenings and COVID-19 testing throughout the pandemic and now cannot claim an undue hardship in doing so. Nor can DH legally claim that Dr. Auteri remaining unvaccinated but subject to testing jeopardizes patient safety because DH's Vice President and Chief Medical Officer, Scott Levy, M.D. acknowledged in an August 15, 2021 email to the Bucks County Health Commissioner (copy enclosed) "the ability of the vaccinated to transmit the virus [i.e. COVID-19]." DH's denial of Dr. Auteri's privileges of employment due to his need for an exemption to the vaccine mandate and reasonable accommodation, where DH admits through one of its top executives that vaccinated individuals can transmit COVID-19, is a violation of Dr. Auteri's civil rights. By agreeing to daily health screenings and weekly testing for COVID-19, Dr. Auteri poses <u>less</u> of a COVID-19 transmission risk than vaccinated personnel who are capable of transmitting the virus but not subjected to testing. Dr. Levy also previously equated patients who have been vaccinated with those who have already been infected with COVID-19 and exempted those patients from pre-procedure COVID-19 testing. <u>See</u> Dr. Levy's January 8, 2021 email (copy enclosed) stating in pertinent part "[a]nalogous to patient (sic) who have already had infection with COVID; those individuals who have been fully vaccinated for Covid do NOT need to have preprocedure testing done." There can be no lawful, nondiscriminatory, and/or nonretaliatory basis to deny Dr. Auteri's requested reasonable accommodation.

**<u>Breach of Dr. Auteri's Contractual Rights</u>**

The claims in your October 13, 2021 letter that Dr. Auteri has breached his Employment Agreement are based upon the entirely false premise that Dr. Auteri engaged in conduct which jeopardizes patient safety and justifies the revocation or suspension of Dr. Auteri's privileges. As demonstrated above, Dr. Auteri has engaged in no conduct which jeopardizes patient safety and Dr. Auteri's proposed reasonable accommodation actually makes him less of a "hazard" to

Barbara Hebel, VP, Human Resources
October 22, 2021
Page 4

patient safety than untested, vaccinated individuals who, by DH's admission, also are capable of transmitting the COVID-19 virus. Contrary to the claims in your October 13, 2021 letter, DH is in breach of Dr. Auteri's Employment Agreement because DH suspended Dr. Auteri's privileges without cause and then used that improper suspension to give notice of Dr. Auteri's impending termination. Dr. Auteri hereby demands that DH immediately reinstate Dr. Auteri's privileges, pay to Dr. Auteri all lost pay and benefits, and provide the reasonable accommodation requested above. If DH fails to do so and terminates Dr. Auteri in violation of the Employment Agreement, Dr. Auteri will take legal action against DH for breach of contract and seek all available remedies against DH. DH cannot breach Dr. Auteri's Employment Agreement and then seek to benefit from DH's breach by terminating Dr. Auteri in violation of that Agreement. DH must cure its breach immediately.

## Dr. Auteri has Communicated Truthfully with Third Parties about DH's Improper Conduct and DH's Threat to Terminate Dr. Auteri's Employment

In your October 13, 2021 letter, you falsely accused Dr. Auteri of telling third parties that he "has been terminated" and "interfering with [DH's] business relationship with those third parties." I do not know the basis of your false statements, but your statements are without basis in fact and seem only to evidence DH's continued retaliation against Dr. Auteri (discussed in further detail below). Enclosed is a copy of Dr. Auteri's October 16, 2021 text message, which he has sent multiple times to multiple individuals, in which Dr. Auteri accurately states that (1) Dr. Auteri requested an exemption from the vaccine mandate, (2) DH then placed Dr. Auteri on an unpaid suspension, and (3) "in 30 days that will turn into a termination." Dr. Auteri's text is an entirely accurate summary and representation of Brenda Foley, M.D.'s October 11, 2021 letter to Dr. Auteri stating in pertinent part that Dr. Auteri is "being placed on a 30 day precautionary suspension from the medical staff" and your October 13, 2021 letter stating that if Dr. Auteri does not "cure his breach" by submitting proof of vaccination, DH "will terminate [Dr. Auteri's] employment for cause." Do not again accuse Dr. Auteri of "interfering with DH's business relationships" without first obtaining evidence of that interference. Dr. Auteri is permitted to communicate with employees and third parties about the terms and conditions of his employment and such communications are protected as a matter of law under the National Labor Relations Act.

## DH's Slander of Dr. Auteri

It has come to Dr. Auteri's attention that DH has instructed staff in Dr. Auteri's office to advise patients seeking care that Dr. Auteri is on a "personal leave of absence." That statement is absolutely false and misleads patients. Stating that Dr. Auteri is on a personal leave of absence falsely implies that Dr. Auteri requested and/or is taking a leave of absence due to some problem with Dr. Auteri which renders Dr. Auteri unable to care for Dr. Auteri's patients. Nothing could be further from the truth, and DH's directive to the staff in Dr. Auteri's office is directing the slander of Dr. Auteri which will lead patients to question Dr. Auteri's fitness to practice medicine. Such a result damages Dr. Auteri's reputation by DH's knowingly false statement and constitutes slander. DH has suspended Dr. Auteri due to DH's improper denial of Dr.

