## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOSEPH S. AUTERI, M.D.** | : | |
| Plaintiff, | : | No. 22-cv-03384 |
| | : | |
| v. | : | |
| | : | |
| **VIA AFFILIATES, d/b/a** | : | JURY TRIAL DEMANDED |
| **DOYLESTOWN HEALTH** | : | |
| **PHYSICIANS** | : | |
| Defendant. | : | |

### SECOND AMENDED COMPLAINT

Plaintiff Joseph S. Auteri, M.D. (**"Dr. Auteri"**), by and through his undersigned counsel, brings this Second Amended Complaint against Doylestown Health VIA Affiliates, d/b/a Doylestown Health Physicians (**"Doylestown Health"**) pursuant to this Court's Order dated August 8, 2024, and in support thereof avers as follows:

### PREFACE

The instant action stems from Doylestown Health's failure to grant Dr. Auteri's requests for a religious exemption from Doylestown Health's COVID-19 vaccine mandate, including Doylestown Health's failure to engage in the interactive process to discuss Dr. Auteri's proposed reasonable accommodation, failure to grant Dr. Auteri's accommodation request, Doylestown Health's creation of a hostile work environment, and Doylestown Health's retaliation against Dr. Auteri, culminating in Doylestown Health's termination of Dr. Auteri's employment and breach of Dr. Auteri's employment agreement, all of which has resulted in grievous and substantial harm to Dr. Auteri. After terminating Dr. Auteri's employment without any effort to engage in the interactive process to accommodate Dr. Auteri's exemption request, Doylestown Health began engaging in the same COVID-19 testing process which Dr. Auteri sought as a reasonable accommodation and required employees to work when infected with COVID-19, yet Doylestown

Health refused to reinstate Dr. Auteri, demonstrating Doylestown Health's intentional discrimination against Dr. Auteri. As set forth in detail below, Doylestown Health engaged in systemic and purposeful discrimination against Dr. Auteri on the basis of Dr. Auteri's religious affiliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. (**"Title VII"**) and the Pennsylvania Human Relations Act, 43 P.S. § 951, et seq. (**"PHRA"**). Doylestown Health's intentionally discriminatory and harassing conduct must be eradicated and Doylestown Health must be made to remedy all such discrimination conduct in full.

## PARTIES

1.      Dr. Auteri is an adult individual who at all times relevant hereto was a resident of the Commonwealth of Pennsylvania. Dr. Auteri currently is a resident of the State of Illinois.

2.      Doylestown Health is Pennsylvania nonprofit corporation existing under the laws of Pennsylvania.

3.      At all times material hereto, Doylestown Health was headquartered at 595 West State Street, Doylestown, PA  18901.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because the action arises under the laws of the United States and seeks redress under federal laws. This Court has supplemental jurisdiction over Dr. Auteri's state law claims because those claims arise out of the same common nucleus of operative facts as Dr. Auteri's federal claims asserted herein.

5.      The exact number of Doylestown Health employees is unknown but upon information and belief, there are thousands of Doylestown Health employees.

6.      At all times material hereto, Dr. Auteri performed the duties of his employment with Doylestown Health in Bucks County, Pennsylvania.

7.      This Court has personal jurisdiction over Doylestown Health because at all times material hereto, Doylestown Health operated its business in the Commonwealth of Pennsylvania and within the judicial district of the United States District Court for the Eastern District of Pennsylvania.

8.      Venue is proper in this Court because all of the acts and/or omissions giving rise to the claims set forth herein occurred in the judicial district of the United States District Court for the Eastern District of Pennsylvania.

9.      Dr. Auteri exhausted his administrative remedies as the EEOC issued to Dr. Auteri a Notice of Dr. Auteri's Right to Sue on August 17, 2022.

## FACTUAL BACKGROUND

10.     Dr. Auteri is a cardiac surgeon licensed to practice medicine in the Commonwealth of Pennsylvania and until his wrongful termination was the Chief of Cardiovascular Surgery at Doylestown Health and the Medical Director of the Doylestown Heart Institute.

11.     Dr. Auteri had been on staff at Doylestown Health since May 2007 and in the process thereof built the cardiac program into one of the top cardiac programs in the Commonwealth.  Dr. Auteri led the fundraising and logistical efforts to build and create state of the art cardiac facilities at Doylestown Hospital, for which Doylestown Health provides staffing.

12.     Dr. Auteri is considered a leader and expert in his field and was singlehandedly responsible for the prominence enjoyed by the cardiac program at Doylestown Health at the time of Dr. Auteri's termination.

13.     Doylestown Health employed Dr. Auteri pursuant to an Employment Agreement effective April 1, 2012, which Employment Agreement was extended and amended during Dr. Auteri's employment. A true and correct copy of the pertinent portions of the Employment Agreement is attached hereto as **Exhibit "1."**

14.     In recognition of Dr. Auteri's talents and work on behalf of Doylestown Health, on or about December 17, 2019, Doylestown Health and Dr. Auteri executed an "Amendment of Employment Agreement Between VIA Affiliates, Inc. and Joseph S. Auteri, M.D.," pursuant to which Doylestown Health extended the term of Dr. Auteri's employment through December 31, 2024, with an automatic two year renewal (as amended, the **"Employment Agreement"**).  A true and correct copy of the pertinent portions of the Employment Agreement as amended is attached hereto as **Exhibit "2."**

15.     Pursuant to the Employment Agreement, Dr. Auteri was required to maintain privileges at Doylestown Hospital, but those privileges could be revoked directly or indirectly by Doylestown Health.

16.     If Dr. Auteri's privileges at Doylestown Hospital were revoked, Doylestown Health then would be able to terminate the Employment Agreement.

17.     As set forth below, Doylestown Health used its influence to revoke Dr. Auteri's privileges at Doylestown Hospital to perpetrate Doylestown Health's discrimination and retaliation against Dr. Auteri and ultimately terminate Dr. Auteri.

