IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| JOSEPH S. AUTERI, M.D., | : | |
| Plaintiff, | : | |
| v. | : | |
| VIA AFFILIATES d/b/a DOYLESTOWN HEALTH PHYSICIANS, | : | CIVIL ACTION NO. 2:22-cv-03384 |
| Defendant. | : | |

## ORDER

AND NOW this ___ day of _____, 202__, upon consideration of the Motion for Summary Judgment of Defendant, VIA Affiliates d/b/a Doylestown Health, and all documents submitted in support thereof and in opposition thereto, it is ORDERED that the Motion is GRANTED and judgment is entered against Plaintiff and in favor of Defendant, VIA Affiliates d/b/a Doylestown Health Physicians, on both counts of Plaintiff's Second Amended Complaint.

**BY THE COURT:**

_____

**R. BARCLAY SURRICK, J.**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| JOSEPH S. AUTERI, M.D., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | CIVIL ACTION NO. 2:22-cv-03384 |
| VIA AFFILIATES d/b/a DOYLESTOWN HEALTH PHYSICIANS, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant, VIA Affiliates d/b/a Doylestown Health Physicians, hereby moves pursuant to Federal Rule of Civil Procedure 56 for summary judgment on both counts of Plaintiff's Second Amended Complaint. The basis for this Motion is set forth in the attached Memorandum of Law, which is incorporated herein.

Respectfully submitted,

*/s/ Christopher D. Durham*
Christopher D. Durham, Esquire
Adam D. Brown, Esquire
Elisabeth G. Bassani, Esquire
Duane Morris LLP
30 South 17th Street
Philadelphia, PA 19103
(215) 979-1800

*Attorneys for Defendant, VIA Affiliates*
*d/b/a Doylestown Health Physicians*

Dated: May 12, 2025

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSEPH S. AUTERI, M.D., | : | |
| Plaintiff, | : | |
| v. | : | |
| VIA AFFILIATES d/b/a DOYLESTOWN HEALTH PHYSICIANS, | : | CIVIL ACTION NO. 2:22-cv-03384 |
| Defendant. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

Page

I.   INTRODUCTION ...................................................................................... 1

II.  UNDISPUTED MATERIAL FACTS ...................................................... 3

    A.   Doylestown Health, Its Medical Staff, and Its Operations. .................. 3

    B.   The COVID-19 Pandemic and Its Effect on Medical Facilities'
        Operations. ........................................................................................... 3

    C.   The Role of COVID-19 Vaccines in Mitigating the Threats and Risks of
        COVID-19 to Healthcare Facilities, Patients, and Medical Staff. ......... 4

        1.   The Safety and Efficacy of the COVID-19 Vaccines ................. 4

        2.   The Unique Threats and Risks of COVID-19, and the Importance of
            Vaccination Mandates, to Healthcare Facilities During the Pandemic ...... 5

    D.   Plaintiff's Employment with Doylestown Health as its Chief Heart
        Surgeon. ................................................................................................ 6

    E.   Doylestown Health Considers a COVID-19 Vaccine Mandate, to Which
        Plaintiff Objects Based Exclusively on Safety, Efficacy, and Other
        Medical Concerns. ................................................................................ 7

    F.   Doylestown Health Implements a COVID-19 Vaccine Mandate. ........ 10

        1.   The Impact of Exemptions from Vaccination Mandates on Healthcare
            Facilities' Operations, and the Necessity of Granting Only Valid
            Exemptions. ........................................................................... 11

        2.   Defendant's Process for Evaluating Exemption Requests. ....... 12

    G.   Plaintiff Refuses to Comply with the Mandate Based on Safety Concerns,
        Despite Doylestown Health's Efforts to Assuage Those Concerns. ..... 14

    H.   On the October 11, 2021 Vaccination Deadline, Plaintiff For the First
        Time Requests Medical and Religious Exemptions from the Mandate. ...... 16

    I.   The Availability to Plaintiff of the Non-mRNA Janssen Biotech Vaccine
        and the Science Establishing That mRNA Vaccines Do Not Alter DNA. .......... 18

    J.   Doylestown Health Suspends Plaintiff's Medical Staff Membership and
        Privileges Because He Refuses to Comply with the Mandate. ............... 18

K.  Doylestown Health Denies Plaintiff's Exemption Requests Because They Would Have Posed Unacceptable Health and Safety Risks to Patients and Staff. .......................................................................................... 19

L.  Plaintiff's Counsel Writes Doylestown Health to Reiterate Plaintiff's Exemption Requests and Propose Alternative Measures That Were Less Effective Than Vaccination. .................................................................... 19

M.  Doylestown Health Terminates Plaintiff's Employment Due to His Failure to Maintain Medical Staff Membership and Privileges. ....................................... 21

III.  LEGAL STANDARD .......................................................................................... 22

IV.  LEGAL ARGUMENT .......................................................................................... 22

A.  Plaintiff's Stated Basis for Requesting an Exemption from the Mandate is Not Religious in Nature. .................................................................................... 23

   1.  Plaintiff's Stated Objections to the Mandate in Support of His Exemption Request Were Not Based on Beliefs About Fundamental or Ultimate Questions ................................................................................ 24

   2.  Plaintiff's Stated Religious Objection to COVID-19 Vaccines Was, at Most, an Isolated Moral Teaching, not a Comprehensive System of Beliefs. ....................................................................................... 34

B.  Exempting Plaintiff, a Heart Surgeon Treating Patients at Higher Risk of Severe Illness from COVID-19, from the Mandate Would Have Imposed an Undue Hardship on Doylestown Health. ....................................................... 36

   1.  Undue Hardship Defeats a Claim of Religious Discrimination. ............... 36

   2.  The Third Circuit's Recent Decision in *Bushra* Compels Summary Judgment in Favor of Doylestown Health Based on Undue Hardship. ..... 37

   3.  Doylestown Health's Denial of Plaintiff's Religious Exemption Request on Undue Hardship Grounds Was Lawful and Is Supported by Dr. Salmon's Expert Opinion. .................................................................... 40

   4.  The Opinions of Plaintiff's So-Called Expert, Dr. McCullough, Do Not Create a Genuine Issue of Material Fact on the Issue of Undue Hardship. ......................................................................................... 44

C.  Any Purported Separate Disparate Treatment Claim Based on Religion Fails as a Matter of Law. .................................................................................. 48

V.  CONCLUSION ...................................................................................................... 49

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265 (3d Cir. 2001)....................................49

*Africa v. Com. of Pa.*, 662 F.2d 1025 (3d Cir. 1981).............................................*Passim*

*Al Refat v. Franklin Fin. Servs. Corp.*, No. 1:19-CV-1507, 2021 WL 2588789
    (M.D. Pa. June 24, 2021) ......................................................................48

*Aliano v. Twp. of Maplewood*, No. 22-cv-5598, 2023 WL 4398493 (D.N.J. July 7, 2023)..........24

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ......................................22

*Atkinson v. Lafayette Coll.*, 460 F.3d 447 (3d Cir. 2006) ......................................23

*Aukamp-Corcoran v. Lancaster Gen. Hosp.*, No. 19-5734, 2022 WL 507479
    (E.D. Pa. Feb. 18, 2022)..........................................................29, 32, 42

*Berna v. Bayhealth Med. Ctr., Inc.*, No. CV 23-945-RGA, 2024 WL 456420
    (D. Del. Feb. 5, 2024) ......................................................................25

*Bey v. Pocono Med. Ctr.*, No. 3:23-CV-688, 2024 WL 1977986 (M.D. Pa. May 3, 2024) ..........41

*Brunson v. Aiken/Barnwell Ctys. Cmty. Action Agency, Inc.*, No. CV 1:24-36-JDA-SVH,
    2024 WL 4186082 (D.S.C. Mar. 1, 2024), *report and recommendation adopted*, No.
    1:24-CV-00036-JDA, 2024 WL 3665783 (D.S.C. Aug. 6, 2024)..........................................31

*Bushra v. Main Line Health, Inc.*, 709 F. Supp. 3d 164 (E.D. Pa. 2023), *aff'd*,
    2025 WL 1078135 ................................................................................ 36-39

*Bushra v. Main Line Health, Inc.*, No. 24-1117, 2025 WL 1078135
    (3d Cir. Apr. 10, 2025)..........................................................................*Passim*

*Dennison v. Bon Secours Charity Health Sys. Med. Grp., P.C.*, No. 22-CV-2929 (CS),
    2023 WL 3467143 (S.D.N.Y. May 15, 2023) ......................................................43

*Fallon v. Mercy Cath. Med. Ctr. of Se. Pa.*, 877 F.3d 487 (3d Cir. 2017) .............................. 23-24

*Garza v. Wellspan Philhaven*, No. 23-00698, 2024 WL 3904984
    (M.D. Pa. Aug. 22, 2024)..........................................................................29

*Geerlings v. Tredyffrin/Easttown Sch. Dist.*, No. 21-cv-4024, 2021 WL 4399672
    (E.D. Pa. Sept. 27, 2021) ......................................................................25

*Gray v. Main Line Hospitals, Inc.*, 717 F. Supp. 3d 437
    (E.D. Pa. 2024)...................................................................... 31-32, 35

*Groff v. DeJoy*, 600 U.S. 447 (2023) ..........................................................................36-37, 42-43

*Hailey v. Legacy Health*, No. 3:23-cv-00149-IM, 2024 WL 4253238
(D. Or. Sept. 20, 2024)..................................................................................................43, 46

*Hand v. Bayhealth Med. Ctr., Inc.*, No. CV 22-1548-RGA, 2024 WL 359245
(D. Del. Jan. 31, 2024), *aff'd sub nom. McDowell v. Bayhealth Med. Ctr., Inc.*,
No. 24-1157, 2024 WL 4799870 (3d Cir. Nov. 15, 2024) ...........................................*Passim*

*Harmon v. Boston Med. Ctr.*, 2024 WL 4815292 (D. Mass. Nov. 18, 2024)...............................43

*Harris v. Univ. of Mass., Lowell*, 557 F. Supp. 3d 304 (D. Mass. 2021), *appeal dismissed*,
43 F.4th 187 (1st Cir. 2022)..................................................................................................47

*Kennedy v. PEI-Genesis*, 719 F. Supp. 3d 412 (E.D. Pa. 2024), *aff'd*, No. 24-1563, 2025
WL 602159 (3d Cir. Feb. 25, 2025)..............................................................................33, 35-36

*Klaassen v. Trs. of Indiana Univ.*, 549 F. Supp. 3d 836 (N.D. Ind. 2021), *vacated and
remanded on other grounds*, 24 F.4th 638 (7th Cir. 2022)........................................................47

*Lake v. HealthAlliance Hosp. Broadway Campus*, 738 F. Supp. 3d 208 (N.D.N.Y. 2024) ..........43

*Maher v. Bayhealth Med. Ctr., Inc.*, No. 22-cv-1551, 2024 WL 406494 (D. Del. Feb. 2,
2024), *aff'd sub nom. McDowell*, 2024 WL 4799870 (3d Cir. Nov. 15, 2024).......................33

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)....................................22

*Messina v. Coll. of N.J.*, 566 F. Supp. 3d 236 (D.N.J. 2021).........................................................31

*Miller v. Charleston Area Med. Ctr.*, No. 2:23-CV-00340, 2024 WL 4518293
(S.D.W. Va. Oct. 17, 2024)....................................................................................................43

*Mullen v. AstraZeneca Pharms., LP*, No. CV 23-3903, 2023 WL 8651411
(E.D. Pa. Dec. 14, 2023) ........................................................................................................41

*Navy SEAL 1 v. Austin*, 600 F. Supp. 3d 1 (D.D.C. 2022), *vacated and remanded on other
grounds*, No. 22-5114, 2023 WL 2482927 (D.C. Cir. Mar. 10, 2023).............................44, 47

*Ritter v. Lehigh Valley Health Network*, No. 22-4897, 2024 WL 643543
(E.D. Pa. Feb. 15, 2024)....................................................................................................*Passim*

*Roth v. Austin*, 603 F. Supp. 3d 741 (D. Neb. 2022) ....................................................................45

*Saqa v. Factory Mut. Ins. Co.*, No. CV 23-3994 (SDW) (JBC), 2024 WL 4345209
(D.N.J. Sept. 30, 2024) .....................................................................................................32, 35

*Savel v. MetroHealth Sys.*, No. 1:22-CV-02154, 2024 WL 4581542
(N.D. Ohio Oct. 25, 2024) .....................................................................................................42

*Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220 (3d Cir. 2000) ................................23

*Shields v. Main Line Hosps., Inc.*, 700 F. Supp. 3d 265 (E.D. Pa. 2023) .............................*Passim*

*Slattery v. Main Line Health, Inc.*, No. CV 22-4994, 2025 WL 897526
(E.D. Pa. Mar. 24, 2025)................................................................................45, 47

*Smith v. Biden*, No. 1:21-CV-19457, 2021 WL 5195688 (D.N.J. Nov. 8, 2021).........................31

*Sturgill v. Am. Red Cross*, 114 F.4th 803 (6th Cir. 2024)....................................................48

*Ulrich v. Lancaster Gen. Health*, No. 22-4945, 2023 WL 2939585
(E.D. Pa. Apr. 13, 2023) .........................................................................34, 36

*United States v. Martin*, No. CR 98-178, 2021 WL 4169429
(E.D. Pa. Sept. 14, 2021), *aff'd*, No. 21-2853, 2022 WL 621689
(3d Cir. Mar. 3, 2022)..........................................................................................38

*Valdez v. Lujan Grisham*, No. 21- CV-783 MV/JHR, 2022 WL 3577112
(D.N.M. Aug. 19, 2022)......................................................................................31

*Wallace v. City of Phila.*, No. 06-4236, 2010 WL 1730850 (E.D. Pa. Apr. 26, 2010)................48

*Wilhoit v. AstraZeneca Pharmaceuticals LP*, No. 22-1634-GBW-SRF,
2024 WL 2843169 (D. Del. June 5, 2024)...........................................................29

**Statutes**

42 U.S.C. § 2000e-2(a)(1)................................................................................................23

42 U.S.C. § 2000e(j) ......................................................................................................23

**Rules**

Fed. R.A.P. 40(a) .........................................................................................................39

Fed. R. Civ. P. 56(a) .....................................................................................................22

Fed. R. Civ. P. 56(e) .....................................................................................................22

**Non-Periodical Publications**

AMA, *AMA in support of COVID-19 vaccine mandates for health care workers* (July 26,
2021), https://www.ama-assn.org/press-center/ama-press-releases/ama-support-covid-
19-vaccine-mandates-health-care-workers (last visited May 12, 2025)..................................9

CDC, *Bust Myths and Learn the Facts about COVID-19 Vaccines*,
https://archive.cdc.gov/www_cdc_gov/coronavirus/2019-ncov/vaccines/facts.html
(last visited May 12, 2025) ...........................................................................................4

CDC, *Myths and Facts about COVID-19 Vaccines* (last updated Feb. 16, 2023),
  https://archive.cdc.gov/www_cdc_gov/coronavirus/2019-ncov/vaccines/facts.html
  (last visited May 12, 2025) ..................................................................................................18

CMS, *Biden-Harris Administration to Expand Vaccination Requirements for Health Care
  Settings* (September 9, 2021), https://www.cms.gov/newsroom/press-releases/biden-
  harris-administration-expand-vaccination-requirements-health-care-settings (last
  visited May 12, 2025) ..........................................................................................................11

Doylestown Health, *About Us*, https://www.doylestownhealth.org/about-us (last visited
  May 12, 2025) ........................................................................................................................3

Doylestown Health, *Doylestown Health: Doylestown Hospital*,
  https://www.doylestownhealth.org/find-a-location/doylestown-health-doylestown-
  hospital-loc0000093376 (last visited May 12, 2025) ............................................................3

FDA, *FDA Approves First COVID-19 Vaccine* (Aug. 23, 2021),
  https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-
  vaccine (last visited May 12, 2025) ....................................................................................18

## I.    INTRODUCTION

Plaintiff, Dr. Joseph Auteri, is a heart surgeon and former employee of Defendant, VIA

Affiliates d/b/a Doylestown Health Physicians ("Defendant" or "Doylestown Health").  Like

countless other healthcare providers, during the COVID-19 pandemic Doylestown Health

required its doctors and other personnel to receive COVID-19 vaccinations, consistent with

scientific consensus at the time and authoritative guidance from numerous sources that the

available vaccines were safe, effective, and the best way to protect the health and safety of

patients and staff.  Plaintiff, who performed heart surgery on vulnerable cardiac patients at high

risk of severe illness from COVID-19, refused to be vaccinated.  Because allowing Plaintiff to be

unvaccinated and treat vulnerable cardiac patients would have imposed an undue hardship on

Defendant, Defendant terminated Plaintiff's employment in November 2021.

Plaintiff chose not to comply with Defendant's COVID-19 vaccination requirement based

on scientific and medical objections to the COVID-19 vaccines that he expressed over the course

of several months as Doylestown Health considered and implemented its vaccination mandate.

In this litigation, Plaintiff attempts to recast those objections as religious beliefs, contending that

Doylestown Health discriminated against him based on his religion by not granting him an

exemption from the vaccination requirement.[1]  Plaintiff's claims fail as a matter of law, and

Doylestown Health is entitled to summary judgment, for the following reasons.

*First*, under applicable law, the alleged beliefs on which Plaintiff relies for his claim of

entitlement to an exemption from the vaccination requirement are *not religious at all*.  They are

purported science-based objections reflecting Plaintiff's consistently articulated concerns: (1)

---

[1] Pursuant to the Court's Order dated October 12, 2024 (ECF Doc. No. 12), Plaintiff's only remaining claims are those asserting religious discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Pennsylvania Human Relations Act ("PHRA").

that the vaccines were harmful and had potential side effects, or that he did not need one because he was immune based on prior infection; (2) the false and disproven notion that the vaccines alter one's deoxyribonucleic acid ("DNA"); and/or (3) the fact that vaccinated persons could still contract and transmit the virus. None of these concerns has to do with fundamental or ultimate questions about deep and imponderable matters, and none is part of a comprehensive system of beliefs, as the law requires for a sincerely held belief to be protected as religious.

*Second*, the record evidence, including the opinions of Doylestown Health's expert, establishes beyond any genuine dispute that exempting Plaintiff from the vaccination mandate would have jeopardized the health and safety of others, particularly Plaintiff's vulnerable heart patients. The Third Circuit recently held in indistinguishable circumstances that granting a religious exemption for a doctor such as Plaintiff is an undue hardship for a hospital. The existence of such an undue hardship is a complete defense to Plaintiff's claims.

*Third*, to the extent this action includes a separate, standalone claim of disparate treatment, any such claim fails as well, because there is no evidence in the record that any similarly situated doctor outside of Plaintiff's protected class (followers of Christ) was treated more favorably than he was.

In sum, no reasonable jury could find that (1) Plaintiff's objections to the COVID-19 vaccine were based on religious beliefs, or (2) Doylestown Health could grant Plaintiff's exemption request without undue hardship. Doylestown Health thus is entitled to judgment as a matter of law.

II.    **UNDISPUTED MATERIAL FACTS**

A.    **Doylestown Health, Its Medical Staff, and Its Operations.**

Doylestown Health is a nonprofit corporation that employs physicians and other medical professionals (collectively, the "Medical Staff") who work at Doylestown Hospital, among other locations.  Def.'s Answer to 2d Am. Compl., ECF Doc. No. 21, ¶¶ 2, 6.  Doylestown Hospital is a comprehensive healthcare facility within the Doylestown Health network of medical providers, serving communities throughout the northern suburbs of Philadelphia, Pennsylvania.[2]

B.    **The COVID-19 Pandemic and Its Effect on Medical Facilities' Operations.**

COVID-19 was a deadly and unprecedented global pandemic, with reports of tens of millions of cases and hospitalizations and almost 760,000 deaths in the United States as of November 15, 2021.  Exhibit 2, Expert Report of Daniel Salmon, Ph.D., MPH (the "Salmon Report"), at 4-5.  The Centers for Disease Control and Prevention ("CDC") reported that, as of July 2021, 97% of hospitalizations and 99% of deaths were among unvaccinated persons.  *Id.* at 5.

During the pandemic, patients in healthcare facilities were at substantial risk of exposure to and infection with COVID-19, despite precautionary measures directed at reducing the risk of transmission.  *Id.*  And, as Plaintiff admits, patients with cardiac disease were at increased risk for serious consequences from COVID-19, which made them more vulnerable than other patients to the health and safety risks of the virus.  Excerpts from Deposition of Plaintiff, Exhibit 3, 60:10-61:11; Ex. 2, Salmon Report, at 5.

---

[2] Doylestown Health, *About Us*, https://www.doylestownhealth.org/about-us (last visited May 12, 2025); Doylestown Health, *Doylestown Health: Doylestown Hospital*, https://www.doylestownhealth.org/find-a-location/doylestown-health-doylestown-hospital-loc0000093376 (last visited May 12, 2025); Excerpts from Deposition of Elinor Pernitsky, Exhibit 1, 20:20-21:1.

COVID-19 had a tremendous impact on healthcare systems broadly, including with respect patient access to care and quality of care.  *Id.* at 6.  The effect of COVID-19 on healthcare facilities was exacerbated by COVID-19 illness and death among healthcare workers and worker burnout.  *Id.*  COVID-19 posed a direct threat to patients and staff in healthcare facilities, and healthcare staff disproportionately experienced the effects of the virus.  *Id.* at 13. The prevalence of COVID-19 infection among healthcare workers was 11% in 2020, significantly higher than in the general population.  *Id.* at 8.  More than 3,600 healthcare workers died of COVID-19 in the first year of the pandemic.  *Id.*

**C.    The Role of COVID-19 Vaccines in Mitigating the Threats and Risks of COVID-19 to Healthcare Facilities, Patients, and Medical Staff.**

In November 2021, three COVID-19 vaccines were available, each developed and manufactured by a different company: (1) Moderna, (2) Pfizer and BioNTech, and (3) Janssen Biotech (Johnson & Johnson).  *Id.* at 9.  The Moderna and Pfizer/Biotech vaccines used messenger ribonucleic acid ("mRNA") technology.  *Id.* at 9-11.  The Janssen Biotech vaccine was a conventional viral vector vaccine that did not use mRNA technology.  *Id.* at 11.

**1.    The Safety and Efficacy of the COVID-19 Vaccines**

According to the CDC, COVID-19 vaccines are safe, and "[g]etting a COVID-19 vaccine is a safer and more dependable way to build immunity to COVID-19 than getting sick with COVID-19."  CDC, *Bust Myths and Learn the Facts about COVID-19 Vaccines*, https://archive.cdc.gov/www_cdc_gov/coronavirus/2019-ncov/vaccines/facts.html (last visited May 12, 2025).  A CDC study available in August 2021 indicated that reinfection was about two times higher among previously infected persons than among those who were fully vaccinated, leading the CDC to recommend that, "[t]o reduce their likelihood for future infection, all eligible persons should be offered a COVID-19 vaccine, even those with previous [COVID-19]

infection." Ex. 2, Salmon Report, at 12-13 (citing CDC, *Reduced Risk of Reinfection with SARS-CoV-2 After COVID-19 Vaccination — Kentucky, May–June 2021* (August 13, 2021), https://www.cdc.gov/mmwr/volumes/70/wr/mm7032e1.htm (last visited May 12, 2025)).

In November 2021, COVID-19 vaccines were proven and known to be highly effective at preventing COVID-19 infections and transmission. *Id.* at 9-11. Based on observational CDC data regarding frontline workers collected from December 14, 2020 to August 14, 2021, the available COVID-19 vaccines were at least 66% effective at preventing infection with the then-newly emerged Delta variant, and they were up to 80% effective at preventing infection with other strains of COVID-19. *Id.* at 11.

Although data indicated that natural infection resulted in an immune response which lasted at least for months, it was unknown in November 2021 whether that immune response protected against COVID-19 infection. *Id.* at 12. Additionally, scientific evidence available in November 2021 could not predict whether antibodies from a prior COVID-19 infection would protect against infection by a new strain of COVID-19. *Id.* at 13. On the other hand, vaccination was known to be the most effective strategy to protect healthcare workers from contracting viruses and thus to prevent them from transmitting such viruses to patients. *Id.* at 13-14.

2.    **The Unique Threats and Risks of COVID-19, and the Importance of Vaccination Mandates, to Healthcare Facilities During the Pandemic.**

In this matter, Defendant has proffered the expert opinions of Dr. Daniel Salmon, Ph.D., MPH, regarding the COVID-19 pandemic, its effect on medical facilities' operations, and the role of vaccines and vaccination mandates in managing the threats and risks of COVID-19 in the healthcare setting.[3] *Id. passim*. According to Dr. Salmon, in November 2021 unvaccinated

---

[3] Dr. Salmon is a vaccinologist at the Johns Hopkins University Bloomberg School of Public Health. *Id.* at 1, 21. He serves as a Professor of Global Disease Epidemiology and Control in the Johns Hopkins

healthcare workers were at greater risk of contracting COVID-19 than vaccinated ones and, therefore, they were more likely to transmit COVID-19 to others. *Id.* at 8-9, 19. Unvaccinated healthcare workers thus posed a significant risk of infecting their patients while providing direct care. *Id.* at 9, 19. For those and other reasons, the CDC prioritized healthcare workers for COVID-19 vaccines when they became available. *Id.* at 8-9.

Mandatory COVID-19 vaccine policies were a critical protective action for patients and staff of healthcare facilities because: (1) COVID-19 posed a substantial threat to patients and staff; (2) COVID-19 vaccines provided a high level of protection against contracting COVID-19, and they reduced transmission of COVID-19; and (3) experience has demonstrated that mandatory vaccination policies (e.g., for influenza) in healthcare settings are necessary to achieve high levels of vaccine coverage, since voluntary policies, even coupled with free access to vaccines and education, do not achieve very high levels of vaccine coverage. *Id.* at 13-14.

### D. Plaintiff's Employment with Doylestown Health as its Chief Heart Surgeon.

Plaintiff is a heart surgeon who worked for Doylestown Health beginning in May 2007. Ex. 3, Pl. Dep. 49:13-16. In 2021, Plaintiff's position was Chief of Cardiovascular Surgery and Medical Director of Cardiovascular Surgery and Cardiology. Employment Agreement and subsequent renewal and amendment, D0000052-74; D0000075; and D0000077 (collectively, "Employment Agreement"), Exhibit 4; Ex. 3, Pl. Dep. 54:15-19. In these capacities, Plaintiff worked at the Center for Heart and Vascular Care (the "Heart Institute") at Doylestown Hospital. Ex. 3, Pl. Dep. 54:15-19. His primary duty was performing heart surgery on patients seeking treatment at the Heart Institute. *Id.* 56:2-14.

---

University Department of International Health, with a joint appointment in the Department of Health, Behavior and Society. *Id.*

Plaintiff's employment was governed by an Employment Agreement effective April 1, 2012, and subsequently renewed and amended to provide for a term of employment through December 31, 2024, Ex, 4.  The Employment Agreement required, among other things, that Plaintiff "remain a member in good standing of the Active Medical Staff of [Doylestown] Hospital."  *Id.* at D0000057.  The Employment Agreement further required that Plaintiff "conduct his medical practice in conformity with all . . . policies, rules and regulations of [Doylestown Health] and [Doylestown] Hospital."  *Id.*  Defendant could terminate Plaintiff's employment for cause "[u]pon the revocation, termination, suspension or limitation of [his] privileges at any hospital or facility" and/or if Defendant "determine[d], in good faith after a reasonable investigation, that . . . the safety of patients [was] jeopardized by [his] continued services."  *Id.* at D0000065.

Plaintiff was a member of Doylestown Health's Medical Executive Committee ("MEC"), which is responsible for decision-making regarding the Medical Staff.  Exhibit 5, Medical Executive Committee composition, July 1, 2021 – June 30, 2022, ,D0000095; Ex. 3, Pl. Dep. 74:1-14; Ex. 1, Pernitsky Dep. 20:5-21:1, 28:2-17.

### E.    Doylestown Health Considers a COVID-19 Vaccine Mandate, to Which Plaintiff Objects Based Exclusively on Safety, Efficacy, and Other Medical Concerns.

In the summer of 2021, the MEC began to consider implementing a policy that would require all members of the Medical Staff to become vaccinated for COVID-19.  Exhibit 6, Minutes of June 15, 2021, MEC meeting, D0000096-100; Exhibit 7, Minutes of July 20, 2021, MEC meeting, D0000101-05.  At a June 15, 2021 meeting, the MEC concluded that, "[g]iven the existing approach at [Doylestown Health] to mandate other health related interventions such as

TB testing and influenza vaccinations [,] ultimately requiring Covid vaccination would be consistent with that approach[.]"  Ex. 6 at 0000098.

During meetings of the MEC that took place "through the summer of 2021, and into the fall, when the topic of mandated vax for all employees came up," Plaintiff expressed his opinions that the vaccine was not safe or effective.  Ex. 3, Pl. Dep. 150:14-22.  Plaintiff testified that, at one of the MEC meetings during that period, the members were "having a discussion of [the COVID-19 vaccine's] efficacy and it[s] safety, and a number of opinions were thrown around," including his own:

> I expressed the opinion, and said, I'm not so sure it's as safe as we're telling people, based on the data I was looking at, the data coming out of Israel, UK, and Australia, among others. I'm not so sure it's as safe as -- as we're telling people. And, therefore, I'm not so sure that we should make a mandate.

Ex. 3, Pl. Dep. 154:4-155:1.

Plaintiff also objected to the vaccine based on more specific medical concerns.  *See* 2d Am. Compl., ECF Doc. No. 20, ¶ 27.  For example, he stated that the human body's potential response to a COVID-19 vaccine posed a "danger" to individuals previously infected, explaining his view that vaccination was not safe for such people because of "[t]he antigens in their system, due in part to the antigen-specific immune response triggered by the vaccine, and targeting of tissues which were damaged from prior COVID-19 infections."  Ex. 3, Pl. Dep. 128:22-130:17; *see* 2d Am. Compl., ECF Doc. No. 20, ¶ 27.  According to Plaintiff, the vaccine "could interact with my own, or anyone who's had the infection's immune system for a potentially negative outcome, either rev up the immune system, or cause an autoimmune response like Guillain-Barre [Syndrome], or pericarditis, like myocarditis."  Ex. 3, Pl. Dep. Tr. 129:22-130:17.

Plaintiff was especially "concerned about the early reports of pericarditis and myocarditis, and [he] shared that" with the MEC.  Ex. 3, Pl. Dep. 140:9-12.  He also "was

concerned about the early reports of Guillain-Barre and other immunologic disorders." *Id.*
140:13-15.  And he believed there were "other smaller -- smaller in number complications that
were leaking out of -- whether it was Israel or UK or -- or others, saying that this was not the safe
and effective -- you know, a hundred percent safe." *Id.* 140:15-22.

Plaintiff further maintained that he did not need a COVID-19 vaccine because he enjoyed
natural immunity from COVID-19 based on his previous infection.[4]  *Id.* 254:10-257:21.  As
Plaintiff recalled asserting, "let me get this straight. There's data out there that says God-given
natural immunity is as good, or better, than vaccinated immunity. . . . [L]ook, I got natural
immunity. Why are you insisting I have a vax? This is a dumb idea. Grrrrr." *Id.* 257:5-15.

Plaintiff also opposed a vaccine mandate due to the possibility of COVID-19
transmission among vaccinated individuals.  *See* 2d Am. Compl., ECF Doc. No. 20 ¶ 28.  As
Plaintiff puts it, "the revelation for everyone looking was that CDC came out and said vaxed
patients could transmit the virus." Ex. 3, Pl. Dep. 134:2-136:6.  In Plaintiff's view, based on this
"revelation," vaccination mandates were unnecessary because the CDC had acknowledged,
"[W]e were wrong. You can get [COVID-19 even after vaccination]. You can transmit it, though
you're vaxed." *Id.*

At a July 20, 2021 MEC meeting, the MEC proposed "that at such time the FDA [Food
and Drug Administration] grants full FDA approval (as opposed to EUA [Emergency Use
Authorization]), the Executive Committee endorse requiring vaccination for the medical staff
and all hospital [employees] (except for those with approved medical or religious exemptions)."[5]

---

[4] In May 2021, Plaintiff contracted COVID-19.  Ex. 3, Pl. Dep. 97:10-99:16.

[5] A few days later, on July 26, 2021, the American Medical Association ("AMA") issued a press release
stating, "It is critical that all people in the healthcare workforce get vaccinated against COVID-19 for the
safety of our patients and colleagues."  AMA, *AMA in support of COVID-19 vaccine mandates for health*

Ex. 7 at D0000104.  Plaintiff was the only MEC member who dissented from the proposal.  *Id.*;

Ex. 3, Pl. Dep. 171:8-172:12.

On August 3, 2021, MEC President Dr. Brenda Foley proposed that the MEC implement

a COVID-19 vaccination mandate applicable to the Medical Staff.  Exhibit 8, Email dated

August 3, 2021, from Scott Levy to Brenda Foley, D0001043-45.  On August 4, 2021, the MEC

adopted a resolution that endorsed "requiring vaccination for the medical staff and all hospital

[employees] (except those with approved medical or religious exemptions)."  Exhibit 9, Email

dated August 4, 2021, from Elinor Pernitsky to MEC members, D0000106-08.

### F.    Doylestown Health Implements a COVID-19 Vaccine Mandate.

On August 6, 2021, Defendant announced that it was instituting a COVID-19 vaccination

mandate for all staff, requiring COVID-19 vaccination except for those who qualified for and

received medical or religious exemptions (the "Mandate").  Exhibit 10, Memorandum dated

August 6, 2021, from Barbara Hebel to all employees, D0000114-15.  The Mandate obligated

staff to receive a first dose of a COVID-19 vaccine by September 10, 2021, and it initially

required each staff member to be fully vaccinated by October 4, 2021, in the absence of an

exemption.  Exhibit 11, Email dated August 30, 2021, from Barbara Hebel to associates,

D0001587-88.  The deadline for full vaccination later was extended to October 11, 2021. 2d Am.

Compl., ECF Doc. No. 20, ¶ 39; Ex. 3, Pl. Dep. 227:16-24.  Notably, on September 9, 2021,

barely a month after Defendant announced the Mandate, the U.S. Centers for Medicare &

Medicaid Services announced that it would require every medical facility certified to participate

in Medicare and Medicaid programs, including Doylestown Health, to mandate COVID-19

---

*care workers* (July 26, 2021), https://www.ama-assn.org/press-center/ama-press-releases/ama-support-covid-19-vaccine-mandates-health-care-workers (last visited May 12, 2025).

vaccination among medical staff except in cases of valid medical and/or religious exemptions. CMS, *Biden-Harris Administration to Expand Vaccination Requirements for Health Care Settings* (September 9, 2021), https://www.cms.gov/newsroom/press-releases/biden-harris-administration-expand-vaccination-requirements-health-care-settings (last visited May 12, 2025).

At the time, the non-mRNA Janssen Biotech vaccine was available, and receiving that vaccine constituted compliance with the Mandate. Ex. 11 at D0001587 ("If receiving the J&J vaccine, Associates may schedule anytime up until October 4, 2021."); Exhibit 12, COVID-19 Vaccines FAQ's, D0000116-23.

Doylestown Health revised and distributed its Immunization Policy, which previously required vaccination for influenza, among other immunizations, to reflect the Mandate. Exhibit 13, Doylestown Hospital Occupational Health Services Immunization Policy, Review Date August 5, 2021, D0000124-30. The policy included a declination statement for employees to complete if they sought an exemption from the Mandate. *Id.* at D0000129-30; Exhibit 14, Excerpts from Deposition of Scott Levy, M.D., 161:15-20; Exhibit 15, Excerpts from Deposition of James Brexler, 128:19-23.

1.    **The Impact of Exemptions from Vaccination Mandates on Healthcare Facilities' Operations, and the Necessity of Granting Only Valid Exemptions.**

As discussed above, unvaccinated persons working in a healthcare facility (those with medical and non-medical exemptions) are at increased risk of contracting and transmitting disease. Ex. 2, Salmon Report, at 17. Accordingly, each exemption from a COVID-19 vaccine requirement had the potential to undermine the requirement's effectiveness, thereby increasing the risk of COVID-19 infection to patients and healthcare workers. *Id.* at 17-19. Simply put, the greater the number of religious exemptions, the higher the risk of COVID-19 infection and

transmission.  *Id.*  Healthcare institutions therefore had a responsibility to review carefully all religious exemption requests and grant only those which satisfied the criteria for religious exemption, thereby limiting the number of religious exemptions, to the extent possible, while meeting applicable legal obligations to the employees seeking them.  *Id.*

Of particular concern in this regard was the increased risk unvaccinated staff posed to patients who were vulnerable and at increased risk of severe disease from COVID-19.  *Id.* at 19. Because unvaccinated staff were more likely to contract and transmit COVID-19 compared with vaccinated staff, it was appropriate based upon available scientific evidence to make distinctions between vulnerable and non-vulnerable patient populations for purposes of accommodating exemption requests.  *Id.*  For example, permitting unvaccinated (exempt) staff to work only with less vulnerable patients was based on established science at the time and could be expected to mitigate the risk arising from exemptions.  *Id.*

In November 2021, certain subpopulations, including those with cardiac conditions, were at increased risk of severe disease.  *Id.*  Persons with cardiac disease therefore were at increased risk for serious consequences from COVID-19.  *Id.* at 5, Ex. 3; Pl. Dep. 60:10-61:11.  The Heart Institute, where Plaintiff worked, involved the treatment of patients with cardiac conditions, on whom Plaintiff routinely performed heart surgery.  Ex. 3, Pl. Dep. Tr. 56:2-14.

### 2.    Defendant's Process for Evaluating Exemption Requests.

Consistent with the above principles, Doylestown Health developed a process for considering and accommodating exemption requests that would account for the relative risks that exemptions posed to various patient populations.  Declaration of Barbara Hebel ¶ 5; Exhibit 16, Department Job Code List with Associate Count, 09/2021, D0001979.  Doylestown Health, in consultation with subject matter experts in its Infection Control department ("Infection

Control"), and with input from other sources, determined which of its departments and service lines involved relatively greater contact with more vulnerable patients, such that having unvaccinated healthcare workers in those areas would unacceptably risk those patients' health and safety.  Hebel Decl. ¶ 6; Exhibit 17, Excerpts from Deposition of Barbara Hebel 27:25-28:20; Ex. 16 (reflecting vulnerable patient areas with highlighting).  With input from Infection Control and other sources, Doylestown Health determined that the only available accommodation for employees who worked in such areas was, where feasible, reassignment to a department or service line that involved contact with less vulnerable patients.  Hebel Decl. ¶ 7; Exhibit 18, Managing DHS/Employees with COVID-19 Vaccine Exemption – Accommodation Strategies, D0001974-75; Ex. 17, Hebel Dep. 13:8-14:12.  Additionally, based in part on recommendations from Infection Control, Doylestown Health established enhanced safety precautions for any employee granted a medical or religious exemption from the Mandate.  Hebel Decl. ¶ 8.  Those precautions included double-masking, social distancing, refraining from eating in groups in the Doylestown Hospital cafeteria, and twice-weekly COVID-19 testing.  *Id. Id.*; Exhibit 19, Form of letter from Barbara Hebel granting exemption to employees providing care to vulnerable patients, D0001976.

Consistent with this process, Doylestown Health accepted and duly considered every exemption request it received.  Hebel Decl. ¶ 9.  Ultimately, Doylestown Health granted 95 such requests, including numerous religious exemption requests submitted by employees based on their professed beliefs as Christians.  Hebel Decl. ¶ 10; Ex. 14, Levy Dep. 60:23-61:4.[6]

---

[6] In considering religious exemption requests, Doylestown Health did not seek to make any factual determination as to whether the stated religious belief was sincerely held.  Nor did it assess whether the stated belief would qualify as religious under applicable law. Rather, if the request on its face asserted a basis for seeking an exemption from the Mandate that could reasonably be construed as

Doylestown Health identified the Heart Institute as an area requiring contact with more vulnerable patients and thus an area where unvaccinated employees could not safely work. Hebel Decl. ¶ 15; Ex. 16. Therefore, Doylestown Health determined that no unvaccinated employee could provide direct care in the Heart Institute. Hebel Decl. ¶ 16; Ex. 19.

### G. Plaintiff Refuses to Comply with the Mandate Based on Safety Concerns, Despite Doylestown Health's Efforts to Assuage Those Concerns.

On September 10, 2021, because Plaintiff had neither complied with the Mandate nor sought an exemption, Dr. Scott Levy, Doylestown Health's Chief Medical Officer, wrote to him seeking to address his stated medical views about the COVID-19 vaccines. Exhibit 20, Email dated September 10, 2021, from Scott Levy to Plaintiff, D0001742. Later that day, Plaintiff met with Dr. Levy and restated his purported concerns about COVID-19 vaccine safety. Exhibit 21, Email dated September 10, 2021, from Scott Levy to Joseph Auteri, D0000139-40. Specifically, Plaintiff raised his belief that there were "complications of the vaccine, namely, the one [they] discussed most, was Guillain-Barre, which is an autoimmune disease against one's own nerve cells, which produces dystonia, which produces -- your arm doesn't work, your leg doesn't work; whatever." Ex. 3, Pl. Dep. 193:1-24. During the meeting, according to Plaintiff, Dr. Levy raised the concept of "making [Plaintiff] whole, should [he] get Guillain-Barre, or any other complication[.]" *Id.* 194:6-196:24.

The following week, Plaintiff repeated to James Brexler, Doylestown Health's President and Chief Executive Officer ("CEO"), his concern about experiencing an "adverse reaction" to a COVID-19 vaccine that would impair his ability to perform surgery. Exhibit 22, Email dated

---

religious, Doylestown Health assumed, solely for purposes of considering the request, that the stated belief was religious. Hebel Decl. ¶ 12.

September 18, 2021, from James Brexler to Joseph Auteri, D0000148; Ex. 3, Pl. Dep. 289:21-

292:21.  Plaintiff and Mr. Brexler met to discuss this concern, after which Plaintiff thanked Mr.

Brexler and requested "a written addendum to [his] contract" that would provide him with

assurances about his employment in the event of such an adverse reaction.[7]  Ex. 12.  To address

Plaintiff's concern, Doylestown Health offered to amend his Employment Agreement to provide

that, if he were to develop a neurologic condition as a result of becoming vaccinated and was no

longer able to perform heart surgery, he would continue to receive his then-current compensation

for an 18-month period.  Exhibit 23, Proposed Fifth Amendment to Employment Agreement

between VIA Affiliates d/b/a Doylestown Health Physician and Joseph S. Auteri, M.D., executed

September 25, 2021, D0000149-50; Ex. 3, Pl. Dep. 297:16-300:19.  Plaintiff considered and

negotiated certain terms of the proposed amendment, but he never signed it.  Ex. 13; Ex. 3, Pl.

Dep. 300:13-19.  At the time, Plaintiff was still struggling with whether or not to take the

vaccine.  Ex. 3, Pl. Dep. 294:24-295:16, 296:2-5.[8]

---

[7] Mr. Brexler also asked Alex Gorsky, whom Plaintiff knew through prior fundraising work through the
Doylestown Health Foundation (the philanthropic arm of Doylestown Health), to speak with Plaintiff to
attempt to assuage his purported concerns about the COVID-19 vaccines.  Ex. 15, Brexler Dep. 79:5-
80:11; Ex. 3, Pl. Dep. 56:22-57:21; Mot. of Non-Party Alex Gorsky to Quash Subpoena and for a
Protective Order, ECF Doc. No. 30.  At the time, Mr. Gorsky was CEO of Johnson & Johnson, which had
developed the non-mRNA Janssen Biotech vaccine, and, therefore, he had unique access to information
regarding that vaccine that could help Plaintiff better understand the science underlying it.  Ex. 15,
Brexler Dep. 80:24-81:16.  For that reason, Mr. Brexler, who was not aware at the time that Plaintiff had
requested any religious exemption, hoped that Mr. Gorsky could help Plaintiff make a better-informed
decision regarding vaccination that would enable him to continue his work as head of the Heart Institute.
Ex. 15, Brexler Dep. 83:3-16, 87:13-24.  Mr. Gorsky, who had no decision-making authority with respect
to Doylestown Health employment matters (ECF Doc. No. 30-1, ¶ 5), spoke with Plaintiff and later told
Mr. Brexler that Plaintiff had expressed concerns about the safety and efficacy of the vaccines, which Mr.
Gorsky tried to address.  *Id.* 91:17-92:18.

[8] On September 14, 2021, Defendant offered Plaintiff an opportunity to receive the non-mRNA Janssen
Biotech vaccine, setting aside a vial specifically for him to take the vaccine on the October 11 deadline,
Exhibit 24, Email dated September 14, 2021, from Christine Roussel to Joseph Auteri,
D0001887.

**H.     On the October 11, 2021 Vaccination Deadline, Plaintiff For the First Time Requests Medical and Religious Exemptions from the Mandate.**

On October 11, 2021, the deadline to be fully vaccinated, Plaintiff delivered two letters to Ms. Hebel requesting exemptions from the Mandate.  Ex. 3, Pl. Dep. 303:13-23.  One letter sought a medical exemption (Exhibit 25, Letter dated October 6, 2021, from Joseph S. Auteri, M.D., to Barbara Hebel, D0000153-54 (the "Medical Exemption Request")) and the other sought a religious exemption (Exhibit 26, Letter dated October 6, 2021, from Joseph S. Auteri, M.D., to Barbara Hebel, D0000151-52 (the "Religious Exemption Request"); collectively, the "Exemption Requests").  Plaintiff testified that the basis for his request for a religious exemption from the Mandate included the reasons set forth in the Religious Exemption Request, as well as an objection (not stated in either written request) to the vaccine being an mRNA vaccine.  Ex. 3, Pl. Dep. 314:3-315:14.

In the Medical Exemption Request, Plaintiff wrote that he "was infected with Covid in May 2021" and asserted that he "had a positive antigen test in May, and recently ha[d] been tested for both antibody as well as T-Cell immunity and based on these results my physician describe[d] [him] as having 'robust immunity'."  Ex. 15 at D0000153.  Plaintiff further wrote that he "believe[s] the natural God-given immunity that one gets from having been infected previously with Covid confers as good and in some cases better protection from a future Covid infection than any vaccination could."  *Id.* at D0000154.

In the Religious Exemption Request, Plaintiff wrote that he wished to "request a religious exemption to Doylestown Hospital's Covid Vaccination Mandate," asserting, "I have a personal, deeply held and sincere religious conviction against this vaccine mandate."  Ex. 16 at D0000151. The Religious Exemption Request further stated:

> I have recently been through a . . . season of prayer and fasting regarding the vaccine mandate. I am being led by the Holy Spirit to respectfully decline the Covid vaccine. I believe my body belongs to God and is the temple of his Holy Spirit. As it says in 1 Corinthians 6:19-20 'do you not know that your body is a temple of the Holy Spirit who is in you, whom you have from God, and that you are not your own?  For you have been bought with a price: therefore glorify God in your body.'  I believe that for me to ingest this vaccine is a violation of the Holy Spirit's leading, and therefore would be sin.

*Id.* at D0000152.[9]

Plaintiff testified that another basis for his request was his concern about mRNA vaccines, which he said he believed would "by definition, alter DNA and RNA in the recipient, and that goes against my deeply-held religious conviction."  Ex. 3, Pl. Dep. 440:7-441:7.

Plaintiff elaborated as follows:

> I think [the Religious Exemption Request] doesn't say that part of my rejecting it was that it was an mRNA. . . . It was an mRNA vaccine, which is not an attenuated virus, or small amounts of virus. The vaccine label -- the vaccine definition changed, and it became outside of where I was comfortable when they're trying to change my DNA. . . . I don't believe that's consistent with my religious belief that we shouldn't mess with people's DNA.

Ex. 3, Pl. Dep. 313:12-315:3.  According to Plaintiff, the Religious Exemption Request, his concern that the mRNA vaccines "mess with people's DNA," and subsequent correspondence from his counsel capture the basis for his request for a religious exemption from the Mandate. Ex. 3, Pl. Dep. 312:23-315:14.[10]

---

[9] Plaintiff testified at his deposition that he did not recall raising the possibility of a religious exemption prior to delivering the Religious Exemption Request, other than inquiries he said he made of Ms. Hebel and Dr. Levy (and possibly Mr. Brexler) about the process for seeking medical or religious exemptions. Ex. 3, Pl. Dep. 251:19-254:9, 257:22-258:21.

[10] Plaintiff testified that that subsequent correspondence from his counsel did "not state an additional basis for [a] religious exemption request beyond what was stated in" the Religious Exemption Request.  Ex. 3, Pl. Dep. 332:2-333:1.

I.    **The Availability to Plaintiff of the Non-mRNA Janssen Biotech Vaccine and the Science Establishing That mRNA Vaccines Do Not Alter DNA.**

As the Salmon Report explains, the Janssen Biotech COVID-19 vaccine "was not an mRNA vaccine."  Ex. 2, Salmon Report, at 11.  Rather, it was a conventional viral vector vaccine, comparable to other widely administered vaccines.  *Id.*  The Janssen Biotech COVID-19 vaccine was available to Plaintiff in October 2021.  Ex. 14, Email dated September 14, 2021, from Christine Roussel to Joseph Auteri; Ex. 12 at D0000116.  And, setting aside the fact that Plaintiff could have complied with the Mandate by receiving the Janssen Biotech vaccine, it was widely accepted among the scientific community in November 2021 that mRNA vaccines could not alter one's DNA.  Ex. 2, Salmon Report, at 11.[11]

J.    **Doylestown Health Suspends Plaintiff's Medical Staff Membership and Privileges Because He Refuses to Comply with the Mandate.**

By letter dated October 11, 2021, Dr. Brenda Foley, President of the Medical Staff, notified Dr. Auteri that, because he had not received any dose of COVID-19 vaccine as of that date, Doylestown Health was placing him on a 30-day precautionary suspension from the Medical Staff.  Exhibit 27, Letter dated October 11, 2021, from Brenda Foley to Joseph Auteri, D0000184.  Dr. Foley stated, in relevant part:

> If you do not send Doylestown Hospital proof of your receipt of a COVID vaccination by Wednesday, November 10th, before 5:00 p.m., the Medical Staff will accept that you have voluntarily resigned your privileges and Medical Staff membership at Doylestown Hospital, effective November 10th, 2021.

---

[11] *See also* FDA, *FDA Approves First COVID-19 Vaccine* (Aug. 23, 2021), https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine (last visited May 12, 2025) ("The mRNA in [the Pfizer/BioNTech vaccine] . . . is not incorporated into - nor does it alter - an individual's genetic material."); CDC, *Myths and Facts about COVID-19 Vaccines* (last updated Feb. 16, 2023), https://archive.cdc.gov/www_cdc_gov/coronavirus/2019-ncov/vaccines/facts.html (last visited May 12, 2025) ("**MYTH: COVID-19 vaccines can alter my DNA.  FACT:** COVID-19 vaccines do not change or interact with your DNA in any way.") (bold text in original).

*Id.*

**K.    Doylestown Health Denies Plaintiff's Exemption Requests Because They Would Have Posed Unacceptable Health and Safety Risks to Patients and Staff.**

By letter dated October 13, 2021, Ms. Hebel wrote to Plaintiff to inform him that Doylestown Health was not able to grant his requests for an exemption from the Mandate. Exhibit 28, Letter dated October 13, 2021, from Barbara Hebel to Joseph Auteri, D0000145-47. Ms. Hebel explained that granting the exemption request(s) would create an undue hardship, because having an unvaccinated heart surgeon providing direct care to vulnerable, high-risk cardiac patients would jeopardize the health and safety of those patients.[12]  *Id.* at D0000146.

The decision to deny Plaintiff's Religious Exemption Request was based on his position as head of the Heart Institute, his contractual obligation to serve in that capacity, his specialized, non-fungible skill set as a heart surgeon, and the fact that the Heart Institute was a vulnerable patient area.  Ex. 18; Ex. 17, Hebel Dep. 27:4-24; 40:4-41:1; Hebel Decl. ¶¶ 14-19.  Plaintiff also lacked medical credentials to practice in another area.  Ex. 14, Levy Dep. 133:10-135:7.

**L.    Plaintiff's Counsel Writes Doylestown Health to Reiterate Plaintiff's Exemption Requests and Propose Alternative Measures That Were Less Effective Than Vaccination.**

By letter dated October 22, 2021, Plaintiff's counsel wrote to Ms. Hebel regarding the denial of Plaintiff's Exemption Requests.  Exhibit 29, Letter dated October 22, 2021, from Kimberly L. Russell to Barbara Hebel, D0000201-07.  Plaintiff's counsel's letter stated, for the first time, that Plaintiff would agree to two safety measures in lieu of vaccination: (1) a daily health questionnaire, including temperature checks, and (2) weekly COVID-19 testing.  *Id.* at

---

[12] Doylestown Health assumed, for purposes of evaluating exemption requests only, that every stated religious belief, including the belief stated by Plaintiff, was sincere.  Ex. 17, Hebel Dep. 11:24-13:20, 14:7-15:14; Ex. 30 at D0000826.

D0000203. The letter did not state that Plaintiff would agree to the enhanced safety precautions Doylestown Health required of employees who were granted exemptions from the Mandate. *Id.*; *see* Ex. 19. Plaintiff subsequently testified that, as to nearly all of those required precautions, he would consider them only if: (1) he received "data" to support their efficacy, and (2) both vaccinated and unvaccinated employees had to follow them. Ex. 3, Pl. Dep. 334:12-341:3. The October 22, 2021 letter also asserted that the proposed alternative measures were better than vaccination because vaccinated persons could transmit the virus. Ex. 19 at D0000203.

Doylestown Health determined that it could not agree to Plaintiff's counsel's proposal because, even with his proposed alternative safety measures, his direct contact with a vulnerable patient population posed a health and safety risk that Doylestown Health could not accept. Ex. 17, Hebel Dep. 18:2-17, 24:21-26:10, 27:4-24, 40:4-41:41:1; Hebel Decl. ¶¶ 14-16. Nor was reassignment to a different department or service line an acceptable accommodation, because Plaintiff's specialized role as a heart surgeon (as expressly provided for in his Employment Agreement) and his lack of credentials to work in another area meant that there was no suitable, available position into which to transfer him. Ex. 17, Hebel Dep. 14:13-15:14,; Ex. 14, Levy Dep. 133:10-135:7; Hebel Decl. ¶¶ 17-18.

Dr. Salmon confirms in his report that Defendant's determination was valid and scientifically supported, explaining that, although it was known at that time that it was possible for vaccinated workers to transmit the virus, it also was widely accepted in the scientific community that vaccination was the most effective way to protect the health and safety of patients and staff. Ex. 2, Salmon Report, at 12. This was because vaccination reduced the likelihood of infection, which in turn reduced the likelihood of transmission. *Id.*

Health questionnaires, temperature checks, and testing were not adequate substitutes for vaccination and posed a health and safety risk to patients and staff because, among other reasons, they rely in part on self-reported data that could be inaccurate, and they would not detect asymptomatic or early infections. *Id.* at 16-17. Asymptomatic COVID-19 transmission by an unvaccinated healthcare worker was a significant risk to patients, especially more vulnerable ones, and staff. *Id.* at 6.

On November 9, 2021, counsel for Doylestown Health wrote to Plaintiff's counsel outlining why exempting him from the Mandate would cause an undue hardship. Exhibit 30, Letter dated November 9, 2021, from Christopher Durham to Kimberly L. Russell, D0000824-33 at D0000826-28. Among other things, in response to Plaintiff's counsel's assertion that vaccinated individuals could still transmit COVID-19, the letter explained that such transmissibility does not diminish the effectiveness of vaccination, which slows the spread of the virus by reducing the likelihood of infection in the first place. *Id.* at D0000828.

Without Medical Staff privileges, Plaintiff could not perform his duties pursuant to the Employment Agreement. Ex. 14, Levy Dep. 75:18-77:1, 115:23-23; Ex. 4 at D0000055-58. Therefore, the November 9, 2021 letter from Doylestown Health's counsel further notified Plaintiff and his counsel that, due to his breach of the provisions of the Employment Agreement obligating him to maintain his Medical Staff privileges and to comply with applicable Doylestown Hospital polices, Doylestown Health could terminate his employment following the expiration of his 30-day suspension. Ex. 30 at D0000824, D0000829.

### M.    Doylestown Health Terminates Plaintiff's Employment Due to His Failure to Maintain Medical Staff Membership and Privileges.

Because Dr. Auteri did not communicate to Doylestown Health that he was vaccinated for COVID-19 as of November 10, 2021, by letter dated November 11, 2021, the Medical Staff

notified Dr. Auteri that it recognized his voluntarily resignation of his Medical Staff membership and privileges.  Exhibit 31, Letter dated November 11, 2021, from Elinor Pernitsky to Joseph Auteri, D0000208.  On November 18, 2021, Doylestown Health formally terminated Dr. Auteri's employment.  Exhibit 32, Letter dated November 18, 2021, from John B. Reiss, Ph.D., J.D. to Joseph F. Auteri, M.D., 11/18/2021 D0000209-10.

## III.    LEGAL STANDARD

A court must grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). The "threshold inquiry" is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  If the moving party shows that there are no such issues, then, to avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, the nonmoving party must identify "specific facts showing that there is a genuine issue for trial*."* Fed. R. Civ. P. 56(e).  Additionally, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247-48.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Matsushita*, 475 U.S. at 587 (internal quotation marks and citation omitted).

## IV.    LEGAL ARGUMENT

Title VII prohibits religious discrimination in employment and requires an employer to accommodate an employee's sincerely held religious belief, unless doing so would impose an

"undue hardship on the conduct of the employer's business."  42 U.S.C. §§ 2000e-2(a)(1), 2000e(j)).[13]  To make out a prima facie case of religious discrimination under Title VII, including failure to accommodate a religious belief, an employee must show that: (1) he held a sincere religious belief that conflicted with a job requirement, (2) he informed his employer of the conflict, and (3) he was disciplined for failing to comply with the conflicting requirement. *Fallon v. Mercy Cath. Med. Ctr. of Se. Pa.*, 877 F.3d 487, 490 (3d Cir. 2017).  Once a plaintiff has established a prima facie case, the burden then shifts to the employer to show either that "it made good faith efforts to accommodate, or that the requested accommodation would work an undue hardship."  *Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 224 (3d Cir. 2000) (internal quotation marks and citations omitted).

Plaintiff's claims fail as a matter of law for two reasons.  First, Plaintiff's alleged belief is not religious in nature under applicable law and, therefore, he cannot establish the first element of a prima facie case.  Second, even if Plaintiff could make out a prima facie case, the record evidence establishes that exempting him from the Mandate would have imposed an undue hardship on Doylestown Health.  The Court should enter summary judgment for Defendant.

A.      **Plaintiff's Stated Basis for Requesting an Exemption from the Mandate is Not Religious in Nature.**

The Third Circuit has established a three-part test for assessing whether a belief meets the first element of a prima facie case of failure to accommodate.  *Africa v. Com. of Pa.*, 662 F.2d 1025, 1032 (3d Cir. 1981).  A belief is "religious" under the *Africa* framework only if it: (1) addresses fundamental and ultimate questions having to do with deep and imponderable matters;

---

[13] Courts in the Third Circuit analyze PHRA claims using the same analytical framework as Title VII claims.  *See Atkinson v. Lafayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006) ("Claims under the PHRA are interpreted coextensively with Title VII claims.").

(2) is comprehensive in nature; and (3) is accompanied by the presence of certain formal and external signs.  "While 'no court should inquire into the validity or plausibility of' a plaintiff's alleged beliefs, it is nonetheless incumbent upon the court to ensure that the alleged beliefs are rooted in a plaintiff's religion and are entitled to the broad protections guaranteed thereunder." *Aliano v. Twp. of Maplewood*, No. 22-cv-5598, 2023 WL 4398493, at *5 (D.N.J. July 7, 2023) (quoting *Fallon*, 877 F.3d at 490).  Courts therefore must distinguish "between those whose views [are] religious in nature and those whose views [are, for example,] 'essentially political, sociological, or philosophical.'"  *Fallon*, 877 F.3d at 490 (quoting *U.S. v. Seeger*, 380 U.S. 163, 184 (1965)); *see also Africa*, 662 F.2d at 1031 (internal quotation marks and citation omitted) ("[T]he very concept of ordered liberty precludes allowing [a plaintiff], . . . a blanket privilege to make [their] own standards on matters of conduct in which society as a whole has important interests.").

Here, Plaintiff's articulated beliefs on which his exemption request was based meet neither of the first two requirements of the *Africa* test. Therefore, his religious discrimination claims fail as a matter of law, and the Court should enter judgment in Defendant's favor.

      **1.**      **Plaintiff's Stated Objections to the Mandate in Support of His Exemption Request Were Not Based on Beliefs About Fundamental or Ultimate Questions.**

The first element of the *Africa* framework for determining whether a belief is religious asks whether the belief is about fundamental and ultimate questions having to do with deep and imponderable matters.  *Africa*, 662 F.2d at 1033.  Such questions include those "having to do with, among other things, life and death, right and wrong, and good and evil."  *Id.*  Importantly,

"plaintiffs cannot convert medical beliefs into religious ones by simply mentioning God."

*Shields v. Main Line Hosps., Inc.*, 700 F. Supp. 3d 265, 271 (E.D. Pa. 2023).

It is well-established, therefore, that "[t]he notion that we should not harm our bodies is ubiquitous in religious teaching, but a 'concern that [a treatment] may do more harm than good[ ] *is a medical belief, not a religious one.*'" *Geerlings v. Tredyffrin/Easttown Sch. Dist.*, No. 21-cv-4024, 2021 WL 4399672, at *7 (E.D. Pa. Sept. 27, 2021) (emphasis added) (quoting *Fallon*, 877 F.3d at 492) (modification in original) (denying motion for preliminary injunction against masking requirement because objection to masks was not sufficiently religious); *see also Berna v. Bayhealth Med. Ctr., Inc.*, No. CV 23-945-RGA, 2024 WL 456420, at *5 (D. Del. Feb. 5, 2024) (dismissing failure to accommodate claims, holding that "Plaintiff's focus on the efficacy and potential harm caused by the vaccine demonstrate[s] that Plaintiff's objection to the vaccine is based on scientific and medical beliefs [regarding, among other things, risks of myocarditis and pericarditis]"). This concept applies with equal force to a claim that an mRNA vaccine conflicts with religious beliefs by altering genetics. *See Hand v. Bayhealth Med. Ctr., Inc.*, No. CV 22-1548-RGA, 2024 WL 359245, at *5 (D. Del. Jan. 31, 2024), *aff'd sub nom. McDowell v. Bayhealth Med. Ctr., Inc.*, No. 24-1157, 2024 WL 4799870 (3d Cir. Nov. 15, 2024) (holding plaintiff's concern about DNA alteration was merely an "aversion to harming her body").

In the Religious Exemption Request, Plaintiff stated that he had "recently been through a . . . season of prayer and fasting regarding the vaccine mandate" and was "being led by the Holy Spirit to respectfully decline the Covid vaccine." Ex. 15 at D0000154. He explained that he "believe[d] [his] body belongs to God and is the temple of his Holy Spirit." *Id.* As support, Plaintiff quoted the Bible passage 1 Corinthians 6:19-20: "'[D]o you not know that your body is a temple of the Holy Spirit who is in you, whom you have from God, and that you are not your

own?  For you have been bought with a price: therefore glorify God in your body.'"  *Id.*  He

concluded, "I believe that for me to ingest this vaccine is a violation of the Holy Spirit's leading,

and therefore would be sin."  *Id.*  Plaintiff also objected to vaccination based on alleged natural

immunity from a prior COVID-19 infection.  Ex. 15.

　　　　While Defendant does not question whether Plaintiff is a "follower of Christ," his *general*

religiosity is immaterial here.  Each of Plaintiff's stated reasons for refusing a COVID-19

vaccine is personal, secular and/or medical, and consistent with the purported concerns with

COVID-19 vaccines he raised repeatedly in the months before he raised his eleventh-hour

religious objection, namely:

(a)　　safety concerns (Ex. 3, Pl. Dep. 154:4-155:1), including possible adverse effects
such as Guillain-Barre Syndrome and myocarditis (*id.* 114:20-116:14, 128:22-
130:17, 140:1-24, 193:1-24), fear of other harm to the immune system due to the
presence of antigens from previous infection (*id.* 128:22-130:17), and the
supposed superiority of "God-given" natural immunity over vaccination (*id.*
106:2-107:3, 241:21-244:23; 254:10-257:21), all of which Plaintiff has sought to
reconceptualize in this litigation as a belief that his "body is a temple";

(b)　　worries about alleged genetic alteration, which Plaintiff did not mention in the
Religious Exemption Request but now claims was part of a religious objection
(*id.* 314:3-315:22,440:7-441:7); and

(c)　　data reflecting that vaccinated individuals could transmit the virus, which Plaintiff
cited (and he and his proffered expert continue to cite) as a major reason why he
should not have been required to comply with the Mandate (*id.* 134:2-136:6).

None of these concerns qualify as religious under *Africa*.  This deficiency is fatal to Plaintiff's

failure to accommodate claim as a matter of law.

　　　　　　　　**a.**　　**Plaintiff's Belief That His "Body is a Temple" Is Not Religious
　　　　　　　　as a Matter of Law.**

　　　　The Third Circuit conclusively and recently has held that a belief that one's "body is a

temple" does not meet the first element of the *Africa* test.  *McDowell*, 2024 WL 4799870, at *3.

In *McDowell*, a case nearly identical to this one, involving the same type of a challenge to a

healthcare employer's COVID-19 vaccine mandate, the Third Circuit noted that "claiming one's body is G-d's temple is a high-level, religiously-inspired goal: treat one's body well[.]" *McDowell*, 2024 WL 4799870, at *3 (quotation omitted). Under the first *Africa* element, however, "[e]ven viewing [this] objection as religiously inspired, a 'concern that [a] vaccine may do more harm than good [ ] is a medical belief, not a religious one[,]' and a 'general moral commandment' drawn from religion *cannot transform a medical objection into a religious one*." *Id.* (emphasis added) (citing *Fallon*, 877 F.3d at 492).

In *McDowell*, a group of employees objected to their employer's COVID-19 vaccine requirement. *Id.* at *1. Like Plaintiff, they argued that receiving a COVID-19 vaccine would violate the "religious teaching" that "their bodies are G-d's temples," including that "they are created in G-d's image with a G-d-given immune system, that G-d guides them and informs their conscience, that altering one's DNA is contrary to their religious teachings, or some combination thereof." *Id.* The Third Circuit affirmed the dismissal with prejudice of the plaintiffs' religious discrimination claims, holding that those stated beliefs "were medical, scientific, personal, or secular in nature, rather than religious." *Id.* at *1, *3.

Even before *McDowell*, this Court held that a belief that one's body is a "temple of [God's] Holy Spirit," such that it would be against religious precepts to accept a COVID-19 vaccine, "does not suffice to qualify as a religious belief under *Africa*." *Ritter v. Lehigh Valley Health Network*, No. 22-4897, 2024 WL 643543, at *5 (E.D. Pa. Feb. 15, 2024) (quoting *Finkbeiner v. Geisinger Clinic*, 623 F. Supp. 3d 458, 465–66 (M.D. Pa. 2022)). In *Ritter*, the plaintiff's exemption request, like Plaintiff's here, said she "believe[d] her body is a 'temple of His Holy Spirit,'" that she had "'prayed about how to respond to the COVID-19 vaccination directive[,]' and [that] 'the Holy Spirit ha[d] moved on [her] heart, and conscience that [she]

27

must not accept the COVID-19 vaccines.'"  *Id.* at *5.  Because the stated belief did not satisfy the first *Africa* factor, among other reasons, the court dismissed the plaintiff's religious discrimination claims.  *Id.* at *6.

Plaintiff's belief that his "body belongs to God and is the temple of his Holy Spirit" is *the same belief*—stated in nearly *verbatim* language in the Religious Exemption Request—that the *McDowell* and *Ritter* courts found did not qualify as religious under *Africa*.  The specifics of this belief, as Plaintiff himself articulated them, included generalized safety concerns (Ex. 3, Pl. Dep. 154:4-155:1), risks of Guillain-Barre Syndrome and myocarditis (*id.* 128:22-130:17, 140:1-24, 193:1-24), and other alleged harmful effects on persons with previous COVID-19 infections (*id.* 128:22-130:17).  Those concerns were a subject of extensive discussion between Doylestown Health and Plaintiff, including a proposed amendment to the Employment Agreement designed to alleviate Plaintiff's trepidation about possible side effects of the vaccines that he thought might affect his ability to perform surgery.  Ex. 12, Ex. 13; Ex. 3, Pl. Dep. 193:1-24, 194:6-196:24, 297:16-300:19.  As a matter of law, such concerns are *not* about fundamental and ultimate questions having to do with deep and imponderable matters.  Therefore, they cannot sustain a claim of religious discrimination.  *Africa*, 662 F.2d at 1033; *McDowell*, 2024 WL 4799870, at *3; *Ritter*, 2024 WL 643543, at *5-*6.

Further, to the extent Plaintiff relies for his "body is a temple" position on an alleged view that "God-given" natural immunity provided him with better protection than a vaccine, as he stated in the Medical Exemption Request and on prior occasions, that alleged belief, too, is medical and not religious.  *See McDowell*, 2024 WL 4799870, at *2 n.5 (noting that such a belief is "rooted in personal, secular, scientific, or medical views about the vaccine and its impact on [recipient's] bodies in ways that are unconnected to their overarching religious beliefs"); *Shields*,

28

700 F. Supp. 3d at 271-72 (granting summary judgment for defendant employer on plaintiff's religious accommodation claim, explaining that alleged "belief in God-given natural immunity" does not qualify as a religious belief under *Africa* because such a "natural immunity belief is rooted in medical and scientific beliefs, rather than religion").

Here, as in *Shields*, Plaintiff's stated belief in natural immunity is not about fundamental and ultimate questions having to do with life and death.  Furthermore, Plaintiff's statements and conduct prior to submitting the Exemption Requests make clear that his "natural immunity" objection to the vaccine was entirely science-based, until he supplemented it with the word "God" for the first time in the Medical Exemption Request in October 2021.  Those earlier assertions reveal the actual, purportedly scientific nature of the "natural immunity" basis for Plaintiff's exemption request.  *See Garza*, 2024 WL 3904984, at *5 ("[T]the fact that [plaintiff] consistently attempted to request medical exemptions at the same time and with the same basis as her religious exemption requests suggest that Plaintiff's beliefs are political, sociological, or philosophical, rather than religious.") (internal citation omitted); *Aukamp-Corcoran v. Lancaster Gen. Hosp.*, No. 19-5734, 2022 WL 507479, at *4 (E.D. Pa. Feb. 18, 2022) (noting "the circumstances and timing surrounding Plaintiff's request for a religious-based exemption to Defendant's vaccine requirement are suspicious" because "she only requested her religious-based exemption after she had researched vaccines 'from a medical perspective'").  "[S]imply mentioning God," as Plaintiff has done, does not "convert medical beliefs into religious ones." *Shields*, 700 F. Supp. 3d at 271; s*ee also Wilhoit v. AstraZeneca Pharmaceuticals LP*, No. 22-1634-GBW-SRF, 2024 WL 2843169, at *4 (D. Del. June 5, 2024) (holding that "Plaintiffs' beliefs about the effects of natural immunity are scientific and thus separate from their religious objections to the vaccine mandate") (internal quotation marks and citation omitted).  No

reasonable jury could accept Plaintiff's eleventh-hour attempt to convert these scientific beliefs into religious ones.

> **b.    Plaintiff's Purported Concerns About Genetic Alteration Are Immaterial and Purely Scientific and Medical.**

Plaintiff also bases his religious exemption request on his purported concern that taking "an mRNA vaccine" would "mess with [his] DNA." Ex. 3, Pl. Dep. 313:12-315:3. This concern, which Plaintiff notably mentioned for the first time in his deposition (more than three years after submitting the Exemption Requests), cannot support his failure to accommodate claim as a matter of law, for two distinct reasons.

First, the Mandate did not require Plaintiff to receive an mRNA vaccine. The Janssen Biotech vaccine, available to Plaintiff in November 2021, was *not an mRNA vaccine*. Ex. 2, Salmon Report, at 11. This alone precludes Plaintiff's stated genetic concern from creating a genuine issue of material fact as to whether his exemption request actually was religious in nature.

Second, Plaintiff's concern about alleged genetic effects of taking an mRNA vaccine is scientific and medical in nature and cannot form the basis for a protected religious exemption request as a matter of law. *See, e.g.*, *Hand*, 2024 WL 359245, at *5 (holding plaintiff's stated belief that mRNA vaccine "will be integrated into your DNA, thus altering the DNA that God created us with" was "based fundamentally on her scientific and medical beliefs about the vaccine," and that "[s]uch medical and scientific judgments do not qualify as religious belief"). Like the plaintiff in *Hand*, Plaintiff's position "lacks any explanation of how altering one's DNA, even if it is the one 'God created us with,' is prohibited by [his] religious beliefs." *Id.*

The proffered opinions of Plaintiff's expert, Dr. McCullough, only further reinforce that Plaintiff's beliefs in this regard are scientific and medical rather than religious. *See, e.g.*, Expert

Report of Dr. Peter McCullough, MD, MPH (the "McCullough Report"), Exhibit 33 at 12 ("Dr. Auteri's sincerely held and expressed religious beliefs [regarding alleged genetic alteration and other matters] were supported by *the data* known in 2021[.]") (emphasis added); *id.* ("Dr. Auteri's expressed religious concerns about the potential of the COVID-19 [v]accines to alter Dr. Auteri's genetic profile were well founded based upon the known mechanism of action of those vaccines, which has been shown to alter the human genome through reverse transcription."). These opinions confirm that Plaintiff's concern was about the science of COVID-19 vaccination, as allegedly reflected in "data" about alleged genetic effects on the body. *See Brunson v. Aiken/Barnwell Ctys. Cmty. Action Agency, Inc.*, No. CV 1:24-36-JDA-SVH, 2024 WL 4186082, at \*8 (D.S.C. Mar. 1, 2024), *report and recommendation adopted*, No. 1:24-CV-00036-JDA, 2024 WL 3665783 (D.S.C. Aug. 6, 2024) "[W]hether the COVID-19 vaccine is harmful or ineffective is not a belief, religious or otherwise, but rather a concern of scientific fact.").[14]

Unlike in *Gray v. Main Line Hospitals, Inc.*, 717 F. Supp. 3d 437 (E.D. Pa. 2024), Plaintiff has only questioned the safety and efficacy of the vaccine from a personal or medical

---

[14] Notably, and as discussed in greater detail in Doylestown Health's Motion to Exclude the Report and Testimony of Dr. Peter McCullough, although Plaintiff's position regarding alleged genetic alteration is entirely areligious whether well-founded or not, Dr. McCullough's opinion that COVID-19 vaccines alter genetic makeup is not scientifically correct, as several federal courts have recognized. *See, e.g., Messina v. Coll. of N.J.*, 566 F. Supp. 236, 248 (D.N.J. 2021) (rejecting attempts by plaintiffs to "re-categoriz[e] the COVID-19 vaccines as 'Gene Therapy Products'" and instead accepting the CDC's scientifically supported position that "the COVID-19 vaccines in fact qualify as vaccines"); *Smith v. Biden*, No. 1:21-CV-19457, 2021 WL 5195688, at \*6 (D.N.J. Nov. 8, 2021) (holding that plaintiffs "provided no medical authority or competent evidence to support the argument that COVID-19 vaccines are gene therapy products rather than vaccines"); *Valdez v. Lujan Grisham*, No. 21- CV-783 MV/JHR, 2022 WL 3577112, at \*12–13 (D.N.M. Aug. 19, 2022) ("Plaintiffs characterize the COVID-19 vaccines as 'gene modification therapies,' . . . but provide no medical authority to distinguish the COVID-19 mRNA vaccines from any other vaccines; indeed, public health information is to the contrary, as 'the CDC has clearly opined that the [vaccines against COVID19] constitute 'vaccines.'"). The reality, of which the Court may take judicial notice, is that "[t]he vaccine *does not alter a person's DNA*." *Brunson*, 2024 WL 4186082, at \*10 n.3 (emphasis added) (taking "judicial notice of factual information" posted on CDC website directly contradicting plaintiff's purported belief that COVID-19 vaccines alter DNA).

perspective, and he has not connected his stated beliefs in that regard to any sufficiently religious principle.  In *Gray*, the court held that the plaintiff met the first *Africa* factor only because she did "not *explicitly* state that the vaccine would harm her body," and her alleged belief had other characteristics, such as views about conception, natural death, and fertility, which the court recognized as potential "evidence that her belief is specifically against vaccines with 'genetic components' that would alter her God given design and not concern with the safety of vaccines." *Id.* at 447-48 (emphasis added).  Here, in contrast, Plaintiff has never linked his alleged concerns about genetic alteration to anything other than his belief that his "body is a temple," which courts have recognized is purely about harm to one's body.  *Hand*, 2024 WL 359245, at *4.

<blockquote>

c.      **Plaintiff's Stated Beliefs About Transmissibility Were Personal and/or Medical.**

</blockquote>

When Doylestown Health was considering the Mandate and Plaintiff was still open to becoming vaccinated (*see* Ex. 3, Pl. Dep. 294:24-295:16, 296:2-5), Plaintiff focused heavily on the fact that the COVID-19 vaccines available in November 2021 did not completely prevent all transmission of the virus, indicating that his real concern was the efficacy of the vaccines, not any violation of religious principles. Ex. 3, Pl. Dep. 134:2-136:6.  Plaintiff's "concerns about the effectiveness of COVID-19 vaccines [such as transmissibility among the vaccinated] bear no relationship to the present discussion [regarding alleged religious belief] and, if anything, actually serve to strengthen the view that Plaintiff's request is personal and/or medical in nature as opposed to religious." *Saqa v. Factory Mut. Ins. Co.*, No. CV 23-3994 (SDW) (JBC), 2024 WL 4345209, at *5 (D.N.J. Sept. 30, 2024) (citing *Garza v. Wellspan Philhaven*, No. 23-00698, 2024 WL 3904984, at *5 (M.D. Pa. Aug. 22, 2024)).  Plaintiff's earlier emphasis on the scientific argument regarding transmissibility significantly undermines the notion that his objection to the COVID-19 vaccines was religious.  *See Aukamp-Corcoran*, 2022 WL 507479 at

*4 (internal quotation marks omitted) (rejecting employee's narrative that abrupt shift from scientific to purported religious views was "natural progression from medical to religious" where earlier objections to vaccination focused solely on science).

*    *    *

The beliefs articulated by Plaintiff in support of his exemption request—i.e., that his body is a "temple," including alleged "natural immunity" from contracting COVID-19 previously; that mRNA COVID-19 vaccines somehow alter one's DNA; and his position on transmissibility—are not religious.  At bottom, they are personal, secular, and/or medical in nature.  *McDowell*, 2024 WL 4799870, at *3; *Shields*, 700 F. Supp. 3d at 271.  And "'[t]he notion that all of life's activities can be cloaked with religious significance' cannot transform an otherwise secular idea into a religious belief."  *Maher v. Bayhealth Med. Ctr., Inc.*, No. 22-cv-1551, 2024 WL 406494, at *2 (D. Del. Feb. 2, 2024) (quoting *Africa*, 662 F.2d at 1035), *aff'd sub nom. McDowell*, 2024 WL 4799870 (3d Cir. Nov. 15, 2024). ),

Because the beliefs asserted by Plaintiff as the basis for his religious exemption request are not about fundamental and ultimate questions having to do with deep and imponderable matters, as a matter of law they fail to meet the first *Africa* factor.  *See Kennedy v. PEI-Genesis*, 719 F. Supp. 3d 412, 418 (E.D. Pa. 2024), *aff'd*, No. 24-1563, 2025 WL 602159 (3d Cir. Feb. 25, 2025) (quoting *Rodrique v. Hearst Commc'ns, Inc. et al.*, Civ. A. No. 22-12152-RGS, 2024 WL 733325, at *2 (D. Mass. Feb. 22, 2024)) (holding plaintiff's allegedly religious objection "'[a]t best, . . . reflect[ed] a personal medical judgment about the necessity of Covid-19 vaccination rigged out with religious verbiage'" and, therefore, "[n]o reasonable juror could conclude that his opposition to the vaccine is a product of deep and imponderable questions.").  For that reason alone, Defendant is entitled to summary judgment on Plaintiff's failure to accommodate claim.

33

2.    **Plaintiff's Stated Religious Objection to COVID-19 Vaccines Was, at Most, an Isolated Moral Teaching, not a Comprehensive System of Beliefs.**

Plaintiff also fails as a matter of law to meet the second *Africa* factor, because his alleged religious views about COVID-19 vaccines are not comprehensive in nature. A belief is a comprehensive system if it "consist[s] of something more than a number of isolated, unconnected ideas." *Africa*, 662 F.2d at 1035. The belief cannot be "confined to one question or one moral teaching"; it must instead have "a broader scope" and "lay[ ] claim to an ultimate and comprehensive truth." *Id.* (internal quotation marks and citation omitted).

The belief that one's body is a "temple of [God's] Holy Spirit" precluding COVID-19 vaccination "does not suffice to qualify as a religious belief under *Africa*" because, among other reasons (discussed above), it is merely "an isolated moral teaching." *Ritter*, 2024 WL 643543, at *5 (quoting *Finkbeiner*, 623 F. Supp. 3d at 465–66) (rejecting argument that objection to COVID-19 vaccine was religious where plaintiff said that she "believes her body is a 'temple of His Holy Spirit,' that she 'prayed about how to respond to the COVID-19 vaccination directive' and 'the Holy Spirit has moved on [her] heart, and conscience that [she] must not accept the COVID-19 vaccines'"). As courts consistently have recognized, "[t]hough fungible enough to cover anything [the employee] trains it on, this belief [that one's body is God's temple or the like] is an isolated moral teaching . . . not a comprehensive system of beliefs about fundamental or ultimate matters.'" *Ulrich v. Lancaster Gen. Health*, No. 22-4945, 2023 WL 2939585, at *5 (E.D. Pa. Apr. 13, 2023) (quoting *Finkbeiner*, 623 F. Supp. 3d at 465-66) (granting motion to dismiss failure to accommodate claim based on in part on belief that one's "body is a temple of the Holy Spirit"); *Hand*, 2024 WL 359245, at *5 (same).

Similarly, an employee's "argument that God bestowed natural immunity upon [him], thereby obviating the need to get vaccinated, 'would amount to a blanket privilege and a limitless excuse for avoiding all unwanted obligations.'"[15] *Shields*, 700 F. Supp. 3d at 270 (quoting *Finkbeiner*, 623 F. Supp. 3d at 466) (granting summary judgment for employer on failure to accommodate claim and finding employees assertion that "God bestowed natural immunity upon her" was mere isolated moral teaching).  In *Shields*, this Court held that the plaintiff did not satisfy the second *Africa* factor because her objections to a COVID-19 vaccine based on natural immunity were nothing more than "'a number of isolated, unconnected ideas'" that "d[id] not rise to the level of comprehensiveness necessary to be considered religion."  *Shields*, 700 F. Supp. 3d at 271-72 (quoting *Africa*, 662 F.2d at 1035); *see also Kennedy*, 719 F. Supp. 3d at 418 (granting summary judgment on plaintiff employee's failure to accommodate claim, holding that plaintiff's allegedly Christianity-based objection to COVID-19 vaccines was "an isolated view based on a single moral teaching: that [employee] should not defile his body").[16]

---

[15] As discussed above, the remaining bases for Plaintiff's request for exemption from the Mandate—worries about alleged genetic alteration and his belief that the transmissibility of COVID-19 by vaccinated persons rendered vaccination ineffective—are so plainly scientific or medical that they could not possibly be part of a comprehensive system of religious beliefs.  *See, e.g.*, *Saqa*, 2024 WL 4345209, at *2-*4 (internal quotation marks omitted) (dismissing plaintiff's failure to accommodate claim in part because plaintiff's stated belief, which included concerns about "mRNA genetic modification technology" and the position that "vaccine products then available to the public did not actually prevent transmission or infection" was "not part of a comprehensive system" of religious beliefs).

[16] Such beliefs stand in contrast to the belief articulated by the plaintiff in *Gray* that the court found was part of a comprehensive set of beliefs because, in that case, the plaintiff "connected the belief [that the vaccine would alter her God-created design] to her refusal to pursue certain fertility options," which the court reasoned was indicative that "her belief does not seem to be an isolated and unconnected belief." 717 F. Supp. 3d at 447.  Here, unlike in *Gray*, Plaintiff has not connected his vaccine objections to any comprehensive belief system, instead presenting them as discrete, unrelated maxims without any larger religious context.

Plaintiff's stated beliefs in support of his religious are akin to the hodgepodge of beliefs that the court held did not meet the second *Africa* factor in *Ritter*, *Ulrich*, *Shields*, and *Kennedy*. This Court should hold likewise and grant summary judgment in favor of Defendant.[17]

**B.    Exempting Plaintiff, a Heart Surgeon Treating Patients at Higher Risk of Severe Illness from COVID-19, from the Mandate Would Have Imposed an Undue Hardship on Doylestown Health.**

Plaintiff's claims fail as a matter of law for another reason: under Third Circuit law, including a recent controlling decision directly on point, exempting him from the Mandate would have imposed an undue hardship on Doylestown Health.  Because such undue hardship fully disposes of any failure to accommodate claim, Defendant is entitled to summary judgment.

**1.    Undue Hardship Defeats a Claim of Religious Discrimination.**

"Undue hardship is a complete defense to" claims of failure to accommodate a religious belief.  *Bushra v. Main Line Health, Inc.*, No. 24-1117, 2025 WL 1078135, at *1 (3d Cir. Apr. 10, 2025).  A religious accommodation imposes an undue hardship on an employer if it "would result in substantial increased costs in relation to the conduct of [the employer's particular business." *Groff v. DeJoy*, 600 U.S. 447, 470 (2023).  In applying this standard, this Court must "take[ ] into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size, and operating cost of an employer." *Id.*  "Thus, 'the context of an employer's business' matters in determining whether a hardship would be substantial.'" *Bushra v. Main Line Health, Inc.*, 709 F. Supp. 3d

---

[17] As to the last *Africa* factor, the record is devoid of any evidence that Plaintiff's alleged religious views regarding the vaccine are subjects of any formal or external manifestation.  *See, e.g.*, *Ritter*, 2024 WL 643543, at *5 ("Plaintiff's view [that her body is a 'temple of His Holy Spirit] is not manifested in any formal or external signs.").  At best, viewed in the light most favorable to Plaintiff, this factor is neutral. Regardless, as a matter of law it cannot overcome Plaintiff's inability to establish either of the first two *Africa* factors.

164, 175–76 (E.D. Pa. 2023), *aff'd*, 2025 WL 1078135 (quoting *Groff*, 600 U.S. at 470).

Consistent with *Groff*, the Third Circuit "has recognized that both "economic and non-economic

costs can impose an undue hardship on employers.'" *Id.* (quoting *E.E.O.C. v. Geo Group, Inc.*,

616 F.3d 265, 273 (3d Cir. 2010)).

> **2.     The Third Circuit's Recent Decision in *Bushra* Compels Summary Judgment in Favor of Doylestown Health Based on Undue Hardship.**

In *Bushra*, a case on all fours with this action, the Third Circuit recently affirmed a grant

of summary judgment in favor of a hospital on a doctor's religious failure to accommodate

claim, holding that exempting the doctor from his health system employer's COVID-19 vaccine

mandate would have imposed an undue hardship on the health system.  2025 WL 1078135, at *2.

*Bushra* compels the same result here: a grant of summary judgment for Doylestown Health.

Relying extensively on the opinion of Dr. Salmon, in *Bushra* the Third Circuit held that

having "unvaccinated healthcare workers, like" a doctor who "treated vulnerable patients" in the

hospital's emergency department[18] constituted an undue hardship to a hospital because it

"presented an increased risk of transmitting COVID-19 to others, particularly when they

interacted with vulnerable groups." *Id.* at *2.  As the court explained:

> The consequences of increased COVID-19 transmission are well-established and undisputed: patients and employees at [the hospital] died from COVID-19, and the on-site spread of this serious infectious disease compromised [the hospital's] mission and ability to care for sick patients, and it jeopardized the health and efficacy of its employees and staff.

---

[18] The vulnerability of patients in the Heart Institute, where Plaintiff worked, arguably is greater than that of the patients the plaintiff-doctor in *Bushra* treated in the emergency department.  Plaintiff treated only cardiac patients, all of whom are particularly vulnerable to COVID-19 (albeit perhaps in varying degrees) (Pl. Dep. 56:2-14), whereas the *Bushra* plaintiff-doctor treated a wider variety of patients, likely including many who were not particularly vulnerable (e.g., an otherwise healthy patient who suffered a broken bone).  2025 WL 1078135, at *1-*2.  Thus, unlike the doctor in *Bushra*, it was a certainty that Plaintiff would provide direct care to a highly vulnerable patient population on a daily basis.

*Id.* Here, too, Doylestown Health proffers Dr. Salmon's expert opinion that allowing unvaccinated doctors to provide direct care to vulnerable patients threatens the health and safety of those patients, as well as other staff members. *See* Ex. 2, Salmon Report, at 5, 13.

In *Bushra*, the Third Circuit also agreed with Dr. Salmon that "alternative infection control strategies, such as frequent testing and masking, were not sufficient to prevent transmission." 2025 WL 1078135, at *2. Here, Dr. Salmon similarly opines that alternatives to vaccination, such as the testing and health screening proposed by Plaintiff, do not suffice to mitigate the risk of transmission and the resulting, potential deadly consequences thereof. *See* Ex. 2, Salmon Report, at 16-17.

In *Bushra*, the district court also relied extensively on the expert opinion of Dr. Salmon in granting summary judgment for the hospital. 709 F. Supp. 3d at 175-76. As he does here, "Dr. Salmon explain[ed] that vaccines were proven to be highly effective in preventing the disease at the time that [the hospital] instituted the mandate," and the court agreed. *Id.* at 175. The court noted that "[t]he CDC recommended, in no uncertain terms, that all eligible persons should be vaccinated, including those with previous COVID-19 infection,"[19] and it took "judicial notice that COVID-19 caused a deadly global pandemic at a scale unseen in a century." *Id.* Thus, the court accepted Dr. Salmon's opinion—the *same one* he provides here—that "each vaccine exemption poses a significant risk to the health and safety of employees and patients." *Id.*; *see* Ex. 2, Salmon Report, at 18 ("[E]ach non-medical exemption a healthcare facility granted

---

[19] This Court should "join the significant majority of judges reviewing [COVID-19-related] arguments who choose to follow CDC guidance[.]" *United States v. Martin*, No. CR 98-178, 2021 WL 4169429, at *6 (E.D. Pa. Sept. 14, 2021), *aff'd*, No. 21-2853, 2022 WL 621689 (3d Cir. Mar. 3, 2022).

increased the risk of COVID-19 disease transmission and outbreaks adversely impacting other healthcare staff, patients, and the capacity of the healthcare system to operate.").

The court further agreed with the hospital and Dr. Salmon that, "[b]ecause healthcare workers faced such significant infection risk, they were also more likely to transmit the disease . . . [and] healthcare workers were at increased risk of infecting their patients, which included persons at increased risk of serious complications and death from the disease." 709 F. Supp. 3d at 175. As he does in this case, Dr. Salmon also opined, and the court agreed, that "[a]lthough several studies found that some natural immunity derived from contracting COVID-19 existed for at least a short period of time, there was insufficient empirical data to determine its effectiveness, the length of protection, and whether protection extended to new variants that might emerge." *Id.*; Ex. 2, Salmon Report, at 12, 19. Based heavily on these opinions, the court concluded:

> It cannot be disputed that without the vaccine, Dr. Bushra was at great risk of contracting and transmitting the disease because he had frequent and direct contact with patients and staff as a doctor in the emergency room. Unvaccinated, Dr. Bushra risked infecting and even causing the death not only of his colleagues and [hospital] staff but also of vulnerable patients. The ability of [the hospital] to continue its mission of caring for, treating, and healing the sick and injured *would have been **severely impaired*** with an unvaccinated Dr. Bushra in its midst. In sum, ***there can be <u>no doubt</u>*** that [the hospital] ***<u>would have incurred undue hardship</u>*** in the form of substantial social, if not economic, costs if it had been required to accommodate Dr. Bushra's religious beliefs.

*Id.* at 175-76 (emphasis added). On that basis, the court granted summary judgment for the hospital. *Id.* As noted above, the Third Circuit affirmed. *Bushra*, 2025 WL 1078135, at *2-*3.[20]

---

[20] On April 24, 2025, the plaintiff in *Bushra* filed a petition seeking rehearing before the original panel that heard the appeal, as well as before the Third Circuit en banc. Pet. for Rehearing or Rehearing En Banc of Appellant Joseph Bushra Pursuant to Fed. R.A.P. 40(a). *Bushra*, No. 24-1117, ECF Doc. No.

Because there is no daylight between *Bushra* and this case, it is fully dispositive of Plaintiff's claims.  This Court should follow the Third Circuit's holding and grant summary judgment in Defendant's favor.

> **3.    Doylestown Health's Denial of Plaintiff's Religious Exemption Request on Undue Hardship Grounds Was Lawful and Is Supported by Dr. Salmon's Expert Opinion.**

As set forth above, in establishing the Mandate, Defendant determined that mandatory COVID-19 vaccination was the most effective method of protecting its patients and staff from COVID-19.  Ex. 8; Ex. 9.  Furthermore, for the purpose of considering exemption requests from the Mandate, Defendant identified departments and service lines that involved relatively greater contact with more vulnerable patients, including the Heart Institute where Plaintiff performed heart surgery on vulnerable cardiac patients, in which having unvaccinated healthcare workers would unacceptably risk those patients' health and safety.  Hebel Decl. ¶ 6, 15-16; Ex. 16. Defendant determined that the only available accommodation for employees who worked in such areas was, where feasible, reassignment to a department or service line that involved contact with less vulnerable patients.  Hebel Decl. ¶ 7; Ex. 18; Ex. 17, Hebel Dep. 13:8-14:12.  In Plaintiff's case, because he was head of the Heart Institute, was contractually obligated to serve in that capacity and perform heart surgery, had a specialized, non-fungible skill set as a heart surgeon, and lacked medical credentials to practice in another area, Defendant could not reassign him. Ex. 17, Hebel Dep. 27:4-24; 40:4-41:1; Ex. 14, Levy Dep. 133:10-135:7; Hebel Decl. ¶ 18. Accordingly, Defendant denied his request for a religious exemption from the Mandate. Hebel Decl. ¶ 19.

---

34 (3d Cir. Apr. 24, 2025) On May 9, 2025, the Third Circuit denied that petition.  Order Sur Petition for Rehearing, *Bushra*, No. 24-1117, ECF Doc. No. 35 (May 9, 2025).

These decisions and actions are supported by the opinion of Dr. Salmon, a qualified and

experienced vaccinologist whose analysis and opinions have been accepted by numerous courts,

including in *Bushra*. Dr. Salmon opines that unvaccinated healthcare workers are at greater risk

of contracting COVID-19 than vaccinated workers and, therefore, they are more likely to

transmit COVID-19 to others. Ex. 2, Salmon Report, at 8-9, 19. Unvaccinated healthcare

workers thus pose a significant risk of infecting their patients while providing direct care. *Id.* at

9, 19. Dr. Salmon further explains that, in November 2021, it was scientifically clear that

COVID-19 vaccines were highly effective at preventing COVID-19 infections and transmission,

including by and among healthcare workers and their patients. *Id.* at 9-11.

    Critically, according to Dr. Salmon, other approaches to managing the COVID-19

pandemic in the context of a healthcare facility, such as health questionnaires, temperature

checks, and testing, were not adequate substitutes for vaccination, and reliance on such measures

posed a health and safety risk to patients and staff.[21] *Id.* at 16-17. Moreover, questionnaires and

temperature checks would not address the risk of asymptomatic COVID-19 transmission by an

unvaccinated worker. *Id.* at 6. Vaccination was understood to be the most effective strategy to

---

[21] In the Second Amended Complaint, Plaintiff makes various allegations to the effect that "Doylestown
Health refused to engage in the interactive process in an effort to reach a reasonable accommodation of
the [COVID-19 vaccination] [m]andate requirements with [Plaintiff]." 2d Am. Compl., ECF Doc. No.
20, ¶ 165; *see also id.* at ¶¶ 75, 77, 78, 82, 84, 102, 103, 115-17, 120-22, 125, 128, 145, 150. The
allegation that Defendant failed to engage in the interactive process is irrelevant to Plaintiff's religious
discrimination claims. *Mullen v. AstraZeneca Pharms., LP*, No. CV 23-3903, 2023 WL 8651411, at *5
n.2 (E.D. Pa. Dec. 14, 2023) (citing *Miller v. Port Authority of New York & New Jersey*, 788 F. App'x
886, 890 n.19 (3d Cir. 2019)) ("While engagement in an 'interactive process' through which an employer
and employee will work together to find an appropriate reasonable accommodation, is a duty imposed by
the Americans with Disabilities Act, a similar duty has not yet been imposed for Title VII religious
accommodation claims."); *see also Ritter*, 2024 WL 643543, at *7 (same); *Bey v. Pocono Med. Ctr.*, No.
3:23-CV-688, 2024 WL 1977986, at *6 (M.D. Pa. May 3, 2024) (holding, in context of claim alleging
failure to accommodate religious objection to COVID-19 vaccination mandate, "this court agrees with the
*Ritter* court on this specific issue and finds that Defendant was also not required to engage in an
interactive process here").

protect healthcare workers from contracting viruses, and thus to prevent them from transmitting such viruses to their patients. *Id.* at 12.

For these reasons, each exemption from a vaccination mandate increases the health and safety risk of COVID-19 for a healthcare facility like Doylestown Health. *Id.* at 18. And, because some patients are more vulnerable than others to the risks of COVID-19, it was appropriate for Doylestown Health to distinguish between more vulnerable and less vulnerable patient populations for purposes of determining whether it could accommodate an exemption from the Mandate. *Id.* at 19.

Dr. Salmon's thoroughly referenced opinions in this case support the legality of Doylestown Health's denial of Plaintiff's religious exemption request based on undue hardship and are consistent with his opinions on which the district court and the Third Circuit relied in *Bushra* to hold that the requested exemption would impose an undue hardship on the hospital seeking to enforce its COVID-19 mandate. *See Bushra*, 709 F. Supp. 3d 175-76; *Bushra*, 2025 WL 1078135, at *2-*3.[22]

Numerous courts in other jurisdictions also have concluded that allowing unvaccinated employees to work in healthcare facilities constitutes an undue hardship under Title VII. *See, e.g.*, *Savel v. MetroHealth Sys.*, No. 1:22-CV-02154, 2024 WL 4581542, at *12 (N.D. Ohio Oct. 25, 2024) (collecting cases) ("Courts across the country, both pre- and post *Groff*, have held that

---

[22] The opinions also are consistent with those Dr. Salmon provided, and the court accepted, in a prior, similar matter involving a medical facility's influenza vaccination mandate. *See Aukamp-Corcoran*, 2022 WL 507479, at *7-*8 (granting summary judgment based on opinion of Dr. Salmon that "[a]ny exemption, for whatever reason granted, weakens Defendant's ability to protect patients from influenza" and "necessary medical exemptions make it even more important for Defendant to limit the number of additional exemptions to only those individuals who demonstrate an actual established right to a[ ] religious exemption" because "[e]very single additional unvaccinated employee to whom patients are exposed adds to the risk to those patients," even when unvaccinated employees take extra precautions such as wearing masks).

allowing unvaccinated employees to continue work in a healthcare setting with vulnerable

patients constitutes an undue hardship."); *Miller v. Charleston Area Med. Ctr.*, No. 2:23-CV-

00340, 2024 WL 4518293, at *4 (S.D.W. Va. Oct. 17, 2024) (collecting cases) (noting that "[i]n

the hospital context, there is extensive case law holding that retaining an unvaccinated employee

is an undue hardship" and holding that "[t]he non-economic costs that come with allowing an

unvaccinated, respiratory therapist to be in contact with people often seeking care for life

threatening illnesses has exactly the type of impact the Court in *Groff* would deem an undue

burden"); *Dennison v. Bon Secours Charity Health Sys. Med. Grp., P.C.*, No. 22-CV-2929 (CS),

2023 WL 3467143, at *6 (S.D.N.Y. May 15, 2023) (finding "obvious hardship associated with

the increased health and safety risk posed to other employees and patients by allowing Plaintiffs

to remain unvaccinated").[23]

      Doylestown Health denied Plaintiff's exemption request because allowing Plaintiff to

remain unvaccinated for COVID-19 and treat vulnerable patients side-by-side with other

Doylestown Health staff would have imposed an undue hardship on Defendant in the form of an

unacceptable health and safety risk to those patients and staff.  This denial was rooted in the

---

[23] *See also Harmon v. Boston Med. Ctr.*, 2024 WL 4815292 (D. Mass. Nov. 18, 2024) (finding undue hardship and granting summary judgment for hospital where plaintiff's "work as [a registered nurse] placed her in a particularly risky position to spread infection, as she was in-person and in close contact with vulnerable patients, their families, and other [hospital] staff . . .[and] accommodation would impede the [hospital]'s ability to provide a safe environment for their already vulnerable patients, and negatively impact its reputation"); *Hailey v. Legacy Health*, No. 3:23-cv-00149-IM, 2024 WL 4253238, at *14 (D. Or. Sept. 20, 2024) (finding undue hardship and granting summary judgment for hospital where hospital "reasonably concluded that allowing unvaccinated employees to have direct, in-person contact with patients and employees posed a substantial increased cost" because "unvaccinated employees working in-person would put other staff members and a vulnerable patient population at risk"); *Lake v. HealthAlliance Hosp. Broadway Campus*, 738 F. Supp. 3d 208, 221 (N.D.N.Y. 2024) (finding undue hardship and granting summary judgment for hospital because plaintiff's proposed alternative to vaccination "would have exposed [hospital's] vaccinated employees to plaintiff and caused operational hardships," which "is precisely the kind of context-specific application of the undue hardship standard contemplated by the Court in *Groff*").

scientific consensus as of November 2021 and is consistent with similar decisions of healthcare

institutions that have been vindicated by courts in the Third Circuit and across the country.

There is no reasonable basis for a finder of fact to conclude otherwise.

> **4.    The Opinions of Plaintiff's So-Called Expert, Dr. McCullough, Do Not Create a Genuine Issue of Material Fact on the Issue of Undue Hardship.**

In contrast to the opinion of Dr. Salmon, who has been relied on by multiple courts

holding that accommodating medical providers' religious exemptions to COVID-19 vaccine

mandates would impose an undue due hardship on healthcare entities, including the Third

Circuit's controlling *Bushra* decision, Plaintiff proffers the opinions of Dr. McCullough, whose

opinions fall well outside the mainstream of scientific thought on COVID-19 and have been

rejected by multiple courts in COVID-19 vaccine cases.  As discussed below, Dr. McCullough's

opinions do not create a genuine issue of material fact as to whether accommodating Plaintiff's

religious exemption request would have imposed an undue hardship on Defendant.[24]

Dr. McCullough is an internist and cardiologist with no expertise in vaccinology or

epidemiology whose "practice was almost entirely internal medicine and clinical cardiology until

he began publishing on COVID-19 in the early days of the pandemic." *Navy SEAL 1 v. Austin*,

600 F. Supp. 3d 1, 16 (D.D.C. 2022), *vacated and remanded on other grounds*, No. 22-5114,

2023 WL 2482927 (D.C. Cir. Mar. 10, 2023).  In 2022, the American Board of Internal Medicine

("ABIM") revoked Dr. McCullough's board certifications.  *See* October 18, 2022 letter from

ABIM to Dr. McCullough, Exhibit 34.  As the ABIM stated:

> [Y]ou have provided false or inaccurate medical information to the public. By
> casting doubt on the efficacy of COVID-19 vaccines with such seemingly

---

[24] The reasons the Court should reject Dr. McCullough's opinion and not consider it in deciding Defendant's Motion for Summary Judgment are set forth in greater detail in Defendant's Motion to Exclude the Report and Testimony of Dr. Peter McCullough, filed contemporaneously herewith.

authoritative statements, made in various official forums and widely reported in various media, your statements pose serious concerns for patient safety. Moreover, they are inimical to the ethics and professionalism standards for board certification.

*Id.* at 4.  Accordingly, courts in analogous matters have declined to accept the opinions of Dr. McCullough regarding COVID-19.  *See, e.g.*, *Slattery v. Main Line Health, Inc.*, No. CV 22-4994, 2025 WL 897526, at *7-*9 (E.D. Pa. Mar. 24, 2025) (emphasis in original) ("Not only has Dr. McCullough never *practiced* in the field of epidemiology, but his presence in this field did not begin until the COVID-19 pandemic began in early 2020. The Court is unwilling to certify an expert on a relatively novel virus when they have had no previous experience with epidemiology, immunology, or infectious disease."); *Roth v. Austin*, 603 F. Supp. 3d 741, 772, 774 (D. Neb. 2022) ("Not only is it doubtful that Dr. McCullough's credentials demonstrate he is an expert on COVID-19, Dr. McCullough makes several claims that are outside the conclusions of the mainstream of the vast scientific studies of the COVID-19 virus and COVID-19 vaccination.").

In this matter, Dr. McCullough opines, in relevant part, that "an unvaccinated Dr. Autieri [sic] posed no undue or additional risk or harm to himself, hospital staff, or patients greater than that posed by Doylestown Health's vaccinated medical staff."  Ex. 33, McCullough Report, at 13.  His rationale for this opinion is that "COVID-19 vaccinated staff members could transmit the virus" and, therefore, according to him, "Doylestown Health's reliance upon the COVID-19 vaccines to determine 'patient safety' likely made the spread of the virus worse" rather than limiting it.  *Id.*  In essence, Dr. McCullough's stated view is that the COVID-19 vaccines did not stop virus *transmission* by infected vaccinated persons and, therefore, there was no reason for

45

healthcare workers to become vaccinated.[25]  *Id.* ("By the time of Dr. Auteri's termination on November 18, 2021, the COVID-19 vaccine campaign had failed and the vaccine status was irrelevant for surgeons such as Dr. Auteri.").

Dr. McCullough's purported reasoning in this regard falls apart in the face of a straightforward premise, supported by scientific consensus in November 2021 and widely accepted in the medical community: vaccination for COVID-19, *even if not 100% effective*, substantially reduces the likelihood of a healthcare worker *contracting* COVID-19 in the first place and, as a result, substantially reduces the likelihood of a healthcare worker transmitting the virus to another person.  Ex. 2, Salmon Report, at 17.  Therefore, the fewer vaccinated healthcare workers there are in a workplace, the greater the risk of healthcare workers contracting, and subsequently transmitting, the virus.  *Id.* at 17.  As a result, each non-medical exemption a healthcare facility grants has an adverse effect on operations.  *Id.* at 18.

Dr. McCullough also suggests that Plaintiff's proposed alternatives to COVID-19 vaccination—health questionnaires, temperature checks, and periodic testing—"provided better safety protection to patients and staff than Doylestown Health's reliance upon the COVID-19 vaccines."  Ex. 33, McCullough Report, at 12.  Dr. McCullough is wrong.  As Dr. Salmon explains, self-reported health questionnaire responses are not necessarily accurate, temperature checks would not identify asymptomatic infections, and tests can yield false positives or otherwise fail to identify active infections, and therefore would not adequately safeguard against

---

[25] Dr. McCullough relies in part for this opinion on an August 2021 statement by Dr. Rochelle Walensky, then Director of the CDC, to the effect that some data showed similar viral loads in vaccinated and unvaccinated people, so that transmission could occur notwithstanding vaccination.  Ex. 33, McCullough Report, at 9.  As at least one court has recognized, this statement is irrelevant, because it "concerns the viral loads of persons who have already suffered an infection of COVID-19 and not whether vaccines help prevent infection in the first place."  *Hailey*, 2024 WL 4253238, at *15 (internal quotation marks omitted).

the risks of Plaintiff contracting COVID-19 and transmitting it to his vulnerable patients.  *Id.* at

16-17.  By contrast, vaccination mandates are *proven* to be effective, including in the context of

influenza-control efforts over the course of years.  *Id.* at 14-15.

In *Slattery*, a similar case involving an employee's refusal to get vaccinated for COVID-

19, the court recently excluded Dr. McCullough's report.  2025 WL 897526, at *7-*9.  The court

found it "clear that Dr. McCullough uses limited, and unreliable, sources to support his

propositions," and that, "[i]n addition to making factually inaccurate statements, Dr. McCullough

fails to even suggest that his sources are legitimate."  *Id.* at *9.  Here, as in *Slattery*, "Dr.

McCullough repeatedly makes grand and conclusory assertions that are unsupported by studies

or are outright incorrect."  *Id.*  And, as the *Austin* court recognized in rejecting Dr. McCullough's

purported opinions in that matter, Dr. McCullough's disagreement with accepted science

"contravene[s] the hundreds of scientists, immunologists, virologists, and epidemiologists that

support [the employer-defendant's] position" regarding the effectiveness of vaccines.  *Id.* (noting

"a battery of medical authorities contest Dr. McCullough's positions").

Other courts likewise have rejected Dr. McCullough's purported opinions regarding the

safety and/or efficacy of the COVID-19 vaccines.  *See Harris v. Univ. of Mass., Lowell*, 557 F.

Supp. 3d 304, 309 n.5 (D. Mass. 2021) (explaining that Dr. McCullough's attempt to "dispute [ ]

the safety and efficacy of the vaccines" was based on flawed data and mischaracterizations),

*appeal dismissed*, 43 F.4th 187 (1st Cir. 2022); *Klaassen v. Trs. of Indiana Univ.*, 549 F. Supp.

3d 836, 878 (N.D. Ind. 2021), *vacated and remanded on other grounds*, 24 F.4th 638 (7th Cir.

2022) (noting that "[a] close review of Dr. McCullough's testimony reveals a true failing"

regarding attempts to link alleged side effects to vaccine).  Here, as in those cases, Dr.

McCullough seeks to deny scientific consensus in favor of self-serving, unsupported, and/or

outright discredited hypotheses about the COVID-19 vaccines that cannot create any issue of material fact.

There is no genuine dispute that allowing Plaintiff to perform heart surgery on vulnerable cardiac patients while unvaccinated would have imposed an undue hardship on Defendant: unacceptable health and safety risks to patients and staff.  Accordingly, Doylestown Health is entitled to judgment as a matter of law on Plaintiff's failure to accommodate claims.

## C.    Any Purported Separate Disparate Treatment Claim Based on Religion Fails as a Matter of Law.

Plaintiff does not explicitly assert an independent theory of disparate treatment based on religion.  Instead, the Second Amended Complaint focuses solely on the allegedly wrongful denial of his accommodation request.  *See generally* 2d Am. Compl., ECF Doc. No. 20, ¶¶ 161-183 (outlining theory that alleged violations of Title VII and PHRA arose from denial of accommodation request).  The Court should grant summary judgment for Defendant on any disparate treatment claim for this reason alone.[26]  *See*, *e.g.*, *Sturgill v. Am. Red Cross*, 114 F.4th 803, 811 (6th Cir. 2024) ("If plaintiff wanted to plead a disparate-treatment claim independent of her accommodation claim, she could have done so. . .  Yet nothing in her complaint can be plausibly read to put [defendant] on notice that she claimed it treated her differently on account

---

[26] Additionally, authority within the Third Circuit is not entirely consistent as to whether religion-based disparate treatment is a standalone claim separate and apart from a claim of failure to accommodate religious beliefs, particularly where a plaintiff fails to plead disparate treatment as a distinct theory. *Compare Wallace v. City of Phila.*, No. 06-4236, 2010 WL 1730850 at *6 (E.D. Pa. Apr. 26, 2010) ("In the Third Circuit, employees may rely on two different theories to establish a claim for religious discrimination: 'disparate treatment' on account of religion, or 'failure to accommodate' religious beliefs.") (citing *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 281 (3d Cir. 2001)) *with Al Refat v. Franklin Fin. Servs. Corp.*, No. 1:19-CV-1507, 2021 WL 2588789, at *3 n.2 (M.D. Pa. June 24, 2021) ("Because 'failure to accommodate a religious practice' is part of a disparate-treatment claim, we do not conduct a separate analysis on this point.") (citing *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 773 (2015)).  Nevertheless, Doylestown Health assumes, for summary judgment purposes only, the availability of a separate and independent disparate treatment theory.

of her religious beliefs separate from her failure to accommodate claim [regarding a COVID-19 policy.]").

But even if Plaintiff can assert (and has asserted) such a claim, it fails as a matter of law. To state a prima facie case of religious discrimination under Title VII under precedent recognizing such a claim distinct from a failure to accommodate claim, a plaintiff must establish that: (1) the employee is "a member of a protected class," (2) the employee "suffered an adverse employment action," and (3) "nonmembers of the protected class were treated more favorably." *Abramson*, 260 F.3d at 281–82. Here, there is nothing in the record indicating that any employee outside of Plaintiff's protected group (which, by inference from Plaintiff's allegations, is "follower[s] of Christ," *see* 2d Am. Compl., ECF Doc. No. 20, ¶ 42) was treated more favorably than he was. Because there is no record evidence that could support a disparate treatment claim, there is no genuine issue of material fact as to any such claim. *See Shields*, 700 F. Supp. at 275 (granting summary judgment "on the disparate treatment issue" because "there [wa]s no record evidence to support [plaintiff's] claim that non-Catholics were treated more favorably than she was"). The Court should grant summary judgment for Defendant on any separate claim of disparate treatment.

## V.    CONCLUSION

Plaintiff's religious accommodation claims fail as a matter for law for two independent reasons. None of the beliefs Plaintiff has articulated, whether in connection with the Religious Exemption Request or after the fact in this litigation, are religious in nature under applicable law. Furthermore, even assuming the existence of a religious belief, allowing an unvaccinated doctor to perform heart surgery on vulnerable patients would have imposed an undue hardship on Defendant.

49

Additionally, Plaintiff cannot identify a similarly situated employee outside of his protected class whom Defendant treated more favorably, and thus there is no evidence to support a potential disparate treatment claim.

Accordingly, and for all the reasons set forth above, Defendant respectfully requests that the Court enter judgment in its favor on both counts of Plaintiff's Second Amended Complaint.

Respectfully submitted,

/s/ Christopher D. Durham
Christopher D. Durham, Esquire
Adam D. Brown, Esquire
Elisabeth G. Bassani, Esquire
Duane Morris LLP
30 South 17th Street
Philadelphia, PA 19103
(215) 979-1800

Date:  May 12, 2025

*Attorneys for Defendant, VIA Affiliates
d/b/a Doylestown Health Physicians*

Exhibit 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


JOSEPH S. AUTERI, M.D.   :   No. 22-cv-03384
          Plaintiff,   :
                       :
      vs.   :   :
                       :
VIA AFFILIATES, d/b/a   :   JURY TRIAL
DOYLESTOWN HEALTH       :   DEMANDED
PHYSICIANS             :
          Defendant.   :


- - -
Friday, February 7, 2025
- - -


          Deposition of ELINOR PERNITSKY,

taken pursuant to notice, at the law offices

of Kaplin Stewart Meloff Reiter & Stein,

P.C., 910 Harvest Drive, Blue Bell,

Pennsylvania, before Michele L. Murphy, a

Registered Professional Reporter and Notary

Public, on the above date, beginning at

approximately 9:00 a.m.

- - -

1    A.   I would call it an announcement, but
2  okay.
3    Q.   Okay.  I'm going to refer to it as
4  the mandate then, so you'll know what I mean,
5  this particular document.
6            MR. BROWN:  Just so I'm clear,
7        you're talking you're going to refer to
8        the document as the mandate, not the
9        mandate as a mandate?  I'm sorry.
10           MS. RUSSELL:  I'm going to
11       refer to this document and the overall
12       policy as the mandate.
13           MR. BROWN:  Both.
14           MS. RUSSELL:  Okay?
15           MR. BROWN:  Thank you for
16       clarifying.
17           MS. RUSSELL:  Thanks.
18  BY MS. RUSSELL:
19    Q.   So this actual document, D-112, it
20  looks to be from BHebel@dh.org on August 6th
21  of 2021.  Do you see that?
22    A.   I do.
23    Q.   Is that Barb Hebel?
24    A.   It is.
25    Q.   And you'll see that there is a list

1  of recipients on D-112 and D-113.  Are you, to
2  your knowledge, or were you at the time in any
3  of the recipient groups that are noted in the
4  "To" line of D-112?
5    A.   I am a DH Associate.
6    Q.   Okay.  Any others?
7    A.   No.
8    Q.   Okay.  And so then beneath that,
9  again, begins on Page D-112, there is
10  something that says Doylestown Health System,
11  memo to all associates, again, from Ms. Hebel
12  August 6th, 2021, required COVID-19 vaccine.
13           Do you see that?
14    A.   Yes.
15    Q.   Did you have any input in drafting
16  this mandate?
17    A.   No.
18    Q.   Did you see any earlier drafts of
19  this mandate before it was issued?
20    A.   No.
21    Q.   Do you know who did?
22    A.   I do not.
23    Q.   You have no idea who drafted the
24  mandate?
25    A.   It would be my thought that Barb

1  Hebel drafted the mandate.
2    Q.   Anyone else that you know had
3  drafted the mandate?
4    A.   No.
5    Q.   Were you a participant in any
6  discussions regarding the mandate before
7  August 6th, 2021 when the mandate was issued?
8            MR. BROWN:  Objection; vague
9        and ambiguous.
10  BY MS. RUSSELL:
11    Q.   You can answer.
12    A.   Okay.  Not this particular mandate,
13  but at the Medical Executive Committee, it was
14  discussed as to what the Medical Staff -- the
15  Medical Executive Committee represents the
16  medical staff.  So there was discussion at the
17  Medical Executive Committee as to what the
18  Medical Staff position would be if there were
19  a vaccine mandate, and I was there.
20    Q.   When you say the Medical Executive
21  Committee represents the medical staff, what
22  is the medical staff?
23    A.   The medical staff is the physicians,
24  podiatrists, dentists at Doylestown.  It
25  includes the psychologists and nurse midwives

1  that are on staff at the hospital.
2    Q.   The nurses, what are they
3  considered, the nurses who work there?
4    A.   Well, RNs would be in the Department
5  of Nursing.  Advanced practice professionals
6  are part of the -- they follow the rules of
7  the Medical Staff, but they are not like
8  voting members of the Medical Staff, and
9  that's not unusual.
10    Q.   Advanced practice professionals,
11  that group is made up of whom?
12    A.   Nurse practitioners, physician's
13  assistants, and nurse anesthetists.
14    Q.   And RNs are in their own group; is
15  that correct?
16    A.   They're in the Department of
17  Nursing, yes.
18    Q.   So the mandate that we're looking at
19  as D-112 and 113 applied to physicians,
20  podiatrists, dentists, psychologists, and also
21  advanced practice professionals; is that
22  correct?
23    A.   Yes.
24    Q.   Okay.  And then RNs are in the
25  Department of Nursing.  Did the Department of

Page 26

1    Q.   The first group or individuals that
2    you mentioned as being involved is
3    Occupational Health?
4    A.   Yes.
5    Q.   Who headed up the Occupational
6    Health Department or group in this timeframe?
7    A.   I believe Marjorie Whelan.
8    Q.   And who is Ms. Whelan?
9    A.   She's a nurse practitioner that
10   worked in Occupational Health.
11   Q.   Was she the head of the Occupational
12   Health group or just a participant?
13   A.   Within that office, I believe that
14   she was the lead person, but, yeah,
15   Occupational Health reports to HR.  So I don't
16   know exactly who she reported to, but to HR.
17   Q.   What group or individuals within the
18   hospital would maintain the records of the
19   vaccines offered and given at the hospital
20   during the timeframe of August through
21   November of 2021?
22   A.   I would say Occupational Health,
23   MIS.
24   Q.   And what is MIS?
25   A.   Medical Information Services.

Page 27

1    For employees, right?  That's what
2    you want to know, for employees?
3    Q.   Yes, for now the employees.
4    A.   Yes.
5    Q.   Anyone else other than Occupational
6    Health and MIS?
7    A.   We would have gotten in the Medical
8    Staff Office information from one of those if
9    someone were vaccinated at the hospital.
10   Q.   So when you say we would have
11   received what I'll call a vaccination record,
12   when somebody got the COVID-19 vaccine, who is
13   "we" that got the record?
14   A.   The Medical Staff Office.
15   Q.   And did the Medical Staff Office
16   transmit either the record or information
17   about the vaccination record to any other
18   entity in the hospital?
19   A.   Yes, because --
20   Q.   To whom?  Go ahead.
21   A.   The Medical Staff leaders and
22   Dr. Levy.
23   Q.   Who are the Medical Staff leaders?
24   A.   The Medical Staff leaders would be
25   considered the president, president-elect, and

Page 28

1    treasurer of the Medical Staff.
2    Q.   So what information about some
3    employees' COVID vaccination record did the
4    Medical Staff Office transmit to the MS
5    leaders and Dr. Levy?
6    A.   It would have been a list of
7    outstanding providers who we had not received
8    documentation for.
9    Q.   And why would you do that?  Why
10   would the Medical Staff Office transmit that
11   information to the individuals that you have
12   mentioned?
13   A.   Because the Medical Staff would be
14   the oversight for physicians at the hospital,
15   and since the mandate included everyone, it
16   was updating them on where the medical staff
17   stood with the vaccination rates.
18   Q.   Who was the President of the Medical
19   Staff at the time?
20   A.   Dr. Brenda Foley.
21   Q.   And how about the President-elect?
22   A.   Dr. Sean Reinhardt.
23   Q.   And who was the treasurer?
24   A.   Dr. Nicole Geracimos.
25   Q.   I'm sorry.  Could you spell the last

Page 29

1    name, please, for me?
2    A.   G-E-A-C-I-M-O-S [sic].
3    Q.   And how do you pronounce that?
4    A.   Geracimos.
5    Q.   So I'm going to move ahead for a
6    minute based upon what you just told me.
7    So as of October 11th of 2021, as to
8    Dr. Auteri's vaccination record or lack
9    thereof, if I understand you correctly, your
10   office knew that Dr. Auteri had not been
11   vaccinated?
12        MR. BROWN:  Objection;
13        mischaracterizes prior testimony.
14   BY MS. RUSSELL:
15   Q.   Is that correct?
16   A.   He was on a list, yes.
17   Q.   And what was the list called of the
18   people who were not yet vaccinated?
19   A.   Probably vaccination compliance
20   list.
21   Q.   You say "probably," but you're not
22   sure?
23   A.   I'm not sure, no.
24   Q.   Okay.  I'm going to ask you to
25   please take a look for the vaccination

# Exhibit 2

**April 9, 2025**
**Expert Report of Daniel Salmon, Ph.D., MPH**

Professional Experience

Dr. Salmon is a Professor of Global Disease Epidemiology and Control, Department of International Health, Johns Hopkins University Bloomberg School of Public Health. He also has a joint appointment in the Department of Health, Behavior and Society. Dr. Salmon serves as the Director of the Institute for Vaccine Safety at Johns Hopkins.

Dr. Salmon is broadly trained in vaccinology, with an emphasis in epidemiology, behavioral epidemiology, and health policy. Dr. Salmon received a Bachelor of Arts (BA) in Political Science with a minor in Psychology from Rutgers University in 1991. He received a Master of Public Health (MPH) from Emory University Rollins School of Public Health in 1996. Dr. Salmon received a Doctor of Philosophy (PhD) from Johns Hopkins University Bloomberg School of Public Health in 2003.

Dr. Salmon has held positions in government and academia. Dr. Salmon has worked for the Centers for Disease Control and Prevention as a contractor and later as a Policy Analyst. In these positions, he used surveillance systems to conduct studies of measles and pertussis and coordinated Federal efforts around vaccine safety, immunization information systems, and development of new vaccines such as for tuberculosis. Dr. Salmon also served as the Director of Vaccine Safety, National Vaccine Program Office, Department of Health and Human Services. In this capacity, Dr. Salmon was responsible for coordinating and overseeing the nation's vaccine safety system including vaccine safety activities in the Department of Health and Human Services (National Institute of Health, Food and Drug Administration, Centers for Disease Control and Prevention, and Health Resources and Services Administration) other Federal Departments (Defense, Veterans Affairs, State), and non-federal partners including academia, industry, professional medical and public health associations, states and localities, and the public. Dr. Salmon led a Secretary's initiative in vaccine safety, oversaw the 2009 H1N1 vaccine safety program, and served as the Designated Federal Official for the National Vaccine Advisory Committee (NVAC) Vaccine Safety Working Group and the Advisory Commission on Childhood Vaccines (ACCV). Among other accomplishments, Dr. Salmon created the Post-Licensure Rapid Immunization Safety Monitoring (PRISM) Network to conduct active vaccine safety surveillance for the 2009 H1N1 immunization program. PRISM became an ongoing surveillance system for the Food and Drug Administration as a part of the Sentinel program.

Dr. Salmon has conducted a broad range of research in academia including research grants funded by the National Institutes of Health, Centers for Disease Control and Prevention, state health departments, the World Health Organization, Gavi, the Vaccine Alliance, the Robert Wood Johnson Foundation, and private industry including Walgreens, Pfizer, Merck and Crucell. Dr. Salmon has also served as a grant reviewer for the National Institutes for Health, Centers for Disease Control and Prevention, Food and Drug Administration, National Science Foundation, the Gates Foundation, as well as numerous other country federal health authorities. Dr. Salmon has taught and continues to teach a class in vaccine policy for two decades and also currently teaches a class in public health practice at Johns Hopkins University Bloomberg School of Public Health. Dr. Salmon has mentored numerous students and scientists, many of which now hold leadership positions in academia, government, and international organizations.

Dr. Salmon's research and practice work has included a broad range of studies examining the individual and community risks of vaccine refusal, the impact of laws and policies in increasing vaccination coverage and controlling vaccine preventable diseases, the reasons why patients and parents refuse vaccines, and the role of healthcare providers in impacting patient and parent vaccine decision-making. Dr. Salmon is widely considered a national and global expert in these areas. Dr. Salmon was a member of the Lancet Commission on Vaccine Hesitancy and served on a National Vaccine Advisory Committee Working Group on vaccine hesitancy.

Dr. Salmon has published more than 100 papers in top medical and public health journals including the New England Journal of Medicine, the Lancet, the Journal of the American Medical Association, Health Affairs, and Pediatrics. Dr. Salmon regularly serves as a peer reviewer for these and other high impact journals. He has been invited to give presentations at the National Foundation for Infectious Diseases, Federal advisory committees, and many international meetings. Dr. Salmon has served as an expert witness for a variety of legal cases. Dr. Salmon's current curriculum vitae is attached (Appendix 1).

Dr. Salmon has been retained by VIA Affiliates d/b/a Doylestown Health Physicians ("Doylestown Health"). Dr. Salmon has reviewed the following materials provided by Duane Morris LLP, on behalf of Doylestown Health:

1. Doylestown Health System Memorandum Re: COVID-19 Vaccination Mandate, August 6, 2021
2. COVID-19 Vaccines FAQ's transmitted on August 6, 2021 with Doylestown Health System Memorandum Re: COVID-19 Vaccination Mandate
3. Doylestown Hospital Occupational Health Services Immunization Policy, Review Date August 5, 2021
4. COVID-19 Vaccine Update, September 10, 2021
5. Doylestown Health Physicians (Medical Staff) COVID-19 Vaccine Mandate Announcement Email, August 6, 2021
6. Application for Religious Exemption For COVID-19 Vaccine
7. COVID Vaccination Documentation Requirement Email, August 13, 2021
8. COVID-19 Vaccine Requirement Email, August 30, 2021
9. Form of Letter Granting Exemption from COVID-19 Vaccination Mandate for Employees Remaining in Positions
10. Form of Letter Granting Exemption from COVID-19 Vaccination Mandate for Employees Reassigned to Different Positions
11. Managing DHS/Employees With COVID-19 Vaccine Exemption – Accommodation Strategies
12. List of Departments Reflecting Assessment of Patient Population Vulnerability for Each Department
13. Expert Report of Dr. Peter A. McCullough, MD, MPH

The client has not impacted the content of this report. All opinions herein are that of Dr. Salmon. Dr. Salmon has been compensated $20,000 for this report. Dr. Salmon will be

compensated at a rate of $450/hour for expert services rendered to Doylestown Health following completion of this expert report, including testimony at a deposition or trial.

Dr. Salmon was requested by the Defendant to provide opinions on the following issues:

**Threats of COVID-19 to Patients and Healthcare Workers in November 2021**

1.     In November 2021, was COVID-19 a potentially fatal disease, particularly for vulnerable populations?

2.     Are cardiac patients, particularly those undergoing cardiac surgery, more vulnerable to the threat of COVID-19 infection than other patients?

3.     What are the risks of an unvaccinated person providing direct care, including surgery, to cardiac patients?

4.     In November 2021, how did COVID-19 spread from person to person?

5.     In November 2021, how did COVID-19 affect healthcare facilities, particularly with respect to patient access to care and quality of patient care?

6.     In November 2021, what was the effect of asymptomatic transmission on the spread of COVID-19 on healthcare facilities?

7.     In November 2021, how difficult was it for healthcare facilities to track the transmission of COVID-19 within the healthcare facility by vaccinated and/or unvaccinated persons, and would the data resulting from such tracking have been reliable?

8.     Was exposure to COVID-19 an occupational hazard for employees of healthcare facilities?

9.     Why were healthcare workers one of the first populations to receive the COVID-19 vaccine when it initially became available?

**Safety and Efficacy of COVID-19 Vaccines**

1.     In November 2021, what was the efficacy of the available COVID-19 vaccines?

2.     Does a COVID-19 vaccine that utilizes messenger ribonucleic acid (mRNA) have the effect of altering the genetic makeup of a person who receives such a vaccine?

3.     Was the COVID-19 vaccine developed and manufactured by Janssen Biotech, Inc., an mRNA vaccine?

4.     In November 2021, were unvaccinated persons, as compared to vaccinated persons, at an increased risk of becoming infected with COVID-19 and, therefore, transmitting the virus to others?

5.      In November 2021, did available scientific evidence indicate that natural immunity (i.e., the presence of antibodies from prior infection) was as effective as vaccination to protect persons from COVID-19 infection?

6.      In November 2021, was it possible to determine how long antibodies from prior COVID-19 infection could protect against subsequent COVID-19 infection?

7.      In November 2021, did available scientific evidence indicate that antibodies from prior COVID-19 infection could protect persons against infection by a new strain of COVID-19?

**Role of COVID-19 Vaccination Mandates in Managing Threats of COVID-19 to Patients and Healthcare Workers**

1.      In November 2021, did COVID-19 pose a direct threat to patients and healthcare workers?

2.      In November 2021, were COVID-19 vaccination mandates a critical protection for patients and healthcare workers?

3.      In November 2021, how effective were COVID-19 infection-control measures such as daily health questionnaires, temperature checks, and weekly testing, and were they sufficient safety measures in lieu of COVID-19 vaccination?

**Effect of Non-Medical Exemptions From COVID-19 Vaccination Mandates**

1.      Did non-medical exemptions from COVID-19 vaccination mandates increase the risks of COVID-19 infection to patients and healthcare workers?

2.      Did healthcare facilities have a responsibility to protect the safety of patients and staff by establishing and implementing processes for evaluating requests for exemption from COVID-19 vaccination mandates?

3.      In evaluating requests for non-medical exemptions from COVID-19 vaccination mandates, was it appropriate to make distinctions between more vulnerable and less vulnerable patient populations for purposes of determining whether such a request could be accommodated?

Dr. Salmon's professional judgement in these areas is based upon review of current scientific evidence and federal advisory repots (referenced accordingly).  However, at the request of counsel, data sources were limited to those available as of November 2021.

**<u>Threats of COVID-19 to Patients and Healthcare Workers in November 2021</u>**

**In November 2021, was COVID-19 a potentially fatal disease, particularly for vulnerable populations?**

COVID-19 was a very serious disease during this time as we were in the midst of a global pandemic with about 48 million cases of COVID-19 reported (November 15, 2021), about 35

4

million hospitalizations, and almost 760,000 deaths in the United States (U.S.).[1]  On November 15, 2021, the seven day average was about 95,000 cases, 48,000 hospitalizations, and 1,200 deaths. The CDC reported that 97% of hospitalizations and 99% of deaths were among unvaccinated persons in July, 2021.[2]  Hospitalizations and deaths were disproportionately impacting the elderly and those with chronic medical conditions.[3]  However, even some young and healthy individuals were experiencing serious disease, hospitalization and death.  Vulnerable racial/ethnic populations (Black, Hispanic and Native American) were also disproportionately impacted by COVID-19.[4]  The U.S. was experiencing the Delta (B.1.617.2) wave during this period.  COVID-19 was appearing in waves and varied substantially by locality, state and region, as often is the case with infectious diseases.

**Are cardiac patients, particularly those undergoing cardiac surgery, more vulnerable to the threat of COVID-19 infection than other patients?**

It was well known in November 2021 that persons with cardiac disease were at increased risk for serious consequences from COVID-19.  According to the American Heart Association in February, 2021: "Conditions such as heart failure (where the heart does not pump blood effectively), coronary artery disease (blocked arteries) and cardiomyopathies (weakening, thinning and/or thickening of the heart muscle) lead to more severe cases of COVID-19".[5]  For these reasons, cardiac patients were particularly vulnerable to the health risks of COVID-19.

**What are the risks of an unvaccinated person providing direct care, including surgery, to cardiac patients?**

As discussed in greater detail below in connection with questions specifically about the risks of unvaccinated persons, an unvaccinated person was at increased risk of contracting and transmitting COVID-19 compared with a vaccinated person. Thus, an unvaccinated person providing direct care, including surgery, to cardiac patients was an increased risk to those cardiac patients compared to a vaccinated person providing direct care to cardiac patients. Given cardiac patients were among the high-risk groups for severe illness from COVID-19, the risk of unvaccinated persons providing care to this patient population was particularly high.

---

[1]  Johns Hopkins Coronavirus Resource Center.  https://coronavirus.jhu.edu/region/united-states  accessed 03/23/25.
[2]  CNN interview with Dr. Walensky, CDC Director.  https://www.cnn.com/2021/07/19/health/us-coronavirus-monday/index.html  accessed 03/22/25.
[3]  Centers for Disease Control and Prevention.  People with Certain Medial Conditions.
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html  accessed 03/22/25.
[4]  Don Bambino Geno Tai, Irene G. Sia, Chyke A. Doubeni, Mark L. Wieland. Disproportionate Impact of COVID-19 on Racial and Ethnic Minority Groups in the United States: a 2021 Update.  J Racial Ethn Health Disparities. 2022; 9(6): 2334–2339.
[5]  American Heart Association. https://www.heart.org/en/news/2021/02/11/heres-what-heart-patients-need-to-know-about-covid-19-in-2021  accessed 03/22/25.

**In November 2021, how did COVID-19 spread from person to person?**

It was well accepted among the scientific community at the time that COVID-19 spread person to person through respiratory droplets.[6]   It was understood that the virus mainly spread between people in close contact with an infected person's mouth or nose when they cough, sneeze, speak, sing or breathe. This was particularly the case in indoor settings as aerosols could remain in the air.  People could also be infected after touching surfaces or objects that had been contaminated with the virus.

**In November 2021, how did COVID-19 affect healthcare facilities, particularly with respect to patient access to care and quality of patient care?**

COVID-19 had a tremendous impact on healthcare systems, patient access to care and quality of care.  As COVID-19 spread across the country in waves, disproportionately impacting some communities and then moving on to others, healthcare systems struggled to keep up with patient demand.  Healthcare capacity in the United States is generally designed to meet demand, often with rural healthcare facilities below community needs.  Consequently, the healthcare system was not well prepared for the surge of healthcare needs that resulted from COVID-19.  The impact of COVID-19 on healthcare facilities was further strained by COVID-19 illness and death among healthcare workers and worker burnout.[7]  Healthcare systems attempted to respond by establishing surge capacity, including portable morgues in hospitals for COVID-19 deaths. Additionally, healthcare providers and facilities delayed routine and non-emergency procedures to free up capacity to address heath care needs related to COVID-19.[8]  The consequence was reduced access to care for patients and, in some cases, reductions in quality of care with increases in many diseases which were not diagnosed during routine care visits.  The long-term impact of rationing healthcare because of the COVID-19 pandemic will take many years to fully characterize.

**In November 2021, what was the effect of asymptomatic transmission on the spread of COVID-19 on healthcare facilities?**

At this point, it was well accepted in the scientific community that asymptomatic persons were transmitting COVID-19.[9]  Asymptomatic transmission of COVID-19 in healthcare facilities was a major problem through November 2021.  Many healthcare facilities were regularly testing staff.  However, such tests were imperfect and testing frequency limits the value of testing in detecting asymptomatic infections.[10]

---

[6] Galbadage T, Peterson BM, Gunasekera RS. Does COVID-19 Spread Through Droplets Alone? Front Public Health. 2020 Apr 24;8:163.

[7] Wu H et al. National Healthcare Safety Network. Hospital capacities and shortages of healthcare resources among US hospitals during the coronavirus disease 2019 (COVID-19) pandemic, National Healthcare Safety Network (NHSN), March 27-July 14, 2020. Infect Control Hosp Epidemiol. 2022 Oct;43(10):1473-1476.

[8] The Rand Corporation.  https://www.rand.org/content/dam/rand/pubs/research_briefs/RBA100/RBA164-1/RAND_RBA164-1.pdf  accessed 03/22/24.

[9] Michael Johansson, Talia quandelacy, Sarah Kada et al.  SARS-CoV-2 Transmission from People Without COVID-19 Symptoms. JAMA Netw Open. 2021;4(1):e2035057.

[10] Black JRM et al.  COVID-19: the case for health-care worker screening to prevent hospital transmission.  The Lancet.   Volume 395, ISSUE 10234, P1418-1420, May 02, 2020.

**In November 2021, how difficult was it for healthcare facilities to track the transmission of COVID-19 within the healthcare facility by vaccinated and/or unvaccinated persons, and would the data resulting from such tracking have been reliable?**

It would be extremely difficult, labor intensive and costly for a healthcare facility to track the transmission of COVID-19 within a healthcare facility by vaccinated and/or unvaccinated persons. Additionally, doing so would require expertise not readily available to a healthcare facility, the data would be of poor quality, and it would take a lot of time further limiting the utility of such an endeavor as the virus would have likely mutated by the time the data were available.

For example, in July 2020 an article was published describing the investigation and management of a COVID-19 outbreak in Watford General Hospital, a 521-bed acute district general hospital situated in West Hertfordshire, U.K.[11]  As described:

> SARS-CoV-2 outbreaks are difficult to recognise and control due to its high infectivity and the wide range of clinical manifestations of the infection…An outbreak control team (OCT) was convened…Root cause analyses (RCAs) were carried out on cases to identify possible causes, possible route of transmission and any learning points. All contact patients and staff were screened with RT PCR and genomic sequencing was performed on a set of positive specimens.  In addition to active contact tracing, screening and cohorting of patients and staff, standard and transmission-based precautions were reinforced to control the outbreak…We recognised several challenges in investigating a COVID-19 outbreak in a hospital setting. Problems arising from variable sensitivity of the tests, difficulty in differentiating COVID-19 related symptoms from underlying diseases, problems related to establishing the route of transmission, issues with contact tracing.

If a healthcare facility were to track transmission, it would want to include identifying and implementing management processes so that there would be actionable information available to the healthcare facility.  As described by the Centers for Medicare and Medicaid Services (CMS), root cause analysis is "a structured facilitated team process to identify root causes of an event that resulted in an undesired outcome and develop corrective actions. The RCA process provides you with a way to identify breakdowns in processes and systems that contributed to the event and how to prevent future events. The purpose of an RCA is to find out what happened, why it happened, and determine what changes need to be made."[12]

Once this entire process was complete, a hospital could then separate cases by vaccination status and try to ascertain chains of transmission (which would be very difficult and often inaccurate) to ascertain transmission by vaccination status.   As a result, data from such tracking would not

---

[11] Kannangara CI, Seetulsingh P, Foley J, Bennett G, Carter T. Investigation and management of an outbreak of COVID-19 infection in an acute admission unit in a District General Hospital: lessons learnt. Infect Prev Pract. 2021 Sep;3(3):100156.
[12] CMS.  https://www.cms.gov/medicare/provider-enrollment-and-certification/qapi/downloads/guidanceforrca.pdf accessed 03/23/25.

7

be very reliable and therefore not actionable. Additionally, conducting this sort of analysis would be very labor intensive and costly, multi-disciplinary expertise to do so would be beyond many healthcare facilities and it would take a substantial amount of time to design the study and then collect, analyze and interpret the data. This sort of study would typically be conducted by academic researchers.

**Was exposure to COVID-19 an occupational hazard for employees of healthcare facilities?**

Specific to employees of healthcare facilities, the Occupational Safety and Health Administration (OSHA), Department of Labor, provides the following definition of healthcare workers: "Healthcare workers (HCWs) are occupationally exposed to a variety of infectious diseases during the performance of their duties. The delivery of healthcare services requires a broad range of workers, such as physicians, nurses, technicians, clinical laboratory workers, first responders, building maintenance, security and administrative personnel, social workers, food service, housekeeping, and mortuary personnel."[13]  From an epidemiological perspective, some healthcare workers may be at greater risk than others based on their job duties, particularly those who come into more direct patient contact.  However, to prevent nosocomial infections and protect patients and healthcare workers, hospitals and other healthcare facilities must take a system wide approach focusing on all persons who may acquire and transmit disease.

Healthcare workers were at risk of occupational acquired COVID-19 through exposure to infected patients and other healthcare staff.  Particularly concerning would be healthcare workers at increased risk of COVID-19 morbidity and mortality.  The Advisory Committee on Immunization Practices (ACIP) of the CDC consequently prioritized healthcare workers for vaccination.[14] More than 3,600 healthcare workers died of COVID-19 in the first year of the pandemic.[15]  The prevalence of SARS-CoV-2 infection among healthcare workers was 11% in 2020, noticeably higher than in the general population.[16]  In a large healthcare system of about 30,000 employees between June 1 to December 31, 2020, 2,357 employees were involved in occupational COVID-19 exposures; 1,128 (48%) were exposed to patients and 1,229 (52%) to other employees.[17]

**Why were healthcare workers one of the first populations to receive the COVID-19 vaccine when it initially became available?**

The Advisory Committee on Immunization Practices (ACIP) and the Centers for Disease Control and Prevention (CDC) determined that healthcare personnel were the first priority for COVID-19 vaccine when it was available:

   **Phase 1a.** Health care personnel (HCP) are being considered for phase 1a, which includes

---

[13] https://www.osha.gov/healthcare/infectious-diseases/ accessed 03/23/25.

[14] Bell BP, Romero JR , Lee GM. Scientific and ethical principles underlying recommendations from the advisory committee on immunization practices for COVID-19 vaccination implementation. *JAMA.* 2020; 324: 2025-2026

[15]  KHN. 12 Months of Trauma: More Than 3,600 US Health Workers Died in Covid's First Year. https://khn.org/news/article/us-health-workers-deaths-covid-lost-on-the-frontline/  accessed 03/23/25.

[16] Sergio Alejandro Gómez-Ochoa et al.  COVID-19 in Healthcare Workers: A Living Systematic Review and Meta-analysis of Prevalence, Risk Factors, Clinical Characteristics, and Outcomes.  Am J Epidemiol. 2020 Sep 1.

[17] Jessica Ibiebele, Christina Silkaitis, Gina Dolgin et al. Occupational COVID-19 exposures and secondary cases among healthcare personnel.  Am J Infect Control. 2021 Oct; 49(10): 1334–1336.

the first available doses and an extremely constrained supply. HCP are defined as all paid and unpaid persons serving in health care settings who have the potential for direct or indirect exposure to patients or infectious materials, comprising an estimated 20 million people. Examples include hospital, long-term care and assisted living, home health care, and outpatient facility staff, as well as pharmacies and emergency medical services. HCP are essential for the ongoing COVID-19 response and are at high risk for exposure to SARS-CoV-2.[18]

Healthcare personnel were the first priority for initial availability of COVID-19 vaccines for several reasons:

1) Healthcare personnel were at increased risk of contracting and transmitting COVID-19 because of their occupational exposure to COVID-19 cases;
2) Healthcare personnel were in regular contact with persons at increased risk of serious complications and death from COVID-19, including persons who were immunocompromised, had other comorbidities, and/or were elderly; and
3) Healthcare facilities were often at or beyond capacity caring for persons with COVID-19 as well as other healthcare needs.  As essential personnel, reducing the risk of healthcare personnel contracting COVID-19 resulting in missed time from work and potentially morbidity and mortality was a local, state and national priority in order to maintain healthcare capacity; and
4) Given the sacrifice healthcare personnel were making to care for COVID-19 infected persons in addition to persons requiring other healthcare needs, it was equitable for personnel to receive all means available to protect themselves from COVID-19.

**<u>Safety and Efficacy of COVID-19 Vaccines</u>**

**In November 2021, what was the efficacy of the available COVID-19 vaccines?**

In November of 2021, three vaccines were available:
1) Moderna COVID-19 vaccine (mRNA-1273);
2) Pfizer and BioNTech COVID-19 vaccine (BNT162b2); and
3) Janssen Biotech COVID-19 vaccine (Ad26.COV2.S)

The most accurate estimates of the efficacy of COVID-19 vaccines at the time were based on the information available from the phase 3 clinical trials that were consider by the Food and Drug Administration (FDA) and its Vaccines and Related Biological Product Advisory Committee (VRBPAC), which were made available to the public.

The Moderna COVID-19 vaccine (mRNA-1273) was authorized for use to prevent COVID-19 caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2).  The Phase 3 randomized, double-blinded and placebo-controlled trial of mRNA-1273 included approximately 30,400 participants. The primary efficacy endpoint was the reduction of incidence of COVID-19 among participants without evidence of SARS-CoV-2 infection before the first dose of vaccine.

---

[18] Bell BP, Romero JR , Lee GM. Scientific and ethical principles underlying recommendations from the advisory committee on immunization practices for COVID-19 vaccination implementation.  *JAMA*. 2020; 324: 2025-2026

Efficacy in preventing confirmed COVID-19 occurring at least 14 days after the second dose of vaccine was 94.5.0% (95% CI 86.5%, 97.8%).  Subgroup analyses showed similar efficacy across age groups, genders, racial and ethnic groups, and participants with medical comorbidities associated with high risk of severe COVID-19.[19]

The Pfizer and BioNTech COVID-19 vaccine (BNT162b2) was authorized for use to prevent COVID-19 caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2). The Phase 3 randomized, double-blinded and placebo-controlled trial of BNT162b2 included approximately 44,000 participants. The primary efficacy endpoint was incidence of COVID-19 among participants without evidence of SARS-CoV-2 infection before or during the 2-dose vaccination regimen.  Efficacy in preventing confirmed COVID-19 occurring at least 7 days after the second dose of vaccine was 95.0%.  Subgroup analyses showed similar efficacy across age groups, genders, racial and ethnic groups, and participants with medical comorbidities associated with high risk of severe COVID-19.[20]

Janssen Biotech COVID-19 vaccine (Ad26.COV2.S) was authorized for use to prevent COVID-19 caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2). The Phase 3 randomized, double-blind and placebo-controlled trial of Ad26.COV2.S included approximately 40,000 participants. Vaccine efficacy against central laboratory-confirmed moderate to severe/critical COVID-19 was 66.9% (95% CI 59.0, 73.4) when considering cases occurring at least 14 days after the single-dose vaccination. Subgroup analyses showed similar efficacy across age groups, genders, racial and ethnic groups, and participants with medical comorbidities associated with high risk of severe COVID-19.[21]

The Delta variant was the most dominant strain in November 2021.  It was widely accepted in the scientific community that the Delta variant had higher transmissibility and was responsible for the majority of illness, hospitalization and death in the US.  Cases of COVID were reported among vaccinated persons (breakthrough cases) and there were indications that the vaccines were not as effective as previously characterized.  The decrease in effectiveness may have been due to waning immunity of the vaccine (protection goes down over time) or because of differences in strain (Delta).

The most recent and highest quality data examining the effectiveness of vaccines, published by the CDC on August 27, 2021, was real world or observational data among frontline workers between December 14, 2020–August 14, 2021. [22]

---

[19] Vaccines and Related Biological Products Advisory Committee Meeting. December 17, 2020. FDA Briefing Document. Moderna COVID-19 Vaccine. https://www.fda.gov/media/144434/download  Accessed 03/23/2025.
[20] Vaccines and Related Biological Products Advisory Committee Meeting. December 10, 2020.  FDA Briefing Document. Pfizer-BioNTech COVID-19 Vaccine. https://www.fda.gov/media/144245/download  Accessed 03/23/2025.
[21] Vaccines and Related Biological Products Advisory Committee Meeting
February 26, 2021 FDA Briefing Document: Janssen Ad26.COV2.S Vaccine for the Prevention of COVID-19. https://www.fda.gov/media/146217/download. Accessed 03/23/2025.
[22] Centers for Disease Control and Prevention.  Effectiveness of COVID-19 Vaccines in Preventing SARS-CoV-2 Infection Among Frontline Workers Before and During B.1.617.2 (Delta) Variant Predominance — Eight U.S. Locations, December 2020–August 2021.  MMWR. August 27, 2021 / 70(34);1167-1169.

Regarding waning immunity, the CDC reported: "Adjusted VE against SARS-CoV-2 infection was 80% (95% confidence interval [CI] = 69%–88%). The VE point estimate was 85% among participants for whom <120 days had elapsed since completion of full vaccination compared with 73% among those for whom ≥150 days had elapsed; however the VE 95% CI were overlapping, indicating the difference was not statistically significant."

When focusing exclusively on the Delta variant, the CDC reported the following:

> During December 14, 2020–August 14, 2021, full vaccination with COVID-19 vaccines was 80% effective in preventing RT-PCR–confirmed SARS-CoV-2 infection among frontline workers, further affirming the highly protective benefit of full vaccination up to and through the most recent summer U.S. COVID-19 pandemic waves. The VE point estimates declined from 91% before predominance of the SARS-CoV-2 Delta variant to 66% since the SARS-CoV-2 Delta variant became predominant at the HEROES-RECOVER cohort study sites; however, this trend should be interpreted with caution because VE might also be declining as time since vaccination increases and because of poor precision in estimates due to limited number of weeks of observation and few infections among participants.

From these data and other similar limited and preliminary results in the scientific literature, it was clear that the vaccine was still very beneficial in preventing disease and consequent disease transmission. Concerns about waning immunity led to consideration of and ultimately recommendations for a booster doses.

**Does a COVID-19 vaccine that utilizes messenger ribonucleic acid (mRNA) have the effect of altering the genetic makeup of a person who receives such a vaccine?**

No, mRNA COVID-19 vaccines could not change someone's DNA (genetic makeup). As described by the National Human Genome Research Institute of the National Institute of Health at the time (August 30, 2021): "mRNA vaccines inject cells with instructions to generate a protein that is normally found on the surface of SARS-CoV-2, the virus that causes COVID-19…. mRNA vaccines are safe and cannot alter your DNA".[23] It was widely accepted among the scientific community that mRNA vaccines could not alter DNA.

**Was the COVID-19 vaccine developed and manufactured by Janssen Biotech, Inc., an mRNA vaccine?**

No, Janssen Biotech COVID-19 vaccine was not an mRNA vaccine. The Janssen vaccine was a viral (adenovirus) vector vaccine. Other viral vector vaccines include Japanese encephalitis, Lassa fever, Ebola, hepatitis B, hepatitis E and malaria.

**In November 2021, were unvaccinated persons, as compared to vaccinated persons, at an increased risk of becoming infected with COVID-19 and, therefore, transmitting the virus to others?**

---

[23] National Human Genome Research Institute of the National Institute of Health. https://www.genome.gov/about-genomics/fact-sheets/Understanding-COVID-19-mRNA-Vaccines accessed 03/23/25.

Given the benefits of COVID-19 vaccines in reducing disease acquisition and transmission, unvaccinated persons were at an increased risk of contracting COVID-19 and transmitting it to others, including through meeting in person with fellow employees and patients, who could not be vaccinated because of medical contraindications as well as persons who were vaccinated but the vaccine did not sufficiently work for them (the vaccines were not 100% effective, see earlier discussion). The protection afforded by COVID-19 vaccines, like all vaccines, is not perfect so it was known that a vaccinated person could transmit disease. However, because the vaccines reduced the likelihood of infection, they also reduced the likelihood of transmission of disease to others. It was difficult to perfectly predict the reduced likelihood of disease transmission in vaccinated versus unvaccinated persons, particularly during a pandemic with evolving knowledge of the disease and uncertainty around mutations. Additionally, because experience with the vaccine was limited the potential for protection from the vaccine to wane over time was not well understood. Despite these limitations, it was widely accepted in the scientific community that COVID-19 vaccines reduced the likelihood of disease transmission and consequently unvaccinated persons were at increased risk of disease transmission.

**In November 2021, did available scientific evidence indicate that natural immunity (i.e., the presence of antibodies from prior infection) was as effective as vaccination to protect persons from COVID-19 infection?**

Several studies were available at that time that indicated an immune response to COVID-19 that lasted for at least a short time,[24, 25,26, 27] reduced the risk of reinfection,[27] and infections provided some level of protection among Rhesus monkeys.[28] However, good correlates of protection were not available. A correlate of protection is a set of "empirically defined, quantifiable immune parameters that determine the attainment of protection against a given pathogen."[29] In other words, it was not known what sort or type of immune response or how strong an immune response was necessary to protect from COVID-19, including but not limited to new variants that might emerge. So, although it was measured that natural infection resulted in an immune response which lasted at least for months, it was not known if that immune response protected against COVID-19. Additionally, while there was some indication that infection reduced the risk of reinfection, there was not a good measure of how much it reduced reinfection nor for how long. A CDC study available in August of 2021 indicated that among previously infected persons, reinfection was about twice as high if not being fully vaccinated, leading CDC to recommend "To reduce their likelihood for future infection, all eligible persons should be

[24] Staines HM, Kirwan DE, Clark DJ, et al. IgG seroconversion and pathophysiology in severe acute respiratory syndrome coronavirus 2 infection. Emerg Infect Dis. 2021 Jan;27.

[25] Wajnberg A, Amanat F, Firpo A, et al. Robust neutralizing antibodies to SARS-CoV-2 infection persist for months. Science. 2020 Dec;370(6521):1227-1230.

[26] Dan JM, Mateus J, Kato Y, et al. Immunological memory to SARS-CoV-2 assessed for up to 8 months after infection. Science. 2021 Feb 5;371(6529):eabf4063.

[27] Gallais F, Gantner P, Bruel T, et al. Anti-SARS-CoV-2 Antibodies Persist for up to 13 Months and Reduce Risk of Reinfection. medRxiv. 2021.

[28] Bao L, Deng W, Gao H, et al. Lack of Reinfection in Rhesus Macaques Infected with SARS-CoV-2. bioRxiv. 2020.

[29] Altmann DM, Douek DC, Boyton RJ. What policy makers need to know about COVID-19 protective immunity. The Lancet. 2020 May;395(10236):1527–1529.

offered COVID-19 vaccine, even those with previous SARS-CoV-2 infection."[30]  Natural immunity also comes with the potential for morbidity and mortality from COVID-19. Monitoring of healthy individuals for more than 35 years had shown that reinfection with the same seasonal coronavirus occurred frequently[31] and protection from seasonal coronavirus infections are short lived.[32]

**In November 2021, was it possible to determine how long antibodies from prior COVID-19 infection could protect against subsequent COVID-19 infection?**

In November 2021 there was not scientific consensus on how long prior COVID-19 infection would protect against subsequent COVID-19 infection.

**In November 2021, did available scientific evidence indicate that antibodies from prior COVID-19 infection could protect persons against infection by a new strain of COVID-19?**

In November 2021, available scientific evidence could not predict if antibodies from prior COVID-19 infection would protect against infection by a new strain of COVID-19.  The virus was mutating in unpredictable ways domestically and globally.  Scientists were struggling to keep track of these mutations and determining which mutation would become dominant. Additionally, not knowing what the new strain would be it was impossible to ascertain if prior infection from a previous infection would protect against a new strain.

**<u>Role of COVID-19 Vaccination Mandates in Managing Threats of COVID-19 to Patients and Healthcare Workers</u>**

**In November 2021, did COVID-19 pose a direct threat to patients and healthcare workers**?

In November 2021, COVID-19 posed a direct threat to patients and staff in healthcare facilities. Healthcare facilities around the country and the world were being overwhelmed by COVID-19. Healthcare staff were disproportionately impacted by COVID-19.  Additionally, patients in healthcare facilities were at substantial risk of exposure to and infection with COVID-19 despite precautionary measures that were taken to reduce the risk of transmission in healthcare settings.  Often, patients in healthcare settings were at increased risk of severe COVID-19 because of underlying health conditions and age.

**In November 2021, were COVID-19 vaccination mandates a critical protection for patients and healthcare workers?**

Mandatory COVID-19 vaccination policies for healthcare employees were a critical protective action at this time to protect patients and staff.  As discussed, COVID-19 posed a direct threat to

---

[30] Centers for Disease Control and Prevention.  Reduced Risk of Reinfection with SARS-CoV-2 After COVID-19 Vaccination — Kentucky, May–June 2021.  MMWR. August 13, 2021 / 70(32);1081-1083.
[31] Om E, Byrne P, Walsh KA, et al. Immune response following infection with SARS-CoV-2 and other coronaviruses: A rapid review. Rev Med Virol. 2021 Mar;31(2):e2162.
[32] Edridge AWD, Kaczorowska J, Hoste ACR, et al. Seasonal coronavirus protective immunity is short-lasting. Nat Med. 2020 Nov;26(11):1691–1693.

patients and staff in healthcare settings. Healthcare facilities around the country and the world were being overwhelmed by COVID-19. Healthcare staff were disproportionately impacted by COVID-19. Additionally, patients were at substantial risk of exposure and infection with COVID-19 despite precautionary measures that were taken to reduce the risk of transmission.[33]

Mandatory COVID-19 vaccine policies were a critical protective action to protect patients and staff for the following reasons:

1) COVID-19 posed a substantial threat to patients and staff;
2) COVID-19 vaccines provided a high level of protection against contracting COVID-19 and reducing transmission of COVID-19; and
3) Mandatory vaccination policies for influenza vaccines in healthcare settings have been demonstrated to be necessary to achieve high levels of vaccine coverage (voluntary policies even coupled with free access to vaccines and education did not achieve very high levels of vaccine coverage).

Mandatory COVID-19 vaccine policies were directly related to and often drew from mandatory influenza vaccine policies that have long been very important for healthcare institutions. Mandatory influenza vaccine policies are very important for healthcare institutions and directly relate to mandatory COVID-19 vaccine policies. Exposure to influenza in healthcare settings is an occupational hazard. Asymptomatic and healthcare workers who come to work ill (including the day before symptoms become apparent and the person is infectious) can transmit influenza to patients. Likewise, patients may be asymptomatic and transmitting influenza, including to unvaccinated healthcare workers and other patients. There is a broad range of strategies to reduce the risk of influenza among healthcare workers and protect patients who come into contact with such personnel. Strategies to reduce the risk of influenza in healthcare institutions include offering education and free, on-site vaccination, implementation of hand and respiratory hygiene and cough etiquette, screening and isolation of healthcare workers and patients with acute respiratory infections, and other prevention measures.[34]

Influenza vaccination is the most effective strategy to protect healthcare workers from contracting influenza and transmitting it to their patients. Vaccination of healthcare workers has been shown to be very effective, with minimal adverse effects, and shown to reduce patient mortality.[35] Despite considerable efforts at the Federal level and among states, with strong support from medical associations, influenza vaccination coverage among healthcare workers remains suboptimal.

Many healthcare institutions require influenza vaccination among their workers to protect their employees and the patients they care for. The Society for Healthcare Epidemiology of America (SHEA) strongly endorses mandatory vaccination of healthcare workers to protect against influenza, as can be seen in their most recent policy position on this topic:

---

[33] Du Q et al. Nosocomial infection of COVID-19: A new challenge for healthcare professionals (Review). Int J Mol Med. 2021 Apr;47(4):31. doi: 10.3892/ijmm.2021.4864. Epub 2021 Feb 4.

[34] CDC. Prevention Strategies for Seasonal Influenza in Healthcare Settings. [cited 2011 17 November]; Available from: http://www.cdc.gov/flu/professionals/infectioncontrol/healthcaresettings.htm. accessed 03/23/25.

[35] Burls A, Jordan R, Barton P et al. Vaccinating healthcare workers against influenza to protect the vulnerable – is it. A good use of healthcare resources? A systematic review of the evidence and an economic evaluation. Vaccine. 2006. May 8; 24(19): 4212-21.

SHEA views influenza vaccination of HCP as a *core patient and HCP safety practice* with which noncompliance should not be tolerated. It is the professional and ethical responsibility of HCP and the institutions within which they work to prevent the spread of infectious pathogens to their patients through evidence-based infection prevention practices, including influenza vaccination. *Therefore, for the safety of both patients and HCP, SHEA endorses a policy in which annual influenza vaccination is a condition of both initial and continued HCP employment and/or professional privileges.*[36]

Many professional medical and public health associations also support mandatory influenza vaccination of healthcare workers, including the American Academy of Family Physicians, the American Academy of Pediatrics, the American College of Physicians, the American Hospital Association, the American Medical Directors Association, the American Nurses Association, the American Public Health Association, the Association for Professionals in Infection Control and Epidemiology, the Infectious Disease Society of America, the National Association of County and City Health Officials, National Patient Safety Foundation, and others.[37]

This experience with influenza vaccine mandates in healthcare settings is directly applicable to COVID-19 mandates in healthcare settings. As with influenza, COVID-19 exposure in healthcare settings is an occupational hazard. Asymptomatic healthcare workers who come to work ill (including the day before symptoms become apparent and the person is infectious) can transmit COVID-19 to patients. Likewise, patients may be asymptomatic and transmitting COVID-19, including to unvaccinated healthcare workers and other patients. Voluntary programs for COVID-19 vaccination even coupled with access and education, as is the case with influenza, were unlikely to adequately reach very high levels of vaccine coverage necessary for protecting healthcare workers and patients. For example, we conducted a survey in late 2020 before the vaccines were available at SUNY Upstate Medical University in Syracuse, NY, the only academic medical center in Central New York and the region's largest employer with 9,565 employees.[38] We found that 57.5% of individuals expressed intent to receive COVID-19 vaccine, including 80.4% of physicians and scientists. Nearly half or more of nurses, Master's level clinicians, allied health professionals, and ancillary service personnel were not sure whether the vaccine would work and protect them from COVID-19; slightly lower but similar levels of uncertainty were expressed by the same groups about vaccine safety, and nearly a third of each group was unsure whether they would take a vaccine for COVID-19 if offered for free. The attitudes and concerns of nurses were very similar to those of the general public at the time. We conducted a follow-up survey in this healthcare system between 21 February and 19 March 2021 and found that 87.7% of respondents had already received a COVID-19 vaccine or planned to get vaccinated.[39] Physicians and scientists

---

[36] Revised SHEA position paper: influenza vaccination of healthcare personnel. Infection Control and Hospital Epidemiology. Oct 2010. 31(10); 987-995.

[37] See https://www.immunize.org/honor-roll/influenza-mandates/ for list of these organizations that have policy positions supporting mandatory influenza vaccination for healthcare workers, including links to these policy statements. Accessed 03/23/25.

[38] Jana Shaw, Telisa Steward, Kathryn Anderson, Samantha Hanley, Stephen Thomas, Daniel Salmon, Christopher Morley. Assessment of U.S. health care personnel (HCP) attitudes towards COVID-19 vaccination in a large university health care system. Clin Infect Dis. 2021 Jan 25.

[39] Jana Shaw, Samantha Hanley, Telisa Steward, Daniel Salmon, Christin Ortiz, Paula Trief, Elizabeth Reddy, Christopher Morley, Stephen Thomas, Kathryn Anderson. Healthcare Personnel (HCP) Attitudes About

showed the highest acceptance rate (97.3%), whereas staff in ancillary services showed the lowest acceptance rate (79.9%). These levels of COVID-19 vaccine coverage were too low to provide adequate protection, leading New York to require vaccination of healthcare workers in September of 2021 and experiencing a 10% increase in vaccine coverage within a week.[40]

Similarly, many healthcare systems and medical providers were finding voluntary programs for COVID-19 vaccination to be insufficient and were thus turning to mandatory programs. According to the COVID States Project, as of July 2021, 27% of healthcare workers were unvaccinated and 15% were vaccine resistant, leading the authors to conclude that "absent mandates, most of the currently unvaccinated healthcare workers will remain unvaccinated, potentially fueling outbreaks in health care facilities."[41] A joint statement by 88 major medical organizations and associations called for mandatory vaccination of healthcare workers, including the American Hospital Association, the American Medical Association, the American College of Physicians, the American Academy of Family Physicians, and the American Public Health Association.[41,42] In August, 2021, the Department of Veterans Affairs announced that all employees and staff at VA facilities had to be vaccinated for COVID-19.[43] On September 9, 2021, President Biden announced a requirement for all healthcare workers working in settings that receive Medicare or Medicaid reimbursement to receive COVID-19 vaccines.[44]

**In November 2021, how effective were COVID-19 infection-control measures such as daily health questionnaires, temperature checks, and weekly testing, and were they sufficient safety measures in lieu of COVID-19 vaccination?**

Daily health questionnaires, temperature checks and weekly testing were not sufficient safety measures in lieu of vaccination. Health questionnaires are self-reported data, which are notoriously inaccurate. However, even if the person completing the questionnaire is perfectly accurate in their responses, as is largely the case with temperature checks (not self-reported), at best these approaches might be an indication that a test was warranted. However, by November of 2021, it had been well established that people could transmit COVID-19 before becoming symptomatic and among asymptomatic cases.

Regular testing for COVID-19 may allow for the identification of persons who have active disease. However, there are limitations to this approach. First, available COVID-19 tests are

---

Coronavirus Disease 2019 (COVID-19) Vaccination After Emergency Use Authorization. Clin Infect Dis. 2022 Aug 24;75(1):e814-e821.
[40] Forbes. Covid-19 Vaccine Mandates Are Working—Here's The Proof
https://www.forbes.com/sites/tommybeer/2021/10/04/covid-19-vaccine-mandates-are-working-heres-the-proof/?sh=8555e4b23058 accessed 03/23/25.
[41] Lazer David, et al. The COVID States Project #62: COVID-19 vaccine attitudes among healthcare workers. The COVID States Project. Aug 18, 2021
[42] Joint Statement in Support of COVID-19 Vaccine Mandates for All Workers in Health and Long-Term Care. https://assets.acponline.org/acp_policy/statements/joint_statement_covid_vaccine_mandate_2021.pdf accessed 03/23/25.
[43] US Department of Veteran Affairs. VA mandates COVID-19 vaccines among its medical employees including VHA facilities staff. https://www.va.gov/opa/pressrel/pressrelease.cfm?id=5696 accessed 03/23/25.
[44] The White House. Remarks by President Biden on Fighting the COVID-19 Pandemic
https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-the-covid-19-pandemic-3/ accessed 03/23/25.

imperfect with the potential for both false positives and false negatives. Second, weekly COVID-19 testing would not identify people as soon as they became infectious, potentially allowing someone to transmit COVID-19 for up to a week before testing positive. Even daily testing would still miss cases transmitting disease between tests. Regardless of testing interval, in the time between when a person first became infectious and when the test was taken there was risk that the person would infect others.

## Effect of Non-Medical Exemptions From COVID-19 Vaccination Mandates

**Did non-medical exemptions from COVID-19 vaccination mandates increase the risks of COVID-19 infection to patients and healthcare workers?**

Unvaccinated persons (those with medical and non-medical exemptions) are at increased risk of contracting disease and transmitting disease to unvaccinated individuals (including, but not limited to, others who cannot be vaccinated because of medical contraindications or who are too young to be vaccinated), and to vaccinated individuals for whom the vaccine did not work (no vaccine is 100% effective). The impact of non-medical exemptions has been extensively studied among children for pertussis and measles, though the epidemiological principles apply to influenza vaccine and non-medical exemptions among healthcare workers. Children who have non-medical exemptions are 22-35 times more likely to contract measles and 6 times more likely to contract pertussis than vaccinated children.[45,46] In addition to this individual risk, exempt persons also increase the risk to others. Studies we have conducted demonstrate that communities with higher rates of non-medical exemptions are at increased risk of pertussis outbreaks.[45,46,47] We also found that states that had easier non-medical exemptions processes for granting exemptions had higher rates of non-medical exemptions and higher rates of pertussis.[48,49]

Measles also highlights the community risks of vaccine refusal.[50] Measles has been eliminated in the United States because of sustained high coverage of a very safe and effective vaccine. However, there are communities in the United States with high rates of vaccine refusal and measles is still circulating in many parts of the world. As a result, measles is introduced into these communities with high rates of vaccine refusal – clustered socially or geographically –

[45] Salmon DA, Haber M, Gangarosa EJ, Phillips L, Smith N, Chen RT. Health consequences of religious and philosophical exemptions from immunization laws: individual and societal risks of measles. JAMA. 1999 July 7; 282(1): 47-53.
[46] Feikin DR, Lezotte DC, Hamman RF, Salmon DA**,** Chen RT, Hoffman RE. Individual and community risks of measles and pertussis associated with personal exemptions to immunizations. JAMA. 2000 Dec. 27; 284(24): 3145-3150.
[47] Atwell JE, Van Otterloo J, Zipprich J, Winter K, Harriman K, Salmon DA, Halsey NA, Omer SB. Nonmedical vaccine exemptions and pertussis in California, 2010. Pediatrics. 2013 Oct;132(4):624-30.
[48] Rota JS, Salmon DA, Rodewald LE, Chen RT, Hibbs BF, Gangarosa EJ. Processes for obtaining nonmedical exemptions to state immunization laws. AJPH. April 2000; 91: 645-8.
[49] Omer SB, Pan WK, Halsey NA, Stokely S, Moulton LH, Navar AM, Salmon DA. Nonmedical Exemptions to School Immunization Requirements: Secular Trends and Association of State Policies with Pertussis Incidence. JAMA. 2006 Oct 11; 296(14):1757-63.
[50] Salmon DA, Dudley MZ*, Glanz JM, Omer SB. Vaccine hesitancy: Causes, consequences, and a call to action. Co-Published. Vaccine & Am J Prev Med. 2015 Nov 23; Suppl 4:D66-71.

resulting in outbreaks of measles.[51]  An outbreak originating in Disneyland in 2015 caught the most national attention though there have been similar outbreaks in the Somali community in Minnesota and orthodox Jewish community in New York.  As a result, the United States almost lost its "elimination status" in 2009, the same year that the World Health Organization declared vaccine hesitancy a top 10 global health threat.  Several states (California, New York, Maine and Washington) have consequently eliminated their non-medical exemptions (Washington only eliminated non-medical exemptions for the MMR vaccine).  There was recently a case of paralytic polio in the same orthodox Jewish community in New York which had the measles outbreak.  This single case of polio indicates there are likely thousands of cases of asymptomatic polio in the community given the often-asymptomatic nature of polio.  Sewage samples testing positive for polio support this.

These studies have been focused on children because every state has laws requiring vaccination for school entry.  These studies have focused on measles and pertussis because the epidemiology of the diseases makes them well suited for such studies.  However, the findings from these studies are very generalizable to non-medical exemptions to COVID-19 vaccine requirements for healthcare workers given the nature of infectious diseases and the impact of unvaccinated persons with exemptions.  In fact, the impact of exemptions for COVID-19 vaccine among healthcare workers would be much higher than in the case with childhood vaccines because healthcare workers regularly come into contact with patients who are at increased risk for COVID-19 complications and death.

**Did healthcare facilities have a responsibility to protect the safety of patients and staff by establishing and implementing processes for evaluating requests for exemption from COVID-19 vaccination mandates?**

Exemptions to COVID-19 vaccine requirements had the potential to undermine vaccine requirements, particularly if a large number of exemptions were granted.  However, many COVID-19 vaccine requirements were implemented in such a way that exemptions were either not granted or only a small number of exemptions were granted, and in such situations, there were substantial increases in vaccine coverage and a small number of persons who left employment because of the mandates.  Many healthcare institutions that instituted mandates offered medical exemptions for those with valid medical contraindications and religious exemptions.  Even if medical exemptions met guidelines for contraindications or religious exemptions were determined to be sincere, many healthcare institutions determined that the risks to others imposed an undue burden and, consequently, did not grant some or all exemption requests.

As previously described, each non-medical exemption a healthcare facility granted increased the risk of COVID-19 disease transmission and outbreaks adversely impacting other healthcare staff, patients, and the capacity of the healthcare system to operate.  One can reasonably conclude that exemptions would be geographically clustered, increasing their impact, given COVID-19 vaccine hesitancy had been shown to geographically cluster and healthcare workers tended to live in the communities in which they work.

---

[51] Phadke VK. Bednarczyk RA, Salmon DA, Omer SB. Association between Vaccine Refusal and Vaccine Preventable Diseases in the United States: A Focus on Measles and Pertussis. JAMA. 2016 Mar; 315(11): 1149-58.

**In evaluating requests for non-medical exemptions from COVID-19 vaccination mandates, was it appropriate to make distinctions between more vulnerable and less vulnerable patient populations for purposes of determining whether such a request could be accommodated?**

It was appropriate, based upon available scientific evidence, to make distinctions between more vulnerable and less vulnerable patients for the purpose of evaluating exemption requests. As described, unvaccinated (exempt) staff were at increased risk of contracting and transmitting COVID-19 compared with vaccinated staff. The increased risk of unvaccinated (exempt) staff compared to vaccinated staff included the risk of transmission to other staff and patients. Many patients in this setting were at increased risk of severe disease, while other patients were not at increased risk of severe disease. Of particular concern was the increased risk of unvaccinated (exempt) staff to patients at increased risk of severe disease. At this time, subpopulations at increased risk of severe disease (such as those with cardiac disease) were well characterized. Requiring unvaccinated (exempt) staff to only work with less-vulnerable patients was based upon well accepted science at the time and could be expected to reduce or mitigate the risk of unvaccinated (exempt) staff.

## Conclusion

In summary, in November 2021 the world was amid a global pandemic with the United States experiencing a large number of cases and substantial morbidity and mortality. Certain subpopulations such as the elderly and persons with underlying health conditions, such as cardiac patients, were at substantial increased risk of more severe disease and death if they contracted COVID-19. Healthcare institutions were particularly hard hit by COVID-19, experiencing high rates of disease and struggling to meet patient needs given limited capacity. Unvaccinated healthcare workers were at increased risk of contracting and transmitting COVID-19.

At the time, it was well accepted in the scientific and medical communities that COVID-19 was spread from person to person and people could asymptomatically transmit disease. It would have been extremely difficult for a healthcare facility to track transmission by vaccination status and any such efforts would not have yielded reliable and actionable information.

COVID-19 was an occupational hazard and, for all the foregoing reasons, healthcare workers were prioritized by the CDC to be among the first to receive the vaccine. Three vaccines were available at the time, and they were found to be very safe and effective. While there was indication that there was some level of natural immunity post infection, it was unclear how effective and for how long natural infection would provide protection and there was no evidence to indicate how well natural infection would protect against the next variant. Because of the risk of COVID-19 transmission from unvaccinated healthcare workers to high-risk patients and suboptimal voluntary vaccine acceptance among healthcare workers, and following the model of influenza vaccine, many healthcare institutions implemented mandatory COVID-19 vaccination polices.

Measures such as daily health questionnaires, temperature checks and weekly testing were insufficient in leu of vaccination.  Non-medical exemptions to COVID-19 vaccine requirements increased the risk of COVID-19 to patients and healthcare workers.  Healthcare facilities had a responsibility to protect the safety of patients and staff by evaluating exemption requests. It was very reasonable and consistent with available science to make a distinction between staff who interacted with more vulnerable versus less vulnerable patients for the purpose of evaluating exemption requests.

20

REVISED JANUARY 1, 2025

**CURRICULUM VITAE**

**Daniel Salmon**

*Home*                                                Global Disease Epidemiology and Control
168 Country Ridge Road                   Department of International Health
Red Lion, PA, 17356                          Department of Health, Behavior & Society
                                                            Institute for Vaccine Safety
*Business*                                          The Johns Hopkins University
615 N. Wolfe Street, W5035             Bloomberg School of Public Health
Baltimore, MD 21205
Tel: (443) 803-7754
E-mail: dsalmon1@jhu.edu

# Education and Training

2003        PhD, Health Policy and Management, Johns Hopkins University Bloomberg
               School of Public Health, Baltimore, MD
               Dissertation:  *School Implementation of Immunization Requirements: Are School
               Policies or Personnel Associated with the Likelihood of a Child Claiming an
               Exemptions or School-Based Outbreaks of Measles or Pertussis?*

1996        MPH, Health Policy and Management, Emory University Rollins School of
               Public Health, Atlanta, GA
               Thesis: *Health Consequences of Religious and Philosophical Exemptions from
               Immunization Laws: Individual and Societal Risk of Measles*

1991        BA, Political Science with Minor in Psychology, Rutgers University, New
               Brunswick, NJ

# Professional Experience

2018 -       Director, Institute for Vaccine Safety, The Johns Hopkins University, Bloomberg
               School of Public Health

2017 -       Professor, Global Disease Epidemiology and Control, Department of International
               Health, The Johns Hopkins University, Bloomberg School of Public Health

2017 -       Professor, Health, Behavior and Society (joint appointment), The Johns Hopkins
               University, Bloomberg School of Public Health

2018 - 2021  Director of PhD Program, Global Disease Epidemiology and Control, Department
               of International Health, The Johns Hopkins University, Bloomberg School of
               Public Health

| | |
|---|---|
| 2012 - 2018 | Deputy Director, Institute for Vaccine Safety, The Johns Hopkins University, Bloomberg School of Public Health |
| 2012 - 2017 | Associate Professor, Global Disease Epidemiology and Control, Department of International Health, The Johns Hopkins University, Bloomberg School of Public Health |
| 2013 - 2017 | Associate Professor, Health, Behavior and Society (joint appointment), The Johns Hopkins University, Bloomberg School of Public Health |
| 2007 - 2012 | Director of Vaccine Safety (GS 15 – Step 10), National Vaccine Program Office, Office of the Assistant Secretary for Health, Department of Health and Human Services |
| 2007 - 2012 | Adjunct Associate Professor, Global Disease Epidemiology and Control, Department of International Health, The Johns Hopkins University, Bloomberg School of Public Health |
| 2005 - 2007 | Associate Professor, Department of Epidemiology and Health Policy Research, University of Florida, College of Medicine |
| 2003 - 2005 | Assistant Scientist, Division of Disease Prevention and Control, Department of International Health, Associate Director for Policy and Behavioral Research, Institute for Vaccine Safety, The Johns Hopkins University, Bloomberg School of Public Health |
| 2001 - 2003 | Research Associate, Division of Disease Prevention and Control, Department of International Health, Associate Director for Policy and Behavioral Research, Institute for Vaccine Safety, The Johns Hopkins University, Bloomberg School of Public Health |
| 1999 - 2001 | Consultant, Institute for Vaccine Safety, The Johns Hopkins University, Bloomberg School of Public Health |
| 2000 | Consultant, Merck Vaccine Division, Merck and Co, Inc. |
| 1997 - 1999 | Policy Analyst, National Vaccine Program Office, Centers for Disease Control and Prevention |
| 1995 -1997 | Contractor, National Immunization Program, Centers for Disease Control and Prevention |
| 1994 - 1995 | HIV Prevention Community Coordinator, Health Visions, Inc. |
| 1994 | Consultant, Health Visions, Inc. |

1990 - 1992    Residential Aide/Counselor, Alternatives, Inc.

# Professional Activities

*Society Membership*
- American Public Health Association, Member (1995-1999)
- Infectious Disease Society of America, Member (2005-2007)

*Advisory Panels*
*Advisory Panels*
- National Academy of Science, Engineering, and Medicine.  Guidance on Routine Childhood Immunization (2004)
- National Vaccine Advisory Committee (NVAC) Vaccine Confidence Working Group (2020-2022)
- Moderna Vaccine Safety Board (2020-2022)
- Merck Vaccine Confidence Board (2019, 2023)
- 39th National Immunization Conference External Planning Committee (2004)
- Merck Vaccine Policy Board Member (2007)
- Parents of Kids with Infectious Diseases (PKIDS), Board Member (2007- 2010)
- Brighton Collaboration, Board Member, Vaccine Hesitancy Working Group Co-Chair (2012-2020)
- National Vaccine Advisory Committee (NVAC) Vaccine Confidence Working Group (2018-22)
- Janssen Vaccine Policy Board Member (2021)
- Moderna Vaccine Safety Board (2022-2023)

# Editorial Activities

*Peer Reviewer (selected)*
- American Journal of Preventive Medicine
- American Journal of Public Health
- Archives of Pediatric and Adolescent Medicine
- Biosecurity and Bioterrorism
- BMC Family Practice
- BMC Public Health
- Expert Reviews of Vaccines
- Health Affairs
- Health Education Research
- Indian Journal of Medical Science
- Journal of Comparative Family Studies
- Journal of Health Communication
- Journal of the American Medical Association
- Journal of the National Medical Association
- Journal of Urban Health

- New England Journal of Medicine
- Pediatrics Pediatric Infectious Disease Journal
- Pediatrics International
- Public Health Reports
- The Lancet
- The Lancet Infectious Diseases
- Vaccine
- Vaccines

*Editorial Board*
Vaccine, Associate Editor (2021- 2022)
Vaccines (2012-2013)

*Guest Editor*
Pediatrics Supplement: Vaccine Safety Throughout the Product Life Cycle (2011)
Vaccines Supplement: Confidence in Vaccines (2013)

# Review of Proposals (selected)

Health Promotion in Communities (HPC) Study Section National Institutes of Health (standing member) and Dissemination & Implementation in Heath Study Section (DIHR, ad hoc reviewer). Special Emphasis Panels for National Institutes of Health, Centers for Disease Control and Prevention, Food and Drug Administration (Chair), National Science Foundation, and Canadian Institutes of Health Research.

# Honors and Awards

- Haddon Fellow, Johns Hopkins University Bloomberg School of Public Health (1999-2001)
- Achievement Award – Dedication to Students, Johns Hopkins Bloomberg School of Public Health (2005)
- Development of the Federal Immunization Safety Task Force, Assistant Secretary for Health (2008)
- Federal Monitoring of H1N1 Vaccine Safety, Assistant Secretary for Health (2010)
- Patient Education Working Group Co-Chair, Assistant Secretary for Health (2012)
- Outstanding recent graduate (within past 10 years), Johns Hopkins Bloomberg School of Public Health (2013)
- Delta Omega Society (2014)

# Publications (* indicated student/advisee/mentee)

## Journal Articles (Peer Reviewed)

1. Powell TW, Forr A, Johnson S, Clinton T, Gaither J, Brewer J, Dudley MZ, Holifield J, Wilson P, Benson LR, Harr L, **Salmon DA**, Mendelson T. The Voices on Vax Campaign:

Lessons Learned from Engaging Youth to Promote COVID Vaccination. Prog Community Health Partnersh. 2024;18(3):345-353.

2.  Kitano T, Dudley MZ, Engineer L, Thompson DA, **Salmon DA**. The authors reply to Kurita et al and Lataster. Am J Epidemiol. 2024 Jun 3;193(6):932-934.

3.  Salmon DA, Orenstein WA, Plotkin SA, Chen RT. Funding Postauthorization Vaccine-Safety Science. N Engl J Med. 2024 Jul 11;391(2):102-105. doi: 10.1056/NEJMp2402379. Epub 2024 Jul 6.

4.  Zapf AJ, Schuh HB, Dudley MZ, Rimal RN, Harvey SA, Shaw J, Balgobin K, **Salmon DA**. Knowledge, attitudes, and intentions regarding COVID-19 vaccination in the general population and the effect of different framing messages for a brief video on intentions to get vaccinated among unvaccinated individuals in the United States during July 2021. Patient Educ Couns. 2024 Jul;124:108258.

5.  Dudley MZ, Schuh HB, Forr A, Shaw J, **Salmon DA**. Changes in vaccine attitudes and recommendations among US Healthcare Personnel during the COVID-19 pandemic. NPJ Vaccines. 2024 Feb 28;9(1):49.

6.  **Salmon DA**, Chen RT, Black S, Sharfstein J. Lessons learned from COVID-19, H1N1, and routine vaccine pharmacovigilance in the United States: a path to a more robust vaccine safety program. Expert Opin Drug Saf. 2024 Feb;23(2):161-175.

7.  Kitano T, **Salmon DA**, Dudley MZ, Thompson DA, Engineer L. Benefit-Risk Assessment of mRNA COVID-19 Vaccines in Children Aged 6 Months to 4 Years in the Omicron Era. J Pediatric Infect Dis Soc. 2024 Feb 26;13(2):129-135.

8.  Dudley MZ, Schuh HB, Goryn M, Shaw J, **Salmon DA**. Attitudes toward COVID-19 and Other Vaccines: Comparing Parents to Other Adults, September 2022. Vaccines (Basel). 2023 Nov 21;11(12):1735.

9.  Dudley MZ, Schwartz B, Brewer J, Kan L, Bernier R, Gerber JE, Budigan Ni H*, Proveaux TM, Rimal RN, **Salmon DA**. COVID-19 vaccination attitudes, values, intentions: US parents for their children, September 2021. Vaccine. 2023 Nov 30;41(49):7395-7408.

10. Delamater PL, Buttenheim AM, **Salmon DA**, Schwartz JL, Omer SB. Kindergarten Vaccination Status in California After Changes to Medical Exemption Policy. JAMA. 2023 Oct 24;330(16):1585-1587.

11. Schuh HB, Rimal RN, Breiman RF, Orton PZ, Dudley MZ, Kao LS, Sargent RH, Laurie S, Weakland LF, Lavery JV, Orenstein WA, Brewer J, Jamison AM*, Shaw J, Josiah Willock R, Gust DA, **Salmon DA**. Evaluation of online videos to engage viewers and support decision-making for COVID-19 vaccination: how narratives and race/ethnicity enhance viewer experiences. Front Public Health. 2023 Aug 21;11:1192676.

12. Kitano T*, Thompson DA, Engineer L, Dudley MZ, **Salmon DA**. Risk and Benefit of mRNA COVID-19 Vaccines for the Omicron Variant by Age, Sex, and Presence of Comorbidity: A Quality-Adjusted Life Years Analysis. Am J Epidemiol. 2023 Jul 7;192(7):1137-1147.

13. **Salmon DA**, Dudley MZ, Brewer J, Shaw J, Schuh HB, Proveaux TM, Jamison AM*, Forr A, Goryn M, Breiman RF, Orenstein WA, Kao LS, Josiah Willcock R, Cantu M, Decea T, Mowson R, Tsubata K, Bucci LM, Lawler J, Watkins JD, Moore JW, Fugett JH, Fugal A, Tovar Y, Gay M, Cary AM, Vann I, Smith LB, Kan L, Mankel M, Beekun S, Smith V, Adams SD, Harvey SA, Orton PZ. LetsTalkShots: personalized vaccine risk communication. Front Public Health. 2023 Jun 30;11:1195751.

14. Dudley MZ, Schuh HB, Shaw J, **Salmon DA**. Attitudes and Values of US Adults Not Yet Up-to-Date on COVID-19 Vaccines in September 2022. J Clin Med. 2023 Jun 8;12(12):3932.

15. Carleton BC, **Salmon DA**, Wong ICK, Lai FTT. Benefits v. risks of COVID-19 vaccination: an examination of vaccination policy impact on the occurrence of myocarditis and pericarditis. Lancet Reg Health West Pac. 2023 May 19;37:100797.

16. Schwartz B, Brewer J, Budigan H, Bernier R, Dudley MZ, Kan L, Proveaux TM, Roberts R, Tafoya N, Hamlin MD, Moore L, Hughes M, Turner B, Al-Dahir S, Velasco E, Privor-Dumm L, Veloz W, White JA, Dubois S, Ooton J, Kipp BJ, Show TJ, Salu K, Chavez B, Montes MDP, Najera R, King T, **Salmon DA**. Factors Affecting SARS-CoV-2 Vaccination Intent and Decision Making Among African American, Native American, and Hispanic Participants in a Qualitative Study. Public Health Rep. 2023 May-Jun;138(3):422-427.

17. **Salmon DA**, Plotkin S, Navar AM. Vaccine Decision-making in a Time of Conflicting Recommendations: A Call to Go Beyond Politics. Pediatr Infect Dis J. 2023 May 1;42(5):e138-e139.

18. Dudley MZ, Gerber JE*, Budigan Ni H*, Blunt M*, Holroyd TA*, Carleton BC, Poland GA, **Salmon DA.** Vaccinomics: A scoping review. Vaccine. 2023 Mar 31;41(14):2357-2367.

19. Schwartz B, Brewer J, Budigan H, Bernier R, Dudley MZ, Kan L, Proveaux TM, Roberts R, Tafoya N, Hamlin MD, Moore L, Hughes M, Turner B, Al-Dahir S, Velasco E, Privor-Dumm L, Veloz W, White JA, Dubois S, Ooton J, Kipp BJ, Show TJ, Salu K, Chavez B, Montes MDP, Najera R, King T, **Salmon DA**. Factors Affecting SARS-CoV-2 Vaccination Intent and Decision Making Among African American, Native American, and Hispanic Participants in a Qualitative Study. Public Health Rep. 2023 Mar 27:333549231160871.

20. Carpiano RM, Callaghan T, DiResta R, Brewer NT, Clinton C, Galvani AP, Lakshmanan R, Parmet WE, Omer SB, Buttenheim AM, Benjamin RM, Caplan A, Elharake JA, Flowers LC, Maldonado YA, Mello MM, Opel DJ, **Salmon DA**, Schwartz JL, Sharfstein JM, Hotez PJ. Confronting the evolution and expansion of anti-vaccine activism in the USA in the COVID-19 era. Lancet. 2023 Mar 18;401(10380):967-970.

21. Dudley MZ, Schuh HB, Shaw J, Rimal RN, Harvey SA, Balgobin KR*, Zapf AJ, **Salmon DA**. COVID-19 vaccination among different types of US Healthcare Personnel. Vaccine. 2023 Feb 17;41(8):1471-1479.

22. Dudley MZ, Barnett EE, Paulenich A, Omer SB, Schuh H, Proveaux TM, Buttenheim AM, Klein NP, Delamater P, McFadden SM, Patel KM, **Salmon DA**. Characterization of parental intention to vaccinate elementary school aged children in the state of California. Vaccine. 2023 Jan 16;41(3):630-635.

23. Budigan Ni H*, de Broucker G, Patenaude BN, Dudley MZ, Hampton LM, **Salmon DA**. Economic impact of vaccine safety incident in Ukraine: The economic case for safety system investment. Vaccine. 2023 Jan 4;41(1):219-225.

24. Opel DJ, Brewer NT, Buttenheim AM, Callaghan T, Carpiano RM, Clinton C, Elharake JA, Flowers LC, Galvani AP, Hotez PJ, Schwartz JL, Benjamin RM, Caplan A, DiResta R, Lakshmanan R, Maldonado YA, Mello MM, Parmet WE, **Salmon DA**, Sharfstein JM, Omer SB. The legacy of the COVID-19 pandemic for childhood vaccination in the USA. Lancet. 2023 Jan 7;401(10370):75-78.

25. **Salmon DA**, Schuh HB, Sargent RH, Konja A, Harvey SA, Laurie S, Mai BS, Weakland LF, Lavery JV, Orenstein WA, Breiman RF. Impact of vaccine pause due to Thrombosis

with thrombocytopenia syndrome (TTS) following vaccination with the Ad26.COV2.S vaccine manufactured by Janssen/Johnson & Johnson on vaccine hesitancy and acceptance among the unvaccinated population. PLoS One. 2022 Oct 11;17(10):e0274443.

26. Mello MM, Opel DJ, Benjamin RM, Callaghan T, DiResta R, Elharake JA, Flowers LC, Galvani AP, **Salmon DA**, Schwartz JL, Brewer NT, Buttenheim AM, Carpiano RM, Clinton C, Hotez PJ, Lakshmanan R, Maldonado YA, Omer SB, Sharfstein JM, Caplan A. Effectiveness of vaccination mandates in improving uptake of COVID-19 vaccines in the USA. Lancet. 2022 Aug 13;400(10351):535-538.

27. Omer SB, O'Leary ST, Bednarczyk RA, Ellingson MK, Spina CI, Dudley MZ, Chamberlain AT, Limaye RJ, Brewer SE, Frew PM, Malik FA, Orenstein W, Halsey N, Ault K, **Salmon DA**. Multi-tiered intervention to increase maternal immunization coverage: A randomized, controlled trial. Vaccine. 2022 Aug 12;40(34):4955-4963.

28. Sargent RH, Laurie S, Weakland LF, Lavery JV, **Salmon DA**, Orenstein WA, Breiman RF. Use of Random Domain Intercept Technology to Track COVID-19 Vaccination Rates in Real Time Across the United States: Survey Study. J Med Internet Res. 2022 Jul 1;24(7):e37920.

29. Dudley MZ, Schwartz B, Brewer J, Kan L, Bernier R, Gerber JE, Ni HB, Proveaux TM, Rimal RN, **Salmon DA**. COVID-19 Vaccination Status, Attitudes, and Values among US Adults in September 2021. J Clin Med. 2022 Jun 28;11(13):3734.

30. Sargent RH, Laurie S, Moncada L, Weakland LF, Lavery JV, **Salmon DA,** Orenstein WA, Breiman RF. Masks, money, and mandates: A national survey on efforts to increase COVID-19 vaccination intentions in the United States. PLoS One. 2022 Apr 21;17(4):e0267154.

31. Brewer NT, Buttenheim AM, Clinton CV, Mello MM, Benjamin RM, Callaghan T, Caplan A, Carpiano RM, DiResta R, Elharake JA, Flowers LC, Galvani AP, Hotez PJ, Lakshmanan R, Maldonado YA, Omer SB, **Salmon DA,** Schwartz JL, Sharfstein JM, Opel DJ. Incentives for COVID-19 vaccination. Lancet Reg Health Am. 2022 Apr;8:100205.

32. Trent MJ*, **Salmon DA**, MacIntyre CR. Predictors of pneumococcal vaccination among Australian adults at high risk of pneumococcal disease. Vaccine. 2022 Feb 16;40(8):1152-1161.

33. Patel KM, McFadden SM, Mohanty S, Joyce CM, Delamater PL, Klein NP, **Salmon DA**, Omer SB, Buttenheim AM. Evaluation of Trends in Homeschooling Rates After Elimination of Nonmedical Exemptions to Childhood Immunizations in California, 2012-2020. JAMA Netw Open. 2022 Feb 1;5(2):e2146467.

34. Dudley MZ, Omer SB, O'Leary ST, Limaye RJ, Ellingson MK, Spina CI, Brewer SE, Bednarczyk RA, Chamberlain AT, Malik F, Frew PM, Church-Balin C, Riley LE, Ault KA, Orenstein WA, Halsey NA, **Salmon DA**. MomsTalkShots, tailored educational app, improves vaccine attitudes: a randomized controlled trial. BMC Public Health. 2022 Nov 21;22(1):2134.

35. Trent M*, Seale H, Chughtai AA, **Salmon D**, MacIntyre CR. Trust in government, intention to vaccinate and COVID-19 vaccine hesitancy: A comparative survey of five large cities in the United States, United Kingdom, and Australia.  Vaccine. 2022 Apr 14;40(17):2498-2505.

36. Brewer NT, Buttenheim AM, Clinton CV, Mello MM, Benjamin RM, Callaghan T, Caplan A, Carpiano RM, DiResta R, Elharake JA, Flowers LC, Galvani AP, Hotez PJ,

Lakshmanan R, Maldonado YA, Omer SB, **Salmon DA**, Schwartz JL, Sharfstein JM, Opel DJ. Incentives for COVID-19 vaccination.  Lancet Reg Health Am. 2022 Apr;8.

37. Patel KM, McFadden SM, Mohanty S, Joyce CM, Delamater PL, Klein NP, **Salmon DA**, Omer SB, Buttenheim AM. Evaluation of Trends in Homeschooling Rates After Elimination of Nonmedical Exemptions to Childhood Immunizations in California, 2012-2020. JAMA Netw Open. 2022 Feb 1;5(2).

38. Trent MJ*, **Salmon DA**, MacIntyre CR. Predictors of pneumococcal vaccination among Australian adults at high risk of pneumococcal disease. Vaccine. 2022 Feb 16;40(8):1152-1161.

39. **Salmon DA**, Elharake JA, Brewer NT, Carpiano RM, DiResta R, Maldonado YA, Sgaier SK, Omer SB Vaccine Verification in the COVID-19 World. Lancet Commission on Vaccine Refusal, Acceptance, and Demand in the USA. Lancet Reg Health Am. 2022 Feb;6.

40. Omer SB, Benjamin RM, Brewer NT, Buttenheim AM, Callaghan T, Caplan A, Carpiano RM, Clinton C, DiResta R, Elharake JA, Flowers LC, Galvani AP, Lakshmanan R, Maldonado YA, McFadden SM, Mello MM, Opel DJ, Reiss DR, **Salmon DA**, Schwartz JL, Sharfstein JM, Hotez PJ. Promoting COVID-19 vaccine acceptance: recommendations from the Lancet Commission on Vaccine Refusal, Acceptance, and Demand in the USA. 2021 Dec 11;398(10317):2186-2192.

41. Sharfstein JM, Callaghan T, Carpiano RM, Sgaier SK, Brewer NT, Galvani AP, Lakshmanan R, McFadden SM, Reiss DR, **Salmon DA**, Hotez PJ. Uncoupling vaccination from politics: a call to action. Lancet Commission on Vaccine Refusal, Acceptance, and Demand in the USA. Lancet. 2021 Oct 2;398(10307):1211-1212.

42. **Salmon D**, Opel DJ, Dudley MZ, Brewer J, Breiman R. Reflections On Governance, Communication, And Equity: Challenges And Opportunities In COVID-19 Vaccination. Health Aff (Millwood). 2021 Mar;40(3):419-425. doi: 10.1377/hlthaff.2020.02254. Epub 2021 Feb 4.

43. Shaw J, Hanley S, Stewart T, **Salmon DA**, Ortiz C, Trief PM, Asiago Reddy E, Morley CP, Thomas SJ, Anderson KB. Health Care Personnel (HCP) attitudes about COVID-19 vaccination after emergency use authorization.  Clin Infect Dis. 2021 Sep 1.

44. Schoch-Spana M, Brunson EK, Long R, Ruth A, Ravi SJ, Trotochaud M, Borio L, Brewer J, Buccina J, Connell N, Hall LL, Kass N, Kirkland A, Koonin L, Larson H, Lu BF, Omer SB, Orenstein WA, Poland GA, Privor-Dumm L, Quinn SC, **Salmon D**, White A. The public's role in COVID-19 vaccination: Human-centered recommendations to enhance pandemic vaccine awareness, access, and acceptance in the United States. Vaccine. 2021 Sep 24;39(40):6004-6012.

45. Dudley MZ, Bernier R, Brewer J, **Salmon DA.** Walking the Tightrope: Reevaluating science communication in the era of COVID-19 vaccines. Vaccine. 2021 Sep 15;39(39):5453-5455.

46. Wu Q, Dudley MZ, Chen X, Bai X, Dong K, Zhuang T, **Salmon D**, Yu H. Evaluation of the safety profile of COVID-19 vaccines: a rapid review. BMC Med. 2021 Jul 28;19(1):173.

47. **Salmon DA**, Lambert PH, Nohynek HM, Gee J, Parashar UD, Tate JE, Wilder-Smith A, Hartigan-Go KY, Smith PG, Zuber PLF. Novel vaccine safety issues and areas that would benefit from further research. BMJ Glob Health. 2021 May;6(Suppl 2):e003814.

28

48. Gerber JE*, Brewer J, Limaye RJ, Sutherland A, Blunt M, Holroyd TA*, Geller G, Carleton B, Kahn J, **Salmon DA.** Vaccinomics: a cross-sectional survey of public values. Hum Vaccin Immunother. 2021 Jun 21:1-17.

49. Kochhar S, Dubé E, Graham J, Jee Y, Memish ZA, Menning L, Nohynek H, **Salmon D**, Top KA, MacDonald NE. COVID-19 vaccine safety questions and answers for healthcare providers (CONSIDER). Vaccine. 2021 Apr 28;39(18):2504-2505.

50. Holroyd TA*, Limaye RJ, Gerber JE*, Rimal RN, Musci RJ, Brewer J, Sutherland A, Blunt M, Geller G, **Salmon DA.** Development of a Scale to Measure Trust in Public Health Authorities: Prevalence of Trust and Association with Vaccination.  J Health Commun. 2021 May 16:1-9.

51. Limaye RJ, Opel DJ, Dempsey A, Ellingson M, Spina C, Omer SB, Dudley MZ, **Salmon DA**, Leary SO. Communicating With Vaccine-Hesitant Parents: A Narrative Review. Acad Pediatr. 2021 May-Jun;21(4S):S24-S29.

52. **Salmon DA**, Dudley MZ, Brewer J, Kan L, Gerber JE, Budigan H*, Proveaux TM, Bernier R, Rimal R, Schwartz B. COVID-19 vaccination attitudes, values and intentions among United States adults prior to emergency use authorization. Vaccine. 2021 Mar 24:S0264-410X(21)00315-7..

53. Gerber JE*, Brewer J, Limaye RJ, Sutherland A, Geller G, Spina CI, **Salmon DA.** Ethical and policy implications of vaccinomics in the United States: community members' perspectives. Hum Vaccin Immunother. 2021 Feb 24:1-12.

54. DeDominicis K, Buttenheim AM, Howa AC, Delamater PL, **Salmon D**, Klein NP, Omer SB. Studying attitudes towards vaccine hesitance and California law SB 277 in online discourse: A dataset and methodology. Data Brief. 2021 Feb 24;35:106841.

55. Trent MJ*, **Salmon DA**, MacIntyre CR. Using the health belief model to identify barriers to seasonal influenza vaccination among Australian adults in 2019. Influenza Other Respir Viruses. 2021 Feb 15.

56. Dudley MZ, Limaye RJ, **Salmon DA**, Omer SB, O'Leary ST, Ellingson MK, Spina CI, Brewer SE, Bednarczyk RA, Malik F, Frew PM, Chamberlain AT. Racial/Ethnic Disparities in Maternal Vaccine Knowledge, Attitudes, and Intentions. Public Health Rep. 2021 Jan 28.

57. Holroyd TA*, Howa AC, Proveaux TM, Delamater PL, Klein NP, Buttenheim AM, Limaye RJ, Omer SB, **Salmon DA**. School-level perceptions and enforcement of the elimination of nonmedical exemptions to vaccination in California. Hum Vaccin Immunother. 2021 Jan 25:1-8.

58. Shaw J, Stewart T, Anderson KB, Hanley S, Thomas SJ, **Salmon DA**, Morley C. Assessment of U.S. health care personnel (HCP) attitudes towards COVID-19 vaccination in a large university health care system. Clin Infect Dis. 2021 Jan 25. :

59. Dudley MZ, Taitel MS, Smith-Ray R, Singh T, Limaye RJ, **Salmon DA**. Effect of educational and financial incentive-based interventions on immunization attitudes, beliefs, intentions and receipt among close contacts of pregnant women. Vaccine. 2021 Feb 5;39(6):961-967.

60. DeDominicis K, Buttenheim AM, Howa AC, Delamater PL, **Salmon D**, Omer SB, Klein NP. Shouting at each other into the void: A linguistic network analysis of vaccine hesitance and support in online discourse regarding California law SB277. Soc Sci Med. 2020 Dec;266:113216.

61. Holroyd TA*, Howa AC, Delamater PL, Klein NP, Buttenheim AM, Limaye RJ, Proveaux TM, Omer SB, **Salmon DA**. Parental vaccine attitudes, beliefs, and practices: initial evidence in California after a vaccine policy change. Hum Vaccin Immunother. 2020 Nov 24:1-6.

62. Spina CI, Brewer SE, Ellingson MK, Chamberlain AT, Limaye RJ, Orenstein WA, **Salmon DA**, Omer SB, O'Leary ST. Adapting Center for Disease Control and Prevention's immunization quality improvement program to improve maternal vaccination uptake in obstetrics. Vaccine. 2020 Nov 25;38(50):7963-7969.

63. Kochhar S, **Salmon DA**. Planning for COVID-19 vaccines safety surveillance. Vaccine. 2020 Sep 11;38(40):6194-6198.

64. Dudley MZ, Limaye RJ, **Salmon DA**, Omer SB, O'Leary ST, Ellingson MK, Spina CI, Brewer SE, Bednarczyk RA, Malik F, Frew PM, Chamberlain AT. Latent Class Analysis of Maternal Vaccine Attitudes and Beliefs. Health Educ Behav. 2020 Oct;47(5):765-781.

65. Bleser WK, **Salmon DA**, Miranda PY. A hidden vulnerable population: Young children up-to-date on vaccine series recommendations except influenza vaccines. PLoS One. 2020 Jun 18;15(6):e0234466.

66. Limaye RJ, Malik F, Frew PM, Randall LA, Ellingson MK, O'Leary ST, Bednarczyk RA, Oloko O, **Salmon DA**, Omer SB. Patient Decision Making Related to Maternal and Childhood Vaccines: Exploring the Role of Trust in Providers Through a Relational Theory of Power Approach. Health Educ Behav. 2020 Jun;47(3):449-456.

67. Dudley MZ, Halsey NA, Omer SB, Orenstein WA, O'Leary ST, Limaye RJ, **Salmon DA**. The state of vaccine safety science: systematic reviews of the evidence. Lancet Infect Dis. 2020 May;20(5):e80-e89.

68. Dudley MZ*, Limaye RJ, Omer SB, O'Leary ST, Ellingson MK, Spina CI, Brewer SE, Chamberlain AT, Bednarczyk RA, Malik F, Frew PM, Salmon DA. Factors associated with referring close contacts to an app with individually-tailored vaccine information. Vaccine. 2020 Mar 17;38(13):2827-2832.

69. Holroyd TA*, Oloko OK, **Salmon DA**, Omer SB, Limaye RJ. Communicating Recommendations in Public Health Emergencies: The Role of Public Health Authorities. Health Secur. 2020 Jan/Feb;18(1):21-28.

70. Dudley MZ*, Limaye RJ, Omer SB, O'Leary ST, Ellingson MK, Spina CI, Brewer SE, Chamberlain AT, Bednarczyk RA, Malik F, Frew PM, **Salmon DA**. Characterizing the vaccine knowledge, attitudes, beliefs, and intentions of pregnant women in Georgia and Colorado. Hum Vaccin Immunother. 2020 Feb 20:1-9.

71. Mohanty S, Joyce CM, Delamater PL, Klein NP, **Salmon D**, Omer SB, Buttenheim AM. Homeschooling parents in California: Attitudes, beliefs and behaviors associated with child's vaccination status. Vaccine. 2020 Feb 18;38(8):1899-1905.

72. Gostin LO, Hodge JG Jr, Bloom BR, El-Mohandes A, Fielding J, Hotez P, Kurth A, Larson HJ, Orenstein WA, Rabin K, Ratzan SC, **Salmon D**. The public health crisis of underimmunisation: a global plan of action. Lancet Infect Dis. 2020 Jan;20(1):e11-e16.

73. Delamater PL, Buttenheim AM, Klein NP, Mohanty S, **Salmon DA**, Omer SB. Assessment of Exemptions from Vaccination in California, 2015 to 2027. Ann Intern Med. 2019 Nov 5.

74. **Salmon DA**, Limaye RJ, Dudley MZ*, Oloko OK, Church-Balin C, Ellingson MK, Spina CI, Brewer SE, Orenstein WA, Halsey NA, Chamberlain AT, Bednarczyk RA, Malik FA, Frew PM, O'Leary ST, Omer SB. MomsTalkShots: An individually tailored educational application for maternal and infant vaccines. Vaccine. 2019 Oct 8;37(43):6478-6485.

75. Pingali SC, Delamater PL, Buttenheim AM, **Salmon DA**, Klein NP, Omer SB. Associations of Statewide Legislative and Administrative Interventions with Vaccination Status Among Kindergartners in California. JAMA. 2019 Jul 2;322(1):49-56.

76. Ratzan SC, Bloom BR, El-Mohandes A, Fielding J, Gostin LO, Hodge JG, Hotez P, Kurth A, Larson HJ, Nurse J, Omer SB, Orenstein WA, **Salmon D**, Rabin K. The Salzburg Statement on Vaccination Acceptance. J Health Commun. 2019;24(5):581-583.

77. Delamater PL, Pingali SC, Buttenheim AM, **Salmon DA**, Klein NP, Omer SB. Elimination of Nonmedical Immunization Exemptions in California and School-Entry Vaccine Status. Pediatrics. 2019 Jun;143(6).

78. Chamberlain AT, Limaye RJ, O'Leary ST, Frew PM, Brewer SE, Spina CI, Ellingson MK, Dudley MZ*, Orenstein WA, Donnelly MA, Riley LE, Ault KA, **Salmon DA**, Omer SB. Development and acceptability of a video-based vaccine promotion tutorial for obstetric care providers. Vaccine. 2019 May 1;37(19):2532-2536.

79. Herman R, McNutt LA, Mehta M, **Salmon DA**, Bednarczyk RA, Shaw J. Vaccination perspectives among adolescents and their desired role in the decision-making process. Hum Vaccin Immunother. 2019 Feb 8

80. McDonald P*, Limaye RJ, Omer SB, Buttenheim AM, Mohanty S, Klein NP, **Salmon DA**. Exploring California's new law eliminating personal belief exemptions to childhood vaccines and vaccine decision-making among homeschooling mothers in California. Vaccine. 2019 Jan 29;37(5):742-750.

81. Ellingson MK, Dudley MZ*, Limaye RJ, **Salmon DA**, O'Leary ST, Omer SB. Enhancing uptake of influenza maternal vaccine. Expert Rev Vaccines. 2019 Feb;18(2):191-204.

82. Bleser WK*, Miranda PY, **Salmon DA**. Child Influenza Vaccination and Adult Work Loss: Reduced Sick Leave Use Only in Adults With Paid Sick Leave. Am J Prev Med. 2019 Feb;56(2):251-261.

83. Mohanty S, Buttenheim AM, Joyce CM, Howa AC, **Salmon D**, Omer SB. Californian's Senate Bill 277: Local health jurisdictions' experience with the elimination of nonmedical vaccine exemptions. Am J Public Health. 2018 Nov 29:e1-e6.

84. Mohanty S, Buttenheim AM, Joyce CM, Howa AC, **Salmon D**, Omer SB. Experiences With Medical Exemptions After a Change in Vaccine Exemption Policy in California. Pediatrics. 2018 Nov;142(5).

85. Kasting ML, Christy SM, Sutton SK, Lake P, Malo TL, Roetzheim RG, Schechtman T, Zimet GD, Walkosz BJ, **Salmon D**, Kahn JA, Giuliano AR, Vadaparampil ST. Florida physicians' reported use of AFIX-based strategies for human papillomavirus vaccination. Prev Med. 2018 Nov;116:143-149.

86. Jones M, Buttenheim AM, **Salmon D**, Omer SB. Mandatory health care provider counseling of parents led to a decline in vaccine exemptions in California. Health Aff (Millwood). 2018 Sep;37(9):1494-1502.

87. Bednarczyk RA, Chamberlain A, Mathewson K, **Salmon DA**, Omer SB. Practice-, Provider-, and Patient-level interventions to improve preventive care: Development of the P3 Model. Prev Med Rep. 2018 Jun 18;11:131-138.

88. Buttenheim AM, Jones M, Mckown C, **Salmon D**, Omer SB. Conditional admission, religious exemption type, and nonmedical vaccine exemption in California before and after a state policy change. Vaccine. 2018 May 16. Epub ahead of print.

89.  Omer SB, Allen K, Chang DH, Guterman LB, Bednarczyk RA, Jordan A, Buttenheim A, Jones M, Hannan C, deHart MP, **Salmon DA**.  Exemptions from mandatory immunization after legally mandated parental counseling.  Pediatrics. 2018 Jan;141(1).

90.  Frew PM, Randall LA, Malik F, Limaye RJ, Wilson A, O'Leary ST, **Salmon D**, Donnelly M, Ault K, Dudley MZ*, Fenimore VL, Omer SB.  Clinician perspectives on strategies to improve patient maternal immunization acceptability in obstetrics and gynecology practice settings.   Hum Vaccin Immunother. 2018 Jan 9:1-10.

91.  Omer SB, Porter RM, Allen K, **Salmon DA**, Bednarczyk RA. Trends in Kindergarten Rates of Vaccine Exemption and State-Level Policy, 2011-2016.  Open Forum Infect Dis. 2017 Nov 15;5(2).

92.  Bednarczy RA, Frew PM, **Salmon DA**, Whitney E, Omer SB.  ReadyVax: A new mobile vaccine information app. Hum Vaccin Immunother. 2017 May 4;13(5):1149-1154.

93.  Vadaparampil ST, Malo TL, Sutton SK, Ali KN, Kahn JA, Casler A, **Salmon D**, Walkosz B, Roetzheim RG, Zimet GD, Giuliano AR.  Missing the target for routine Human Papillomavirus vaccination: consistent and strong physician recommendations are lacking for 11 to 12-year old males.  Cancer Epidemiol Biomarkers Prev. 2016 Oct;25(10):1435-46.

94.  Lee C, Whetten K, Omer S, Pan W, **Salmon D**. Hurdles to herd immunity: distrust of government and vaccine refusal in the U.S., 2002-2003.  Vaccine. 2016 Jul 25; 34(34):2972-8.

95.  Phadke VK. Bednarczyk RA, **Salmon DA**, Omer SB. Association between Vaccine Refusal and Vaccine Preventable Diseases in the United States: A Focus on Measles and Pertussis.  JAMA. 2016 Mar; 315(11): 1149-58.

96.  Halsey NA, Talaat KR, Greenbaum A, Mensah E, Dudley* MZ, Proveaux T, **Salmon DA**.  The safety of influenza vaccines in children: An Institute for Vaccine Safety white paper. Vaccine. 2015 Dec 30;33 Suppl 5:F1-67.

97.  **Salmon DA**, Dudley MZ*, Glanz JM, Omer SB. Vaccine hesitancy: Causes, consequences, and a call to action. Co-Published.  Vaccine & Am J Prev Med. 2015 Nov 23; Suppl 4:D66-71.

98.  Buttenheim AM, Sethuraman K, Omer SB, Hanlon AL, Levy MZ, **Salmon D**. MMR vaccination status of children exempted from school-entry immunization mandates. Vaccine. 2015 Nov 17;33(46):6250-6.

99.  Geller G, Dvoskin R, Thio CL, Duggal P, Lewis MH, Bailey TC, Sutherland A, **Salmon DA**, Kahn JP.  Genomics and infectious disease: a call to identify the ethical, legal and societal implications for public health and clinical practice.  Genome Medicine 2014 Nov 18; 6:(11): 106.

100. Vadaparampil ST, Malo TL, Kahn JA, **Salmon DA**, Lee JH, Quinn GP, Roetzheim RG, Bruder KL, Proveaux TM, Zhao X, Halsey NA, Giuliano AR. Physicians' human papillomavirus vaccine recommendations, 2009 and 2011.  Am J Prev Med. 2014 Jan; 46(1):80-4.

101. Siddiqui M, **Salmon DA**, Omer SB.  Epidemiology of vaccine hesitancy in the United States. Hum Vaccin Immunother. 2013 Nov 18;9(12).

102. Atwell JE, Van Otterloo J, Zipprich J, Winter K, Harriman K, **Salmon DA**, Halsey NA, Omer SB.  Nonmedical vaccine exemptions and pertussis in California, 2010.  Pediatrics. 2013 Oct;132(4):624-30.

103. **Salmon DA**, Vellozzi C, Chen RT, Halsey NA. Did the influenza A (H1N1) 2009 monovalent inactivated vaccines increase the risk for Guillain-Barré syndrome? Expert Rev Clin Immunol. 2013 Sep;9(9):795-7.

104. Mergler MJ*, Omer SB, Pan WK, Navar-Boggan AM*, Orenstein W, Marcuse EK, Taylor J, Dehart MP, Carter TC, Damico A, Halsey N, **Salmon DA**. Association of vaccine-related attitudes and beliefs between parents and health care providers. Vaccine. 2013 Jul 26.

105. Sadaf A, Richards JL, Glanz J, **Salmon DA**, Omer SB. A systematic review of interventions for reducing parental vaccine refusal and vaccine hesitancy. Vaccine. 2013 Jul 13.

106. Dodd CN, Romio SA, Black S et al. International collaboration to assess the risk of Guillain-Barré Syndrome following Influenza A (H1N1) 2009 monovalent vaccines. Vaccine. 2013 June 13.

107. Richards JL, Wagenaar BH, Van Otterloo J, Gondalia R, Atwell JE*, Kleinbaum DG, **Salmon DA**, Omer SB. Nonmedical exemptions to immunization requirements in California: a 16-year longitudinal analysis of trends and associated community factors. Vaccine. 2013 May 10.

108. **Salmon DA**, Proschan M, Forshee R, Gargiullo P, Bleser W*, Burwen DR, Cunningham F, Garman P, Greene SK, Lee GM, Vellozzi C, Yih WK, Gellin B, Lurie N, and the H1N1 GBS Meta-Analysis Working Group. A Meta-Analysis of the Association between Guillain-Barré Syndrome and Influenza A (H1N1) 2009 Monovalent Inactivated Vaccines in the United States. The Lancet. 2013 Apr 27; 2819876): 1461-8.

109. **Salmon DA**, Yih WK, Lee GM, Rosofsky R, Brown J, Vannice K*, Tokars J, Roddy J, Brand W, Ball R, Gellin B, Lurie N, Platt R, Lieu TA, and the PRISM Program H1N1 Project Collaborators. Success of program linking data sources to monitor H1N1 vaccine safety points to potential for even broader safety surveillance. Health Aff (Millwood). 2012 Nov; 31(11):2518-27.

110. Bruder KL, Downes KL, Malo TL, Giuliano AR, **Salmon DA**, Vadaparampil ST. Physicians' intentions to change pap smear frequency following human papillomavirus vaccination. J Pediatr Adolesc Gynecol. 2012 Dec;25(6):384-9.

111. Jones AM, Omer SB, Bednarczyk RA, Halsey NA, Moulton LH, **Salmon DA**. Parents' source of vaccine information and impact on vaccine attitudes, beliefs, and nonmedical exemptions. Adv Prev Med. Epub 2012 Oct 2.

112. Yih KW, Lee GM, Lieu TA, Ball R, Kulldorff M, Rett M, Wahl PM, Walraven CNM, Platt R, **Salmon DA**. Pandemic 2009 H1N1 Vaccine Safety Surveillance by the Post-Licensure Rapid Immunization Safety Monitoring (PRISM) System in 2009-2010. Am J Epidemiol. 2012 Jun 1;175(11):1120-8.

113. Vadaparampil ST, Kahn JA, **Salmon D**, Lee JH, Quinn GP, Roetzheim R, Bruder K, Malo TL, Proveaux T, Zhao X, Halsey N, Giuliano AR. Missed clinical opportunities: provider recommendations for HPV vaccination for 11-12 year old girls are limited. Vaccine. 2011 Nov 3;29(47):8634-41.

114. **Salmon DA**, Pavia A, Gellin B. From Sugar Cubes to Injections: Vaccine Safety throughout the Product Lifecycle. Introduction from Guest Editors. Pediatrics. 2011 May;127 Suppl 1:S1-4.

115. **Salmon DA**, Akhtar A, Mergler MJ*, Vannice KS*, Izurieta H, Ball R, Lee GM, Vellozzi C, Garman P, Cunningham F, Gellin B, Koh H, Lurie N, and the H1N1 Working Group of

the Federal Immunization Safety Task Force. Immunization Safety Monitoring Systems for the 2009 H1N1 Monovalent Influenza Vaccination Program. Pediatrics. 2011 May;127 Suppl 1:S78-86.

116. Hussain H*, Omer SB, Manganello JA, Kromm EE, Carter T*, Kan L, Stokley S, Halsey NA, **Salmon DA**. Immunization Safety in United States Print Media, 1995-2005. Pediatrics. 2011 May;127 Suppl 1:S100-6.

117. Vannice KS*, **Salmon DA**, Omer SB, Kissner J, Edwards KM, Sparks R, Dekker CL, Klein NP, Gust DA. Attitudes and Beliefs of Parents with Concern about Vaccines: Impact of Timing of Immunization Information. Pediatrics. 2011 May;127 Suppl 1:S120-6.

118. Shen AK, Spinner JR, **Salmon DA**, Gellin BG.  Strengthening the U.S. Vaccine and Immunization Enterprise: The Role of the National Vaccine Advisory Committee.  Public Health Reports. Jan-Feb 2011. 126: 4-8.

119. Smith PJ, Humiston SG, Parnell TS, Vanice KS*, **Salmon DA**. The association between intentional delay of vaccine administration and timely childhood vaccination coverage. Public Health Reports. 2010;25(4).

120. Esteves-Jaramillo A, Omer SB, Gonzalez-Diaz E, **Salmon DA**, Hixson B, Navarro F, Kawa-Karasik S, Frew P, Morfin-Otero R, Rodriguez-Noriega E, Ramirez Y, Rosas A, Acosta E, Varela-Badillo V, Del Rio C. Acceptance of a vaccine against novel influenza A (H1N1) virus among health care workers in two major cities in Mexico.  Arch Med Res. 2009 Nov;40(8):705-11.

121. Black S, Siegrist, MA, Halsey NA, MacDonald N, Law B, Miller E, Andrews N, Stowe J, **Salmon DA**, Vannice K*, Izurieta HS, Akhtar A, Gold M, Oselka G, Zuber P, Pfeifer D, Vellozzi C.  Importance of background rates of disease in assessment of vaccine safety during mass immunisation with pandemic H1N1 influenza vaccines. The Lancet. 2009 Oct 31.

122. **Salmon DA**, Smith PJ, Pan WK, Navar AM*, Omer SB, Halsey NA.  Disparities in preschool immunization coverage associated with maternal age.  Hum Vaccin. 2009 Aug;5(8):557-61. 2009 Aug 14.

123. Glanz JM, McClure DL, Magid DJ, Daley MF, France EK, **Salmon DA**, Hambidge SJ.  Parental refusal of pertussis vaccination is associated with an increased risk of pertussis infection in children.  Pediatrics. 2009 Jun;123(6):1446-51.

124. Omer SB*, **Salmon DA**, Orenstein WA, deHart MP, Halsey N.  Vaccine refusal, mandatory immunization, and the risks of vaccine-preventable diseases.  N Engl J Med. 2009 May 7;360(19):1981-8.

125. Gust DA, Kennedy A, Weber D, Evans G, Kong Y, **Salmon D**.  Parents questioning immunization: evaluation of an intervention.  Am J Health Behav. 2009 May-Jun;33(3):287-98.

126. **Salmon DA**, Sotir MJ, Pan WK, Berg JL, Omer SB*, Stokley S, Hopfensperger DJ, Davis JP, Halsey NA.  Parental vaccine refusal in Wisconsin: a case-control study. WMJ. 2009 Feb;108(1):17-23.

127. Omer SB*, Enger KS, Moulton LH, Halsey NA, Stokley S, **Salmon DA**.  Geographic clustering of nonmedical exemptions to school immunization requirements and associations with geographical clustering of pertussis.  Am J Epidemiol. 2008 Oct 15.

128. Malm H, May T, Francis LP, Omer SB, **Salmon DA**, Hood R. Ethics, pandemics, and the duty to treat.  Am J Bioth. 2008 Aug; 8: 4-19.

129. **Salmon DA**, Pan WK, Omer SB, Navar AM*, Orenstein W, Marcuse EK, Taylor J, deHart MP, Stokley S, Carter T*, Halsey NA.  Vaccine knowledge and practices of primary care providers of exempt vs. vaccinated children.  Hum Vaccin. 2008 Jul-Aug. 4(4): 286-91.

130. Giuliano AR, **Salmon D**. <u>The case for a gender-neutral (universal) human papillomavirus vaccination policy in the United States: Point.</u> Cancer Epidemiol Biomarkers Prev. 2008 Apr;17(4):805-8.

131. Vernick JS, Rutkow L, **Salmon DA**.  Availability of litigation as a public health tool for firearm injury prevention: comparison of guns, vaccines, and motor vehicles.  AJPH. 2007 Nov; 97(11): 1991-7.

132. Navar AM*, Halsey NA, Carter TC*, Montgomery MP, **Salmon DA**.  Prenatal immunization education: the pediatric prenatal visit and routine obstetric care.  AJPM. 2007 Sep: 33(3): 211-3.

133. Shuster JJ, Jones LS, **Salmon DA**.  Fixed vs random effects meta-analysis in rare event studies: the rosiglitazone link with myocardial infraction and cardiac death. Stat Med. 2007 Oct 30; 26(24): 4375-85.

134. Irving SA*, **Salmon DA**, Curbow BA. Vaccine risk communication interventions in the United States, 1996-2006: a review.  Current Ped Reviews. 2007 Aug 3; 3: 238-247.

135. Thompson JW, Tyson S. Card-Higginson P, Jacobs RF, Wheeler JG, Simpson P, Bost JE, Ryan KW, **Salmon DA**.  Impact of addition of philosophical exemptions on childhood immunization rates.  AJPM. 2007 Mar; 32(3): 194-201.

136. Omer SB*, Pan WK, Halsey NA, Stokely S, Moulton LH, Navar AM*, **Salmon DA.** Nonmedical Exemptions to School Immunization Requirements: Secular Trends and Association of State Policies with Pertussis Incidence. JAMA. 2006 Oct 11; 296(14):1757-63.

137. **Salmon DA**, Omer SB*.  Individual Freedoms versus Collective Responsibility: Immunization Decision-Making in the Face of Occasionally Competing Values. Emerging Themes in Epidemiology. 2006 Sep 27; 3:13-15.

138. Linkins RW, **Salmon DA**, Omer SB*, Pan WKY, Stokley S, Halsey NA.  Support for immunization registries among parents of vaccinated and unvaccinated school-aged children. BMC Public Health. 2006 Sep 22; 6:236-243.

139. **Salmon DA**, Smith PJ, Navar AM*, Pan WKY, Omer SB*, Singleton JA, Halsey NA. Measuring immunization coverage among pre-school children: past, present and future opportunities. Epidemiologic Reviews.  2006; 28:27-40.

140. **Salmon DA**, Teret SP, MacIntyre CR, Salisbury D, Halsey NA.  Compulsory Vaccination and Conscientious or Philosophical Exemptions: Past, Present and Future.  The Lancet. 2006 Feb 4; 367(9508):436-42.

141. **Salmon DA**, Moulton LH, Omer SB*, DeHart P, Stokley S, Halsey NA.  Factors Associated with Refusal of Childhood Vaccines: A Case-Control Study.  Arch Pediatr Adolesc Med. 2005 May; 159(5):470-6.

142. **Salmon DA**, Sapsin J, Jacobs J, Thompson J, Teret S, Halsey NA.  Public Health and the Politics of School Immunization Requirements.  AJPH. 2005 May; 95(5):778-83.

143. **Salmon DA**, Omer SB*, Moulton L, Stokley S, DeHart P, Lett S, Norman B, Teret S, Halsey N. Exemptions to School Immunization Requirements: The Role of School-Level Requirements, Policies and Procedures. AJPH. March 2005; 95(3); 436-440.

144. **Salmon DA**, Moulton L, Omer SB*, Chace L, Klassen, Talebian P, Halsey N. The Knowledge Attitudes and Beliefs of School Personnel and Associations with Non-Medical Exemptions. Pediatrics. 2004 June 6; 113(6): 552-559.

145. **Salmon DA**, Moulton LM, Halsey NA.  Enhancing Public Confidence in Vaccines through Independent Oversight of Post-Licensure Vaccine Safety.  AJPH.  2004 June; 94(6); 947-950.

146. **Salmon DA**, Siegel AW. Religious and philosophical exemptions from vaccination requirements and lessons learned from conscientious objectors from conscription.  Public Health Reports.  2001 July-August; 116: 289-295.

147. Feikin DR, Lezotte DC, Hamman RF, **Salmon DA,** Chen RT, Hoffman RE. Individual and community risks of measles and pertussis associated with personal exemptions to immunizations. JAMA. 2000 Dec. 27; 284(24): 3145-3150.

148. Rota JS*, **Salmon DA**, Rodewald LE, Chen RT, Hibbs BF, Gangarosa EJ. Processes for obtaining nonmedical exemptions to state immunization laws. AJPH. April 2000; 91: 645-8.

149. **Salmon DA**, Haber M, Gangarosa EJ, Phillips L, Smith N, Chen RT. Health consequences of religious and philosophical exemptions from immunization laws: individual and societal risks of measles. JAMA. 1999 July 7; 282(1): 47-53.

## Commentaries

1. **Salmon DA**, Black S, Didierlaurent AM, Moulton LH. Commentary on "Common Vaccines and the Risk of Dementia: A Population-Based Cohort Study": Science Can be Messy but Eventually Leads to Truths. J Infect Dis. 2023 May 29;227(11):1224-1226.

2. Gostin LO, Shaw J, **Salmon DA.** Mandatory SARS-CoV-2 Vaccinations in K-12 Schools, Colleges/Universities, and Businesses. JAMA. 2021 Jun 7. *Invited*

3. Gostin LO, **Salmon DA**, Larson HJ. Mandating COVID-19 Vaccines. JAMA. 2021 Feb 9;325(6):532-533. doi: 10.1001/jama.2020.26553. PMID: 33372955. *Invited*

4. Opel DJ, **Salmon DA**, Marcuse EK. Building Trust to Achieve Confidence in COVID-19 Vaccines. JAMA Netw Open. 2020 Oct 1;3(10):e2025672. doi: *Invited*

5. **Salmon DA**, Dudley MZ, Carleton BC. Guillain-Barré Syndrome Following Influenza Vaccines Affords Opportunity to Improve Vaccine Confidence. J Infect Dis. 2021 Feb 13;223(3):355-358. doi: 10.1093/infdis/jiaa544. PMID: 33137189. *Invited*

6. **Salmon DA**, Dudley MZ. It is time to get serious about vaccine confidence. Lancet. 2020 Sep 26;396(10255):870-871. doi: 10.1016/S0140-6736(20)31603-2. Epub 2020 Sep 10. PMID: 32919522. *Invited*

7. Gostin LO, **Salmon DA**. The Dual Epidemics of COVID-19 and Influenza: Vaccine Acceptance, Coverage, and Mandates. JAMA. 2020 Jul 28;324(4):335-336. doi: 10.1001/jama.2020.10802. PMID: 32525519. *Invited*

8. **Salmon DA**, MacIntyre CR, Omer SB. Making mandatory vaccination truly compulsory: well intentioned but ill conceived.  Lancet Infect Dis. 2015 Aug;15(8):872-3.

9. Halsey NA, **Salmon DA**. Measles at Disneyland, a problem for all ages.  Ann Intern Med. 2015 May 5;162(9):655-6. *Invited*

10. Atwell JE*, **Salmon DA**.  Pertussis resurgence and vaccine uptake: implications for reducing vaccine hesitancy.  Pediatrics. 2014 Sep; 134(3): 602-4. *Invited*

11. **Salmon DA**, Halsey. Guillain-Barré Syndrome and vaccination.  Clin Infect Dis. 2013 Jul; 57(2):205-7.  *Invited*

12. **Salmon DA**, Halsey NA.  Keeping the M in medical exemptions: protecting our most vulnerable children.  J Infect Dis. 2012 Oct 1; 206(7): 987-8.
13. MacIntyre CR, Kelly H, Jolley D, Butzkueven H, **Salmon D**, Halsey N, Moulton LH Recombinant hepatitis B vaccine and the risk of multiple sclerosis: a prospective study. Neurology. 2005 Apr 12;64(7):1317.

## Books

The Clinician's Vaccine Safety Resource Guide: Optimizing the Prevention of Vaccine-Preventable Diseases Across the Lifespan.  Mathew Z. Dudley.  **Daniel A Salmon**, Neal A. Halsey, alter A. Orenstein, Rupali J. Limaye, Sean T. O'Leary, Saad B. Omer. Springer Publishing, 2018.

## Government and Advisory Committee Reports

1. White Paper on the United States Vaccine Safety System.  National Vaccine Advisory Committee (NVAC), 2012.  Role: Served as the Designated Federal Official for the Vaccine Safety Working Group with responsibilities including determining the charge and membership of the working group, holding closed and public meetings to gather scientific and programmatic information and incorporation of stakeholder views, and oversaw drafting of final report.
2. H1N1 Vaccine Safety Risk Assessment Working Group (VSRAWG).  National Vaccine Advisory Committee (NVAC).  Interim reports (12/2009, 1/2010, 2/2010, 3/2010, 4/2010, 6/2010) and final report (1/2012). Role: Served as the Designated Federal Official with responsibilities including determining the charge and membership of the VSRAWG, coordinating bi-monthly conference calls with the Federal Immunization Safety Task Force and the VSRAWG reviewing all H1N1 safety data, facilitated discussions of safety issues among the VSRAWG, drafting all reports.
3. Recommendations on 2009 H1N1 Influenza Vaccine Safety Monitoring.  National Vaccine Advisory Committee (NVAC). 7/2009. Role: Served as the Designated Federal Official for the Vaccine Safety Working Group with responsibilities including determining the charge and membership of the Working Group, holding meetings with Working Group and HHS leadership, and drafting final report.
4. Federal Plans to Monitor Immunization Safety for Pandemic 2009 H1N1 Influenza Vaccination Program.  Department of Health and Human Services, 2009.  Role:  Primary author with the Federal Immunization Safety Task Force.
5. Recommendations on the Centers for Disease Control and Prevention Immunization Safety Office Draft 5-Year Scientific Agenda. National Vaccine Advisory Committee (NVAC), 2009.  Role: Served as the Designated Federal Official for the Vaccine Safety Working Group with responsibilities including determining the charge and membership of the working group, holding closed and public meetings to gather scientific and programmatic information and incorporation of stakeholder views, and oversaw drafting final report.
6. A Comprehensive Review of Federal Vaccine Safety Programs and Pubic Health Activities.  Department of Health and Human Services, 2008.  Role:  Primary author with the Federal Immunization Safety Task Force.
7. Vaccine Safety Action Plan (Implementation Plan for the Task Force Report on Safer Childhood Vaccines).  Department of Health and Human Services, 1999.  Role:  Primary author with the many HHS agencies (NIH, FDA, CDC, HRSA).

## Practice Activities

Dr. Salmon's public health practice has been carried out while he held positions in the Federal government and academia and has resulted in 15 peer reviewed publications, 7 Federal and advisory committee reports, dozens of testimony to Federal advisory committees and state legislators, regular consultation with policy-makers, and more than 50 interviews with national media outlets.  This practice work has been funded by state and Federal government agencies, has been integrated into Dr. Salmon's teaching, and has resulted in several awards for outstanding services by the Assistant Secretary for Health.   Dr. Salmon's leadership has impacted policy and public health practice nationally.  Dr. Salmon has assisted in the development of model state laws for school immunization requirements, based upon public health scholarship, and evaluated the impact of the application of this model.  Dr. Salmon was a major contributor to realigning vaccine safety activities within the Centers for Disease Control and Prevention in order to provide greater public confidence in vaccine safety, surveillance and response activities.

While serving as the Director of Vaccine Safety at the National Vaccine Program Office, Dr. Salmon led an inter-agency and inter-departmental Secretarial task force, The Federal Immunization Safety Task Force, responsible for ensuring the coordination and strategic planning of Federal vaccine safety activities.  Under his leadership, this Task Force wrote a Secretarial report to enhance our vaccine safety systems and the safety chapter of the National Vaccine Plan.  Dr. Salmon led the development of the National Vaccine Advisory Committee (NVAC) Vaccine Safety Working Group, issuing reports to the Assistant Secretary for Health to improve the national vaccine safety system and focus vaccine safety research activities.  This Working Group was cited by RAND on how to effectively utilize the National Vaccine Advisory Committee.  The Department of Health and Human Services has been able to garner and focus vaccine safety programmatic and research activities through these internal government and advisory committee reports.

The 2009-10 H1N1 vaccine program brought unusual challenges and opportunities for vaccine safety and Dr. Salmon's work.  The last national effort to quickly vaccinate the country to prevent a novel swine flu pandemic in 1976 resulted in a public health and political failure as the vaccine caused Guillain-Barré syndrome (GBS) and the pandemic never materialized as anticipated.  The New York Times referred to this as the Swine Flu Fiasco as the Director of the Centers for Disease Control and Prevention and the Surgeon General were dismissed as President Ford faced public criticism.  A new administration and the public remembered this experience as the 2009-10 H1N1 vaccine program was launched with considerable skepticism.  Dr. Salmon seized these challenges and was able to capitalize on them to ensure the safety monitoring was robust and credible and build long lasting infrastructure.

Dr. Salmon oversaw the largest and most comprehensive vaccine safety monitoring program (2009-10 H1N1 vaccine program) ever in the US or internationally.  Dr. Salmon worked with seven agencies in the Department of Health and Human Services, as well as the Departments of Defense and Veterans Affairs, to enhance active safety monitoring programs.  Dr. Salmon developed a novel vaccine safety surveillance system, the Post Licensure Rapid Immunization Safety Monitoring (PRISM) Network that is now a part of permanent infrastructure at the Food

and Drug Administration and has served as a model for drug and product safety monitoring.  Dr. Salmon led the Federal Immunization Safety Task Force to develop a safety-monitoring plan for H1N1 that was shared with stakeholders and the public and once the program was launched.  To enhance public and stakeholder engagement and improve public confidence, Dr. Salmon developed the H1N1 Vaccine Safety Risk Assessment Working Group of the National Vaccine Advisory Committee that provided independent oversight of all 2009-10 H1N1 vaccine data across the government every two weeks and provided publically deliberated reports on a monthly basis throughout the vaccine program. Dr. Salmon's work in this area was cited by an Institute of Medicine report reviewing the National Vaccine Plan and Federal vaccine activities as an area in vaccines with exemplary leadership and coordination.  Many aspects of this 2009-10 H1N1 vaccine program that were instituted under his leadership continue today.

## Testimony

Dr. Salmon has made dozens of presentations to the National Vaccine Advisory Committee (NVAC), Advisory Commission on Childhood Vaccines (ACCV), the Advisory Committee on Immunization Practices (ACIP), and the National Biodefense Science Board (NBSB). He has also provided testimony for the Maryland and Florida Legislators.

## Expert Testimony in Legal Cases (past 5 years)

1.    *Mitra v Mullenax,*
            Court of Common Pleas, Crawford County, PA, Case No. F.D. 2022-35
            Testimony at trial

2.    *Connolly v. Biomarin Pharmaceuticals Inc..*
            USDC, Southern District of Texas, Case No. 4:23-cv-00938
            Testimony at arbitration hearing

3.    *Marcoux, et al v. Eisenhower Medical Center*
            Riverside County, CA Superior Court, Case No. CVPS2203384
            Deposition

## Presentations to Policy-Makers

Dr. Salmon has provided dozens of briefings for 3 CDC Directors, 3 Secretary's, two Deputy Secretary's, and 5 Assistant Secretary's for Health, U.S Department of Health and Human Services.

## Consultations with Policy-Makers and Other Stakeholders

Served as the Federal Ex-Officio for the Advisory Commission on Childhood Vaccines (ACCV; 2007-2012) which provides advice to the Secretary, HHS, regarding the Vaccine Injury Compensation Program (HRSA).  Developed working groups (as the Designated Federal Official) of the National Vaccine Advisory Committee (NVAC) that provides policy advice to the Director of the National Vaccine Program/Assistant Secretary for Health to optimize the prevention of disease through vaccination and the prevention of vaccine adverse events.

Through Dr. Salmon's leadership, the NVAC produced the following reports: 1) Review and prioritization of CDC Immunization Safety Office research agenda; 2) Recommendations for improving the Nations vaccine safety system; 3) Recommendations for improvements to H1N1 safety monitoring programs; and 4) Independent ongoing review of all H1N1 safety data. Through these Federal Advisory Committee efforts, Dr. Salmon worked closely with a very broad range of stakeholders including state and local health departments, Federal agencies (NIH, FDA, CDC, HRSA, IHS) and departments (HHS, DoD, VA, USAID), vaccine manufacturers, professional associations, academia, and advocacy organizations. Dr. Salmon has held many local, regional and national meetings to engage these stakeholders in vaccine policy and practice, issuing meeting reports, and impacting the policy and practice recommendation of the aforementioned advisory committee reports.

## Research Finding Dissemination through Media Appearances

Dr. Salmon has made many media appearances and contributed to stories for CNN, Reuters News, The Associated Press, The New York Times, The Wall Street Journal, The Washington Post, The LA Times, and many other city, state and national media outlets.

## Software Development

Developing and evaluating immunization App to increase maternal and infant vaccination uptake.

## Practice Positions (outside academia)

Director of Vaccine Safety, National Vaccine Program Office, Office of the Assistant Secretary for Health, US Department of Health and Human Services (2007-2012): Coordinated, evaluated and provided leadership for federal vaccine safety programs.

- Developed a Secretarial Task Force (Federal Immunization Safety Task Force) issuing a report to the Secretary to enhance safety systems and providing ongoing coordination and leadership of Federal vaccine safety activities.
- Coordinated Federal H1N1 vaccine safety monitoring across multiple HHS Agencies and Departments, including development of federal strategic planning, addressing emerging issues, and development of innovative initiatives.
- Developed a novel active surveillance system (Post Licensure Rapid Immunization Safety Monitoring (PRISM)) for H1N1 vaccination program, capturing vaccine histories from 8 state immunization registries linked with health records for about 35 million persons through 5 large health insurance companies. This program is now a permanent part of vaccine safety monitoring by the FDA.
- Conducted a meta-analysis combining GBS data across multiple safety monitoring systems and worked with Vaccine Injury Compensation Program (HRSA) to determine if GBS should be a compensatable injury.
- Guest Edited supplement for Pediatrics to improve understanding of vaccine safety systems and science and enable effective communications by pediatricians when discussing vaccine safety with parents.

40

**CURRICULUM VITAE**

# Daniel Salmon
# Part II

# Teaching
## Masters Advisees
- Ann Marie Navar, 2005
- Jana Goins, 2005
- Bernadette Cambell, 2005
- Brian Rosen, 2013
- Kevin Wright, 2013
- Benjamin Williams, 2013
- Matthew Dudley, 2013
- Bansari Patel, 2013
- Oladeji Oloko, 2014
- Hannah Steinberg, 2014
- Moar Sherbini, 2014
- Aderemi Sanusi, 2016
- Caroline Picher, 2016
- Nicholas Albaugh, 2019
- Alex Zapf, 2020
- Emily Clifford, 2021
- Alexandria Cull Weatherer, 2021
- Alex Paulenich, 2022
- Azim Abdul Wahid, 2023
- Amar Fadeel, 2023
- Ana Stevens, 2024
- Gabby Liu (23/25 cohort)
- Angela Zhai (24/26 cohort)

## Doctoral Advisees
- Dustin Gibson, PhD, 2014
- Matthew Dudley, PhD, 2019
- Andrea Carcelen, PhD, 2020
- Jennifer Gerber, PhD, 2020
- Taylor Halroyd, PhD, 2020

## Preliminary Oral Participation
- Saad Omer, 2004
- Dustin Gibson, 2012

- Elizabeth Chmielewski, 2016

## Final Oral Participation

- Saad Omer, 2006: "Societal Risk of Pertussis in the United States: Role of State Policies and Spatial Clustering of Childhood Vaccine Refusers"
- Ann Marie Navar, 2009: "Impact of Immunization in the Neonatal Intensive Care Unit"
- Zunera Gilani (alternate), 2012: "Population Immunity to Measles and Rubella Virus in Rural Zambia"
- Noor Rakshani, DRPH, 2013: "Individual and Contextual Level Factors Influencing Initiation, Completion and Up to Date Vaccination in Routine Immunization Program"
- Jennifer Kreslake (chair), 2014: "Determinants of Risk Behaviors in the Containment of Highly Pathogenic Avian Influenza and Implications for Risk Communication"
- Dustin Gibson, 2014: "The Readiness, Need for, and Effect of mHealth Interventions to Improve Immunization Timeliness and Coverage in Rural Western Kenya"
- Brittany Kmush, 2016: "Determinants of Immunologic Persistence of Hepatitis E Virus Antibodies." (alternate)

## MSPH/Post-MPH Internships Hired and Supervised (Current position, number of co-authored papers)

- Ann Marie Navar, 2006 (Associate Professor of Medicine (Cardiology)
- UT Southwestern Medical School; 5 papers)
- Terrel Carter, 2007 (American Academy of Pediatrics, Global Immunization Staff; 4 papers)
- Stephanie Irving, 2007 (Kaiser Permanente Center for Health Research; 1 paper)
- Kirsten Vannice, 2008-10 (World Health Organization & Gates; 6 papers)
- Michelle Mergler, 2009-10 (Johns Hopkins Doctoral Student; 2 papers)
- Will Bleser, 2010 (Duke Policy Center; 3 paper)

# Classroom Instruction
## Primary Instructor

2003 -        Vaccine Policy Issues (223.687.01). This 3-credit course examines current national and international policy issues in vaccine research, development, manufacturing, supply, and utilization. Topics include development of orphan vaccines, ensuring an adequate supply of safe and effective vaccines, vaccine injury compensation, and disease eradication. Emphasizes the identification of important vaccine policy issues and the development and evaluation of policies to address these issues. Presents the roles, responsibilities, and policy positions of key immunization stakeholders via guest lectures by a wide array of experts who have worked for important vaccine groups (i.e., FDA, GAVI, Vaccine Industry, US Vaccine Injury Compensation Program, Consumer Group). 35-45 students masters and doctoral students from across the School of Public Health and

|  | Preventive Medicine Residents.  Consistently received high student course evaluations. |
| 2018 - | The Practice of Public Health Through Vaccine Case Studies: Problem Solving Seminar (223.630.81).  Vaccines are among the most effective medical and public health interventions. This class for DrPH students presents historic vaccine case studies highlighting challenges in emerging science, program design and evaluation, management, policy and communication. The seminar examines decision-making surrounded by scientific uncertainty, controversy and competing public health priorities and explores the challenges of developing policy and practice decisions within the constraints of emerging and uncertain science. Students are challenged to make policy decisions and develop programmatic and communication strategies in real world settings. |
| 2012 - 2013 | Vaccine Policy Issues (223.687.98).  Johns Hopkins Fall Institute, Barcelona, Spain. |

## Co-Instructor

| 2004-05 | Public Health Practice (305.607.01).  This 4 credit course focused on the areas of knowledge and skills necessary to the administration of health agencies. The course covered topics such as administrative structure, intergovernmental relations, legislation, politics, and the public budgetary process with reference to health departments on the federal, state, and local levels. The course also reviewed public sector issues for which health agencies are responsible, including AIDS, health promotion strategies, primary care, and immunization programs. Developed and taught class on-site and online. |

# Research Grant Participation

**Adult Immunization Quality Improvement for Providers (IQIP)**
Sponsor: CDC
Role: Principal Investigator (15% effort)
Dates: 08/01/23 – 08/01/26
Project: Develop, evaluate and widely disseminate an evidence-based QI program for immunization that integrates adult-specific strategies across healthcare provider settings.

**Evaluating Social Media as a Tool for Connecting Vulnerable Communities with a Personalized Vaccination Decision-Making Website**
Sponsor: Vaccine Confidence Fund
Role: Principal Investigator (15% effort)
Dates: 04/01/23 – 03/01/24
Project: Evaluate the relative impact and cost effectiveness of grassroot public health efforts vs. paid social media strategies on community engagement with LetsTalkShots.

**LetsTalkCOVIDVaccines | Orange County, New York**
Sponsor: Orange County Health Department
Role: Principal Investigator (20% effort)

Dates: 12/01/22 – 12/01/23
Project:  Pilot the LetsTalkShots provider talking points with Little Pediatrics in Orange County, NY.

**Improving Vaccine Acceptance through EHR Integrated Patient- and Provider-Facing Decision Support**
Sponsor: Merck Sharp And Dohme Corp
Role: Principal Investigator (10% effort)
Dates: 11/01/22 – 11/01/24,
Project: Establish the technical feasibility and evaluate the effectiveness of a scalable, integrated platform to improve patient informed decision-making and increase vaccine uptake.

**Health Care Provider Training to Increase Vaccine Uptake and Reduce Vaccine Hesitancy**
Sponsor: Merck Sharp And Dohme Corp
Role: Principal Investigator (15% effort)
Dates: 01/11/2021 – 01/10/2025
Project: Develop and evaluate Johns Hopkins CME module teaching how clinicians can effectively communicate with patients about vaccines and conversion of Springer published clinical guide into Unbound Medicine version.

**Public and Health Care Provider knowledge, attitudes, beliefs, intentions, and behaviors regarding COVID-19 disease and SARS-CoV-2 vaccines: the mediating role of trust in health care providers and public health authorities**
Sponsor: Merck Sharp And Dohme Corp
Role: Principal Investigator (10% effort)
Dates: 01/11/2021 – 01/11/2024
Project: Evaluate the immediate impact of outbreaks of COVID-19 disease and response measures on uptake of recommended vaccines, including but not limited to SARS-CoV-2 vaccines (when such vaccines are recommended), with a focus on trust in health care providers and public health authorities, and their vaccine knowledge, attitudes
and beliefs.

**TweenVax: A comprehensive practice-, provider-, and parent/patient-level intervention to improve adolescent HPV vaccination**
Sponsoring Agency: National Cancer Institute, National Institutes of Health
Role: Co-Investigator (5% effort)
Dates: 09/01/2019 – 06/30/2024
Project: The aim of the project is to develop and refine the practice-, provider-, and patient/parent-level intervention that will be tested in primary care pediatric and family practice offices for adolescents aged 9-14.

**LetsTalkCovidVaccine Tailored for Local Communities**
Sponsor: NACCHO
Role: Principal Investigator (20% effort)
Dates: 12/1/2021 - 7/31/2023
Project: Tailored LetsTalkCovidVaccine, a personalized health communication tool, to five underserved communities.

44

**Assessing Vaccine Hesitancy and a Pharmacist Led Intervention Model to**
Sponsor: XULA
Role: Co- Investigator (5% effort)
Dates: 11/13/2020 - 5/23/2023
Project: Training pharmacists to work with vaccine hesitant patients.

**LetsTalkCovidVaccine Tailored for Guilford County**
Sponsor: GCGPH
Role: Principal Investigator (5% effort)
Dates: 3/1/2022 - 10/31/2022
Project: Tailored LetsTalkCovidVaccine, a personalized health communication tool, to Guildford County, NC.

**CGHI Vaccine Access and Training (VAT) Initiative for a Community-Based Workforce**
Sponsor: GHC3
Role: Co-Investigator (20% effort)
Dates: 3/1/2022 - 10/31/2022
Project: Trained over 100 community health workers to go into their vulnerable communities and work with vaccine hesitant persons.

**Vaccine Hesitancy for COVID 19**
Sponsor: NACHC
Role: Principal Investigator (20% effort)
Dates: 7/15/2021 - 6/30/2022
Project: Built LetsTalkCovidVacciens, a personalized risk communication tool, based on our MomsTalkShots model.

**Let's talk COVID shots web app for Canadians**
Sponsor: CPHA
Role: Principal Investigator (10% effort)
Dates: 10/1/2021 - 3/18/2022
Project: Tailored LetsTalkCovidVaccine, a personalized health communication tool, for Canada.

**SARS-CoV2 Vaccines Information Equity and Demand Creation Project (COVIED)**
Sponsor: Centers for Disease Control and Prevention
Role: Multiple Principal Investigator (mPIs Robert Breiman and Walter Orenstein) (25% effort)
Dates: 02/01/2021-09/31/2021
Project: Implements a systematic approach to provide interpretable, context- and culture-specific accurate and trusted information about the vaccines that will be offered, and to package and deliver this information to susceptible populations at risk for COVID and demonstrating vaccine hesitancy as a means to substantively reduce the disproportionate impact of COVID illness and death associated with this pandemic.

**Understanding Diverse Communities and Supporting Equitable and Informed COVID-19 Vaccination Decision-Making**
Sponsor: Robert Wood Johnson Foundation

Role: Principal Investigator (20% effort)
Dates: 11/1/2020-9/1/2021
Project: Collaborat with NACCH, ASTHO, AIM and NIHB to better understand how people are approaching decision-making regarding COVID-19 vaccination and what additional information they need to make an informed decision for themselves, their family, and their community.

**Valuation of Vaccine Safety**
Sponsor: GAVI
Role: Principal Investigator (20% effort)
Dates: 07/15/2020 – 07/31/2021
Project: Quantify the health and economic costs associated with the vaccine safety disaster that occurred in the Ukraine in 2008 where there was a decline in vaccine public confidence triggered by mishandled death following a measles vaccine campaign, leading to a large measles outbreak including exportation to other countries.

**Impact of Eliminating Non-Medical Exemptions in California**
Sponsoring Agency: National Institute of Allergy and Infectious Diseases, National Institutes of Health
Role: Co-Investigator (20% effort)
Dates: 2016-2021
Project: California is the first state in decades to abolish non-medical exemptions to school immunization requirements. This study examines the implementation and impact of this change by assessing the burdens on health care providers, health departments, schools and parents and the rates of medical exemptions and home schooling.

**PHASE II: Development and Writing of the Global Vaccine Safety Blueprint 2.0**
Sponsor: WHO
Role: Principal Investigator (15% effort)
Dates: 1/17/2020 - 4/30/2020
Project: In collaboration with the World Health Organization, drafted verson 2.0 of the Global Vaccine Safey Blueprint.

**Ethical, Legal and Social Issues (ELSI) for Precision Medicine and Infectious Disease: Centers for Excellence in ELSI Research (CEER)**
Sponsoring Agency: National Human Genome Research Institute, National Institutes of Health
Role: Co-Investigator, Lead Vaccinomics (15% effort)
Dates: 2016-2020
Project: Anticipate and examine the ethical, legal, social, historical and policy issues confronting the incorporation of genomics in the prevention, outbreak control, and treatment of a range of infectious diseases, and plan for the responsible translation of genomic advances into practice.

**A Comprehensive Pre-natal Intervention to Increase Vaccine Coverage**
Sponsoring Agency: National Institutes of Health: Dissemination and Implementation Research in Health (R01)
Role: Multiple Principal Investigator (with Saad Omer, Emory University) (35% effort)
Dates: 2015-2020
Project: Develop and evaluate a comprehensive intervention at the patient, provider and practice

levels to increase maternal and childhood vaccine uptake.

**Cocooning (influenza and Tdap vaccines)**
Sponsor: Walgreens
Role: Principal Investigator (15% effort)
Dates: 1/26/2017 - 6/30/2019
Project: Randomized controlled Trial to ascertain the impact of MomsTalkShots on friends and family of pregnant women.

**The Vaccine Safety Communication E-Library**
Sponsor: WHO
Role: Principal Investigator (5% effort)
Dates: 02/01/2019 – 04/30/2019
Project: The objective is to work with the WHO vaccine safety office to develop the e-library by assisting with growing the content and enhancing the organization and searchability of the VSN e-library and the development of a plan of action to increase participation of members and new members.

**Programmatic Impact of Multi-dose Vaccines**
Sponsoring Agency: Bill and Melinda Gates Institute through the Johns Snow Institute
Role: Co-Investigator (10% effort)
Dates: 2016-2018
Project: Equip global and country level decision makers with the evidence, guidance, and tools needed to assess when, where, and how the selection of vaccine presentation affects timely, equitable, and safe vaccination coverage.

**Case Studies of the Impact of Meningitis Epidemics on Local Health Departments and College Health Facilities**
Sponsoring Agency: Pfizer
Role: Principal Investigator (25% effort)
Dates: 2015-2016
Project: Evaluate the non-medical costs associated with Meningitis outbreaks in university settings.

**Capitalizing on Recent Changes to School Immunization Requirements to Improve the Publics Health**
Sponsoring Agency: Robert Wood Johnson Foundation Public Health Law Program
Role: Hopkins Principal Investigator (10% effort)
Dates: 2014-2016
Project: Evaluate the implementation and impact of recent changes made to state school immunization requirements and develop model school immunization law.

Note: Dr. Salmon was a Federal employee for 5 years and consequently could not receive external funding

**Evaluation of Parents Claiming Exemptions to School Entry Immunization Requirements**

Sponsoring Agency: Centers for Disease Control and Prevention
Role: Principal Investigator (20% effort)
Dates: 2004-2006
Project: Examine the secular trends and geographical clustering of immunization exemptions and associations with pertussis, reasons why parents refuse vaccines, and conducted a content analysis of vaccine safety newspaper stories.

**Mentored Patient-Oriented Research Career Development Award (K23).  Decision Making of Parents to Vaccinate Their Children**
Sponsoring Agency: National Institutes of Health
Role: Principal Investigator (75% effort)
Dates: 2004-2007
Project: Explore the role of health care providers in influencing parental vaccination decisions.

**Policy and Ethical Consultation on Pandemic Planning and Public Health Emergencies**
Sponsoring Agency: Florida Department of Health
Role: Principal Investigator (10% effort)
Dates: 2005-2006
Project: Explore ethical issues regarding responding to an influenza pandemic and developed a training module for public health workers to understand ethical issues surrounding vaccination during a pandemic.

**Implementation of Mandatory Immunization Requirements**
Sponsoring Agency: Centers for Disease Control and Prevention
Role: Co-Principal Investigator (with Neal Halsey) (75% effort)
Dates: 2001-2003
Project: Assess the role of school personnel and school policies in implementing immunization requirements.  Explored the reasons why some parents claim exemptions to school immunization requirements.

**The Role of School Personnel and Policies in Implementing Immunization Requirements**
Sponsoring Agency: Washington State Department of Health
Role: Principal Investigator (10% effort)
Dates: 2001-2004
Project: Explore the role of school personnel and school policies in implementing immunization requirements in Washington State.

# Academic Service

2003 - 2005     Admissions Committee for MSPH Program, Disease Prevention and Control, Department of International Health, Johns Hopkins Bloomberg School of Public Health
2005 - 2007     Epidemiology Program Director, Interdisciplinary Program (IDP), University of Florida, College of Medicine
2012 -     Admissions Committee for PhD Program, Global Disease Epidemiology and Control, Department of International Health, Johns Hopkins Bloomberg School of Public Health

| 2014 - | Honors and Awards Committee, Department of International Health, Johns Hopkins Bloomberg School of Public Health |
| 2015 - | Public Health Practice Committee, Johns Hopkins Bloomberg School of Health |

# Advisory Committee Presentations (selected)

| 2020 | National Vaccine Advisory Committee, Vaccine Confidence Working Group |
| 2006 | National Vaccine Advisory Committee, Adolescent Vaccine Working Group. *History and Impact of School Immunization Requirements: Implications for Adolescent Vaccination* |
| 2004 | National Vaccine Advisory Committee, Subcommittee on Vaccine Safety. *Enhancing Public Confidence in Vaccines through Independent Oversight of Post-Licensure Vaccine Safety* |
| 2002 | National Vaccine Advisory Committee Working Group on Implementing Vaccine Recommendations, *presentation to the Committee and expert witness for panel discussion* |
| 1998 | National Vaccine Advisory Committee Working Group on Philosophical Exemptions, *presentation to the Committee* |

# Personal Statement

Dr. Salmon's primary research and practice interest is optimizing the prevention of childhood infectious diseases through the use of vaccines. He is broadly trained in vaccinology, with an emphasis in epidemiology, behavioral epidemiology, and health policy. Dr. Salmon's focus has been on determining the individual and community risks of vaccine refusal, understanding factors that impact vaccine acceptance, evaluating and improving state laws providing exemptions to school immunization requirements, developing systems and science in vaccine safety, and effective vaccine risk communication. Dr. Salmon has considerable experience developing surveillance systems, using surveillance data for epidemiological studies, and measuring immunization coverage through a variety of approaches. Dr. Salmon has worked with state and federal public health agencies to strengthen immunization programs and pandemic planning.

Controversies have always existed around vaccines. However, increasingly parents are worried about the safety of vaccines and the rates of parents refusing vaccines have been increasing. Dr. Salmon's led the first study quantifying the individual and community risks of measles associated with vaccine refusal. He and others have replicated these studies examining the risk of vaccine refusers for pertussis, *Haemophilus influenzae* type b, varicella, and pneumococcal. Dr. Salmon's studies in this area have demonstrated that local clustering of refusal is associated with measles and pertussis, explaining why we see sporadic measles outbreaks despite very high vaccine coverage nationally. Dr. Salmon's work quantifying the individual and community risks of disease resulting from vaccine refusal has directly impacted national and state policy in this area.

Having quantified the magnitude of the problem of vaccine refusal, Dr. Salmon conducted a broad range of studies examining factors that contribute to vaccine acceptance and refusal. He conducted studies comparing parents who refused vaccines for their children compared to parents of fully vaccinated children. He then linked these parents to their healthcare providers to understand the impact of healthcare providers on parental vaccine decision-making. Dr. Salmon conducted studies exploring the impact of school-level personnel and policies on vaccine refusal and the impact of the media's focus on vaccine safety.

Dr. Salmon's investigations of parents who refuse vaccines for their children have included parents who claim exemptions to school immunization requirements because they are actively deciding to refuse vaccines altogether rather than delay vaccines. Dr. Salmon has investigated compulsory vaccination in the US compared to other developed countries. He has explored how school laws are implemented and enforced at the state and local level and how this impacts the rates of exemptions. He developed an evidence-based model state exemption law that has been implemented in various forms in many states to strengthen their state exemption laws. He has evaluated the impact of these applications of this model and is in the process of revising this model law with a broad range of stakeholders. Dr. Salmon's work in this area has largely shaped the debate we see in many states making exemption laws more stringent and offers a policy approach to limiting exemptions while preserving parental autonomy.

Concerns about the safety of vaccines are the primary (but not the only) reason that parents are increasingly refusing vaccines. Dr. Salmon has focused on developing the science base for vaccine safety. He served as the Director for Vaccine Safety, National Vaccine Program Office, HHS, where he was responsible for coordinating and leading our national vaccine safety efforts

including, but not limited to, the 2009 H1N1 vaccine program.  In this capacity, Dr. Salmon improved our vaccine safety systems.  During the H1N1 vaccine program he oversaw the largest, most comprehensive vaccine safety monitoring program ever in the US and the world.  Dr. Salmon developed a new active surveillance system (Post-licensure Rapid Immunization Safety Monitoring (PRISM) Network) that is now a permanent part of our vaccine safety monitoring program.  He created independent vaccine safety assessment to improve trust and confidence. The success of these efforts was highlighted by the IOM when reviewing the National Vaccine Plan. Dr. Salmon has also conducted safety studies, such as the most comprehensive evaluation of GBS post-influenza vaccine since 1976.  Dr. Salmon is currently a board member of the Brighton Collaboration, an international network of vaccine safety investigators, and co-chairs their vaccine confidence working group.

While improving safety systems and science is essential to addressing parental safety concerns, it is necessary to effectively communicate the risks and benefits of vaccines to the scientific community, healthcare providers, the media and the public.  To work toward this objective, Dr. Salmon has conducted vaccine risk perception and communication studies, developed communication strategies for the Department of Health and Human Services and its Agencies, and developed resources for healthcare providers.  Dr. Salmon is currently focused on developing and evaluating interventions at the patient, provider and practice levels to improve maternal and infant vaccine acceptance.  Dr. Salmon was the guest editor to a supplement in Pediatrics that assisted pediatricians in working with vaccine hesitant parents by reviewing the complex vaccine safety system in the US, reviewing factors that impact vaccine hesitancy, and assisting pediatricians with how to communicate with parents. Dr. Salmon is widely considered a national and international expert in vaccine safety and factors impacting vaccine acceptance.

## Keywords

Vaccine, Immunization, Infectious Diseases, Epidemiology, Health Policy, Public Health Practice

Exhibit 3

Page 1

1          IN THE UNITED STATES DISTRICT COURT

        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2                      -   -   -

3      JOSEPH S. AUTERI, M.D.    : Civil Action

                    Plaintiff  : No. 2:22-cv-03384

4                                :

5              V.                :

                                 :

        VIA AFFILIATES, D/B/A    :

6      DOYLESTOWN HEALTH         :

        PHYSICIANS               :

7                    Defendant   :

8                      -   -   -

9                  January 31, 2025

10                     -   -   -

11                  CONFIDENTIAL

12                     -   -   -

13          Video deposition of JOSEPH S. AUTERI,

14     MD, taken pursuant to notice, was conducted

15     at the law offices of DUANE MORRIS LLP, 30

16     South 17th Street, 12th Floor, Philadelphia,

17     Pennsylvania 19103, commencing at 9:55 a.m.,

18     on the above date, before Susan B. Berkowitz,

19     a Registered Professional Reporter and Notary

20     Public in the Commonwealth of Pennsylvania.

21                     -   -   -

22

23

24

JOSEPH S. AUTERI, MD

Page 46

1  is the educational history that is on this
2  CV also true, accurate and complete, at
3  least as it relates to your postsecondary
4  education?
5      A.  It relates to?
6      Q.  Your postsecondary education.
7      A.  So the Jefferson dates are
8  correct, and the Harvard dates are correct.
9          Does that answer your question?
10     Q.  Yes.  Thank you.
11          Since you graduated medical
12  school, have you always been a heart
13  surgeon?
14     A.  Since graduating medical school,
15  I had to do residency and Fellowship to
16  become a heart surgeon.  So that was the
17  eight or nine years at Columbia.  But since
18  I finished Columbia, I've always been a
19  cardiothoracic surgeon.
20     Q.  Thank you.
21          At your various jobs throughout
22  your career, have you been required to
23  receive an annual influenza vaccination?
24     A.  Not early on, but in more recent

Page 47

1  years, yes.
2      Q.  Have you ever declined to
3  receive a required influenza vaccination in
4  connection with your employment?
5      A.  I have.
6      Q.  When did you decline to receive
7  an influenza vaccination in connection with
8  your employment?
9      A.  Once word came out that mRNA
10  vaccines were included in the flu vaccine;
11  and, therefore, because of my religious
12  objection to mRNA vaccines, I declined the
13  flu vaccine since then.
14     Q.  And when was that?  When did you
15  -- when did you first decline a flu
16  vaccination?
17     A.  Once the COVID pandemic hit, and
18  it became clear that they were putting mRNA
19  mixed in with the flu vaccine.  So early-
20  2020s.  I don't recall if it was '21 or '22,
21  but certainly since then.
22     Q.  You said "they."  Who is "they"?
23     A.  I'm sorry.  Who's they?
24     Q.  You said --

Page 48

1      A.  I'm not sure what you mean.
2      Q.  Well, you said they are putting
3  mRNA.
4      A.  The companies that makes the
5  vaccines.
6      Q.  Okay.  So who makes the flu
7  vaccines that you've declined to receive?
8      A.  I don't know.
9      Q.  How do you know that the
10  companies that are making the flu vaccine,
11  that you can't identify, are putting mRNA
12  vaccines in flu vaccines?
13          MS. RUSSELL:  Objection.
14          You can answer.
15          THE WITNESS:  Because the
16          vaccines are now coming combined
17          with COVID and flu together.
18  BY MR. DURHAM:
19     Q.  Am I understanding you
20  correctly, you cannot receive a standalone
21  influenza vaccination, currently?
22     A.  I have not been offered a
23  standalone vaccination, currently.  Pardon
24  me.  A standalone flu vaccine, currently.

Page 49

1      Q.  Have you made an attempt to find
2  out if you can receive a standalone flu
3  vaccination?
4          MS. RUSSELL:  Objection.
5          You can answer.
6          THE WITNESS:  I have not.
7  BY MR. DURHAM:
8      Q.  Other than a COVID vaccination
9  and an influenza vaccination, have you been
10  required to receive other vaccinations in
11  connection with your employment?
12     A.  Required?  No.
13     Q.  Dr. Auteri, when did you start
14  working at Doylestown Hospital?  Or --
15  sorry.  Doylestown Health.
16     A.  I believe it was May 2007.
17          -  -  -
18      (Auteri-4 marked for identification.)
19          -  -  -
20  BY MR. DURHAM:
21     Q.  Dr. Auteri, the court reporter
22  has handed you a document marked Auteri
23  Exhibit 4.  The beginning Bates number of
24  D-52.

13 (Pages 46 - 49)

JOSEPH S. AUTERI, MD

Page 50

1     A.   Yes.
2     Q.   Do you recognize this document
3  as an employment agreement with Doylestown
4  Health, effective April 13th of 2012?
5     A.   Yes, I recognize it.
6     Q.   And if you turn to the page
7  Bates-labeled D-69, please, is that your
8  signature on P-69?
9     A.   Yes, it is.
10    Q.   And that signature is dated
11 April 13th, 2012, correct?
12    A.   That is correct.
13    Q.   Was this employment agreement,
14 as subsequently amended, the employment
15 agreement in effect at all times through
16 2021, up to the termination of your
17 employment?
18    A.   As subsequently amended, yes.
19    Q.   Does this employment agreement
20 require you to remain a member in good
21 standing of the medical staff at Doylestown
22 Hospital?
23       MS. RUSSELL:  Objection.
24       You can answer.

Page 51

1        THE WITNESS:  It does.
2  BY MR. DURHAM:
3     Q.   Does the employment agreement
4  require you to conduct your medical practice
5  in conformity with all policies, rules, and
6  regulations of Doylestown Health and
7  Doylestown Hospital?
8        MS. RUSSELL:  Objection.
9        You can answer.
10       THE WITNESS:  It does.
11 BY MR. DURHAM:
12    Q.   Did the employment agreement
13 provide that Doylestown Health can terminate
14 your employment for cause immediately if
15 your privileges at Doylestown Hospital were
16 revoked?
17       MS. RUSSELL:  Objection.
18       You can answer.
19       THE WITNESS:  It does.
20         - - -
21 (Auteri-5 marked for identification.)
22         - - -
23 BY MR. DURHAM:
24    Q.   Dr. Auteri, the court reporter

Page 52

1  has handed you a document that's been marked
2  Auteri Exhibit 5.  Bates-labeled D-75.
3        Do you recognize this document
4  as an employment contract renewal between
5  yourself and the Doylestown Health?
6     A.   I do.
7     Q.   And this was signed by you on
8  December 21, 2012.
9     A.   Correct.
10    Q.   Is that correct?
11       And does this amendment -- or
12 renewal, I'm sorry -- extend the term of
13 that 2012 agreement through April of 2022?
14    A.   Yes, it does.
15         - - -
16 (Auteri-6 marked for identification.)
17         - - -
18 BY MR. DURHAM:
19    Q.   Dr. Auteri, the court reporter
20 has handed you a document that's been marked
21 Auteri Exhibit 6.  Bates-labeled P-381.
22       Do you recognize this as the
23 amendment of your employment agreement with
24 Doylestown Health, produced in this

Page 53

1  litigation by you, and executed by you on
2  December 17th, 2019?
3     A.   I do recognize it, yes.
4     Q.   As I just described it, do you
5  recognize it?
6        MS. RUSSELL:  Objection.
7        You can answer it.
8        THE WITNESS:  Well, you said
9     produced by you and signed by you on
10    12-7-19.  I doubt I produced it on
11    12-7-19, but, yes, I recognize it.
12 BY MR. DURHAM:
13    Q.   You signed it on December 17th,
14 2019?
15    A.   I signed it on December 17th,
16 2019.
17    Q.   And does this document amend the
18 2012 employment agreement that was marked
19 Auteri Exhibit 4?
20       MS. RUSSELL:  Objection.
21       You can answer.
22       THE WITNESS:  Yes, it amends it.
23 BY MR. DURHAM:
24    Q.   And does this document,

14 (Pages 50 - 53)

JOSEPH S. AUTERI, MD

Page 54

1 Auteri-6, reflect that you were earning an
2 annual salary with Doylestown Health of 1.5
3 effective July 1 of 2021?
4 A. Yes, it says that.
5 Q. And is that -- was that your
6 annual salary, 1.5 million, at the time your
7 employment with Doylestown Health was
8 terminated?
9 A. Yes, it was.
10 Q. Other than the annual salary of
11 1.5 million, were you earning any other
12 compensation from Doylestown Health as of
13 the termination of your employment?
14 A. No, I was not.
15 Q. What was your position with
16 Doylestown Health in 2021?
17 A. Chief of cardiothoracic and
18 vascular surgery. Medical director of the
19 Heart Institute.
20 Q. Is that like a comparable
21 position to your current position at Capital
22 Health, in terms of your role?
23 A. It is.
24 Q. To whom did you report in 2021

Page 55

1 at Doylestown Health?
2 A. The chief medical officer, Dr.
3 Scott Levy.
4 Q. And what were your job duties as
5 the director of cardiovascular surgery and
6 the director of the Heart Institute at
7 Doylestown Health in 2021?
8 A. Can I refer to the job duties --
9 Q. Yes, certainly.
10 A. -- described in the contract?
11 Q. If you want to look at -- I
12 think that's Auteri-4. And I believe it's
13 at D-70 and 71.
14 A. So you have it already. The
15 duties and responsibilities.
16 Do you want me to read all
17 these?
18 Q. You don't have to read them.
19 Does the duties and
20 responsibilities on D-70 and 71 accurately
21 capture your duties and responsibilities at
22 Doylestown Health in 2021?
23 A. I think it captures most of
24 them. I don't think it speaks of my role on

Page 56

1 the Medical Executive Committee.
2 Q. And we'll talk about that in a
3 minute.
4 I also -- I'm not sure it
5 actually specifically says your -- addresses
6 you performing heart surgery.
7 You mentioned you're a
8 cardiothoracic surgeon. You performed heart
9 surgery at Doylestown Health in 2021,
10 correct?
11 A. I did. The majority of what I
12 did was perform heart surgery. I think this
13 is speaking to the medical directorship
14 duties and responsibilities.
15 Q. So outside of what is listed on
16 D-70 and 71, you testified you performed
17 heart surgery, which is the majority of what
18 you did; and you served on the Medical
19 Executive Committee. Any other job duties
20 and responsibilities that you had at
21 Doylestown Health in 2021?
22 A. I'm not sure if it's adequately
23 described in here, but I was very involved
24 in the philanthropic arm, working with the

Page 57

1 foundation to raise, at the time they
2 terminated me, 80 million of the 100 million
3 capital campaign.
4 Q. When you say "the foundation,"
5 that's Doylestown foundation?
6 A. Yes.
7 Q. And can you briefly describe what
8 the capital campaign you're referring to is?
9 A. The capital campaign was a five-
10 year campaign that was launched to end the
11 50th year on the 100th-year anniversary of
12 the hospital. I was asked to be on the
13 Capital Campaign Committee, along with a
14 number of other people, to include the two
15 co-chairs.
16 Alex Gorsky was the then, at the
17 time, CEO of J&J -- Johnson & Johnson; and
18 the immediate past CEO of Merck, which was
19 Richard -- goes by Dick -- Clark.
20 I served on the Capital Campaign
21 Committee. And I also was asked to be the
22 poster child, if you will, to speak at many
23 engagements to help fundraise.
24 I was the keynote speaker at the

15 (Pages 54 - 57)

JOSEPH S. AUTERI, MD

Page 58

1  opening ceremony of 300 people in a tent in
2  Dick Clark's backyard, and was asked on many
3  occasions to speak and help fundraise. I
4  had many dinners with many potential donors,
5  many lunches.
6        So that was a very significant
7  portion of what I did for Capital Health. I
8  also gave personally.
9        Q.  Other than, I think you said,
10 performing heart surgery, the duties that
11 are covered in D-70 and 71, serving on the
12 Medical Executive Committee, and serving on
13 the capital campaign committee, did you have
14 any other duties and responsibilities at
15 Doylestown Health in 2021?
16       A.  I may have had some others that
17 I'm not thinking of. Those four were the
18 majority of what I --
19       Q.  The primary jobs?
20       A.  Yes.
21       Q.  And -- and just so I'm clear,
22 you mentioned the co-chairs being Alex
23 Gorsky and Dick Clark. You were not a
24 co-chair, but you were on the committee?

Page 59

1        A.  That is correct. I believe you
2  had to give ten million to be a co-chair,
3  and I was not in a position to do that.
4        Q.  As a cardiothoracic surgeon, can
5  you describe the types of patients or the
6  types of conditions that you treat?
7        A.  We typically treat patients who
8  have either just had a heart attack, or are
9  impending; who have chest pain. We treat
10 patients with valve disease. We did -- a
11 significant portion of our practice was
12 valve disease. We did aortic dissections
13 and other -- cardiac tumors. We performed
14 the vast majority of cardiothoracic surgery
15 at Doylestown.
16       Q.  When you -- when you say "we," I
17 was asking about your, the types of surgery
18 you performed.
19       You performed all those types of
20 surgeries?
21       A.  Same answer; yes.
22       Q.  Is it fair to say that the types
23 of surgeries you perform require a high
24 degree of skill and specialization?

Page 60

1        A.  I think that's fair to say; yes.
2        Q.  Is it true that with respect to
3  many of the patients on whom you performed
4  surgeries that you described, that if you
5  did not perform the surgery they might die?
6        A.  I don't know that I'd say many,
7  but certainly a percentage. I'm not sure if
8  it's above 51 or below. But, certainly,
9  they are at risk of dying, yes.
10       Q.  Would you agree that, all other
11 things being equal, the types of patients
12 that you just described treating would be a
13 higher risk of severe illness from COVID-19
14 than patients who did not have the types of
15 conditions that you described?
16       MS. RUSSELL:  Objection.
17       You can answer.
18       THE WITNESS:  I think the
19       experience with COVID-19 has shown
20       that multiple other comorbidities
21       makes the patient at high risk.
22       And, certainly, cardiac surgery
23       patients typically have multiple
24       comorbidities.

Page 61

1  BY MR. DURHAM:
2        Q.  So -- and, again, I said "all
3  other things being equal." Right? So take
4  a patient with -- some of the patients that
5  you described. Would those patients be at a
6  higher risk of severe illness from
7  contracting COVID-19?
8        MS. RUSSELL:  Objection.
9        You can answer.
10       THE WITNESS:  I think so, in
11       general.
12 BY MR. DURHAM:
13       Q.  Dr. Auteri, I don't think we're
14 going to reference the rest of those, the
15 exhibits we've already looked. But if we
16 do, I'll call them to your attention.
17       A.  Fair enough. I was just putting
18 them in order because I noticed Sue, the
19 court reporter, was looking to see what's
20 the next number up. So I was trying to put
21 the highest one up to help her out.
22       Q.  Thank you.
23             - - -
24       (Auteri-7 marked for identification.)

16 (Pages 58 - 61)

JOSEPH S. AUTERI, MD

Page 62

1              - - -
2    BY MR. DURHAM:
3        Q.  Dr. Auteri, the court reporter
4    has placed in front of you a document marked
5    Auteri Exhibit 7.
6            Do you recognize this as the
7    Second Amended Complaint that you filed in
8    this litigation?
9        A.  Yes, I do.
10       Q.  Did you review the Second
11   Amended Complaint before it was filed in
12   this litigation?
13       A.  Yes, I did.
14       Q.  Did you verify that the Second
15   Amended Complaint was truthful and accurate,
16   in all respects, before it was filed in this
17   litigation?
18       A.  Yes.
19       Q.  Dr. Auteri, I'd like to direct
20   you to Paragraph 12 of the Second Amended
21   Complaint.  It's on Page 3 of Auteri-7.
22       A.  So no Bates numbers on these?
23   We're going off the top?
24       Q.  Correct.

Page 63

1        A.  Okay.  12.  Yes.  I see it.
2        Q.  And Paragraph 12 says that you
3    were single-handedly responsible for the
4    prominence enjoyed by the cardiac program at
5    Doylestown Health at the time of your
6    termination.
7            Did I read that correctly?
8        A.  You did read that correctly.
9        Q.  So do I understand that to mean
10   that you, alone, were responsible for the
11   prominence of the heart program at
12   Doylestown Health at the time of your
13   termination?
14       A.  I would say that cardiac surgery
15   is a team sport.  And I would say,
16   certainly, I was not alone in advancing the
17   prominence of the program.  But the program
18   was nowhere near as prominent when I got
19   there; and as a leader of other people I
20   helped bring the entire program up.
21       Q.  So, I guess, what did you mean
22   by single-handedly responsible for the
23   prominence of the program?
24       A.  That had I not been there, I

Page 64

1    don't know that someone else would have
2    brought the program as much prominence had
3    they done what I did.
4        Q.  After the termination of your
5    employment, did the Heart Institute continue
6    to operate?
7        A.  Continue to operate?  Yes.
8        Q.  To your knowledge, did the --
9    did your departure have any negative impact
10   on the Heart Institute's operations,
11   fundraising, or ability to serve the
12   community's needs?
13       A.  Very much so.
14       Q.  Can you describe what personal
15   knowledge you are basing that testimony on?
16       A.  Can I describe what?  I'm sorry.
17       Q.  What personal knowledge you base
18   your testimony on, that the Heart
19   Institute -- or your departure had a
20   negative impact on the Heart Institute's
21   operations, fundraising, or ability to serve
22   the needs of the community.
23       A.  Okay.  When they terminated me,
24   they hired a surgeon to come in on short

Page 65

1    notice from another facility, who was a
2    surgeon that I had replaced 14 or 15 years
3    prior.  And he came in and had very poor
4    results.  I am aware of three of the first
5    five cases -- I should say three or four of
6    the first five cases that he did went very
7    poorly, enough to be transferred down to
8    Penn.
9            And my understanding is, a few
10   of those, I don't know if it's two or three
11   or all four, died at Penn.  They
12   subsequently fired him, I believe, a month
13   or two after they hired him, and went in a
14   different direction with a different
15   surgeon.
16           They then -- my understanding of
17   this may not be sequential.  It may not be
18   exactly the dates.
19           They then hired -- they leased a
20   surgeon from Penn who was, at the time, late
21   70s, or early 80s, to come and fill the gap
22   until the physician -- the young physician
23   fresh out of training that I had hired --
24   sorry -- that we had hired when I was still

17 (Pages 62 - 65)

JOSEPH S. AUTERI, MD

Page 66

1  there -- was not set to start until
2  approximately July 1.  They needed to fill
3  the gap.
4        They fired me November 12.  They
5  had this other surgeon who had horrible
6  results, maybe for a month or two.  I don't
7  know.  So they had another six months to
8  fill, and hired -- my understanding is they
9  leased a surgeon from Penn to come up and
10  fill that gap until the surgeon that I had
11  helped hire could show up July 1, or
12  thereabouts.
13      Q.  So what is -- what is your
14  personal firsthand knowledge as to the poor
15  results that you talked about from that
16  first surgeon who came in after your
17  employment was terminated?
18      A.  I got multiple phone calls from
19  colleagues that I worked with, saying, this
20  is a mess.
21      Q.  Other than the phone calls from
22  colleagues you got saying "this is a mess,"
23  do you have any knowledge as to the results
24  of the surgeries performed by the surgeon

Page 67

1  who came in immediately after your
2  employment was terminated?
3      A.  Same colleagues.  Same phone
4  calls.  More descriptive than "this was a
5  mess."
6      Q.  Other than colleagues from phone
7  calls -- sorry -- phone calls from
8  colleagues or former colleagues, do you have
9  any knowledge regarding the results of
10  surgeries performed by the surgeon that
11  replaced you, or came in immediately after
12  you at Doylestown?
13      A.  What kind of knowledge?  Other
14  than people calling me saying this is what's
15  happening?
16      Q.  Right.  Any other knowledge,
17  other than people calling you saying this is
18  what's happening.
19      A.  No.
20      Q.  And what was the name of the
21  surgeon who came in immediately after you
22  left Doylestown Health?
23        THE WITNESS:  Can I answer that?
24        MS. RUSSELL:  Sure.  If you

Page 68

1  know.
2        THE WITNESS:  Brian Priest.
3  BY MR. DURHAM:
4      Q.  Priest?  P-R-E -- sorry.
5  P-R-I-E-S-T?
6      A.  Yes.
7      Q.  Do you know Dr. Priest,
8  personally?
9      A.  Not personally.  I've spoken to
10  him, maybe, at a conference, but not
11  personally.
12      Q.  And then I believe you testified
13  that following Dr. Priest, Doylestown Health
14  leased a surgeon in his 70s from Penn, who
15  was there until about July 1 of 2022.
16        Did I understand that correctly?
17      A.  I don't know when he ended.
18  But, yes, they leased another surgeon late
19  in his career to come spend time, a day or
20  two a week, or five days a week -- I'm not
21  aware -- to come spend time at Doylestown.
22      Q.  And what's the name of that
23  surgeon?
24      A.  Clark Hargrove.

Page 69

1      Q.  Do you know Dr. Hargrove
2  personally?
3      A.  Not personally.
4      Q.  Do you have any firsthand
5  personal knowledge of the results of
6  surgeries performed by Dr. Hargrove at
7  Doylestown Health, following your separation
8  from Doylestown Health?
9      A.  Don't have personal knowledge of
10  that.
11      Q.  And then there's a young
12  physician who you said you, or Doylestown,
13  had hired while you were there, who started
14  in mid-2022?
15      A.  Yes.
16      Q.  Is that correct?
17        And what is that physician's
18  name?
19      A.  Anthony Tran, T-R-A-N.
20      Q.  Is Anthony Tran, to your
21  knowledge, a good surgeon?
22      A.  Yes, he is, very good.  I hired
23  him.
24      Q.  To your knowledge, has Anthony

18 (Pages 66 - 69)

JOSEPH S. AUTERI, MD

Page 70

1  Tran performed well in surgery at Doylestown
2  Health?
3          MS. RUSSELL:  Objection.
4          You can answer.
5          THE WITNESS:  To my knowledge,
6      he does.
7  BY MR. DURHAM
8      Q.  Do -- you know Dr. Tran
9  personally, it sounds like?  You hired him?
10     A.  I hired him.  Yes.
11     Q.  Have you been in contact with
12 Dr. Tran since your separation from
13 Doylestown Health?
14     A.  Since my separation, yes.
15     Q.  Have you talked to Dr. Tran
16 about this case?
17     A.  About what case?
18     Q.  The litigation.
19     A.  No.
20     Q.  Did you study health data as
21 part of your duties at Doylestown Health?
22     A.  I'm sorry.  Say it again.
23     Q.  Did you study health data as
24 part of your duties at Doylestown Health?

Page 71

1      A.  Did I study data?
2      Q.  Yes.
3      A.  Yes.
4      Q.  Health data?
5      A.  Yes.
6      Q.  And is it part of your duties as
7  a physician to study data and statistics of
8  treatment methods and those medical devices
9  and drugs used in the care of patients?
10     A.  Very much so.
11     Q.  In your experience, do the data
12 and statistics of treatment methods, medical
13 devices, and drugs used in the care of
14 patients ever change over time?
15     A.  Yes, they do change.
16     Q.  I guess by way of example, might
17 a treatment or preventative measure that's
18 thought to be effective at one point in
19 time, subsequently be learned to be less
20 defective later?
21         MS. RUSSELL:  Objection.
22         You can answer.
23         THE WITNESS:  That happens
24     sometimes, yes.

Page 72

1  BY MR. DURHAM:
2      Q.  I guess, can it happen the other
3  way, too?  That a treatment or preventative
4  measure thought to be ineffective might
5  later be learned to be more effective?
6          MS. RUSSELL:  Objection.
7          You can answer.
8          THE WITNESS:  It changes in both
9      directions; yes.
10 BY MR. DURHAM:
11     Q.  Do you study diseases -- strike
12 that.
13         Did you, while you were at
14 Doylestown Health, study diseases?
15     A.  Yes.
16     Q.  In your experience, does a
17 medical and scientific understanding of a
18 particular disease change over time?
19     A.  Yes.
20     Q.  Was that true with respect to
21 COVID-19?
22     A.  That it changed?
23     Q.  That the medical and scientific
24 understanding of COVID-19 changed over time.

Page 73

1      A.  Yes.
2      Q.  Is that still true, with respect
3  to COVID-19?  In other words, is the medical
4  and scientific understanding of COVID-19
5  still changing?
6          MS. RUSSELL:  Objection.
7          You can answer.
8          THE WITNESS:  I think the study
9      of every disease, COVID-19 included,
10     evolves over time as we gain more
11     data and more knowledge, yes.
12 BY MR. DURHAM:
13     Q.  I believe you testified earlier
14 that you were a member of the Medical
15 Executive Committee at Doylestown Health?
16     A.  Yes, that's correct.
17     Q.  When did you join the Medical
18 Executive Committee?
19     A.  I don't recall.  I had been on
20 it a few years.  I don't know how many.
21     Q.  A few years prior to your
22 separation from Doylestown Health?
23     A.  A few years prior to the
24 COVID-19 pandemic.

19 (Pages 70 - 73)

JOSEPH S. AUTERI, MD

Page 74

1    Q.  Can you describe what the
2  Medical Executive Committee does?  In
3  summary form.  I'm not looking for an
4  exhaustive descrip -- description.
5    A.  The Medical Executive Committee
6  discusses things with members of
7  administration.  It's made up of a number of
8  physician leaders throughout the hospital.
9  And it discusses and gets feedback -- it's
10  designed to discuss and get feedback on
11  issues relating to the hospital and the
12  medical staff.
13         And that is certainly not
14  exhaustive.
15    Q.  You said it was comprised of
16  physician leaders at Doylestown Health.  Is
17  it -- are the members of the Medical
18  Executive Committee all -- were the members
19  of the Medical Executive Committee in 2021
20  all physicians?
21    A.  No.  There are administrators,
22  also, at the meeting.
23    Q.  Right.  But the members of the
24  committee itself.  I'm not asking who was at

Page 75

1  the meetings.  The members of the committee
2  itself, are they all physicians?
3    A.  I honestly don't know who's
4  voting or not voting.  Jim Brexler comes to
5  the meeting, and has a lot of say at the
6  meeting.  He is not a physician.  So I -- I
7  don't know that I can answer was everybody a
8  physician.
9    Q.  Well, is -- was Jim Brexler, in
10  2021, a member of the Medical Executive
11  Committee?
12    A.  I don't know.  He was certainly
13  at most of them; if he wasn't out of town;
14  whatever.
15    Q.  Was Dr. Scott Levy a member of
16  the Medical Executive Committee?
17    A.  Yes.  He used to run the
18  meeting.
19    Q.  You said the Medical Executive
20  Committee discusses things with
21  administration.
22         To whom are you referring when
23  you say "administration"?
24    A.  Scott Levy and Jim Brexler.

Page 76

1    Q.  Is that administration of
2  Doylestown Hospital?
3         MS. RUSSELL:  Objection.
4         You can answer.
5         THE WITNESS:  I'm not sure what
6    you mean.
7  BY MR. DURHAM:
8    Q.  Well, what is -- what are Levy
9  and Brexler -- what are Dr. Scott Levy and
10  Jim Brexler the administration of?
11         MS. RUSSELL:  Objection.
12         You can answer.
13         THE WITNESS:  Scott Levy is the
14    VP, and is chief medical officer of
15    the hospital.  I put these in the
16    admin wing.  I put that under
17    administration.
18  BY MR. DURHAM:
19    Q.  Administration of the hospital,
20  then?
21    A.  Yeah.
22    Q.  Does the -- at least while you
23  were at Doylestown in 2021, did the Medical
24  Executive Committee meet on a regular basis?

Page 77

1    A.  Yes.
2    Q.  Approximately how frequently?
3    A.  Approximately monthly.  There
4  were certain months that it would be
5  canceled for whatever reason; but,
6  approximately, monthly.
7    Q.  Dr. Auteri, I'd like to direct
8  you to Exhibit Auteri-7, the Second Amended
9  Complaint, Paragraph 20, which is on Page 5.
10         It says:  During the COVID-19
11  pandemic, Doylestown help implement a health
12  screening program, including daily
13  temperature checks and health questions, to
14  screen its employees for COVID-19.
15         Can you describe the health
16  screening program referenced in Paragraph
17  20, please?
18    A.  Yes, I can.
19         The hospital limited entrances
20  for employees to go through, from prior.
21  There were many entrances, and that got
22  funneled to two or three, or thereabouts.
23  And then had an employee of the hospital sit
24  at a desk at each of the entrances.  And

20 (Pages 74 - 77)

JOSEPH S. AUTERI, MD

Page 94

1  that time.
2      I would just like you to answer
3  the question, please, which was a
4  yes-or-no question.
5      MS. RUSSELL:  Objection.  Asked
6  and answered.
7      You can answer again, if you
8  have one.
9      THE WITNESS:  If I'm correct,
10  you asked me if I am qualified to
11  make the decision.  And my answer
12  is --
13  BY MR. DURHAM:
14      Q.  Relating to COVID-19.
15      A.  Yes.  And my answer is:  I think
16  I am qualified to be in the room of multiple
17  people; to be involved in that decision.
18  But I don't think any one person should --
19  should be -- should be made to answer the
20  decision -- the question.  And that is my
21  understanding of what happened.  And I don't
22  -- you know.
23      Q.  At any time from the beginning
24  of the COVID-19 pandemic, through the end of

Page 95

1  your employment, did you believe that
2  medical providers should have to wear masks
3  in any circumstances differently from when
4  they wore masks prior to the pandemic?
5      MS. RUSSELL:  Objection.
6      You can answer.
7      THE WITNESS:  Early on in the
8  COVID-19 pandemic, when we were
9  still gathering information about
10  it, and patients were scared if they
11  saw the provider not have a mask, I
12  felt we should all wear masks, yes.
13      As time wore on, and it became
14  clear that the virus could transmit
15  through a cloth mask, which many
16  people were wearing, or other types
17  of makeshift masks, and the
18  hospital, for reasons of supply
19  chain were given non-virus-stopping
20  masks, I thought it was more -- I
21  thought it was a good thing.
22  Because it gave the right message to
23  our patients.  We care about you.
24  We're trying to limit this.

Page 96

1      But I think the data
2  subsequently came out that says
3  masks don't stop viruses.  Masks, as
4  they were being used then, don't
5  stop viruses.
6  BY MR. DURHAM:
7      Q.  So your understanding of the
8  data is that masks do not reduce the
9  transmission of the COVID-19 virus?
10      MS. RUSSELL:  Objection.
11      You can answer.
12      THE WITNESS:  I think there's
13  lots of data in both directions.  I
14  think the masks, as they were being
15  used at the time, I don't think were
16  limiting transmission.
17      But that is -- that's the
18  answer.  Yeah.
19  BY MR. DURHAM:
20      Q.  Were you required to wear a mask
21  at Doylestown Hospital during the COVID-19
22  pandemic?
23      A.  I'm a heart surgeon.  I wear a
24  mask most of the time when I'm at the

Page 97

1  hospital, operating.
2      Q.  Were you required to wear a mask
3  in circumstances that -- during the COVID-19
4  pandemic, in circumstances that you were not
5  required to prior to the COVID-19 pandemic?
6      A.  Yes.
7      Q.  And did you comply with that
8  requirement at all times?
9      A.  Yes.
10      Q.  You contracted COVID-19 in May
11  of 2021; is that correct?
12      A.  That is correct.
13      Q.  And Paragraph 23 of the Second
14  Amended Complaint -- it's on Page 5 --
15  states that you contracted it while in the
16  course of treating patients.
17      What do you mean by "in the
18  course of treating patients"?
19      A.  Well, in May of 2021, I was
20  going to work every day and treating
21  patients.  And then one day I fell sick.
22      And so there were many COVID
23  patients in the hospital.  I can't point --
24  I cannot point to one and say I got it from

JOSEPH S. AUTERI, MD

Page 98

1  that person, because I was involved in the
2  care of many patients.
3        Q.  Do you have --
4        A.  But it was while I was in the
5  course of treating patients.
6        Q.  Do you know for certain whether
7  you contracted COVID-19 at Doylestown
8  Hospital?
9        A.  I was working at Doylestown
10  Hospital and I contracted it.  I don't know
11  the vector through which I got it.
12        Q.  So do you know whether the
13  vector through which you got COVID-19 was at
14  the hospital or outside of the hospital?
15        A.  I think it would be pretty hard
16  to figure that out; so, no, I don't know.
17  I'm not sure how I would know.
18        Q.  Did you experience symptoms from
19  COVID-19 in May of 2021?
20        A.  Yes.
21        Q.  Can you describe your symptoms,
22  briefly?
23        A.  Fever, cough, muscle aches,
24  chills, sweats, cough.

Page 99

1        Q.  In Paragraph 23 of the Second
2  Amended Complaint you state that you
3  followed the isolation requirement at
4  Doylestown Health before returning to work.
5            What were those isolation
6  requirements?
7        A.  Get tested to confirm, which I
8  did, and then stay away for -- and I don't
9  remember if it was 10 or 15 days at the
10  time.  Don't come in.  And then if your
11  symptoms are gone, you can come back.  No
12  fever.  I think at the time it was no fever
13  for three days, not on fever-lowering
14  medicines, and the symptoms gone by then.
15  There may have been more that I don't
16  recall.
17        Q.  To whom did those isolation
18  requirements apply at Doylestown Health?
19        A.  Anyone who worked at Doylestown.
20        Q.  Anybody who contracted COVID-19?
21        A.  Yes.
22        Q.  Do you know who developed the
23  isolation requirements that you just
24  described?

Page 100

1        A.  I don't know.
2        Q.  Do you believe that you should
3  have had to follow those isolation
4  requirements?
5            MS. RUSSELL:  Objection.
6            THE WITNESS:  Very much so.
7        Good patient care.  We care about
8        the patient.
9  BY MR. DURHAM:
10        Q.  At the time, did you believe
11  those isolation requirements to be
12  scientifically and medically sound?
13            MS. RUSSELL:  Objection.
14            You can answer.
15            THE WITNESS:  I -- I -- I can't
16        speak to the -- is five days the
17        right number, or 10 days or 14 days.
18        But the general idea of them, yes, I
19        believed to be sound.
20  BY MR. DURHAM:
21        Q.  Before your COVID infection in
22  May of 2021, what was your typical work
23  schedule during the COVID-19 pandemic?
24        A.  Initially, we, as a hospital,

Page 101

1  canceled all elective surgery and only would
2  operate on patients if they were in with a
3  heart attack and couldn't wait.  So the
4  schedule was significantly lighter than it
5  had been prior.  The surgery schedule was
6  significantly lighter than it had been
7  prior.
8        Q.  Did -- when did Doylestown
9  Health resume -- or Doylestown Hospital
10  resume elective cardiac procedures?
11        A.  Based on the e-mail from Levy on
12  -- I don't recall the date -- we tried to
13  resume it in early-'21.  COVID pandemic hit
14  March of '20.  We tried to get elective
15  surgery resumed Christmas or early of '21.
16        Q.  Christmas of 2020?
17        A.  2020 or -- yeah.
18        Q.  You say you tried to go back --
19        A.  We had discussion at Medical
20  Exec.  How long are we going to keep this
21  where it's no elective cases?  Can we bring
22  back elective cases on a staggered basis?
23  What -- what are the issues around sicker
24  patients versus not?  Sicker patients --

26 (Pages 98 - 101)

JOSEPH S. AUTERI, MD

1    BY MR. DURHAM:
2        Q.   Did you make any disparaging
3    statement regarding Dr. Fauci in the past?
4            MS. RUSSELL:  Objection.  You
5        can answer, if you have one.
6            THE WITNESS:  I believe at one,
7        I made a statement -- I'm not sure
8        where it might be -- that my immune
9        system is designed by God, and,
10       therefore, better than anything
11       Fauci can cock up in a lab.
12           I believe I made that statement.
13       I know I've made that statement in
14       the past.  I don't know exactly
15       when.
16   BY MR. DURHAM:
17       Q.   What -- what was Fauci cooking
18   in a lab?  What were you referring to, when
19   you made that statement?
20           MS. RUSSELL:  Objection.  You
21       answer.
22           THE WITNESS:  I'm referring to
23       God-given natural immunity, which I
24       believe is the best immunity; and

1        vaccines created in a lab to try to
2        be as good as, or better, than God-
3        given immunity.
4    BY MR. DURHAM:
5        Q.   So when you made the statement
6    that -- about Dr. Fauci cooking something up
7    in a lab, you were referring to vaccines?
8            MS. RUSSELL:  Objection.
9        You can answer.
10           THE WITNESS:  Yeah.
11   BY MR. DURHAM:
12       Q.   Any specific vaccines you were
13   referring to?
14       A.   mRNA COVID vaccine.
15       Q.   To your knowledge, was Dr. Fauci
16   involved in the development of mRNA COVID
17   vaccines?
18           MS. RUSSELL:  Objection.
19       You can answer.
20           THE WITNESS:  I believe he
21       headed up the agency that oversaw
22       development of vaccines.  So as the
23       head of that, I suspect he was.
24   BY MR. DURHAM:

1        Q.   What do you understand to be
2    Dr. Fauci's involvement in developing the
3    mRNA vaccines for COVID?
4            MS. RUSSELL:  Objection.  Okay.
5        You can answer.
6            THE WITNESS:  Dr. Fauci was the
7        head of the agency that oversaw
8        development of vaccines.  So I'm not
9        sure what his contract looks like in
10       terms of, here are your
11       responsibilities.
12           In know when I was the head of,
13       and I had responsibilities laid out
14       in my contract, I suspect he did,
15       too.  But I don't know.
16   BY MR. DURHAM:
17       Q.   So you don't know what Dr.
18   Fauci's role was in the development of the
19   mRNA COVID-19 vaccines?
20           MS. RUSSELL:  Objection.
21   BY MR. DURHAM:
22       Q.   Do I understand that correctly?
23           MS. RUSSELL:  Objection.
24           THE WITNESS:  I don't think you

1        understand that correctly.  I think
2        what I'm saying is, he is the head
3        of the agency that oversaw the
4        development of COVID-19
5        vaccinations.
6    BY MR. DURHAM:
7        Q.   So other than being the head of
8    the agency that oversaw the development of
9    the COVID-19 vaccines, you don't have any
10   knowledge as to Dr. Fauci's involvement in
11   the development of the mRNA COVID-19
12   vaccine?
13       A.   Other than being the head of the
14   agency, no, I don't have any knowledge of
15   that.
16       Q.   We've -- each of us have said
17   the word "vaccine" many times today.
18           Please look at Paragraph 24 of --
19       A.   7?
20       Q.   Yeah, of Auteri-7, the Second
21   Amended Complaint.  It says:  The COVID-19
22   vaccines.
23           And the word "vaccines" is in
24   quotation marks.  Why is the word "vaccines"

JOSEPH S. AUTERI, MD

1    A.  I'd have to see it before I'd
2  say yes or no.  If you have a statement, I'd
3  like to see it.
4    Q.  I'm just asking you a question.
5    A.  I was concerned that -- that
6  revenue and profit might be altering how we
7  view the data.  Let me put it that way.
8    Q.  Have you ever made a statement
9  that you believe that the pharmaceutical
10  companies involved in developing the
11  COVID-19 vaccines were engaged in fraud, in
12  connection with the COVID-19 vaccines?
13        MS. RUSSELL:  Objection.  Asked
14    and answered.
15        You can answer again, if you
16    have one.
17        THE WITNESS:  I may have.  I
18    don't recall.
19  BY MR. DURHAM:
20    Q.  In Paragraph 26 of the Second
21  Amended Complaint, so A-7 -- Auteri-7, sorry
22  -- it says that you studied the data
23  regarding the efficacy of the COVID-19
24  vaccines, and side effects thereof, as well

1  as statistics surrounding the duration and
2  efficacy of those who had natural immunity
3  from a prior COVID-19 infection.
4        Did I read that correctly?
5    A.  You summarized it, but, yes,
6  pretty accurate.
7    Q.  How did I misread it?
8    A.  You didn't.  You just skimmed
9  over a whole bunch.
10    Q.  What data did you study
11  regarding the efficacy of the COVID-19
12  vaccines and the side effects, thereof?
13    A.  I believe I produced that data
14  in one of the -- I don't know if it was an
15  Interrogatory, or one of the documents that
16  we reviewed over this.
17    Q.  Other than the documents you've
18  produced in this case to date, did you study
19  any data regarding the efficacy of the
20  COVID-19 vaccines and the side effects,
21  thereof?
22    A.  There was a lot of data that was
23  coming out from the very beginning of COVID,
24  from other countries, the data from Israel,

1  the United Kingdom, and Australia.  Based on
2  them being an island country, or -- or group
3  of countries, allowed them to have very --
4  more precise data because they had a
5  captured population, if you will.  And some
6  of that data suggested that there were
7  issues with side effects from the COVID-19
8  shots.  The myocarditis was a clear, early
9  one.  Guillain-Barre was another early one.
10        And, so, yes, I did review data,
11  as was my role as a member in the Medical
12  Executive Committee to do that.  They were
13  paying me to do that.  That was part of my
14  job.
15    Q.  And you mentioned like
16  myocarditis and Guillain -- Guillain --
17  Guillain-Barre, Guillain-Barre, however you
18  say it.  I apologize.  But I'm asking about
19  the efficacy of the COVID-19 vaccines.
20    A.  There was --
21        MS. RUSSELL:  Objection.
22        THE WITNESS:  Sorry.
23  BY MR. DURHAM:
24    Q.  So have you -- other than the

1  documents that you've produced in this
2  litigation to date, did you study any data
3  regarding the efficacy of the COVID-19
4  vaccines?
5        MS. RUSSELL:  Objection.
6        You can answer.
7        THE WITNESS:  Yes.  There was
8    lots of data coming out saying the
9    -- the vaxed population had no less
10    of a rate of infection post-vax than
11    the unvaxed population.
12        Those data were coming out
13    sometimes by state, within the
14    United States; other times by
15    country, elsewhere.  And, yes, I
16    looked at that as well, in my role
17    as member of the Medical Executive
18    Committee.
19  BY MR. DURHAM:
20    Q.  And so just -- you just
21  referenced state-level data regarding
22  infection rates and vaccinated -- COVID-19
23  infection rates and vaccinated versus
24  unvaccinated people.

30 (Pages 114 - 117)

JOSEPH S. AUTERI, MD

Page 126

1    data published by the CDC, do you believe
2    that the CDC published misleading data
3    relating to COVID-19 or the COVID-19
4    vaccines?
5        MS. RUSSELL:  Objection.
6        You can answer.
7        THE WITNESS:  I don't know that
8    "misleading" is the right word,
9    because they didn't publish it.  But
10   we, as physicians, who are, again,
11   on MEC, or in a position to help
12   guide policy, were dying for who's
13   vaxed and who's not, in those death
14   rates or infection rates.  We were
15   trying to get that from our own
16   hospital.  We were trying to get
17   that from the federal government.
18   We couldn't get that data.
19       Is that misleading?  Yes, I
20   believe.
21       Is it they published misleading
22   data?  No, to answer your question,
23   because they didn't publish it.  But
24   that's the data a good investigator

Page 127

1    wants.  Is this causing trouble?  Is
2    this killing people?  No, that guy
3    got hit by a bus.  Why are we
4    putting him on that list?
5        So the practice is misleading.
6    But you asked me is the data
7    misleading.  No, because we never
8    could get that data.  We couldn't
9    get it from our own hospital.  We
10   couldn't get it from the CDC.
11   BY MR. DURHAM:
12       Q.  Did the CDC withhold data that
13   you believe would have contradicted the data
14   that the CDC published?
15       MS. RUSSELL:  Objection.
16       You can answer.
17       THE WITNESS:  I think any
18   investigator that wants to find out
19   cause and effect which say all the
20   ones that died had vaxed or didn't
21   have vax; all the ones that didn't
22   die had vax or didn't have vax.
23   That's important data to look at to
24   determine is this a good idea or

Page 128

1    not.
2        And we couldn't see that data.
3        Did they intentionally do it?  I'll
4    let you speak to that.  I can't
5    speak to that.
6    BY MR. DURHAM:
7        Q.  So the data that the CDC
8    withheld, do you know what that data would
9    have showed?
10       A.  No.
11       MS. RUSSELL:  Objection.
12   BY MR. DURHAM:
13       Q.  Dr. Auteri, please turn to the
14   next page.  Page 6 of Auteri-7, Paragraph 27
15   of the Second Amended Complaint.
16       Paragraph 27 references a
17   leading immunologist.  Who was, or who is
18   leading immunologist referenced in Paragraph
19   27?
20       A.  I don't recall, as I sit here
21   today.
22       Q.  Paragraph 27 of the Second
23   Amended Complaint states that the leading
24   immunologist warned FDA regulators about the

Page 129

1    potential danger from COVID-19 vaccination
2    to the health of persons with SARS-CoV-2
3    antigens in their system.
4        What was the potential danger of
5    which this immunologist warned?
6        MS. RUSSELL:  Objection.
7        You can answer.
8        THE WITNESS:  I think it's in
9    the next line:  The antigens in
10   their system, due in part to the
11   antigen-specific immune response
12   triggered by the vaccine, and
13   targeting of tissues which were
14   damaged from prior COVID-19
15   infections.
16       And this leading immunologist
17   urged the FDA to delay COVID
18   vaccination in those like myself,
19   who had previous COVID infection, by
20   using antibody screening.
21   BY MR. DURHAM:
22       Q.  I don't think it says what the
23   danger is.  It says "danger."  And then it
24   says what it's due to.  Due in part to the

33 (Pages 126 - 129)

JOSEPH S. AUTERI, MD

Page 130

1  antigen-specific immune response triggered
2  by the vaccine, and the vaccine's targeting
3  of tissues which were damaged from prior or
4  current COVID-19 infection.
5        My question to you is:  What was
6  the potential danger?
7        MS. RUSSELL:  Objection.
8        THE WITNESS:  I think the
9     potential danger is the vaccination
10    could -- could interact with my own,
11    or anyone who's had the infection's
12    immune system for a potentially
13    negative outcome, either rev up the
14    immune system, or cause an
15    autoimmune response like
16    Guillain-Barre, or pericarditis,
17    like myocarditis.
18 BY MR. DURHAM:
19    Q.  So this was a concern not
20 limited to you.  It's a concern about that
21 the COVID-19 vaccines could have a harmful
22 effect on anyone who had previously had a
23 COVID-19 infection?
24        MS. RUSSELL:  Objection.

Page 131

1        You can answer.
2        THE WITNESS:  I think all of
3     these recent questions have to do
4     with my role on the Medical
5     Executive Committee, and whether I
6     would, if it ever came to a vote --
7     it never did -- whether I would
8     recommend mandating that all our
9     staff get it, that all our patients
10    get it; whatever.
11       It was an assessment in that
12    role that really has nothing to do
13    with why we're here today.  My case
14    is about religious exemption, and
15    why it was unlawfully denied.
16       MR. DURHAM:  Well, I --
17       THE WITNESS:  These -- let me
18    finish.
19       MR. DURHAM:  Sure.
20       THE WITNESS:  These concerns
21    have to do with, okay, guys, we're
22    sitting in a room.  We're about to
23    say, should we make everybody get
24    this or they're fired?  Should we

Page 132

1        make all our patients get it or
2     we're not going to operate on them?
3     Keep them out of the ER if you're
4     unvaxed?  Should we make all our
5     staff get it?
6        In that role on Medical Exec,
7     these were all considered.
8  BY MR. DURHAM:
9     Q.  Well, I appreciate you telling
10 me what these questions are about.  But my
11 job is to ask questions today, and your job
12 is to answer the questions that I ask; not
13 the questions you think I'm asking.
14       And, again, you'll get an
15 opportunity, if your attorney wants to ask
16 you questions at the end of the deposition,
17 to say whatever you want to say.
18       So, again, I will ask you:  With
19 respect to Paragraph 27 in the Second
20 Amended Complaint, the potential danger
21 referenced, that is a danger that applied to
22 both yourself, as well as to other
23 individuals who had had a prior COVID-19
24 infection, correct?

Page 133

1     A.  Correct.
2        MS. RUSSELL:  Objection.
3        THE WITNESS:  Correct.  Sorry.
4        MS. RUSSELL:  It's okay.
5  BY MR. DURHAM:
6     Q.  Dr. Auteri, Paragraph 28 and 29
7  in the Second Amended Complaint, could you
8  read those paragraphs, please.
9     A.  Paragraph 28:  On July 30, 2021,
10 the Director of the CDC admitted in an
11 official statement that persons vaccinated
12 for COVID-19 could transmit the virus and
13 had viral loads similar -- similar to those
14 of unvaccinated persons.
15       And then there's a link to that
16 release from the CDC.
17       Paragraph 29:  By August of
18 2021, the CDC published data on its website
19 showing that the COVID-19 viral load was
20 essentially the same in the vaccinated and
21 unvaccinated, and the CDC Director admitted
22 that both vaccinated and unvaccinated
23 persons could transmit the COVID-19 virus.
24       Again, there's two references to

34 (Pages 130 - 133)

JOSEPH S. AUTERI, MD

Page 134

1  CDC releases.
2      Q.  Do either Paragraph 28 or
3  Paragraph 29, or the citations to the CDC's
4  statement or data, address the effect of
5  COVID-19 vaccines on the likelihood of a
6  person to contract a COVID-19 infection in
7  the first place?
8      MS. RUSSELL:  Objection.
9      You can answer.
10      THE WITNESS:  The likelihood --
11  I'm sorry.  The likelihood of what?
12  Just pick up from there.  You don't
13  have to say the first part.
14      MR. DURHAM:  The likelihood of
15  contracting the COVID-19 virus in
16  the first place.
17      THE WITNESS:  Vax versus unvax,
18  you mean?
19      MR. DURHAM:  Correct.
20      THE WITNESS:  The answer is, I
21  don't know.  I'd have to go back and
22  look at the releases.
23  BY MR. DURHAM:
24      Q.  Do your allegations in Paragraph

Page 135

1  28 or 29 make any reference to the CDC
2  guidance or statements relating to the
3  likelihood of vax versus unvax contracting
4  COVID-19?
5      MS. RUSSELL:  Objection.
6      You can answer.
7      THE WITNESS:  I -- I think in
8  Paragraph 28, the revelation for
9  everyone looking was that CDC came
10  out and said vaxed patients could
11  transmit the virus.  And that was a
12  game changer for all of us; all of
13  us at the hospital, all of us
14  nationally, all of us
15  internationally.  That was a game
16  changer.  When the CDC, which up
17  until that point had said, no, you
18  can't -- if you're vaxed, you can't
19  give somebody else COVID, they came
20  out and said no, we were wrong,
21  essentially.
22      I don't want to quote them.
23  But, no, we were wrong.  You can get
24  it.  You can transmit it, though

Page 136

1  you're vaxed.
2      To me, that was a massive game
3  changer.  That suddenly changed.
4      And I will get back to what
5  we're here -- what we're supposed to
6  talk about.
7      MR. DURHAM:  You'll get back to
8  my question eventually.
9      THE WITNESS:  I answered your
10  question.
11  BY MR. DURHAM:
12      Q.  No.  My question was:  In either
13  Paragraph 28 or 29 of the Second Amended
14  Complaint, do those allegation relate -- do
15  those allegations address the likelihood of
16  a person who's vaccinated with a COVID-19
17  vaccine, versus a person unvaccinated with a
18  COVID-19 vaccine, contracting COVID-19 in
19  the first place?
20      MS. RUSSELL:  Objection.  Asked
21  and answered.
22      You can answer again.
23      THE WITNESS:  The answer is:  I
24  don't know.  I'd have to pull out

Page 137

1  those releases to see if they spoke
2  of that.  I will say, at the time,
3  there was lots of data saying that
4  you can still get COVID-19, even if
5  you're vaxed.
6  BY MR. DURHAM:
7      Q.  Does the allegation in Paragraph
8  28 of the Second Amended Complaint address
9  the likelihood of a vaxed person, unvaxed
10  person contracting COVID-19 in the first
11  place?
12      A.  I don't know.  I'd have to read
13  that release to see if it addressed it.
14      Q.  I'm not asking you to read the
15  release.  I'm asking you to read the
16  Complaint.  Paragraph 28.
17      A.  On July 21 --
18      MS. RUSSELL:  Objection.
19      You can go ahead.
20      THE WITNESS:  -- the Director of
21  the CDC admitted in an official
22  statement that persons vaccinated
23  for COVID-19 could transmit the
24  virus, and had viral loads similar

35 (Pages 134 - 137)

JOSEPH S. AUTERI, MD

Page 138

1     to those of unvaccinated persons.
2  BY MR. DURHAM:
3     Q.   Does that address the likelihood
4  of vaxed versus unvaxed becoming infected
5  for COVID-19 in the first place?
6     A.  I think it implies --
7        MS. RUSSELL: Objection. Asked
8     and answered. Go ahead.
9        THE WITNESS: I think it implies
10    if their viral loads are similar,
11    then it does address that.
12 BY MR. DURHAM:
13    Q.   So your understanding is that
14 the viral load of a person who already has
15 COVID-19?
16    A.   What do you mean "already has
17 COVID-19"?
18    Q.   Well, if you have a viral -- you
19 have -- you have to have COVID-19 to have a
20 viral load; is that correct?
21    A.   Yeah.  I think we're getting far
22 afield from one that -- what that says.
23       So I -- I --
24    Q.   So -- so -- so is the answer no?

Page 139

1     A.  No, what?
2     Q.  It does not address the
3  likelihood of a person, vaxed versus
4  unvaxed, contracting COVID-19 in the first
5  place. Not transmitting.  Contracting.
6        MS. RUSSELL: Objection.
7        You can answer.
8        THE WITNESS: Yeah. I don't
9     know if it says that or not. I
10    think it's too much of a leap to say
11    it says that.
12 BY MR. DURHAM:
13    Q.  You don't know --
14    A.  I think you're try --
15    Q.   -- those words that -- that are
16 here?  You don't know what they say?
17       MS. RUSSELL: Objection.
18       You can answer.
19       THE WITNESS: I know what they
20    say. I don't think they address the
21    question you're asking.
22       So I can't answer the question
23    you're asking.
24 BY MR. DURHAM:

Page 140

1     Q.   What specific concerns did you
2  have relating to the safety of the COVID-19
3  vaccines that you -- let me rephrase that.
4        What concerns, relating to the
5  safety of the COVID-19 vaccines, did you
6  share with the Medical Executive Committee?
7        MS. RUSSELL: Objection.
8        You can answer.
9        THE WITNESS: I was concerned
10    about the early reports of
11    pericarditis and myocarditis, and I
12    shared that.
13       I was concerned about the early
14    reports of Guillain-Barre and other
15    immunologic disorders.  And there
16    were other smaller -- smaller in
17    number complications that were
18    leaking out of -- whether it was
19    Israel or UK or -- or others, saying
20    that this was not the safe and
21    effective -- you know, a hundred
22    percent safe.  And it's not -- it
23    wasn't that.  I was concerned about
24    pregnant women.

Page 141

1        We sat at a meeting of the
2  Medical Staff.  And the leader at
3  the time -- the president of Medical
4  Staff was Brenda Foley.  She's an ER
5  doc.
6        And the pregnant -- I believe
7  she was a nurse -- a pregnant nurse
8  raised the question.  She was
9  clearly pregnant.  She stands up,
10 take -- they hand her the
11 microphone, and she says, I'm seven
12 months pregnant.  Your arbitrary
13 deadline for such and such -- and
14 I'm paraphrasing -- your arbitrary
15 deadline to get the mandate would
16 make me get the mandate in my third
17 trimester.  Can I wait two more
18 weeks, deliver the baby, and then
19 get the vax?
20       They handed the microphone to
21 Brenda Foley.  And Brenda Foley
22 said: It's been shown to be safe in
23 pregnant women, including third
24 trimester.

36 (Pages 138 - 141)

JOSEPH S. AUTERI, MD

Page 150

1    Q.   Were there any other safety
2  measures you thought Doylestown Health
3  should consider?
4    A.   As I said on the last question,
5  not that I recall sitting here.  There may
6  be one or two others, but not that I recall.
7    Q.   When did you share your -- I
8  believe, earlier, you testified that you
9  shared your concerns about the safety of the
10  COVID-19 vaccines with the Medical Executive
11  Committee.
12      Right?
13    A.   I did.
14    Q.   When did you share your concerns
15  about the COVID-19 vaccine with the Medical
16  Executive Committee?
17    A.   Mostly through the summer of
18  2021, and into the fall, when the topic of
19  mandated vax for all employees came up.  I
20  wouldn't limit myself to that, but that's
21  when the topic became a topic of -- an
22  agenda item on the MEC.
23    Q.   Do you recall a June 15th, 2021
24  MEC committee meeting?

Page 151

1    A.   I recall a number of meetings
2  through that summer.  I don't know
3  necessarily which one was the June one, the
4  July one, or the August one.
5    Q.   Do you recall attending a June
6  2021 Medical Executive Committee meeting?
7    A.   I recall a number of meetings
8  that I attended in the summer of 2021.  I
9  can't tell you if they're June or July or
10  August.
11        - - -
12    (Auteri-8 marked for identification.)
13        - - -
14  BY MR. DURHAM:
15    Q.   Dr. Auteri, the court reporter
16  has placed in front of you a document that's
17  been marked as Exhibit Auteri-8, beginning
18  Bates number of D-94.  Please take a minute
19  to review it.  Let me know when you've had a
20  chance to do so.
21      I'm -- just so you don't have to
22  spend time reviewing the whole thing, I'm
23  not going to ask you about anything other
24  than the attendees of the meeting, as listed

Page 152

1  on D-96 --
2    A.   I see that.
3    Q.   -- and the Chief Medical Officer
4  Report on D-98, going to D-99.
5    A.   Okay.
6    Q.   I'm going to represent to you,
7  Dr. Auteri, that this is an e-mail from
8  Elinor Pernitsky to herself, with two
9  attachments.  One is a roster of the Medical
10  Executive Committee, and then the second are
11  minutes from the June 15th, 2021 meeting of
12  the Medical Executive Committee.
13      On D-96 it states that the
14  meeting took place at 6 p.m. in the
15  Chairman's boardroom; lists the individuals
16  present, including yourself.
17      Does this reflect -- refresh
18  your recollection as to whether you attended
19  a June 15, 2021 Medical Executive Committee
20  meeting?
21    A.   It doesn't refresh -- refresh my
22  recollection.  But the fact that I'm listed
23  there, I have no reason to believe that I
24  wasn't there.

Page 153

1    Q.   Do you recall a discussion of
2  the COVID-19 vaccine at this Medical
3  Executive Committee meeting on June 15th,
4  2021?
5    A.   As I sit here today, I do not
6  recall that meeting.
7    Q.   On the page Bates-labeled D-98,
8  there's a COVID update provided within the
9  Chief Medical Officer Report.
10      Do you recall Dr. Levy
11  presenting a report along the lines of what
12  is written on the Page D-98 where it says
13  COVID update?
14    A.   As I sit here today, I don't
15  recall him presenting that report.  I got no
16  reason to believe he didn't, though, given
17  that these are the minutes of that.
18    Q.   Just to be clear, do you recall
19  any discussion of the COVID-19 vaccines, or
20  any medical or scientific data related to
21  same, at the June 2021 Medical Executive
22  Committee meeting?
23    A.   I recall lots of discussion
24  about it.  I can't decipher which one was

39 (Pages 150 - 153)

JOSEPH S. AUTERI, MD

Page 154

1  June, which one was July, and which one was
2  August, or even May or April.  I can't
3  recall that.  I don't recall that.
4      Q.   Then why don't you just
5  generally sort of describe to me the
6  discussion of the COVID-19 vaccine that took
7  place at the Medical Executive Committee's
8  meetings in June, July and August of 2021.
9      A.   The one I do recall had Jim
10  Brexler at the head of the table, on Zoom,
11  on a big screen in the conference room.  And
12  the rest of us, including Levy, sitting
13  around the table, if I remember correctly,
14  or if I recall correctly, where Jim
15  Brexler -- when we were having a discussion
16  of it's efficacy and it's safety, and a
17  number of opinions were thrown around.  And
18  I expressed the opinion, and said, I'm not
19  so sure it's as safe as we're telling
20  people, based on the data I was looking at,
21  the data coming out of Israel, UK, and
22  Australia, among others.  I'm not so sure
23  it's as safe as -- as we're telling people.
24  And, therefore, I'm not so sure that we

Page 155

1  should make a mandate.
2          And, specifically, I recall, and
3  it doesn't -- I didn't really look.  It
4  might be on this one.  It might be on the
5  next one, if you have the next one.  We had
6  a discussion about how many nurses we were
7  down, were without, because of the ongoing
8  pandemic.
9          And if I recall, it was 150 or
10  200 nurses were down, that -- that either
11  were tired at the pandemic, or went
12  elsewhere, or something.  But we were down a
13  very large number of nurses.
14          And the conversation included,
15  we're improving, because we're not down as
16  many as we were last quarter; whatever.  But
17  we were still down, a hundred down, you
18  know, from 160, or whatever.
19          And it struck me that the next
20  conversation was a conversation about a
21  COVID vaccine mandate that then could
22  potentially put us down further.  We're
23  working our tails off.  We spent many
24  minutes at the meeting discussing how do we

Page 156

1  entice them back?  How do we get nurses that
2  quit to come back?  How do we give bonuses
3  and advance their salaries; whatever we had
4  to do to get more nurses.
5          And then, okay, thanks.  We'll
6  take that under advisement.  Let's go to the
7  next topic.
8          And the next topic is COVID
9  mandate.  And I recall saying, we just
10  finished talking about we're down a hundred
11  nurses.  And we really want to do a COVID
12  mandate that potentially could put us down
13  another 20, another 50, another 500?  I
14  don't know.  Are we sure we want to have
15  people fired over not taking the vax?
16          And I distinctly remember Jim
17  Brexler coming in on Zoom from wherever he
18  was, saying, forcefully, we're not talking
19  about firing anybody.  Nobody is going to
20  get fired over this.
21          And a month later, or two months
22  later, again, depending if it was the July
23  or August meeting, two months later the
24  e-mail surprisingly appeared to everybody at

Page 157

1  the hospital that said, take the vax or you
2  get fired.  And it was a complete 180 from
3  what he had just said in the Medical
4  Executive Committee meeting; what he said
5  loudly and clearly in the Medical Executive
6  Committee.
7          And that struck me as a bad
8  decision.
9      Q.   What else do you recall about
10  the discussion of the COVID-19 vaccine, or
11  the vaccine mandate, at the Medical
12  Executive Committee meetings in the summer
13  of 2021?
14      A.   I distinctly recall -- it might
15  have been at the exact same meeting.  In
16  fact, I suspect it was.  But it might not
17  have been.
18          I distinctly recall Scott Levy
19  calling me out in front of 15 of my good
20  friends and colleagues, who I respect, and
21  who, hopefully, respected me.  Calling me
22  out and saying, your data is wrong.  That's
23  all not the right data.  This is the right
24  data.

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

JOSEPH S. AUTERI, MD

Page 170

1    Q.  I'd say review the top -- time,
2  place, attendance, date -- on D-101.  And
3  then the Chief Medical Officer Report,
4  beginning on -- the portion of the Chief
5  Medical Officer Report on D-104,
6  specifically with the heading COVID Update.
7    A.  Okay.
8    Q.  Dr. Auteri, does A-9 refresh
9  your recollection as to whether there was a
10 Medical Executive Committee meeting on July
11 20 of 2021 that you attended?
12   A.  I -- yes.  I attended, based on
13 this, July 2021.  I didn't know it was the
14 date July, but -- dated July 20, but, yes.
15   Q.  And on D-104, under the heading
16 COVID Update, can you read the second
17 paragraph, beginning with Proposed.
18   A.  It was proposed that at such
19 time the FDA grants full FDA approval (as
20 opposed to EUA), the Executive Committee
21 endorsed requiring vaccination for the
22 medical staff and all hospital associates,
23 except for those with approved medical or
24 religious exemption.  The MEC proposal is

Page 171

1  based on the safety, efficacy and value of
2  this vaccine; the implementation and
3  enforcement for associates beyond the
4  purview of the Committee.  The Executive
5  Committee voted to endorse vaccination, as
6  outlined with one dissent -- misspelled --
7  notes.
8    Q.  Dr. Auteri, does this re -- do
9  you recall now such a proposal, as you just
10 read, being made at the July 20th, 2021
11 Medical Executive Committee meeting?
12   A.  I recall a proposal made.  I
13 can't tell you that it was July 20th, but
14 this seems to indicate it was.  So I'm fine
15 with that.  So, yes, I recall it being made.
16   Q.  And do you recall a vote to
17 endorse vaccination, as set forth in this
18 proposal?
19   A.  I do.
20   Q.  And this says "one dissent noted."
21 Were you that dissent?
22   A.  Very much so.
23   Q.  Did everyone else vote to
24 endorse this proposal?  Everyone else on the

Page 172

1  Medical Executive Committee?
2    MS. RUSSELL:  Objection.
3    You can answer.
4    THE WITNESS:  I can't answer
5  "everyone."  It says the Executive
6  Committee voted to endorse it, as
7  outlined, with one dissent.
8    I can tell you I was --
9  BY MR. DURHAM:
10   Q.  The one dissent?
11   A.  Was it eight, 10, 15?  I don't
12 know how -- that voted for.  I don't know.
13   MR. DURHAM:  Let's go off the
14 record.  We can break for lunch.
15   I actually drank too much water,
16 in any event, so now is a good time
17 to --
18   THE VIDEOGRAPHER:  The time is
19 12:41.  We are going off the video
20 record.
21   This ends media unit number two.
22      - - -
23   (Lunch recess taken.)
24      - - -

Page 173

1    THE VIDEOGRAPHER:  The time is
2  1:27 p.m.  We're back on the video
3  record.  This begins media unit
4  number three --
5  BY MR. DURHAM:
6    Q.  Great.  Dr. Auteri, welcome
7  back.
8    Do you recall the instructions
9  that I gave you at the beginning of the
10 deposition?
11   A.  Yes, I do.
12   Q.  Thank you.
13   Before we broke, you testified
14 to a vote that took place at the July 20th,
15 2021 Medical Executive Committee meeting.
16   Do you recall whether the
17 COVID-19 vaccine mandate for Doylestown
18 Health was subsequently adopted by the
19 Medical Executive Committee, via e-mail?
20   MS. RUSSELL:  Objection.
21   You can answer.
22   THE WITNESS:  It was adopted.
23   That's why I got terminated.
24 BY MR. DURHAM:

44 (Pages 170 - 173)

JOSEPH S. AUTERI, MD

Page 190

1  guy.  I may believe you.
2        Never.  Never had a conversation
3  like that.  "Shut up.  You don't know what
4  you're talking about.  These data are fact."
5        Okay.  What am I going to do,
6  bang my head against the wall?  Fine.  You
7  don't believe me?  You don't want to do it?
8  Okay.
9        By the way, then we had a mandate
10 and we lost 76 nurses.  And then you're
11 crying you don't have any nurses.  I told
12 you this was coming.
13       And by the way, you said we're
14 not firing everybody over this.
15       She didn't write that in the
16 minutes.  I don't know if it was this one.
17 Maybe it was the August one.  I think it was
18 the August one.  She didn't write Brexler
19 states we're not firing anybody over this.
20       And then two -- a few weeks
21 later we all get an e-mail that says it's
22 mandated and we're firing a bunch of people.
23       If you don't want to listen to
24 me -- I'm there at your pleasure.  I'm there

Page 191

1  to advise you, because you're asking me to
2  advise you.  If you don't want to listen to
3  me -- I'm not sure why you want me there
4  anymore, if you're not going to listen to
5  me.  That's okay.  That's your prerogative.
6  You're the CEO of the hospital.  You're the
7  CMO of the hospital.  You do what you think
8  appropriate.  I got to do what you're paying
9  me to do.  Give me your advice.  What do you
10 think?
11       I did.  Got shouted at.  Harassed.
12 Bullied.  Whatever you want to call it.
13 Very embarrassing.  I walked out, tail
14 between my legs.  I guarantee if there was
15 anybody else who felt like I did, they
16 weren't going to say anything.  They'll walk
17 out.  Shut up.  Yeah, I'll vote for it.  I'm
18 not getting thrown off the committee or
19 fired, or any of it.  Okay.
20    Q.  Dr. Auteri, can you please take
21 a look at Paragraph 36 of the Second Amended
22 Complaint, Exhibit Auteri-7, Page 7.
23    A.  36?
24    Q.  Yes, Paragraph 36.

Page 192

1    A.  Okay.
2    Q.  Would you read Paragraph 36,
3  please.
4    A.  36:  After Dr. Auteri voiced his
5  concerns about the vaccines following his
6  study of the vaccines, Dr. Levy began to
7  harass Dr. Auteri about the vaccines, and
8  Dr. Auteri's continued efforts to study the
9  vaccines as a clinician and to protect the
10 health of Doylestown Health's employees and
11 patients.
12    Q.  Can you also read Paragraph 37,
13 please.
14    A.  37:  On multiple occasions, Dr.
15 Auteri screamed at Dr. -- pardon me -- Dr.
16 Levy screamed at Dr. Auteri in front of
17 staff members, and refused to review data
18 with Auteri -- with Dr. Auteri in order to
19 evaluate Doylestown Hospital's policies
20 related to a possible mandate.
21    Q.  You've already testified to the
22 Medical Executive Committee meeting where
23 Dr. -- you say that Dr. Levy shouted you
24 down.

Page 193

1        Please tell me about the other
2  times that Dr. Levy harassed you about the
3  vaccines, and your efforts to study the
4  vaccine, including screaming at you in front
5  of staff members, and refusing to review
6  data with you.
7    A.  Off the top of my head, I don't
8  recall the date of the meeting.  But Dr.
9  Levy was soon to be leaving for a trip, I
10 believe, to Greece; a two-week trip.  He
11 texted me:  Can we meet?
12       And he recognized my concern
13 about losing my career if I had one of the
14 known complications, known by that time --
15 complications of the vaccine, namely, the
16 one we discussed most, was Guillain-Barre,
17 which is an autoimmune disease against one's
18 own nerve cells, which produces dystonia,
19 which produces -- your arm doesn't work,
20 your leg doesn't work; whatever.
21       And as a cardiac surgeon, I need
22 to have exceptional manual dexterity.  And
23 if I even got a hint of Guillain-Barre, that
24 would ruin my career.

49 (Pages 190 - 193)

JOSEPH S. AUTERI, MD

Page 194

1      He wanted -- he desperately
2  wanted me to take the vaccine.  Brexler also
3  wanted me to take the vaccine, desperately.
4  Brexler called me in -- well, let me take it
5  in a time-wise fashion.
6      Q.   And if I could -- I'm sorry to
7  interrupt you.  If we can just stick to Levy
8  for a minute.  And I'll certainly --
9      A.   That's what I said.  That's what
10  I said.
11      Q.   Then we can get to Brexler.
12  Yeah.
13      A.   Levy texted me while I was in
14  the OR one morning.  It turned out it was
15  the day he was about to get on a plane to go
16  to -- again, I think, Greece.  He was going
17  out of town for two weeks.  He texted me
18  while I was in the OR.
19      I get out of the OR, typically,
20  after coronary bypass, 11, 11:30.  I look at
21  my phone.  And it's:  Can we meet?  I'm
22  getting on a plane this afternoon.
23      By the way, I think that's in
24  here.  The texts -- I think you have the

Page 195

1  texts of Levy, so I don't have to guess as
2  to what time or what day it was.  If you
3  want to produce those, I'm happy to go off
4  of that.  If you don't, I'll go off of what
5  I recall.
6      He texted me.  He said:  Can we
7  meet?
8      I said yes.
9      He said, let's meet in a Med
10  Staff office.  Which was, at the time, the
11  -- the -- the head of Med Staff was Elinor
12  Pernitsky, who was on -- who's in these
13  papers.
14      We met.  There's a -- there's an
15  office with two secretary desks, two
16  assistant desks.  And Elinor Pernitsky's
17  office is behind that.  You got to go past
18  that to get to her office.  And behind this,
19  there was another office that was empty with
20  a bunch of desks and chairs piled up being
21  used as storage.
22      He texted me:  Can we meet?
23      I said:  Sure.  Finishing up.
24  Let me go talk to family.  And then I'll go

Page 196

1  meet.
2      He said, let's meet in the Med
3  Staff office.
4      I show up in the Med Staff
5  office soon thereafter.  And he says, let's
6  go back into the office.
7      And I distinctly remember it,
8  because all the desks were piled upside
9  down.  It was a storage room, essentially,
10  but it had been an office at one point.
11      And we had to physically take
12  the desks -- pardon me -- the chairs down so
13  we had a place to sit.  At which point he
14  told me:  I have three minutes to talk to
15  you.  Then I have to go get a COVID shot to
16  be able to get on the plane to go to Greece.
17      That upset me.  After 15 years
18  of helping to build a quality worldwide
19  program, you want to have this discussion
20  about making me whole, should I get
21  Guillain-Barre, or any other complication?
22  You want to have a discussion -- first he
23  wanted to have it in text.  And I said, I
24  don't think this is a text negotiation.

Page 197

1      He said, okay, but I only have
2  three minutes.
3      Fine.  I'll take what I can get.
4      So I show up.  And my concern,
5  again, was voiced that there's other data.
6  The data similar to what I had showed Dr.
7  Guidera.  There's other data, and you don't
8  seem open to looking at it.
9      He, again, talked about these
10  data are fact.  Your data is baloney.  And
11  he started shouting at me.  And I did not
12  want to be the recipient of that all over
13  again.  It had already happened.  I'm tired
14  of him screaming at me.  And he's shouting
15  loud enough that I stand up.  Because I'm
16  leaving.  In fact, I remember him get scared
17  that I was going to come towards him and
18  physically accost him, punch him, or
19  something.  I was standing up to walk out.
20  It made me chuckle.  "You think I'm going to
21  hit you over this?  I'm getting out of
22  here."
23      So I stood up to walk out, and I
24  think that scared him.  Nonetheless, I walk

JOSEPH S. AUTERI, MD

Page 226

1    And this e-mail does state that
2  anyone subject to the mandate could request
3  a religious exemption, right?
4    A.  It states that, yes, you can ask
5  for a religious exemption.
6    Q.  And that declination statement
7  on the last two pages of A-15, D-129 and
8  D-130, specifically on D-130, does provide
9  that a reason for declining was a request
10  for religious accommodation; is that
11  correct?
12    A.  Where -- where is that?  I'm on
13  the page.  But where?
14    Q.  130.  It's right under the
15  Reason for Declining.  It's in bold.
16    A.  Request a medical exemption.
17  Request a religious accommodation.
18    Yes, I see that.
19    Q.  Dr. Auteri, can I direct you
20  back to Auteri-7, please?
21    A.  7?
22    Q.  Yes, the Second Amended
23  Complaint.
24    A.  Yes.

Page 227

1    Q.  Paragraph 39 states that
2  Doylestown Health set a deadline of
3  September 10th for employees seeking
4  exemption to the mandate on the basis of a
5  medical condition or religious affiliation.
6    Is that correct?
7    A.  They set an arbitrary date for
8  us to apply.  Yes.
9    Q.  And that was September 10th,
10  2011?
11    A.  That's what this says.  Yes.
12    Q.  And this is your Second Amended
13  Complaint you're pleading you verified is
14  true and accurate, right?
15    A.  Yes.
16    Q.  And Paragraph 39 in the Second
17  Amended Complaint also states that there was
18  an October 11th, 2011 vaccination deadline,
19  correct?
20    A.  That's what that states; yes.
21    Q.  And this is your Second Amended
22  Complaint that you verified was truthful and
23  accurate, correct?
24    A.  Second Amended Complaint.  Yes.

Page 228

1    Q.  Do you know if other physicians
2  employed by Doylestown Hospital or
3  Doylestown Health requested a religious
4  exemption from the COVID-19 vaccine mandate?
5    A.  I know of three physicians.  I
6  don't remember their names.  Levy mentioned
7  them in the 86 West meeting.  And I don't
8  know what they requested, in terms of
9  exemption.  I only know about them because
10  he mentioned them.
11    Q.  So you don't have any personal
12  knowledge of any physicians requesting a
13  religious exemption from the COVID-19
14  vaccine mandate?
15    MS. RUSSELL:  Objection.
16    You can answer.
17    THE WITNESS:  From Doylestown, I
18  don't know of other physicians.
19  BY MR. DURHAM:
20    Q.  Do you know if any non-physician
21  employees of Doylestown Hospital requested a
22  religious exemption from the COVID-19
23  vaccine mandate?
24    A.  I know of a e-mail screen of 76

Page 229

1  nurses and/or lab techs, et cetera,
2  non-physicians, that were struggling with
3  the mandate, and being forced to take it;
4  and didn't want to.
5    Q.  But do you know if any employees
6  -- non-physician employees of Doylestown
7  Hospital requested a religious exemption
8  from the COVID-19 vaccination mandate?
9    A.  I know of non-physician
10  employees that requested religious
11  exemption.
12    Q.  And what is your personal
13  knowledge of those requests for religious
14  exemption?
15    A.  I'd have to look back at the
16  e-mails.  I don't recall, you know, who, and
17  how many.  But many of them sent me texts or
18  e-mails.
19    Q.  Other than texts and e-mails you
20  received from employees saying that they
21  requested a religious exemption from the
22  vaccine mandate, do you have any personal
23  knowledge regarding employees' requests for
24  religious exemption from the vaccine

58 (Pages 226 - 229)

JOSEPH S. AUTERI, MD

Page 238

1 terminated effective November 11?
2       A.   I think 12.  30 days from
3 October 11.
4       Q.   Either following the suspension
5 or following the termination, did you reach
6 back out to the CEO of Capital Health to see
7 if that opportunity was still available?
8       A.   Very much so.
9       Q.   And when -- how did you reach
10 out to him?
11      A.   Called Josh Eisenberg, the Chief
12 Medical Officer, who I had hired 15 years
13 prior to come do vascular surgery at
14 Doylestown.
15      Q.   And when was that?  Was that
16 after the suspension?  After you were
17 suspended or after you were terminated?
18      A.   Don't know, but I suspect after
19 I was terminated.  Because I had every hope
20 that the suspension would be withdrawn and
21 they would grant the religious exemption.
22      Q.   And you asked Josh Eisenberg if
23 that opportunity or that offer was still
24 available to come to Capital Health?

Page 239

1       A.   Your words, not mine.
2       Q.   Why don't you tell me what --
3 how that conversation went.
4       A.   Happy to.  Something to the
5 effect of, hey, Josh, I just got terminated
6 because I wouldn't take the vax.  A, is the
7 job still open; but, B, will you accept
8 somebody that's unvaxed?
9       Q.   And what did he say?
10      A.   Currently, our policy is we will
11 only grant religious exemption to physicians
12 or staff that already work here.  We can't
13 -- we won't grant it to somebody that's not
14 yet hired.
15      Q.   Did you have any further
16 discussion with Josh Eisenberg, or anybody
17 else at Capital Health, regarding
18 potentially coming to work for Capital
19 Health around that time?
20      A.   Three years later, with Josh
21 Eisenberg.  And that's how I got the job
22 that I'm in now.
23      Q.   So that was the next conver --
24 following that conversation you just

Page 240

1 testified to, the next time you had a
2 discussion with anyone at Capital Health was
3 three years later?
4       A.   Correct.
5       Q.   About an opportunity to work
6 there?
7       A.   Correct.
8       Q.   So you have a conversation with
9 Dr. Levy.  Capital Health -- you've already
10 testified to the conversation you had with
11 Dr. Levy in the Medical Staff Office,
12 right, following the September 8th messages
13 that you had with Dr. Levy.
14           When was the next time that you
15 discussed with Dr. Levy COVID-19 or a
16 COVID-19 vaccine mandate?
17      A.   I don't know that it was
18 specifically the next time.  But it came up
19 again when I was at church on Sunday
20 morning, the day before I was suspended,
21 which would have been October 10th.
22      Q.   Sitting here today, can you
23 recall any discussion between the Medical
24 Staff Office conversation and October 10th,

Page 241

1 with Dr. Levy, regarding the COVID-19
2 vaccine mandate?
3       A.   As I testified earlier to a
4 different question, we had a number of
5 shouting matches in his office.  And I can't
6 recall if that was after the September 8th,
7 that you're referring to, or before.
8           So the answer is maybe.
9       Q.   Any conversations, other than
10 those shouting matches, occur between --
11 what you've already testified to occurred
12 between September 10th and October 10th?
13      A.   Unfortunately, all of them were
14 shouting matches.  So the answer is, no, I
15 can't recall a specific one that was between
16 those two dates.
17      Q.   And you've -- you've already
18 testified to those shouting matches, right?
19      A.   Right.  But I don't know -- as I
20 said, I don't know when they occurred.
21      Q.   So tell me how did that October
22 10th meeting or discussion with Dr. Levy --
23 I think you said it was West -- eighty -- 86
24 West?

61 (Pages 238 - 241)

JOSEPH S. AUTERI, MD

Page 242

1    A.  86 West.
2    Q.  Tell me how that came about, and
3  tell me about the meeting you had with him.
4    A.  I think it's all in the texts.
5  If you want to show me the texts, I can read
6  them to you.
7       He texted me when I was at
8  church, I believe 9-ish in the morning.  We
9  normally go to the 8:00 service, which goes
10  till 9:15.  He texted during church, or
11  thereafter.  I responded, to my
12  recollection, that I don't think you and I
13  meeting is a good idea, because every time
14  we meet you start screaming at me.
15       He responded, I'd really like to
16  do it.  Tomorrow is the suspension date.  I
17  would feel bad if we didn't give it one last
18  shot.
19       So I thought about, prayed about
20  it, and said, you know what, he's right.  I
21  want to give this one last shot, too,
22  because I don't want to leave.
23       So I said okay; and then
24  decided, A, to bring somebody else, so if he

Page 243

1  started shouting, I at least have a witness;
2  and, B, to not do it in a private setting
3  like Pernitsky's office or his office.
4  Let's do it at a restaurant.  And we picked
5  86 West.  That's a restaurant in Doylestown.
6       Do you want me to keep going?
7    Q.  Please.
8    A.  So we got to the restaurant.  We
9  picked a table in the back with lots of
10  other people around.  So I hoped he would
11  not -- I hoped that would restrain him from
12  screaming.  He came a few minutes -- we got
13  there a few minutes early.  He came a few
14  minutes late.
15    Q.  I'm sorry to interrupt.  You
16  said "we got there"?
17    A.  My wife.  I brought my wife so I
18  had a witness to -- to, A, hopefully help --
19  help keep him in line from screaming; and B,
20  so some day it wouldn't be my word against
21  his, fully expecting it to be another
22  shouting match.
23       He started off the conversation
24  when he came in, and my wife and I were

Page 244

1  sitting at a table, a four-person table.  We
2  were sitting, and he came over and I stood
3  up to shake his hand.  And he said, I'm not
4  sure I should shake your hand.
5       And I said, why is that?
6       And he said, I'm getting over a
7  horrible bout of COVID.
8       And I said, with a -- with a
9  strange look, you're getting over a horrible
10  bout of COVID?  You've had two shots.
11       And he said, yeah, and a
12  booster, he responded.
13       So I said, you're making my case
14  for me.
15       And he smiled and sat down.  And
16  I don't believe he shook my hand.  We sat
17  down and we talked.
18    Q.  How was he making your case for
19  you?
20    A.  Two shots and a booster, and I
21  had natural immunity, God-given immunity.
22  And I hadn't gotten sick, and he had gotten
23  sick.
24    Q.  So in other words, proving your

Page 245

1  point that the vaccine was not effective?
2       MS. RUSSELL:  Objection.
3       You can answer.
4       THE WITNESS:  A single data
5    point, among many thousands of data
6    points, that say the effectiveness
7    of this vaccine is called into
8    question.
9       By the way, he threw out that
10    his wife was also getting over it.
11    And I believe I said, is she also
12    vaxed?
13       Yes, two, plus booster.
14       So two data points.
15  BY MR. DURHAM:
16    Q.  Can you tell me more about that
17  discussion, or was that the entirety of the
18  discussion?
19    A.  Yes, I can.
20       So he pushed hard for me to get
21  the vax.  You have until tomorrow, 5:00.
22       He spoke about, if you don't get
23  it by 4:59, at 5:00 the Medical Executive
24  Committee, as is their right, is going to

62 (Pages 242 - 245)

JOSEPH S. AUTERI, MD

Page 250

1 already?
2     A.  Not that I recall, as I sit here
3 today.  I may be forgetting something.  But
4 not that I recall.
5     Q.  There's nothing impairing your
6 ability to recall events today, is there?
7     A.  Yeah.
8         MS. RUSSELL:  Objection.
9         You can answer.
10        THE WITNESS:  The inability to
11        look at the letter I wrote to Barb
12        Hebel, summarizing, that is
13        impairing my ability to recall it.
14        If we just pull it out of here, I
15        can read it to you and say, oh,
16        yeah, he said this.
17        MR. DURHAM:  I want to hear what
18        you have to say.
19        THE WITNESS:  That is what I had
20        to say, when I didn't have to
21        remember it three years later.
22        So I suggest if you want it
23        accurate, we go look at that.
24        But it's your deposition.

Page 251

1         MR. DURHAM:  It is.
2 BY MR. DURHAM:
3     Q.  I'll refer you to Auteri-7
4 again, please, specifically Paragraph 62,
5 which is on Page 11, through 69.
6         Those paragraphs, 62 through 69
7 in the Second Amended Complaint, I believe,
8 describe the meeting about which you just
9 testified.
10        Correct?
11    A.  I believe that those paragraphs
12 do describe what I was just testifying to.
13    Q.  Do they refresh your
14 recollection as to anything else that may
15 have been said at the October 10th meeting
16 with Dr. Levy at 86 West?
17    A.  They do not.  I think that I
18 covered it.
19    Q.  In Paragraph 65, you allege that
20 Dr. Levy did not discuss Dr. Auteri's prior
21 verbal request for exemption from the
22 mandate due to Dr. Auteri's religion, and
23 the effects of the COVID-19 shot on Dr.
24 Auteri's medical condition.

Page 252

1         What prior verbal request for
2 exemption from the mandate, due to your
3 religion, had you made before October 10th,
4 2021?
5     A.  I made request to Barb Hebel, at
6 HR.  I believe the letter is dated October
7 6th, which would predate this by four, five
8 days, stating I was looking for the
9 parameters by which I could apply for
10 religious and medical exemption.  So maybe
11 "verbal" should be "verbal and -- and
12 written."
13    Q.  Other than the letter dated
14 October 6th, that you just referenced, and
15 prior to October 10th, had you made any
16 requests for religious exemption from the
17 vaccine mandate?
18    A.  Other than the October 6th?
19    Q.  Correct.
20    A.  I had not made any formal
21 requests, no.
22    Q.  Had you made any informal
23 requests?
24    A.  I spoke to Levy and I spoke to

Page 253

1 Hebel -- I don't remember what date -- to
2 say, what's involved in the requesting of
3 religious or medical exemption.
4         And they told me I was past the
5 date.
6     Q.  Was that a single conversation
7 with Barb Hebel, when you asked what was
8 involved about -- in seeking a religious
9 exemption?
10    A.  I don't recall if it was single
11 or multiple.
12    Q.  Other than asking Barb Hebel
13 what was involved in seeking a religious
14 exemption, did you have any further
15 discussion about your religious exemption
16 with Barb Hebel, prior to October 10th?
17    A.  Other than asking what's
18 involved?  I don't recall that I did that,
19 so I would say no.
20    Q.  Other than asking -- did you say
21 Dr. Levy -- what was involved in requesting
22 -- did you testify Dr. Levy as that?
23    A.  I did.
24    Q.  Other than asking Dr. Levy,

64 (Pages 250 - 253)

JOSEPH S. AUTERI, MD

Page 254

1   prior to October 10th, what was involved in
2   seeking a religious exemption from the
3   COVID-19 vaccine mandate, did you discuss
4   anything else with Dr. Levy relating to your
5   request for religious exemption?
6       A.   I discussed medical as well; so,
7   both.
8       Q.   Okay.
9       A.   So both.
10      Q.   But anything -- and I know we --
11  we've discussed the medical a lot, right,
12  with, you know, the potential harm of the
13  vaccines, and the like.
14          But with respect to the
15  religious exemption, specifically, did you
16  discuss with Dr. Levy, before October 10th,
17  anything more than finding out how you would
18  go about making a request for a religious
19  exemption?
20          MS. RUSSELL:  Objection.
21          You can answer.
22          THE WITNESS:  Yes, I did.  And
23  first off, the premise of your
24  question is, you said, I know we

Page 255

1   discussed medical a lot.
2           We didn't discuss my request for
3   medical exemption.  We discussed
4   Medical Exec setting:  Is this the
5   right thing to do for a large
6   population of patients?
7           In my specific medical request
8   -- sorry, medical exemption request,
9   in discussions with Levy, I had
10  proposed an idea that I was more
11  protected than he was, because I had
12  had COVID, and had God-given natural
13  immunity.  And he had what I'll call
14  lab immunity.  I'll call it vax
15  immunity; whatever you want to call it.
16          And I suggested very early on
17  that we should test people to see if
18  the vax is working as well as the
19  natural immunity is working.
20          And I had shown data to Dr. Levy
21  on multiple occasions to say,
22  there's data out there that says --
23  let me get this straight.  There's
24  data out there that says God-given

Page 256

1   natural immunity is as good, or
2   better, than vaccinated immunity.
3   Why aren't we exploring that?  Why
4   are we not dealing with that?
5           In those conversations then when
6   it gets to me, that's a MEC large
7   population sort of discussion.  But
8   then as it -- as it changes to talk
9   about me, I says Scott, I have
10  immunity.  Why are you not granting
11  me a medical exemption?  I don't
12  need the vax.  I got better immunity
13  than you do.  It was part of those
14  conversation.
15          And I reminded him about
16  coalescent serum.  Many doctors --
17  sorry.  Many people, one of whom is
18  a very good friend of mine, who's
19  chief of aortic surgery at Penn,
20  very internationally known, who I
21  knew well, got COVID very early on,
22  and got asked to be in studies that
23  take his -- he got over it and he
24  had antibody and anti-cell immunity --

Page 257

1   to say, would you donate your serum
2   so we can get this sick, dying patient
3   in the ICU incubator, some of your
4   serum to help them get better?
5           It was a well-known --
6   "treatment" is not the right word.
7   It was a well-known statement that
8   natural immunity works.
9           So in bringing that up with Dr.
10  Levy, on a grander scale patients
11  populations, it then, same
12  conversation, say, look, I got
13  natural immunity.  Why are you
14  insisting I have a vax?  This is a
15  dumb idea.  Grrrrr.
16  BY MR. DURHAM:
17      Q.   When you say "natural immunity,"
18  you're referring to the natural God-given
19  immunity that you've referred to earlier?
20      A.   That's what I'm referring to,
21  yes, God-given immunity.
22      Q.   So I guess then -- thank you for
23  -- for correcting me on the medical
24  exemption discussion with Dr. Levy.

65 (Pages 254 - 257)

JOSEPH S. AUTERI, MD

Page 258

1    As it relates to the religious
2 exemption, did you have any discussion with
3 him, other than asking how you would go
4 about seeking a religious exemption, prior
5 to October 10th?
6    A.  I'm going to say, no, I did not.
7    I should say, not that I recall.
8    Q.  So prior to October 10th, other
9 than the discussions with Barb Hebel and
10 Dr. Levy, that you've testified to here
11 today, and that -- that October 6th letter,
12 which we'll get to, did you make any
13 requests for religious exemption from the
14 COVID-19 vaccine mandate?
15    MS. RUSSELL:  Objection.
16    You can answer.
17    THE WITNESS:  I don't recall if
18    my discussions with Jim Brexler
19    included that or not.  But the
20    answer to your question is, maybe
21    with -- with Jim Brexler.
22    - - -
23    (Auteri-14 marked for identification.)
24    - - -

Page 259

1 BY MR. DURHAM:
2    Q.  Dr. Auteri, the court reporter
3 has handed you a document marked Exhibit
4 Auteri-14.  Let me know when you've had a
5 chance to review it.
6    Have you had a chance to review
7 it?
8    A.  I have.
9    Q.  Dr. Auteri, do you recognize
10 Exhibit A-14 as an e-mail exchange between
11 yourself and Dr. Levy that led to your
12 meeting with him at 86 West on October 10th?
13    A.  I recognize it.
14    Q.  Do you recognize it as the
15 exchange, e-mail exchange that led to your
16 meeting him at 86 West on October 10th?
17    A.  Yes, I do.
18    - - -
19    (Auteri-15 marked for identification.)
20    - - -
21 BY MR. DURHAM:
22    Q.  Dr. Auteri, the court reporter
23 has handed you a document marked Auteri-15.
24 Please let me know when you've had a chance

Page 260

1 to review it.
2    A.  Okay.
3    Q.  Dr. Auteri, do you recognize
4 A-15 as an e-mail exchange between yourself
5 and Dr. Levy on September 10th, 2021?
6    A.  Yes, I do.
7    Q.  Your e-mail, at the bottom of
8 the first page, and then moving onto the
9 second page of A-15 that you sent, is
10 directed to Dr. Levy, right?  Scott?
11    A.  Correct.
12    Q.  Did you copy the individuals who
13 are copied on Dr. Levy's response to your
14 e-mail?  Barb Hebel, Jim Brexler, and Eileen
15 Fortna -- or Aileen Fortna?
16    A.  The answer is, I don't know.  I
17 think I did, but it's not listed.  He -- if
18 he cut it off or whatnot.  I don't know.  Or
19 if he hit "reply all."  So the answer is, I
20 don't know.
21    Q.  Please take a look at Auteri-7,
22 the Second Amended Complaint, Paragraph 55,
23 which you can find on Page 10.
24    A.  55?  5-5?

Page 261

1    Q.  55.  5-5.
2    A.  Okay.
3    Q.  Is A -- Auteri-15 the e-mail --
4 the September 10th e-mail referenced in
5 Paragraph 55 of the Second Amended
6 Complaint?
7    A.  I believe 55 references this
8 Auteri-15, yes.
9    Q.  Thank you.
10    With respect to Dr. Levy's reply
11 to your e-mail, he states that you had had
12 several conversations as to the requirements
13 of the vaccine policy.
14    Is that true?
15    A.  If he considers shouting me out
16 of his office a conversation, then, yes,
17 it's true.
18    Q.  Is it true that as of September
19 10th, the policy was finalized, or
20 formalized?
21    MS. RUSSELL:  Objection.
22    You can answer.
23    THE WITNESS:  Again, I think so.
24    I'd have to go back and look at what

66 (Pages 258 - 261)

JOSEPH S. AUTERI, MD

Page 286

1   Q.  So are there -- Dr. Auteri, are
2   there any other discussions you had with
3   Ms. Hebel regarding Dr. Levy's conduct
4   toward and harassment of you, as alleged in
5   the Second Amended Complaint, that you have
6   not testified to today?
7       A.  Not that I recall, no.
8           MR. DURHAM:  Can we, if that's
9   all right, take a break?
10          MS. RUSSELL:  Sure.
11          THE VIDEOGRAPHER:  The time is
12  3:36 p.m.  We are going off the
13  record.  This ends media unit number
14  four.
15          (Brief recess taken.)
16          THE VIDEOGRAPHER:  The time is
17  3:47.  We are back on the record.
18  BY MR. DURHAM:
19      Q.  Dr. Auteri, before the COVID-19
20  vaccine mandate was issued in early-August,
21  did you have any communications with Jim
22  Brexler relating to the vaccine mandate?
23      A.  I recall communications at MEC
24  with Jim Brexler; and, specifically, the

Page 287

1   July 20 meeting where he first said we were
2   way down on -- on --
3       Q.  That's the one you already
4   testified to when he was on Zoom --
5       A.  Yes.
6       Q.  -- on the screen?
7       A.  Yes.
8       Q.  Did you have any other
9   interactions with Jim Brexler relating to
10  the -- to the COVID-19 vaccine, prior to the
11  vaccine mandate, other than at MEC committee
12  meetings?
13      A.  Not that I recall.
14      Q.  Did you have any interactions
15  with Jim Brexler related to the COVID-19
16  vaccine mandate, after the mandate was
17  issued?
18      A.  I believe I did.
19      Q.  Can you tell me about that,
20  starting with when?
21      A.  The when, I don't think I can be
22  very specific; somewhere between the August
23  6th mandate and my suspension and
24  termination.

Page 288

1       Q.  Does -- does mid-September sound
2   about right?
3       A.  It does.
4       Q.  Okay.
5       A.  Yeah.  Don't hold me exactly to
6   that, but, yeah, it does sound right.  It
7   was a conversation about the "make you
8   whole" if you get injured.
9       Q.  Was this an in-person
10  conversation?
11      A.  In his office, yes.
12      Q.  In his office.
13          Was anyone else present for the
14  conversation?
15      A.  No, just me and Jim.
16      Q.  And is this -- I'll refer you to
17  Auteri-16.  This is still Interrogatory 1,
18  but sub-number 2.
19      A.  Auteri-16?
20      Q.  Auteri-16.
21      A.  Auteri-16.  I see it.
22      Q.  Take a look at that, and let me
23  know if -- if the meeting described here is
24  the meeting that you were -- you had in

Page 289

1   mind, when you were beginning your
2   testimony.
3       A.  Yes, that's the one I had in
4   mind.
5       Q.  Was this meeting at your request
6   or his request?
7       A.  I don't recall.
8       Q.  What did you discuss with Jim
9   Brexler when you met with him?
10      A.  We discussed the make whole if
11  you're injured.  And we discussed if you do
12  take the vax, I would like you to stand in
13  front of the 76 or thereabouts nurses that
14  don't want to take it, and I want you -- I
15  want to show you as a smart man who reads a
16  lot of data and is, therefore, comfortable
17  that the vax is safe and effective, to
18  encourage those nurses to take the vax.
19          I took that as, can I parade you
20  around as the vax poster child.
21      Q.  Did you -- in this meeting, did
22  you share with Jim Brexler your research
23  regarding your concerns about the safety
24  and/or efficacy of the COVID-19 vaccines?

73 (Pages 286 - 289)

JOSEPH S. AUTERI, MD

Page 290

1    A.  I don't specifically recall
2  that, but that certainly could have come up.
3    Q.  Did you tell Jim Brexler about
4  someone who you knew had been injured as a
5  result of taking the COVID-19 vaccine
6  mandate -- or not mandate -- the COVID-19
7  vaccine?
8    A.  I don't specifically recall
9  saying that, but I certainly could have.
10    Q.  Did you discuss your views on
11  Dr. Anthony Fauci with Jim Brexler in that
12  meeting?
13    A.  I don't recall.
14    Q.  Did you discuss your views on
15  the pharmaceutical companies developing the
16  COVID-19 vaccines in that meeting with Jim
17  Brexler?
18    A.  I don't recall.
19    Q.  So you said you -- you talked
20  about the make whole if injured.
21    What if you're injured?  What
22  did you discuss with Jim Brexler in that
23  regard during the meeting?
24    A.  I -- I believe by that time,

Page 291

1  although I've got to go back and check the
2  dates, but the Scott Levy going to Greece
3  discussions about 18 months, how much we're
4  going to pay you if you get injured -- I
5  believe that had been -- "finalized" not the
6  right word, but come as close to we can get
7  it.  And Jim had to agree to it.  And I
8  think that was part of that discussion.
9  That's -- that's what I'm referring to when
10  I say "make whole if you get injured."
11    I don't think it's making me
12  whole, but that was their version of make
13  whole if you get injured.
14    Q.  You said the details had been
15  discussed, so Jim had to agree to it.
16    So had you sort of discussed
17  further with Dr. Levy the details around
18  this concept of a "make whole"?
19    A.  I believe at that time Levy was
20  still away, so he handed off the discussion
21  from their side of the table to Adam
22  Edelson, his sidekick.
23    Q.  Do you recall -- and you had
24  discussions with Adam Edelson?

Page 292

1    A.  Yes, I did.
2    Q.  Do you recall whether those
3  discussions were before or after your
4  meeting with Jim Brexler, or both?
5    A.  I believe they were before,
6  because this was sort of the meeting, when
7  Jim was sort of the culmination of it.
8    Q.  So what specifically did you
9  discuss with Jim Brexler relating to this,
10  as you're phrasing it, the "make whole"
11  proposal?
12    A.  Again, I'm going off of what I
13  recall, that we had come up with whatever
14  the parameters were in the signed -- signed
15  by him, by Adam -- letter that says we'll
16  pay you for 18 months at this rate.  If you
17  get injured beyond that, we'll pay you not
18  less than 30 percent of your current to be
19  in an administrative role, non-operative
20  role, something to that effect.
21    I'm paraphrasing what it said.
22    Q.  Did Mr. Brexler agree with --
23  with you that the COVID-19 vaccine could
24  harm you?

Page 293

1    MS. RUSSELL:  Objection.
2    You can answer.
3    THE WITNESS:  I doubt it.  I
4    don't recall, but I doubt it.
5    Nobody agreed with me that would go
6    verbal with it.
7  BY MR. DURHAM:
8    Q.  Did Alex Gorsky, come up in your
9  meeting with Jim Brexler?
10    A.  In that meeting, no.
11    Q.  Did you have another meeting
12  with Jim Brexler regarding the COVID-19
13  vaccine mandate?
14    A.  I don't believe so, no.
15    Q.  Did you discuss anything else
16  with Jim Brexler in that meeting, that you
17  haven't already testified to discussing with
18  him?
19    A.  Not that I recall.
20    - - -
21  (Auteri-18 marked for identification.)
22    - - -
23  BY MR. DURHAM:
24    Q.  Dr. Auteri, the court reporter

74 (Pages 290 - 293)

JOSEPH S. AUTERI, MD

Page 294

1  has handed you a document marked Exhibit
2  Auteri-18. Please take a moment to review
3  it, and let me know when you've had a chance
4  to do so.
5      A.   So reading this leads me to
6  believe that it wasn't finalized by the time
7  I spoke with Jim.
8      Q.   Well, let me ask you first: Do
9  you recognize this document that's been
10  marked as Auteri-18 as an e-mail exchange
11  between yourself and Jim Brexler on
12  September 18th, 2021?
13      A.   Yes, I do.
14      Q.   And I'll -- I'll represent to
15  you that September 18th was a Saturday. And
16  so the Thursday was September 16th, when
17  you're referencing a meeting with him.
18      Is that the meeting that you
19  just testified to?
20      A.   Yes.
21      Q.   And the Adam who's referred to
22  in your e-mails, is that Adam Edelson?
23      A.   Yes, it is.
24      Q.   Your e-mail says: Thank you

Page 295

1  for giving me almost an hour on Thursday to
2  discuss the vaccine mandate and the
3  constraints you and I are under.
4      What are the constraints that
5  you and Mr. Brexler were under, as referred
6  to by you in this e-mail?
7      A.   He was the CEO of a hospital,
8  and had to figure out how to go forward with
9  a potential vaccine mandate and potential
10  loss of many nurses and doctors.
11      I was chief of cardiac surgery
12  on the MEC level, trying to guide and advise
13  on the MEC level for a population, but also
14  struggling with my own deeply-held religious
15  beliefs that forbade me from taking an mRNA
16  vaccine.
17      Q.   The reference to Scott in your
18  September 18th e-mail is a reference to Dr.
19  Levy; is that right?
20      A.   "While Scott is out of town."
21  Yes. Dr. Levy.
22      Q.   The looming October 11th
23  deadline in your e-mail refers to the
24  vaccination deadline?

Page 296

1      A.   Yes, it does.
2      Q.   So as you said, at this point,
3  you were struggling with whether or not to
4  take the vaccine.
5      A.   Yes, I was.
6      Q.   And you're in this e-mail
7  requesting a written addendum to your
8  contract, stating what Jim Brexler had given
9  you his word to, which is that if you had an
10  adverse reaction to the vaccine that would
11  make you unable to perform cardiac surgery,
12  you would continue to be employed as a
13  medical director for many years.
14      Right?
15      A.   I didn't believe his word. I
16  didn't trust him. Me having his word did
17  zero for my confidence that it would
18  actually happen. So I wanted it in writing,
19  as any good lawyer would suggest.
20      Q.   Other than what you've testified
21  to today, in terms of the MEC meeting at
22  which Jim Brexler was present, and spoke,
23  and your meeting with Jim Brexler in
24  September of 2021, did you have any

Page 297

1  discussions with Jim Brexler relating to the
2  COVID-19 vaccine mandate?
3      A.   Not that I recall. It may have
4  come up at another MEC, but not a specific
5  discussion.
6      Q.   Not separate from an MEC.
7          - - -
8      (Auteri-19 marked for identification.)
9          - - -
10  BY MR. DURHAM:
11      Q.   Dr. Auteri, the court reporter
12  has placed in front of you a document marked
13  Auteri-19. Please review it and let me know
14  when you've had a chance to do so.
15      A.   Okay. Go ahead.
16      Q.   Dr. Auteri, this document was
17  produced by you in this litigation. Do you
18  recognize this as the Fifth Amendment to the
19  Employment Agreement between yourself and
20  VIA Affiliates that was proposed to you by
21  the Defendant in this case?
22      A.   Yes, I recognize it.
23      Q.   And was this the addendum or
24  amendment you were discussing with Jim

75 (Pages 294 - 297)

JOSEPH S. AUTERI, MD

Page 298

1  Brexler?
2      A.  We were discussing it prior to
3  this.
4      Q.  Putting it to paper?
5      A.  Yes.
6      Q.  Same with Dr. Levy.  This was
7  sort of the paper form of what you were
8  discussing with Dr. Levy, as it related to
9  "make whole"?
10      A.  I think that's accurate, yes.
11      Q.  And I think you testified that
12  you discussed this with Adam Edelson?
13      A.  The negotiation was with Adam,
14  in Scott Levy's absence.
15      Q.  Can you tell me about your
16  negotiation with Adam?
17      A.  I was concerned about the timing
18  of it, the minimum salary, the 18 months.
19  And I was especially concerned about the new
20  neurological condition.  So if I developed
21  myocarditis, and suddenly had congestive
22  heart failure from a poorly functioning
23  heart, this didn't apply.  I was concerned
24  about a lot of things.  That was part of the

Page 299

1  negotiation.  This is where they settled.
2      Q.  Were -- do you recall if the
3  written form -- throughout the negotiation
4  of the written form of this ever change, or
5  the terms of it ever change?
6      A.  There were some concessions that
7  they made that are apparent in this.  This
8  was the final version that they offered.
9  And there were clearly some concessions that
10  they did not accept.
11      Q.  What concessions did Doylestown
12  Health accept?
13      A.  I believe the 18 months was
14  extended beyond what the original was.
15         I believe the six months of --
16  must occur within six months of receiving
17  the vaccine.  It wasn't originally six
18  months.  It had to occur in a week, or
19  monthly.  And I said no.
20         So there were a number of things
21  like that, that we went back and forth over.
22      Q.  This appears to be signed by
23  Adam Edelson on September 24th, 2021.
24         Do you see that on the second

Page 300

1  page?
2      A.  I see that, yes.
3      Q.  Is that about the time that you
4  received it from Mr. Edelson?
5      A.  Yes.
6      Q.  Did you tell Mr. Edelson that
7  this amendment covered exactly what you had
8  asked?
9      A.  No.  We negotiated to the
10  middle.  And he was aware of that, because
11  he was the one negotiating for his side of
12  the table.
13      Q.  And I assume you did not sign
14  this amendment.
15         Correct?
16      A.  Mine's not signed.  Is yours?
17      Q.  Did you sign any other form of
18  this amendment that's not here today?
19      A.  No.
20      Q.  In the context of your
21  discussions with Mr. Edelson, did you ever
22  discuss what would be the terms of a
23  potential accommodation, should you not be
24  vaccinated and continue working at

Page 301

1  Doylestown Health?
2      A.  Nobody from Doylestown Hospital
3  ever offered discussion about accommodation
4  terms, ever, throughout this entire process.
5  Nobody.
6      Q.  Did you ever raise potential
7  accomodation terms to anyone at Doylestown
8  Health?
9      A.  Our second --
10      Q.  Prior -- prior to the -- your
11  attorney's letter.
12         MS. RUSSELL:  Objection.
13         You can answer.
14         THE WITNESS:  Did I ever raise
15  accommodations?
16         I think we spoke about how is it
17  appropriate to make our patients the
18  safest.  And simply requiring a vax
19  is not what is making our patients
20  the safest.
21         And so that is reflected,
22  subsequently, in my law firm
23  proposing that in what we asked for,
24  in terms of accommodations, which

JOSEPH S. AUTERI, MD

Page 302

1    was never offered by Barb Hebel, or
2    anybody from Doylestown Hospital
3    side.
4    BY MR. DURHAM:
5        Q.   So before your attorney's
6    letter, that you just referenced, did you
7    propose to Barb Hebel, or anyone on the
8    Doylestown Health side, an accommodation?
9    Hey, if I am not vaccinated for COVID-19,
10   here are the accommodations that I would
11   agree to?
12       A.   No.
13           MS. RUSSELL:  Objection.
14           You can answer.
15           THE WITNESS:  Sorry.  No.
16               - - -
17   (Auteri-20 marked for identification.)
18               - - -
19   BY MR. DURHAM:
20       Q.   Dr. Auteri, the court reporter
21   has handed you a document that's been marked
22   as Exhibit Auteri-20.  Please take a minute
23   to review it, and let me know when you've
24   done so.

Page 303

1        A.   It's a nice letter.
2        Q.   You had a chance to review it?
3        A.   I have.
4        Q.   And do you recognize this as
5    your letter to Barb Hebel, requesting a
6    religious exemption from the COVID-19
7    vaccine mandate?
8            MS. RUSSELL:  Objection.
9            You can answer.
10           THE WITNESS:  I recognize it as
11   such.
12   BY MR. DURHAM:
13       Q.   It's dated October 6th.  But you
14   delivered this to Ms. Hebel on October 11th;
15   is that right?
16       A.   I hand-delivered it to her on
17   October 11th, the date of the 5 p.m.
18   deadline.
19       Q.   Why did you wait until October
20   11th to make your religious exemption
21   request?
22       A.   Because I was still editing the
23   letter.
24       Q.   So did you edit it after October

Page 304

1    6th, even though it's dated October 6th?
2        A.   I may have.
3        Q.   You wrote this letter yourself?
4        A.   Myself.
5        Q.   So the first page of the letter
6    references a number of things.  And I'm
7    going to summarize here.  But you correct me
8    if I'm wrong.
9            It talks about the growth in the
10   cardiac program at Doylestown since you
11   arrived.  The growth in the vascular
12   program.  Starting a multidisciplinary TAVR
13   program.  Fundraising that you had been
14   involved in.  Partnering with other health
15   systems.
16           Did that sort of accurately
17   summarize the first page of the letter?
18       A.   It skims over some, but, yes,
19   pretty accurate.
20       Q.   Anything, specifically, you want
21   to call out to add, to how I just summarized
22   the first page of Auteri-20?
23           MS. RUSSELL:  Objection.
24           You can answer.

Page 305

1            THE WITNESS:  Cardiac volume is
2    way up.  Vascular volume is way up.
3    Multidisciplinary TAVR program with
4    fantastic results.
5    Multidisciplinary Watchman Program.
6    Lead Extraction Program.  Mitral
7    Clip Program.  All -- all separate
8    programs that I helped initiate and
9    was instrumental in getting off the
10   ground.
11           Again, I was the poster child
12   for the philanthropic arm.  And by
13   the time I left, $80 million raised
14   of the hundred.  And the two other
15   very large, one of which is capital,
16   recently contacted by the larger
17   health system.
18           Yeah, so that -- that summarizes
19   the first page.
20   BY MR. DURHAM:
21       Q.   How is any of that relevant to
22   your request for religious exemption from
23   the vaccine mandate?
24           MS. RUSSELL:  Objection.

77 (Pages 302 - 305)

JOSEPH S. AUTERI, MD

Page 310

1      A.  No.  I was advocating in favor
2  of all employees, no matter, janitor to the
3  CEO.  If they want a religious exemption, we
4  should grant it.  That's what I was
5  advocating for.  "I" and "we" has nothing to
6  do with that.
7          And by the way, they're all
8  "we."
9      Q.  Could you please turn to the
10  second page of Auteri-20, the Bates label
11  152.
12      A.  The second page of the same
13  letter?
14      Q.  Yeah.
15      A.  Yes.
16      Q.  Auteri-20.  Yes.
17      A.  I'm there.  Yes.
18      Q.  Do you see where it begins:  I
19  have recently been?
20      A.  The second paragraph?
21      Q.  Second paragraph.
22      A.  Yes.
23      Q.  Could you please read the second
24  through the -- through the fourth

Page 311

1  paragraphs.
2      A.  I have recently been through a
3  similar season of prayer and fasting
4  regarding the vaccine mandate.  I'm being
5  led by the Holy Spirit to respectfully
6  decline the COVID vaccine.  I believe my
7  body belongs to God and is the temple of his
8  Holy Spirit.  As it says in 1 Corinthians
9  6:19 and 20, quote, do you not know that
10  your body is a temple of the Holy Spirit,
11  who is in you, whom you have from God, and
12  that you are not your own?  For you have
13  been bought with a price:  Therefore,
14  glorify God in your body.  End quote.
15          I believe that for me to ingest
16  this vaccine is a violation of the Holy
17  Spirit's leading, and, therefore, would be
18  sin.
19          When considering whether to obey
20  all the various laws of mankind, or not to
21  obey them, relies on whether or not those
22  same laws would cause me to disobey my
23  understanding of God's Words, if I were to
24  follow Man's rules.  In a situation where,

Page 312

1  in order to obey Man's rules or laws I would
2  have to disobey God's word, I must obey God
3  and His Word.  Therefore, I am unable to
4  submit to this vaccine mandate imposed by
5  the hospital -- by Doylestown Hospital.
6          To deny the clear leading of the
7  Spirit would be sinful on my part, and I
8  have no desire to do this.  I have a peace
9  about this decision, which I believe the
10  Holy Spirit gives when one is being led by
11  the Spirit.
12          Title VII of the Civil Rights
13  Act --
14      Q.  That was all that I was -- I
15  just asked you to read the second through
16  the fourth.
17      A.  Oh, you don't want the bottom
18  one?
19      Q.  I don't need the bottom one.
20          The -- I think you've testified
21  earlier that you spent, you know, time for
22  working on this.
23          Does what you just read, the
24  second through the fourth paragraphs, fully

Page 313

1  capture the basis of your request for
2  religious exemption from the COVID-19
3  vaccine mandate, as submitted on October 11,
4  2021?
5          MS. RUSSELL:  Objection.
6          You can answer.
7          THE WITNESS:  I don't know if
8      "fully" is the right word there,
9      but, yes, it captivates what my
10      thoughts were.  Yes.
11  BY MR. DURHAM:
12      Q.  Other than what is included in
13  this letter, A-20, did you communicate any
14  basis for your religious exemption request
15  in writing to Doylestown Hospital?
16          MS. RUSSELL:  Objection.
17          You can answer.
18          THE WITNESS:  Yes.  This is the
19      letter that was written October 6th;
20      hand-delivered October 11th.
21          We then submitted a second
22      request when this request was
23      summarily denied; the second request
24      which then included our suggestion

79 (Pages 310 - 313)

JOSEPH S. AUTERI, MD

Page 314

1    on accommodation.
2    BY MR. DURHAM:
3        Q.   So then does this request -- not
4    the second request -- and we'll get to that
5    second request -- fully capture the basis
6    for your request from religious exemption
7    under the COVID-19 vaccine mandate?
8            MS. RUSSELL: Objection.
9            You can answer.
10           THE WITNESS: I think this
11    doesn't say that part of my
12    rejecting it was that it was an
13    mRNA. That's where the, quote,
14    vaccine, comes in. It was an mRNA
15    vaccine, which is not an attenuated
16    virus, or small amounts of virus.
17           The vaccine label -- the vaccine
18    definition changed, and it became
19    outside of where I was comfortable
20    when they're trying to change my
21    DNA.
22    BY MR. DURHAM:
23        Q.   "They" being?
24        A.   The people who created the

Page 315

1    vaccine. I don't believe that's consistent
2    with my religious belief that we shouldn't
3    mess with people's DNA.
4        Q.   So then this letter, and what
5    you've just explained about the mRNA, does
6    that fully capture the basis for your
7    religious exemption request?
8            MS. RUSSELL: Objection.
9            You can answer.
10           THE WITNESS: And add the then
11    subsequent second one.
12           MR. DURHAM: The content of the
13    second one.
14           THE WITNESS: Then, yes.
15    BY MR. DURHAM:
16        Q.   Did you ever communicate
17    anything about that mRNA piece, that you
18    just testified to, to Doylestown Health?
19           MS. RUSSELL: Objection.
20           You can answer.
21           THE WITNESS: Verbally, perhaps.
22    I doubt in writing.
23    BY MR. DURHAM:
24        Q.   You understood that you were

Page 316

1    required to submit the exemption request in
2    writing, right?
3            MS. RUSSELL: Objection.
4            You can answer.
5            THE WITNESS: I did submit the
6    exemption request in writing. I'm
7    not sure what you're getting at.
8    Twice.
9    BY MR. DURHAM:
10        Q.   Oh. So let's -- let's go to --
11    you say -- in the last paragraph, you say:
12    I look forward to accepting your reasonable
13    accommodation so that we can together
14    continue this wonderful work we are doing at
15    Doylestown Health.
16           Did you propose any
17    accommodation in this letter?
18           MS. RUSSELL: Objection.
19           You can answer.
20           THE WITNESS: I think you can
21    see from the letter I did not. I
22    thought the way it worked was, I
23    request it. They say we can do it,
24    if you do this, that or the other.

Page 317

1            I thought that's how this works.
2    That's why there's an HR Department
3    that knows the laws that say you
4    have to offer reasonable
5    accommodation.
6            I didn't know I was supposed to
7    offer a reasonable accommodation.
8            A week or two later, my attorney
9    gets involved and says, let's offer
10    it anyway.
11           So, no, I did not, in this
12    letter, as you can see.
13    BY MR. DURHAM:
14        Q.   Did you discuss this letter with
15    anyone at Doylestown Health?
16           MS. RUSSELL: Objection.
17           You can answer.
18           THE WITNESS: You're talking
19    about verbally?
20           MR. DURHAM: Yes, verbally.
21           THE WITNESS: When I handed it
22    to Barb, I may have discussed it. I
23    don't recall.
24           I also handed her, at the exact

80 (Pages 314 - 317)

JOSEPH S. AUTERI, MD

Page 330

1     MR. DURHAM:  Can we go off the
2   record for a minute?
3     MS. RUSSELL:  Sure.
4     THE VIDEOGRAPHER:  The time is
5   4:42 p.m.  We are going off the
6   record.
7     This ends media unit number
8   five.
9     (Brief recess taken.)
10    THE VIDEOGRAPHER:  The time is
11  4:53.  We are going back on the
12  record.
13    This begins media unit number
14  six.
15  BY MR. DURHAM:
16    Q.  Dr. Auteri, the court reporter
17  has handed you an exhibit that's been marked
18  Auteri-25.
19    Please let me know when you've
20  had a chance to review it.
21    Dr. Auteri, I'm not going to ask
22  you about much.  I'm going to ask you about
23  a little bit on the second page, and a
24  little bit on the third page of the letter.

Page 331

1     A.  Okay.
2     Q.  And a little bit on -- I'm
3   sorry -- a little bit on the fifth page.  So
4   717 through there, you're good.
5     A.  Okay.
6     Q.  Dr. Auteri, do you recognize
7   Auteri-25 as an October 22, 2021 letter that
8   your attorney, Kimberly Russell, sent to
9   Barbara Hebel at Doylestown Health?
10    A.  Yes, I recognize it.
11    Q.  Did you review this letter
12  before it was sent?
13    A.  I did.
14    Q.  And at least with respect to the
15  factual content of this letter -- you're not
16  a lawyer so I'm not asking about the legal
17  content.
18    But with respect to the factual
19  content, did you confirm that the letter was
20  truthful and accurate in all respects?
21    A.  I believe it is truthful and
22  accurate.
23    Q.  Did you -- but did you confirm
24  that prior to the letter being sent?

Page 332

1     A.  Yes.
2     Q.  Dr. Auteri, on Page 2 of the
3   letter, bearing Bates 714, under the second
4   heading, Dr. Auteri's Request for Religious
5   Exemption and Reasonable Accommodation, Ms.
6   Russell states that you submitted a valid
7   request for religious exemption to the
8   COVID-19 vaccine mandate.
9     In that request, Dr. Auteri
10  articulated a sincerely-held religious
11  belief which exceeds the requirements to
12  grant such an exemption.  Dr. Auteri
13  articulated that as a person of faith and a
14  follower of Jesus Christ, his sincerely-held
15  religious beliefs do not permit him to take
16  the COVID-19 vaccine.
17    Would you agree that what I just
18  read does not state an additional basis for
19  religious exemption request beyond what was
20  stated in your letter submitted to Barb
21  Hebel on October 11th?
22    MS. RUSSELL:  Objection.
23    You can answer.
24    THE WITNESS:  I would agree

Page 333

1   with that.
2   BY MR. DURHAM:
3     Q.  Please turn to the following
4   page, bearing Bates P-715.  The -- this is
5   the second full paragraph, the first
6   sentence.
7     Would you mind reading that
8   first sentence for me, please?
9     A.  Second full one, so:  Dr. Auteri
10  requests?
11    Q.  Yes.
12    A.  Dr. Auteri requests that his
13  exemption request be granted, and that as a
14  reasonable accommodation, Dr. Auteri submit
15  to one daily healthcare screening in which
16  Dr. Auteri's temperature is taken, and Dr.
17  Auteri certifies that he has not been
18  exposed to or experiencing any symptoms of
19  COVID-19, and two weekly COVID-19 testing.
20    Q.  Were you willing to agree to
21  those measures if you were allowed to
22  continue performing heart surgery without
23  receiving the COVID-19 vaccination?
24    A.  Yes.

84 (Pages 330 - 333)

JOSEPH S. AUTERI, MD

Page 334

1    Q.   For what period of time were you
2  willing to agree to those measures?
3    A.   I never got asked what period of
4  time.
5    Q.   I'm asking you now.  For what
6  period of time would you have been willing
7  to agree?
8    A.   Such time as the pandemic
9  passed, and it was no longer a threat to
10  patient safety.  Because I was interested,
11  as they claimed to be, in patient safety.
12    Q.   Would you have been willing to
13  agree to any other measures, other than
14  those stated in this letter, as an
15  accommodation?
16    MS. RUSSELL:  Objection.
17    You can answer.
18    THE WITNESS:  You'd have to
19    propose what other measures, and I
20    can tell you if I agree.
21  BY MR. DURHAM:
22    Q.   Would you agree to double
23  masking at all times while in the hospital,
24  unless you're in an enclosed area by

Page 335

1  yourself?
2    MS. RUSSELL:  Objection.
3    You can answer.
4    THE WITNESS:  If somebody showed
5    me data showing that double masking
6    was more effective at reducing
7    transmission than single masking, I
8    would consider it.
9  BY MR. DURHAM:
10    Q.   But if no one showed you data
11  demonstrating that double masking was more
12  effective than single masking, you would not
13  agree to that --
14    MS. RUSSELL:  Object --
15  BY MR. DURHAM:
16    A.   -- accomodation?
17    MS. RUSSELL:  I'm sorry.
18    Objection.
19    You can answer.
20  BY MR. DURHAM:
21    Q.   Is that correct?
22    A.   If double masking was capricious
23  and arbitrary without data to support it,
24  I'd have a hard time doing that.  Number

Page 336

1  one.
2    And number two, I think once the
3  CDC came out and said vaxed people can still
4  transmit the virus, then I would submit to
5  whoever is offering this up, to say,
6  everybody should double mask.  Why just not
7  the vaxed people if the -- sorry -- why just
8  not the unvaxed?  If the vaxed, too, can
9  transmit the virus, they should double mask,
10  too; if we really care about patient safety.
11    Q.   Would you have agreed to wearing
12  a face shield and goggles at all times in
13  the hospital, unless you were in an enclosed
14  area with no other people?
15    MS. RUSSELL:  Objection.
16    You can answer.
17    THE WITNESS:  Same answer.  If
18    data supported that, and it wasn't
19    capricious and arbitrary.  Number
20    one.
21    And number two, the vaxed
22    employees, doctors, whatever -- the
23    vaxed folks who clearly can also
24    transmit virus would also be asked

Page 337

1  to do that.
2  BY MR. DURHAM:
3    Q.   Under those conditions, you
4  would agree to do it?
5    MS. RUSSELL:  Objection.
6    THE WITNESS:  If vaxed and
7    unvaxed were asked to do it, and if
8    there was data to support it, yes.
9  BY MR. DURHAM:
10    Q.   But absent those conditions
11  being met, you would not agree to wearing a
12  face shield and goggles at all times in the
13  hospital unless you were in an enclosed area
14  by yourself?
15    MS. RUSSELL:  Objection.
16    You can answer.
17    THE WITNESS:  Absent those
18    conditions, there's no reasonable
19    argument to be made for doing it.
20    So, no.  I don't think anybody
21    should do it, if you don't have data
22    to show it's a good idea.
23  BY MR. DURHAM:
24    Q.   Would you be willing to practice

85 (Pages 334 - 337)

JOSEPH S. AUTERI, MD

Page 338

1 social distancing, when possible, when not
2 delivering patient care?
3        MS. RUSSELL: Objection.
4        You can answer.
5        THE WITNESS: Same answer. If
6    vaxed and unvaxed were asked to do
7    it, and if data clearly showed it
8    made a difference, be happy to do
9    it.
10 BY MR. DURHAM:
11        Q. Would you be willing to refrain
12 from eating in the cafeteria at Doylestown
13 Health?
14        MS. RUSSELL: Objection.
15        You can answer.
16        THE WITNESS: I'm not sure what
17    eating in the cafeteria has anything
18    to do with this.
19        But if vaxed and unvaxed were
20    asked to do that, and if there was
21    data to show that where you eat
22    affected patient safety, I'd be
23    happy to do it.
24 BY MR. DURHAM:

Page 339

1        Q. Would you agree to refrain from
2 eating in groups anywhere on Doylestown
3 Health's campus?
4        MS. RUSSELL: Objection.
5        You can answer.
6        THE WITNESS: Same answer.
7    Do you want me to say it each
8    time?
9        MR. DURHAM: Please do, yes.
10        THE WITNESS: If vaxed and
11    unvaxed -- because unvaxed -- pardon
12    me -- because vaxed clearly can
13    transmit virus.
14        If vaxed and unvaxed were asked
15    to do that -- what was it, eat in
16    small groups?
17        MR. DURHAM: Refrain from eating
18    in groups anywhere in the hospital.
19        THE WITNESS: Refrain from
20    eating in groups anywhere.
21        Vaxed and unvaxed? Data to
22    support that reduces -- that that
23    improves patient safety? Be happy
24    to do it.

Page 340

1 BY MR. DURHAM:
2        Q. Would you be willing to eat only
3 in an enclosed area, alone, or outside?
4        MS. RUSSELL: Objection.
5        You can answer.
6        THE WITNESS: How many more of
7    these do we got?
8        MS. RUSSELL: Just answer the
9    question, if you don't mind.
10        MR. DURHAM: Answer the
11    question, please.
12        THE WITNESS: Same answer.
13    Vaxed and unvaxed same? Data to
14    support it improves patient safety.
15 BY MR. DURHAM:
16        Q. Would you be willing to undergo
17 twice weekly COVID testing?
18        A. We offered that.
19        MS. RUSSELL: Objection.
20        THE WITNESS: Yes.
21 BY MR. DURHAM:
22        Q. We offered -- I think you
23 offered weekly. So my question was: Would
24 you be willing to undergo twice weekly COVID

Page 341

1 testing?
2        A. Be happy to, yes, because
3 patient safety is the ultimate issue.
4        Q. Go to Auteri-17, please. Please
5 keep Auteri-25 with you as well.
6        A. I'm sorry. What is 17?
7        Q. 17 is the October 16 -- the
8 letter dated October 16.
9        A. Okay.
10        MS. RUSSELL: This is it.
11        THE WITNESS: Okay. 17. Got
12    it.
13 BY MR. DURHAM:
14        Q. So with respect to Auteri-25,
15 please turn to Page 5, which bears Bates
16 P-717.
17        A. I'm there.
18        Q. In the second paragraph under
19 the heading that begins DH's Retaliation.
20        A. I see it.
21        Q. Second sentence. Do you see it
22 says: On October 16th, 2021, Dr. Auteri
23 again reported abuse and harassment at the
24 hands of Dr. Levy?

86 (Pages 338 - 341)

JOSEPH S. AUTERI, MD

Page 438

1  at Doylestown -- from Doylestown Hospital
2  Management notify you about the testing
3  program that is reflected in Auteri-34,
4  Pages 245 and 246?
5        MR. DURHAM: Objection. Lacks
6     foundation.
7        THE WITNESS: No one from
8     anywhere in Doylestown Management
9     notified me of the program.
10 BY MS. RUSSELL:
11    Q.  In January of 2022, did anyone
12 from Doylestown Hospital Management offer
13 you reinstatement if you were willing to
14 follow the testing program that is reflected
15 in Auteri-34?
16       MR. DURHAM: Objection. Lacks
17    foundation.
18       THE WITNESS: No, they did not.
19 BY MS. RUSSELL:
20    Q.  In January 2022, by that time,
21 had you signed any other employment
22 agreement which would have precluded you
23 from accepting an offer of reinstatement at
24 Doylestown, subject to this testing program,

Page 439

1  had it been offered to you?
2        MR. DURHAM: Objection to the
3     form, and lack of foundation.
4        THE WITNESS: No, I hadn't
5     signed anything.
6  BY MS. RUSSELL:
7     Q.  Dr. Auteri, you were asked quite
8  a bit of -- of questions, quite a number of
9  questions earlier in the day about data,
10 about the effectiveness of the COVID-19
11 vaccines.
12       Do you recall Mr. Durham
13 questioning you at length about data, and
14 discussions that you had about data?
15    A.  I recall, yes.
16    Q.  All right.
17       For the purpose of my question,
18 I want you to assume that there was no
19 conflict in any data, and that it was agreed
20 by everyone that the mRNA vaccines were
21 safe; whatever that means.  Just presume
22 that for the sake of this question.
23       Do you understand that?
24    A.  That the vaccines were safe?

Page 440

1     Q.  Correct.  The mRNA vaccines.
2     A.  Presume we had proof that they
3  were safe.
4     Q.  I want you to just assume that.
5  Okay?
6     A.  Okay.
7     Q.  Presuming that the mRNA vaccines
8  were determined to be safe, and there wasn't
9  any disputed data about that, would you have
10 taken the mRNA vaccines and complied with
11 the mandate?
12       MR. DURHAM: Object to the form.
13       THE WITNESS: No, I would not.
14 BY MS. RUSSELL:
15    Q.  Why?
16    A.  Because the mRNA vaccines, by
17 definition, alter DNA and RNA in the
18 recipient, and that goes against my deeply-
19 held religious conviction 1 Corinthians
20 6:19, for, do you not know your body is a
21 temple of the Holy Spirit given to you by
22 God, glorified God in your body.
23       No, I would not have taken the
24 mRNA vaccine, which is why I was waiting

Page 441

1  till the last moment to see if the non-mRNA
2  vaccine -- I believe it was called Novavax,
3  although I may be off on that -- was being
4  developed in Maryland, and it was close, and
5  can I wait?  Will that happen in time?
6        But, no, I would not have taken
7  an mRNA vaccine.
8        MS. RUSSELL: That's all I have.
9     Thank you.
10       MR. DURHAM: Just a couple of
11    more questions for me.
12              - - -
13       EXAMINATION
14              - - -
15 BY MR. DURHAM:
16    Q.  Dr. Auteri, A-34, or Auteri-34,
17 I'll keep my focus on the first page, P-245.
18       Who sent that first e-mail; the
19 bottom of the page?
20       MS. RUSSELL: Objection.
21    There's been a privilege that's been
22    -- or an objection that has been
23    asserted.  There's been a privilege
24    log that's been produced.  And we

111 (Pages 438 - 441)

# Exhibit 4

## Exhibit Filed Under Seal

Exhibit 5

**MEDICAL EXECUTIVE COMMITTEE**
**July 1, 2021 - June 30, 2022**

President.................................................... Brenda A. Foley, M.D. (2023)
President-Elect........................................... Sean C. Reinhardt , M.D. (2023)
Secretary/Treasurer.................................... Nicole E. Geracimos, M.D. (2023)


Cardiovascular Service Line....................... Joseph S. Auteri, M.D. (2022)
Community Service Line............................. Elizabeth A. McKenna, M.D. (2022) and
Diana Pallin, M.D. (2023)
Diagnostic Service Line.............................. Mark S. Silidker, M.D. (2022)
Emergency Service Line............................. Michael Goodyear, D.O. (2023)
Medical Service Line................................... Jeffrey D. Gould, M.D.  (2023) and
Oleg Vinnikov, M.D. (2022)
Oncology Service Line................................ Donna M. Angotti, M.D. (2023)
Orthopedic Service Line............................. Charles B. Burrows, M.D. (2023)
Surgical Service Line.................................. Marc A. Stiefel, M.D. (2023) and
Mikhael H. Sarkis, M.D. (2023)
Women & Children's Health Service Line... Scott A. Dinesen, D.O. (2023)
Member-at-Large……………………………. Christopher J. Bruce, M.D. (2022)
Member-at-Large……………………………. Pinak S. Acharya, M.D. (2022)
Past President………………………………. Kiernan D. Cody, M.D. (2023)

# Exhibit 6

Exhibit Filed Under Seal

# Exhibit 7

## Exhibit Filed Under Seal

# Exhibit 8

Message

---

**From:**      SLevy@dh.org [SLevy@dh.org]
**Sent:**      8/3/2021 7:19:21 PM
**To:**        BFoley@dh.org
**Subject:**   Fwd: Important Message from Brenda Foley, MD


Sent via iPhone
Scott Levy, MD
VP-CMO
Doylestown Hospital
215-345-2010


Begin forwarded message:

**From:** "Levy MD, Scott" <SLevy@dh.org>
**Date:** August 3, 2021 at 3:17:57 PM EDT
**To:** "Pernitsky, Elinor" <EPernitsky@dh.org>
**Cc:** "Foley, Brenda" <BFoley@dh.org>
**Subject: Re: Important Message from Brenda Foley, MD**

 we should Just let him know that 6-7 weeks to get all with both doses is already pretty aggressive

Sent via iPhone
Scott Levy, MD
VP-CMO
Doylestown Hospital
215-345-2010



On Aug 3, 2021, at 3:15 PM, Pernitsky, Elinor <EPernitsky@dh.org> wrote:


I thought he sent this to all-

---

**From:** Gould, Jeffrey <JGould@dh.org>
**Sent:** Tuesday, August 3, 2021 2:08 PM
**To:** Pernitsky, Elinor <EPernitsky@dh.org>
**Subject:** RE: Important Message from Brenda Foley, MD

Would we move this timeline up if the FDA approves the vaccine as non-experimental?

TY!
JG

---

**From:** Pernitsky, Elinor <EPernitsky@dh.org>
**Sent:** Tuesday, August 3, 2021 2:05 PM

**To:** Acharya, Pinak <pinak.acharya@gmail.com>; Angotti, Donna <DAngotti@dh.org>; Auteri, Joseph <JAuteri@dh.org>; Brexler, James <JBrexler@dh.org>; Bruce, Christopher <CBruce@dh.org>; Burrows, Charles <CBurrows@dh.org>; Burrows,Charles <cburrows@yahoo.com>; Cody, Kieran <kcody@bucksortho.com>; Cody, Kieran <kierancody@ymail.com>; Dinesen, Scott <sddo@aol.com>; Dinesen, Scott <SDinesen@dh.org>; Foley, Brenda <BFoley@dh.org>; Geracimos, Nicole <NGeracimos@dh.org>; Goodyear, Michael <MGoodyear@dh.org>; Gould, Jeffrey <JGould@dh.org>; Levy MD, Scott <SLevy@dh.org>; McHugh, Joseph <jmchugh220@aol.com>; McHugh, Joseph <JMcHugh@dh.org>; McKenna, Elizabeth <EMcKenna@dh.org>; Pallin, Diana <dianapallin@yahoo.com>; Pallin, Diana <DPallin@dh.org>; Reinhardt, Sean <seanreinhardt@gmail.com>; Sarkis, Mikhael <MSarkis@dh.org>; Silidker, Mark <MSilidker@dh.org>; Stiefel, Marc <MStiefel@dh.org>; Vinnikov, Oleg <OVinnikov@dh.org>
**Subject:** Important Message from Brenda Foley, MD
**Importance:** High

Good afternoon,

Confidentially, senior hospital administration met this AM and approved moving forward with adding a COVID vaccine requirement to the existing vaccine requirements (e.g. flu) for all DH employees and associates.  This includes employed physicians, staff, volunteers, Pine Run employees, vendors, students, etc.   Full vaccination will be required by 10/4 for all those groups.  Effective 10/5, those that are not vaccinated will be suspended, with termination effective 11/5 if not vaccinated.

This will apply to the majority of our medical staff, as all providers who have clinical privileges to work in the hospital will also require the vaccine.  As with other vaccine requirements at DH, religious/medical exception will be considered.

Med Exec has already endorsed requiring the COVID vaccine for all medical staff members.  We had discussed making this effective after FDA approval, and also not specifically weighing in on consequences if not vaccinated.

*Given the recent mandate as above, does this committee want to extend our endorsement to be effective (as it will be for hospital) now (before FDA approval)?*  [Of note, most medical staff members are already impacted by above mandate.  Our requirement would extend to the independent physicians who work in the community but may not have clinical privileges, and be consistent with rest of medical staff, including suspension/termination.}

D0001044

Given the developments in the COVID landscape, even since our last med exec meeting, I'm sure you have all continued to give this much thought.  I personally am very eager to see our staff get behind this vaccine mandate. History tells us that vaccine requirements have fueled victories over many diseases in our past (ex. polio).  While I recognize the importance of one to have the freedom of choice, this requirement does challenge the value of freedom of choice versus our value of public health for the community we serve.  I welcome your thoughts on this important topic.  Please respond with your thoughts to above question by the end of the day today, August 3rd.

Thank you,

Brenda Foley, MD, FACEP
Medical Director, Emergency Department
Medical Staff President
Doylestown Hospital

# Exhibit 9

Message

| | |
|---|---|
| **From**: | Pernitsky, Elinor [/O=PENNCARE/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=485CBB4AC4714D98ACA188851F958A07-PERNITSKY, ELIN] |
| **Sent**: | 8/4/2021 5:53:43 PM |
| **To**: | Acharya, Pinak [pinak.acharya@gmail.com]; Angotti, Donna [DAngotti@dh.org]; Auteri, Joseph [jauteri@dh.org]; Brexler, James [JBrexler@dh.org]; Bruce, Christopher [CBruce@dh.org]; Burrows, Charles [CBurrows@dh.org]; Burrows, Charles [cburrows@yahoo.com]; Cody, Kieran [kcody@bucksortho.com]; Cody, Kieran [kierancody@ymail.com]; Dinesen, Scott [sddo@aol.com]; Dinesen, Scott [SDinesen@dh.org]; Foley, Brenda [bfoley@dh.org]; Geracimos, Nicole [NGeracimos@dh.org]; Goodyear, Michael [MGoodyear@dh.org]; Gould, Jeffrey [JGould@dh.org]; Levy, Scott [slevy@dh.org]; McHugh, Joseph [jmchugh220@aol.com]; McHugh, Joseph [JMcHugh@dh.org]; McKenna, Elizabeth [emckenna@dh.org]; Pallin, Diana [dianapallin@yahoo.com]; Pallin, Diana [DPallin@dh.org]; Reinhardt, Sean [seanreinhardt@gmail.com]; Sarkis, Mikhael [MSarkis@dh.org]; Silidker, Mark [MSilidker@dh.org]; Stiefel, Marc [MStiefel@dh.org]; Vinnikov, Oleg [OVinnikov@dh.org] |
| **Subject**: | Important Message from Brenda Foley, MD |

**Importance**:    High

Thank you to all of you for your thoughtful responses.

To memorialize this, the resolution is as below:

"...~~(pending FDA approval)~~ **the Executive Committee endorses requiring vaccination for the medical staff and all hospital Associates (except those with approved medical or religious exemptions)"**. ~~The implementation and enforcement is beyond the purview of this Committee"~~.

Regards,

Brenda Foley, MD, FACEP
Medical Director, Emergency Department
Medical Staff President
Doylestown Hospital

---

**From:** Pernitsky, Elinor
**Sent:** Tuesday, August 3, 2021 2:05 PM
**To:** Acharya, Pinak ; Angotti, Donna ; Auteri, Joseph ; Brexler, James ; Bruce, Christopher ; Burrows, Charles ; Burrows, Charles ; Cody, Kieran ; Cody, Kieran ; Dinesen, Scott ; Dinesen, Scott ; Foley, Brenda ; Geracimos, Nicole ; Goodyear, Michael ; Gould, Jeffrey ; Levy, Scott ; McHugh, Joseph ; McHugh, Joseph ; McKenna, Elizabeth ; Pallin, Diana ; Pallin, Diana ; Reinhardt, Sean ; Sarkis, Mikhael ; Silidker, Mark ; Stiefel, Marc ; Vinnikov, Oleg
**Subject:** Important Message from Brenda Foley, MD
**Importance:** High

Good afternoon,

Confidentially, senior hospital administration met this AM and approved moving forward with adding a COVID vaccine requirement to the existing vaccine

requirements (e.g. flu) for all DH employees and associates. This includes employed physicians, staff, volunteers, Pine Run employees, vendors, students, etc. Full vaccination will be required by 10/4 for all those groups. Effective 10/5, those that are not vaccinated will be suspended, with termination effective 11/5 if not vaccinated.

This will apply to the majority of our medical staff, as all providers who have clinical privileges to work in the hospital will also require the vaccine. As with other vaccine requirements at DH, religious/medical exception will be considered.

Med Exec has already endorsed requiring the COVID vaccine for all medical staff members. We had discussed making this effective after FDA approval, and also not specifically weighing in on consequences if not vaccinated.

_Given the recent mandate as above, does this committee want to extend our endorsement to be effective (as it will be for hospital) now (before FDA approval)?_ [Of note, most medical staff members are already impacted by above mandate. Our requirement would extend to the independent physicians who work in the community but may not have clinical privileges, and be consistent with rest of medical staff, including suspension/termination.}

Given the developments in the COVID landscape, even since our last med exec meeting, I'm sure you have all continued to give this much thought. I personally am very eager to see our staff get behind this vaccine mandate. History tells us that vaccine requirements have fueled victories over many diseases in our past (ex. polio). While I recognize the importance of one to have the freedom of choice, this requirement does challenge the value of freedom of choice versus our value of public health for the community we serve. I welcome your thoughts on this important topic. Please respond with your thoughts to above question by the end of the day today, August 3rd.

Thank you,

Brenda Foley, MD, FACEP
Medical Director, Emergency Department
Medical Staff President
Doylestown Hospital

D0000108

# Exhibit 10

**DOYLESTOWN HEALTH SYSTEM**

MEMO TO:      ALL ASSOCIATES
MEMO FROM:  Barbara Hebel, VP Human Resources
DATE:         August 6, 2021
SUBJECT:      **REQUIRED COVID-19 VACCINE**

First, thank you. The last 16 months health care professionals have sacrificed much to care for many, fighting COVID-19 skillfully, bravely and tirelessly. A grateful community has watched and rightly bestowed upon you a legacy of respect. On behalf of Senior Leadership and the Boards of our organizations, we add our own thanks for the tremendous dedication you each have shown in the face of a relentless pandemic. Yet, we must ask more.

While the arrival of vaccines was great news in the fight to defeat COVID-19, it has not brought an immediate end the pandemic.  Just as we have been pushing for adoption of the precautions we all know work – masking, hand hygiene and physical distancing – we must also push for high rates of vaccination within our communities and the U.S. population if we hope to overcome this virus. This will require trust in the COVID vaccination process, from the development, distribution and the administration of a safe and effective vaccine as well as a willing public to be vaccinated.

As frontline caregivers, our essential role in protecting the health and wellbeing of our communities goes beyond the care we provide. As a valued and trusted voice, our example is perhaps the strongest health resource we have.  **Therefore, in keeping with our commitment to protect the health and safety of our Associates, volunteers, patients, Medical Staff and the community we proudly serve, Doylestown Health will require that all Associates, volunteers and Medical Staff members, whether or not they provide direct patient care, and whether they work on campus or remotely, be vaccinated against COVID-19.**  This decision was not made lightly, as members of the senior and Medical Staff leadership conducted a thorough analysis as part of the decision-making process.  Requiring the vaccination as a condition of employment, is the most effective way we can protect our Associates, our patients and the communities we serve. The COVID-19 vaccines offer us the path to move beyond the pandemic in the same way vaccination has brought an end to the epidemics of smallpox, polio, measles and other deadly diseases.

Currently, 82% of our Associate population have already been vaccinated, as have millions of individuals across the country and world.  The decision, is consistent with national, state and local actions, and supported by the major healthcare professional organizations.  Based on current scientific research, the COVID 19 vaccines are safe and effective at preventing COVID, and the few post-vaccine cases are far less likely to cause severe illness or require hospitalization.

Our timeline for completing the vaccine series and meeting this requirement will be **October 4, 2021**. First dose vaccinations must be administered, no later than **September 8, 2021**; with the second dose being completed by **October 4, 2021**.  We will follow Doylestown Health's current vaccination policy (which is attached.)   In those instances when an individual is unable to get vaccinated due to a documented medical condition or strongly held religious belief, Doylestown Health will follow the established process for requesting an exemption consistent with our overall vaccination policy for other diseases including flu, hepatitis B, etc. To offer convenient access to the vaccine, we will offer vaccine clinics at a variety of locations free of charge.  If you are not able to attend one of the on-site vaccination clinics, you may choose to get vaccinated by another COVID-19 vaccination provider or site throughout the community.  Any Associate that has received the vaccination through an outside organization must provide proof of inoculation by October 4, 2020 to the Occupational Health Department.

We understand you may have questions about the vaccine. COVID-19 vaccines are being held to the same safety standards as all other vaccines.  As such over the next several days, educational sessions and details on the vaccination session will be announced.

Should you have any questions or comments, we have established two communication lines for our Associates to utilize:

**Online Form- insert this link**                              [ HYPERLINK "https://doylestownhealth.formstack.com/forms/associate_covid_vaccine_questions" ]

**Voicemail**
**215-489-1247 (x1247**

We are confident that together, we can make a different in the fight against this pandemic so that we can continue to grow and meet the needs of the community we serve who come to us for care.

D0000115

Exhibit 11

Message

---

**From**:       BHebel@dh.org [BHebel@dh.org]
**Sent**:       8/30/2021 8:39:16 PM
**CC**:         AEdelson@dh.org
**Subject**:    COVID-19 Vaccine Requirement Information

As frontline caregivers, our essential role in protecting the health and wellbeing of our communities goes beyond the care we provide. As a valued and trusted voice, our example is perhaps the strongest health resource we have. **Therefore, in keeping with our commitment to protect the health and safety of our Associates, volunteers, patients, Medical Staff and the community we proudly serve, Doylestown Health will require that all Associates, volunteers and Medical Staff members, whether or not they provide direct patient care, and whether they work on campus or remotely, be vaccinated against COVID-19.**

Our timeline for completing the vaccine series and meeting this requirement will be **October 4, 2021**. First dose vaccinations must be administered, no later than **September 10, 2021**; with the second dose being completed by **October 4, 2021**. We will follow Doylestown Health's current vaccination policy (which is attached.)   In those instances when an individual is unable to get vaccinated due to a documented medical condition or significantly held religious belief, Doylestown Health will follow the established process for requesting an exemption consistent with our overall vaccination policy for other diseases including flu, hepatitis B, etc. To offer convenient access to the vaccine, we have been offering  vaccine clinics at a variety of locations free of charge.   The remaining clinic are scheduled to get your vaccine.  Please schedule a time ASAP.   If you are not able to attend one of the on-site vaccination clinics, you may choose to get vaccinated by another COVID-19 vaccination provider or site throughout the community.  **Any Associate that has received the vaccination through an outside organization must provide proof of inoculation by October 4, 2020 to the Occupational Health Department.**

**NOTE:   If receiving the J& J vaccine, Associates may schedule anytime up until October 4, 2021**

How to sign up for a vaccine appointment:

Please use the links below to sign up for a vaccine appointment. Due to recent upgrades, do not use Internet Explorer to sign up. You are unable to access dates/times.

Please **COPY + PASTE** the link of the date you want to sign up for into Google Chrome directly. Google Chrome is the red, yellow, and green icon.

**LOCATION:  HOSPITAL – Old rehab area off of the Main Lobby**

**Tuesday, 8/31 4pm-7:50pm -  Pfizer and J&J Vaccine**
https://www.eventbrite.com/e/166157147501

**Friday, 9/3 5:30 am – 9 am – Moderna and J&J Vaccine**
https://www.eventbrite.com/e/166155085333

**Tuesday, 9/7 4pm-7:50pm - Pfizer and J&J Vaccine**
https://www.eventbrite.com/e/166157699151
 Additional clinics will be added for J&J  - watch for e-mails.


**URGENT CARE – Swamp Road – across from Thompson BMW**

**Wednesday, 9/1 - noon -4 pm - Pfizer and J&J Vaccine**

https://www.eventbrite.com/e/166188266579

**Wednesday, 9/8 - noon -4 pm - Pfizer and J&J Vaccine**
https://www.eventbrite.com/e/166189109099


Should you have any questions or comments, we have established two communication lines:

**Online Form- insert this
link**                          https://doylestownhealth.formstack.com/forms/associate_covid_vaccine_questions
**Voicemail**
**215-489-1247 (x1247)**


We are confident that together, we can make a different in the fight against this pandemic so that we can continue to grow and meet the needs of the community we serve who come to us for care.

*Barbara A Hebel*
Vice President and Chief Human Resources Officer
Doylestown Health System
595 West State Street
Doylestown, PA  18901
bhebel@dh.org
215-345-2688

D0001588

Exhibit 12

# COVID-19 Vaccines FAQ's

*For the most up-to-date and detailed information, see* [ HYPERLINK "https://www.cdc.gov/vaccines/covid-19/clinical-considerations/covid-19-vaccines-us.html" ]

This document includes FAQ on the following topics:

- General information about the vaccines
- COVID-19 Infection, exposure, or testing and the vaccine
- Vaccination in Special Populations
- Administration with other vaccines
- Allergies and the vaccine

**Key points**

COVID-19 vaccination is recommended for everyone 12 years and older for the prevention of coronavirus disease 2019 (COVID-19) in the United States. The Advisory Committee on Immunization Practices (ACIP) has issued interim recommendations for the use of:

- Pfizer-BioNTech COVID-19 vaccine (in persons ages ≥12 years)
- Moderna COVID-19 vaccine (in persons ages ≥18 years)
- Janssen (Johnson & Johnson) COVID-19 vaccine (in persons ages ≥18 years)

## General information about the COVID-19 vaccines

- **How do the vaccines work?**
    - mRNA Vaccines (Pfizer and Moderna)
        - Two COVID-19 vaccines use messenger RNA (mRNA), which is a set of instructions that tells a cell to make a specific protein. For SARS-CoV-2 (COVID-19), this is the spike protein that is found on the surface of the viral envelope. The mRNA used in the vaccines <u>do not</u> enter the cell's nucleus and has no interaction with a cell's DNA. It is also <u>not a virus</u> and cannot replicate itself. The mRNA is <u>rapidly broken down</u> by the cell once the instructions have been transmitted, so it does not cause mutations or cellular defects, and has not been associated with infertility. Although these are the first mRNA vaccines to be broadly tested and used in clinical practice, scientists have been working on mRNA therapies for 30 years and US government provided significant grants in support mRNA vaccine research (ex. $25 million to Moderna in 2013 for mRNA flu vaccine).
    - Adenovirus COVID-19 Vaccines (J&J)
        - This vaccine uses modified adenovirus that contains DNA for the spike protein. The adenovirus is able to enter a cell and cause the spike protein to be made. Adenoviruses are a source of the common cold, <u>but this particular virus cannot</u> replicate so it will not cause disease. Once the spike protein is made, it is put on the surface of the cell, where it is seen by the immune cells and causes them to become activated and respond. The result is the production of neutralizing antibodies.

- **Why should I get a vaccine?**
  - All COVID-19 vaccines are effective at preventing COVID-19, hospitalizations and death.
  - By getting vaccinated, you are reducing your risk of disease, hospitalization, severe complications, and even death.
  - Vaccines make it harder for the virus to spread, which can prevent new viral variants
  - While efficacy at preventing COVID-19 with the delta variant is decreased, the vaccines are still very effective at reducing infection, hospitalization and death (deaths due to breakthrough infections in vaccinated individuals are rare)

- **Can the vaccine make me sick from COVID-19 or can I spread COVID-19 to someone after receiving the vaccine?**
  - mRNA vaccines do not contain any actual virus and do not carry a risk of causing disease in the vaccinated person, or of the person being vaccinated spreading the disease.
  - The authorized adenovirus vaccine (J&J) uses a modified virus that can't replicate and does not cause any disease, so it would not cause COVID-19 nor could the vaccinated person be at risk of spreading COVID-19 from receiving the vaccine.
  - Following vaccination, a person can develop some fevers and chills which is the body's natural response when creating the antibodies, but this should not be confused with a COVID infection.

- **Are the vaccines FDA-approved?**
  - There are currently no FDA-approved vaccines to prevent COVID-19
    - This may change soon as the FDA is currently evaluating Pfizer and is expected to make a decision by early fall.  Additionally, Moderna plans to submit for full approval evaluation by the end of August
  - The vaccines are currently approved through Emergency Use Authorization (EUA)
  - EUA's allow the government to facilitate the availability of medications, vaccines, and devices (diagnostic testing) during public health emergencies (such as the current COVID-19 pandemic)
  - The FDA has met to review the available efficacy and safety data from the clinical trials (which showed ~95% efficacy) and authorized the vaccines to be used for the pandemic

- **Are the vaccines safe if they have not followed the normal FDA-approval process?**
  - No safety steps were skipped in evaluating the vaccines for efficacy and safety
  - Operation Warp Speed assisted with reducing the time until vaccines were available by reducing hurdles in the manufacturing and distribution processes as well as prioritizing COVID-19 vaccine regulatory decisions over the FDA back log of other medications seeking approval.
  - Historically, vaccine monitoring has shown that side effects happen within 6 weeks of receiving a vaccine dose. These vaccines were studied for at least 8 weeks after the final doses were administered in the initial studies that lead to their emergency use authorization. mRNA vaccines approved in Dec and Jan; J&J approved at end of Feb)  Since EUA approval side effects to these vaccines have been closely monitored by the CDC in a transparent database of reported side effects (anyone can report events) and  that can be accessed by anyone via the internet.

- o Over 193 **MILLION** people have received at least one dose of a COVID-19 Vaccine in the US alone (over 348 million total doses have been administered) and no long-term side effects have been detected.
- o It is estimated that vaccinations have prevented 1.25 million hospitalizations and 240,000 deaths from COVID.
- o As of July 19th 2021, a total of 3 people have died in America as the result of COVID vaccination. All 3 deaths were due to very rare immune reactions that caused blood clots related to the Janssen COVID-19 Vaccine. Through vaccine safety monitoring these were identified and now healthcare workers have the ability to identify and treat this rare side effect to prevent any future deaths.
- o There have been no deaths associated with either mRNA vaccine in America.
- o As of August 5th 2021 there have been over 619,500 deaths in America from COVID-19.

- **What are the dosing scheduled of the vaccines and will booster dosing be required?**

| Vaccine | Vaccine Type | Number of Doses | Minimum interval between doses |
|---|---|---|---|
| Pfizer-BioNTech | mRNA | 2 | 3 weeks (21 days) |
| Moderna | mRNA | 2 | 1 month (28 days) |
| Janssen | Adenovirus | 1 | N/A |

- o A person is considered fully vaccinated against COVID-19 two weeks after receipt of the completing the vaccine series (2 doses for mRNA vaccines and 1 dose for adenovirus)
- o It is not recommended to receive the vaccine earlier than the minimum interval
- o The need for and timing of booster doses has not been established at this time

## COVID-19 infection, exposure or testing and the vaccine

- **Should I get the COVID-19 vaccine if I have recently been infected with the COVID-19 virus?**
- o Even if you have been infected with SARS-CoV-2 virus, it is possible to be re-infected.
- o The COVID-19 vaccines are safe in persons with evidence of a prior COVID-19 infection.
- o Vaccination should be deferred until the person has recovered from acute illness and they are no longer required to quarantine
- o People who have received treatment for COVID-19 with monoclonal antibody medication [i.e. bamlanivimab/etesevimab or casirivimab/indevimab]) may receive the COVID-19 vaccine, <u>but it should be deferred for at least 90 days</u>
    - This is a precautionary measure to avoid potential interference of antibody therapy with vaccine-induced immune response
    - For the mRNA vaccines, if monoclonal antibodies are received between the first and

D0000118

## Special populations

- **Can persons with underlying medical conditions receive the COVID-19 vaccine?**
  - Both mRNA and viral vector vaccines may be administered to people with underlying medical conditions as long as there are no contraindications to vaccination.
- **Can people with a history of myocarditis and pericarditis (inflammation in or around the heart) receive the COVID-19 vaccine?**
  - People with a history of myocarditis and pericarditis (inflammation in or around the heart) unrelated to mRNA COVID-19 vaccinations may receive any COVID-19 vaccine after the episode of myocarditis or pericarditis has completely resolved
  - There have been rare occurrences of myocarditis (inflammation of the heart) and pericarditis (inflammation of the lining around the heart) following mRNA vaccines
  - Cases have primarily been in males aged 12-29 soon after receiving a 2nd dose (~4 days).
  - Most patients required hospitalizations, but symptoms were manageable and resolved
  - If a person develops myocarditis after the first dose of a mRNA COVID-19 vaccine, it is recommended to defer a second dose at this time
- **Can immunocompromised people receive the COVID-19 vaccine?**
  - Immunocompromised people include people living with HIV and other immunocompromising conditions, or people who take immunosuppressive medications or therapies that may be at increased risk of developing severe COVID-19
  - All currently authorized FDA authorized COVID-19 vaccines <u>are not live vaccines</u> and are safe to use in immunocompromised people who have no other contraindications
  - Although safe, the effectiveness of the COVID-19 vaccines may be reduced in immunocompromised people
    - The potential benefits of the vaccines still outweigh any uncertainties and the vaccine is still recommended in immunocompromised people
    - Ensure practice of other prevention measures in addition to vaccination – including wearing a mask, staying 6 feet apart from others, avoiding crowds and poorly ventilated spaces, and frequent hand washing
- **Can people with autoimmune conditions receive the COVID-19 vaccine?**
  - People with autoimmune conditions were eligible for enrollment in COVID-19 vaccine clinical trials
  - No imbalances were observed in the occurrence of symptoms consistent with autoimmune conditions or inflammatory disorders in clinical trial participants who received COVID-19 vaccine compared to placebo
  - People with autoimmune conditions who have no contraindications may receive any FDA-authorized COVID-19 vaccine
- **Can people with a history of Guillain-Barré syndrome receive the COVID-19 vaccine?**
  - Guillain-Barré syndrome (GBS) is a disorder of the immune system where the nerves are attacked by the immune cells.
  - No cases of Guillain-Barré syndrome (GBS) were reported following vaccination among participants in the mRNA COVID-19 vaccine clinical trials
  - One case of GBS was reported in a participant in the vaccine group in the Janssen COVID-19 vaccine clinical trial, compared to one GBS case among those who received placebo
  - The FDA has released a report that there have been 100 cases of suspected GBS out of 12.8 Million people who have received the Janssen (J&J) adenovirus vaccine

- These were reported using the VAERS system and are not confirmed cases of GBS
- The GBS Foundation supports the stance that the benefits of any of the COVID-19 vaccines outweigh any potential risks and recommends vaccination with any of the COVID-19 vaccines
- There have been no increased incidence of GBS reported with the mRNA vaccines and in persons who remain concerned about GBS at this time, may preferentially consider receiving an mRNA vaccine.
  - People with a history of GBS may receive any FDA-authorized COVID-19 vaccine as long as they have no other contraindications
- **Can people with a history of Bell's palsy (a specific type of facial paralysis) receive the COVID-19 vaccine?**
  - There have been rare reports of Bell's palsy in COVID-19 vaccine trials, however there is insufficient data to determine if these cases were linked to vaccination
  - Any patient with a history of Bell's palsy and no other contraindications may still receive any FDA-authorized COVID-19 vaccine
  - The FDA is continually monitoring the safety of the vaccines
- **Can people with a history of dermal filler (such as 'lip fillers') use receive the COVID-19 vaccine?**
  - Infrequently, people who have received dermal fillers might experience swelling at or near the site of filler injection (usually face or lips) following administration of a dose of an mRNA COVID-19 vaccine
    - No similar occurrences were observed in the Janssen  (J&J) COVID-19 vaccine clinical trials
  - The swelling is temporary and resolves with medical treatment
  - FDA-authorized COVID-19 vaccines can be administered to people who have received injectable dermal fillers who have no contraindications or precautions for vaccination
    - Contact a healthcare professional if experiencing swelling at or near a dermal filler site following vaccination
- **Which vaccine is recommended for women aged < 50 years?**
  - Women less than 50 years old may receive any of the FDA-authorized COVID-19 vaccines
  - The Janssen (J&J) adenovirus vaccine has a rare risk for thrombosis with thrombocytopenia syndrome (TTS) (this when blood clots and low blood platelets occur at the same time). While rare, risk appears to be higher in women < 50 years of age than in women older than 50 years (7 cases per million in women ages 18-49)
- **Can pregnant women be vaccinated?**
  - Pregnant people with COVID-19 have an increased risk of severe illness from COVID-19
  - Additionally, they are at increased risk of preterm birth and other adverse pregnancy complications
  - There is limited but growing data on the safety of COVID-19 vaccines in pregnant people
  - Based on current knowledge, experts believe that COVID-19 vaccines are unlikely to pose a risk to the pregnant person or fetus
    - The vaccines cannot cause infection in the mother or fetus
    - No evidence exists of risk to the fetus from vaccinating pregnant people with non-replicating vaccines in general (meaning years of data from many vaccines)
  - CDC recently released the first U.S. data on the safety of mRNA COVID-19 vaccines administered during pregnancy which <u>did not</u> identify any safety concerns for pregnant people who were vaccinated or for their babies

- o A conversation between the patient and their clinical team may assist with decisions about the use of a COVID-19 vaccine
- o Any of the of the currently authorized COVID-19 vaccines can be administered to pregnant people with no other contraindications
- o Acetaminophen can be offered as an option for pregnant people experiencing fever or other post-vaccination symptoms
- o Those who are trying to become pregnant do not need to avoid pregnancy after COVID-19 vaccination and there is no evidence that any of the COVID-19 vaccines affect future fertility
- o **The American College of Obstetricians and Gynecologists (ACOG) and the Society for Maternal-Fetal Medicine (SMFM) recommends that all eligible persons, including pregnant and lactating individuals, receive a COVID-19 vaccine or vaccine series**
- o Read more about these recommendations: https://s3.amazonaws.com/cdn.smfm.org/media/3044/Press_Release_with_ACOG.pdf

- **Can people who are breastfeeding/lactating be vaccinated?**
  - o There are no data on the safety of COVID-19 vaccines in lactating people or the effects of COVID-19 vaccines on the breastfed infant or milk production and excretion
  - o However, the FDA-authorized COVID-19 vaccines cannot cause infection in either the mother or the infant
  - o Therefore, lactating people with no other contraindications can receive a COVID-19 vaccine

- **Which vaccine should I receive if I have a history of thrombosis (blood clots) or risk factors for thrombosis?**
  - o Until more information is available, mRNA vaccines are preferred to the Janssen (J&J) adenovirus vaccine in persons with a recent history (≤ 90 days)  of an immune-mediated syndrome characterized by thrombosis and thrombocytopenia (such as heparin-induced thrombocytopenia aka HIT)
    - ▪ After 90 days, patients may be vaccinated with any FDA-authorized COVID-19 vaccine
  - o Persons with a history of deep vein thrombosis or pulmonary embolism may receive any FDA-authorized COVID-19 vaccine


## Administration with other vaccines

- COVID-19 vaccines and other vaccines may be administered without regard to timing
- If multiple vaccines are administered at a single visit, they should be administered at a separate injection site

## Allergies and the vaccines (see chart See chart for potential characteristics of reactions)

- mRNA vaccines
    - Polyethylene glycol (PEG) is an ingredient in both mRNA vaccines. Persons with severe allergic reactions (e.g. anaphylaxis) to polyethylene glycol should avoid both mRNA vaccines
    - People who received one mRNA COVID-19 vaccine dose but for whom the 2nd dose is contraindicated may receive the J&J vaccine but should wait at least 28 days after mRNA vaccine.
- Janssen (J&J) adenovirus vaccine
    - Polysorbate 80 is an ingredient in Janssen (J&J) adenovirus vaccine. Persons with severe allergic reactions (e.g. anaphylaxis) to polysorbate 80 should avoid the J&J adenovirus vaccine
- Allergic reactions to food, pets, venom, or environmental allergies are not a contraindication or precaution to the vaccine. In addition, the mRNA vaccines do not contain egg, gelatin, latex or preservatives
- Vasovagal reactions (fainting or near fainting) are not precautions or contraindications to the vaccine

| Characteristic | Immediate allergic reactions (including anaphylaxis) | Vasovagal reaction | Vaccine side effects (local and systemic) |
|---|---|---|---|
| Timing after vaccination | Most occur within 15-30 minutes of vaccination | Most occur within 15 minutes | Median of 1 to 3 days after vaccination (with most occurring day after vaccination) |
| **Signs and symptoms** | | | |
| Constitutional | Feeling of impending doom | Feeling warm or cold | Fever, chills, fatigue |
| Cutaneous | Skin symptoms present in ~90% of people with anaphylaxis, including pruritus, urticaria, flushing, angioedema | Pallor, diaphoresis, clammy skin, sensation of facial warmth | Pain, erythema or swelling at injection site; lymphadenopathy in same arm as vaccination |
| Neurologic | Confusion, disorientation, dizziness, lightheadedness, weakness, loss of consciousness | Dizziness, lightheadedness, syncope (often after prodromal symptoms for a few seconds or minutes), weakness, changes in vision (such as spots of flickering lights, tunnel vision), changes in hearing | Headache |
| Respiratory | Shortness of breath, wheezing, bronchospasm, stridor, hypoxia | Variable; if accompanied by anxiety, may have an elevated respiratory rate | N/A |
| Cardiovascular | Hypotension, tachycardia | Variable; may have hypotension or bradycardia during syncopal event | N/A |
| Gastrointestinal | Nausea, vomiting, abdominal cramps, diarrhea | Nausea, vomiting | Vomiting or diarrhea may occur |
| Musculoskeletal | N/A | N/A | Myalgia, arthralgia |
| **Vaccine recommendations** | | | |
| Recommended to receive 2nd dose of mRNA COVID-19 vaccine? | No | Yes | Yes |

D0000122

## How can I manage the side effects of the Vaccine

- For all COVID-19 vaccines, NSAIDs (ex. Motrin or Advil) or acetaminophen (aka Tylenol) can be taken for the treatment of post-vaccination local or systemic symptoms, if medically appropriate for you (meaning some patients doctors may tell them to avoid acetaminophen or NSAIDs due to other medical conditions)
- However, it is not recommended to take any of these medications prior to vaccination for the purpose of preventing post-vaccination symptoms. Some patient experience no post-vaccination symptoms at all.
- Anaphylactic reactions have been rarely reported following receipt of COVID-19 vaccines. Administration of antihistamines to COVID-19 vaccine recipients before vaccination to prevent allergic reactions is not recommended. Antihistamines do not prevent anaphylaxis, and their use might mask symptoms, which could lead to a delay in the diagnosis and management of anaphylaxis.

- Although rare regarding the Janssen (J&J) COVID-19 vaccine, seek medical attention right away of the following symptoms occur:

  - Shortness of breath
  - Chest pain
  - Leg swelling
  - Persistent abdominal pain
  - Severe or persistent headaches or blurred vision
  - Easy bruising or tiny blood spots under the skin beyond the site of the injection.

# Exhibit 13

## Exhibit Filed Under Seal

# Exhibit 14

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


JOSEPH S. AUTERI, M.D.   :   No. 22-cv-03384
       Plaintiff,   :
                :
    vs.   :
                :
VIA AFFILIATES, d/b/a   :   JURY TRIAL
DOYLESTOWN HEALTH   :   DEMANDED
PHYSICIANS   :
       Defendant.   :


- - -

Thursday, February 13, 2025

- - -


Deposition of SCOTT LEVY, M.D.,
taken pursuant to notice, at the law offices
of Kaplin Stewart Meloff Reiter & Stein,
P.C., 910 Harvest Drive, Blue Bell,
Pennsylvania, before Michele L. Murphy, a
Registered Professional Reporter and Notary
Public, on the above date, beginning at
approximately 9:34 a.m.

- - -

1  it printed in black and white also, if that's
2  a little easier for you, but let me know when
3  you've had a chance to look at it.
4         (Brief pause.)
5     A.   Okay.
6     Q.   Is P-256 an e-mail that you sent on
7  August 15th of 2021?
8     A.   Yes, it is.
9     Q.   The next document that I'm going to
10 show you, sir, begins at Page D-129.  Please
11 take a minute to look at that document and let
12 me know when you've finished and can answer a
13 question about it.
14        (Brief pause.)
15    A.   Okay.
16    Q.   Can you identify this document,
17 which for the record is D-129 and D-130?
18    A.   I can't.  It looks like it's a
19 COVID-19 Vaccination Declination, but I see
20 language regarding the influenza.
21    Q.   Look in the bullet points that are
22 underneath the heading that says Declination
23 of Annual Influenza Vaccination.  Does that
24 refer to COVID-19 vaccination in any of the
25 bullet points?

1     A.   It appears to.
2     Q.   Okay.  And then if we look at the
3  Precautions sections below, the first bulleted
4  item, which is little boxes, refers to the
5  COVID-19 vaccine.  Do you see that?
6     A.   I do.
7     Q.   Now, have you seen this form before
8  today?
9     A.   I thought I had, with that one
10 exception on the top of the -- which says
11 influenza, but the COVID content seems
12 familiar with what I've seen before.
13    Q.   Regardless of the, what I'll just
14 call, errant heading at the top, do you
15 understand this to be a form to be used for an
16 individual to decline COVID-19 vaccination?
17    A.   That is correct.
18    Q.   Who prepared this document?
19    A.   I am not sure.
20    Q.   Did you draft any portion of it?
21    A.   I did not.
22    Q.   Did you review this document before
23 it was issued?
24    A.   I don't have any recollection of
25 having done so.

1     Q.   Did you approve this document for
2  circulation?
3     A.   I did not.
4     Q.   To your knowledge, was this document
5  in effect in October and November of 2021?
6     A.   Barring any potential change I'm not
7  familiar with, yes.  It was the same -- it
8  would be the same document.
9     Q.   Does this document accurately
10 reflect Doylestown Health and Doylestown
11 Hospital's policy regarding COVID-19 vaccine
12 declination as of November 18th of 2021?
13    A.   It would.
14    Q.   Did Doylestown Health and Doylestown
15 Hospital follow this policy at all times from
16 August of 2021 through January of 2022?
17        MS. BASSANI:  Objection to
18    form.
19        You can answer.
20        THE WITNESS:  From my
21    recollection and my understanding, yes.
22 BY MS. RUSSELL:
23    Q.   Did Doylestown Health or Doylestown
24 Hospital grant any religious exemptions at any
25 time from August of 2021 through January 2022?

1     A.   They did.
2     Q.   How many?
3     A.   My recollection is the number was
4  somewhere between 40 and 50.
5     Q.   Did Doylestown Health grant any
6  medical exemptions for the timeframe from
7  August of 2021 through January of 2022?
8     A.   I'm familiar with two deferrals of
9  vaccination.  I don't recall specifically any
10 medical exemptions.
11    Q.   Were any of the religious exemptions
12 which were granted in the timeframe from
13 August of 2021 through January of 2022 of
14 patient-facing employees?
15    A.   I was not involved in the religious
16 exemption overview.  However, I am aware of
17 the fact that there were employees who worked
18 in high-risk areas who were reassigned to
19 other areas.
20    Q.   What were the other areas to which
21 those individuals were reassigned?
22    A.   Non-patient-facing areas in the
23 institution and other areas that were
24 considered to be of low risk for patient
25 contact and transmission.

Page 130

1  individuals.
2  BY MS. RUSSELL:
3      Q.   Did you discuss with Elinor
4  Pernitsky Dr. Auteri's first or second
5  exemption request on or before November 18th
6  of 2021 when Dr. Auteri was terminated?
7           MS. BASSANI:  Objection to
8      form.
9           You can answer.
10          THE WITNESS:  As I've testified
11     earlier today, HR documentation was
12     confidential and I did not have the
13     authority, ability, nor would I have
14     conversations about those requests with
15     anybody beyond the scope of the HR
16     Department.
17 BY MS. RUSSELL:
18     Q.   Did you have any discussions with
19 Elinor Pernitsky regarding Dr. Auteri's first
20 and second exemption requests and how he could
21 be accommodated on or before November 18, 2021
22 when Dr. Auteri was terminated?
23          MS. BASSANI:  Objection to
24     form.
25          You can answer.

Page 131

1           THE WITNESS:  As I've stated
2      previously and just now, no.
3  BY MS. RUSSELL:
4      Q.   Did you hear Elinor Pernitsky
5  discuss Dr. Auteri's first or second exemption
6  request and how Dr. Auteri could be
7  accommodated any time before Dr. Auteri was
8  terminated on November 18th of 2021?
9           MS. BASSANI:  Objection to
10     form.
11          You can answer.
12          THE WITNESS:  No.
13 BY MS. RUSSELL:
14     Q.   Did you speak with Dr. Guidera
15 regarding Dr. Auteri's first or second
16 exemption request and how Dr. Auteri could be
17 accommodated on or before November 18th, 2021
18 when Dr. Auteri was terminated?
19          MS. BASSANI:  Objection to
20     form.
21          You can answer.
22          THE WITNESS:  The question is
23     after October 12th, was that conversation
24     had?  The answer is no.
25 BY MS. RUSSELL:

Page 132

1      Q.   Did you hear Dr. Guidera speaking
2  with anyone about Dr. Auteri's first or second
3  exemption request and how Dr. Auteri could be
4  accommodated on or before November 18, 2021
5  when Dr. Auteri was terminated?
6      A.   No.
7           MS. BASSANI:  Objection to
8      form.
9           You can answer.
10 BY MS. RUSSELL:
11     Q.   You testified earlier about a
12 conversation that you had with Mr. Gorsky
13 about Dr. Auteri and the discussion that
14 Mr. Gorsky had with Dr. Auteri.  Do you recall
15 that testimony a minute ago?
16     A.   I do.
17     Q.   My question to you is, when you had
18 the conversation with Mr. Gorsky about which
19 you testified, did you specifically discuss
20 with Mr. Gorsky Dr. Auteri's first or second
21 exemption request and how those requests could
22 be accommodated before Dr. Auteri was
23 terminated on November 18th, 2021?
24          MS. BASSANI:  Objection to
25     form.

Page 133

1           You can answer.
2           THE WITNESS:  There was --
3      other than my conversations with
4      Mrs. Hebel, there was no conversations
5      that I was involved with anybody
6      regarding Dr. Auteri's submission of a
7      request for exemption to the HR
8      Department.
9  BY MS. RUSSELL:
10     Q.   What were your specific discussions
11 with Ms. Hebel regarding Dr. Auteri's specific
12 exemption request?
13     A.   As I've testified earlier, simply
14 that Dr. Auteri had submitted this request
15 after the deadline.  She subsequently shared
16 it with me at some point, and I don't recall how
17 soon afterwards, and that she was going to be
18 responding to it, addressing it even though
19 the deadline had passed.
20     Q.   Did you discuss with Ms. Hebel at
21 any time prior to November 18th, 2021 when
22 Dr. Auteri was terminated the specific
23 accommodations that Dr. Auteri proposed in the
24 second exemption request?
25     A.   There was a discussion about

Page 134

1 accommodation requests that I had with Mrs.
2 Hebel. I can't tell you specifically what
3 that request was, but I do remember a
4 discussion about accommodation.
5     Q. Tell me what you discussed
6 specifically.
7     A. Mrs. Hebel was working through the
8 potential opportunity for an accommodation,
9 and the discussion -- and I don't remember who
10 said what, but given the fact that Dr. Auteri
11 was a cardiac surgeon and was a member of the
12 medical staff in cardiac surgery, there was no
13 ability to have him work in a different area.
14     For example, pathology was an area
15 where people could work, because it's not
16 direct patient care. Dr. Auteri didn't have
17 the credentials to be a pathologist and
18 therefore work in pathology.
19     So from a medical staff viewpoint,
20 there was no possibility to accommodate
21 somebody and have them work in a less risky
22 area because they don't have the credentials
23 to do that, and Barbara Hebel's conclusion
24 was, well, if Dr. Auteri can't be accommodated
25 by the Medical Staff, I can't put him in a

Page 135

1 different department because he doesn't have
2 the medical credentials to do that. And he
3 can't be employed if he's not on the medical
4 staff, there didn't seem to be any way an
5 accommodation was possible even -- there
6 wasn't any way a medical accommodation would
7 be feasible.
8     Q. Okay. Let's break this all down.
9 By October 11th of 2021 when
10 Dr. Auteri made the first exemption request,
11 you were aware that the vaccine didn't stop
12 transmission, correct?
13     MS. BASSANI: Objection to
14 form.
15     You can answer.
16     THE WITNESS: The vaccine did
17 not 100 percent prevent transmission,
18 absolutely.
19 BY MS. RUSSELL:
20     Q. And as of October 11th of 2021 when
21 Dr. Auteri made the first exemption request,
22 Doylestown Health was not engaging in regular
23 testing for its physicians or medical staff
24 unless they showed symptoms of illness,
25 correct?

Page 136

1     A. That was the Delta variant in
2 October. So at that time, we were not doing
3 so, that's correct.
4     Q. Motion to strike.
5     On October 11th of 2021 when
6 Dr. Auteri made the first exemption request,
7 vaccinated medical staff were not being tested
8 regularly for COVID unless they showed
9 symptoms of illness, correct?
10     A. That is correct.
11     Q. And as of October 22nd of 2021, did
12 that remain the same? There was no regular
13 testing for vaccinated medical staff unless
14 they showed symptoms of illness, correct?
15     A. That is correct.
16     Q. On October 22nd of 2021, Dr. Auteri
17 submitted the second exemption request. Do
18 you recall that?
19     A. I saw that today. Yes, I do recall
20 seeing that documentation.
21     Q. As of October 22nd, 2021, Dr. Auteri
22 was offering to engage in regular testing as
23 part of his proposed accommodations. Do you
24 understand that?
25     A. I do.

Page 137

1     Q. As of October 22nd of 2021,
2 Dr. Auteri was offering to do daily
3 temperature checks. You understand that?
4     A. I do.
5     Q. As of October 22nd, 2021, the
6 medical staff were being provided with
7 personal protective equipment in an effort to
8 prevent the transmission of the virus; is that
9 correct?
10     A. Absolutely.
11     Q. As of October 22nd, 2021, Dr. Auteri
12 was offering in real-time to undergo testing
13 so that the Medical Staff would know that
14 Dr. Auteri did not have COVID on any given
15 day. Do you understand that?
16     MS. BASSANI: Objection to
17 form.
18     You can answer.
19     THE WITNESS: I do not -- that
20 is not true.
21 BY MS. RUSSELL:
22     Q. Dr. Auteri was offering, as of his
23 second exemption request, to undergo regular
24 testing, he offered weekly, as of October 22nd
25 of 2021. Are you aware of that?

Page 158

1    day will give information about one
2    having live virus at any given day, not a
3    level of disease, level of infection, or
4    level of transmissibility.  So that
5    information does not allow one to draw
6    the conclusion that you're suggesting.
7    BY MS. RUSSELL:
8        Q.   I'm not suggesting any conclusions,
9    and motion to strike.  It's not responsive.
10       Did Doylestown Health, Doylestown
11   Hospital, or VIA Affiliates have antigen
12   testing for all of the vaccinated care
13   providers as of October 11, 2021?
14       A.   No.
15       Q.   Did Doylestown Health, Doylestown
16   Hospital, VIA Affiliates have antigen testing
17   on all vaccinated care providers as of
18   October 22nd, 2021?
19       A.   No.
20       Q.   Was Doylestown Health, Doylestown
21   Hospital, VIA Affiliates conducting daily
22   testing for COVID on its vaccinated care
23   providers as of October 11, 2021?
24       A.   Certainly not, for the reason
25   suggested earlier.

Page 159

1        Q.   Was Doylestown Health, Doylestown
2    Hospital, and VIA Affiliates conducting weekly
3    testing of its vaccinated care providers in
4    October of 2021?
5        A.   They were not.
6        Q.   So on any given day in October and
7    November of 2021, if I understand you
8    correctly, Doylestown Health, Doylestown
9    Hospital, and VIA Affiliates on any given day
10   didn't have antigen testing for any of its
11   vaccinated care providers, it didn't have a
12   COVID test for that day necessarily for its
13   care providers, and it didn't have information
14   specifically for all of its care providers on
15   any given day in October and November '21
16   about whether those providers had COVID,
17   correct?
18            MS. BASSANI:  Objection to
19       form.
20            You can answer.
21            THE WITNESS:  Several things in
22       that question.  You said antigen testing
23       and COVID testing.  I believe we're
24       talking about the same things.  You
25       separated those as two separate testing.

Page 160

1    I believe you're talking about antigen
2    COVID testing.
3            Having a positive test equates
4    to disease.  Having a negative test
5    doesn't demonstrate absence of disease.
6    BY MS. RUSSELL:
7        Q.   Great.  So then testing doesn't
8    matter, does it?
9            MS. BASSANI:  Objection to
10       form.
11            You can answer.
12            THE WITNESS:  I don't believe
13       that's what I indicated.  Testing is a
14       lead indicator for those individuals who
15       are representing symptoms, and there's a
16       strong sensitivity and specificity of
17       those individuals who have the testing.
18   BY MS. RUSSELL:
19       Q.   So testing doesn't necessarily tell
20   you whether somebody has COVID, right?
21       A.   Not in every instance, correct.
22       Q.   And somebody who is vaccinated may
23   have COVID, right?
24       A.   That's correct.
25       Q.   And somebody who is vaccinated may

Page 161

1    have COVID and could be spreading the virus
2    and they don't have symptoms, right?
3        A.   That's a possibility.
4        Q.   So no matter whether somebody is
5    vaccinated or they're not vaccinated, they
6    could have COVID on any given day and you
7    wouldn't know it, right?
8            MS. BASSANI:  Objection to
9       form.
10            You can answer.
11            THE WITNESS:  That is
12       absolutely a possibility in an individual
13       case, certainly.
14   BY MS. RUSSELL:
15       Q.   Was the Johnson & Johnson vaccine
16   offered as part of a mandate in August of --
17   the mandate in August of '21?
18       A.   I believe we did have access to that
19   vaccine, and that was one of the vaccination
20   protocols that was considered acceptable.
21       Q.   At any time from March of 2020
22   through the date that you retired, did
23   Doylestown Health, Doylestown Hospital, or VIA
24   Affiliates receive any COVID relief funds
25   directly or indirectly from a government

# Exhibit 15

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


JOSEPH S. AUTERI, M.D.  :  No. 22-cv-03384
          Plaintiff,  :
                       :
      vs.              :
                       :
VIA AFFILIATES, d/b/a  :  JURY TRIAL
DOYLESTOWN HEALTH      :  DEMANDED
PHYSICIANS             :
          Defendant.   :


- - -

Monday, February 17, 2025

- - -


Deposition of JAMES BREXLER,

taken pursuant to notice, at the law offices

of Kaplin Stewart Meloff Reiter & Stein,

P.C., 910 Harvest Drive, Blue Bell,

Pennsylvania, before Michele L. Murphy, a

Registered Professional Reporter and Notary

Public, on the above date, beginning at

approximately 9:32 a.m.

- - -

Page 78

1    than any required reporting that may exist?
2                MR. DURHAM:  Objection.
3                THE WITNESS:  I'm sorry.  Could
4        you repeat that question?
5                MS. RUSSELL:  Could you read it
6        back for us, please.
7                (Court Reporter read back the
8        pending question.)
9                THE WITNESS:  No.
10   BY MS. RUSSELL:
11       Q.   Do you know who Alex Gorsky is?
12       A.   Yes, ma'am.
13       Q.   Who is he?
14       A.   He was formerly the Chairman of
15   Johnson & Johnson.
16       Q.   And was he on the Board of
17   Doylestown Health at any time?
18                MR. DURHAM:  Objection.
19                THE WITNESS:  He may have been
20       years ago.  He was not on the Board at
21       the time I've been there.
22   BY MS. RUSSELL:
23       Q.   Was he a co-chair of the capital
24   campaign that was engaging in certain
25   activities through the Doylestown Health

Page 79

1    Foundation or otherwise in the 2021 timeframe?
2        A.   Yes, ma'am.
3                MR. DURHAM:  Objection.
4    BY MS. RUSSELL:
5        Q.   Mr. Gorsky called Dr. Auteri on
6    October 12th of 2021 to discuss Dr. Auteri's
7    refusal to take the vaccine.  Are you aware of
8    that?
9                MR. DURHAM:  Objection.
10               THE WITNESS:  Yes.
11               MR. DURHAM:  Lacks foundation.
12   BY MS. RUSSELL:
13       Q.   How did you come to find out about
14   that?
15       A.   Let me circle back for just a
16   second.  The date of October 11th I'm not
17   familiar with.  It may have been that date.
18       Q.   I didn't say the 11th.  I said the
19   12th.  Are you aware of that date?
20       A.   I'm aware that there was a
21   conversation had between Mr. Gorsky and
22   Dr. Auteri.
23       Q.   Okay.  What is your understanding as
24   to when that occurred?
25       A.   If that's when that occurred, then

Page 80

1    that would be the case.  I'm just not
2    personally aware exactly what day.  I don't
3    recall the date.
4        Q.   Were you a participant in the phone
5    call?
6        A.   No, ma'am.
7        Q.   How did you become aware that the
8    phone call occurred?
9        A.   Because I called Mr. Gorsky and
10   asked if he would be willing to talk to
11   Dr. Auteri about the vaccine.
12       Q.   Did you tell Mr. Gorsky that
13   Dr. Auteri had not received the vaccine?
14       A.   I told Mr. Gorsky that Dr. Auteri
15   was not willing at this point and
16   uncomfortable taking the vaccine.
17       Q.   Did you ask Dr. Auteri's permission
18   to disclose that information to Mr. Gorsky?
19       A.   I actually had that conversation
20   with him in my office and said, would you be
21   willing to talk to Mr. Gorsky about your
22   concerns about the vaccine, and he said, yes,
23   he would.
24       Q.   Did you get Dr. Auteri's permission
25   to tell Mr. Gorsky that Dr. Auteri had not

Page 81

1    taken the vaccine himself?
2        A.   That was -- Dr. Auteri was rather --
3    was open about the fact that he was not
4    interested in taking the vaccine.  There was
5    no -- there was not a confidential medical
6    history issue, from my perspective.  It was
7    very public that Dr. Auteri was concerned
8    about the vaccine.  He had expressed his
9    concerns about the vaccine, had talked to the
10   Medical Executive Committee about his concerns
11   about the vaccine.  And I in my meeting with
12   Mr. Auteri -- Dr. Auteri asked if he would be
13   open to talking to Mr. Gorsky about the
14   vaccine, as his company was one that had
15   developed the vaccine, to help alleviate his
16   fears about that and learn more about it.
17       Q.   Did Dr. Auteri authorize you to tell
18   Mr. Gorsky that Dr. Auteri himself had not
19   taken the vaccine as opposed to any generic
20   concerns Dr. Auteri may have had?
21                MR. DURHAM:  Objection.
22                THE WITNESS:  No, ma'am.
23   BY MS. RUSSELL:
24       Q.   But you told Mr. Gorsky that
25   Dr. Auteri was refusing to take the vaccine?

Page 82

1    A.    I believe that was --
2             MR. DURHAM:  Objection.
3             THE WITNESS:  -- very
4    reasonable for me to take that position,
5    as he was clear to me that he was not --
6    he had not taken the vaccine and was
7    concerned about taking the vaccine, and
8    the conversation was about learning more,
9    would he be open to learning more about
10   it to hopefully feel more comfortable
11   about it.  There was no confidentiality
12   that he expressed or asked for in that.
13   BY MS. RUSSELL:
14   Q.    Move to strike.
15         Why did you tell --
16   A.    I don't know -- oh, I'm sorry.
17   Q.    That's okay.
18         Why did you tell Mr. Gorsky that
19   Dr. Auteri himself was refusing to take the
20   COVID-19 vaccine?
21             MR. DURHAM:  Objection.
22             THE WITNESS:  I felt it was
23   important for Dr. -- if I was requesting
24   Mr. Gorsky to take the time to talk to
25   Dr. Auteri to be aware of the context of

Page 83

1    why he was talking to Dr. Auteri.
2    BY MS. RUSSELL:
3    Q.    Did you ask Mr. Gorsky to speak with
4    Dr. Auteri?
5    A.    Yes, I did.
6    Q.    Why?
7    A.    I asked if he would be comfortable
8    doing that.
9    Q.    Why?
10   A.    Because, quite honestly, I wanted
11   our Chief of Cardiac Surgery to get the
12   vaccine and be able to continue to be the
13   Chief of Cardiac Surgery, and given the
14   position he was taking, it was going to be
15   nearly impossible for us to figure a way to
16   work through that.
17   Q.    When did you ask Mr. Gorsky to talk
18   to Dr. Auteri about Dr. Auteri's refusal to
19   take the vaccine?
20   A.    That would have likely been the
21   evening after the meeting that Dr. Auteri and
22   I had to discuss his concerns.
23   Q.    When was that meeting?
24   A.    I don't remember the exact date.
25   I'm sure it's documented somewhere.

Page 84

1    Q.    Well, you told me earlier that you
2    haven't spoken with Dr. Auteri in person, over
3    the phone, or through any written
4    communications since on or after October 11,
5    2021.  So when did you have a discussion with
6    Mr. Gorsky and ask Mr. Gorsky to talk to
7    Dr. Auteri and tell Mr. Gorsky that Dr. Auteri
8    was refusing the vaccine?
9             MR. DURHAM:  Objection.
10            THE WITNESS:  I'm not
11   comfortable knowing -- I don't recall the
12   exact dates.  It would have been on or
13   around those dates, but I don't remember
14   exactly the dates.
15   BY MS. RUSSELL:
16   Q.    On or around which dates?
17   A.    The dates that I had the meeting
18   with Dr. Auteri.
19   Q.    What documents do you have that
20   would show me when you spoke with Dr. Auteri?
21   A.    There was a correspondence from
22   Dr. Auteri and I relating to that meeting.
23   Q.    What correspondence?
24   A.    I think that was in the form of an
25   e-mail perhaps back and forth that just said

Page 85

1    thank you for -- Dr. Auteri expressed his
2    appreciation for my taking the time to meet
3    with him and addressing his concerns about the
4    potential of being injured, and I said I
5    appreciated the time that we had to spend with
6    that.
7         So that would have been the date,
8    whatever the date of that correspondence is.
9    Q.    Was that before or after the draft
10   addendum to Dr. Auteri's employment agreement
11   was circulated by Adam Edelson to Dr. Auteri?
12            MR. DURHAM:  Objection.
13            THE WITNESS:  The draft
14   addendum to Dr. Auteri's contract would
15   have come after the meeting, because it
16   was after I heard his concerns about the
17   potential of him being injured, his fear
18   of not having -- his inability to
19   continue to perform surgery if that were
20   to take place, and my attempt to provide
21   some assurance to him that we would find
22   a way to work with him to provide some
23   form of compensation for him if that were
24   to take place.
25   BY MS. RUSSELL:

Page 86

1    Q.   Mr. Gorsky called Dr. Auteri on
2  October 12th of 2021, the day after Dr. Auteri
3  submitted his first exemption request.  Did
4  you reach out to Mr. Gorsky on October 11th or
5  October 12th and ask Mr. Gorsky to call
6  Dr. Auteri?
7          MR. DURHAM:  Objection.
8      There's no foundation for the fact you're
9      asserting of a conversation that
10     happened --
11         MS. RUSSELL:  You are coaching
12     the witness.
13         MR. DURHAM:  I'm not coaching
14     the witness.  You are testifying --
15         MS. RUSSELL:  You can object to
16     the form.
17         MR. DURHAM:  -- and I'm telling
18     you that you're testifying.  I'm telling
19     you why you're testifying.
20         MS. RUSSELL:  No, I am not.  I
21     am asking a specific question and I'd
22     like an answer to it.
23  BY MS. RUSSELL:
24     Q.   Go ahead, Mr. Brexler.
25     A.   I am not specifically recalling the

Page 87

1  exact date on which I called Mr. Gorsky.  I
2  know the sequence of events that started with
3  the meeting with Dr. Auteri, which led to a
4  call to Mr. Gorsky.  I don't know how long it
5  took for me to get in touch with him.  I
6  thought it was pretty shortly thereafter and
7  asked if he would get in touch with -- if he
8  would be open to talking to Dr. Auteri, and he
9  said he would.
10         And so whatever those dates are.  I
11  don't -- I just don't recall what those dates
12  were.
13     Q.   Did you tell Mr. Gorsky that
14  Dr. Auteri had made a request for a religious
15  exemption to the COVID-19 vaccine mandate and
16  had requested an accommodation?
17     A.   I was not aware of any request that
18  he had made at that time.  There was no
19  request to me at the meeting that I had with
20  him or thereafter.
21         I don't recall these dates being
22  consistent with what I recall of the meeting
23  and the times that I had my meeting with
24  Dr. Auteri.
25     Q.   Well, nobody knows the date of that

Page 88

1  meeting here, sir, because you've told me that
2  you don't recall when it was, but the date
3  that we do know is the date of Dr. Auteri's
4  first exemption request.  And so my question
5  to you, sir, is, did you speak with Mr. Gorsky
6  on October 11th, 2021, the day that Dr. Auteri
7  made the exemption request, or October 12th,
8  2021?
9      A.   I did not talk to Mr. Gorsky about
10  any exemption request, and I don't recall the
11  date with which I talked to Mr. Gorsky.
12     Q.   What records would you have that
13  would reflect the dates on which you spoke
14  with Mr. Gorsky about Dr. Auteri?
15     A.   I don't believe I have any documents
16  that would reflect that.
17     Q.   How about phone records; did you
18  talk to him over the phone?
19         MR. DURHAM:  Objection.
20         THE WITNESS:  I may -- I
21     don't -- probably.  It would have been a
22     phone call.  I don't recall even whether
23     I called him by cell or from the hospital
24     phone.
25  BY MS. RUSSELL:

Page 89

1      Q.   Did you ever text Mr. Gorsky?
2          MR. DURHAM:  Objection.
3          THE WITNESS:  I don't recall.
4  BY MS. RUSSELL:
5      Q.   Did you ever e-mail Mr. Gorsky about
6  Dr. Auteri?
7      A.   No, I did not.
8      Q.   Sitting here today, what's your
9  recollection as to how you contacted
10  Mr. Gorsky to ask Mr. Gorsky about talking
11  with Dr. Auteri?
12     A.   I either called him or I may have
13  texted him or I may have asked my assistant to
14  get in touch with Mr. Gorsky to see if he had
15  time for me to talk to him.  I just don't
16  recall how I got in touch with him.
17     Q.   In the timeframe from October
18  through November 2021, was your cell phone
19  number 215-470-4530?
20     A.   Yes, ma'am.
21     Q.   I'd like you to take a look for your
22  phone records and text messages showing any
23  calls between you and Alex Gorsky in the
24  timeframe of September, October, and November
25  of 2021 and please produce them to your

Page 90

1  counsel so that he can produce them to me.
2              MR. DURHAM:  Objection.  You
3      can make a written request for that.
4              MS. RUSSELL:  There's a request
5      on the record.  We've already made a
6      written request for any documents I
7      request today, but we'll follow up with
8      another one.  Not a problem at all.
9  BY MS. RUSSELL:
10     Q.   How many calls did you have with
11 Mr. Gorsky related to Dr. Auteri and the
12 request that Mr. Gorsky talk to Dr. Auteri
13 about getting the vaccine?
14             MR. DURHAM:  Objection.
15             THE WITNESS:  I recall two.
16 BY MS. RUSSELL:
17     Q.   So tell me about the first
18 conversation with Mr. Gorsky.
19     A.   It was simply a call to -- it was a
20 conversation with him to let him know that
21 Dr. Auteri had concerns about the vaccine, was
22 not interested in taking it.  We were
23 concerned that this could lead to him not
24 being able to be our Chief of Cardiac Surgery,
25 would he be open to having a conversation with

Page 91

1  Dr. Auteri to help address his concerns and
2  questions and see if he could help him feel
3  better about taking the vaccine.
4      Q.   Okay.  What did Mr. Gorsky say?
5      A.   I would be glad to do that.
6      Q.   Anything else?
7      A.   No.
8      Q.   Who else was on the call?
9      A.   Just the two of us.
10     Q.   And, again, sitting here today, do
11 you have anything that could verify for us at
12 all the date on which you had that discussion?
13     A.   Well, I'm about to go look.
14     Q.   Okay.  I appreciate that.
15             Tell me about the second
16 conversation.  You said you had two.
17     A.   The second conversation happened
18 after he had had the conversation with
19 Dr. Auteri.  They did have a conversation, my
20 understanding is.  I was not on that call.
21             Mr. Gorsky called me back to say
22 that he had gone through, listened to
23 Dr. Auteri, talked to him, tried to share with
24 him how the vaccine had been developed and
25 talked through the science of it a little bit,

Page 92

1  and my understanding is offered for Dr. Auteri
2  to speak to either the head of the division
3  that created the vaccine or the lead scientist
4  that created the vaccine for Dr. Auteri to
5  have even further discussion with somebody
6  about the science behind the vaccine.  And
7  that's all.
8      Q.   Anything else?
9      A.   And just said that we had the
10 conversation.  Dr. Auteri expressed his
11 concerns about the efficacy of the vaccine.
12 He tried to assure Dr. Auteri about that it
13 was safe and that it would be good to take,
14 and that Dr. Auteri appreciated the call -- my
15 understanding was Alex believed that he
16 appreciated the call, and he said, I don't
17 know where Dr. Auteri will land, but I know we
18 had the conversation.
19     Q.   Did Mr. Gorsky report to you whether
20 he and Dr. Auteri had any discussions about
21 Dr. Auteri's request for a religious exemption
22 and accommodation which Dr. Auteri submitted?
23     A.   There was no discussion around
24 exemptions.  It was only about the science and
25 the efficacy of the vaccine and the potential

Page 93

1  for complications should he get the vaccine.
2      Q.   Did you authorize Mr. Gorsky to have
3  that conversation with Dr. Auteri, the
4  conversation you just described?
5              MR. DURHAM:  Objection.
6              THE WITNESS:  I don't know that
7      I authorized it.  I asked him if he would
8      have that conversation, and he offered to
9      do so.
10 BY MS. RUSSELL:
11     Q.   At the time that you asked
12 Mr. Gorsky to have that conversation, were you
13 in your position as the CEO of Doylestown
14 Health that you told me about earlier today?
15     A.   Yes, ma'am.
16     Q.   Dr. Auteri testified that Mr. Gorsky
17 asked Dr. Auteri, what would it take to get
18 you on board to take the vax.  Did Mr. Gorsky
19 report to you that he asked that question of
20 Dr. Auteri?
21             MR. DURHAM:  Objection.
22             THE WITNESS:  I think
23     Mr. Gorsky --
24 BY MS. RUSSELL:
25     Q.   I'm sorry.  You were shaking your

Page 126

1     Q.   After Dr. Auteri made his exemption
2   request and had his conversation with
3   Mr. Gorsky that you testified Mr. Gorsky
4   reported to you, did Mr. Gorsky have another
5   call with Dr. Auteri in which Mr. Gorsky
6   discussed Dr. Auteri's exemption request and
7   request for accommodation?
8            MR. DURHAM:  Objection.
9            THE WITNESS:  Not that I'm
10    aware of.
11  BY MS. RUSSELL:
12    Q.   After Dr. Auteri made his first
13  exemption request on October 11th of 2021, did
14  anyone take that request to the Infectious
15  Disease Committee or the Infection Control
16  Department, anyone who was operating in the
17  capacity of infectious disease or infection
18  control, and consult with them about
19  Dr. Auteri's specific exemption request?
20           MR. DURHAM:  Objection.
21           THE WITNESS:  I'm not aware of
22    that.
23  BY MS. RUSSELL:
24    Q.   Dr. Auteri made his second exemption
25  request on October 22nd of 2021.  Did anyone

Page 127

1   go to the Infectious Disease Department or
2   Infection Control within Doylestown Health and
3   talk to them about the second exemption
4   request and request for accommodation that
5   Dr. Auteri made?
6            MR. DURHAM:  Objection.
7            THE WITNESS:  I'm not aware of
8    that.
9   BY MS. RUSSELL:
10    Q.   Ms. Hebel testified during her
11  deposition about a set of standard
12  accommodations for those who made exemption
13  requests.  Are you aware of that?
14    A.   Yes.
15           MR. DURHAM:  Objection.
16  BY MS. RUSSELL:
17    Q.   And did you authorize the
18  establishment of a set of standard
19  accommodations to be made to employees who
20  requested an exemption from the COVID-19
21  vaccine mandate?
22           MR. DURHAM:  Objection.
23           THE WITNESS:  I did not
24    authorize those.  Those were developed by
25    our clinical teams that established the

Page 128

1    appropriate protocols for patient safety
2    and associate safety.
3   BY MS. RUSSELL:
4     Q.   After those standard accommodations
5   were issued, did you at any time say to
6   Ms. Hebel in words or substance that those
7   standard accommodations had to be revoked?
8            MR. DURHAM:  Objection.
9            THE WITNESS:  Absolutely not.
10  BY MS. RUSSELL:
11    Q.   At any time after those standard
12  accommodations were issued, did you at any
13  time say to Ms. Hebel in form or substance
14  that those standard accommodations were not
15  sufficient?
16           MR. DURHAM:  Objection.
17           THE WITNESS:  No, ma'am.
18  BY MS. RUSSELL:
19    Q.   The Johnson & Johnson vaccine was
20  one of the vaccines that was offered by
21  Doylestown Health at the time of the mandate,
22  correct?
23    A.   Correct.
24    Q.   At any time from March 2020 through
25  today, did Doylestown Health, Doylestown

Page 129

1   Hospital, or VIA Affiliates receive any COVID
2   funds, COVID relief funds, from any government
3   agency, directly or indirectly?
4            MR. DURHAM:  Objection.
5            THE WITNESS:  Could you just
6    repeat the question?  I'm sorry.
7            MS. RUSSELL:  Can you read the
8    question back for me, please.
9            (Court Reporter read back the
10    pending question.)
11           THE WITNESS:  Yes.
12  BY MS. RUSSELL:
13    Q.   How much?
14    A.   We're still receiving some funds and
15  applying for some.  So I think we're at -- I
16  think we've received about $30 million of
17  funds and still waiting on another 17 million
18  in requests.
19    Q.   And from what agencies did
20  Doylestown Health, Doylestown Hospital, or VIA
21  Affiliates receive those monies?
22    A.   It came from the COVID relief funds
23  as authorized by the federal government
24  through the Department of Health and Human
25  Services, and I don't know what other agencies

# Exhibit 16

**Hospital and DH Physicians**
**Dept-Job Code List with Associate Count (not FTE's) Sep 2021**

| Dept | DEPT-JC | POSITION | Total by Dept/JC |
|------|---------|----------|------------------|
| 00.6011 | DOH NUR ADM | | |
| | 0201 | NURSING SUPERVISOR | 8 |
| | 0203 | DIRECTOR, INFECTION CONTR | 1 |
| | 0270 | INFECTION CONTROL COORDIN | 2 |
| | 1080 | RN, WOUND, OSTOMY & CONTI | 2 |
| | 1091 | CLINICAL EDUCATION COORDI | 1 |
| | 1095 | CLINICAL EDUCATOR | 1 |
| | 1182 | NURSING IS COORDINATOR | 1 |
| | 1183 | INFORMATION SYSTEMS NURSE | 1 |
| | 3003 | NURSING ADMINISTRATION AS | 2 |
| | 3015 | PT SERVICES ADMINISTRATIV | 1 |
| | 3260 | NURSING RESOURCE COORDINA | 2 |
| 00.6011 Total | | | 22 |
| 00.6013 | DOH DIABETIC | | |
| | 0222 | NURSE PRACTITIONER,DIABET | 1 |
| | 0225 | DIABETES EDUCATION SPECIA | 1 |
| | 3004 | PATIENT EDUCATION ASSISTA | 1 |
| 00.6013 Total | | | 3 |
| 00.6014 | DOH NUTRITION | | |
| | 1202 | O/P DIETITIAN/NUTRITION T | 3 |
| 00.6014 Total | | | 3 |
| 00.6020 | DOH MAT/CHILD SVCS | | |
| | 0082 | DIRECTOR, MATERNAL/CHILD | 1 |
| | 0205 | CLINICAL MANAGER | 1 |
| | 0402 | PINS SYSTEM ADMINISTRATOR | 1 |
| | 1095 | CLINICAL EDUCATOR | 1 |
| 00.6020 Total | | | 4 |
| 00.6021 | DOH LDRP | | |
| | 1105 | RN | 53 |
| | 1117 | LACTATION CONSULTANT | 4 |
| | 2015 | LPN | 2 |
| | 2017 | OB TECH - NON-CERTIFIED | 5 |
| | 2021 | OB TECH | 1 |
| | 2083 | UNIT CLERK/PATIENT CARE T | 2 |
| | 3041 | CHOP NEWBORN CARE CLIN/AD | 1 |
| | 3163 | UNIT CLERK/PCT | 12 |
| | 3165 | UNIT CLERK | 1 |
| | 3167 | UNIT CLERK/PCT/SCHEDULER | 1 |
| | 3260 | NURSING RESOURCE COORDINA | 1 |
| 00.6021 Total | | | 83 |
| 00.6024 | DOH CHDBTH ED | | |
| | 1085 | PATIENT EDUCATION COORD | 3 |
| 00.6024 Total | | | 3 |
| 00.6027 | DOH 2 ACUTE N | | |
| | 1105 | RN | 20 |
| | 2024 | PATIENT CARE TECH | 9 |
| | 2081 | PATIENT CARE TECH,CERTIFI | 2 |
| | 3163 | UNIT CLERK/PCT | 1 |
| | 3165 | UNIT CLERK | 2 |
| 00.6027 Total | | | 34 |
| 00.6028 | DOH 2 ACUTE S | | |
| | 0205 | CLINICAL MANAGER | 1 |

**Hospital and DH Physicians**

**Dept-Job Code List with Associate Count (not FTE's) Sep 2021**

| Dept | DEPT-JC | POSITION | Total by Dept/JC |
|------|---------|----------|------------------|
| 00.6028 | 1095 | CLINICAL EDUCATOR | 1 |
| | 1105 | RN | 23 |
| | 2024 | PATIENT CARE TECH | 9 |
| | 2081 | PATIENT CARE TECH,CERTIFI | 1 |
| | 3165 | UNIT CLERK | 3 |
| | 3260 | NURSING RESOURCE COORDINA | 1 |
| 00.6028 Total | | | 39 |
| 00.6030 | DOH PCS | | |
| | 0073 | DIRECTOR, CARDIO/PULMONAR | 1 |
| | 1092 | RN-HEART FAILURE COORDINA | 1 |
| | 1105 | RN | 1 |
| | 3005 | CARDIOLOGY SERVICES ASSIS | 2 |
| 00.6030 Total | | | 5 |
| 00.6036 | | | 40 |
| 00.6041 | DOH ICU | | |
| | 0205 | CLINICAL MANAGER | 1 |
| | 1095 | CLINICAL EDUCATOR | 1 |
| | 1105 | RN | 49 |
| | 2033 | PHLEBOTOMIST/PCT | 5 |
| | 2085 | PHLEBOTOMIST/CERTIFIED PC | 1 |
| | 3165 | UNIT CLERK | 4 |
| 00.6041 Total | | | 61 |
| 00.6043 | DOH IMU | | |
| | 1105 | RN | 25 |
| | 2033 | PHLEBOTOMIST/PCT | 6 |
| | 2085 | PHLEBOTOMIST/CERTIFIED PC | 2 |
| | 3165 | UNIT CLERK | 5 |
| 00.6043 Total | | | 38 |
| 00.6045 | DOH 3 ACUTE W | | |
| | 0205 | CLINICAL MANAGER | 1 |
| | 1105 | RN | 34 |
| | 2024 | PATIENT CARE TECH | 16 |
| | 2081 | PATIENT CARE TECH,CERTIFI | 5 |
| | 3006 | ACUTE CARE SERVICES ASSIS | 1 |
| | 3165 | UNIT CLERK | 6 |
| 00.6045 Total | | | 63 |
| 00.6050 | DOH HEART CEN | | |
| | 0125 | CV PATIENT CARE COORD | 2 |
| | 0126 | RN-LEAD CV PATIENT CARE C | 1 |
| | 1016 | PHYSICIAN LIASION-CARDIOV | 1 |
| | 1082 | NURSE PRACTITIONER | 2 |
| | 1128 | RN - TRANSITIONAL CARE | 2 |
| | 1180 | MANAGER,DATA MGT/PI CARDI | 1 |
| | 1191 | CARDIAC DATABASE SPECIALI | 1 |
| | 1197 | CARDIAC DATABASE SPECIALI | 1 |
| | 1226 | STRUCTURAL HEART COORDINA | 1 |
| | 1238 | HEART & VASCULAR PERF IMP | 1 |
| | 1344 | CHEST PAIN/AFIB COORDINAT | 1 |
| | 2202 | CARDIOVASCULAR NURSE NAVI | 1 |
| | 2207 | PHYSICIAN ASST/NP-INTENSI | 2 |
| | 2214 | PHYSICIAN ASST / NP-NIGHT | 4 |
| | 2215 | PHYSICIAN ASSIST-CARDIOTH | 7 |
| | 2218 | PHYSICIAN ASSISTANT/NP -V | 2 |

**Hospital and DH Physicians**

**Dept-Job Code List with Associate Count (not FTE's) Sep 2021**

| Dept | DEPT-JC | POSITION | Total by Dept/JC |
|------|---------|----------|------------------|
| 00.6050 | 2220 | PHYSICIAN ASSISTANT-CHIEF | 1 |
| | 2221 | PHYSICIAN ASST/NP VASCULA | 1 |
| | 3027 | HEART CENTER OFFICE MANAG | 1 |
| | 3159 | SCHEDULING COORDINATOR | 1 |
| **00.6050 Total** | | | **34** |
| 00.6052 | DOH CVICU | | |
| | 0205 | CLINICAL MANAGER | 1 |
| | 1105 | RN | 23 |
| | 3163 | UNIT CLERK/PCT | 1 |
| **00.6052 Total** | | | **25** |
| 00.6054 | DOH VASCULAR | | |
| | 1105 | RN | 4 |
| | 2142 | VASCULAR TECH | 4 |
| | 7031 | CATH LAB ASSISTANT-HOUSEK | 1 |
| **00.6054 Total** | | | **9** |
| 00.6055 | DOH IVU | | |
| | 1105 | RN | 25 |
| | 2033 | PHLEBOTOMIST/PCT | 4 |
| | 2085 | PHLEBOTOMIST/CERTIFIED PC | 1 |
| | 2114 | PHLEBOTOMIST/UNIT CLERK/P | 3 |
| | 3163 | UNIT CLERK/PCT | 2 |
| **00.6055 Total** | | | **35** |
| 00.6065 | DOH PEDIATRICS | | |
| | 1105 | RN | 13 |
| | 1119 | RN, LEAD/CHARGE | 1 |
| **00.6065 Total** | | | **14** |
| 00.6073 | DOH 4 WEST | | |
| | 0205 | CLINICAL MANAGER | 1 |
| | 1095 | CLINICAL EDUCATOR | 2 |
| | 1105 | RN | 34 |
| | 2024 | PATIENT CARE TECH | 6 |
| | 2081 | PATIENT CARE TECH,CERTIFI | 7 |
| | 3165 | UNIT CLERK | 7 |
| **00.6073 Total** | | | **57** |
| 00.6074 | DOH 4 ACUTE E | | |
| | 0075 | DIRECTOR, ACUTE CARE | 1 |
| | 1105 | RN | 26 |
| | 2024 | PATIENT CARE TECH | 9 |
| | 2081 | PATIENT CARE TECH,CERTIFI | 4 |
| | 3163 | UNIT CLERK/PCT | 1 |
| | 3165 | UNIT CLERK | 3 |
| **00.6074 Total** | | | **44** |
| 00.6082 | DOH ICN | | |
| | 1105 | RN | 24 |
| **00.6082 Total** | | | **24** |
| 00.6091 | DOH PRE NATAL | | |
| | 1105 | RN | 4 |
| | 2012 | ULTRASOUND TECH REG - PRE | 6 |
| | 3165 | UNIT CLERK | 1 |
| **00.6091 Total** | | | **11** |
| 00.6211 | DOH OR | | |
| | 0027 | DIRECTOR, NURSING SURGICA | 1 |
| | 0122 | ROBOTIC SURGERY-RNFA COOR | 1 |

**Hospital and DH Physicians**

**Dept-Job Code List with Associate Count (not FTE's) Sep 2021**

| Dept | DEPT-JC | POSITION | Total by Dept/JC |
|------|---------|----------|------------------|
| 00.6211 | 1077 | CLINICAL EDUCATOR | 1 |
| | 1105 | RN | 33 |
| | 1112 | RN, SCHEDULING COORDINATO | 1 |
| | 2009 | OR TECH/INSTRUMENT LIAISO | 1 |
| | 2031 | SURGICAL TECHNOLOGIST- CE | 5 |
| | 2038 | LEAD INVENTORY COORDINATO | 1 |
| | 2056 | OR MATERIALS COORD/NON CE | 1 |
| | 3165 | UNIT CLERK | 1 |
| | 7019 | OPERATING ROOM ASSISTANT | 4 |
| 00.6211 Total | | | 50 |
| 00.6215 | DOH CARDIAC O | | |
| | 0115 | CLINICAL MANAGER - CV | 1 |
| | 1105 | RN | 8 |
| | 1119 | RN, LEAD/CHARGE | 1 |
| 00.6215 Total | | | 10 |
| 00.6216 | DOH PERFUSION | | |
| | 0100 | PERFUSIONIST-CHIEF | 1 |
| | 0120 | PERFUSIONIST-STAFF | 2 |
| 00.6216 Total | | | 3 |
| 00.6221 | DOH PACU | | |
| | 1105 | RN | 21 |
| | 1146 | RN - ON CALL PROG | 1 |
| | 3165 | UNIT CLERK | 1 |
| 00.6221 Total | | | 23 |
| 00.6241 | DOH ED | | |
| | 0074 | DIRECTOR,EMERGENCY | 1 |
| | 1095 | CLINICAL EDUCATOR | 1 |
| | 1105 | RN | 74 |
| | 1122 | RN PATIENT FLOW COORDINAT | 2 |
| | 2018 | SENIOR ED TECH | 1 |
| | 2023 | ED TECH | 7 |
| | 2032 | LPN/INVENTORY SPECIALIST | 1 |
| | 3164 | ED TECH/UNIT CLERK | 28 |
| | 3165 | UNIT CLERK | 2 |
| 00.6241 Total | | | 117 |
| 00.6242 | DOH ANN S CHC | | |
| | 0068 | EXEC DIR - FREE CLINIC | 1 |
| | 0223 | DENTAL HYGIENIST | 2 |
| | 1082 | NURSE PRACTITIONER | 2 |
| | 1109 | CLINIC NURSE-RN | 1 |
| | 1152 | SR ACCOUNTANT | 1 |
| | 3019 | ADMINISTRATIVE CLINIC MAN | 1 |
| | 3078 | PATIENT NAVIGATOR | 1 |
| 00.6242 Total | | | 9 |
| 00.6245 | DOH IRAD RN | | |
| | 1105 | RN | 7 |
| | 3067 | SR ADMINISTRATIVE ASSISTA | 1 |
| 00.6245 Total | | | 8 |
| 00.6250 | DOH PRE ADMIS | | |
| | 1105 | RN | 8 |
| | 1119 | RN, LEAD/CHARGE | 1 |
| 00.6250 Total | | | 9 |
| 00.6251 | DOH SDS | | |

**Hospital and DH Physicians**

**Dept-Job Code List with Associate Count (not FTE's) Sep 2021**

| Dept | DEPT-JC | POSITION | Total by Dept/JC |
|------|---------|----------|------------------|
| 00.6251 | 1105 | RN | 19 |
| | 1119 | RN, LEAD/CHARGE | 1 |
| | 2083 | UNIT CLERK/PATIENT CARE T | 1 |
| | 2085 | PHLEBOTOMIST/CERTIFIED PC | 1 |
| | 2114 | PHLEBOTOMIST/UNIT CLERK/P | 1 |
| | 3165 | UNIT CLERK | 1 |
| 00.6251 Total | | | 24 |
| 00.6252 | DOH ENDOS LAB | | |
| | 1105 | RN | 7 |
| | 1119 | RN, LEAD/CHARGE | 1 |
| | 7052 | ENDOSCOPY TECH | 1 |
| 00.6252 Total | | | 9 |
| 00.6253 | DOH ENDO-OP | | |
| | 0119 | ASC CLINICAL ADMINISTRATO | 1 |
| | 1105 | RN | 12 |
| | 2032 | LPN/INVENTORY SPECIALIST | 1 |
| | 3155 | REGISTRAR/RECEPTIONIST | 4 |
| | 7052 | ENDOSCOPY TECH | 11 |
| 00.6253 Total | | | 29 |
| 00.6261 | DOH VAT | | |
| | 1105 | RN | 17 |
| 00.6261 Total | | | 17 |
| 00.6411 | DOH C RHB OP | | |
| | 1094 | CLINICAL ADVISOR, CARDIAC | 1 |
| | 1167 | CARDIAC THERAPIST I | 4 |
| | 1168 | CARDIAC THERAPIST II | 8 |
| 00.6411 Total | | | 13 |
| 00.6417 | DOH STROKE | | |
| | 1079 | PA/NP STROKE SERVICES COO | 2 |
| 00.6417 Total | | | 2 |
| 00.6421 | DOH CANCER IN | | |
| | 0091 | DIRECTOR, CANCER SERVICES | 1 |
| | 1074 | NURSE PRACTITIONER-CANCER | 1 |
| | 1105 | RN | 5 |
| | 2061 | CANCER INSTITUTE LABORATO | 2 |
| | 2203 | ONCOLOGY SERVICES COORDIN | 1 |
| | 2204 | CANCER RISK EVALUATION PR | 1 |
| | 2205 | RN-ONCOLOGY RESEARCH | 1 |
| | 2206 | RN-ONCOLOGY NURSE NAVIGAT | 4 |
| | 3030 | TUMOR REGISTRAR | 1 |
| | 3037 | CANCER REGISTRY COORDINAT | 1 |
| | 3061 | CANCER INSTITUTE OFFICE C | 1 |
| | 3155 | REGISTRAR/RECEPTIONIST | 3 |
| 00.6421 Total | | | 22 |
| 00.7011 | DOH LAB ADM | | |
| | 0081 | DIRECTOR, LABORATORY | 1 |
| | 1131 | LIS COORDINATOR | 1 |
| | 1144 | LAB QUALITY ASSURANCE LEA | 1 |
| | 1201 | LAB QUALITY ASSURANCE COO | 1 |
| | 3049 | SR ADMIN ASST/TRANSCRIPTI | 1 |
| | 3056 | SR OFFICE ASSISTANT | 1 |
| | 3150 | LAB AIDE/ACCESSION CLERK | 1 |
| | 3151 | LAB OUTPATIENT CLERK | 2 |

**Hospital and DH Physicians**

**Dept-Job Code List with Associate Count (not FTE's) Sep 2021**

| Dept | DEPT-JC | POSITION | Total by Dept/JC |
|------|---------|----------|------------------|
| **00.7011 Total** | | | **9** |
| 00.7012 | **DOH LAB PATH** | | |
| | 1123 | HISTOLOGY TECHNICIAN | 4 |
| | 1127 | CYTOTECHNOLOGIST | 1 |
| | 1234 | PATHOLOGIST'S ASSISTANT | 1 |
| | 2195 | HISTOLOGY/CYTOLOGY ASSIST | 1 |
| **00.7012 Total** | | | **7** |
| 00.7013 | **DOH LAB CHEM** | | |
| | 1130 | MEDICAL TECHNOLOGIST | 4 |
| | 1135 | LEAD TECH - LABORATORY | 1 |
| | 1137 | SR TECH - LABORATORY | 1 |
| | 2060 | MEDICAL LABORATORY TECHNI | 6 |
| | 2161 | MEDICAL LAB TECHNICIAN-NO | 1 |
| **00.7013 Total** | | | **13** |
| 00.7014 | **DOH LAB HEMA** | | |
| | 1130 | MEDICAL TECHNOLOGIST | 5 |
| | 2060 | MEDICAL LABORATORY TECHNI | 2 |
| | 2161 | MEDICAL LAB TECHNICIAN-NO | 1 |
| | 3150 | LAB AIDE/ACCESSION CLERK | 1 |
| **00.7014 Total** | | | **9** |
| 00.7016 | **DOH LAB MICRO** | | |
| | 1130 | MEDICAL TECHNOLOGIST | 3 |
| | 1135 | LEAD TECH - LABORATORY | 1 |
| | 2060 | MEDICAL LABORATORY TECHNI | 2 |
| **00.7016 Total** | | | **6** |
| 00.7017 | **DOH HWC LAB D** | | |
| | 2115 | PHLEBOTOMIST | 1 |
| **00.7017 Total** | | | **1** |
| 00.7019 | **DOH LAB PHLEB** | | |
| | 2027 | LEAD PHLEBOTOMIST | 1 |
| | 2033 | PHLEBOTOMIST/PCT | 3 |
| | 2115 | PHLEBOTOMIST | 17 |
| | 3211 | OFFICE ASST/TRANSCRIPTION | 1 |
| **00.7019 Total** | | | **22** |
| 00.7020 | **DOH COVIDTEST** | | |
| | 2047 | COVID TESTER | 2 |
| | 2062 | COVID CENTER SUPERVISOR | 1 |
| | 3105 | COVID SCHEDULER | 4 |
| **00.7020 Total** | | | **7** |
| 00.7031 | **DOH BLOOD BK** | | |
| | 0208 | LAB CLINICAL COORDINATOR | 1 |
| | 1132 | MEDICAL TECHNOLOGIST- NON | 1 |
| | 1135 | LEAD TECH - LABORATORY | 1 |
| | 2060 | MEDICAL LABORATORY TECHNI | 1 |
| **00.7031 Total** | | | **4** |
| 00.7036 | **DOH DCA ECHO** | | |
| | 2098 | ECHO TECH | 1 |
| **00.7036 Total** | | | **1** |
| 00.7041 | **DOH CARD SVC** | | |
| | 1105 | RN | 2 |
| | 1136 | LEAD TECH - CARDIAC SVCS | 1 |
| | 1169 | EXERCISE PHYSIOLOGIST - C | 3 |
| | 2100 | SR CARDIAC TECH | 2 |

**Hospital and DH Physicians**

**Dept-Job Code List with Associate Count (not FTE's) Sep 2021**

| Dept | DEPT-JC | POSITION | Total by Dept/JC |
|------|---------|----------|------------------|
| 00.7041 | 2125 | ECG TECH | 4 |
| **00.7041 Total** | | | **12** |
| 00.7042 | DOH ECHO | | |
| | 0268 | DIRECTOR, TECHNICAL CARDI | 1 |
| | 2096 | PEDIATRIC ECHO TECH | 1 |
| | 2097 | ECHO TECH,LEAD | 1 |
| | 2098 | ECHO TECH | 10 |
| | 3049 | SR ADMIN ASST/TRANSCRIPTI | 1 |
| **00.7042 Total** | | | **14** |
| 00.7043 | DOH NEURO SVC | | |
| | 2044 | EEG TECH-POOL PROGRAM | 2 |
| | 2045 | EEG TECH | 1 |
| **00.7043 Total** | | | **3** |
| 00.7044 | DOH CATH LAB | | |
| | 0130 | DIRECTOR CATH/EP/VASCULAR | 1 |
| | 0205 | CLINICAL MANAGER | 1 |
| | 1033 | RN-EDUCATOR | 1 |
| | 1105 | RN | 17 |
| | 1220 | CATH LAB FINANCIAL SPECIA | 1 |
| | 2015 | LPN | 1 |
| | 2030 | CATH LAB INVENTORY COORDI | 2 |
| | 2038 | LEAD INVENTORY COORDINATO | 1 |
| | 2122 | CARDIOVASCULAR SPECIALIST | 7 |
| | 3165 | UNIT CLERK | 2 |
| | 3170 | UNIT CLERK-ACC DATA SPECI | 1 |
| **00.7044 Total** | | | **35** |
| 00.7048 | DOH EP CATH | | |
| | 1105 | RN | 17 |
| | 2111 | CARDIOVASCULAR SPECIALIST | 1 |
| | 2122 | CARDIOVASCULAR SPECIALIST | 2 |
| | 2123 | CARDIOVASCULAR SPECIALIST | 1 |
| **00.7048 Total** | | | **21** |
| 00.7049 | DOH TAVR | | |
| | 0259 | VALVE CLINIC MANAGER - TA | 1 |
| | 1081 | TAVR COORDINATOR | 1 |
| **00.7049 Total** | | | **2** |
| 00.7050 | DOH RAD SHARED SERVICES | | |
| | 1279 | SYSTEMS & DOCUMENTATION C | 1 |
| | 3051 | MEDICAL EDITOR/TRANSCRIPT | 2 |
| | 3056 | SR OFFICE ASSISTANT | 9 |
| | 3065 | FILE ROOM SUPERVISOR | 1 |
| | 3067 | SR ADMINISTRATIVE ASSISTA | 1 |
| **00.7050 Total** | | | **14** |
| 00.7052 | DOH RAD DIAGN | | |
| | 0230 | MANAGER, NUCLEAR MED & DI | 1 |
| | 2055 | RADIOLOGIC TECHNOLOGIST | 32 |
| **00.7052 Total** | | | **33** |
| 00.7053 | DOH NUCL MED | | |
| | 2005 | NUCLEAR MED TECH - REG | 4 |
| | 3066 | ADMINISTRATIVE ASSISTANT | 1 |
| **00.7053 Total** | | | **5** |
| 00.7054 | DOH ULTRASND | | |
| | 0233 | CLINICAL MANAGER, US SERV | 1 |

Hospital and DH Physicians
**Dept-Job Code List with Associate Count (not FTE's) Sep 2021**

| Dept | DEPT-JC | POSITION | Total by Dept/JC |
|------|---------|----------|------------------|
| 00.7054 | 0271 | ULTRASOUND TECH- LEAD VAS | 1 |
| | 2010 | ULTRASOUND TECH REG | 23 |
| 00.7054 Total | | | **25** |
| 00.7055 | DOH CT SCAN | | |
| | 2160 | CT TECH-REGISTERED | 11 |
| | 2165 | CT TECH- NON-REGISTERED | 1 |
| 00.7055 Total | | | **12** |
| 00.7056 | DOH IRAD | | |
| | 0269 | LEAD TECH- INTERVENTIONAL | 1 |
| | 2170 | INTERVENTIONAL RAD TECH-R | 3 |
| 00.7056 Total | | | **4** |
| 00.7058 | DOH MRI | | |
| | 0045 | DIRECTOR, MRI | 1 |
| | 2002 | LEAD MRI TECH | 1 |
| | 2006 | MRI TECH | 11 |
| | 3082 | MRI SENIOR SERVICE ASSIST | 1 |
| | 3084 | MRI SERVICES ASSISTANT | 11 |
| | 7023 | TECHNOLOGIST ASSISTANT - | 5 |
| 00.7058 Total | | | **30** |
| 00.7062 | DOH HWC G RAD | | |
| | 2055 | RADIOLOGIC TECHNOLOGIST | 5 |
| 00.7062 Total | | | **5** |
| 00.7063 | DOH HWC NUCLEAR MEDICINE | | |
| | 1167 | CARDIAC THERAPIST I | 1 |
| | 2005 | NUCLEAR MED TECH - REG | 1 |
| 00.7063 Total | | | **2** |
| 00.7064 | DOH HWC ULTRASOUND | | |
| | 2010 | ULTRASOUND TECH REG | 3 |
| 00.7064 Total | | | **3** |
| 00.7065 | DOH HWC CT S | | |
| | 2160 | CT TECH-REGISTERED | 3 |
| 00.7065 Total | | | **3** |
| 00.7066 | DOH HWC SPEC | | |
| | 1216 | PROGRAM DIRECTOR | 1 |
| 00.7066 Total | | | **1** |
| 00.7067 | DOH HWC WOMEN | | |
| | 2167 | MAMMOGRAPHY TECH | 4 |
| 00.7067 Total | | | **4** |
| 00.7071 | DOH C SUPPLY | | |
| | 0218 | DIRECTOR, CENTRAL SUPPLY | 1 |
| | 7020 | LEAD CENTRAL SUPPLY ASSIS | 2 |
| | 7021 | CENTRAL SUPPLY ASSISTANT | 12 |
| | 7028 | LINEN/MATERIAL DELIVERY A | 4 |
| | 7100 | LEAD CENTRAL SUPPLY RECEI | 1 |
| | 7101 | CENTRAL SUPPLY LINEN COOR | 1 |
| | 7105 | CENTRAL SUPPLY RECEIVING | 1 |
| | 7106 | CENTRAL SUPPLY INVENTORY | 1 |
| 00.7071 Total | | | **23** |
| 00.7075 | DOH STERIL | | |
| | 0337 | SR MANAGER, STERILE PROCE | 1 |
| | 2069 | INSTRUMENT TECHNICIAN, LE | 1 |
| | 2086 | INSTRUMENT TECHNICIAN-CER | 4 |
| | 2095 | INSTRUMENT TECHNICIAN | 4 |

Hospital and DH Physicians
Dept-Job Code List with Associate Count (not FTE's) Sep 2021

| Dept | DEPT-JC | POSITION | Total by Dept/JC |
|------|---------|----------|------------------|
| 00.7075 Total | | | 10 |
| 00.7078 | DOH MOB MRI | | |
| | 2006 | MRI TECH | 3 |
| | 3084 | MRI SERVICES ASSISTANT | 2 |
| 00.7078 Total | | | 5 |
| 00.7081 | DOH PHARMACY | | |
| | 0044 | SR EXEC DIRECTOR, PHARMAC | 1 |
| | 0237 | PHARMACY CLINICAL MANAGER | 1 |
| | 0298 | OPERATIONS MANAGER | 1 |
| | 1010 | PHARMACY RESIDENT, POSTGR | 1 |
| | 1011 | PHARMACIST, CLINICAL-INFE | 1 |
| | 1012 | PHARMACIST,CLINICAL | 4 |
| | 1025 | PHARMACIST | 19 |
| | 1036 | PHARMACIST, CLINICAL-EMER | 1 |
| | 1038 | PHARMACY PGY1 RESIDENCY D | 1 |
| | 1065 | PHARMACY COMPOUNDING COOR | 1 |
| | 1066 | PHARMACY INFORMATICS PHAR | 1 |
| | 1068 | PHARMACY ONCOLOGY/OP INFU | 1 |
| | 1069 | PHARMACIST 7/7 PROGRAM | 2 |
| | 2046 | PHARMACY TECH 7/7 PROGRAM | 2 |
| | 2051 | PHARMACIST, CLINICAL, LON | 1 |
| | 2068 | PHARMACY INVENTORY & PROC | 1 |
| | 2087 | ASSISTANT PHARM PURCHASIN | 1 |
| | 2089 | PHARMACY TECH-LEAD,CERTIF | 1 |
| | 2090 | PHARMACY TECH | 14 |
| | 2093 | PHARMACY TECH-CERTIFIED | 7 |
| | 3066 | ADMINISTRATIVE ASSISTANT | 1 |
| | 3217 | PHARMACY MEDICATION RECON | 3 |
| 00.7081 Total | | | 66 |
| 00.7091 | DOH ANESTH | | |
| | 7079 | LEAD ANESTHESIA TECH | 1 |
| | 7080 | ANESTHESIA TECH | 3 |
| 00.7091 Total | | | 4 |
| 00.7102 | DOH ORTHOPED | | |
| | 0109 | SR EXEC DIRECTOR, SURGICA | 1 |
| | 1195 | ORTHOPEDIC NAVIGATOR-MSW | 2 |
| | 2223 | PHYSICIAN ASSISTANT-ORTHO | 2 |
| 00.7102 Total | | | 5 |
| 00.7110 | DOH OP REHAB | | |
| | 1105 | RN | 1 |
| | 3101 | ADMINISTRATIVE ASSISTANT- | 3 |
| | 3102 | LEAD SR ADMIN ASSISTANT | 1 |
| 00.7110 Total | | | 5 |
| 00.7112 | DOH R SVC PT | | |
| | 1045 | PHYSICAL THERAPIST | 18 |
| | 1062 | REHAB SVCS ACUTE CARE LEA | 1 |
| | 7029 | REHAB TECH-ORTHO | 1 |
| 00.7112 Total | | | 20 |
| 00.7113 | DOH R SVC OT | | |
| | 1100 | OCCUPATIONAL THERAPIST | 9 |
| 00.7113 Total | | | 9 |
| 00.7114 | DOH REH IP ST | | |
| | 1063 | SPEECH THERAPY LEAD THERA | 1 |

**Hospital and DH Physicians**
**Dept-Job Code List with Associate Count (not FTE's) Sep 2021**

| Dept | DEPT-JC | POSITION | Total by Dept/JC |
|------|---------|----------|------------------|
| 00.7114 | 1102 | SPEECH PATHOLOGIST | 6 |
| 00.7114 Total | | | 7 |
| 00.7118 | DOH REH OP PT | | |
| | 0378 | OUTPATIENT CLINICAL MANAG | 1 |
| | 1045 | PHYSICAL THERAPIST | 13 |
| | 1051 | PELVIC FLOOR LEAD PHYSICA | 1 |
| | 1097 | PHYSICAL THERAPY EDUCATOR | 1 |
| | 7025 | REHAB TECH | 1 |
| 00.7118 Total | | | 17 |
| 00.7119 | DOH REH OP OT | | |
| | 1099 | OT-CERTIFIED HAND SPECIAL | 2 |
| | 1100 | OCCUPATIONAL THERAPIST | 2 |
| 00.7119 Total | | | 4 |
| 00.7120 | DOH REH OP ST | | |
| | 1102 | SPEECH PATHOLOGIST | 3 |
| 00.7120 Total | | | 3 |
| 00.7121 | DOH RESP TH | | |
| | 0079 | DIRECTOR, RESPIRATORY CAR | 1 |
| | 1170 | RESP CARE PRACTITIONER-RE | 28 |
| | 1172 | LEAD RESPIRATORY THERAPIS | 2 |
| | 2050 | RESP CARE PRACTITIONER-CE | 2 |
| | 3066 | ADMINISTRATIVE ASSISTANT | 1 |
| 00.7121 Total | | | 34 |
| 00.7122 | DOH PULMONARY | | |
| | 1170 | RESP CARE PRACTITIONER-RE | 1 |
| 00.7122 Total | | | 1 |
| 00.7411 | DOH HH NURSE | | |
| | 1105 | RN | 19 |
| | 1125 | SOCIAL WORKER (MSW) | 1 |
| | 1225 | RN HOME CARE ADMISSIONS | 4 |
| | 7040 | HOME HEALTH AIDE | 1 |
| 00.7411 Total | | | 25 |
| 00.7417 | DOH HH THERAP | | |
| | 0251 | REHAB SUPERVISOR | 1 |
| | 1045 | PHYSICAL THERAPIST | 14 |
| | 1100 | OCCUPATIONAL THERAPIST | 6 |
| | 1102 | SPEECH PATHOLOGIST | 2 |
| 00.7417 Total | | | 23 |
| 00.7421 | DOH HH ADMIN | | |
| | 0108 | ASSISTANT DIRECTOR, VN/HC | 1 |
| | 0302 | HOME HEALTH INTAKE NURSE/ | 1 |
| | 0331 | HOME HEALTH -HOSPITAL LIA | 1 |
| | 0415 | RN-NURSING SUPERVISOR/TEA | 1 |
| | 1112 | RN, SCHEDULING COORDINATO | 1 |
| | 1224 | RN, UTILIZATION REVIEW | 2 |
| | 1233 | STAFF DEVELOPMENT COORDIN | 1 |
| | 1289 | QUALITY ASSURANCE PERFORM | 1 |
| | 3018 | HOME HEALTH INTAKE SPECIA | 1 |
| | 3021 | INTAKE/AUTHORIZATION CLER | 1 |
| | 3031 | INTAKE REGISTRATION ASST | 1 |
| | 3045 | HOMECARE OFFICE & BILLING | 1 |
| | 3067 | SR ADMINISTRATIVE ASSISTA | 1 |
| | 3108 | VN/HC/HOSPICE/BIL/COLLECT | 2 |

**Hospital and DH Physicians**
**Dept-Job Code List with Associate Count (not FTE's) Sep 2021**

| Dept | DEPT-JC | POSITION | Total by Dept/JC |
|------|---------|----------|------------------|
| **00.7421 Total** | | | **16** |
| 00.7422 | DOH HOSPICE | | |
| | 0057 | DIRECTOR OF OPERATIONS, H | 1 |
| | 0274 | HOSPICE PATIENT CARE MANA | 1 |
| | 0279 | RN-HOSPICE CLINICAL LIAIS | 1 |
| | 0280 | CHAPLAIN,HOSPICE | 1 |
| | 0281 | BEREAVEMENT COORDINATOR | 2 |
| | 0411 | HOSPICE EDUCATION AND COM | 1 |
| | 1088 | RN HOSPICE- ON CALL | 2 |
| | 1105 | RN | 11 |
| | 1125 | SOCIAL WORKER (MSW) | 2 |
| | 1227 | RN ADMISSIONS-HOSPICE | 1 |
| | 1292 | HOSPICE VOLUNTEER COORDIN | 1 |
| | 2054 | HOSPICE OFFICE COORDINATO | 1 |
| | 7040 | HOME HEALTH AIDE | 3 |
| | 7041 | HOME HEALTH AIDE-CERTIFIE | 1 |
| **00.7422 Total** | | | **29** |
| 00.7424 | DOH HEALTHY B | | |
| | 0301 | HEALTHY BEGIN PLUS CARE M | 1 |
| | 1116 | RN-HEALTHY BEGIN PLUS CAR | 1 |
| | 1125 | SOCIAL WORKER (MSW) | 1 |
| **00.7424 Total** | | | **3** |
| 00.7429 | DOH BPCI | | |
| | 1228 | RN, CARE TRANSITION | 1 |
| **00.7429 Total** | | | **1** |
| 00.7431 | DOH CASE M | | |
| | 0018 | PHYSICIAN ADVISOR | 1 |
| | 0104 | MEDICAL DIRECTOR,CASE MAN | 1 |
| | 0256 | MANAGER, CASE MANAGEMENT | 1 |
| | 1013 | CASE MANAGER-ED | 2 |
| | 1121 | CASE MANAGER-RN | 5 |
| | 1124 | SOCIAL WORKER (BSW) | 4 |
| | 1125 | SOCIAL WORKER (MSW) | 9 |
| | 1187 | UTILIZATION REVIEW NURSE | 6 |
| | 3038 | CM DATABASE SPECIALIST/OF | 1 |
| | 3116 | CASE MANAGEMENT ASSISTANT | 1 |
| **00.7431 Total** | | | **31** |
| 00.7435 | DOH QUALITY | | |
| | 0056 | DIRECTOR, QUALITY INITIAT | 1 |
| | 0247 | MANAGER,QUALITY INITIATIV | 1 |
| | 1286 | QUALITY SYSTEMS ANALYST | 1 |
| | 1298 | QUALITY ANALYST | 1 |
| | 3067 | SR ADMINISTRATIVE ASSISTA | 1 |
| **00.7435 Total** | | | **5** |
| 00.7441 | DOH HIS | | |
| | 0050 | DIRECTOR, HIS | 1 |
| | 3050 | MEDICAL TRANSCRIPTIONIST | 1 |
| | 3053 | MEDICAL TRANSCRIPTIONIST | 9 |
| | 3070 | RELEASE OF INFORMATION SP | 3 |
| | 3118 | CHART PROCESSING SUPERVIS | 1 |
| | 3152 | CODING COMPLIANCE MANAGER | 1 |
| | 3175 | EMR TECHNICIAN (ELECTRONI | 9 |
| | 3180 | CODING ANALYST-COC CERTIF | 4 |

**Hospital and DH Physicians**

**Dept-Job Code List with Associate Count (not FTE's) Sep 2021**

| Dept | DEPT-JC | POSITION | Total by Dept/JC |
|------|---------|----------|------------------|
| 00.7441 | 3181 | CLINICAL DATA ANALYST | 3 |
| | 3184 | CLINICAL DATA SPECIALIST | 1 |
| | 3186 | CODING ANALYST- CCS CERTI | 5 |
| | 3190 | CHART COMPLETION ANALYST | 5 |
| | 3191 | LEAD CODER/COMPLIANCE SPE | 1 |
| | 7131 | CODER TRAINEE | 1 |
| 00.7441 Total | | | 45 |
| 00.7442 | DOH CDI | | |
| | 1294 | CLINICAL DOCUMENTATION IM | 7 |
| | 1295 | MANAGER, CDI SPECIALIST | 1 |
| 00.7442 Total | | | 8 |
| 00.7457 | DOH ISLT | | |
| | 0047 | DIRECTOR,DATA ANALYTICS & | 1 |
| | 1264 | SR QUALITY IMPROV REPORT | 1 |
| | 1277 | DATA MANAGER/ANALYST | 2 |
| | 1284 | CLINICAL PROCESS IMPROVEM | 1 |
| | 1297 | SR HEALTHCARE DATA ANALYT | 1 |
| 00.7457 Total | | | 6 |
| 00.7461 | DOH LIBRARY | | |
| | 3169 | CLININCAL INFORMATION ADM | 1 |
| 00.7461 Total | | | 1 |
| 00.7621 | DOH CHILD VIL | | |
| | 0305 | ASSISTANT DIRECTOR,CHILDR | 1 |
| | 0306 | BUSINESS MANAGER, CHIL VI | 1 |
| | 1155 | PROGRAM COORDINATOR, CHIL | 2 |
| | 1160 | TEACHER | 29 |
| | 1161 | LIBRARIAN/TEACHER | 1 |
| | 2112 | BUILDING SUBSTITUTE | 3 |
| | 3066 | ADMINISTRATIVE ASSISTANT | 2 |
| | 7075 | ASSISTANT TEACHER | 19 |
| 00.7621 Total | | | 58 |
| 00.7631 | DOH SNACK BAR | | |
| | 7007 | COOK 2 | 2 |
| 00.7631 Total | | | 2 |
| 00.7641 | DOH OCC H SVC | | |
| | 1082 | NURSE PRACTITIONER | 1 |
| | 1105 | RN | 1 |
| | 3046 | ADMIN ASSISTANT OHS/OUTRE | 1 |
| 00.7641 Total | | | 3 |
| 00.8011 | DOH F&N SVC | | |
| | 0365 | SUPERVISOR | 3 |
| | 1205 | CLINICAL DIETITIAN | 2 |
| | 7003 | SOUS CHEF | 1 |
| | 7007 | COOK 2 | 10 |
| | 7008 | COOK 1 | 4 |
| | 7009 | RECEIVING STOREROOM CLERK | 1 |
| | 7010 | FOOD SERVICE WORKER | 10 |
| | 7026 | FOOD SERVICE CASHIER | 2 |
| | 7062 | HOST/HOSTESS | 23 |
| | 7078 | UTILITY WORKER-F&N | 2 |
| 00.8011 Total | | | 58 |
| 00.8017 | DOH COFFEE | | |
| | 7004 | COFFEE KIOSK ATTENDANT | 2 |

**Hospital and DH Physicians**

**Dept-Job Code List with Associate Count (not FTE's) Sep 2021**

| Dept | DEPT-JC | POSITION | Total by Dept/JC |
|------|---------|----------|------------------|
| 00.8017 Total | | | 2 |
| 00.8021 | DOH HOUSEKEEP | | |
| | 0375 | GROUP LEADER, HOUSEKEEPIN | 7 |
| | 7015 | HOUSEKEEPING AIDE | 55 |
| | 7045 | PT AMBASSADOR/ADMIN ASST | 1 |
| | 7126 | OXYGEN TANK/BED TECHNICIA | 1 |
| 00.8021 Total | | | 64 |
| 00.8041 | DOH PL OPER | | |
| | 0113 | SR EXEC DIRECTOR,PROPERTY | 1 |
| | 3014 | PLANT OPERATIONS OFFICE C | 1 |
| | 4001 | CARPENTER | 2 |
| | 4005 | ELECTRICIAN | 1 |
| | 4006 | ELECTRICAL SYSTEMS ENGINE | 1 |
| | 4010 | PLUMBER | 1 |
| | 4020 | PAINTER | 1 |
| | 5025 | UTILITY PLANT OPERATOR | 4 |
| | 6005 | MAINTENANCE WORKER | 3 |
| 00.8041 Total | | | 15 |
| 00.8044 | DOH SECURITY | | |
| | 0226 | DIRECTOR, SECURITY | 1 |
| | 0339 | SECURITY ASSISTANT DIRECT | 1 |
| | 7058 | SECURITY SHIFT SUPERVISOR | 2 |
| | 7060 | SECURITY/SAFETY OFFICER | 31 |
| | 7129 | ENTRANCE SCREENER/CONCIER | 6 |
| 00.8044 Total | | | 41 |
| 00.8045 | DOH TELECOMM | | |
| | 0360 | MANAGER, TELECOMMUNICATIO | 1 |
| | 3215 | SWITCHBOARD OPERATOR | 11 |
| | 3219 | TELECOMMUNICATIONS COORDI | 1 |
| 00.8045 Total | | | 13 |
| 00.8046 | DOH RISK/SAFE | | |
| | 0025 | DIRECTOR, RISK SERVICES - | 1 |
| | 0379 | RISK MANAGER/PATIENT ADVO | 1 |
| | 1320 | RISK ASSISTANT- TEMP RN | 1 |
| | 3067 | SR ADMINISTRATIVE ASSISTA | 1 |
| | 3071 | IRB COORDINATOR/LEGAL ASS | 1 |
| 00.8046 Total | | | 5 |
| 00.8047 | DOH COURIER | | |
| | 7125 | TRANSPORTER | 2 |
| | 7128 | COURTESY SHUTTLE DRIVER | 3 |
| 00.8047 Total | | | 5 |
| 00.8048 | DOH CL ENG | | |
| | 1035 | BIOMEDICAL ENGINEERING MA | 1 |
| | 2035 | BIOMEDICAL TECHNICIAN | 3 |
| | 2036 | BIOMEDICAL TECHNICIAN, AD | 1 |
| 00.8048 Total | | | 5 |
| 00.8049 | DOH ENVIRCARE | | |
| | 0383 | ENVIRONMENT OF CARE MANAG | 1 |
| 00.8049 Total | | | 1 |
| 00.8051 | DOH INTEGRATE SVCS | | |
| | 3064 | BUSINESS CENTER ASSOCIATE | 1 |
| 00.8051 Total | | | 1 |
| 00.8111 | DOH ADM | | |

**Hospital and DH Physicians**

**Dept-Job Code List with Associate Count (not FTE's) Sep 2021**

| Dept | DEPT-JC | POSITION | Total by Dept/JC |
|------|---------|----------|------------------|
| 00.8111 | 0001 | PRESIDENT-CEO | 1 |
| | 0010 | EXECUTIVE DIR, PINE RUN C | 1 |
| | 0014 | VICE PRESIDENT,GENERAL CO | 1 |
| | 0016 | VICE PRESIDENT,AMBULATORY | 1 |
| | 0017 | VICE PRESIDENT-STRATEGIC | 1 |
| | 0024 | VICE PRESIDENT - INFORMAT | 1 |
| | 0031 | CONSULTANT | 2 |
| | 0041 | EXECUTIVE DIRECTOR, BCHIP | 1 |
| | 0064 | VICE PRESIDENT, CRITICAL | 1 |
| | 0069 | DIRECTOR, COMMUNITY & GOV | 1 |
| | 0072 | SR EXECUTIVE, DIRECTOR OF | 1 |
| | 0080 | VICE PRESIDENT,NURSING AN | 1 |
| | 0103 | SR EXEC DIRECTOR, CARE TR | 1 |
| | 0216 | DIRECTOR OF FACILITY DESI | 1 |
| | 3028 | SR EXECUTIVE ASSISTANT | 2 |
| | 3039 | VIA SR ADMINISTRATIVE ASS | 1 |
| | 3042 | ADMINISTRATION/HR ASSISTA | 1 |
| | 3043 | DHP,LLC ADMINISTRATIVE MA | 1 |
| | 3047 | EXECUTIVE SUPPORT MANAGER | 1 |
| | 3066 | ADMINISTRATIVE ASSISTANT | 1 |
| **00.8111 Total** | | | **22** |
| 00.8112 | DOH MED STAFF | | |
| | 0006 | VICE PRESIDENT - MEDICAL | 1 |
| | 0325 | ADMIN DIRECTOR - MED STAF | 1 |
| | 1082 | NURSE PRACTITIONER | 5 |
| | 3072 | CREDENTIALLING ASSISTANT | 1 |
| **00.8112 Total** | | | **8** |
| 00.8119 | DOH HWC ADMIN | | |
| | 0209 | DIRECTOR, H&W CTR, CLINIC | 1 |
| **00.8119 Total** | | | **1** |
| 00.8131 | DOH PURCH | | |
| | 3068 | PURCHASING AGENT | 3 |
| | 3069 | DIRECTOR, PURCHASING | 1 |
| **00.8131 Total** | | | **4** |
| 00.8132 | DOH PRINTING | | |
| | 0355 | MAIL ROOM SUPERVISOR | 1 |
| **00.8132 Total** | | | **1** |
| 00.8141 | DOH VOLUNTEER | | |
| | 0052 | DIRECTOR,VOLUNTEER SVCS | 1 |
| | 0062 | ASSISTANT DIRECTOR,VOLUNT | 1 |
| | 3011 | VOLUNTEER SERVICES COORDI | 1 |
| | 3213 | OFFICE ASSISTANT | 1 |
| **00.8141 Total** | | | **4** |
| 00.8142 | DOH TRANSPORT | | |
| | 0370 | PATIENT TRANSPORT COORDIN | 4 |
| | 0382 | PATIENT TRANSPORT MANAGER | 1 |
| | 7095 | PATIENT TRANSPORT ASSOCIA | 3 |
| **00.8142 Total** | | | **8** |
| 00.8161 | DOH HUM RES | | |
| | 0020 | VICE PRESIDENT- HUMAN RES | 1 |
| | 0088 | SR DIRECTOR, HUMAN RESOUR | 1 |
| | 0292 | BENEFITS MANAGER | 1 |
| | 0293 | DIRECTOR, COMPENSATION,BE | 1 |

**Hospital and DH Physicians**

**Dept-Job Code List with Associate Count (not FTE's) Sep 2021**

| Dept | DEPT-JC | POSITION | Total by Dept/JC |
|------|---------|----------|------------------|
| 00.8161 | 0334 | DIRECTOR OF TALENT ACQUIS | 1 |
| | 1194 | MANAGER,EMPLOYEE RELATION | 1 |
| | 1239 | HRIS SPECIALIST/PAYROLL S | 1 |
| | 1263 | RECRUITER, NURSE | 1 |
| | 1265 | RECRUITER | 2 |
| | 2184 | HR GENERALIST | 2 |
| | 2198 | BENEFITS SUPPORT SPECIALI | 2 |
| | 3035 | HUMAN RESOURCES ASSISTANT | 2 |
| | 3058 | CLINICAL RECRUITMENT SPEC | 1 |
| | 3060 | PAYROLL PROCESSING COORDI | 1 |
| | 3067 | SR ADMINISTRATIVE ASSISTA | 1 |
| **00.8161 Total** | | | **19** |
| 00.8162 | DOH EDUCATION | | |
| | 1086 | PATIENT & FAMILY EDUCATIO | 1 |
| | 1403 | ACLS COORDINATOR | 1 |
| **00.8162 Total** | | | **2** |
| 00.8168 | DOH STRTGOUTR | | |
| | 0227 | DIRECTOR, MARKETING & OUT | 1 |
| | 0232 | PEDIATRIC PROGRAM MANAGER | 1 |
| | 2219 | PHYSICIAN ASSISTANT- OHS | 1 |
| | 3040 | EDUCATION OUTREACH LIAISO | 2 |
| | 3067 | SR ADMINISTRATIVE ASSISTA | 1 |
| | 3099 | MANAGER, WELLNESS AND OUT | 1 |
| | 7138 | INTERN | 1 |
| **00.8168 Total** | | | **8** |
| 00.8171 | DOH PASTORAL | | |
| | 0105 | CHAPLAIN,DIRECTOR | 1 |
| | 0257 | EMERGENCY CARE CHAPLAIN | 1 |
| | 0258 | CHAPLAIN, PINE RUN | 1 |
| | 3066 | ADMINISTRATIVE ASSISTANT | 1 |
| **00.8171 Total** | | | **4** |
| 00.8411 | DOH FIN ADM | | |
| | 0007 | VICE PRESIDENT - FINANCE/ | 1 |
| **00.8411 Total** | | | **1** |
| 00.8421 | DOH FINANCE | | |
| | 0086 | DIRECTOR, PAYOR MANAGEMEN | 1 |
| | 0098 | CHIEF ACCOUNTING OFFICER | 1 |
| | 0110 | DIRECTOR, FINANCE | 1 |
| | 0386 | ACCOUNTING SYSTEMS ADMINI | 1 |
| | 1014 | HEALTHCARE MANAGEMENT ENG | 1 |
| | 1198 | SR FINANCIAL ANALYST | 1 |
| **00.8421 Total** | | | **6** |
| 00.8423 | DOH ACCTING | | |
| | 0063 | MANAGER, GENERAL ACCOUNTI | 1 |
| | 0387 | FINANCIAL ANALYST | 1 |
| | 1152 | SR ACCOUNTANT | 2 |
| | 1199 | ACCTS PAYABLE & DISBURSEM | 1 |
| **00.8423 Total** | | | **5** |
| 00.8432 | DOH PT FIN SV | | |
| | 0046 | DIRECTOR, PATIENT ACCESS | 1 |
| | 0211 | MANAGER, REVENUE INTEGRIT | 1 |
| | 0321 | THIRD PARTY ACCOUNTS RECE | 1 |
| | 0400 | FINANCIAL SVCS SYSTEMS AN | 1 |

**Hospital and DH Physicians**

**Dept-Job Code List with Associate Count (not FTE's) Sep 2021**

| Dept | DEPT-JC | POSITION | Total by Dept/JC |
|------|---------|----------|------------------|
| 00.8432 | 0403 | REVENUE RECOVERY SPECIALI | 1 |
| | 3090 | CASHIER | 1 |
| | 3106 | ACCOUNTS RECEIVABLE BILLI | 9 |
| | 3107 | INSURANCE PAYMENT PROCESS | 2 |
| | 3110 | CLAIMS PROCESSOR | 2 |
| | 3117 | LEAD ACCOUNTS RECEIVABLE | 1 |
| **00.8432 Total** | | | **20** |
| 00.8433 | DOH PT ACC | | |
| | 0322 | PATIENT ACCESS COORDINATO | 1 |
| | 0327 | PAFS MANAGER | 1 |
| | 3109 | ACCESS FINANCIAL SVCS REP | 5 |
| | 3158 | OUTPATIENT REGISTRAR | 15 |
| | 3162 | PRESERVICE REPRESENTATIVE | 13 |
| **00.8433 Total** | | | **35** |
| 00.8434 | DOH ADMISSION | | |
| | 0322 | PATIENT ACCESS COORDINATO | 1 |
| | 0323 | SR MANAGER, PT ACCESS/ADM | 1 |
| | 3085 | I/P ADMISSION REGISTRAR | 6 |
| | 3160 | EMERGENCY DEPARTMENT REGI | 27 |
| | 3162 | PRESERVICE REPRESENTATIVE | 2 |
| | 3168 | LEAD EMERGENCY DEPARTMENT | 1 |
| **00.8434 Total** | | | **38** |
| 00.8445 | DOH HWC REGIS | | |
| | 0332 | OPERATIONS SUPERVISOR-REG | 1 |
| | 3158 | OUTPATIENT REGISTRAR | 5 |
| **00.8445 Total** | | | **6** |
| 00.8550 | DOH MIS ADS | | |
| | 0435 | DIRECTOR, APPLICATIONS SY | 1 |
| | 0437 | PROJECT LEADER, ADV CLINI | 1 |
| | 1244 | SR DATABASE ANALYST | 1 |
| | 1261 | DATABASE MANAGER | 1 |
| | 1273 | CLINICAL SYSTEMS ANALYST | 6 |
| | 1274 | FINANCIAL SYSTEMS ANALYST | 1 |
| | 1285 | SYSTEMS ANALYST | 1 |
| **00.8550 Total** | | | **12** |
| 00.8552 | DOH NET & TEL | | |
| | 0295 | CHIEF TECHNOLOGY OFFICER | 1 |
| | 0408 | PC ENDPOINT MANAGER | 1 |
| | 0414 | SR INFORMATION SECURITY A | 2 |
| | 0431 | MANAGER OF TECHNICAL INFR | 1 |
| | 0438 | SERVICE DESK MANAGER | 1 |
| | 1237 | TELECOM NETWORK ANALYST | 1 |
| | 1255 | NETWORK ANALYST, LEAD | 1 |
| | 1271 | WIDE AREA NETWORK (WAN) E | 1 |
| | 1280 | PC ANALYST | 5 |
| | 1282 | NETWORK ANALYST | 2 |
| | 1296 | STORAGE ENGINEER | 1 |
| | 1316 | SECURITY ANALYST | 1 |
| | 1317 | SENIOR SERVER ADMINISTRAT | 1 |
| | 2181 | JR SYSTEMS ANALYST-HELP D | 2 |
| | 3012 | MIS DEPARTMENT COORDINATO | 1 |
| **00.8552 Total** | | | **22** |
| 00.8553 | DOH MIS ACISS | | |

**Hospital and DH Physicians**

**Dept-Job Code List with Associate Count (not FTE's) Sep 2021**

| Dept | DEPT-JC | POSITION | Total by Dept/JC |
|------|---------|----------|------------------|
| 00.8553 | 0241 | DIRECTOR, AMBULATORY CARE | 1 |
| | 1268 | PROJECT MANAGER, ACISS | 1 |
| | 1275 | SR SYSTEMS ANALYST | 3 |
| 00.8553 Total | | | 5 |
| 00.8555 | DOH MIS ADMIN | | |
| | 1299 | MANAGER, MEDICAL IMAGING | 1 |
| | 1321 | HIPAA SECURITY COMPLIANCE | 1 |
| 00.8555 Total | | | 2 |
| 00.9008 | DOH J L H | | |
| | 7110 | CARETAKER | 1 |
| 00.9008 Total | | | 1 |
| 00.9010 | DOH HQP REC | | |
| | 0015 | CEO, HQP | 1 |
| | 0058 | DIRECTOR OF OPERATIONS,HQ | 1 |
| | 0076 | DIRECTOR, CARE MANAGEMENT | 1 |
| | 0078 | SR VICE PRESIDENT, HQP | 1 |
| | 0102 | SENIOR CLINICAL LEAD | 2 |
| | 0242 | CHIEF, INFORMATION TECHNO | 1 |
| | 1129 | CARE MANAGER | 1 |
| | 1212 | HQP ADMINISTRATIVE COORD | 1 |
| | 1215 | CHART AUDITOR | 1 |
| | 1256 | STRATEGIC DATA SCIENTIST | 1 |
| | 1267 | CHIEF OF FINANCE AND ANAL | 1 |
| 00.9010 Total | | | 12 |
| 00.9013 | DOH DEV OFF | | |
| | 0011 | VICE PRESIDENT - DEVELOPM | 1 |
| | 0116 | DIRECTOR, DEVELOPMENT COM | 1 |
| | 0117 | DIRECTOR, DEVELOPMENT | 1 |
| | 0285 | DEVELOPMENT MANAGER, COMM | 1 |
| | 0341 | SPECIAL GIFTS OFFICER | 1 |
| | 2154 | DEVELOPMENT SPECIALIST,GI | 1 |
| | 2159 | DEVELOPMENT SPECIALIST | 1 |
| | 3098 | DEVELOPMENT MANAGER, EVEN | 1 |
| | 3132 | DEVELOPMENT COORDINATOR, | 1 |
| 00.9013 Total | | | 9 |
| 00.9024 | DOH MARKETING | | |
| | 0294 | MANAGER,DIGITAL & INTERAC | 1 |
| | 0390 | MARKETING SPECIALIST | 1 |
| | 0409 | SR GRAPHIC DESIGNER/MARKE | 1 |
| | 0441 | DIGITAL MARKETING COORDIN | 1 |
| | 2101 | WEB & INTRANET ADMINISTRA | 1 |
| | 2196 | MARKETING COORDINATOR/WRI | 3 |
| | 3266 | PR/COMMUNICATIONS COORDIN | 1 |
| 00.9024 Total | | | 9 |
| 00.9043 | DOH CBHCT | | |
| | 0042 | EXECUTIVE DIRECTOR, CB CA | 1 |
| | 0342 | PROGRAM COORDINATOR- CB C | 1 |
| 00.9043 Total | | | 2 |
| 00.9052 | DOH DWDC | | |
| | 0385 | CLINICAL MANAGER, WOMENS | 1 |
| | 2010 | ULTRASOUND TECH REG | 2 |
| | 2167 | MAMMOGRAPHY TECH | 8 |
| | 3056 | SR OFFICE ASSISTANT | 5 |

**Hospital and DH Physicians**
**Dept-Job Code List with Associate Count (not FTE's) Sep 2021**

| Dept | DEPT-JC | POSITION | Total by Dept/JC |
|------|---------|----------|------------------|
| 00.9052 | 3162 | PRESERVICE REPRESENTATIVE | 1 |
| | 7024 | TECHNOLOGIST ASSISTANT | 1 |
| 00.9052 Total | | | 18 |
| 00.9220 | DOH RESEARCH ADMIN | | |
| | 0272 | DIRECTOR, MEDICAL RESEARC | 1 |
| | 0303 | RN-MEDICAL RESEARCH COORD | 4 |
| | 1134 | RN, MEDICAL RESEARCH | 1 |
| | 2156 | MEDICAL RESEARCH GRANTS A | 1 |
| | 3024 | RESEARCH SPECIALIST | 1 |
| 00.9220 Total | | | 8 |
| 00.9925 | DOH PALLATIVE | | |
| | 1105 | RN | 1 |
| | 1125 | SOCIAL WORKER (MSW) | 1 |
| | 3017 | PHYSICIAN OFFICE MANAGER | 1 |
| 00.9925 Total | | | 3 |
| 00.9935 | DOH DH HEALTH | | |
| | 0131 | DHP ADMINISTRATIVE DIRECT | 1 |
| | 1254 | DHP - CARE COORDINATOR | 2 |
| | 3125 | PRACTICE SUPPORT SPECIALI | 2 |
| 00.9935 Total | | | 5 |
| 03.6059 | VIAA AUTERI | | |
| | 30013 | CARDIOVASCULAR SURGEON | 2 |
| | 30037 | MEDICAL DIRECTOR, CARDIOL | 1 |
| | 33017 | PHYSICIAN OFFICE MANAGER- | 1 |
| | 33020 | ASSISTANT OFFICE MANAGER | 1 |
| 03.6059 Total | | | 5 |
| 03.8109 | VIAA ADM/BILL | | |
| | 30014 | DHP OPERATIONS DIRECTOR | 2 |
| | 30111 | DIRECTOR, FINANCE-DHP | 1 |
| | 30458 | DIRECTOR, IT- DHP | 1 |
| | 31016 | PHYSICIAN LIAISON-DHP | 1 |
| | 31095 | DH PHYSICIANS EDUCATOR MA | 1 |
| | 31152 | SR ACCOUNTANT | 1 |
| | 31166 | ETT CARDIAC TECH/FRONT DE | 1 |
| | 31275 | IT SYSTEMS ANALYST- DHP | 1 |
| | 31294 | CDI & CODING SPECIALIST & | 1 |
| | 32145 | MEDICAL ASSISTANT | 1 |
| | 32147 | FLOAT - FRONT DESK | 1 |
| | 33028 | ADMINISTRATIVE SERVICES C | 1 |
| | 33081 | FLOAT-FRONT DESK/MA | 5 |
| | 37135 | SEASONAL WORKER | 2 |
| 03.8109 Total | | | 20 |
| 03.9025 | VIAA SUB ACUTE | | |
| | 30023 | PHYSICIAN | 4 |
| | 31082 | NURSE PRACTITIONER | 2 |
| 03.9025 Total | | | 6 |
| 03.9028 | VIAA RHBMED | | |
| | 30023 | PHYSICIAN | 1 |
| 03.9028 Total | | | 1 |
| 03.9034 | VIAA INT MED FOUNTAINVILLE | | |
| | 30023 | PHYSICIAN | 3 |
| | 31082 | NURSE PRACTITIONER | 1 |
| | 31100 | NURSING SUPERVISOR,DHP | 1 |

**Hospital and DH Physicians**

**Dept-Job Code List with Associate Count (not FTE's) Sep 2021**

| Dept | DEPT-JC | POSITION | Total by Dept/JC |
|------|---------|----------|------------------|
| 03.9034 | 32145 | MEDICAL ASSISTANT | 2 |
| | 33038 | FRONT DESK/MEDICAL ASSIST | 1 |
| | 33067 | FRONT DESK COORDINATOR | 1 |
| **03.9034 Total** | | | **9** |
| 03.9040 | VIA  HSPITLIST | | |
| | 30018 | LEAD HOSPITALIST | 1 |
| | 30035 | HOSPITALIST | 24 |
| | 31081 | NURSE PRACTITIONER-HOSPIT | 2 |
| | 32212 | PHYSICIAN ASSISTANT-HOSPI | 1 |
| | 33029 | PHYSICIAN OFFICE MANAGER- | 1 |
| **03.9040 Total** | | | **29** |
| 03.9049 | VIAA DR WOUND | | |
| | 30023 | PHYSICIAN | 1 |
| | 32215 | PHYSICIAN ASSISTANT | 1 |
| **03.9049 Total** | | | **2** |
| 03.9054 | VIA NEUROLOGY | | |
| | 30023 | PHYSICIAN | 4 |
| | 31082 | NURSE PRACTITIONER | 1 |
| | 32145 | MEDICAL ASSISTANT | 2 |
| | 33017 | PHYSICIAN OFFICE MANAGER- | 1 |
| | 33040 | FRONT DESK/MEDICAL ASST-C | 1 |
| | 33067 | FRONT DESK COORDINATOR | 2 |
| | 37040 | MEDICAL ASSISTANT,REGISTE | 1 |
| **03.9054 Total** | | | **12** |
| 03.9105 | VIAA SURGICAL | | |
| | 30025 | GENERAL SURGEON | 1 |
| | 30026 | SURGEON | 4 |
| | 30045 | PRACTICE MANAGER | 1 |
| | 32145 | MEDICAL ASSISTANT | 2 |
| | 33067 | FRONT DESK COORDINATOR | 2 |
| | 33087 | PATIENT NAVIGATOR, SURGER | 1 |
| **03.9105 Total** | | | **11** |
| 03.9112 | VIAA ADM OTHER | | |
| | 30303 | DIRECTOR,REVENUE CYCLE-DH | 1 |
| | 31293 | CLINICAL DOCUMENTATION & | 1 |
| | 33106 | BILLING REPRESENTATIVE | 25 |
| | 33112 | ACCOUNTS RECEIVABLE BILLI | 1 |
| | 33114 | CREDENTIALING SPECIALIST | 2 |
| | 33116 | BILLING REPRESENTATIVE,LE | 1 |
| | 33173 | CODING AND CHARGE ENTRY S | 1 |
| | 33174 | CODING & DOCUMENTATION SP | 4 |
| **03.9112 Total** | | | **36** |
| 03.9120 | VIAA COLREC S | | |
| | 30026 | SURGEON | 2 |
| | 32215 | PHYSICIAN ASSISTANT | 1 |
| | 33016 | PHYSICIAN OFFICE MANAGER- | 1 |
| | 33040 | FRONT DESK/MEDICAL ASST-C | 2 |
| | 33087 | PATIENT NAVIGATOR, SURGER | 1 |
| **03.9120 Total** | | | **7** |
| 03.9150 | VIAA UROLOGY | | |
| | 30023 | PHYSICIAN | 8 |
| | 30045 | PRACTICE MANAGER | 1 |
| | 31102 | REGISTERED NURSE,SURGICAL | 1 |

**Hospital and DH Physicians**

**Dept-Job Code List with Associate Count (not FTE's) Sep 2021**

| Dept | DEPT-JC | POSITION | Total by Dept/JC |
|------|---------|----------|------------------|
| 03.9150 | 31105 | REGISTERED NURSE | 1 |
| | 31109 | UROLOGY NURSE SPECIALIST | 1 |
| | 32015 | NURSING LPN | 1 |
| | 33067 | FRONT DESK COORDINATOR | 5 |
| | 33087 | PATIENT NAVIGATOR, SURGER | 3 |
| | 33176 | MEDICAL RECORDS-INVENTORY | 2 |
| | 37040 | MEDICAL ASSISTANT,REGISTE | 1 |
| **03.9150 Total** | | | **24** |
| 03.9155 | VIAA AMBY SVCS | | |
| | 31105 | REGISTERED NURSE | 3 |
| | 31110 | REGISTERED NURSE,LEAD | 1 |
| | 32093 | INSTRUMENT TECH-UROLOGY | 1 |
| | 33067 | FRONT DESK COORDINATOR | 2 |
| **03.9155 Total** | | | **7** |
| 03.9240 | VIAA  PEDIATRIC | | |
| | 30021 | LEAD PEDIATRIC HOSPITALIS | 1 |
| | 30022 | PEDIATRIC HOSPITALIST | 3 |
| **03.9240 Total** | | | **4** |
| 03.9245 | VIAA BFP | | |
| | 30023 | PHYSICIAN | 4 |
| | 30045 | PRACTICE MANAGER | 1 |
| | 31082 | NURSE PRACTITIONER | 4 |
| | 31100 | NURSING SUPERVISOR,DHP | 1 |
| | 31108 | REGISTERED NURSE,TRIAGE | 3 |
| | 31254 | DHP-CARE COORDINATOR, RN | 2 |
| | 32145 | MEDICAL ASSISTANT | 3 |
| | 32215 | PHYSICIAN ASSISTANT | 3 |
| | 33067 | FRONT DESK COORDINATOR | 14 |
| | 33083 | FRONT DESK SUPERVISOR | 1 |
| | 37040 | MEDICAL ASSISTANT,REGISTE | 7 |
| **03.9245 Total** | | | **43** |
| 03.9250 | VIAA GI | | |
| | 30023 | PHYSICIAN | 9 |
| | 30045 | PRACTICE MANAGER | 1 |
| | 31082 | NURSE PRACTITIONER | 3 |
| | 31100 | NURSING SUPERVISOR,DHP | 1 |
| | 31105 | REGISTERED NURSE | 1 |
| | 31112 | RN, MOTILITY GI | 1 |
| | 32015 | NURSING LPN | 3 |
| | 32145 | MEDICAL ASSISTANT | 2 |
| | 33020 | ASSISTANT OFFICE MANAGER | 1 |
| | 33038 | FRONT DESK/MEDICAL ASSIST | 2 |
| | 33067 | FRONT DESK COORDINATOR | 4 |
| | 33083 | FRONT DESK SUPERVISOR | 1 |
| | 33086 | OPEN ACCESS SUPERVISOR | 1 |
| | 33087 | PATIENT NAVIGATOR, SURGER | 1 |
| | 33158 | SCHEDULER | 7 |
| | 33175 | MEDICAL RECORDS CLERK | 3 |
| | 37040 | MEDICAL ASSISTANT,REGISTE | 1 |
| **03.9250 Total** | | | **42** |
| 03.9255 | VIA  FAMILY HE | | |
| | 30023 | PHYSICIAN | 5 |
| | 30045 | PRACTICE MANAGER | 1 |

**Hospital and DH Physicians**

**Dept-Job Code List with Associate Count (not FTE's) Sep 2021**

| Dept | DEPT-JC | POSITION | Total by Dept/JC |
|------|---------|----------|------------------|
| 03.9255 | 31082 | NURSE PRACTITIONER | 1 |
| | 31108 | REGISTERED NURSE,TRIAGE | 1 |
| | 32145 | MEDICAL ASSISTANT | 1 |
| | 33025 | PATIENT CARE COORDINATOR- | 1 |
| | 33038 | FRONT DESK/MEDICAL ASSIST | 3 |
| | 33040 | FRONT DESK/MEDICAL ASST-C | 1 |
| | 33067 | FRONT DESK COORDINATOR | 4 |
| | 33070 | CALL CENTER ASSOCIATE | 2 |
| | 33175 | MEDICAL RECORDS CLERK | 1 |
| **03.9255 Total** | | | **21** |
| 03.9260 | VIAA VASCULAR | | |
| | 30016 | VASCULAR SURGEON | 2 |
| | 32015 | NURSING LPN | 1 |
| | 32145 | MEDICAL ASSISTANT | 1 |
| | 32215 | PHYSICIAN ASSISTANT | 1 |
| | 33067 | FRONT DESK COORDINATOR | 2 |
| | 33087 | PATIENT NAVIGATOR, SURGER | 1 |
| | 37040 | MEDICAL ASSISTANT,REGISTE | 1 |
| **03.9260 Total** | | | **9** |
| 03.9265 | VIAA DR. GAIBL | | |
| | 30023 | PHYSICIAN | 1 |
| | 32215 | PHYSICIAN ASSISTANT | 1 |
| | 33017 | PHYSICIAN OFFICE MANAGER- | 1 |
| | 33025 | PATIENT CARE COORDINATOR- | 1 |
| | 33067 | FRONT DESK COORDINATOR | 2 |
| | 37040 | MEDICAL ASSISTANT,REGISTE | 1 |
| **03.9265 Total** | | | **7** |
| 03.9275 | VIAA PC RICHBO | | |
| | 30023 | PHYSICIAN | 1 |
| | 31082 | NURSE PRACTITIONER | 1 |
| | 33017 | PHYSICIAN OFFICE MANAGER- | 1 |
| | 33038 | FRONT DESK/MEDICAL ASSIST | 1 |
| | 33040 | FRONT DESK/MEDICAL ASST-C | 1 |
| | 33067 | FRONT DESK COORDINATOR | 2 |
| | 37040 | MEDICAL ASSISTANT,REGISTE | 1 |
| **03.9275 Total** | | | **8** |
| 03.9285 | VIAA IntMed | | |
| | 30023 | PHYSICIAN | 4 |
| | 30045 | PRACTICE MANAGER | 1 |
| | 32015 | NURSING LPN | 2 |
| | 32145 | MEDICAL ASSISTANT | 1 |
| | 32215 | PHYSICIAN ASSISTANT | 1 |
| | 33025 | PATIENT CARE COORDINATOR- | 1 |
| | 33038 | FRONT DESK/MEDICAL ASSIST | 1 |
| | 33067 | FRONT DESK COORDINATOR | 4 |
| | 33081 | FLOAT-FRONT DESK/MA | 1 |
| **03.9285 Total** | | | **16** |
| 03.9295 | VIAA PCP SPRUC | | |
| | 30023 | PHYSICIAN | 1 |
| | 33017 | PHYSICIAN OFFICE MANAGER- | 1 |
| | 33038 | FRONT DESK/MEDICAL ASSIST | 2 |
| | 33067 | FRONT DESK COORDINATOR | 1 |
| **03.9295 Total** | | | **5** |

Hospital and DH Physicians

Dept-Job Code List with Associate Count (not FTE's) Sep 2021

| Dept | DEPT-JC | POSITION | Total by Dept/JC |
|------|---------|----------|------------------|
| 03.9310 | VIAA INFECT DI | | |
| | 30023 | PHYSICIAN | 3 |
| | 33016 | PHYSICIAN OFFICE MANAGER- | 1 |
| | 33040 | FRONT DESK/MEDICAL ASST-C | 1 |
| | 33067 | FRONT DESK COORDINATOR | 1 |
| 03.9310 Total | | | 6 |
| 03.9315 | VIAA WRIGHTSAT | | |
| | 33038 | FRONT DESK/MEDICAL ASSIST | 1 |
| 03.9315 Total | | | 1 |
| 03.9910 | VIAA CBC EXPEN | | |
| | 30019 | CARDIOLOGIST | 10 |
| | 30045 | PRACTICE MANAGER | 1 |
| | 30302 | ARRHYTHMIA DEVICE COORDIN | 1 |
| | 31082 | NURSE PRACTITIONER | 3 |
| | 31083 | NURSE PRACTITIONER, CLINI | 1 |
| | 31108 | REGISTERED NURSE,TRIAGE | 4 |
| | 31168 | ETT CARDIAC TECH | 2 |
| | 31169 | EXERCISE PHYSIOLOGIST | 1 |
| | 32015 | NURSING LPN | 1 |
| | 32145 | MEDICAL ASSISTANT | 4 |
| | 33067 | FRONT DESK COORDINATOR | 4 |
| | 33070 | CALL CENTER ASSOCIATE | 2 |
| | 33083 | FRONT DESK SUPERVISOR | 1 |
| | 33085 | PATIENT NAVIGATOR, CARDIA | 1 |
| | 33175 | MEDICAL RECORDS CLERK | 2 |
| 03.9910 Total | | | 38 |
| 03.9915 | VIAA HV CARD | | |
| | 30019 | CARDIOLOGIST | 7 |
| | 30045 | PRACTICE MANAGER | 1 |
| | 31082 | NURSE PRACTITIONER | 1 |
| | 32023 | ARRHYTHMIA MONITORING TEC | 1 |
| | 32098 | ECHO TECH | 1 |
| | 32145 | MEDICAL ASSISTANT | 1 |
| | 33037 | FRONT DESK/MA CERT- HV | 2 |
| | 33038 | FRONT DESK/MEDICAL ASSIST | 1 |
| | 33041 | MEDICAL ASSISTANT, LEAD | 1 |
| | 33067 | FRONT DESK COORDINATOR | 1 |
| | 33068 | VETERANS WAY SITE COORDIN | 1 |
| | 33071 | CALL CENTER SUPERVISOR | 1 |
| | 33083 | FRONT DESK SUPERVISOR | 1 |
| | 33085 | PATIENT NAVIGATOR, CARDIA | 1 |
| | 33175 | MEDICAL RECORDS CLERK | 4 |
| | 37040 | MEDICAL ASSISTANT,REGISTE | 1 |
| 03.9915 Total | | | 26 |
| 03.9918 | VIAA REDEEMER | | |
| | 30019 | CARDIOLOGIST | 4 |
| | 30045 | PRACTICE MANAGER | 1 |
| | 32098 | ECHO TECH | 1 |
| | 32145 | MEDICAL ASSISTANT | 1 |
| | 33067 | FRONT DESK COORDINATOR | 2 |
| | 33085 | PATIENT NAVIGATOR, CARDIA | 1 |
| | 37040 | MEDICAL ASSISTANT,REGISTE | 2 |
| 03.9918 Total | | | 12 |

**Hospital and DH Physicians**
**Dept-Job Code List with Associate Count (not FTE's) Sep 2021**

| Dept | DEPT-JC | POSITION | Total by Dept/JC |
|------|---------|----------|------------------|
| 03.9920 | **VIAA DCA EXPEN** | | |
| | 30019 | CARDIOLOGIST | 10 |
| | 30045 | PRACTICE MANAGER | 1 |
| | 30301 | NURSE PRACT/ ARRHYTHMIA S | 1 |
| | 30302 | ARRHYTHMIA DEVICE COORDIN | 1 |
| | 31100 | NURSING SUPERVISOR,DHP | 1 |
| | 31108 | REGISTERED NURSE,TRIAGE | 6 |
| | 31168 | ETT CARDIAC TECH | 1 |
| | 32015 | NURSING LPN | 1 |
| | 32023 | ARRHYTHMIA MONITORING TEC | 1 |
| | 32145 | MEDICAL ASSISTANT | 1 |
| | 32215 | PHYSICIAN ASSISTANT | 3 |
| | 33017 | PHYSICIAN OFFICE MANAGER- | 1 |
| | 33067 | FRONT DESK COORDINATOR | 7 |
| | 33070 | CALL CENTER ASSOCIATE | 1 |
| | 33083 | FRONT DESK SUPERVISOR | 1 |
| | 33085 | PATIENT NAVIGATOR, CARDIA | 2 |
| | 33158 | SCHEDULER | 1 |
| | 33215 | OPERATOR/MEDICAL RECORD T | 2 |
| | 37040 | MEDICAL ASSISTANT,REGISTE | 1 |
| **03.9920 Total** | | | **43** |
| 03.9930 | **VIAA BREAST SURGERY EXPENSE** | | |
| | 30101 | BREAST SURGEON | 1 |
| | 33067 | FRONT DESK COORDINATOR | 1 |
| | 33087 | PATIENT NAVIGATOR, SURGER | 1 |
| | 37040 | MEDICAL ASSISTANT,REGISTE | 1 |
| **03.9930 Total** | | | **4** |
| 03.9950 | **VIAA URGNT CRE** | | |
| | 30023 | PHYSICIAN | 2 |
| | 32055 | RADIOLOGY TECH | 4 |
| | 32215 | PHYSICIAN ASSISTANT | 1 |
| | 33038 | FRONT DESK/MEDICAL ASSIST | 1 |
| | 33040 | FRONT DESK/MEDICAL ASST-C | 4 |
| **03.9950 Total** | | | **12** |
| **Grand Total** | | | **2,748** |

**Hospital and DH Physicians**

**Dept-Job Code List with Associate Count (not FTE's) Sep 2021**

| Dept | DEPT-JC | POSITION | Total by Dept/JC |
|------|---------|----------|------------------|

**Hospital and DH Physicians**

**Dept-Job Code List with Associate Count (not FTE's) Sep 2021**

| Dept | DEPT-JC | POSITION | Total by Dept/JC |
|------|---------|----------|------------------|

**Hospital and DH Physicians**

**Dept-Job Code List with Associate Count (not FTE's) Sep 2021**

| Dept | DEPT-JC | POSITION | Total by Dept/JC |
|------|---------|----------|------------------|

Exhibit 17

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


JOSEPH S. AUTERI, M.D.    :   No. 22-cv-03384
           Plaintiff,     :
                          :
       vs.                :
                          :
VIA AFFILIATES, d/b/a     :   JURY TRIAL
DOYLESTOWN HEALTH         :   DEMANDED
PHYSICIANS                :
           Defendant.     :


- - -
Monday, February 10, 2025
- - -


Deposition of BARBARA HEBEL,

taken pursuant to notice, at the law offices

of Kaplin Stewart Meloff Reiter & Stein,

P.C., 910 Harvest Drive, Blue Bell,

Pennsylvania, before Michele L. Murphy, a

Registered Professional Reporter and Notary

Public, on the above date, beginning at

approximately 9:33 a.m.

- - -

Page 10

1  into a brown envelope, and I opened the letter
2  to read it, both documents.
3       Q.   And after you read it, what did you
4  do with it?
5       A.   I went to speak with counsel and the
6  CEO.
7       Q.   And what counsel did you go to talk
8  with?
9       A.   Our in-house counsel.
10      Q.   Who is that?
11      A.   John Reiss.
12      Q.   And who was the other individual
13 that you spoke to about it?
14      A.   Our CEO, James Brexler.
15      Q.   Did you have discussions with
16 Dr. Auteri about the letter after you received
17 it?
18      A.   No, I did not.
19      Q.   Did you know Dr. Auteri to be a
20 christian in October 2021?
21      A.   I don't know what people's religions
22 were. I didn't ask people what their
23 religions were.
24      Q.   Do you recall having a discussion
25 and meetings with Dr. Auteri in the

Page 11

1  approximate two-year timeframe before October
2  of 2021 where an individual had made a
3  complaint about Dr. Auteri's conduct and he
4  showed you evidence that he had led that
5  individual employee to Christ?
6            MR. DURHAM:  Objection.
7  BY MS. RUSSELL:
8       Q.   Do you recall that, Ms. Hebel?
9       A.   Can you rephrase the question?
10      Q.   Sure.  In the couple-year timeframe
11 before this October 2021 timeframe of the
12 letter that we're looking at, an employee in
13 Dr. Auteri's office made a complaint about
14 Dr. Auteri.  Do you recall that?
15      A.   Yes, I do.
16      Q.   And do you recall --
17           MR. DURHAM:  Objection.
18 BY MS. RUSSELL:
19      Q.   -- in response to that complaint,
20 Dr. Auteri showed you certain materials which
21 referenced Dr. Auteri having led that woman to
22 Christ?
23      A.   I do not recall that.
24      Q.   Okay.  Do you have any reason to
25 believe that Dr. Auteri is not a christian?

Page 12

1            MR. DURHAM:  Objection.
2            THE WITNESS:  I do not delve
3       into whether or not someone has a
4       significantly held belief about their
5       religion.
6  BY MS. RUSSELL:
7       Q.   So when you received this letter on
8  the letterhead similar to Page P-687 and 88,
9  you didn't require Dr. Auteri to give you any
10 information about whether his beliefs stated
11 in the letter were sincere about christian
12 faith; is that correct?
13           MR. DURHAM:  Objection.
14           THE WITNESS:  I did not ask him
15      anything about that.
16 BY MS. RUSSELL:
17      Q.   Did you have any discussions with
18 Dr. Auteri about how you could, "you" the
19 hospital, could accommodate Dr. Auteri's
20 request for an accommodation, an exemption and
21 accommodation on Pages P-687 and 88?
22           MR. DURHAM:  Objection.
23           THE WITNESS:  He did not
24      provide us with any request for
25      accommodations at this time.  We did not

Page 13

1       determine whether anybody in the
2       organization had a significantly held
3       belief.  That was not for us to delve
4       into, but rather could we accommodate
5       their continued employment at Doylestown
6       Hospital.
7  BY MS. RUSSELL:
8       Q.   Did you have a conversation with
9  Dr. Auteri about how he could be accommodated
10 after you received the letter from Dr. Auteri
11 that we're discussing in October of 2021?
12           MR. DURHAM:  Objection.
13           THE WITNESS:  I did not have a
14      conversation, but, again, the
15      organization made sure that we did not
16      look at people's significantly held
17      beliefs and that we looked at whether or
18      not we could reasonably accommodate an
19      individual to continue to be employed and
20      not work in a vulnerable area.
21 BY MS. RUSSELL:
22      Q.   Did you have a conversation with
23 Dr. Auteri after you received this letter that
24 we are looking at replicated in P-687 and 88
25 about how to specifically accommodate

Page 14

1   Dr. Auteri?
2       A.   I did not have a --
3                MR. DURHAM:  Objection.
4                THE WITNESS:  -- conversation.
5   BY MS. RUSSELL:
6       Q.   Thank you.
7       A.   We specifically made sure we did not
8   look at people's religious beliefs.  We held
9   that -- we didn't look at whether a person had
10  a significant belief, and we made sure that
11  people could have accommodations and did not
12  work in a vulnerable area.
13      Q.   Did you propose any specific
14  measures to Dr. Auteri related to Dr. Auteri's
15  specific exemption request?
16      A.   No, we did not, but Dr. Auteri
17  worked in an area that we could not make a
18  reasonable --
19      Q.   Ms. Hebel, there's now no question
20  pending.
21               MR. DURHAM:  Excuse me.  She
22      can finish her answer.  Thank you very
23      much.
24               MS. RUSSELL:  You can deal with
25      it on redirect.

Page 15

1                MR. DURHAM:  Please go ahead
2       and finish.
3                THE WITNESS:  We did not look
4       at anybody and say whether or not they
5       had a significantly held belief.  We made
6       sure that the individuals could work in a
7       department that was not considered a
8       vulnerable patient area.
9                Dr. Auteri worked in those
10      areas, and we could not accommodate that
11      based upon his contract that he was a
12      highly skilled CT surgeon and that the
13      patients that he dealt with were
14      vulnerable patients.
15  BY MS. RUSSELL:
16      Q.   Did you discuss moving him somewhere
17  else?  Did you discuss with Dr. Auteri moving
18  Dr. Auteri someplace else within the hospital?
19      A.   No.  Several individuals had made
20  comments that Dr. Auteri would not be moved
21  and would not accept any accommodations.
22      Q.   Who were those individuals?
23      A.   Eleanor Wilson, John Mitchell.
24      Q.   Did you ask Dr. Auteri if he would
25  accept relocation somewhere else in the

Page 16

1   hospital?  Did you do it?
2       A.   I did not.
3       Q.   Great.
4            Take a look at the document in front
5   of you.  I'm showing you a document that's,
6   again, bottom right corner P-713 through
7   P-718.  I just want to ask you a few specific
8   questions about it.  You're welcome to read
9   the whole thing, but please just let me know
10  when you're ready to answer a question.
11       (Brief pause.)
12      A.   Okay.
13      Q.   Okay.  Can you identify the document
14  in front of you that runs from P-713 to P-718?
15      A.   I believe this is the letter that
16  was sent by your office to the hospital,
17  specifically to me.
18      Q.   What did you do with this letter
19  after you received it?
20      A.   Provided a copy to counsel.
21      Q.   Who was the counsel?
22      A.   Duane Morris.
23      Q.   And who else did you send it to, if
24  anyone?
25      A.   I don't believe I gave it to anybody

Page 17

1   else.  I talked to our CEO with regards to it.
2       Q.   Who is the CEO?
3       A.   James Brexler.
4       Q.   Did you have any discussions with
5   Dr. Auteri about this letter after you
6   received it?
7       A.   No, I did not.
8       Q.   Did you have any discussions with
9   Dr. Auteri about how you could accommodate his
10  request for an exemption after you received
11  this letter?
12               MR. DURHAM:  Objection.
13               THE WITNESS:  No, I did not
14      have a conversation with Dr. Auteri, but
15      the accommodation based upon what I could
16      determine, he could still not work in a
17      vulnerable area and provide patient care.
18  BY MS. RUSSELL:
19      Q.   Are you a doctor?
20      A.   I am not.
21      Q.   Do you have any public health
22  experience, certifications, anything of that
23  nature?
24               MR. DURHAM:  Objection.
25               THE WITNESS:  No, I do not.

Page 18

1  BY MS. RUSSELL:
2      Q.   Did you meet with Dr. Auteri, did
3  you e-mail him, did you have any specific
4  discussions with him about how he could be
5  accommodated?
6              MR. DURHAM:  Objection.
7              THE WITNESS:  No, but in
8      accordance with this letter, Dr. Auteri
9      did not provide us with reasonable
10     accommodations.  We still had the
11     accommodations that everybody else was
12     adhering to, which included double
13     masking, twice testing, social
14     distancing, and also if they worked in
15     the vulnerable patient areas, we
16     reassigned those individuals.  None of
17     that was provided to us by Dr. Auteri.
18  BY MS. RUSSELL:
19     Q.   Ms. Hebel, please look at Page 2.
20     A.   (Witness complies.)
21     Q.   Do you see the heading that says
22  toward the middle of the page Dr. Auteri's
23  Request for Religious Exemption and Reasonable
24  Accommodation?  Do you see that?
25     A.   I do.

Page 19

1      Q.   Was that in the letter when you
2  received it?
3      A.   Yes, it was.
4      Q.   Down below there's a heading that
5  says Dr. Auteri's Reasonable Accommodation
6  Request.  Do you see that?  It goes from the
7  bottom of 2 to Page 3.  Do you see that?
8      A.   Yes, I do.
9      Q.   Was that section in the letter when
10  you received it?
11     A.   It was.
12     Q.   Following your receipt of this
13  letter marked, again, P-713 to 718, did you
14  propose any specific measures to Dr. Auteri
15  that could be used to accommodate Dr. Auteri's
16  request for a religious exemption?
17             MR. DURHAM:  Objection.
18             THE WITNESS:  No, I did not.
19     Basically the exemptions that we had and
20     we had determined to be appropriate were
21     double masking, not working in a
22     vulnerable patient area, which Dr. Auteri
23     did work at in the Heart Institute, twice
24     weekly testing, social distancing.
25             He was asking for something

Page 20

1      here that was not following those
2      protocols and would be different than any
3      other individual in the organization.
4  BY MS. RUSSELL:
5      Q.   Did you talk to Dr. Auteri after you
6  received this letter that is in front of you
7  and discuss those, quote, accommodations that
8  you had per your testimony?
9              MR. DURHAM:  Objection.
10             THE WITNESS:  I did not, but
11     previously other individuals had, and he
12     specifically told those other individuals
13     that he would not follow those
14     accommodations.
15  BY MS. RUSSELL:
16     Q.   Did they have the conversation with
17  Dr. Auteri after the date of this letter in
18  front of you?
19     A.   No, but previously he had told
20  people he would not follow any of the
21  accommodations, and this letter does not
22  adhere to the accommodations that we had set
23  forth.
24     Q.   Who are the people that he allegedly
25  spoke with previously that you're referring

Page 21

1  to?
2      A.   Eleanor Wilson, John Mitchell, and
3  some of the doctors.
4      Q.   Do you have any information sitting
5  here today that any of those individuals whom
6  you just mentioned saw this exemption request
7  in front of you and had a discussion with
8  Dr. Auteri after the date of this letter to
9  discuss specific accommodations for
10  Dr. Auteri?
11             MR. DURHAM:  Objection.
12             THE WITNESS:  No.  However, he
13     would ask us then if we were doing what
14     he had requested would be different than
15     any other individual in this
16     organization, and we do not treat people
17     differently.  He needed to have double
18     testing, double face mask, could not work
19     in a vulnerable patient area, and
20     therefore -- and social distancing and
21     not eating in the cafeteria, and he had
22     already previously told people that he
23     would not do that.
24  BY MS. RUSSELL:
25     Q.   Did you discuss with Dr. Auteri

Page 22

1  social distancing and eating alone after he
2  submitted the two exemption requests we just
3  looked at?  Did you have that discussion with
4  Dr. Auteri?
5      A.   No, I did not.
6      Q.   Okay.  When you referred to the
7  accommodations we had and you just listed a
8  bunch of accommodations that you had, were
9  those accommodations that were the hospital's
10 set of accommodations for everyone who
11 requested an exemption?
12     A.   Yes, they were.
13     Q.   So there wasn't an individual
14 assessment, correct?  You had your set of
15 accommodations; is that fair?
16     A.   We established what those --
17          MR. DURHAM:  Objection.
18          Go ahead.  Sorry.
19          THE WITNESS:  That's okay.
20          We did establish what those
21     accommodations would be.  There was one
22     or two individuals who did not do the two
23     times testing because they only worked
24     occasionally within the hospital.  All
25     other individuals who had requested an

Page 23

1      exemption followed these accommodations
2      routinely.
3  BY MS. RUSSELL:
4      Q.   Okay.  I'm going to show you another
5  document.  The document I put in front of you
6  is P-690 to P-692.  Please take a minute to
7  look at that and let me know when you're ready
8  to answer a question about it.
9      A.   Okay.
10          (Brief pause.)
11          Okay.
12     Q.   Can you tell me what the documents
13 P-690 through P-692 are, please?
14     A.   It is a letter to Dr. Auteri that
15 was sent out on October 13th regarding his
16 request.
17     Q.   You mean his request for exemptions
18 to the vaccine mandate?
19     A.   Yes.
20     Q.   Okay.  And who authored the letter?
21     A.   I did.
22     Q.   Did you draft it?
23          MR. DURHAM:  Objection.
24          THE WITNESS:  I did draft it
25     with the assistance of counsels.

Page 24

1  BY MS. RUSSELL:
2      Q.   With the assistance?
3      A.   Of counsel.
4      Q.   Which counsel?
5      A.   Duane Morris.
6      Q.   Did you review the letter before you
7  signed it and sent it out?
8      A.   Yes, I did.
9      Q.   Prior to sending this letter, did
10 you personally have a discussion with
11 Dr. Auteri about any precautions which could
12 be taken in response to Dr. Auteri's
13 declination to take the COVID vaccine?
14     A.   I did not.
15     Q.   Did you discuss with Dr. Auteri
16 before you issued this letter that we're
17 looking at beginning on P-690 what personal
18 protective equipment he could wear as part of
19 an accommodation to his exemption request?
20     A.   I did not.
21     Q.   Did you discuss with Dr. Auteri any
22 testing protocol which Dr. Auteri could follow
23 as part of an accommodation of Dr. Auteri's
24 exemption request?
25     A.   I did not.  However, other

Page 25

1  individuals did, including Eleanor Wilson and
2  John Mitchell.
3      Q.   Do you have personal knowledge of
4  that?  Were you there?
5      A.   No.
6          MR. DURHAM:  Objection.
7          THE WITNESS:  But there was
8      documents that were provided by
9      Ms. Wilson to the effect that she had the
10     conversations with Dr. Auteri.
11 BY MS. RUSSELL:
12     Q.   And are those documents dated before
13 the date of this letter, October 13, 2021?
14     A.   I believe they are.
15     Q.   Okay.  And are those documents dated
16 before you received Dr. Auteri's first
17 exemption request on October 11, 2021?
18          MR. DURHAM:  Objection.
19          THE WITNESS:  I believe they
20     were.  However, again, we could not make
21     the accommodation to Dr. Auteri because
22     of the fact that he was a highly skilled
23     individual who worked in an area where
24     there were vulnerable patients, and he
25     needed to follow all of the

Page 26

```
 1   accommodations that we set forth for
 2   every other associate within the
 3   organization, and that would be double
 4   masking, testing twice weekly, social
 5   distancing, not being able to eat in the
 6   cafeteria, and, again, the biggest one
 7   was to ensure the safety of our patients
 8   and the patients that he would work on in
 9   our community.  And so those were the
10   accommodations.
11   BY MS. RUSSELL:
12       Q.   Got it.
13            Did you discuss after you received
14   the letter from Dr. Auteri on October 11, 2021
15   and before you issued this letter on
16   October 13, 2021, did you discuss with
17   Dr. Auteri --
18       A.   Could you repeat that, please?
19       Q.   Sure.  So the timeframe that I'm
20   asking you about is between October 11th of
21   2021 when Dr. Auteri sent you the first
22   letter, he hand-delivered it to you in a brown
23   envelope, you told me, right?
24       A.   Mm-hmm.
25       Q.   So October 11th of 2021, and the
```

Page 27

```
 1   date of the letter that is in front of you is
 2   October 13th, 2021.  Do you see that?
 3       A.   Yes.
 4       Q.   So for that timeframe, October 11th
 5   through October 13th of 2021, did you have any
 6   discussions with Dr. Auteri about possibly
 7   reassigning him to another area of the
 8   hospital as an accommodation for his exemption
 9   request?
10            MR. DURHAM:  Objection.
11            THE WITNESS:  I did not have a
12       direct discussion with Dr. Auteri during
13       that time period.  However, his position
14       in the Heart Institute and the way his
15       contract was, we had to follow that
16       contract.  He could not work in the Heart
17       Institute.  That was a vulnerable patient
18       area, and that we had made a
19       determination or that the clinicians had
20       made a determination that no one who was
21       not vaccinated could work in, for the
22       protection of and the safety of the
23       patients and the associates, in that
24       department.
25   BY MS. RUSSELL:
```

Page 28

```
 1       Q.   Who were the clinicians that made
 2   the determination about who could work in
 3   those areas you just testified to?
 4       A.   They would be --
 5            MR. DURHAM:  Objection.
 6            THE WITNESS:  They would be our
 7       Infection Prevention.  We used a whole
 8       host of organizations to make these
 9       determinations.
10   BY MS. RUSSELL:
11       Q.   Who is Infectious Prevention?  Who
12   was in that area?
13            MR. DURHAM:  Objection.
14            THE WITNESS:  Dr. Michael
15       Kimzey, Bridget McEnrue.
16   BY MS. RUSSELL:
17       Q.   Say that again.
18       A.   Bridget McEnrue.  They are our
19   Infection Prevention individuals.  And other
20   clinicians within the organization.
21       Q.   Who?
22       A.   Dr. Levy would have been in that
23   group.  And then also they took information
24   from HAP, Hospital Association of
25   Pennsylvania, the American Hospital
```

Page 29

```
 1   Association, who had done research in all of
 2   this area, and other -- CDC, OSHA, a lot of
 3   different organizations such as that.
 4       Q.   So is it fair to say that the CDC
 5   was one of the associations who provided
 6   information that Doylestown Hospital or
 7   Doylestown Health took into account in setting
 8   up the vaccine mandate and accommodations to
 9   the mandate?
10            MR. DURHAM:  Objection.
11            THE WITNESS:  I was not part of
12       that clinical process.  However, I
13       believe that that was what it was.
14   BY MS. RUSSELL:
15       Q.   From August through November of
16   2021, was Doylestown Health -- and by that I
17   mean the Defendant in this case and the
18   hospital.  Do you understand who I mean by
19   Doylestown Health?  I'll just use that
20   throughout the deposition for brevity.
21       A.   Well --
22            MR. DURHAM:  Just so I'm clear,
23       we're using that term to refer to both
24       Doylestown Health, the Defendant, and
25       Doylestown Hospital?  I think they're
```

Page 38

1   you that's Pages P-720 through P-728, please?
2       A.    This is a letter that was sent to
3   you and your office.
4       Q.    By whom?
5       A.    By Duane Morris.
6       Q.    And that's the counsel you
7   identified to whom you gave the letter that I
8   sent with the second exemption request for
9   Dr. Auteri, correct?
10      A.    That is correct.
11      Q.    Now, when you were flipping through,
12  you said you just wanted to make sure it's the
13  same one.  What were you referring to?
14          (Mr. Day reentered the
15          conference room.)
16      A.    That it's the same letter that
17  counsel had sent to you.
18      Q.    Did you review this document before
19  it was sent out on or about November 9, 2021?
20          MR. DURHAM:  Objection.
21          THE WITNESS:  I am sure that I
22      did read it, but I cannot say for sure.
23      But I am sure that -- I am positive that
24      I read it.
25  BY MS. RUSSELL:

Page 39

1       Q.    Did you draft any portion of it?
2           MR. DURHAM:  Objection.  We're
3       veering into attorney-client privileged
4       territory.
5           MS. RUSSELL:  Asking a question
6       as to who drafted a letter that was sent
7       to my office, which is clearly not
8       privileged, is not in and of itself
9       privileged.
10  BY MS. RUSSELL:
11      Q.    Without giving me any conversations
12  that you had with any counsel at Duane Morris,
13  my question to you is, did you, Ms. Hebel,
14  draft any portion of this letter?
15      A.    No.
16      Q.    Who drafted the letter?
17          MR. DURHAM:  Objection.
18          THE WITNESS:  I believe Chris
19      Durham did.
20  BY MS. RUSSELL:
21      Q.    Did you propose any revisions to the
22  letter?
23      A.    No, I did not.
24      Q.    Now, the date of my letter to which
25  Mr. Durham appears to be responding, as stated

Page 40

1   in the first paragraph, is October 22nd, 2021.
2   Do you see that?
3       A.    Yes, I do.
4       Q.    Okay.  So for the period from
5   October 22nd, 2021 through the date of this
6   letter, which is November 9th, 2021, did you
7   have any discussions with Dr. Auteri about any
8   specific accommodations that could be made for
9   Dr. Auteri in response to his exemption
10  request?
11          MR. DURHAM:  Objection.
12          THE WITNESS:  No, I did not,
13      based upon the fact that his position as
14      the Chief of our Heart Institute would
15      require him to work in a vulnerable
16      patient area, which we could not
17      accommodate with those skill sets and
18      that he -- what he had proposed in his
19      letter -- in your letter, excuse me, was
20      that he would -- that it was not the same
21      type of accommodations.  So he would need
22      to have had twice daily testing, double
23      masking, social distancing, and not eat
24      in the cafeteria, which is what all other
25      associates who requested an exemption

Page 41

1   were following.
2   BY MS. RUSSELL:
3       Q.    After October 22nd, 2021 and on or
4   before November 9th, 2021, did you discuss any
5   of those accommodations, changes to protocol
6   that you just mentioned to me, did you discuss
7   any of those with Dr. Auteri?
8       A.    No, I did not.  The accommodations
9   were set in writing for all associates to --
10  who were requesting exemptions to know and
11  were advised of double masking, twice testing,
12  social distancing, and not eating in the
13  cafeteria.  We're not treating anybody any
14  differently.
15      Q.    So same thing for all associates,
16  right?  Anybody who is in a patient-facing
17  position, there you go, you have to do those
18  standard exemptions, right?  Is that fair?
19          MR. DURHAM:  Objection.
20          THE WITNESS:  No, it is not.
21  BY MS. RUSSELL:
22      Q.    Oh, why not?
23      A.    Because it's not all associates.
24  It's associates who requested an exemption,
25  whether it be medical or religious.

# Exhibit 18

Exhibit Filed Under Seal

Exhibit 19

DATE

NAME
Address
City, State    Zip

Dear Name:

As previously advised, we granted your request for an exemption from Doylestown Health System's COVID-19 vaccination requirement (without determining whether you are necessarily entitled to the exemption under applicable law.)

Because you work in a department that treats vulnerable patients and are not fully vaccinated against COVID-19, you may not remain in your current position.

As an accommodation, we are transferring you to the following vacant position:    .  You will be paid in accordance with our compensation practice based on your experience in this type of position, unless your current rate of pay is lower, in which case your rate of pay will not change.   That rate will be  _____  with applicable shift and weekend differential.

When we met with you, we provided to you other vacant positions for which you may apply if qualified to perform.  If more than one Associate requests to transfer into the same vacant position, the Associate with the most Doylestown Hospital seniority will be transferred into the position.

Doylestown Health currently intends for this accommodation to be in effect for 60-days.  Doylestown Health reserves the right, in its sole discretion, to reevaluate the accommodation either during the 60-day period or at the conclusion of the 60-day period.

Please note that you are required to fully comply at all times with all Doylestown Health enhanced COVID-19 safety precautions applicable to unvaccinated Associates.  These enhanced COVID-19 safety precautions include:
- Wear Double mask, face shield/goggles at all time while in building, unless in enclosed area with no others.
- Practice social distancing when possible when not delivering  patient care
- Refrain from eating (a) in Cafeteria or (b) in groups anywhere; must eat in enclosed area alone or outside
- Undergo twice weekly COVID-19 testing – no cost to Associates.
- Fully comply with all other COVID-19 safety precautions generally applicable to all Associates.


Doylestown Health System reserves the right, in its sole discretion, to changes the enhanced safety precautions.

You must also comply with the safety precautions applicable to all Associates.

Finally, please note that we cannot guarantee that you will be able to return to your current position even if:  (a) you become fully vaccinated in the future; or (b) Doylestown Health System determines that COVID-19 vaccination no longer is required for your current position.

Please sign below agreeing to comply with the enhanced safety precautions as part of your accommodation in addition to the general safety precautions applicable to all Associates.

Thank you

Sincerely,



Barbara Hebel
Vice President of Human Resources


Understood and Agreed:


_____          _____
Associate Signature                                    Date

# Exhibit 20

Message

**From**: SLevy@dh.org [SLevy@dh.org]
**Sent**: 9/10/2021 1:38:34 PM
**To**: AEdelson@dh.org; BHebel@dh.org
**Subject**: FW: meeting

See below
Wanted to be sure there was no ambiguity

Scott Levy, MD
VP-CMO
Doylestown Hospital
215-345-2010



**From:** Levy MD, Scott
**Sent:** Friday, September 10, 2021 9:38 AM
**To:** Auteri, Joseph <JAuteri@dh.org>
**Subject:** meeting

Hope we can catch up today before I leave for Greece
Just wanted to be sure to connect in case that does not transpire; didn't want to forget as I try to wrap up multiple items

a)      New federal mandate that all hospitals (that get Medicare payment) must have vaccine requirement for inclusion in CMS
b)      As I am sure your research has confirmed; there is no know issues re neurologic sequelae associated with mRNA vaccine (as opposed to significant risk of such with actual infection)
c)      If you do decide to go with JJ; want to be sure you saw email from Christine Rousseau that our supply of J&J expires next week and there is little confidence we can obtain additional supply
d)      Deadline for second dose mRNA is 10/11; first dose deadline 9/27 (for Pfizer)
Be well, tks

scott

Scott Levy, MD
VP-CMO
Doylestown Hospital
215-345-2010



# Exhibit 21

Message

**From**:     SLevy@dh.org [SLevy@dh.org]
**Sent**:     9/10/2021 3:17:32 PM
**To**:       JAuteri@dh.org
**Subject**:  RE: meeting


Jammed till noon
Then gotta get my Covid test so I can get on the plane
Coming back to print out copy and then out of dodge
Can meet at 2, gotta be done by 2:30
Let's meet my office if that works

Scott Levy, MD
VP-CMO
Doylestown Hospital
215-345-2010



---

**From:** Auteri, Joseph <JAuteri@dh.org>
**Sent:** Friday, September 10, 2021 11:07 AM
**To:** Levy MD, Scott <SLevy@dh.org>
**Subject:** Re: meeting

Just now finishing in the OR (11am) and am free until office hours from 1 til 4, when I meet with Josh about Capital. Let me know what works for you.

Joseph S. Auteri, MD
Sent from my iPhone


On Sep 10, 2021, at 9:38 AM, Levy MD, Scott <SLevy@dh.org> wrote:


Hope we can catch up today before I leave for Greece
Just wanted to be sure to connect in case that does not transpire; didn't want to forget as I try to wrap up multiple items

a)      New federal mandate that all hospitals (that get Medicare payment) must have vaccine requirement for inclusion in CMS
b)      As I am sure your research has confirmed; there is no know issues re neurologic sequelae associated with mRNA vaccine (as opposed to significant risk of such with actual infection)
c)      If you do decide to go with JJ; want to be sure you saw email from Christine Rousseau that our supply of J&J expires next week and there is little confidence we can obtain additional supply
d)      Deadline for second dose mRNA is 10/11; first dose deadline 9/27 (for Pfizer)
Be well, tks

scott

Scott Levy, MD
VP-CMO
Doylestown Hospital
215-345-2010

Exhibit 22

Message

**From**:          JBrexler@dh.org [JBrexler@dh.org]
**Sent**:          9/18/2021 10:20:32 PM
**To**:            JAuteri@dh.org
**Subject**:       Re: Discussion Thursday

Joe,

I too appreciate the time we spent and the open and candid sharing of our perspectives. I will absolutely have Adam work on documenting the commitment I made to you and see if we can wrap this up next week.

Thank you for your leadership on this very challenging issue!

Jim

Jim Brexler
Sent from my i-phone

On Sep 18, 2021, at 12:36 PM, Auteri, Joseph <JAuteri@dh.org> wrote:

Jim,

Thank you for giving me almost an hour on Thursday to discuss the Vaccine Mandate and the constraints you and I are under.  You mentioned at our meeting that "I have your word" that if I had any adverse reaction to the vaccine that would make me unable to perform cardiac surgery that I would continue to be employed as the Medical Director for many years (as long as you are here is what I recall you saying).

Can I get a written addendum to my contract stating this, so I can feel more comfortable moving forward.  Perhaps Adam could work on that in the next few days while Scott is out of town, so we can keep this moving forward.  I am quite concerned about the looming October 11 deadline and would like to move quickly on this.

Thanks,

JSA

Joseph S. Auteri, MD
Chief, Cardiac Surgery
Medical Director, Woodall Center for Heart and Vascular Care
Of Doylestown Hospital
599 West State Street, Suite 207
Doylestown, PA 18901
215-345-2100

D0000148

# Exhibit 23

Exhibit Filed Under Seal

Exhibit 24

Message

**From:**     Roussel, Christine [croussel@dh.org]
**Sent:**     9/14/2021 5:32:55 PM
**To:**       Auteri; Joseph [jauteri@dh.org]
**Subject:**  Roussel, Christine <croussel@dh.org> e07ed614-3574-4c68-a02b-884622354091, New @ 2021-09-14T17:32:54.0Z,
              Doylestown Hospital


Hello Dr. Auteri. I will ensure that we have a vial of J&J aside for you on 10/11. I have not gotten a chance to
send a communication out (because I will batching other info) but we just received 300 doses (60 vials) of J&J
today. Thank goodness.
If there is anything else you need, please feel free to let me know.

D0001887

# Exhibit 25

Exhibit Filed Under Seal

# Exhibit 26

Exhibit Filed Under Seal

# Exhibit 27

Exhibit Filed Under Seal

# Exhibit 28

Exhibit Filed Under Seal

Exhibit 29



# Kaplin | Stewart
### Attorneys at Law

Kimberly L. Russell, Esquire
Direct Dial: (610) 941-2541
Direct Fax: (610) 684-2026
Email: krussell@kaplaw.com
www.kaplaw.com

October 22, 2021

## EMAIL AND REGULAR MAIL

Barbara Hebel, VP, Human Resources
Doylestown Health
595 West State Street
Doylestown, PA 18901

RE:    **Joseph S. Auteri, M.D.**

Dear Ms. Hebel:

Kaplin Stewart Meloff Reiter & Stein, P.C. represents Joseph S. Auteri, M.D. This is in response to your letter dated October 13, 2021 which improperly denied Dr. Auteri's requests for an exemption from Doylestown Health System's and VIA Affiliates' (collectively, **"DH"**) COVID-19 vaccination requirement and memorialized DH's refusal to engage in the interactive process to establish a reasonable accommodation for Dr. Auteri. The purpose of this letter is to provide DH with the opportunity to reconsider its legal violations of Dr. Auteri's rights, provide Dr. Auteri with reasonable accommodations, cease DH's breach of Dr. Auteri's contractual rights and slander of Dr. Auteri, and remedy the retaliation Dr. Auteri suffered following Dr. Auteri's report of harassment and a hostile work environment.

## Timing of Dr. Auteri's Exemption Requests

Your October 13, 2021 letter denies Dr. Auteri's medical and religious exemption requests in part because those requests allegedly were received after DH's alleged "deadline" of September 10, 2021. That establishment of an arbitrary deadline and apparent adherence to such a deadline is a violation of state and federal law. Title VII of the Civil Rights Act of 1964 (**"Title VII"**), the Americans with Disabilities Act (**"ADA"**), and the Pennsylvania Human Relations Act (**"PHRA"**) do not permit employers to establish "deadlines" beyond which an employee is not permitted to seek an exemption from a workplace standard and resulting reasonable accommodation request. To the extent that DH denied Dr. Auteri's exemption requests in whole or in part due to Dr. Auteri's alleged failure to meet DH's "deadline" for such requests, DH must reconsider those requests immediately in order to avoid a claim for a violation of Dr. Auteri's civil rights.

**Kaplin Stewart**
Union Meeting Corporate Center
910 Harvest Drive, P.O. Box 3037
Blue Bell, PA 19422-0765
610-260-6000 tel

*Offices in*
Pennsylvania
New Jersey

7331287v1

D0000201

Barbara Hebel, VP, Human Resources
October 22, 2021
Page 2

## Dr. Auteri's Request for Medical Exemption and Reasonable Accommodation

Dr. Auteri submitted a valid request for medical exemption to DH's COVID-19 vaccine mandate on October 6, 2021 and enclosed with this letter is another request for medical exemption. The enclosed exemption request is a certification by Dr. Auteri's treating physician that Dr. Auteri should not receive the COVID-19 vaccine. Dr. Auteri's request meets the requirements to obtain a reasonable accommodation under the ADA and PHRA. DH's refusal of Dr. Auteri's prior request for medical exemption based upon CDC guidance is improper under the ADA and PHRA.[1] CDC guidance is just that – guidance – and not law which supersedes the ADA and PHRA. CDC guidance does NOT permit the violation of an employee's civil rights. Even the CDC guidance as cited in your October 13, 2021 letter merely "recommends" that health care providers "offer" vaccination regardless of prior infection. CDC guidance is not a lawful basis to deny a valid request for medical exemption. Dr. Auteri expects that DH will grant his medical exemption request and grant the reasonable accommodation requested below, which accommodation is consistent with DH's past and current practices to mitigate the risk of COVID-19 exposure and transmission in DH facilities.

## Dr. Auteri's Request for Religious Exemption and Reasonable Accommodation

Dr. Auteri submitted a valid request for a religious exemption to DH's COVID-19 vaccine mandate on October 6, 2021. In that request, Dr. Auteri articulated a sincerely held religious belief which exceeds the requirements to grant such an exemption. Dr. Auteri articulated that as a person of faith and follower of Jesus Christ, his sincerely held religious beliefs do not permit him to take the COVID-19 vaccine. DH is not permitted as a matter of law under Title VII or the PHRA to deny such an exemption request, and certainly cannot deny that request because of the request's "untimeliness" as discussed above. Your statement that the grant of a legally protected exemption from a workplace standard on the basis of a sincerely held religious belief would be "special treatment" is a violation of Dr. Auteri's civil rights which DH must cure immediately to avoid legal action. Dr. Auteri expects that DH will grant his religious exemption request and grant the reasonable accommodation requested below, which accommodation is consistent with DH's past and current practices to mitigate the risk of COVID-19 exposure and transmission in DH facilities.

## Dr. Auteri's Reasonable Accommodation Request

In your October 13, 2021 letter denying Dr. Auteri's exemption requests, after denying those valid requests in violation of Dr. Auteri's civil rights, you summarily state that no accommodation would be available which would enable Dr. Auteri to perform his work and not impose an "undue hardship" on DH "because the safety of the vulnerable and high-risk patient population" which Dr. Auteri treats would be "jeopardized" by Dr. Auteri's vaccine exemption,

---

[1] DH also has acknowledged the potential for the COVID-19 "vaccine" to cause harmful side effects, as DH offered to compensate Dr. Auteri if the vaccine resulted in a side effect which would preclude Dr. Auteri from performing surgery. Dr. Auteri's proposed reasonable accommodation described in this letter addresses patient safety, Dr. Auteri's medical condition, and potential adverse side effects from the vaccine.

7331287v1

D0000202

253 of 290

Barbara Hebel, VP, Human Resources
October 22, 2021
Page 3
_____

as determined by "DH Infection Control." Leaving aside the qualifications of those involved in "DH Infection Control" as it relates to COVID-19 matters, your statement that no accommodation is available is false and a violation of Dr. Auteri's civil rights.

When an employee is entitled to an exemption from a workplace standard on the basis of a medical or religious reason, the employer must engage in an interactive process with the employee to determine, in joint consultation, whether a reasonable accommodation is available. Employers who claim that they cannot grant a reasonable accommodation due to an "undue hardship" have an exceedingly high burden to meet. Your letter fails entirely to articulate that hardship and violates Dr. Auteri's civil rights. Contrary to your statement, a reasonable accommodation is available and is readily achievable by DH as a healthcare provider and facility.

Dr. Auteri requests that his exemption requests be granted and that as a reasonable accommodation, Dr. Auteri submit to (1) a daily healthcare screening in which Dr. Auteri's temperature is taken and Dr. Auteri certifies that he has not been exposed to or experiencing any symptoms of COVID-19, and (2) weekly COVID-19 testing. DH certainly can conduct such basic screenings and the additional time and/or expense required to do so does not meet the high burden to demonstrate an "undue hardship." DH has conducted health screenings and COVID-19 testing throughout the pandemic and now cannot claim an undue hardship in doing so. Nor can DH legally claim that Dr. Auteri remaining unvaccinated but subject to testing jeopardizes patient safety because DH's Vice President and Chief Medical Officer, Scott Levy, M.D. acknowledged in an August 15, 2021 email to the Bucks County Health Commissioner (copy enclosed) "the ability of the vaccinated to transmit the virus [i.e. COVID-19]." DH's denial of Dr. Auteri's privileges of employment due to his need for an exemption to the vaccine mandate and reasonable accommodation, where DH admits through one of its top executives that vaccinated individuals can transmit COVID-19, is a violation of Dr. Auteri's civil rights. By agreeing to daily health screenings and weekly testing for COVID-19, Dr. Auteri poses <u>less</u> of a COVID-19 transmission risk than vaccinated personnel who are capable of transmitting the virus but not subjected to testing. Dr. Levy also previously equated patients who have been vaccinated with those who have already been infected with COVID-19 and exempted those patients from pre-procedure COVID-19 testing. See Dr. Levy's January 8, 2021 email (copy enclosed) stating in pertinent part "[a]nalogous to patient (sic) who have already had infection with COVID; those individuals who have been fully vaccinated for Covid do NOT need to have preprocedure testing done." There can be no lawful, nondiscriminatory, and/or nonretaliatory basis to deny Dr. Auteri's requested reasonable accommodation.

**Breach of Dr. Auteri's Contractual Rights**

The claims in your October 13, 2021 letter that Dr. Auteri has breached his Employment Agreement are based upon the entirely false premise that Dr. Auteri engaged in conduct which jeopardizes patient safety and justifies the revocation or suspension of Dr. Auteri's privileges. As demonstrated above, Dr. Auteri has engaged in no conduct which jeopardizes patient safety and Dr. Auteri's proposed reasonable accommodation actually makes him less of a "hazard" to

7331287v1

D0000203

Barbara Hebel, VP, Human Resources
October 22, 2021
Page 4

patient safety than untested, vaccinated individuals who, by DH's admission, also are capable of transmitting the COVID-19 virus. Contrary to the claims in your October 13, 2021 letter, DH is in breach of Dr. Auteri's Employment Agreement because DH suspended Dr. Auteri's privileges without cause and then used that improper suspension to give notice of Dr. Auteri's impending termination. Dr. Auteri hereby demands that DH immediately reinstate Dr. Auteri's privileges, pay to Dr. Auteri all lost pay and benefits, and provide the reasonable accommodation requested above. If DH fails to do so and terminates Dr. Auteri in violation of the Employment Agreement, Dr. Auteri will take legal action against DH for breach of contract and seek all available remedies against DH. DH cannot breach Dr. Auteri's Employment Agreement and then seek to benefit from DH's breach by terminating Dr. Auteri in violation of that Agreement. DH must cure its breach immediately.

## Dr. Auteri has Communicated Truthfully with Third Parties about DH's Improper Conduct and DH's Threat to Terminate Dr. Auteri's Employment

In your October 13, 2021 letter, you falsely accused Dr. Auteri of telling third parties that he "has been terminated" and "interfering with [DH's] business relationship with those third parties." I do not know the basis of your false statements, but your statements are without basis in fact and seem only to evidence DH's continued retaliation against Dr. Auteri (discussed in further detail below). Enclosed is a copy of Dr. Auteri's October 16, 2021 text message, which he has sent multiple times to multiple individuals, in which Dr. Auteri accurately states that (1) Dr. Auteri requested an exemption from the vaccine mandate, (2) DH then placed Dr. Auteri on an unpaid suspension, and (3) "in 30 days that will turn into a termination." Dr. Auteri's text is an entirely accurate summary and representation of Brenda Foley, M.D.'s October 11, 2021 letter to Dr. Auteri stating in pertinent part that Dr. Auteri is "being placed on a 30 day precautionary suspension from the medical staff" and your October 13, 2021 letter stating that if Dr. Auteri does not "cure his breach" by submitting proof of vaccination, DH "will terminate [Dr. Auteri's] employment for cause." Do not again accuse Dr. Auteri of "interfering with DH's business relationships" without first obtaining evidence of that interference. Dr. Auteri is permitted to communicate with employees and third parties about the terms and conditions of his employment and such communications are protected as a matter of law under the National Labor Relations Act.

## DH's Slander of Dr. Auteri

It has come to Dr. Auteri's attention that DH has instructed staff in Dr. Auteri's office to advise patients seeking care that Dr. Auteri is on a "personal leave of absence." That statement is absolutely false and misleads patients. Stating that Dr. Auteri is on a personal leave of absence falsely implies that Dr. Auteri requested and/or is taking a leave of absence due to some problem with Dr. Auteri which renders Dr. Auteri unable to care for Dr. Auteri's patients. Nothing could be further from the truth, and DH's directive to the staff in Dr. Auteri's office is directing the slander of Dr. Auteri which will lead patients to question Dr. Auteri's fitness to practice medicine. Such a result damages Dr. Auteri's reputation by DH's knowingly false statement and constitutes slander. DH has suspended Dr. Auteri due to DH's improper denial of Dr.

D0000204

Barbara Hebel, VP, Human Resources
October 22, 2021
Page 5

Auteri's requests for an exemption from the COVID-19 vaccine mandate and reasonable accommodation. If DH insists upon communicating about Dr. Auteri's absence from work, DH should state the truth or communicate nothing at all. If DH continues damaging Dr. Auteri in such a manner, Dr. Auteri will take appropriate legal action. DH cannot evade the consequences of its unlawful violations of Dr. Auteri's civil rights by defaming Dr. Auteri's reputation.

## DH's Retaliation Against Dr. Auteri Following Dr. Auteri's Report of Harassment and a Hostile Work Environment

On September 10, 2021, Dr. Auteri reported that he was being subjected to harassment and a hostile work environment by Dr. Levy, Dr. Auteri's direct supervisor. Dr. Auteri copied you on an email in which he specifically stated that Dr. Levy was repeatedly engaging with Dr. Auteri in a "heated," "angry" way and with a raised voice. Dr. Levy repeatedly has yelled at and demeaned Dr. Auteri in front of other DH staff. Dr. Auteri reported that Dr. Levy was unable to have a conversation with Dr. Auteri without Dr. Levy becoming "agitated." As a Human Resources professional, you certainly must be aware that your receipt of such a communication triggers your obligation to investigate further Dr. Auteri's allegations. Dr. Auteri is entitled to know exactly what was done to investigate his complaint and the result of that investigation. As of this writing, you have not provided that investigation information to Dr. Auteri. Please provide me with that investigation information immediately, including evidence of the action you took to rectify Dr. Levy's improper conduct.

Following that report of harassment and a hostile work environment, DH retaliated against Dr. Auteri by summarily denying Dr. Auteri's exemption requests, failing to grant Dr. Auteri a reasonable accommodation and without engaging in the interactive process as required by law, and suspending Dr. Auteri in breach of Dr. Auteri's Employment Agreement and violation of Dr. Auteri's civil rights. On October 16, 2021, Dr. Auteri again reported "abuse" and "harassment" at the hands of Dr. Levy. On October 10, 2021, Dr. Levy threatened Dr. Auteri by telling Dr. Auteri that Dr. Auteri would be terminated immediately if Dr. Auteri did not forfeit Dr. Auteri's civil rights and comply with the "vaccine mandate." Dr. Levy harassed Dr. Auteri and said that Dr. Auteri's "legacy" would be that of a "loser" if Dr. Auteri did not forfeit Dr. Auteri's civil rights by succumbing to the "mandate." Dr. Levy threatened Dr. Auteri's business reputation and welfare by stating that Dr. Auteri would never get a job as a cardiac surgeon in the United States again if Dr. Auteri did not forfeit Dr. Auteri's civil rights and succumb to the mandate. Dr. Levy violated HIPAA in the course of Dr. Levy's threats by naming three other unvaccinated physicians on the DH staff, defamed those physicians by stating that Dr. Auteri was "not in good company" by failing to comply and forfeit Dr. Auteri's civil rights, all of which was presented as a threat to Dr. Auteri. The day after Dr. Levy's threats and Dr. Auteri's refusal to forfeit his civil rights, and immediately after asserting those rights by requesting exemptions and accommodations, DH retaliated against Dr. Auteri by summarily denying those exemptions and requests for accommodations without appropriate legal justification to do so.

As of this writing, you have had six days to investigate Dr. Auteri's October 16, 2021 report of harassment and retaliation. Dr. Auteri is entitled to know exactly what was done to investigate

7331287v1

D0000205

Barbara Hebel, VP, Human Resources
October 22, 2021
Page 6

his complaint and the result of that investigation. As of this writing, you have not provided that investigation information to Dr. Auteri. Please provide me with that investigation information immediately, including evidence of the action you took to rectify Dr. Levy's improper conduct. Dr. Levy apparently has no intention of ceasing his improper conduct, and DH apparently cannot control Dr. Levy's improper conduct. DH apparently took no action to rectify Dr. Levy's conduct following notice to you on September 10, 2021, and Dr. Levy believed that he could continue his improper conduct and retaliate against Dr. Auteri. Dr. Auteri hereby demands that DH commence an immediate investigation of Dr. Levy's conduct and that Dr. Levy be removed from DH premises pending the outcome of that investigation so that Dr. Auteri and all DH staff are not subjected to Dr. Levy's improper and uncontrolled conduct.

## Conclusion

Dr. Auteri expects that his exemption requests will be granted and reasonable accommodations adopted as set forth above. Dr. Auteri expects that he will be reinstated immediately and all lost pay and benefits restored. Dr. Auteri will not forfeit his civil rights and will not tolerate DH's continued violation of those rights and refusal to protect Dr. Auteri's rights as stated herein. Make no mistake - Dr. Auteri is not resigning as stated in Dr. Foley's October 11, 2021 letter and on November 11, 2021, if DH pursues its wrongful path as stated in your October 13, 2021 letter and terminates Dr. Auteri's employment, DH will do so in violation of Dr. Auteri's civil rights and Employment Agreement.

If DH has denied other employee's exemption requests as it did Dr. Auteri's and failed to provide reasonable accommodations as required by law, DH had best reconsider and rectify its decisions or DH may be subject to class litigation for DH's civil rights violations, which litigation would seemingly be meritorious on its face. It is unfathomable that DH would flagrantly violate its employees' civil rights and terminate staff or otherwise retaliate against highly skilled staff by effectively demoting those employees to lower paying positions and at the same time jeopardizing patient safety by reducing the availability of such staff. DH is demonstrating a complete disregard of its employees' civil rights and its patients' rights to prompt and effective treatment. DH knows that its position is not based in fact and universal employee vaccination will not stop the spread of COVID-19 (per Dr. Levy's admissions). DH must rectify immediately its conduct or face the severe legal consequences.

Sincerely,

KAPLIN STEWART MELOFF REITER & STEIN, P.C.

By: Kimberly L. Russell, Esquire

KLR:dg

Enclosures

D0000206


**Woodlands Healing Research Center**
Family, Environmental & Preventive Medicine

10/21/2021.

Re: Joseph Auteri
3007 Holicong Road
Doylestown, PA 18902-

To Whom It May Concern,

I am the treating physician of Joseph Auteri, M.D.
Based upon his current medical status and condition, I do not recommend COVID-19 vaccination.

Sincerely,

*Provider:*
Kracht DO, William  10/21/2021 1:09 PM

Document generated by:  William Kracht  10/21/2021

Woodlands Healing Research Center
Integrative Family Medicine
5724 Clymer Rd., Quakertown, PA 18951
www.woodmed.com / foffice@woodmed.com.
Phone: 215-536-1890 / Fax: 215-529-9034

# Exhibit 30

Exhibit Filed Under Seal

# Exhibit 31

## Exhibit Filed Under Seal

# Exhibit 32

## Exhibit Filed Under Seal

Exhibit 33

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

Joseph S. Auteri, M.D.

          Plaintiff;

   v.

VIA *Affiliates, d/b/a Doylestown Health Physicians*,  Inc.,

          Defendant.

Civil No. 22-CV-03384

## EXPERT REPORT OF DR. PETER A. MCCULLOUGH, MD, MPH

## I.    INTRODUCTION, QUALIFICATIONS, AND PRIOR TESTIMONY.

### A.    Introduction.

I have contributed extensively to public policy making on issues surrounding the COVID-19 crisis through a series of OPED's for *The Hill* in 2020.[1]  I have had numerous public political appearances addressing pandemic issues listed on CSPAN.[2]  Since 2021, I have been publishing a weekly contribution on *America Out Loud, The McCullough Report.*[3] Since 2022, I have daily postings with graphical abstracts, interviews, and reports on *Courageous Discourse Substack.*[4]

My expertise on the SARS-CoV-2 infection and COVID-19 syndrome also includes the review of hundreds of manuscripts and the care of many patients with acute COVID-19 illness, post-acute sequelae after SARS-CoV-2 infection, long-COVID, and COVID-19 vaccine injury including cardiovascular, thrombotic, neurologic, autoimmune and neoplastic syndromes that have arisen after mRNA, adenoviral DNA, and antigen-based vaccines. I have formed my opinions in close communications with many clinicians around the world based in part on our collective clinical experience throughout the pandemic.

I am currently in independent practice where I see and examine patients on a daily basis with acute COVID-19, long-COVID syndrome, and COVID-19 vaccine injuries and disabilities.[5] I am President of the McCullough Foundation, a not-for-profit organization dedicated to investigative scholarship, educational media, justice, and public policy.[6] Finally, I am the part-time Chief Scientific Officer of the Wellness Company.[7]

A true and correct copy of my Curriculum Vitae is attached hereto as EXHIBIT A and incorporated herein.

### B.    Qualifications.

Pursuant to Fed. R. Civ. P. 26(a)(2)(B)(iv), I hereby provide my qualifications as an expert in the matters presented herein.[8] After receiving a bachelor's degree from Baylor University, I completed my medical degree as an Alpha Omega Alpha graduate from the University of Texas Southwestern Medical School in Dallas. I went on to complete my internal medicine residency at the University of Washington in Seattle, a cardiology fellowship including service as Chief Fellow at William Beaumont Hospital, and a master's degree in public health in the field of epidemiology at the University of Michigan.  I am board certified by the National Board of American Physicians and Surgeons in internal medicine and cardiovascular diseases.[9]  I am an active scholar in medicine with roles as an author, editor-in-chief, editorialist, and reviewer of dozens of major medical journals and textbooks. I have led clinical, education, research, and program operations at major academic centers (Henry Ford Hospital, Oakland University William Beaumont School of Medicine) as well as academically oriented community health systems.[10] I spearheaded the clinical development of in vitro natriuretic peptide and neutrophil gelatinase associated lipocalin assays in diagnosis, prognosis, and management of heart and kidney disease now used worldwide. I also led the first clinical study demonstrating the relationship between severity of acute kidney injury and

mortality after myocardial infarction.[11] I have contributed to the understanding of the epidemiology of chronic heart and kidney disease through many manuscripts in the Kidney Early Evaluation Program Annual Data Report published in the American Journal of Kidney Disease, and participated in clinical trial design and execution in cardiorenal applications of acute kidney injury, hypertension, acute coronary syndromes, heart failure, and chronic cardiorenal syndromes.[12] I participated in event adjudication (involving attribution of cause of death) in trials of acute coronary syndromes, chronic kidney disease, heart failure, and data safety and monitoring of antidiabetic agents, renal therapeutics, hematology products, and gastrointestinal treatments. I have served as the chairman or as a member of over 20 randomized trials of drugs, devices, and clinical strategies. Sponsors of these trials have included pharmaceutical manufacturers, biotechnology companies, and the National Institutes of Health.

I frequently lecture and advise on internal medicine, nephrology, and cardiology to leading institutions worldwide. I am recognized by my peers for my work on the role of chronic kidney disease as a cardiovascular risk state. I have over 1,000 related scientific publications, including the "Interface between Renal Disease and Cardiovascular Illness" in *Braunwald's Heart Disease Textbook*.[13] My works have appeared in the *New England Journal of Medicine*,[14] *Journal of the American Medical Association*,[15] and other top-tier journals worldwide. I have testified before the U.S. Food and Drug Administration Cardiorenal Advisory Panel and its U.S. Congressional Oversight Committee in 2007. I have been a Fellow of the American Heart Association, the American College of Physicians, the American College of Chest Physicians, the National Lipid Association, the Cardiorenal Society of America, and the National Kidney Foundation; and I am also a Diplomate of the American Board of Clinical Lipidology. In 2013, I was honored with the International Vicenza Award for Critical Care Nephrology for my contribution and dedication to

the emerging problem of cardiorenal syndromes.[16] I am a founding member and former President of Cardiorenal Society of America, an organization that brought together cardiologists and nephrologists to engage in research, improved quality of care, and community outreach to patients with both heart and kidney disease.[17]  I am the current Editor-in-Chief of *International Journal of Cardiovascular Research & Innovation*[18] and the Clinical Section Editor of *Science, Public Health Policy and the Law*.[19]

Since the outset of the pandemic, I have been a leader in the medical response to the COVID-19 disaster and have published "Pathophysiological Basis and Rationale for Early Outpatient Treatment of SARS-CoV-2 (COVID-19) Infection," the first synthesis of sequenced multidrug treatment of ambulatory patients infected with SARS-CoV-2 in the *American Journal of Medicine*[20] and updated in *Reviews in Cardiovascular Medicine*.[21]  Subsequently I published the first detoxification approach titled "Clinical Rationale for SARS-CoV-2 Base Spike Protein Detoxification in Post COVID-19 and Vaccine Injury Syndromes" in the *Journal of American Physicians and Surgeons*[22] and updated in the *Cureus Journal of Biomedical Science in 2024*.[23]  I have over 100 peer-reviewed publications, abstracts, letters, and preprints concerning COVID-19 infection and vaccine safety cited in the National Library of Medicine, Google Scholar, and other indexes.

### C.    Prior Testimony.

My government sworn testimony on the COVID-19 pandemic is summarized below.

Testimony for Government

1. US Senate Homeland Security and Governmental Affairs, lead witness, Early Outpatient Treatment of COVID-19:  An Essential Part of a COVID-19 Solution, Majority Chairman, Sen Ron Johnson (R-WI), Minority Chair Gary Peters, (D-MI)
2. US Senate Panel, co-moderator with Sen Ron Johnson (R-WI), COVID-19: A Second Opinion January 24, 2022

3. US Senate Panel, co-moderator with Sen Ron Johnson (R-WI), Sen Roger Marshall (R-KS), COVID-19 Vaccines: What they Are, How They Work, and Possible Causes of Injuries, December 7, 2022
4. Texas Senate Committee on Health and Human Services on March 10, 2021, June 28, 2022, COVID-19 Pandemic Response, Treatment, Vaccines
5. Colorado General Assembly, Early Therapeutics for COVID-19, March 31, 2021
6. New Hampshire Senate, legislation concerning COVID-19 vaccines, April 14, 2021.
7. Pennsylvania State Senate, Medical Freedom Panel under the Senate Veterans Affairs and Emergency Preparedness Committee, March 1, 2022, June 9, 2023.
8. South Carolina Health and Human Services Committee, Medical Affairs Select Subcommittee, September 22, 2021
9. Novel Coronavirus Southwestern Intergovernmental Committee, Arizona House of Representatives and Senate, May 25, 2023, October 20, 2023, March 15, 2024
10. European Parliament Expert Hearing on Health and Democracy under WHO's Proposed New Rules, Benefits and Risks to Civil Society, EU Parliament Strasbourg, MEP Christine Anderson, Chair, September 13, 2023
11. Brazil's Chamber of Deputies, National Congress of Brazil. Recommendation Against Childhood COVID-19 Vaccination. Brazil, November 21, 2023.
12. United States House of Representatives, COVID-19 Vaccine Injury Panel, Chair Representative Majorie Taylor Greene R-GA, January 12, 2024

Pursuant to Fed. R. Civ. P. 26(a)(2)(B)(v), in the last several years, and in addition to the numerous times I have provided expert testimony to state legislatures and the committees of the United States Congress, I have provided expert testimony multiple districts and federal courts as indicated in appendices.

### D.    Compensation.

Pursuant to Fed. R. Civ. P. 26(a)(2)(B)(vi), I am being compensated $750 per hour for my time as an expert in this case.

### E.    Materials Reviewed.

In support of the opinions in this report, in addition to the many medical and scientific materials cited above, I have reviewed the following materials specific to Dr. Auteri's case:

1. Second Amended Complaint and all Exhibits thereto, including the

Exemption Requests, Second Exemption Request, and resulting denials.

2. Doylestown Health's COVID-19 Vaccine Mandate.

3. Doylestown Health's COVID-19 Vaccines "FAQ's."

4. Email dated August 15, 2021 from Doylestown Health Chief Medical Officer Scott Levy, M.D. admitting that vaccinated persons can transmit "live" COVID-19 virus.  (Document P265).

5. Emails from Dr. Levy dated January 7, 2022 (Documents P-247-248) and January 26, 2022 (Documents P302-303) permitting COVID-19 infected employees to return to work WITHOUT TESTING provided that symptoms were improved.

6. Transcripts of depositions of James Brexler, Scott Levy, and Barbara Hebel.

## II.    EXPERT OPINIONS AND THE BASES FOR SUCH OPINIONS.

### A.    Introductory Opinions.

1. I believe within a reasonable degree of medical certainty that the COVID-19 vaccine(s) offered at the time of Dr. Auteri's termination in November 2021 are gene therapy products which have the ability to alter an individual's human genome, and Dr. Auteri's expressed religious concern about those vaccines was supported by the data available at that time.

2. I believe within a reasonable degree of medical certainty that Dr. Auteri presented no increased safety risk to Defendant Doylestown Health's[1] patients or staff and that Dr. Auteri's proposed reasonable accommodation of weekly testing and daily health screenings provided better safety protection to patients and staff than Doylestown Health's reliance upon the COVID-19 vaccines, which Doylestown Health knew did not stop COVID-19 transmission.  Dr. Auteri's proposed accommodation presented no undue burden but offered patients "real time" assurances that Dr. Auteri was not infected with the COVID-19 virus.  By contrast, Doylestown Health knew

---

[1] Defendant VIA Affiliates, d/b/a Doylestown Health Physicians, Inc. is referred to in this report as "Doylestown Health."

vaccinated staff members could transmit the COVID-19 virus but was not testing vaccinated staff members unless those members showed significant symptoms.  The Centers for Disease Control (**"CDC"**) reported that the COVID-19 vaccines reduced the severity of illness in infected persons, and Doylestown Health's vaccinated staff members likely were spreading the COVID-19 virus to patients and staff because those staff members were infectious and not being tested absent significant symptoms.  Doylestown Health's reliance on the COVID-19 vaccines to protect patient safety was knowingly deficient and not justified by the data available from the Summer of 2021 through the time of Dr. Auteri's termination in November 2021.

The basis for each of the above opinions is discussed in detail below.

**B.**    **Foundational Bases for Expert Opinions.**

**1.**    **Opinion as to COVID-19 Vaccines as Gene Therapy Products.**

The Pfizer, Moderna, and Johnson & Johnson (Janssen) vaccines are considered "genetic vaccines," or vaccines produced from gene therapy molecular platforms which, according to US FDA regulatory guidance, are classified as gene delivery therapies and should be under a 15-year regulatory cycle with annual visits for safety evaluation by the research sponsors. Food and Drug Administration, *Long Term Follow-up After Administration of Human Gene Therapy Products. Guidance for Industry.*[24]  The FDA has "advised sponsors to observe subjects for delayed adverse eventsfor as long as 15 years following exposure to the investigational gene therapy product, specifying that the long-term follow-up observation should include a minimum of five years of annual examinations, followed by ten years of annual queries of study subjects, either in person or by questionnaire."  Before Novavax was introduced[2], the available Emergency Use

---

[2] The Novavax COVID-19 vaccine booster was not available in the timeframe of August through November 2021. Novavax was not granted Emergency Use Authorization until October 2022 and then only as a booster after a primary course of COVID-19 vaccination.  Novavax operated in a different manner more akin to "traditional" vaccines but was not available prior to Dr. Auteri's termination.

Authorized vaccines (Pfizer, Moderna, Janssen) were in essence genetic biotechnology products which have been shown to alter the human genome through reverse transcription.[25]

Additionally, the Pfizer and Moderna vaccines have been shown to be contaminated with SV-40 DNA fragments which are known to readily integrate into the human genome without the need for reverse transcription.[26] [27] Thus, the administration of the Moderna, Pfizer, and Janssen vaccines should not be undertaken without the proper consent and arrangements for long-term follow-up which are currently not offered in the US. (*See*, EUA briefing documents for commitments as to follow up: Moderna, Pfizer, Janssen). These novel, genetic vaccines have a dangerous mechanism of action[28] in that they all cause the body to make an uncontrolled quantity of the pathogenic and potentially lethal SARS-CoV-2 spike protein and unwanted frameshifted proteins for at least six months (and probably a longer period, based on the late emergence of vaccine injury reports).[29] [30] [31] This is unlike all other vaccines where there is a set amount of antigen or killed- or live-attenuated virus particles. This means that, for Pfizer, Moderna, and Janssen vaccines, it is not predictable among patients who will produce more or less of the potentially lethal spike protein.[32] Additionally, Pfizer and Moderna mRNA products are expected to have misreading of the mRNA message and produce a dozen or more unwanted frameshifted peptides. [33] The Pfizer, Moderna, and Janssen vaccines, because they are different, are expected to produce different libraries of limited antibodies to the now extinct wild-type spike protein and prior extinct variants with boosters. It is known that the spike protein produced by the vaccines is obsolete (and was obsolete as of April 2022) because the 17th UK Technical Report on SARS-CoV-2 Variants, issued on June 25, 2021, and the CDC Variant Report issued on June 19, 2021, both indicated that the SARS-CoV-2 wild type virus to which all the vaccines

were originally developed was extinct.[34]

The mechanism of action for the Pfizer, Moderna, and Johnson & Johnson (Janssen) "genetic vaccines" has been shown to alter the human genome through reverse transcription and gives pause to many religious objectors who oppose the alteration of their genetic profile as designed by God.

### 2.    Opinion that COVID-19 Vaccine Alone Does Not Promote Patient Safety.

On August 5, 2021, Dr. Rochelle Walensky, head of the CDC announced that the vaccinated can contract and carry the SARS-CoV-2 virus and spread COVID-19 infection to fellow vaccinated individuals.[35]   Multiple studies indicated fully vaccinated individuals were carrying large viral loads of SARS-CoV-2 in the nasopharynx and fully capable of spreading the virus to vaccinated or unvaccinated contacts.[36] [37] [38] [39] [40] [41] Salvatore and coworkers stated in their paper published November 19, 2021:  "Clinicians and public health practitioners should consider vaccinated persons who become infected with SARS-CoV-2 to be no less infectious than unvaccinated persons." Any school, company, agency or other entity substantially encouraging or mandating COVID-19 vaccination either knew or should have known that mass vaccination would

not stop the spread of SARS-CoV-2 and would not make the classroom, workplace, or public area more safe from COVID-19.

THE ★ STAR     News   Sports   Opinion   Obituaries   e-Editions   Newsletters   Podcast   Classifieds   Public Notices   Jobs   Marketplace   Contests

# CDC: COVID vaccines won't stop transmission; Fully vaccinated can still get, spread Delta strain

Mike Sunnucks   Aug 5, 2021   💬 0





Dr. Rochelle Walensky, director of the Centers for Disease Control and Prevention, adjusts her face mask during a Senate Health, Education, Labor and Pensions Committee hearing on the federal coronavirus response on Capitol Hill in Washington, in this Thursday, March 18, 2021.

The COVID-19 vaccines have never been sufficiently protective against contracting COVID-19. Recurrent SARS-CoV-2 vaccine breakthrough infections were widely reported early in the vaccine campaign. In response to those numerous reports, the CDC announced on May 1, 2021, that community breakthrough cases would no longer be reported to the public and only those vaccine failure cases requiring hospitalization will be reported, presumably on the CDC website.[42] Fully vaccinated patients contract breakthrough infections (except for those vaccinated individuals who were previously immune from prior COVID-19 infection).

By the end of 2021, the CDC reported that the Omicron variant appeared in fully vaccinated persons and was able to spread among those with both natural and vaccine-induced immunity.[43][44] Analyses from Subramanian, Beattie, and Kampf indicated that mass vaccination

was at best worthless or more concerning, it was making the pandemic worse by fostering more spread of the virus by the vaccinated and promoting new strains of SARS-CoV-2 which were resistant to vaccine immunity.[45] [46] [47]  The CDC reported that the COVID-19 vaccines prevented serious illness,[48] but reduced illness and/or symptoms fostered the spread of the virus by the vaccinated who were not showing significant symptoms, were not testing, and were not taking precautions to isolate because those vaccinated persons did not know that they were infected with the virus.

As discussed below, Doylestown Health's reliance on the COVID-19 vaccines without testing unless an infected staff member exhibited significant symptoms likely fostered the spread of the virus and did not create a safe environment.

### C.  Opinions as Applied to the Specific Facts in this Case

**Opinion 1:  I believe within a reasonable degree of medical certainty that the COVID-19 vaccine(s) offered at the time of Dr. Auteri's termination in November 2021 are gene therapy (gene transfer technology) products which have the ability to alter an individual's human genome, and Dr. Auteri's expressed religious concern about those vaccines was supported by the data available at that time.**

Based upon my review of the above materials, I understand that Dr. Auteri declined COVID-19 vaccination and submitted a request for a religious exemption and accommodation. [3]  The basis of Dr. Auteri's religious exemption request was that to Dr. Auteri's understanding, the available Emergency Use Authorized vaccines (Pfizer, Moderna, Janssen) were in essence genetic biotechnology products which have been shown to alter the human genome through reverse transcription.[49]  Additionally, the Pfizer and

---

[3] I understand that Dr. Auteri contracted COVID-19 illness in May, 2021, with confirmatory seropositivity, and also requested a medical exemption.  I also understand that a medical exemption request is not at issue in the case at this time so I will not address further the strong, broad immunity from COVID-19 illness and transmission which results from natural COVID-19 infection.

Moderna vaccines have been shown to be contaminated with SV-40 DNA fragments which are known to readily integrate into the human genome without the need for reverse transcription.[50][51]  Dr. Auteri's firmly and sincerely held religious beliefs disallowed injection of genetic product(s) into his body which held the potential to alter Dr. Auteri's genetic profile as designed by God.  Dr. Auteri's expressed religious concerns about the potential of the COVID-19 Vaccines to alter Dr. Auteri's genetic profile were well founded based upon the known mechanism of action of those vaccines, which has been shown to alter the human genome through reverse transcription.  Those mechanisms of action were known from August through November 2021, the timeframe relevant to Doylestown Health's COVID-19 Vaccine Mandate and Dr. Auteri's termination.  Dr. Auteri's sincerely held and expressed religious beliefs were supported by the data known in 2021 and Doylestown Health should not have required any person expressing such a concern to take the COVID-19 Vaccines.  Dr. Auteri was unjustly fired when he refused to be injected with COVID-19 "genetic" vaccines.

**Opinion 2:  I believe within a reasonable degree of medical certainty that Dr. Auteri presented no increased safety risk to Defendant Doylestown Health's patients or staff and that the requested accommodations to undergo weekly testing for COVID-19 infection and to undergo daily health screenings, including daily temperature checks (the "Auteri Accommodations") provided better safety protection to patients and staff than Doylestown Health's reliance upon the COVID-19 vaccines which Doylestown Health knew did not stop COVID-19 transmission.**

**I believe within a reasonable degree of medical certainty that the Auteri Accommodations presented no undue burden but offered patients "real time" assurances that Dr. Auteri was not infected with the COVID-19 virus, making Dr. Auteri "safer" in caring for vulnerable patients than vaccinated employees and staff who would be expected to carry large viral loads of SARS-CoV-2 in the nasopharynx despite undergoing vaccination at some point which could have been many months in the past from when the COVID-19 vaccine campaign was begun.  By contrast, Doylestown Health knew that vaccinated staff members could transmit the COVID-19 virus but was not testing vaccinated staff members**

**unless those members showed significant symptoms.**

**The CDC reported that the COVID-19 vaccines reduced symptoms in infected persons, and Doylestown Health's vaccinated staff members likely were spreading the COVID-19 virus to patients and staff because those staff members were infectious and not being tested without self-prompting with significant symptoms. Doylestown Health's reliance on the COVID-19 vaccines to protect patient safety was knowingly deficient, insufficient to address patient safety, and not justified by the data available from the Summer of 2021 through the time of Dr. Auteri's termination in November 2021.**

Based upon my review of the above scientific and case-specific materials, I understand that on October 22, 2021, Dr. Auteri offered, as a reasonable accommodation of Dr. Auteri's religious exemption request, to undergo weekly testing for COVID-19 infection and to undergo daily health screenings, including daily temperature checks (the **"Auteri Accommodations"**). Exhibit "6" to the Second Amended Complaint (Second Exemption Request). By October 22, 2021, the CDC had admitted that the COVID-19 Vaccines did not stop transmission of the virus and in an email dated August 15, 2021, the Chief Medical Officer of Doylestown Health admitted the same (Document P-265).

Because COVID-19 vaccination had failed to stop transmission of SARS-CoV-2 as declared by the CDC and supported by multiple studies by August, 2021, and as admitted by Doylestown Health's executive representative Dr. Levy on August 15, 2021, an unvaccinated Dr. Autieri posed no undue or additional risk or harm to himself, hospital staff, or patients greater than that posed by Doylestown Health's vaccinated medical staff. Dr. Auteri was willing to undergo the Auteri Accommodations, but Doylestown Health's administration would not have any discussion about Dr. Auteri's proposed accommodations, refused to offer any alternate accommodation, and did not permit Dr. Auteri to continue his work as a cardiothoracic surgeon. Exhibit "6" to the Second Amended Complaint. Doylestown Health simply concluded that because Dr. Auteri was a

surgeon who treated a "vulnerable population," Dr. Auteri could not be safe in the care of patients.  See transcript of deposition of B. Hebel[4], p. 14, l. 13-p. 15, l. 14; p. 17, l. 8-17; p. 27, l. 11-24.  Ms. Hebel testified that Doylestown Health had a set of standard "accommodations" which did not take into account the actual health status of any specific care provider and used COVID-19 vaccination status as the arbiter of whether a specific care provider could treat patients at a level of "vulnerability" determined in some undisclosed way by Doylestown Health.  See transcript of deposition of B. Hebel, p. 19, l. 12 – p. 20, l. 3; p. 22, l. 6 – p. 23, l. 2; p. 25, l. 20- p. 26, l. 10; see also transcript of J. Brexler,[5] at p. 146, l. 17 – p. 147, l. 14.  Ms. Hebel testified that she did not use any data concerning transmission of the COVID-19 virus from any unvaccinated care provider to patients to determine whether or not to deny Dr. Auteri's accommodation request.  See transcript of deposition of B. Hebel, p. 34, l. 14 – p. 35, l. 7.   As discussed in detail above, Doylestown Health's reliance upon COVID-19 vaccination in the face of the facts known about those vaccines in the August through November 2021 timeframe was wholly deficient, not based in science, and resulted in an unsafe, elevated risk of COVID-19 virus transmission to vulnerable patients.

Multiple representatives of Doylestown Health's executive staff testified that Doylestown Health was NOT testing vaccinated members of the medical staff on a routine basis in that August through November 2021 timeframe in order to determine whether those medical staff members had the COVID-19 virus, despite Doylestown Health's

---

[4] References are to the transcript of the February 9, 2025 deposition of Barbara Hebel, Vice President, Human Resources.
[5] References are to the transcript of the February 17, 2025 deposition of James Brexler, President and Chief Executive Officer.

knowledge that vaccinated persons could harbor large viral loads in the nasopharynx and transmit SARS-CoV-2.  See transcripts of depositions of J. Brexler, p. 135, l. 6-25; p. 136, l. 2-15; S. Levy[6], p. 136, l. 5-15, p. 159, l. 1-5.  Ms. Hebel testified that Doylestown Health did not know which staff members were infected with COVID-19 on any given day, and Doylestown Health did not track the transmission of the virus from vaccinated staff members or health system employees to patients.  See transcript of deposition of B. Hebel, p. 35, l. 6-13; p. 37, l. 10-17.  Ms. Hebel also testified that for the period of August 2021 when Doylestown Health implemented the COVID-19 vaccine mandate through the date of Dr. Auteri's termination on November 18, 2021, Doylestown Health had no data which tracked transmission events nor had any reports of transmission of the COVID-19 virus from any Doylestown Health care provider or employee to a patient, and no evidence that Dr. Auteri transmitted the COVID-19 virus to anyone.  See transcript of B. Hebel, p. 40, l. 24, p. 41, l. 11; p. 41, l. 13-20.

Dr. Levy testified that it was "certainly" a "possibility" that, in October 2021, a vaccinated doctor at Doylestown Health had COVID-19 and was treating patients.  See transcript of deposition of S. Levy, p. 140, l. 9-13; see also transcript of deposition of J. Brexler, p. 137, l. 6-24.  According to Dr. Levy, on any given day, there "absolutely" could be surgeons and doctors treating patients who had COVID-19 at that time.  See transcript of deposition of S. Levy, p. 143, l. 10-13; p. 146, l. 7-10.  In August through October 2021, Doylestown Health had no data showing that Dr. Auteri could transmit SARS-CoV-2 at a higher rate than a vaccinated provider.  See transcript of deposition of S. Levy, p. 152, l. 16-24.  Dr. Levy testified that in October 2021, only medical staff members demonstrating

---

[6] References are to the transcript of the February 13, 2025 deposition of Scott Levy, M.D. Chief Medical Officer.

significant symptoms of illness were being tested for the COVID-19 virus.  <u>See</u> transcript of deposition of S. Levy, p. 136 at l. 5-15.

Had Dr. Auteri remained employed under the Auteri Accommodations, Dr. Auteri would have been safer in treating "vulnerable" patients than vaccinated medical staff members who were not working under the more strict Auteri Accommodations.  As cited from the deposition testimony above, Doylestown Health was permitting vaccinated medical staff members to treat patients, including "vulnerable" patients, without testing unless those medical staff members were experiencing significant symptoms of illness and requested testing prompted by their symptoms.  By early January 2022, approximately 6 weeks after Dr. Auteri's termination, Doylestown Health was permitting COVID-19 infected medical staff members to return to work without testing to determine the then-current presence of persistent SARS-CoV-2 in those staff members and whether those staff members still posed a threat to patients and coworkers.  <u>See</u> Documents P-247-248 and P302-303.

As discussed above, COVID-19 vaccinated staff members could transmit the virus and to the extent that the vaccines were reducing symptoms, Doylestown Health's reliance upon the COVID-19 vaccines to determine "patient safety" likely made the spread of the virus worse by allowing continued virus transmission without any actual, "real time" knowledge of which medical staff members were infected and contagious.  Under the Auteri Accommodations, Dr. Auteri offered to demonstrate on any given day that Dr. Auteri was not infected with SARS-CoV-2 and was safe to treat patients.

The Auteri Accommodations were not unduly burdensome to Doylestown Health in

terms of cost or administrative process.  Had Doylestown Health discussed the Auteri

Accommodations with Dr. Auteri, Doylestown Health could have required Dr. Auteri to

pay for the testing, mandated more frequent testing, required offsite testing, etc.

Doylestown Health admits that Doylestown Health did not discuss the possibility of Auteri

Accommodations with Dr. Auteri at all.  See transcript of deposition of B. Hebel, p. 43 at l.

2-10.  At the time, Doylestown Health had not traced any case of COVID-19 virus

transmission to Dr. Auteri.  See transcript of deposition of S. Levy, p. 152 at l. 16-24; see

also transcript of deposition of J. Brexler, p. 41 at l. 13-20.  Doylestown Health did not

have any internal data showing that Doylestown Health's unvaccinated medical staff

providers were transmitting the COVID-19 virus at a greater rate than vaccinated medical

staff providers.  See transcripts of depositions of S. Levy, p. 148 at p. 13-21; J. Brexler, p.

37, l. 19 – p. 38, l. 7;  B. Hebel, p. 34 at l. 14 – p. 35, l. 7.   At the time of Dr. Auteri's

termination, Doylestown Health had no evidence that Dr. Auteri posed a safety risk to

patients or any greater risk of COVID-19 virus transmission than doctors who had

undergone COVID-19 vaccination.  The hospital administration's decision to terminate Dr.

Auteri was without scientific merit nor grounded in solid public health policy.  That

decision was arbitrary, capricious, and was not in keeping with the standard of care

provided by similar health systems across the country which allowed unvaccinated and

vaccinated employees in the workplace.  By the time of Dr. Auteri's termination on

November 18, 2021, the COVID-19 vaccine campaign had failed and the vaccine status

was irrelevant for surgeons such as Dr. Auteri.

## III.    CONCLUSION

In my expert medical opinion, within a reasonable degree of medical certainty, Dr. Auteri's concern that the COVID-19 vaccines were "genetic vaccines" was well founded in the known science and data at the time.  It is also my expert medical opinion, which is within a reasonable degree of medical certainty, that the Auteri Accommodations would not have caused an undue burden on Doylestown Health.  Doylestown Health's stated concerns about "patient safety" which resulted in Dr. Auteri's termination were not at all served by Doylestown Health's COVID-19 vaccine Mandate and related procedures.  It is my expert medical opinion, which is within a reasonable degree of medical certainty, that Doylestown Health's procedures for allowing vaccinated medical staff members to work with patients without testing to provide "real time" knowledge of COVID-19 infection was not safe for patients and the Auteri Accommodations provided greater protection of patients, and that Doylestown Health knew or should have known that reliance upon COVID-19 vaccination was wholly insufficient to protect the "vulnerable" patient population which Doylestown Health claimed Dr. Auteri was unsafe to treat.  Had Doylestown Health wanted to provide the best and most reasonable, efficient, and effective protection for patients from COVID-19, Doylestown Health would have followed the Auteri Accommodations or required more frequent testing.    Dr. Auteri should not have received any pressure, coercion, or reprisal for requesting exemption from or declining COVID-19 vaccination.

Dr. Auteri's termination based upon his refusal to get vaccinated because of sincerely held religious beliefs was unlawful.

Dated:                                          Respectfully submitted,

                                                /s/ Peter A. McCullough, M.D., MPH

                                                _____

                                                Peter A. McCullough

[1] https://thehill.com/opinion/healthcare/512191-the-great-gamble-of-covid-19-vaccine-development/

[2] https://www.c-span.org/person/peter-mccullough-md/128371/

[3] https://www.americaoutloud.news/author/dr-peter-mccullough/

[4] https://petermcculloughmd.substack.com/

[5] https://wellintmed.com/

[6] https://mcculloughfnd.org/

[7] https://www.twc.health/pages/leadership

[8] Peter A. McCullough, MD, MPH, professional website:  www.petermcculloughmd.com

[9] https://nbpas.org/pages/verify-certification-result?firstname=peter&lastname=mccullough

[10] McCullough PA, Roberts WC. Peter Andrew McCullough, MD, MPH: an interview with the editor. Am J Cardiol. 2014 Dec 1;114(11):1772-85. doi: 10.1016/j.amjcard.2014.08.034. Epub 2014 Sep 16. PMID: 25439453. https://pubmed.ncbi.nlm.nih.gov/25439453/

[11] McCullough PA, Soman SS, Shah SS, Smith ST, Marks KR, Yee J, Borzak S. Risks associated with renal dysfunction in patients in the coronary care unit. J Am Coll Cardiol. 2000 Sep;36(3):679-84. doi: 10.1016/s0735-1097(00)00774-9. PMID: 10987584. Https://pubmed.ncbi.nlm.nih.gov/10987584/

[12] Whaley-Connell A, Kurella Tamura M, McCullough PA. A decade after the KDOQI CKD guidelines: impact on the National Kidney Foundation's Kidney Early Evaluation Program (KEEP). Am J Kidney Dis. 2012 Nov;60(5):692-3. doi: 10.1053/j.ajkd.2012.08.008. PMID: 23067631. https://pubmed.ncbi.nlm.nih.gov/23067631/

[13] https://search.library.albany.edu/discovery/fulldisplay?docid=alma991004562599704801&context=L&vid=01SUNY_ALB:01SUNY_ALB&lang=en&search_scope=allthethings&adaptor=Local%20Search%20Engine&isFrbr=true&tab=allthethings&query=creator,exact,%20Libby,%20Peter%20,AND&facet=creator,exact,%20Libby,%20Peter%20&mode=advanced&offset=0

[14] Maisel AS, Krishnaswamy P, Nowak RM, McCord J, Hollander JE, Duc P, Omland T, Storrow AB, Abraham WT, Wu AH, Clopton P, Steg PG, Westheim A, Knudsen CW, Perez A, Kazanegra R, Herrmann HC, McCullough PA; Breathing Not Properly Multinational Study Investigators. Rapid measurement of B-type natriuretic peptide in the emergency diagnosis of heart failure. N Engl J Med. 2002 Jul 18;347(3):161-7. doi: 10.1056/NEJMoa020233. PMID: 12124404. https://pubmed.ncbi.nlm.nih.gov/12124404/

[15] Stone GW, McCullough PA, Tumlin JA, Lepor NE, Madyoon H, Murray P, Wang A, Chu AA, Schaer GL, Stevens M, Wilensky RL, O'Neill WW; CONTRAST Investigators. Fenoldopam mesylate for the prevention of contrast-induced nephropathy: a randomized controlled trial. JAMA. 2003 Nov 5;290(17):2284-91. doi: 10.1001/jama.290.17.2284. PMID: 14600187. https://pubmed.ncbi.nlm.nih.gov/14600187/

[16] https://link.springer.com/book/10.1007/978-3-030-57460-4

[17] https://cardiorenalsociety.org/

[18] https://www.reseaprojournals.com/jcri/editorial_board

[19] https://publichealthpolicyjournal.com/editorial-board/

[20] McCullough PA, Kelly RJ, Ruocco G, Lerma E, Tumlin J, Wheelan KR, Katz N, Lepor NE, Vijay K, Carter H, Singh B, McCullough SP, Bhambi BK, Palazzuoli A, De Ferrari GM, Milligan GP, Safder T, Tecson KM, Wang DD, McKinnon JE, O'Neill WW, Zervos M, Risch HA. Pathophysiological Basis and Rationale for Early Outpatient Treatment of SARS-CoV-2 (COVID-19) Infection. Am J Med. 2021 Jan;134(1):16-22. doi: 10.1016/j.amjmed.2020.07.003. Epub 2020 Aug 7. PMID: 32771461; PMCID: PMC7410805. https://pubmed.ncbi.nlm.nih.gov/32771461/

[21] McCullough PA, Alexander PE, Armstrong V, Arvinte C, Bain AF, Bartlett RP, Berkowitz RL, Berry AC, Borody TJ, Brewer JH, Brufsky AM, Clarke T, Derwand R, Eck A, Eck J, Eisner RA, Fareed GC, Farella A, Fonseca SNS, Geyer CE Jr, Gonnering RS, Graves KE, Gross KBV, Hazan S, Held KS, Hight HT, Immanuel S, Jacobs MM, Ladapo JA, Lee LH, Littell J, Lozano I, Mangat HS, Marble B, McKinnon JE, Merritt LD, Orient JM, Oskoui R, Pompan DC, Procter BC, Prodromos C, Rajter JC, Rajter JJ, Ram CVS, Rios SS, Risch HA, Robb MJA, Rutherford M, Scholz M, Singleton MM, Tumlin JA, Tyson BM, Urso RG, Victory K, Vliet EL, Wax CM, Wolkoff AG, Wooll V, Zelenko V. Multifaceted highly targeted sequential multidrug treatment of early ambulatory high-risk SARS-CoV-2 infection (COVID-19). Rev Cardiovasc Med. 2020 Dec 30;21(4):517-530. doi: 10.31083/j.rcm.2020.04.264. PMID: 33387997. https://pubmed.ncbi.nlm.nih.gov/33387997/

[22] McCullough, P. A., Wynn, C., & Procter, B. C. (2023). Clinical Rationale for SARS-CoV-2 Base Spike Protein Detoxification in Post COVID-19 and Vaccine Injury Syndromes. Journal of American Physicians and Surgeons, 28(3), 90–94. https://doi.org/10.5281/zenodo.8286460

[23] Hulscher N, Procter BC, Wynn C, McCullough PA. Clinical Approach to Post-acute Sequelae After COVID-19 Infection and Vaccination. Cureus. 2023 Nov 21;15(11):e49204. doi: 10.7759/cureus.49204. PMID: 38024037; PMCID: PMC10663976. https://pubmed.ncbi.nlm.nih.gov/38024037/

[24] https://www.fda.gov/regulatory-information/search-fda-guidance-documents/long-term-follow-after-administration-human-gene-therapy-products

[25] Aldén M, Olofsson Falla F, Yang D, Barghouth M, Luan C, Rasmussen M, De Marinis Y. Intracellular Reverse Transcription of Pfizer BioNTech COVID-19 mRNA Vaccine BNT162b2 In Vitro in Human Liver Cell Line. Curr Issues Mol Biol. 2022 Feb 25;44(3):1115-1126. doi: 10.3390/cimb44030073. PMID: 35723296; PMCID: PMC8946961.

[26] https://osf.io/preprints/osf/mjc97_v1

[27] https://www.researchgate.net/publication/380457155_Methodological_Considerations_Regarding_the_Quantification_of_DNA_Impurities_in_the_COVID-19_mRNA_Vaccine_ComirnatyR

[28] https://jpands.org/vol29no4/oldfield.pdf

[29] Acevedo-Whitehouse K, Bruno R. Potential health risks of mRNA-based vaccine therapy: A hypothesis. Med Hypotheses. 2023 Feb;171:111015. doi: 10.1016/j.mehy.2023.111015. Epub 2023 Jan 25. PMID: 36718314; PMCID: PMC9876036. https://pubmed.ncbi.nlm.nih.gov/36718314/

[30] Boros LG, Kyriakopoulos AM, Brogna C, Piscopo M, McCullough PA, Seneff S. Long-lasting, biochemically modified mRNA, and its frameshifted recombinant spike proteins in human tissues and circulation after COVID-19 vaccination. Pharmacol Res Perspect. 2024 Jun;12(3):e1218. doi: 10.1002/prp2.1218. PMID: 38867495; PMCID: PMC11169277. https://pubmed.ncbi.nlm.nih.gov/38867495/

[31] Brogna C, Cristoni S, Marino G, Montano L, Viduto V, Fabrowski M, Lettieri G, Piscopo M. Detection of recombinant Spike protein in the blood of individuals vaccinated against SARS-CoV-2: Possible molecular mechanisms. Proteomics Clin Appl. 2023 Nov;17(6):e2300048. doi: 10.1002/prca.202300048. Epub 2023 Aug 31. PMID: 37650258. https://pubmed.ncbi.nlm.nih.gov/37650258/

[32] Parry PI, Lefringhausen A, Turni C, Neil CJ, Cosford R, Hudson NJ, Gillespie J. 'Spikeopathy': COVID-19 Spike Protein Is Pathogenic, from Both Virus and Vaccine mRNA. Biomedicines. 2023 Aug 17;11(8):2287. doi: 10.3390/biomedicines11082287. PMID: 37626783; PMCID: PMC10452662. https://pubmed.ncbi.nlm.nih.gov/37626783/

[33] Boros LG, Kyriakopoulos AM, Brogna C, Piscopo M, McCullough PA, Seneff S. Long-lasting, biochemically modified mRNA, and its frameshifted recombinant spike proteins in human tissues and circulation after COVID-19 vaccination. Pharmacol Res Perspect. 2024 Jun;12(3):e1218. doi: 10.1002/prp2.1218. PMID: 38867495; PMCID: PMC11169277. https://pubmed.ncbi.nlm.nih.gov/38867495/

[34] https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/1001354/Variants_of_Concern_VOC_Technical_Briefing_17.pdf; see also https://COVID-19.cdc.gov/COVID-19-datatracker/

[35] https://www.stardem.com/news/national/cdc-covid-vaccines-won-t-stop-transmission-fully-vaccinated-can-still-get-spread-delta-strain/article_5f83d0cb-8b0a-535d-bbad-3f571754e5ae.html

[36] Farinholt T, Doddapaneni H, Qin X, Menon V, Meng Q, Metcalf G, Chao H, Gingras MC, Avadhanula V, Farinholt P, Agrawal C, Muzny DM, Piedra PA, Gibbs RA, Petrosino J. Transmission event of SARS-CoV-2 delta variant reveals multiple vaccine breakthrough infections. BMC Med. 2021 Oct 1;19(1):255. doi: 10.1186/s12916-021-02103-4. PMID: 34593004; PMCID: PMC8483940. https://pubmed.ncbi.nlm.nih.gov/34593004/

[37] Singanayagam A, Hakki S, Dunning J, Madon KJ, Crone MA, Koycheva A, Derqui-Fernandez N, Barnett JL, Whitfield MG, Varro R, Charlett A, Kundu R, Fenn J, Cutajar J, Quinn V, Conibear E, Barclay W, Freemont PS, Taylor GP, Ahmad S, Zambon M, Ferguson NM, Lalvani A; ATACCC Study Investigators. Community transmission and viral load kinetics of the SARS-CoV-2 delta (B.1.617.2) variant in vaccinated and unvaccinated individuals in the UK: a prospective, longitudinal, cohort study. Lancet Infect Dis. 2022 Feb;22(2):183-195. doi: 10.1016/S1473-3099(21)00648-4. Epub 2021 Oct 29. Erratum in: Lancet Infect Dis. 2021 Dec;21(12):e363. doi: 10.1016/S1473-3099(21)00701-5. PMID: 34756186; PMCID: PMC8554486. https://pubmed.ncbi.nlm.nih.gov/34756186/

[38] Riemersma KK, Haddock LA 3rd, Wilson NA, Minor N, Eickhoff J, Grogan BE, Kita-Yarbro A, Halfmann PJ, Segaloff HE, Kocharian A, Florek KR, Westergaard R, Bateman A, Jeppson GE, Kawaoka Y, O'Connor DH, Friedrich TC, Grande KM. Shedding of infectious SARS-CoV-2 despite vaccination. PLoS Pathog. 2022 Sep 30;18(9):e1010876. doi: 10.1371/journal.ppat.1010876. PMID: 36178969; PMCID: PMC9555632. https://pubmed.ncbi.nlm.nih.gov/36178969/

[39] Acharya CB, Schrom J, Mitchell AM, Coil DA, Marquez C, Rojas S, Wang CY, Liu J, Pilarowski G, Solis L, Georgian E, Belafsky S, Petersen M, DeRisi J, Michelmore R, Havlir D. Viral Load Among Vaccinated and Unvaccinated, Asymptomatic and Symptomatic Persons Infected With the SARS-CoV-2 Delta Variant. Open Forum Infect Dis. 2022 Mar 17;9(5):ofac135. doi: 10.1093/ofid/ofac135. PMID: 35479304; PMCID: PMC8992250. https://pubmed.ncbi.nlm.nih.gov/35479304/

[40] Salvatore PP, Lee CC, Sleweon S, McCormick DW, Nicolae L, Knipe K, Dixon T, Banta R, Ogle I, Young C, Dusseau C, Salmonson S, Ogden C, Godwin E, Ballom T, Rhodes T, Wynn NT, David E, Bessey TK, Kim G, Suppiah S, Tamin A, Harcourt JL, Sheth M, Lowe L, Browne H, Tate JE, Kirking HL, Hagan LM. Transmission potential of vaccinated and unvaccinated persons infected with the SARS-CoV-2 Delta variant in a federal prison, July-August 2021. Vaccine. 2023 Mar 10;41(11):1808-1818. doi: 10.1016/j.vaccine.2022.11.045. Epub 2022 Dec 13. PMID: 36572604; PMCID: PMC9744684. https://pubmed.ncbi.nlm.nih.gov/36572604/

[41] Accorsi EK, Britton A, Fleming-Dutra KE, Smith ZR, Shang N, Derado G, Miller J, Schrag SJ, Verani JR. Association Between 3 Doses of mRNA COVID-19 Vaccine and Symptomatic Infection Caused by the SARS-CoV-2 Omicron and Delta Variants. JAMA. 2022 Feb 15;327(7):639-651. doi: 10.1001/jama.2022.0470. PMID: 35060999; PMCID: PMC8848203. https://pubmed.ncbi.nlm.nih.gov/35060999/

[42] https://www.cdc.gov/mmwr/volumes/70/wr/mm7021e3.html

[43] SARS-CoV-2 B.1.1.529 (Omicron) Variant — United States, December 1–8, 2021. MMWR Morb Mortal Wkly Rep 2021;70:1731-1734. DOI: http://dx.doi.org/10.15585/mmwr.mm7050e1 https://www.cdc.gov/mmwr/volumes/70/wr/mm7050e1.htm#suggestedcitation

[44] Keyel AC, Russell A, Plitnick J, et al. SARS-CoV-2 Vaccine Breakthrough by Omicron and Delta Variants, New York, USA. Emerging Infectious Diseases. 2022;28(10):1990-1998. doi:10.3201/eid2810.221058. https://wwwnc.cdc.gov/eid/article/28/10/22-1058_article#

[45] Subramanian SV, Kumar A. Increases in COVID-19 are unrelated to levels of vaccination across 68 countries and 2947 counties in the United States. Eur J Epidemiol. 2021 Dec;36(12):1237-1240. doi: 10.1007/s10654-021-00808-7. Epub 2021 Sep 30. PMID: 34591202; PMCID: PMC8481107. https://pubmed.ncbi.nlm.nih.gov/34591202/

[46] https://www.datascienceassn.org/sites/default/files/Beattie%2C%20K.%20Worldwide%20Bayesian%20Causal%20Impact%20Analysis%20of%20Administration%20on%20Deaths%20and%20Cases%20Associated%20with%20COVID-19_%20A%20BigData%20Analysis%20of%20145%20Countries.pdf

[47] https://www.mdpi.com/2673-947X/1/1/1

[48] http://archive.cdc.gov/www_cdc_gov/coronavirus/2019-ncov/vaccines/vaccine-benefits.html

[49] Aldén M, Olofsson Falla F, Yang D, Barghouth M, Luan C, Rasmussen M, De Marinis Y. Intracellular Reverse Transcription of Pfizer BioNTech COVID-19 mRNA Vaccine BNT162b2 In Vitro in Human Liver Cell Line. Curr Issues Mol Biol. 2022 Feb 25;44(3):1115-1126. doi: 10.3390/cimb44030073. PMID: 35723296; PMCID: PMC8946961.

[50] https://osf.io/preprints/osf/mjc97_v1

[51]https://www.researchgate.net/publication/380457155_Methodological_Considerations_Regarding_the_Quantification_of_DNA_Impurities_in_the_COVID-19_mRNA_Vaccine_ComirnatyR

Exhibit 34

 American Board
of Internal Medicine®

510 Walnut Street | Suite 1700 | Philadelphia, PA | 19106-3699 | 800.441.2246 | www.abim.org | request@abim.org

Richard J. Baron, MD
*President*
*Chief Executive Officer*

ABIM BOARD OF DIRECTORS

Yul Ejnes, MD
*Chair*

Rajeev Jain, MD
*Chair-Elect*

Robert O. Roswell, MD
*Secretary*

C. Seth Landefeld, MD
*Treasurer*

Vineet Arora, MD

M. Safwan Badr, MD

Roger W. Bush, MD

Carladenise A. Edwards, PhD

Alicia Fernandez, MD

Marianne M. Green, MD

Erica N. Johnson, MD

Megan M. Koepke, MHA

Robert D. Siegel, MD

October 18, 2022                                   ABIM ID: 136084

Peter McCullough, M.D.
5231 Richard Avenue
Dallas, TX 75206

**Personal and Confidential**
<u>Sent by Certified Mail</u>

### Re: Notice of Recommended Disciplinary Sanction

Dear Dr. McCullough:

The American Board of Internal Medicine (ABIM) provided you notice by letter dated May 26, 2022 (the "Notice") that ABIM's Credentials and Certification Committee (CCC) would consider whether to recommend a disciplinary sanction against you in light of public statements you made about the purported dangers of, or lack of justification for, COVID-19 vaccines.

The CCC met to consider this matter on July 26, 2022. Present for the meeting were Furman S. McDonald, M.D., M.P.H., Senior Vice President for Academic and Medical Affairs, and chair of the CCC; Richard Battaglia, M.D., FACP, Chief Medical Officer; Lorna Lynn, M.D., Vice President, Medical Education Research; Jeffrey Miller, Chief Information Officer; Michael Melfe, Director, Academic Affairs; Ruth Hafer, Credentials and Licensure Manager; Kathryn Ross, Ph.D., Research Associate; and Lauren Duhigg, Senior Research Associate. Also present were Paul Lantieri III and Emilia McKee Vassallo of Ballard Spahr LLP, counsel to ABIM.

### Background

You are currently certified by ABIM in Internal Medicine and Cardiovascular Disease.

You have made numerous widely reported and disseminated public statements about the purported dangers of, or lack of justification for, COVID-19 vaccines. In March 10, 2021 testimony before the Texas Senate Committee on Health & Human Services, you stated, among other things, that there is no "scientific, clinical, or safety rationale for ever vaccinating a Covid-recovered patient," and that there is "no scientific rationale" for healthy people under 50 to receive a Covid vaccine. Testimony available at https://www.youtube.com/watch?v=QAHi3lX3oGM. Similarly, you asserted in a national television interview that "[t]here is no reason [people who have previously had COVID-19] should take the vaccine." Transcript of *Ingraham Angle*, Fox News Network, June 29, 2021.

You also have reportedly stated that as many as 50,000 Americans may have died due to Covid-19 vaccines in the first half of 2021. *See, e.g.,* D. Villareal, *7 Doctors at Anti-Vax Summit Catch COVID-19 Despite Touting Ivermectin "Treatment,"* Newsweek, Nov. 23, 2021; K. Krause, *System Sues Vaccine Skeptic*, Dallas Morning News, July 30, 2021; *Alarm Grows as Researchers Warn of Dangers of the COVID-19 Shots*, Mizzima, July 25, 2021. And in another public forum, you reportedly asserted that Covid-19 vaccines are part of "bioterrorism research." *Moscow COVID Delta Response May Shock Government Officials*, Newstex Blogs, The Duran, June 26, 2021.

A MEMBER BOARD OF THE
AMERICAN BOARD OF
MEDICAL SPECIALTIES (ABMS)



510 Walnut Street | Suite 1700 | Philadelphia, PA | 19106-3699 | 800.441.2246 | www.abim.org | request@abim.org

Richard J. Baron, MD
*President*
*Chief Executive Officer*

ABIM BOARD OF DIRECTORS

Yul Ejnes, MD
*Chair*

Rajeev Jain, MD
*Chair-Elect*

Robert O. Roswell, MD
*Secretary*

C. Seth Landefeld, MD
*Treasurer*

Vineet Arora, MD

M. Safwan Badr, MD

Roger W. Bush, MD

Carladenise A. Edwards, PhD

Alicia Fernandez, MD

Marianne M. Green, MD

Erica N. Johnson, MD

Megan M. Koepke, MHA

Robert D. Siegel, MD

In addition, in a declaration submitted in support of the plaintiffs in *State of Louisiana, et al. v. Becerra*, No. 3:21-cv-03970-TAD-KDM (W.D. La.), on November 15, 2021 ("*Louisiana* Decl."), you declared – after noting your ABIM certification as part of your background (*Louisiana* Decl. ¶ 4) – that Covid-19 presents a "negligible risk for adults younger than the age of 60" (*Louisiana* Decl. ¶ 9); that "[b]ased on VAERS as of October 29, 2021, there were 18,078 COVID-19 vaccine deaths reported"; and that "COVID-19 mass vaccination is associated with at least a 39-fold increase in annualized vaccine deaths reported to VAERS" (*Louisiana* Decl. ¶ 29).

In response to the Notice, you submitted a letter dated June 14, 2022 "request[ing] prompt dismissal of the matter" or the "right to attend and personally participate and/or have legal counsel represent [you] in the ABIM Credentials and Certification Committee meeting." You included with your letter a "point-by-point declaration" responding to the Notice ("McCullough Decl."). In the McCullough Declaration, you state that you "have been a leader in the medical response to the COVID-19 disaster and have published or been listed on many publications and given testimony before various government bodies. (McCullough Decl. ¶ 5.) Among other things, you discuss and cite purported support for your views of the risks of COVID-19 vaccines (McCullough Decl. ¶¶ 11-33), and you make a number of statements that echo those you have previously made that are described above. For example, you state that "[t]here is negligible mortality risk [from COVID-19] for adults younger than the age of 50" and that "[t]here is no scientific rationale, medical necessity, or clinical indication for people under age 50 or 60 in general to receive a COVID-19 vaccine" (McCullough Decl. ¶ 8, and p. 18 (Conclusion ¶ 4)), and that "the COVID-19 mass vaccination is associated with at least a massive increase in deaths reported to [the Vaccine Adverse Event Reporting System (VAERS)]" (McCullough Decl. ¶ 23; *see also, e.g.*, McCullough Decl. ¶¶ 24-29 (discussing VAERS and other purported adverse event data in connection with COVID-19 vaccines).

In addition, ABIM received a letter concerning your disciplinary proceeding from United States Senator Ron Johnson, and a letter titled, "Open Letter to the American Board of Medical Specialties and the Federation of State Medical Boards: The destruction of Member Boards' credibility," dated June 26, 2022, with dozens of signatures, "condemn[ing]" the "decision to review" your board certification and others "on the frivolous grounds that they are spreading 'medical misinformation.'"

As set forth in the Notice, ABIM's "False or Inaccurate Medical Information" policy provides:

> While ABIM recognizes the importance of legitimate scientific debate, physicians have an ethical and professional responsibility to provide information that is factual, scientifically grounded, and consensus driven. Providing false or inaccurate information to patients or the public is unprofessional and unethical, and violates the trust that the profession of medicine and the public have in ABIM Board Certification. Therefore, such conduct constitutes grounds for disciplinary sanctions.

(*See* ABIM's Policies & Procedures for Certification (P&P), at p. 19. A printed copy of the P&P was provided with the Notice. The P&P is also available on ABIM's website at http://www.abim.org/about/publications/certification-guides.aspx.)

ABIM's "Disciplinary Sanction and Appeals" policy further provides that ABIM may impose disciplinary sanctions, including the suspension or revocation of board certification or

A MEMBER BOARD OF THE
AMERICAN BOARD OF
MEDICAL SPECIALTIES (ABMS)



American Board
of Internal Medicine®

510 Walnut Street | Suite 1700 | Philadelphia, PA | 19106-3699 | 800.441.2246 | www.abim.org | request@abim.org

Richard J. Baron, MD
*President*
*Chief Executive Officer*

ABIM BOARD OF DIRECTORS

Yul Ejnes, MD
*Chair*

Rajeev Jain, MD
*Chair-Elect*

Robert O. Roswell, MD
*Secretary*

C. Seth Landefeld, MD
*Treasurer*

Vineet Arora, MD

M. Safwan Badr, MD

Roger W. Bush, MD

Carladenise A. Edwards, PhD

Alicia Fernandez, MD

Marianne M. Green, MD

Erica N. Johnson, MD

Megan M. Koepke, MHA

Robert D. Siegel, MD

participation in the certification or Maintenance of Certification processes, invalidation of an examination, or other professional sanctions, if ABIM obtains evidence that in its judgment demonstrates that a candidate or diplomate: (1) has had a license to practice medicine restricted in any jurisdiction, has surrendered a license but continues to hold a valid license in another jurisdiction, or has had one or more licenses suspended or revoked but continues to hold a valid license; (2) engaged in irregular or improper behavior or other misconduct in connection with an ABIM examination; (3) made a material misstatement of fact or omission in connection with ABIM with an application, or misrepresented their board certification or Board Eligibility status with anyone; (4) failed to maintain moral, ethical, or professional behavior satisfactory to ABIM; or (5) engaged in misconduct that adversely affects professional competence or integrity. (P&P at p. 18.)

## Decision

As an initial matter, the CCC reviewed your request to participate or be represented by counsel at the meeting of the CCC. The CCC respectfully refers you to the Notice and the other information about ABIM's Disciplinary Sanction and Appeals process set forth in the P&P. The CCC considers documentary evidence and submissions, and physicians who wish to appeal CCC-recommended sanctions have the right of appeal with a hearing before a panel of physicians. (Notice at p. 3; P&P at p. 18; *see also* Appeal Rights, below.)

In its consideration of this matter, the CCC focused particularly on your statements asserting that the mortality risk of COVID-19 is "negligible" for people who are under the ages of 50 or 60, and that there is no medical reason for that population to receive COVID-19 vaccines. (*See* Background, above.) The CCC found that those statements are not factual, scientifically grounded, or consensus driven. Indeed, according to the CDC, from January 1, 2020 to October 8, 2022, more than 71,000 Americans under the age of 50 have died from COVID-19, representing nearly 8% of all deaths for that age group. Moreover, more than 194,000 Americans aged 50 to 64 have died from COVID-19, representing over 12% of all deaths in that age group during the same time period. *See* Centers for Disease Control and Prevention, COVID-19 deaths by sex, age, state, year, and months, https://data.cdc.gov/widgets/9bhg-hcku?mobile_redirect=true (updated as of Oct. 8, 2022).

The CCC also focused on your statements, purportedly relying on VAERS data, suggesting or otherwise insinuating that COVID-19 vaccines themselves have caused or been associated with tens of thousands of deaths that would not have occurred but for the vaccines. The CCC found that those statements are not supported by VAERS data or any other reliable source. Centers for Disease Control and Prevention, COVID-19, Reported Adverse Events, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/safety-of-vaccines.html (updated Oct. 12, 2022) (reporting that "severe reactions after vaccination are rare," and that "[t]he benefits of COVID-19 vaccination continue to outweigh any potential risks"); World Health Organization, Safety of COVID-19 Vaccines, https://www.who.int/news-room/feature-stories/detail/safety-of-covid-19-vaccines (March 31, 2021) (stating that "[b]illions of people have been safely vaccinated against COVID-19," that "mRNA vaccines [for COVID-19] have been rigorously assessed for safety, and clinical trials have shown that they provide a long-lasting immune response," and that "mRNA vaccines are not live virus vaccines and do not interfere with human DNA"). Your suggestions otherwise misrepresent the facts reported in VAERS. Thus, those statements are likewise not factual, scientifically grounded, or consensus driven.

A MEMBER BOARD OF THE
AMERICAN BOARD OF
MEDICAL SPECIALTIES (ABMS)

American Board
of Internal Medicine®

510 Walnut Street | Suite 1700 | Philadelphia, PA | 19106-3699 | 800.441.2246 | www.abim.org | request@abim.org

Richard J. Baron, MD
President
Chief Executive Officer

ABIM BOARD OF DIRECTORS

Yul Ejnes, MD
Chair

Rajeev Jain, MD
Chair-Elect

Robert O. Roswell, MD
Secretary

C. Seth Landefeld, MD
Treasurer

Vineet Arora, MD

M. Safwan Badr, MD

Roger W. Bush, MD

Carladenise A. Edwards, PhD

Alicia Fernandez, MD

Marianne M. Green, MD

Erica N. Johnson, MD

Megan M. Koepke, MHA

Robert D. Siegel, MD

Nothing in your declaration submitted in response to the Notice, or in the materials submitted to ABIM on your behalf, compels a different conclusion.

For these reasons, the CCC found that you have provided false or inaccurate medical information to the public. By casting doubt on the efficacy of COVID-19 vaccines with such seemingly authoritative statements, made in various official forums and widely reported in various media, your statements pose serious concerns for patient safety. Moreover, they are inimical to the ethics and professionalism standards for board certification.

In light of all the evidence and circumstances, the CCC determined to recommend that your board certifications be revoked.

**Appeal Rights**

The recommended revocation will become the final decision of ABIM unless you submit a request for an appeal to ABIM in writing on or before *November 18, 2022*. If you request an appeal, your appeal would be considered by a panel designated by ABIM's Board of Directors (an "Appeal Panel"), which would hold an in-person or telephonic hearing. Appeal panels consist of three independent physicians designated by the Board of Directors, including at least one member of the Board. They have the discretion to affirm, rescind, or modify a recommended sanction, or impose an alternative sanction.

In advance of each appeal hearing, ABIM will provide you and each member of the Appeal Panel with copies of the documentary record for your sanction and appeal proceeding. In its consideration of an appeal of a recommended sanction, an Appeal Panel is not bound by any technical rules of evidence, and it considers any information timely submitted by or on behalf of the physician at any stage of the proceeding, and any other evidence that it deems appropriate.

At the hearing, you and/or your counsel may present information. Subject to the Appeal Panel's discretion, you and/or your counsel may present witnesses, provided that such witnesses were identified in your request for Appeal Panel review. ABIM's counsel may ask questions of you, your counsel, and any witnesses. The Appeal Panel, in its discretion, determines the duration of the hearing. Appeal hearings are transcribed by a professional reporter.

After reaching a decision, an Appeal Panel notifies the physician of its decision in writing. Such written decision includes the factual basis of the decision and a summary of the reason for the decision. The decision of the majority of an appeal panel is a final decision of ABIM.

If you request a hearing before the Appeal Panel, your written request must:

(i)    state whether you request an in-person or telephonic hearing;

(ii)   state whether you will be represented by counsel at the hearing;

(iii)  identify any witnesses you intend to present on your behalf; and

(iv)   include any further statement or information that you would like the Appeal Panel to consider.

A MEMBER BOARD OF THE
AMERICAN BOARD OF
MEDICAL SPECIALTIES (ABMS)

 American Board
of Internal Medicine®

510 Walnut Street | Suite 1700 | Philadelphia, PA | 19106-3699 | 800.441.2246 | www.abim.org | request@abim.org

Richard J. Baron, MD
*President*
*Chief Executive Officer*

ABIM BOARD OF DIRECTORS

Yul Ejnes, MD
*Chair*

Rajeev Jain, MD
*Chair-Elect*

Robert O. Roswell, MD
*Secretary*

C. Seth Landefeld, MD
*Treasurer*

Vineet Arora, MD

M. Safwan Badr, MD

Roger W. Bush, MD

Carladenise A. Edwards, PhD

Alicia Fernandez, MD

Marianne M. Green, MD

Erica N. Johnson, MD

Megan M. Koepke, MHA

Robert D. Siegel, MD

If you request a hearing, ABIM will provide notice of the members of the panel and the date, time, and if applicable, place of the hearing at least forty-five days in advance of the hearing.

Please address any request for an appeal of the recommended sanction to ABIM at **submissions@abim.org**, and kindly include your six-digit ABIM number.

Please note that a recommended revocation is not final and does not affect your current Board Certification status.

Respectfully,

Furman McDonald

Furman S. McDonald, M.D., M.P.H.
Chair, Credentials and Certification Committee

A MEMBER BOARD OF THE
AMERICAN BOARD OF
MEDICAL SPECIALTIES (ABMS)

## <u>CERTIFICATE OF SERVICE</u>

I, Adam D. Brown, certify that on May 12, 2025, I caused a copy of the foregoing

Defendant's Motion for Summary Judgment and Memorandum of Law in Support Thereof to be

filed electronically, and the same is available for viewing and downloading from the ECF

System by the following counsel of record:

**Kimberly L. Russell, Esq.**
**Daniel Zachariah, Esq.**
Kaplan Stewart Meloff Reiter & Stein, P.C.
Union Meeting Corp. Center
910 Harvest Dr.
P.O. Box 3037
Blue Bell, PA 19422
610-941-2541
krussell@kaplaw.com
dzachariah@kaplaw.com

**Karyn L. White, Esq.**
Pacific Justice Institute
PA/NJ Office P.O. Box 276600
Sacramento, CA 95827
609-335-4833
kwhite@pji.org

*Attorneys for Plaintiff*


_/s/ Adam D. Brown_____
Adam D. Brown, Esquire