Barbara Hebel, VP, Human Resources
October 22, 2021
Page 5

Auteri's requests for an exemption from the COVID-19 vaccine mandate and reasonable accommodation. If DH insists upon communicating about Dr. Auteri's absence from work, DH should state the truth or communicate nothing at all. If DH continues damaging Dr. Auteri in such a manner, Dr. Auteri will take appropriate legal action. DH cannot evade the consequences of its unlawful violations of Dr. Auteri's civil rights by defaming Dr. Auteri's reputation.

**DH's Retaliation Against Dr. Auteri Following Dr. Auteri's Report of Harassment and a Hostile Work Environment**

On September 10, 2021, Dr. Auteri reported that he was being subjected to harassment and a hostile work environment by Dr. Levy, Dr. Auteri's direct supervisor. Dr. Auteri copied you on an email in which he specifically stated that Dr. Levy was repeatedly engaging with Dr. Auteri in a "heated," "angry" way and with a raised voice. Dr. Levy repeatedly has yelled at and demeaned Dr. Auteri in front of other DH staff. Dr. Auteri reported that Dr. Levy was unable to have a conversation with Dr. Auteri without Dr. Levy becoming "agitated." As a Human Resources professional, you certainly must be aware that your receipt of such a communication triggers your obligation to investigate further Dr. Auteri's allegations. Dr. Auteri is entitled to know exactly what was done to investigate his complaint and the result of that investigation. As of this writing, you have not provided that investigation information to Dr. Auteri. Please provide me with that investigation information immediately, including evidence of the action you took to rectify Dr. Levy's improper conduct.

Following that report of harassment and a hostile work environment, DH retaliated against Dr. Auteri by summarily denying Dr. Auteri's exemption requests, failing to grant Dr. Auteri a reasonable accommodation and without engaging in the interactive process as required by law, and suspending Dr. Auteri in breach of Dr. Auteri's Employment Agreement and violation of Dr. Auteri's civil rights. On October 16, 2021, Dr. Auteri again reported "abuse" and "harassment" at the hands of Dr. Levy. On October 10, 2021, Dr. Levy threatened Dr. Auteri by telling Dr. Auteri that Dr. Auteri would be terminated immediately if Dr. Auteri did not forfeit Dr. Auteri's civil rights and comply with the "vaccine mandate." Dr. Levy harassed Dr. Auteri and said that Dr. Auteri's "legacy" would be that of a "loser" if Dr. Auteri did not forfeit Dr. Auteri's civil rights by succumbing to the "mandate." Dr. Levy threatened Dr. Auteri's business reputation and welfare by stating that Dr. Auteri would never get a job as a cardiac surgeon in the United States again if Dr. Auteri did not forfeit Dr. Auteri's civil rights and succumb to the mandate. Dr. Levy violated HIPAA in the course of Dr. Levy's threats by naming three other unvaccinated physicians on the DH staff, defamed those physicians by stating that Dr. Auteri was "not in good company" by failing to comply and forfeit Dr. Auteri's civil rights, all of which was presented as a threat to Dr. Auteri. The day after Dr. Levy's threats and Dr. Auteri's refusal to forfeit his civil rights, and immediately after asserting those rights by requesting exemptions and accommodations, DH retaliated against Dr. Auteri by summarily denying those exemptions and requests for accommodations without appropriate legal justification to do so.

As of this writing, you have had six days to investigate Dr. Auteri's October 16, 2021 report of harassment and retaliation. Dr. Auteri is entitled to know exactly what was done to investigate

Barbara Hebel, VP, Human Resources
October 22, 2021
Page 6

his complaint and the result of that investigation. As of this writing, you have not provided that investigation information to Dr. Auteri. Please provide me with that investigation information immediately, including evidence of the action you took to rectify Dr. Levy's improper conduct. Dr. Levy apparently has no intention of ceasing his improper conduct, and DH apparently cannot control Dr. Levy's improper conduct. DH apparently took no action to rectify Dr. Levy's conduct following notice to you on September 10, 2021, and Dr. Levy believed that he could continue his improper conduct and retaliate against Dr. Auteri. Dr. Auteri hereby demands that DH commence an immediate investigation of Dr. Levy's conduct and that Dr. Levy be removed from DH premises pending the outcome of that investigation so that Dr. Auteri and all DH staff are not subjected to Dr. Levy's improper and uncontrolled conduct.