18.     As set forth below, Doylestown Health's representatives, including Scott Levy, M.D., the Chief Medical Officer of Doylestown Health, engaged in a pattern of harassing conduct which resulted in a hostile work environment and the total disregard of Dr. Auteri's civil rights.

19.    Dr. Auteri performed services according to the terms of the Employment Agreement throughout the entirety of the COVID-19 pandemic.

20.    During the COVID-19 pandemic, Doylestown Health implemented a health screening program, including daily temperature checks and health questions, to screen its employees for COVID-19.

21.    Dr. Auteri participated in that screening program.

22.    Dr. Auteri continued to treat patients throughout the COVID-19 pandemic regardless of the patients' COVID-19 status, and whether or not Dr. Auteri was aware of the patients' COVID-19 status.

23.    Dr. Auteri contracted COVID-19 in May 2021 while in the course of treating patients and followed the isolation requirements of Doylestown Health before returning to work.

**Doylestown Health Imposes a COVID-19 Vaccine Mandate and Harasses Dr. Auteri Over His Study of Vaccine Effectiveness and Health Impacts**

24.    In early 2021, the COVID-19 "vaccines" became available and ultimately were made available for administration to Doylestown Health employees.

25.    After the vaccines became widely available in the summer of 2021, Doylestown Health began to consider the imposition of a COVID-19 vaccine mandate.

26.    As a member of Doylestown Health's Medical Executive Committee and as a licensed physician who studied health data as part of his daily duties at Doylestown Health, Dr. Auteri studied the data regarding the efficacy of the COVID-19 vaccines and the side effects thereof, as well as statistics surrounding the duration and efficacy of those who had natural immunity from a prior COVID-19 infection.

27.     By January 2021, a leading immunologist (who supported COVID-19 vaccination) warned lead Food and Drug Administration (**"FDA"**) regulators about the potential danger from COVID-19 vaccination to the health of persons with SARS-CoV-2 antigens in their system due in part to the antigen specific immune response triggered by the vaccine and the vaccine's targeting of tissues which were damaged from prior or current COVID-19 infection, and urged the FDA to delay COVID-19 vaccination in those with SARS-CoV-2 antigens by using antibody screening.

28.     On July 30, 2021, the Director of the Centers for Disease Control (**"CDC"**) admitted in an official statement that persons vaccinated for COVID-19 could transmit the virus and had viral loads similar to those of unvaccinated persons. www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html.

29.     By August of 2021, the CDC published data on its website showing that the COVID-19 viral load was essentially the same in the vaccinated and unvaccinated, and the CDC Director admitted that both vaccinated and unvaccinated persons could transmit the COVID-19 virus.          https://www.cdc.gov/library/covid19/08132021_covidupdate.html          and https://www.cdc.gov/library/covid19/08132021_covidupdate.html .

30.     After studying that data, Dr. Auteri voiced his clinical concerns to the Medical Executive Committee about the imposition of a COVID-19 vaccine mandate and instead supported voluntary vaccination and enhanced safety precautions for all employees as Doylestown Health had done throughout the pandemic.

31.     Dr. Auteri expressed concern that the COVID-19 vaccines were not preventing individuals from becoming infected and transmitting the virus.

32.     After studying available data, Dr. Auteri was concerned about the effect of the COVID-19 vaccine on those who had recovered from a prior infection.

33.     After studying available data, including the CDC's own data and admissions, Dr. Auteri was concerned that the COVID-19 vaccines were not protecting patients and staff from transmitting the virus, and that Doylestown Health should consider safety measures other than a COVID-19 vaccine mandate.

34.     Dr. Auteri also expressed concern that there was insufficient data to ensure that the vaccines were safe for administration to a broad group of people as part of a mandate.

35.     After Dr. Auteri voiced his concerns about the vaccines following his study of the COVID-19 vaccines, representatives of Doylestown Health, including Dr. Levy, refused to engage in any scientific study of available data and discussion of vaccines, and refused to have any professional, non-hostile discussion with Dr. Auteri regarding the COVID-19 vaccines.

36.     After Dr. Auteri voiced his concerns about the vaccines following his study of the COVID-19 vaccines, Dr. Levy began to harass Dr. Auteri about the vaccines and Dr. Auteri's continued efforts to study the vaccines as a clinician and to protect the health of Doylestown Heath's employees and patients.

37.     On multiple occasions, Dr. Levy screamed at Dr. Auteri in front of staff members and refused to review data with Dr. Auteri in order to evaluate Doylestown Hospital's policies related to a possible COVID-19 vaccine mandate.

38.     Despite Dr. Auteri's concerns, Doylestown Health, through the Medical Executive Committee, decided to impose a COVID-19 vaccine mandate on all Doylestown Health employees (the **"Mandate"**)[1].

39.     In imposing the Mandate, Doylestown Health set an artificial deadline of September 10, 2021 for employees to seek an exemption to the Mandate on the basis of a medical condition or religious affiliation, ahead of an October 11, 2021 vaccination deadline.

40.     Dr. Auteri did not submit a request for an exemption from the Mandate by the September 10, 2021 artificial deadline, nor did Doylestown Health have any legal authority to set a deadline after which employees could no longer seek exemptions from a workplace requirement or rule.

41.     Dr. Auteri continued to research the vaccines, the effects of the vaccine on those who already recovered from the virus, and the effect of the mRNA vaccines on the systems of the body.

**Dr. Auteri Is Harassed Over COVID-19 Shots and Submits Exemption Requests**

42.     Dr. Auteri is a follower of Christ and is known to Doylestown Health to be a man of faith.

43.     Prior to joining Doylestown Health in 2007, Dr. Auteri told Doylestown Health that he would have to pray on the decision of whether to accept the employment offer from Doylestown Health.

---

[1] Ultimately, the Centers for Medicare and Medicaid Services imposed a COVID-19 vaccine mandate for all healthcare providers receiving Medicare/Medicaid funds (the **"CMS Mandate"**), which included Doylestown Health and Doylestown Hospital.  The CMS Mandate required the provision of religious and medical exemptions such as those Dr. Auteri sought.  The CMS Mandate does not alter Doylestown Health's obligations as set forth herein.