**Conclusion**

Dr. Auteri expects that his exemption requests will be granted and reasonable accommodations adopted as set forth above. Dr. Auteri expects that he will be reinstated immediately and all lost pay and benefits restored. Dr. Auteri will not forfeit his civil rights and will not tolerate DH's continued violation of those rights and refusal to protect Dr. Auteri's rights as stated herein. Make no mistake - Dr. Auteri is not resigning as stated in Dr. Foley's October 11, 2021 letter and on November 11, 2021, if DH pursues its wrongful path as stated in your October 13, 2021 letter and terminates Dr. Auteri's employment, DH will do so in violation of Dr. Auteri's civil rights and Employment Agreement.

If DH has denied other employee's exemption requests as it did Dr. Auteri's and failed to provide reasonable accommodations as required by law, DH had best reconsider and rectify its decisions or DH may be subject to class litigation for DH's civil rights violations, which litigation would seemingly be meritorious on its face. It is unfathomable that DH would flagrantly violate its employees' civil rights and terminate staff or otherwise retaliate against highly skilled staff by effectively demoting those employees to lower paying positions and at the same time jeopardizing patient safety by reducing the availability of such staff. DH is demonstrating a complete disregard of its employees' civil rights and its patients' rights to prompt and effective treatment. DH knows that its position is not based in fact and universal employee vaccination will not stop the spread of COVID-19 (per Dr. Levy's admissions). DH must rectify immediately its conduct or face the severe legal consequences.

Sincerely,

KAPLIN STEWART MELOFF REITER & STEIN, P.C.

By: Kimberly L. Russell, Esquire

KLR:dg
Enclosures

EXHIBIT "7"

NEW YORK
LONDON
SINGAPORE
PHILADELPHIA
CHICAGO
WASHINGTON, DC
SAN FRANCISCO
SILICON VALLEY
SAN DIEGO
LOS ANGELES
BOSTON
HOUSTON
DALLAS
AUSTIN
HANOI
HO CHI MINH CITY

SHANGHAI
ATLANTA
BALTIMORE
WILMINGTON
MIAMI
BOCA RATON
PITTSBURGH
NEWARK
LAS VEGAS
CHERRY HILL
LAKE TAHOE
MYANMAR

ALLIANCES IN MEXICO
AND SRI LANKA

# DuaneMorris®

*FIRM and AFFILIATE OFFICES*

CHRISTOPHER D. DURHAM
DIRECT DIAL: +1 215 979 1510
PERSONAL FAX: +1 215 689 4915
*E-MAIL:* cddurham@duanemorris.com

*www.duanemorris.com*

November 9, 2021

**CONFIDENTIAL**

**VIA E-MAIL**

Kimberly L. Russell, Esquire
Kaplin Stewart Meloff Reiter & Stein, P.C.
Union Meeting Corporate Center
910 Harvest Drive, Suite 200
Blue Bell, PA 19422
krussell@kaplaw.com

   Re: **Doylestown Health System / Joseph S. Auteri, M.D.**

Dear Ms. Russell,

   As you are aware, this firm represents Doylestown Hospital and VIA Affiliates d/b/a Doylestown Health Physicians ("VIAA") (collectively, "DH") with regard to your client Joseph S. Auteri, M.D. ("Dr. Auteri"). We have reviewed your letter to Ms. Barbara Hebel dated October 22, 2021 (the "Letter"), which alleges that DH failed to provide Dr. Auteri with an exemption from DH's COVID-19 vaccine requirement for hospital staff in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act ("ADA") and the Pennsylvania Human Relations Act ("PHRA"), that VIAA breached Dr. Auteri's Employment Agreement, that DH "slandered" Dr. Auteri and that DH retaliated against Dr. Auteri for allegedly reporting harassment.

   As set forth in greater detail below, these allegations lack factual and legal merit. DH still hopes that Dr. Auteri will become fully vaccinated as soon as possible so that he can be reinstated and can return to work. However, in the event that Dr. Auteri elects not to receive the vaccine, VIAA will terminate his employment for cause.

DUANE MORRIS LLP

30 SOUTH 17TH STREET PHILADELPHIA, PA 19103-4196    PHONE: +1 215 979 1000 FAX: +1 215 979 1020

DuaneMorris

Kimberly L. Russell, Esquire
November 9, 2021
Page 2

I.     **Dr. Auteri Does Not Qualify for a Disability-Based Exemption from DH's COVID-19 Vaccine Requirement.**

Dr. Auteri does not qualify for a disability-based exemption from DH's COVID-19 vaccine requirement because he has not provided documentation of a disability that prevents him from receiving a COVID-19 vaccine.[1]

Your Letter alleges that Dr. Auteri submitted a "valid request for medical exemption to DH's COVID-19 vaccine requirement on October 6, 2021." However, this request was based on Dr. Auteri's May 2021 COVID-19 infection, a positive antigen test in May 2021, and alleged recent antibody and T-Cell test. As you and your client are well aware, neither prior COVID-19 infection nor the presence of certain antibodies is a disability that provides a legal basis for an exemption from DH's COVID-19 vaccination requirement under the ADA or the PHRA. It is concerning that, as a physician, Dr. Auteri is asking DH to disregard CDC guidance, which recommends individuals receive the vaccine even if they have recently recovered from COVID-19.