44.    Dr. Auteri has expressed his sincerely held religious beliefs to others at Doylestown Health and led a former colleague to Christ.

45.    As the deadline for the Mandate loomed closer, Dr. Auteri expressed his concerns about the workings of the vaccine, particularly the research showing that the vaccines caused harm to the immune systems of those who had recovered from the virus, and the manner in which the vaccines impact the overall functioning of the human body as designed by God.

46.    Doylestown Health, including through its Chief Medical Officer Dr. Levy, began to harass and intimidate Dr. Auteri as Dr. Auteri continued to express his concerns.

47.    Doylestown Health requested multiple large donors to the hospital, including donors to the cardiac program which Dr. Auteri was continuing to build, to meet with Dr. Auteri in an effort to "persuade" Dr. Auteri to comply with the Mandate.

48.    Dr. Auteri continued to express his concerns about the effect of the vaccine on Dr. Auteri's medical condition (i.e. his altered and impaired immune system after contracting COVID-19) and the functioning of his body as designed by God.

49.    As Dr. Auteri continued to express his concerns about the effects of the vaccine, Doylestown Health acknowledged Dr. Auteri's research indicating that the vaccine could severely impact Dr. Auteri's medical condition and Dr. Levy offered to have Doylestown Health make certain payments to Dr. Auteri if Dr. Auteri complied with the Mandate and suffered an adverse condition which impacted Dr. Auteri's ability to perform surgery.

50.    Dr. Auteri's desire was to continue to perform surgery using his gifts from God, and not to get a payoff in the event that the vaccine harmed Dr. Auteri.

51.    Prior to the Mandate vaccination deadline, the CDC acknowledged following April 2021 reports that there was a connection between the COVID-19 vaccines and a cardiac condition known as myocarditis, which involves the killing of heart cells, particularly in adolescent and young males, after the administration of the second dose of the Pfizer and Moderna COVID-19 vaccines. See https://www.cdc.gov/vaccines/covid-19/clinical-considerations/myocarditis.html.

52.    Multiple peer reviewed studies published before the Mandate vaccination deadline also demonstrated the link between the COVID-19 vaccines and myocarditis.

53.    Dr. Auteri was aware of the link between the COVID-19 vaccines and myocarditis and was attempting to study how such a link would impact Dr. Auteri's cardiac patients and the population generally.

54.    At a Medical Executive Committee meeting at which Dr. Auteri again raised his concerns about the medical effects of the vaccines based upon the data he compiled, Dr. Levy became agitated at Dr. Auteri and in a very heated and angry tone told Dr. Auteri in front of their peers that Dr. Levy did not dispute Dr. Auteri's research but disagreed that the data compiled was a "fact" and belittled Dr. Auteri's concerns.

55.    Dr. Auteri sent an email dated September 10, 2021 to Dr. Levy and multiple other hospital officials, including Human Resources Officer Barbara Hebel, about Dr. Levy's improper behavior, but no one on behalf of Doylestown Hospital contacted Dr. Auteri to investigate and address timely Dr. Levy's conduct toward Dr. Auteri and prevent further harassment, discrimination, and retaliation against Dr. Auteri.

56.    As a result of Dr. Auteri's expression of his legitimate, well researched, and sincerely held concerns about the medical effects of the vaccine on his own medical condition and

Dr. Auteri's sincerely held religious beliefs about the vaccine's effects upon the functioning of Dr. Auteri's body as designed by God, Dr. Levy as the Chief Medical Officer of Doylestown Health engaged in a pattern of abusive behavior, discrimination, and harassment of Dr. Auteri and after Dr. Auteri reported that behavior, Doylestown Health did nothing to stop Dr. Levy's behavior.

57.     Doylestown Health and its representatives created, promoted, and forced Dr. Auteri to work in a hostile work environment and did nothing to remedy that environment when Dr. Auteri protested his work conditions.

58.     On October 11, 2021, Dr. Auteri submitted two written requests for an exemption from the Mandate, one on the basis of a medical exemption and one on the basis of a religious exemption (the **"Exemption Requests"**).  True and correct copies of the Exemption Requests are attached hereto as **Exhibit "3."**

59.     The Exemption Requests memorialized in writing the verbal exemption requests which Dr. Auteri had made as set forth above when Dr. Auteri expressed his sincerely held concerns and beliefs related to the Mandate.

60.     In the Exemption Requests, Dr. Auteri submitted again the medical and religious reasons for seeking the exemptions.

61.     Both before and after Dr. Auteri submitted the Exemption Requests, Doylestown Health through Dr. Levy engaged in additional harassment and egregious behavior in retaliation for Dr. Auteri's protected activity of seeking lawful exemptions to the Mandate and reasonable accommodations.

62.     On October 10, 2021, the day before the Mandate was to take effect, Dr. Levy texted and emailed Dr. Auteri while Dr. Auteri was in Church and asked that they meet.  Dr. Auteri

replied that because of Dr. Levy's prior hostility to Dr. Auteri when discussing the Mandate, Dr. Auteri was not sure that they should meet. Ultimately, Dr. Auteri agreed to meet with Dr. Levy in a public restaurant in Doylestown in order to hopefully keep Dr. Levy from becoming abusive and threatening.

63.      During the October 10, 2021 meeting, Dr. Levy again demanded that Dr. Auteri comply with the Mandate and told Dr. Auteri that if Dr. Auteri did not get the vaccine by 4:59 p.m. the next day, Dr. Auteri would be terminated at 5:00 p.m.

64.      Dr. Levy told Dr. Auteri that the Medical Executive Committee would remove Dr. Auteri from Doylestown Health's medical staff at 5:00 p.m., Dr. Auteri would be deemed to have breached the Employment Agreement, and Dr. Auteri would be terminated immediately, and without the 30 day cure period mandated by the Employment Agreement.