You also contend that the October 21, 2021 letter from Dr. Auteri's physician, Dr. William Kracht, legally entitles Dr. Auteri to an exemption from DH's COVID-19 vaccine requirement. However, Dr. Kracht's letter, submitted to DH for the first time with your Letter, states only: "Based upon [Dr. Auteri's] current medical status and condition, I do not recommend COVID-19 vaccination." As I assume you are aware, a medical certification to support an accommodation request under the ADA must "specify the existence of an ADA disability and explain the need for reasonable accommodation."[2] Dr. Kracht's letter neither specifies the existence of a disability nor explains the need for accommodation. Rather, it vaguely references Dr. Auteri's "current medical status and condition" without providing any details regarding such "status" or "condition." Furthermore, Dr. Kracht's letter states only that he does "not recommend" vaccination – not that Dr. Auteri cannot receive a COVID-19 vaccine due to a disability. For these reasons, Dr. Kracht's October 21, 2021 letter also does not entitle Dr. Auteri to an exemption from DH's COVID-19 vaccination requirement.

---

[1] Your Letter also asserts that Dr. Auteri's failure to timely submit his medical and religious accommodation requests should not disqualify him from receiving an exemption. DH implemented the September 10, 2021 deadline for exemption requests to ensure that it could evaluate exemption requests in a timely manner, but evaluated late requests, including Dr. Auteri's, even after the deadline had passed.

[2] *See* EEOC, Enforcement Guidance on Disability-Related Inquiries and Medical Examinations of Employees under the ADA, https://www.eeoc.gov/laws/guidance/enforcement-guidance-disability-related-inquiries-and-medical-examinations-employees.

Kimberly L. Russell, Esquire
November 9, 2021
Page 3

II.   **Accommodating Dr. Auteri's Request for a Religious Exemption from DH's COVID-19 Vaccine Requirement Would Impose an Undue Hardship on DH**

Accommodating Dr. Auteri's request for a religious exemption from DH's COVID-19 vaccine requirement would impose an undue hardship on DH because allowing him to continue working in his position as he has requested would pose a significant and unacceptable risk to the health and safety of the extremely vulnerable heart patients whom Dr. Auteri treats.

For purposes of this letter and its evaluation of Dr. Auteri's request for a religious exemption, and consistent with its approach to nearly all employee requests requesting a religious exemption, DH does not question that Dr. Auteri's religious beliefs are sincerely held.[3] As such, for purposes of its evaluation of Dr. Auteri's request, DH assumes that Dr. Auteri is eligible for a religious *exemption* from the COVID-19 vaccine requirement.

However, *accommodating* Dr. Auteri by exempting him from the vaccine requirement and allowing him to continue treating heart patients (including performing heart surgery) as he has requested would impose an undue hardship on DH. DH's Medical Review Committee (the "Committee"), comprised of infection control specialists and physicians, evaluated the risks posed by the presence of unvaccinated employees at Doylestown Hospital, and concluded that permitting unvaccinated employees to continue working in certain departments or service lines with vulnerable patient populations, including the Heart Institute, would unacceptably jeopardize patient health and safety. For that reason, DH requires employees working with such vulnerable patient populations to be vaccinated, or, if they qualify for a medical or religious exemption, to transfer to a department or service line with a less vulnerable patient population as an accommodation and require them to follow enhanced safety measures, to the extent that a comparable position is available and the employee is qualified for the position. No unvaccinated DH employee has been permitted to continue working in a department or service line identified by the Committee as a particularly vulnerable patient population for whom the presence of unvaccinated providers would impose an unacceptable health and safety risk.

Dr. Auteri's cardiovascular patients are among the most vulnerable patients and are at higher risk of complications if they contract COVID-19. For that reason, the Committee concluded that *all* workers in the cardiovascular service line would need to be vaccinated or, if they qualify for a medical or religious exemption, transfer to a department or service line with less-vulnerable patients. As a very highly paid and specialized heart surgeon, there is no comparable position to which Dr. Auteri could be transferred, and allowing him to continue

---

[3] Dr. Auteri did not articulate a *religious* basis for his objection to DH's COVID-19 vaccine requirement until October 6, 2021, well after he already had voiced personal/political opposition to the COVID-19 vaccine requirement. By way of example only, in a September 15, 2021 meeting with Barbara Hebel to discuss DH's vaccination requirement, Dr. Auteri made no mention of his religious beliefs, but forcefully stated his belief that DH's COVID-19 vaccine requirement violated constitutional rights and that it was wrong not to allow employees to choose whether to receive a COVID-19 vaccine.