65.      Dr. Levy did not discuss Dr. Auteri's prior verbal requests for exemption from the Mandate due to Dr. Auteri's religion and the effects of the COVID-19 shot on Dr. Auteri's medical condition; to the contrary, Dr. Levy threatened Dr. Auteri with immediate termination without any regard for Dr. Auteri's protected rights.

66.      After threatening Dr. Auteri, Dr. Levy then engaged in further harassing, berating conduct by telling Dr. Auteri that if Dr. Auteri did not comply with the Mandate, Dr. Auteri's legacy would be that of a "loser."

67.      Dr. Levy analogized Dr. Auteri's invocation of Dr. Auteri's legally protected rights to that of a Major League Baseball player who committed an error in the World Series (Bill Buckner) and said that if Dr. Auteri did not comply with the Mandate, Dr. Auteri would be "forever a loser" and would never get a job as a cardiac surgeon in the United States ever again.

68.     Dr. Levy then violated the protected HIPAA rights of other Doylestown Health employees and told Dr. Auteri that Dr. Auteri was one of four Doylestown Health physicians who refused to comply with the Mandate, and Dr. Levy listed the other three physicians by name.

69.     Dr. Levy then defamed those three physicians by stating that in refusing the Mandate like those physicians, Dr. Auteri "was not in very good company."

70.     Dr. Levy's conduct is a quintessential example of the threats, harassment, discrimination, and retaliation which Title VII and the PHRA are meant to prevent and eliminate.

71.     Dr. Levy's conduct was outrageous, unlawful, and meant to threaten Dr. Auteri into abandoning Dr. Auteri's legal rights in order to meet Doylestown Health's improper demand that Dr. Auteri comply with the Mandate without seeking an exemption.

**Doylestown Health Retaliates Against Dr. Auteri for Seeking Exemptions to the Mandate and Fails to Participate in the Interactive Process After Dr. Auteri Sought an Accommodation**

72.     The day after Dr. Auteri refused to submit to Dr. Levy's demands, harassment, and condescending behavior, Doylestown Health retaliated against Dr. Auteri.

73.     On October 11, 2021, the same day that Dr. Auteri submitted the Exemption Requests, Doylestown Health suspended Dr. Auteri for 30 days because Dr. Auteri had not submitted proof that Dr. Auteri had complied with the Mandate (the **"Suspension Letter"**). A true and correct copy of the Suspension Letter is attached hereto as **Exhibit "4."**

74.     Doylestown Health did nothing to investigate Dr. Levy's conduct prior to Dr. Auteri's suspension, failed to investigate Dr. Auteri's prior report of Dr. Levy's harassing behavior, and instead aided and abetted Dr. Levy's violation of Dr. Auteri's civil rights and retaliation by suspending Dr. Auteri.

75.    In the Suspension Letter, Doylestown Health did not address at all Dr. Auteri's Exemption Requests and did not engage in the interactive process to determine whether any reasonable accommodation could be reached in response to the Exemption Requests.

76.    In the Suspension Letter, Doylestown Health suspended Dr. Auteri without pay and told Dr. Auteri that if he did not submit proof of compliance with the Mandate in thirty days, Dr. Auteri would be terminated.

77.    After Doylestown Health received Dr. Auteri's Exemption Requests, rather than comply with the law and protect Dr. Auteri's rights by properly evaluating those Requests and engaging in the interactive process of discussing a reasonable accommodation, Doylestown Health summarily suspended Dr. Auteri without pay, threatened Dr. Auteri with termination, and simply told Dr. Auteri to comply with the Mandate without further discussion.

78.    Two days after summarily suspending Dr. Auteri, on October 13, 2021, Doylestown Health denied both Exemption Requests (the **"Exemption Denial"**) without engaging in the interactive process and without requesting that Dr. Auteri meet or otherwise discuss with Doylestown Health how Doylestown Health could accommodate Dr. Auteri's Exemption Requests. A true and correct copy of the Exemption Denial is attached hereto as **Exhibit "5."**

79.    In an October 13, 2021 letter authored by Ms. Hebel, the Human Resources official who failed to investigate timely Dr. Levy's improper conduct against Dr. Auteri, Ms. Hebel denied the Exemption Requests because (1) the Requests were "untimely" pursuant to Doylestown Health's unlawful artificial exemption request deadline, (2) Doylestown Hospital substituted its own judgment on the effect of the vaccine upon those who had a prior COVID-19 infection and refused to consider the altered and impaired state of Dr. Auteri's immune system on the propriety of vaccination, and (3) even if Doylestown Health would grant Dr. Auteri "special treatment" and

grant a religious exemption, there is no accommodation available because any accommodation would be an "undue burden" without having literally ANY discussion with Dr. Auteri about possible accommodations.

80.     The Exemption Denial is absolutely unlawful, as the law does not permit an employer to impose any deadline on a request for accommodation; to the contrary, an employee is permitted to request an accommodation when the need for one becomes apparent to either the employee or the employer.

81.     The Exemption Denial is absolutely unlawful in considering a religious exemption to be "special treatment"; to the contrary, the granting of exemptions and reasonable accommodations due to sincerely held religious beliefs is a legal right of employees and obligation of employers protected under Title VII and the PHRA.

82.     Doylestown Health's denial of the Exemption Requests and complete and total failure to engage in the interactive process with Dr. Auteri regarding possible reasonable accommodations is a violation of Dr. Auteri's rights protected under Title VII and the PHRA.

83.     Doylestown Health's attempts to pressure and harass Dr. Auteri into complying with the Mandate, despite Dr. Auteri's sincerely held religious beliefs, Dr. Auteri's concern about the alteration of his immune system by his prior COVID-19 infection, and Dr. Auteri's sincerely held religious beliefs about the vaccine's effects upon the functioning of Dr. Auteri's body as designed by God, created a hostile work environment in which Doylestown Health representatives repeatedly harassed and discriminated against Dr. Auteri.