DuaneMorris

Kimberly L. Russell, Esquire
November 9, 2021
Page 4

working in the Heart Institute would impose an undue hardship on DH. Therefore, DH concluded that it could not accommodate Dr. Auteri's religious exemption request and placed him on a 30-day unpaid leave of absence consistent with how it treated all other DH employees who were not eligible for an accommodation to the COVID-19 vaccine requirement.

Dr. Auteri, however, seeks special treatment to continue working in the Heart Institute as an unvaccinated provider, even though DH has not permitted unvaccinated employees to continue working in other departments or service lines with particularly vulnerable patient populations.[4] In that regard, your Letter claims that DH could accommodate Dr. Auteri by providing him with an accommodation that no other DH employee has been granted: allowing him to continue working with extremely vulnerable patients if he submits to daily health screenings and weekly COVID-19 testing.[5] You also assert that DH has an "exceedingly high burden to meet" to establish that it cannot grant a reasonable accommodation to an employee's religious beliefs because doing so would impose an undue hardship. You are incorrect on both accounts.

By way of reminder, it has been well-established law for decades that an accommodation that imposes "more than a *de minimis* cost" on the operation of the employer's business constitutes an "undue hardship" for purposes of Title VII. *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977). The EEOC recently affirmed this longstanding principle of law in its COVID-19 guidance, reminded employers and the public that "jeopardizing security or health" is more than a minimal burden, and specified that whether an employee will have "close contact with other employees or members of the public (*especially medical vulnerable individuals*)" is a relevant consideration when evaluating whether a requested religious accommodation to the COVID-19 vaccine imposes an undue hardship on an employer."[6] Here, the risk and consequences of unvaccinated providers exposing vulnerable cardio-vascular

---

[4] Indeed, in his September 15 meeting with Ms. Hebel, in support of his assertion that DH had the ability to grant his an exemption from the vaccination requirement, Dr. Auteri stated that he did not care whether DH had accommodated similarly situated employees and, pointing to the newly-constructed Heart Institute building outside the window of Ms. Hebel's office, reminded her that the building "was built by me."

[5] Notably, your Letter is the first time that Dr. Auteri has informed DH that he is willing to consider alternatives to the COVID-19 vaccine such as the daily health screens and weekly testing you propose. Previously, Dr. Auteri stated that he would *not* follow enhanced safety precautions as an alternative to receiving the vaccine, including in an October 6, 2021 meeting with a group of DH doctors and nurses.

[6] *See* EEOC, What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws, https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws (emphasis added) (last accessed Nov. 8, 2021).

DuaneMorris

Kimberly L. Russell, Esquire
November 9, 2021
Page 5

patients to COVID-19 is substantial and in itself would impose an undue hardship on DH's commitment to patient safety.

Finally, your reliance on Dr. Levy's August 2021 acknowledgment that vaccinated individuals can transmit COVID-19, and an outdated pre-procedure testing policy from over ten months ago is misguided. While the currently available vaccines are not 100% effective at preventing infection, the CDC has been clear that "getting vaccinated is the best way to slow the spread of COVID-19 and to prevent infection by Delta or other variants"[7] and thus recommends COVID-19 vaccination for all health care providers. Not surprisingly, the Centers for Medicare and Medicaid Services ("CMS") recently published an interim final rule requiring such vaccination. Furthermore, "evidence is emerging that people get better protection by being fully vaccinated compared with having had COVID-19" and "unvaccinated people who already had COVID-19 are more than 2 times as likely than fully vaccinated people to get COVID-19 again."[8] As such, your reliance on these two statements serves only to underscore the baseless nature of your assertion that with his proposed accommodations Dr. Auteri would "pose[] less of a COVID-19 transmission risk than vaccinated personnel."

### III.    Dr. Auteri is in Breach of his Employment Agreement

DH's mission "is to continuously improve the quality of life and proactively advocate for the health and well-being of the individuals we serve." The vaccine is effective at preventing the spread of COVID-19, and patient safety is DH's top priority. As noted above, the CDC recommends that health care providers become vaccinated against COVID-19 and CMS recently published an interim final rule requiring such vaccination. DH has made the reasonable, good faith determination based on available medical evidence that it cannot fulfill its commitment to patient safety if its providers serving the most vulnerable patients are unvaccinated.

As stated in the letter from Barbara Hebel to Dr. Auteri dated October 13, 2021, Dr. Auteri's Employment Agreement with VIAA, as amended (the "Employment Agreement"), provides that VIAA may terminate his employment for cause immediately "[u]pon the . . . revocation, termination, suspension or limitation of Physician's privileges at any hospital or facility" (Section 9.2.2.3) and/or "[i]f VIAA or [Doylestown Hospital] determine, in good faith after a reasonable investigation, that . . . the safety of patients is jeopardized by his continued services." (Section 9.2.2.8).