**Dr. Auteri Reinstates His Exemption Requests and Proposes Reasonable Accommodations
Which are More Protective than Doylestown Health Procedures, But Doylestown Health
Will Not Engage in the Interactive Process**

84.    In an effort to engage in the interactive process with Doylestown Health, following the Exemption Denial, Dr. Auteri submitted another Exemption Request and also proposed a reasonable accommodation to address the alleged health and safety concerns which Doylestown Health used to deny the Exemption Requests without engaging in the interactive process required by law.

85.    By letter dated October 22, 2021, Dr. Auteri through his legal counsel submitted to Doylestown Health another request for a medical exemption, repeated the request for a religious accommodation, and proposed specific reasonable accommodations (the **"Second Exemption Request"**).  A true and correct copy of the Second Exemption Request without enclosures are attached hereto as **Exhibit "6."**

86.    With the Second Exemption Request, Dr. Auteri again requested an exemption and request for religious accommodation based upon Dr. Auteri's sincerely held religious beliefs and Dr. Auteri's sincerely held religious beliefs about the vaccine's effects upon the functioning of Dr. Auteri's body as designed by God,

87.    In the Second Exemption Request, Dr. Auteri proposed as a reasonable accommodation that Dr. Auteri be tested weekly for COVID-19 and submit to daily health screenings to ensure that Dr. Auteri did not have COVID-19 and did not pose a risk to patient safety.

88.    Dr. Auteri's proposed reasonable accommodation was "reasonable" and did not pose a risk to patient safety because under Dr. Auteri's protocol, Doylestown Health would have actual knowledge that Dr. Auteri did not have COVID-19 while Dr. Auteri was treating patients.

89.     Dr. Auteri's proposed accommodation was reasonable because prior to the Mandate and in an email dated January 8, 2021, Doylestown Health official Dr. Levy instructed staff to treat patients who had already been infected with COVID-19 as being "immunized" and not in need of testing, in recognition of the natural immunity resulting from COVID-19 infection in persons such as Dr. Auteri.

90.     Dr. Auteri's proposed accommodation was reasonable because prior to the Mandate deadline, Doylestown Health official Dr. Levy admitted in a publicly available email to the Bucks County Health Director, as the CDC also had admitted, that persons vaccinated against COVID-19 could catch AND TRANSMIT COVID-19.

91.     Dr. Auteri's proposed accommodation was reasonable because although Doylestown Health's stated purpose of the Mandate was to protect patients and employees from catching the virus, the CDC and Doylestown Health official Dr. Levy admitted that the COVID-19 vaccines did not stop transmission of the virus, and Dr. Auteri's accommodation would provide Doylestown Health and its patients with actual knowledge that Dr. Auteri was not infected.

92.     Prior to the meeting at a Doylestown restaurant at which Dr. Levy retaliated against Dr. Auteri, told Dr. Auteri that Dr. Auteri would be known as a "loser," and threatened Dr. Auteri's immediate termination, Dr. Levy told Dr. Auteri that Dr. Levy caught COVID-19 despite being vaccinated against COVID-19 ("twice plus a booster" according to Dr. Levy).

93.     At the time of the Mandate, Doylestown Health was not performing regular testing of vaccinated employees, leaving patients exposed to COVID-19 from staff who were vaccinated yet infected and spreading the disease.

94.     Prior to the Mandate, Doylestown Health had been permitting Dr. Auteri to treat patients provided that Dr. Auteri submit to daily health screenings.

95.     Under Dr. Auteri's proposed reasonable accommodation, Dr. Auteri would be tested and screened on a regular basis to ensure that Dr. Auteri did not have COVID-19, whereas "vaccinated" employees could be catching and transmitting COVID-19 to patients but those employees would not be tested regularly.

96.     The reasonable accommodation which Dr. Auteri proposed maintained a higher level of patient safety than that which Doylestown Health had in place pursuant to the Mandate.

97.     Shortly after Dr. Auteri's termination, Doylestown Health began performing weekly testing of employees to screen for COVID-19.

98.     Approximately one month after Dr. Auteri's termination, Doylestown Health began a testing program which was the precise accommodation which Dr. Auteri requested but was denied as a pretext for Dr. Auteri's termination.

99.     Dr. Auteri's proposed reasonable accommodation did not pose any more than a de minimis burden, if any burden at all, because Dr. Auteri simply was proposing a regular health screening regimen which Doylestown Health had been conducting throughout the pandemic and weekly testing which Doylestown implemented shortly after Dr. Auteri's termination.

100.    Doylestown Health cannot claim an undue burden by Dr. Auteri's proposed accommodation when Doylestown Health engaged in different components of the proposed accommodation before and after Dr. Auteri's termination.

101.    By engaging in the same testing regimen shortly after Dr. Auteri's termination which Dr. Auteri proposed prior to his termination, Doylestown Health has admitted that Dr. Auteri's proposed accommodation was sufficient to meet patient safety needs.

102.    In response to Dr. Auteri's Second Exemption Request, rather than engage in the interactive process as required by law, by letter dated November 9, 2021, Doylestown Health through its counsel summarily denied Dr. Auteri's Request (the **"Second Exemption Denial"**). A true and correct copy of the Second Exemption Denial is attached hereto as **Exhibit "7."**

103.    Doylestown Health did not engage in the interactive process after receipt of the Second Exemption Request.

104.    Doylestown Health violated Dr. Auteri's civil rights in its denial of Dr. Auteri's exemption based upon Dr. Auteri's religious affiliation and sincerely held religious beliefs.

105.    Doylestown Health's summary Second Exemption Denial violated Title VII and the PHRA.

106.    In the Second Exemption Denial, Doylestown Health again rejected Dr. Auteri's request for a religious exemption.

107.    In the Second Exemption Denial, Doylestown Health stated that because Dr. Auteri had studied and discussed the statistics surrounding COVID-19 vaccination, Dr. Auteri's request for a religious exemption was a pretext for a political objection.