---

[7] *See* CDC, The Possibility of COVID-19 after Vaccination: Breakthrough Infections, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/why-measure-effectiveness/breakthrough-cases.html (last accessed Nov. 1, 2021).

[8] *See* CDC, Frequently Asked Questions about COVID-19 Vaccination, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/faq.html (last accessed Nov. 1, 2021).

DuaneMorris

Kimberly L. Russell, Esquire
November 9, 2021
Page 6

Furthermore, Dr. Auteri's privileges at Doylestown Hospital have been suspended, which entitles VIAA to immediately terminate Dr. Auteri's employment for cause under Section 9.2.2.3 of the Employment Agreement. Allowing Dr. Auteri to continue treating extremely vulnerable heart patients while unvaccinated would, in DH's reasonable good faith judgment, jeopardize patient safety, and thus constitutes an additional basis for immediate termination of Dr. Auteri's employment for cause under Section 9.2.2.8 of the Employment Agreement.

As set forth in Ms. Hebel's October 13, 2021 letter to Dr. Auteri, however, although VIAA has these grounds for cause to terminate Dr. Auteri's employment immediately, it elected not to do so as of October 13 (without prejudice to VIAA's right to terminate his employment for cause pursuant to Section 9.2.2.3, Section 9.2.2.8 or any other provision of the Employment Agreement), instead placing him on a 30-day unpaid leave of absence to allow him that time to become vaccinated in compliance with DH policy.

Finally, because Dr. Auteri is not currently a member in good standing of the Active Medical Staff of Doylestown Hospital and is not conducting his medical practice in conformity with all policies, rules and regulations of VIAA and Doylestown Hospital (specifically, the COVID-19 vaccination requirement), he is in breach of Sections 2.1.8 and 2.1.9 of the Employment Agreement, and having been provided written notice of same by letters dated October 11 and October 13, 2021, VIAA may terminate his employment for cause at the conclusion of the applicable 30-day notice periods pursuant to Section 9.2.2.9 of the Employment Agreement.

## IV. Dr. Auteri's Communications with Third Parties Regarding His Employment Status

Your Letter contends that Ms. Hebel's statements in her October 13 letter that Dr. Auteri of has told third parties that his employment was terminated are "false statements" that are "without basis in fact." In support for this contention, you enclose a copy of an October 16 text message sent by Dr. Auteri only *after* he received Ms. Hebel's letter.

However, Dr. Auteri himself told patients that he was being terminated from DH, as evidenced by his notes in patient medical records. By way of example only, Dr. Auteri wrote in two separate patients' medical records on October 11, 2021:

> F/u appt will be in 2 weeks upon discharge, and will be with Dr. Thomas as I am scheduled to be terminated from employment today at 5pm. Explained this to patient.
>
> *and*
>
> I had a long discussion with the patient and his wife last evening. Explained that care will be assumed by my colleague Dr. Thomas as my employment here at DH is scheduled to be terminated at 5pm today. Pt and wife understood.

DuaneMorris

Kimberly L. Russell, Esquire
November 9, 2021
Page 7

*Please promptly confirm in writing whether Dr. Auteri (a) did in fact tell patients that DH was terminating his employment, or (b) falsified patient medical records.*

As communicated in Ms. Hebel's October 13 letter, while Dr. Auteri is free to share his employment status with others[9], knowingly making false statements to third parties with whom DH has a business relationship potentially has the effect of interfering with DH's business relationships with those third parties. Again, DH expects, moving forward, that Dr. Auteri will communicate truthfully about the status of his employment. DH expressly reserves and does not waive its right to take legal action, including asserting claims of tortious interference, against Dr. Auteri based on his false statements to third parties regarding his employment status with DH.

## V.    DH Has Not "Slandered" Dr. Auteri

Contrary to the assertion in your Letter, DH has not instructed staff in Dr. Auteri's office to advise patients that Dr. Auteri is on a "personal leave of absence." And even if it had, stating that Dr. Auteri is on a "personal leave of absence" would not constitute slander. Dr. Auteri is, in fact, on a leave of absence for personal reasons, *i.e.*, because he told DH that he would not receive a COVID-19 vaccine. Nonetheless, DH has reminded staff that they are not to disclose the reason for or nature of Dr. Auteri's absence.

Please let us know at your earliest convenience if Dr. Auteri would prefer that DH inform patients, colleagues and others who may inquire that he is on a leave of absence because he communicated to DH that he would not receive a COVID-19 vaccine.

## VI.    DH Has Not Unlawfully Retaliated Against Dr. Auteri

Your Letter asserts that DH has retaliated against Dr. Auteri following an alleged report of harassment and a hostile work environment though, tellingly, you do not articulate the statutory basis for this allegation. There is no factual or legal basis for this claim.