108.    Part of Dr. Auteri's duties as a physician is to study data and statistics of treatment methods, medical devices, and drugs used in the care of patients, and such study and discussion is not political but medically necessary.

109.    As a heart surgeon, it would be professionally ignorant and amount to medical malpractice if Dr. Auteri did not study data and information about the COVID-19 vaccine which was to be injected into the patients and staff at Doylestown Health.[2]

110.    Dr. Auteri's study of COVID-19 vaccines and the effects thereof on patients suffering from cardiac distress and disease was a critical part of treating patients during the COVID-19 pandemic and in doing so, Dr. Auteri was meeting his professional obligation to his patients and to Doylestown Health.

111.    Study of medical data is NOT political, and Doylestown Health's deliberate mischaracterization of Dr. Auteri's medical and professional study of the vaccines is a pretext to continue Doylestown Health's harassment of and discrimination against Dr. Auteri.

112.    As stated above, Doylestown Health knows that Dr. Auteri is a follower of Christ and Dr. Auteri's religious beliefs are sincerely held.

113.    Employers are not to question an employee's sincerely held religious beliefs absent strong evidence that the belief is not held and is not sincere.

114.    Employers are NOT permitted to dismiss the sincerely held and articulated religious beliefs of an employee simply because the employee has discussed the underlying subject of an exemption or workplace rule in the course of performing the employee's duties, and particularly not in this instance where Dr. Auteri had a professional, medical obligation to study the underlying basis of that rule.

---

[2] There are no less than 100 peer-reviewed medical papers from all over the world showing a link between the mRNA vaccines and myocarditis (inflammation of the heart and the killing of heart cells) in adults and adolescents who took the COVID-19 vaccines being mandated by Doylestown Health, many of which were published before Dr. Auteri's Exemption Requests and Second Exemption Request.  Dr. Auteri studied that link prior to his termination as being acutely relevant to Dr. Auteri's cardiac patients.

115.    Doylestown Health knew that Dr. Auteri's religious belief as articulated in the Exemption Requests and Second Exemption Request was sincerely held, but Doylestown Health summarily rejected those Requests and refused to engage in the interactive process with Dr. Auteri as required by law.

116.    In the Second Exemption Denial, Doylestown Health refused to engage in the interactive process in any manner and refused to propose alternative accommodations which would permit Dr. Auteri to treat patients.

117.    Doylestown Health refused to engage in the interactive process and propose alternatives to the accommodations which Dr. Auteri proposed, such as more frequent testing, testing offsite as opposed to testing at Doylestown Hospital, etc. as required by law.

118.    Doylestown Health simply stated that Dr. Auteri could not be "safe" treating patients without vaccination and terminated Dr. Auteri without following the law.

119.    Doylestown Health purported to be following the CDC but as set forth in detail above, by the time of the Second Exemption Denial (and before the Mandate deadline), the CDC AND Doylestown Health, through Dr. Levy, already had admitted that the COVID-19 vaccines did not stop the transmission of the virus.

120.    Doylestown Health failed and refused to follow well-established law which mandates the interactive process and implementation of reasonable accommodations where possible.

121.    Dr. Auteri at all times was ready, willing, and able to engage in the interactive process as required by law and never refused an effort to determine an appropriate accommodation.

122.    Doylestown Health literally made no effort to engage in the interactive process with Dr. Auteri.

123.    To the contrary, as Dr. Auteri sought exemptions and reasonable accommodations from the Mandate, Doylestown Health dispatched its Chief Medical Officer Dr. Levy to harass and threaten Dr. Auteri, calling Dr. Auteri a "loser" and threatening Dr. Auteri with immediate termination.

**Doylestown Health Terminates Dr. Auteri's Employment and Shortly Thereafter Implements the Same Testing Procedure Which Dr. Auteri Proposed as a Reasonable Accommodation**

124.    Following the Second Exemption Denial, Doylestown Health caused Doylestown Hospital to terminate Dr. Auteri's medical privileges at Doylestown Hospital by letter dated November 11, 2021 authored by Elinor Pernitsky, Director, Medical Staff Services.  A true and correct copy of Ms. Pernitsky's November 11, 2021 letter is attached hereto as **Exhibit "8."**

125.    The termination of Dr. Auteri's medical privileges was unlawful and occurred after Doylestown Health's unlawful refusal to engage in the interactive process and intentional discrimination against Dr. Auteri as set forth above.

126.    Following the Second Exemption Denial and unlawful revocation of Dr. Auteri's medical privileges, Doylestown Health terminated Dr. Auteri's employment because Dr. Auteri no longer had medical privileges at Doylestown Hospital, which privileges were unlawfully terminated.

127.    Doylestown Health unlawfully terminated Dr. Auteri's employment by letter dated November 18, 2021 authored by John B. Reiss, Vice President, General Counsel, and Chief

Compliance Officer of Doylestown Health.  A true and correct copy of Mr. Reiss' November 18, 2021 letter is attached hereto as **Exhibit "9."**

128.    Doylestown Health's termination of Dr. Auteri's employment is the culmination and direct result of Doylestown Health's concerted pattern of harassment, discrimination, and retaliation against Dr. Auteri and Doylestown Health's refusal to engage in the interactive process as required by law.

129.    Doylestown Health's subsequent conduct and policies after Dr. Auteri's termination demonstrate that Doylestown Health's invocation of "patient safety" and "undue burden" of testing as the basis for the Exemption Denial and Second Exemption Denial was pretext for Doylestown Health's discrimination, harassment, and retaliation against Dr. Auteri on the basis of Dr. Auteri's sincerely held religious beliefs.

130.    By January 2022, Doylestown Health was permitting COVID-19 infected physicians and staff to treat patients, directly exposing patients to COVID-19.

131.    By email dated January 26, 2022, Doylestown Health was permitting COVID-19 infected, symptomatic employees to return to work AND treat patients after five days as long as their symptoms were resolving and employees could treat patients WITHOUT testing to determine whether the employee still had a sufficient viral load so as to be infectious.