The alleged "report of harassment and a hostile work environment" on which Dr. Auteri predicates his retaliation allegation is an email that Dr. Auteri sent to Dr. Levy on September 10, 2021, which you assert Ms. Hebel was copied on. As you did not attach this email to your Letter, I have done so here for ease of reference and in case you have not actually seen the email, as the unprotected nature of the email is self-evident. Dr. Auteri's September 10 email does not

---

[9] Your letter contends that "Dr. Auteri is permitted to communicate with employees and third parties about the terms and conditions of his employment and such communications are protected as a matter of law under the National Labor Relations Act." However, as a reminder, Dr. Auteri is a supervisor and thus not an "employee" entitled to the protections of the National Labor Relations Act ("NLRA"). *See* 29 U.S.C. § 152(3). There are some issues on which reasonable minds can differ. But, there is no question that the Medical Director of the Heart Institute and the Chief of Cardiovascular Surgery is not an employee covered by the NLRA.

DuaneMorris

Kimberly L. Russell, Esquire
November 9, 2021
Page 8

reference harassment or a hostile work environment, does not state that Dr. Auteri is being
subjected to unlawful treatment on the basis of protected group membership, and does not
request that Ms. Hebel or DH investigate Dr. Levy's conduct. Rather, Dr. Auteri's email is little
more than a personal objection to the way in which he contends that a fellow physician discussed
COVID-19 vaccination with him, communicated directly to that physician as well as two
hospital executives (including Ms. Hebel). This email does not constitute legally protected
activity and DH did not have a legal obligation to initiate an investigation into one doctor's
personal objection to the way in which another doctor spoke to him.

Your Letter alleges that following this report, DH "retaliated against Dr. Auteri by
summarily denying Dr. Auteri's exemption requests, failing to grant Dr. Auteri a reasonable
accommodation and without engaging in the interactive process as required by law, and
suspending Dr. Auteri in breach of Dr. Auteri's Employment Agreement and violation of Dr.
Auteri's civil rights." Even if Dr. Auteri's September 10 email was legally protected activity
(which it is not), DH treated Dr. Auteri the same as every other employee who requested an
exemption from the COVID-19 vaccine for a medical or religious reason. Dr. Auteri works in a
service line identified by the Committee as having vulnerable patients who are at higher risk of
complications if they contract COVID-19. Because of the highly specialized nature of his
practice, there was no position outside of cardo-vascular surgery into which Dr. Auteri could be
transferred. As a result, Dr. Auteri was placed on an unpaid leave of absence.

Your Letter also claims that Dr. Auteri submitted a letter to Ms. Hebel on October 16,
2021 documenting alleged harassment and retaliation. As an initial matter, even if such a letter
was submitted as you allege, Dr. Auteri was placed on a leave of absence *five days prior* to the
date of the letter, and as such there can be no causal connection between the letter and any
alleged adverse action. Furthermore, DH did not receive any such letter until you emailed to me
on October 27, 2021, at my request, an unsigned letter from Dr. Auteri to Ms. Hebel. I have
asked you repeatedly to tell me how the unsigned letter allegedly was sent to Ms. Hebel and the
date on which it was sent, and you have refused to provide this information, stating only that Dr.
Auteri does not have evidence of how and when it was sent and received. If you are unable to
provide this information, please have Dr. Auteri submit a sworn affidavit attesting to how and
when he sent the unsigned letter dated October 16.

Regardless, now that DH is in receipt of Dr. Auteri's unsigned letter dated October 16, it
has engaged a third-party investigator to investigate Dr. Auteri's allegations set forth in the
unsigned letter.

**VII.    Dr. Auteri's Obligation to Preserve Relevant Documents and Information**

DH has taken steps to preserve potentially relevant documents and information relating to
Dr. Auteri's allegations. We trust that Dr. Auteri likewise has preserved and will continue to
preserve all documents and information potentially relevant to the allegations set forth in the
Letter. For the avoidance of doubt, Dr. Auteri hereby is directed to preserve and not modify or

DuaneMorris

Kimberly L. Russell, Esquire
November 9, 2021
Page 9

destroy any and all communications and documents relating to the allegations in the Letter and
Dr. Auteri's request for an exemption from DH's COVID-19 vaccination policy including, but
not limited to, text messages, emails, letters, handwritten notes, phone messages, voicemails,
communications on social media such as Facebook or Twitter, records of internet activity and
website access, etc.

\*    \*    \*    \*    \*    \*    \*    \*

Please contact me if you have any questions or would like to discuss this matter further.

Very truly yours,

Christopher D. Durham

CDD
Attachment

cc: Elisabeth Bassani, Esq.

EXHIBIT "8"

 **Doylestown Health**

Doylestown Hospital

November 11, 2021

CERTIFIED MAIL: RETURN RECEIPT REQUESTED

Joseph F. Auteri, M.D.
3007 Holicong Road
Doylestown, PA 18902

RE: Termination of Doylestown Hospital Medical staff membership and privileges.