132.    In that same email, Doylestown Health was permitting COVID-19 infected employees who were asymptomatic to return to work after five days as long as no symptoms developed and could do so WITHOUT testing to determine whether the employee still had a sufficient viral load so as to be infectious.

133.    By December 2021/January 2022, Doylestown Health was conducting a regular COVID-19 testing program for its employees, the same testing program which Doylestown Health denied to Dr. Auteri as being an "undue burden" when Dr. Auteri sought a religious exemption from the Mandate not even two months earlier.

134.    By December 2021/January 2022, Doylestown Health was conducting an ON SITE COVID-19 testing program for its employees by which Doylestown Health was testing employees for COVID-19 two times per week.

135.    By a later point in January 2022, Doylestown Health reduced the on site COVID-19 testing program for its employees to a once a week testing protocol.

136.    Doylestown Health never offered Dr. Auteri an exemption with the accommodation of twice weekly testing, but Doylestown Health offered its remaining employees a twice weekly testing program.

137.    Doylestown Health told Dr. Auteri that weekly on site COVID-19 testing of Dr. Auteri was more than a "de minimis" burden on Doylestown Health, yet less than two months later Doylestown Health was testing its employees on site and twice a week.

138.    Doylestown Health made the exact accommodations to its employees which Dr. Auteri sought in the Exemption Requests and Second Exemption Request, yet Doylestown Health refused to offer those accommodations to Dr. Auteri.

139.    Doylestown Health terminated Dr. Auteri on the basis of Dr. Auteri's request for the same accommodations that Doylestown Health was making for its employees approximately one to two months later.

140.    After implementing its testing program, Doylestown Health never contacted Dr. Auteri to offer Dr. Auteri reinstatement with the accommodation of the testing program which Doylestown Health then offered to its remaining employees.

141.    Doylestown Health's refusal to grant Dr. Auteri's Exemption Requests and Second Exemption Request and later implementation of the exact accommodation requested by Dr. Auteri demonstrates that Doylestown Health's exemption and accommodation denial was pretext for Doylestown Health's discriminatory animus against Dr. Auteri for his sincerely held religious beliefs.

142.    On August 11, 2022, the CDC updated its COVID-19 guidance to effectively eliminate any distinction between the vaccinated and unvaccinated in terms of quarantine, isolation, and preventative measures.    https://www.cdc.gov/coronavirus/2019-ncov/your-health/isolation.html .

143.    After the issuance of the CDC's August 11, 2022 COVID-19 guidance, Doylestown Health never contacted Dr. Auteri to offer Dr. Auteri reinstatement.

144.    Doylestown Health discriminated against Dr. Auteri on the basis of Dr. Auteri's sincerely held religious beliefs.

145.    Doylestown Health discriminated against Dr. Auteri when Doylestown Health refused to engage in the interactive process with Dr. Auteri and discuss a reasonable accommodation for Dr. Auteri's Exemption Requests and Second Exemption Request.

146.    Doylestown Health discriminated against Dr. Auteri when Doylestown Health implemented a testing program which mirrored the accommodation request which Dr. Auteri made, but Doylestown Health refused to offer the same testing program to Dr. Auteri and failed to

offer Dr. Auteri reinstatement subject to Dr. Auteri's compliance with the same testing program offered to other employees.

147.    Doylestown Health violated Dr. Auteri's civil rights in denying the Exemption Requests and Second Exemption Request and refusing to offer Dr. Auteri reinstatement subject to Dr. Auteri's compliance with the same testing program offered to other employees.

148.    Doylestown Health was permitting sick, COVID-19 infected employees to treat patients but refused to permit Dr. Auteri to treat patients even though Dr. Auteri proposed a testing program which was safer than Doylestown Health's protocols.

149.    Doylestown Health's claim that it denied Dr. Auteri's Exemption Requests in the name of "patient safety" is pretext for discriminatory animus as evidenced by Doylestown Health's use of COVID-19 infected employees to treat patients.

150.    Dr. Auteri's proposed reasonable accommodation would meet or exceed Doylestown Health's safety standards in place at the time of the Mandate, yet Doylestown Health refused to grant Dr. Auteri's Exemption Requests and the Second Exemption Request, refused to engage in the interactive process, and refused to offer Dr. Auteri reinstatement.

151.    Doylestown Health's use of COVID-19 infected employees to treat patients and other unlawful conduct described herein demonstrates that Doylestown Health's refusal of Dr. Auteri's accommodation requests was not about patient safety but instead was motivated by Doylestown Health's discriminatory animus against Dr. Auteri for Dr. Auteri's legally protected invocation of his right to exercise his sincerely held religious beliefs.

152.    Doylestown Health discriminated against Dr. Auteri on the basis of Dr. Auteri's sincerely held religious beliefs.

153.    Doylestown Health harassed Dr. Auteri on the basis of his sincerely held religious beliefs.

154.    Doylestown Health retaliated against Dr. Auteri on the basis of his sincerely held religious beliefs.

155.    Doylestown Health engaged in a pattern and practice of discriminating and retaliating against Dr. Auteri who asserted his Constitutionally-protected right to religious freedom.

156.    As a result of Doylestown Health's unlawful, discriminatory, threatening, harassing, and retaliatory conduct set forth above, Dr. Auteri has suffered and will continue to suffer the loss of salary and other compensation and other benefits which Dr. Auteri's employment entailed, and Dr. Auteri also suffered future pecuniary losses, emotional pain and distress, suffering, inconvenience, loss of enjoyment of life, loss of standing in the community, loss of professional reputation, and other non-pecuniary losses.

157.    Doylestown Health engaged in a continuous practice of discrimination, and Dr. Auteri pursues the claims asserted herein under the continuing violations doctrine.

158.    Doylestown Health has exhibited a pattern and practice of discrimination and retaliation.

159.    Dr. Auteri has taken reasonable steps to mitigate and has mitigated some of his damages to the best of his ability, including by the performance of temporary work for other hospital systems in other parts of the Commonwealth and other States, each of which has granted an exemption to any existing COVID-19 vaccine mandate on the same bases for which Dr. Auteri sought an exemption from the Mandate from Doylestown Health.