Dear Dr. Auteri:

By letter dated October 11, 2021, Dr. Brenda Foley, President of the Doylestown Hospital Medical Staff ("Medical Staff"), notified you that you were being placed on a 30 day precautionary suspension from the Medical Staff for failure to obtain a COVID-19 vaccination. In that letter, Dr. Foley stated:

"[i]f you do not send Doylestown Hospital proof of your receipt of a COVID-19 vaccination by Wednesday, November 10th, before 5:00 p.m., the Medical Staff will accept that you have voluntarily resigned your privileges and Medical Staff membership at Doylestown Hospital, effective November 10th, 2021."

Doylestown Hospital received no notice that you were vaccinated for COVID-19 as of 5:00 pm on November 10th, 2021. Consequently, the Medical Staff recognizes that you have chosen to voluntarily resign from your Medical Staff membership and your privileges. Your action will be reported to the Board of Trustees of the Hospital at its meeting on November 18, 2021.

Please note that your voluntary resignation does not require the Medical Staff or the Hospital to make a report to the National Practitioner Data Bank.

Yours sincerely,

Elinor Pernitsky
Director, Medical Staff Services

Cc:    James L. Brexler, FACHE, President and Chief Executive Officer
       Scott Levy, M.D., Vice President and CMO
       John B. Reiss, Ph.D., J.D., Vice President, General Counsel, Chief Compliance Officer
       Brenda Foley, M.D., President, Doylestown Hospital Medical Staff
       ✓Kimberly L. Russell, Esq., Kaplin Stewart

EXHIBIT "9"

**Doylestown Health**

Doylestown Hospital

VIA Affiliates d/b/a
Doylestown Health Physicians

John B. Reiss, Ph.D., J.D.
Vice President, General Counsel
Chief Compliance Officer

November 18, 2021

**CERTIFIED MAIL: RETURN RECEIPT REQUESTED**

Joseph F. Auteri, M.D.
3007 Holicong Road
Doylestown, PA 18902

   RE: Termination of 4/13/2012 Employment Agreement, as amended ("Agreement")

Dear Dr. Auteri:

  By letter dated October 11, 2021, Dr. Brenda Foley, President of the Doylestown Hospital Medical Staff ("Medical Staff"), notified you that you were being placed on a 30 day precautionary suspension from the Medical Staff for failure to obtain a Covid 19 vaccination. In that letter, Dr. Foley stated:

   "[i]f you do not send Doylestown Hospital proof of your receipt of a COVID vaccination by Wednesday, November 10th, before 5:00 p.m., the Medical Staff will accept that you have voluntarily resigned your privileges and Medical Staff membership at Doylestown Hospital, effective November 10th, 2021."

  Doylestown Hospital received no notice that you were vaccinated for COVID as of 5:00 pm on November 10th, 2021. Accordingly, by letter dated November 11, 2021, Doylestown Hospital Medical Staff informed you that the Medical Staff recognized that you had chosen to voluntarily resign from your Medical Staff membership and your privileges, and that your action would be reported to the Board of Trustees of the Hospital at its meeting on November 18, 2021.

  At the Doylestown Hospital Board of Trustees meeting on November 18, 2021, the Board of Trustees accepted the report of the President of the Medical Staff that you resigned from your Medical Staff membership and your surgical privileges, which provides grounds for immediate termination of the Agreement and your employment for cause pursuant to Section 9.2.2.3 of the Agreement.

  Furthermore, you breached Sections 2.1.8 and 2.1.9 of the Agreement by not remaining a member in good standing of the Medical Staff and not conducting your medical practice in conformity with all policies, rules and regulations of VIA Affiliates d/b/a Doylestown Health Physicians ("VIAA") and Doylestown Hospital (specifically, the COVID-19 vaccination requirement). You were provided notice of these breaches more than 30 days ago, and you have not cured such breaches as of the date of this letter. Accordingly, in addition to termination for cause pursuant to Section 9.2.2.3 of the Agreement, cause exists for termination of the Agreement and your employment pursuant to Section 9.2.2.9 of the Agreement.

Joseph F. Auteri, M.D.
November 18, 2021
Page 2

Consequently, on behalf of VIA Affiliates d/b/a Doylestown Health Physicians, I am notifying you that your Employment Agreement, and your employment, are terminated for cause, effective immediately.

Please note that neither of these reasons for termination require the Hospital to make a report to the National Practitioner Data Bank.

Yours sincerely,

John B. Reiss, Ph.D., J.D.
Vice President, General Counsel, Chief Compliance Officer

cc:     James L. Brexler, FACHE, President and Chief Executive Officer
        Scott Levy, M.D., Vice President and CMO
        Barbara Hebel, Vice President and Chief Human Resources Officer
        Brenda Foley, M.D., President, Doylestown Hospital Medical Staff
        Kimberly L. Russell, Esq., Kaplin Stewart: certified mail, RRR