160.    Dr. Auteri requests a jury trial on all issues triable by a jury.

**COUNT I**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT – DISCRIMINATION**
**BASED UPON RELIGIOUS AFFILIATION**

161.    All paragraphs above are incorporated herein by reference.

162.    Dr. Auteri requested an exemption from a workplace rule, the Mandate, on the basis of a sincerely held religious belief.

163.    Doylestown Health had no legitimate, nondiscriminatory basis upon which to question or dispute Dr. Auteri's sincerely held religious beliefs.

164.    Dr. Auteri sought a reasonable accommodation of the Mandate requirements.

165.    Doylestown Health refused to engage in the interactive process in an effort to reach a reasonable accommodation of the Mandate requirements with Dr. Auteri.

166.    Dr. Auteri proposed a reasonable accommodation of the Mandate requirements which was more protective of patient safety than the COVID-19 protocols which Doylestown Health had in place at the time of Dr. Auteri's Exemption Requests and Second Exemption Request.

167.    Dr. Auteri's need for an accommodation of his sincerely held religious beliefs was a motivating factor in Doylestown Health's decision to terminate Dr. Auteri's employment.

168.    Shortly after Doylestown Health terminated Dr. Auteri's employment, Doylestown Health implemented the same COVID-19 testing and/or health screening protocols which Dr. Auteri sought as a reasonable accommodation following his request for a religious exemption from the Mandate.

169.    After implementing the same protocols which Dr. Auteri sought as a reasonable accommodation, Doylestown Health never offered to reinstate Dr. Auteri's employment subject to that accommodation or otherwise.

170.    Doylestown Health cannot claim that Dr. Auteri's proposed reasonable accommodation is an undue burden or imposes more than a de minimis cost to Doylestown Health. At the time of the Exemption Requests or the Second Exemption Request, Doylestown Health could have required Dr. Auteri to cover the costs of COVID-19 testing had it engaged in the interactive process and shortly after Dr. Auteri's termination, Doylestown Health assumed the cost of regular COVID-19 testing of employees.

171.    Doylestown Health violated Title VII by denying the Exemption Requests and Second Exemption Request and/or refusing to engage in the interactive process to determine a reasonable accommodation of the Mandate requirements as to Dr. Auteri.

172.    The reasons Doylestown Health offered for Dr. Auteri's termination are pretext.

173.    Doylestown Health engaged in unlawful, intentional discrimination against Dr. Auteri by suspending Dr. Auteri without pay and thereafter terminating Dr. Auteri for Dr. Auteri's assertion of his right to religious freedom as protected by Title VII.

174.    Doylestown Health intentionally discriminated against Dr. Auteri by acting with malice and/or reckless indifference toward Dr. Auteri such that an award of punitive damages is appropriate.

175.    As a result of Doylestown Health's unlawful conduct, Dr. Auteri suffered damages as set forth above.

176.     Dr. Auteri has taken reasonable steps to mitigate and has mitigated some of his damages as set forth above.

**WHEREFORE,** Dr. Auteri demands judgment in Dr. Auteri's favor and against Doylestown Health in an amount in excess of $150,000.00 plus punitive damages, attorney's fees, and costs.

## COUNT II
## VIOLATION OF PENNSYLVANIA HUMAN RELATIONS ACT – DISCRIMINATION BASED UPON RELIGIOUS AFFILIATION

177.     All paragraphs above are incorporated herein by reference.

178.     Dr. Auteri is a covered employee within the meaning of the PHRA.

179.     Doylestown Health is a covered entity within the meaning of the PHRA.

180.     As set forth fully herein, Dr. Auteri suffered an adverse employment decision as a result of discrimination when Doylestown Health terminated Dr. Auteri from Dr. Auteri's employment on the basis of Dr. Auteri's religious affiliation and without engaging in the interactive process in response to Dr. Auteri's Exemption Requests and Second Exemption Request.

181.     The reasons Doylestown Health offered for Dr. Auteri's termination are pretext.

182.     As a result of Doylestown Health's unlawful conduct and intentional discrimination against Dr. Auteri, Dr. Auteri suffered damages as set forth above.

183.     Dr. Auteri has taken reasonable steps to mitigate and has mitigated some of his damages as set forth above.

**WHEREFORE,** Dr. Auteri demands judgment in Dr. Auteri's favor and against

Doylestown Health in an amount in excess of $150,000.00 plus attorney's fees and costs.

Respectfully submitted,

**KAPLIN STEWART MELOFF REITER & STEIN, P.C.**

By: _____
Kimberly L. Russell, Esquire
910 Harvest Drive
P.O. Box 3037
Blue Bell, PA  19422
(610) 941-2541 (phone)
(610) 684-2026 (fax)
krussell@kaplaw.com

Attorneys for Plaintiff

**Dated:** August ____, 2024

16995/1/10851093/1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOSEPH S. AUTERI, M.D.** | : | |
| Plaintiff, | : | No. 2:22-cv-03384 |
| | : | |
| v. | : | |
| | : | |
| **VIA AFFILIATES, d/b/a** | : | |
| **DOYLESTOWN HEALTH** | : | |
| **PHYSICIANS** | : | |
| Defendant. | : | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing "Second Amended Complaint" was caused to

be sent electronically through the Court's ECF system to:

Christopher D. Durham, Esquire
Elisabeth G. Bassani, Esquire
Duane Morris LLP
30 South 17th Street
Philadelphia, PA  19103
Attorneys for Defendant

**KAPLIN STEWART MELOFF REITER & STEIN, P.C.**

By: _____
Kimberly L. Russell, Esquire
910 Harvest Drive
P.O. Box 3037
Blue Bell, PA  19422
(610) 941-2541 (phone)
(610) 684-2026 (fax)
krussell@kaplaw.com

Attorneys for Plaintiff

**Dated:** August 28, 2024