## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOSEPH S. AUTERI, M.D.** | : | |
| Plaintiff, | : | No. 2-22-cv-03384 |
| | : | |
| v. | : | |
| | : | |
| **VIA AFFILIATES, d/b/a** | : | |
| **DOYLESTOWN HEALTH** | : | |
| **PHYSICIANS** | : | |
| Defendant. | : | |

## <u>ORDER</u>

**AND NOW**, this _____ day of _____, 20__, upon consideration of Defendant's

Motion for Summary Judgment and Plaintiff's response thereto, it is hereby **ORDERED** that the

Motion is **DENIED**.


**BY THE COURT:**


_____
R. Barclay Surrick, J.

## <u>TABLE OF CONTENTS</u>

Page

I.    INTRODUCTION ........................................................................................ 1

II.    PLAINTIFF'S RESPONSE TO DEFENDANT'S UNDISPUTED MATERIAL
FACTS ...................................................................................................... 3

III.    FACTUAL BACKGROUND ...................................................................... 6

IV.    LEGAL STANDARDS ............................................................................... 9

    A.    Summary Judgment Standard ............................................................ 9

    B.    Title VII Religious Discrimination Standards .................................. 10

        1.    Prima Facie Case for Failure to Accommodate, Employer's Resultant
Burden to Prove Undue Hardship, and Employee's Entitlement to
Show Pretext .................................................................... 11

        2.    Sincerity of Religious Beliefs - Presumption in Favor of Employee... 12

        3.    Employer's Duty to Accommodate Employee Requests for Religious
Exemptions and Assess Individual Accommodations .......................... 14

V.    ARGUMENT ............................................................................................. 15

    A.    Doylestown Health Engaged in Repeated Title VII Violations and
Doylestown Health Cannot Claim That Accommodating Dr. Auteri Would
Result in an Undue Burden Where Doylestown Health Failed to Conduct
Itself in Accordance with Title VII Standards ................................... 15

        1.    Title VII Violation:  Doylestown Health's Improper Requirement to
Submit Documentation from Church Leaders and Follow Church
Doctrine as Announced by Church Leaders to Qualify for Religious
Exemption to the Mandate. ................................................. 16

        2.    Title VII Violation:  Doylestown Health's Failure to Consider More
than One Set of Accommodations as Required by Groff and
Imposition of a Per Se Undue Hardship Standard for Dr. Auteri by
Failing to Discuss ANY Accommodations. .............................. 18

    B.    Doylestown Health Waived Any Challenge to the Sincerity of Dr. Auteri's
Religious Beliefs and If Such a Challenge is Allowed, there are Disputed
Material Facts and Credibility Issues to be Determined By the Fact-Finder at
Trial. ............................................................................................. 21

    C.    Multiple Disputed Issues of Material Fact Exist as to Whether Doylestown
Health Can Prove That the Accommodation of Dr. Auteri's Religious
Exemption Request Would Result in an Undue Hardship to Doylestown
Health. ........................................................................................... 27

    D.    Even If Doylestown Health Could Prove Undue Hardship, There are
Genuine Issues of Material Fact Regarding Whether Doylestown Health's
Claim of Undue Hardship is a Pretext ............................................... 31

VI.    CONCLUSION ......................................................................................... 36

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abercrombie & Fitch*,
575 U.S. 768, 135 S. Ct. 2028, 192 L. Ed. 2d 35 (2015) ......................................12, 14, 19, 31

*Abraham v. Raso*,
183 F.3d 279 (3d Cir. 1999) ...............................................................................................10

*Adickes v. S. H. Kress & Co.*,
398 U.S. 144 (1970) ..............................................................................................................9

*Africa v. Com. of Pa.*,
662 F.2d 1025 (3d Cir. 1981) ..............................................................................................13

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ...........................................................................................................9, 10

*Atkinson v. LaFayette Coll.*,
460 F.3d 447 (3d Cir. 2006) ...............................................................................................11

*Bushra v. Main Line Health, Inc.*,
No. 24-1117, 2025 WL 1078135 (3d Cir. Apr. 10, 2025) ...............................................2, 27

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ..............................................................................................................9

*Chuang v. Univ. of Cal. Davis*,
225 F.3d 1115 (9th Cir. 2000) ......................................................................................12, 32

*Davis v. Team Elec. Co.*,
520 F.3d 1080 (9th Cir. 2008) ............................................................................................12

*Doe v. San Diego Unified Sch. Dist.*,
19 F.4th 1173 (9th Cir. 2021) .......................................................................................13, 27

*EEOC v. GEO Grp., Inc.*,
616 F.3d 265 (3d Cir. 2010) ...............................................................................................11

*Fallon v. Mercy Cath. Med. Ctr. Of Se.Pa.*,
877 F.3d 487 (3d Cir. 2017) ..........................................................................................11, 18

*Fuentes v. Perskie*,
32 F.3d 759 (3d Cir. 1994) ..................................................................................................12

ii

*Glover v. The Children's Hospital of Philadelphia*,
2024 WL 290421 ................................................................................12, 14, 24

*Gray v. Main Line Hospitals, Inc.*,
717 F. Supp. 3d 437 (E.D. Pa. 2024) ...................................................13, 15, 18, 31

*Groff v. DeJoy*,
600 U.S. 447 (2023) ........................................................3, 12, 14, 19, 20, 31

*Halsey v. Pfeiffer*,
750 F.3d 273 (3d Cir. 2014) ...........................................................................10

*Hedum v. Starbucks Corp.*,
546 F. Supp. 2d 1017 (D. Ore. 2008) ...........................................................12, 32

*Iadimarco v. Runyon*,
190 F.3d 151 (3d Cir. 1999) ...........................................................................10

*Keene v. City & Cty.. of San Francisco*,
2023 U.S. App. Lexis 11807 (9th Cir. May 15, 2023) ..............................................32

*Makhzoomi v. Southwest Airlines Co.*,
419 F. Supp. 3d 1136 (N.D. Cal. 2019) ...........................................................12

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973) ........................................................................................11

*Passarella v. Aspirus, Inc.*,
108 F.4th 1005 (7th Cir. 2024) ....................................................................24, 27

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
592 U.S. 14, 141 S. Ct. 63, 208 L. Ed. 2d 206 (2020) ...........................................10

*Shields v. Main Line Hosp., Inc.*,
700 F. Supp.3d 265 (U.S.D.C. E.D. Pa. 2023) .....................................12, 13, 15, 18

*St. Mary's Honor Ctr. v. Hicks*,
509 U.S. 502 (1993) ........................................................................................10

*Thomas v. Review Board of Indiana Employment Security Division*,
450 U.S. 707 (1981) ...................................................................................13, 16

*U.S. Postal Serv. Bd. of Governors v. Aikens*,
460 U.S. 711, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983) ........................................10

*United States v. Seeger*,
380 U.S. 163 (1965) ...................................................................................12, 13, 27

**Statutes**

42 U.S.C. § 2000e-2(a)(1)..........................................................................................10

42 U.S.C. § 2000e(j) ...................................................................................................10

Civil Rights Act of 1964 Title VII
...............................2, 3, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 24, 27, 29, 30, 31

**Other Authorities**

EEOC Compliance Manual § 12-IV(A)(2) (Jan. 15, 2021)............................................18

Federal Rule of Civil Procedure 56(a) .........................................................................9

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOSEPH S. AUTERI, M.D.** | : | |
| Plaintiff, | : | No. 2:22-cv-03384 |
| | : | |
| v. | : | |
| | : | |
| **VIA AFFILIATES, d/b/a** | : | |
| **DOYLESTOWN HEALTH** | : | |
| **PHYSICIANS** | : | |
| Defendant. | : | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

Plaintiff, by his undersigned counsel, hereby responds to Defendant's Motion for Summary Judgment and requests that the Motion be denied for the reasons set forth in the attached Memorandum of Law and exhibits thereto, incorporated herein by reference.

Respectfully submitted,

**KAPLIN STEWART MELOFF REITER & STEIN, P.C.**

**By:** _____
Kimberly L. Russell, Esquire
Daniel M. Zachariah, Esquire
910 Harvest Drive
P.O. Box 3037
Blue Bell, PA 19422
(610) 941-2541 (phone)
krussell@kaplaw.com
dzachariah@kaplaw.com

**PACIFIC JUSTICE INSTITUTE**

**By:** */s/ Karyn L. White, Esquire* _____
Karyn L. White, Esquire
PA/NJ Office P.O. Box 276600
Sacramento, CA 95827
(609) 335-4833 (phone)
kwhite@pji.org

Attorneys for Plaintiff

**Dated:** June 12, 2025

1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOSEPH S. AUTERI, M.D.** | : | |
| Plaintiff, | : | No. 2:22-cv-03384 |
| | : | |
| v. | : | |
| | : | |
| **VIA AFFILIATES, d/b/a** | : | |
| **DOYLESTOWN HEALTH** | : | |
| **PHYSICIANS** | : | |
| Defendant. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S RESPONSE TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

I.    **INTRODUCTION**

This case involves an employer which targeted a high-profile employee in a pressure campaign aimed at forcing the employee to abandon his religious beliefs in favor of the employer's secular beliefs.

First, Defendant's assertion that Dr. Auteri's beliefs "are not religious at all" is not an argument to be considered by this Court because Defendant waived any such attack when its written denial of Dr. Auteri's request for religious accommodation failed to assert such a claim. Should this Court allow the issue, it is clear that Defendant is conflating Dr. Auteri's statements made as a physician on the Medical Executive Committee (**"MEC"**) regarding the safety and efficacy of the COVID-19 vaccine and Dr. Auteri's stated sincere religious beliefs which he explained and provided to Defendant in Dr. Auteri's written request for a religious accommodation. As a physician on the MEC, Dr. Auteri was required on multiple occasions to express his views on the propriety of the COVID-19 vaccine mandate as implemented by the Defendant. Dr. Auteri asserts that those statements are not for consideration in determining whether Dr. Auteri sincerely held religious beliefs regarding the COVID-19 vaccine which involved fundamental or ultimate questions about deep and imponderable matters. Instead, the trier

1

of fact must only consider the written statements of Dr. Auteri in his written request for a religious accommodation to determine if Dr. Auteri has adequately established, under the law, sincerely held religious beliefs which prevented him from taking the COVID-19 vaccine. Summary judgment on this issue is improper.

Second, as more fully argued below, Defendant's reliance on *Bushra v. Main Line Health* is misplaced. Defendant's expert has opined that exempting Dr. Auteri from the COVID-19 vaccine mandate would cause Defendant an undue burden; however, that assertion is contradicted by Dr. Auteri's expert, Dr. Peter McCullough. In *Bushra*, the Court explicitly stated that the hospital's expert testified that alternative infection control strategies, such as frequent testing and masking, were insufficient to prevent transmission. Because the *plaintiff doctor did not present any evidence in rebuttal*, the Court found that "substantial, *undisputed* evidence establishes undue hardship." This case is factually distinguishable because Dr. Auteri will present expert testimony disputing that Defendant would have suffered an undue hardship if it had accommodated Dr. Auteri's religious accommodation request. Those disputed facts mandate denial of summary judgment.

Next, Dr. Auteri will establish that there are genuine issues of material fact regarding Defendant's assertion that the undue burden based on safety was a mere pretext. The evidence will establish that many of the actions, or lack of actions, by the Defendant regarding patient safety from COVID-19 did not keep the patients safe at all. Defendant's claim of prioritizing patient safety as the reason to deny Dr. Auteri's religious accommodation request is a disputed fact that a trier of fact must decide.

There also are disputed material facts regarding Defendant's refusal to follow the dictates of Title VII of the Civil Rights Act (**"Title VII"**) in reviewing Dr. Auteri's religious

accommodation request. The United States Supreme Court has made clear in the *Groff v. DeJoy* case discussed below that Title VII requires an employer to reasonably accommodate an employee's practice of religion, not merely assess the reasonableness of a particular possible accommodation or accommodations." Deposition testimony reveals that every single Doylestown Health agent who spoke to Dr. Auteri about Doylestown Health's COVID-19 vaccine mandate, without exception, attempted to pressure Dr. Auteri to take the COVID-19 vaccine; however, not one of those agents discussed Dr. Auteri's request for a religious exemption or how that exemption could be accommodated. Instead, Doylestown Health engaged in an extraordinary pressure campaign, to which Doylestown Health officials testified, which is uncontested, and which demonstrated that Doylestown Health never had any intention of "assess[ing] the reasonableness of a particular possible accommodation or accommodations" with respect to Dr. Auteri's religious accommodation request. The trier of fact in this matter will decide if Defendant's actions violated the dictates of Title VII, as Dr. Auteri asserts and as Defendant denies.

The numerous disputed facts in this matter mandate the denial of Defendant's Motion for Summary Judgment.

## II.    PLAINTIFF'S RESPONSE TO DEFENDANT'S UNDISPUTED MATERIAL FACTS

In its Motion, Defendant proffers the expert opinions of Dr. Daniel Salmon, Ph.D regarding the COVID-19 pandemic's impact on medical facilities' operations. Those opinions are disputed by Dr. Peter McCullough, Dr. Auteri's expert. Thus, Defendant's assertions regarding the specifics of the operational impact, how hospitals should have addressed the dangers of the pandemic, and the role that the COVID-19 vaccine played in solving those challenges are disputed material facts. See Exhibit "20," Dr. McCullough's report. Dr. McCullough disputes Dr. Salmon's broad assertion: "[s]imply put, the greater number of religious exemptions, the higher

the risk of COVID-19 infections and transmission." Dr. Auteri's expert disputes this and argues that no safety protocol could prevent all transmissions of the virus. There were other actions Defendant could have taken to protect patient and staff safety without violating Dr. Auteri's religious convictions. See Exhibit 20, Dr. McCullough's report.

Defendant asserts that it was "appropriate based on scientific evidence to make distinctions between vulnerable and non-vulnerable patient populations for purposes of accommodation requests." Dr. Auteri asserts that this was an arbitrary delineation, supporting this assertion with deposition testimony. Defendant repeatedly stated that patient safety was its top concern, but that stated primary goal of "patient safety" was undermined when Defendant prioritized safety for "vulnerable" patients, but not for "non-vulnerable" patients. See Hebel Dep. at p. 17, l. 8-17.[1] The fact finder will be required to determine if Defendant's prioritization of different patients' safety concerns was a legitimate consideration in denying Dr. Auteri's religious accommodation request.

Defendant next challenged Dr. Auteri's asserted religious beliefs regarding the vaccine and argues that the COVID-19 vaccines could not alter one's DNA. Defendant's attempt to limit Dr. Auteri's religious objection to the COVID-19 vaccine as only an objection to "altering" his DNA is a mischaracterization of Dr. Auteri's accommodation submission. Dr. Auteri's explanation in his request speaks for itself. Dr. Auteri's concerns that the COVID-19 vaccine was gene therapy are confirmed and supported by his expert. See Exhibit 20, Dr. McCullough's report. As stated above, Dr. Auteri asserts that Defendant waived the issue of challenging Dr. Auteri's religious beliefs. However, if the Court permits the issue to be heard, it will be for the trier of fact to determine if Dr. Auteri's written request sufficiently expresses his sincerely held religious beliefs

---

[1] References are to the transcript of the deposition of Vice President of Human Resources Barbara Hebel, the cited portions of which are attached hereto as **Exhibit "12."**

that prevented him from taking the COVID-19 vaccine.  See Gray v. Main Line Hospitals, Inc., 717 F. Supp. 3d 437, 448 (E.D. Pa. 2024).

In its Motion, it is clear that Defendant strongly relies upon Dr. Salmon's opinion that, "although it was possible for vaccinated workers to transmit the virus, it was also widely accepted in the scientific community that vaccination was the most effective way to protect the health and safety of patients and staff."  Dr. Auteri and the supporting evidence dispute this statement in several different ways.  First, Dr. Auteri's expert challenges the characterization of "most effective," and argues that other measures, if done properly and consistently, are also "effective" at protecting the health and safety of patients and staff. See Exhibit 20, McCullough report. Second, the deposition testimony revealed that Defendant's actions, or more accurately, the lack of action, regarding vaccinated individuals who could transmit the virus belied their assertion that "patient safety" was a top priority.  Furthermore, Defendant's actions toward Dr. Auteri, including their refusal to even discuss other possible accommodations, indicate that Defendant's assertion of an undue burden was a pretext based on three facts: (1) Defendant had an animus toward Dr. Auteri's religious convictions; (2) Dr. Auteri refused to comply with Doylestown Health's Chief Executive Officer's request that Dr. Auteri take the COVID-19 vaccine and then tell others that Dr. Auteri did so to make others "feel more comfortable" taking the vaccine, and Dr. Auteri's known "position" was making it "nearly impossible" for Dr. Auteri to stay at Doylestown Health; and (3) one of Defendant's most influential and wealthy donors, Alex Gorsky, who at the time was CEO of COVID-19 vaccine manufacturer Johnson & Johnson, could not convince Dr. Auteri to take the vaccine.  Defendant did everything in its power to influence Dr. Auteri, one of Defendant's most prestigious doctors, to take the COVID-19 vaccine to show other employees that Dr. Auteri

"towed the line" and to save face with Doylestown Health's wealthy donor. Dr. Auteri refused and was summarily fired without any accommodation discussions.

Those disputed facts must be determined by a trier of fact. Summary judgment is not warranted.

## III.    FACTUAL BACKGROUND

The record evidence and facts are discussed in detail as applicable below, but the overarching factual background, alleged in more detail in the Second Amended Complaint, is as follows:

Dr. Auteri is a cardiothoracic surgeon licensed to practice medicine in the Commonwealth of Pennsylvania and, until his wrongful termination, was the Chief of Cardiovascular Surgery at Doylestown Health and the Medical Director of the Doylestown Heart Institute. S.A.C. at 10.[2]

Doylestown Health employed Dr. Auteri pursuant to an Employment Agreement effective April 1, 2012, which Employment Agreement was extended and amended during Dr. Auteri's employment. A true and correct copy of the pertinent portions of the Employment Agreement is attached hereto as **Exhibit "1."** S.A.C. at 13. On or about December 17, 2019, Doylestown Health and Dr. Auteri executed an "Amendment of Employment Agreement Between VIA Affiliates, Inc. and Joseph S. Auteri, M.D.," pursuant to which Doylestown Health extended the term of Dr. Auteri's employment through December 31, 2024, with an automatic two year renewal (as amended, the **"Employment Agreement"**). A true and correct copy of the pertinent portions of the Employment Agreement as amended is attached hereto as **Exhibit "2."** S.A.C. at 14.

Dr. Auteri performed services according to the terms of the Employment Agreement throughout the entirety of the COVID-19 pandemic, treating patients regardless of the patients'

---

[2] References are to paragraphs in the Second Amended Complaint.

COVID-19 status, and whether or not Dr. Auteri was aware of the patients' COVID-19 status. S.A.C. at 19, 22. Dr. Auteri contracted COVID-19 in May 2021 while treating patients and followed the isolation requirements of Doylestown Health before returning to work. S.A.C. at 23.

In early 2021, the COVID-19 vaccines became available after those vaccines became widely available in the summer of 2021, Doylestown Health began to consider the imposition of a COVID-19 vaccine mandate. S.A.C. at 24-25. As a member of Doylestown Health's Medical Executive Committee (MEC) and as a licensed physician who studied health data as part of his daily duties at Doylestown Health, Dr. Auteri studied the data regarding the efficacy of the COVID-19 vaccines and the side effects thereof, as well as statistics surrounding the duration and efficacy of those who had natural immunity from a prior COVID-19 infection. S.A.C. at 26. After studying the data, Dr. Auteri voiced his clinical concerns to the MEC about the imposition of a COVID-19 vaccine mandate, instead supporting voluntary vaccination and enhanced safety precautions for all employees, as Doylestown Health had done throughout the pandemic. S.A.C. at 30.

Despite Dr. Auteri's concerns, Doylestown Health, through the MEC, imposed a COVID-19 vaccine mandate on all Doylestown Health employees on or about August 6, 2021 (the **"Mandate"**)[3]. S.A.C. at 38.

On October 11, 2021, Dr. Auteri submitted two written requests for exemption from the Mandate, one based on a medical exemption and the other based on a religious exemption (the **"First Exemption Requests"**). True and correct copies of the First Exemption Requests are attached hereto as **Exhibit "3."** S.A.C. at 58. On October 11, 2021, the same day that Dr. Auteri

---

[3] Ultimately, the Centers for Medicare and Medicaid Services imposed a COVID-19 vaccine mandate for all healthcare providers receiving Medicare/Medicaid funds (the **"CMS Mandate"**), which included Doylestown Health and Doylestown Hospital. The CMS Mandate required the provision of religious and medical exemptions such as those Dr. Auteri sought. The CMS Mandate does not alter Doylestown Health's obligations as set forth herein.

submitted the First Exemption Requests, Doylestown Health suspended Dr. Auteri for 30 days because Dr. Auteri had not submitted proof that Dr. Auteri had complied with the Mandate (the **"Suspension Letter"**). A true and correct copy of the Suspension Letter is attached hereto as **Exhibit "4."** S.A.C. at 73. Two days after summarily suspending Dr. Auteri, on October 13, 2021, Doylestown Health denied the First Exemption Requests (the **"First Exemption Denial"**) without discussing with Dr. Auteri how Doylestown Health could accommodate Dr. Auteri's First Exemption Requests. A true and correct copy of the First Exemption Denial is attached hereto as **Exhibit "5."** S.A.C. at 78.

By letter dated October 22, 2021, Dr. Auteri, through his legal counsel, submitted to Doylestown Health another request for a medical exemption, repeated the request for a religious exemption, and proposed specific reasonable accommodations (the **"Second Exemption Request"**). A true and correct copy of the Second Exemption Request without enclosures is attached hereto as **Exhibit "6."** S.A.C. at 85. The First Exemption Request and the Second Exemption Request are sometimes hereinafter collectively referred to as the **"Exemption Requests."**

In response to Dr. Auteri's Second Exemption Request, by letter dated November 9, 2021, Doylestown Health, through its counsel, summarily denied Dr. Auteri's Request (the **"Second Exemption Denial"**). A true and correct copy of the Second Exemption Denial is attached hereto as **Exhibit "7."** S.A.C. at 102. Following the Second Exemption Denial, Doylestown Health caused Doylestown Hospital to terminate Dr. Auteri's medical privileges at Doylestown Hospital by letter dated November 11, 2021, authored by Elinor Pernitsky, Director, Medical Staff Services. A true and correct copy of Ms. Pernitsky's November 11, 2021 letter is attached hereto as **Exhibit "8."** S.A.C. at 124.

Doylestown Health unlawfully terminated Dr. Auteri's employment by letter dated November 18, 2021 authored by John B. Reiss, Vice President, General Counsel, and Chief Compliance Officer of Doylestown Health.  A true and correct copy of Mr. Reiss' November 18, 2021 letter is attached hereto as **Exhibit "9."**  S.A.C. 127.

## IV.   LEGAL STANDARDS

### A.   Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Supreme Court has explained, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. "As the moving party, respondent had the burden of showing the absence of a genuine issue as to any material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).

In evaluating a motion for summary judgment, the court must view all evidence in the light most favorable to the non-moving party. As the Supreme Court has emphasized, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes*, 398 U.S. at 158-159).

Critically, at the summary judgment stage, the court's role is limited. "At the summary

judgment stage, the trial judge's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; see also *Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014); *Abraham v. Raso,* 183 F.3d 279, 287 (3d Cir. 1999).

The inherently factual nature of discrimination claims renders them unsuitable for summary disposition. *Iadimarco v. Runyon*, 190 F.3d 151, 161 (3d Cir. 1999); see also *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S. Ct. 1478, 1482, 75 L. Ed. 2d 403 (1983); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

### B.    Title VII Religious Discrimination Standards

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's...religion." 42 U.S.C. § 2000e-2(a)(1). The statute defines "religion" to include all aspects of religious observance and practice, as well as belief, and requires accommodation unless the employer demonstrates that the employer is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business. 42 U.S.C. § 2000e(j).

An employer's duty to accommodate religious exemption requests was not shelved during the COVID-19 pandemic; to the contrary, "even in a pandemic," Title VII, much like the first amendment "cannot be put away and forgotten." *Roman Cath. Diocese of Brooklyn v. Cuomo,* 592 U.S. 14, 19, 141 S. Ct. 63, 68, 208 L. Ed. 2d 206 (2020). The COVID-19 pandemic did not give employers "carte blanche" to ignore Title VII's protections. *Id.*

1.     **Prima Facie Case for Failure to Accommodate, Employer's Resultant Burden to Prove Undue Hardship, and Employee's Entitlement to Show Pretext**

To establish a prima facie case of failure to accommodate a religious practice and corresponding exemption request from a workplace rule under Title VII, a plaintiff must demonstrate that (1) plaintiff holds a sincere religious belief which conflicts with a job requirement, (2) plaintiff informed plaintiff's employer of the conflict, and (3) the employee was disciplined for failing to comply with the conflicting workplace rule requirement. *EEOC v. GEO Grp., Inc.*, 616 F.3d 265, 271 (3d Cir. 2010); see also *Fallon v. Mercy Cath. Med. Ctr. of S.E. Pa.*, 877 F.3d 487, 490 (3d Cir. 2017). Claims under the Pennsylvania Human Relations Act (**"PHRA"**) are evaluated in the same manner and interpreted co-extensively with Title VII claims.[4] *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454, n. 6 (3d Cir. 2006).

Once the plaintiff makes the requisite prima facie showing, the burden shifts to the employer to demonstrate that an accommodation of the plaintiff's request for exemption from a workplace requirement would result in an undue hardship for the employer. *EEOC v. GEO Grp., Inc.*, 616 F.3d at 271. An employer may claim a safety interest in implementing a workplace rule, but merely reciting that interest does not establish undue hardship and a factual review of the specific circumstances at issue must occur. *Smith v. City of Atlantic* City, 2025 WL 1537927 at *7 (3d Cir. May 30, 2025)(vacating summary judgment where there was contradictory evidence of the employer's claimed undue hardship).

Because of an employer's potential to use "undue hardship" to conceal discriminatory motives, courts allow plaintiff employees to demonstrate that the employer's articulated basis of undue hardship was "pretextual." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973);

---

[4] The Second Amended Complaint contains two counts: Count I (Title VII discrimination); and Count II (PHRA discrimination).

*Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1123-24 (9th Cir. 2000). Stated safety concerns may be a pretext for discrimination, particularly during a pandemic. See, e.g., *Makhzoomi v. Southwest Airlines Co.*, 419 F. Supp. 3d 1136, 1155 (N.D. Cal. 2019). An employee can overcome an employer's showing of undue burden by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation of undue hardship is not worthy of credence. *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008). Likewise, the Third Circuit has determined that whether discriminatory animus motivated an employer is a factual dispute in Title VII cases. *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994).

In Title VII "failure to accommodate" cases, the employer's motives for failing to grant an accommodation are relevant. See *Abercrombie & Fitch*, 575 U.S. 768, 135 S. Ct. 2028, 2030, 192 L. Ed. 2d 35 (2015). As the Supreme Court has stated, "if an employer's desire to avoid the prospective accommodation is a motivating factor in [the employer's] decision, the employer violates Title VII." *Id.* Hardships which are attributable to an employer's animosity toward religion, even religion in general, or to accommodating religious practice in general, cannot be considered undue. *Groff*, 600 U.S. at 472. To defeat a summary judgment motion, a plaintiff needs only to show that a fact-finder could conclude that discrimination was the real reason for the defendant-employer's actions. *Hedum v. Starbucks Corp.*, 546 F. Supp. 2d 1017, 1025 (D. Ore. 2008).

## 2.    Sincerity of Religious Beliefs - Presumption in Favor of Employee

Whether a belief is sincerely held is a question of fact. *United States v. Seeger*, 380 U.S. 163, 185 (1965); *Glover v. The Children's Hospital of Philadelphia*, 2024 WL 290421 at *10-11 (E.D. Pa. May 29, 2025)(copy attached hereto as **Exhibit "10"**); *Shields v. Main Line Hosp., Inc.*, 700 F. Supp.3d 265, 270-71 (E.D. Pa. 2023).

12

"The resolution of [whether a belief is religious] is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others to merit First Amendment protection." *Thomas v. Review Board of Indiana Employment Security Division*, 450 U.S. 707, 714 (1981). An employee's religious beliefs are protected, regardless of whether the employee's pastor agrees with them. *Shields*, 700 F. Supp. 3d at 273. It is not the place of a Court to question the legitimacy of a plaintiff's religious beliefs about the COVID-19 vaccine under Title VII law. *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1176, n. 3 (9th Cir. 2021) (citing *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018)).

The Third Circuit Court of Appeals in *Africa v. Com. of Pa.*, 662 F.2d 1025, 1032 (3d Cir. 1981) established a three-part test for determining whether a claimed belief system is "religious." The Court will assess whether the belief:

- addresses fundamental and ultimate questions having to do with deep, imponderable matters;

- is comprehensive in nature; and

- presents formal and external signs.

*Id.*

To the extent that a party, such as an employer, seeks to inquire whether an employee's religious belief system is a "religion" or a sincerely held belief is "religious," such an inquiry is axiomatically fact-based and cannot be determined on summary judgment. See *Seeger*, 380 U.S. at 163, 185. Where there is a dispute as to whether an employee's cited religious basis for an exemption request is sufficiently grounded in religious belief to be afforded Title VII protection, that dispute relates to a genuine issue of material fact which precludes summary judgment. See *Gray v. Main Line Hospitals, Inc.*, 717 F. Supp. 3d 437, 448 (E.D. Pa. 2024). Assessments as to

13

whether any additional, nonreligious reasons for seeking an accommodation of a workplace requirement "nullify" the religious bases for seeking the accommodation is a question of credibility for a jury to decide and not appropriate for disposition on summary judgment. *Glover*, 2024 WL 290421 at *10-11.

### 3.    Employer's Duty to Accommodate Employee Requests for Religious Exemptions and Assess Individual Accommodations

The United States Supreme Court has unfailingly required employers to accommodate employee requests for religious exemptions to workplace rules. The Supreme Court's decision in *Abercrombie & Fitch* fundamentally clarified an employer's obligations regarding religious accommodation. The Court held that "an employer may not make an applicant's religious practice, confirmed or otherwise, a factor in employment decisions." 575 U.S. 768, 773 (2015).

In *Groff v. DeJoy*, 600 U.S. 447, 473 (2023), the Supreme Court held that Title VII imposes an affirmative duty on employers to provide reasonable accommodations for religious practices. Employers may not simply establish a "standard" accommodation for a religious exemption request, but must evaluate specific accommodation alternatives in accordance with the employee's religious practice. See *Id.* The Supreme Court in *Groff* held that "Title VII requires that an employer reasonably accommodate an employee's practice of religion, not merely that it assess the reasonableness of a particular possible accommodation or accommodations." *Id.* The *Groff* Court also held that employers who fail to consider more than one set of accommodations of a particular religious exemption request violate Title VII. See *Id.* "Consideration of other options," not just the rejection of one particular possible accommodation, is required before an employer can claim an "undue hardship" in accommodating a religious exemption request. *Id.* "Faced with an accommodation request like Groff's, it would not be enough for an employer to conclude that forcing other employees to work overtime would constitute an undue hardship. Consideration of

14

other options, such as voluntary shift swapping, would also be necessary." *Id.* Other judges of this Court have followed the "context-specific inquiry" prior to the assertion of an undue hardship. *Glover*, 2024 WL 290421 at *10-11; *Gray v. Main Line Hospitals, Inc.*, 717 F. Supp. 3d 437, 448 (2024).

Under the legal standards set forth above, it is clear that multiple genuine issues of material fact exist as to (1) Doylestown Health's violations of Title VII, (2) whether Doylestown Health waived any challenge to the sincerity of Dr. Auteri's religious beliefs and whether there otherwise is a genuine issue of material fact as to the sincerity of Dr. Auteri's religious beliefs, (3) whether Doylestown Health can demonstrate an undue hardship resulting from accommodating Dr. Auteri's request for a religious exemption from the Mandate, and (4) whether Doylestown Health's claimed reasons for undue hardship were pretextual. Dr. Auteri considers each area of fact issues in turn.

## V.    ARGUMENT

### A.    Doylestown Health Engaged in Repeated Title VII Violations and Doylestown Health Cannot Claim That Accommodating Dr. Auteri Would Result in an Undue Burden Where Doylestown Health Failed to Conduct Itself in Accordance with Title VII Standards

The discovery record reveals that Doylestown Health acted with discriminatory animus toward Dr. Auteri and others asserting Christian beliefs in connection with requests for religious exemptions by imposing burdens greater than those permitted by Title VII and improperly requiring proof of "correct" religious beliefs authorized by a pastor or Church leader, and stating that once the Pope or another Church leader stated publicly that the COVID-19 vaccines were acceptable to take, the employees would have no legitimate basis for a religious objection to those vaccines. An employee's religious beliefs are protected, regardless of whether the employee's pastor agrees with them. *Shields*, 700 F. Supp. 3d at 273. As the Supreme Court has held, the

resolution of whether a belief is religious does not turn on judicial or third-party perception.  See

*Thomas v. Review Bd.*, 450 U.S. at 714.

          **1.**       **Title VII Violation:  Doylestown Health's Improper Requirement to Submit Documentation from Church Leaders and Follow Church Doctrine as Announced by Church Leaders to Qualify for Religious Exemption to the Mandate.**

The following facts revealed in discovery reveal Doylestown Health's repeated Title VII

violations:

- Bridget McEnrue, a member of Doylestown Health's Infection Prevention team who was involved in determining the Mandate and Doylestown Health policy regarding the COVID-19 vaccines and exemptions, stated in an email to other Doylestown Health staff in an email entitled "vaccine exemptions" that "Pfizer and Moderna do not use voluntarily aborted fetuses to manufacture vaccine <u>thus making it OK for those associates of the Catholic religion to receive.</u>"  That Doylestown Health Infection Prevention representative stated that "[m]oving forward, I recommend we do not hire any associate who is not vaccinated or not willing to be vaccinated." D995 (emphasis added).[5]  Ms. McEnrue was one of the Doylestown Health clinicians who determined where clinicians who were not vaccinated, such as Dr. Auteri, could work.  Hebel Dep. at p. 27, l. 11 – p. 28, l. 20.

- Doylestown Health Chief Medical Officer Scott Levy, M.D. stated in an email that Doylestown Health would "accept appropriate religious or medical exemptions – don't know of any, <u>however.</u>"  D1147 (emphasis added).

- Dr. Levy and Ms. McEnrue, two of the Doylestown Health representatives charged with developing the Mandate and exemption standards expressed multiple times in emails with Doylestown Health associates that "I will be very surprised to find a legitimate declination given between the available vaccines" (Levy)… the Pope took the COVID-19 vaccine so the Catholic church "may not endorse but is not against" the COVID-19 vaccine (McEnrue)… and "I know I will be involved in these reviews;… [t]he folks I know who are knowledgeable in this space (both within our organization and beyond) have yet to see a valid request."  (Levy) D1214.

- Elinor Pernitsky, Director of Medical Staff Services, in providing Doylestown Health employees with information on the Mandate, stated that employees

---

[5] Documents with Bates label numbers beginning in "D" are documents produced by Defendant Doylestown Health and true and correct copies are attached collectively hereto as Exhibit "11."

seeking religious exemption requests must "submit reason (justification) <u>and</u> <u>supporting documentation</u> by August 27, 2021." D1396.

- Christine Roussel, Senior Executive Director of Pharmacy, Laboratory, and Medical Research, compiled opinion pieces on Church views about the vaccine in an email to Barbara Hebel, Vice President of Human Resources, stating that there is no "sufficient moral reason" for Catholics to claim an exemption to the Mandate. D1409-1410.

- Ms. Hebel was asked to review a COVID-19 pre-employment vaccination form. That form notified candidates of the Mandate but contained language about seeking exemptions. Ms. Hebel revised the form and eliminated the language permitting exemptions, then returned the revised form to the Doylestown Health recruiting employee for use. Ms. Hebel eliminated that exemption policy language on August 17, 2021, and stated in an email regarding the revised form that "I rewrote some things… <u>We are [not] hiring anyone that</u> <u>won't get the vaccine… so I took out the exemption.</u>" D1421-1423.

- In a "Town Hall" for Doylestown Health employees on or about August 19, 2021, Doylestown Health representatives again stated in a series of Frequently Asked Questions that employees seeking a religious exemption to the Mandate must "include a note from your… clergy." D 1453.

- Dr. Levy again referenced the need to have a letter from clergy in an email to Doylestown Health representatives on August 23, 2021: "[w]ith the recent language by the [C]atholic church, bishops, and Lady of Mount Carmel – It is the moral obligation of Catholics to get vaccinated, and the church would not provide any letters supporting a religious waiver." D 1473.

- Barbara Hebel, the Vice President of Human Resources for Doylestown Health, and Scott Levy, M.D., the Chief Medical Officer who both reviewed religious exemption requests, required that individuals seeking a religious exemption provide a letter from the individual's religious leader demonstrating need for exemption, all in violation of Title VII:
  o Hebel on August 9, 2021, three days after the issuance of the Mandate regarding exemption requests: "Not to worry – we will review each and every one and appropriate document from either the physician or the religious doctrine must be provided." D1217.
  o Levy on August 9, 2021 regarding exemptions: "Will review each individually, however a note from a physician <u>or religious person is in</u> <u>itself not adequate unless the justification is merited.</u>" D1217.
  o Levy on August 23, 2021, regarding religious exemptions to the Mandate: "We require the head of the church/ministry/etc (sic) to provide documentation as to why the vaccine is prohibited/forbidden by the church in question." D1474 .

17

o Doylestown Health's "Application for Religious Exemption for COVID-19 Vaccine" form expressly violates Title VII because that form requires that an employee seeking a religious exemption from the Mandate provide "<u>documentation from your religious</u> or spiritual <u>leader</u> of the religion's doctrine supporting the religious beliefs that are contrary to the COVID-19 vaccine." D1245-1246.  That form also required the employee seeking a religious exemption to list the name of their religious affiliation, the name of their religious leader, and provide a phone number for that leader.

Each of the above statements and requirements violates Title VII.  An employee's religious beliefs are protected, regardless of whether the employee's pastor agrees with them.  *Shields*, 700 F. Supp. 3d at 273.   According to the EEOC Compliance Manual, while "written materials or the employee's own first-hand explanation may be sufficient to alleviate the employer's doubts about the sincerity or religious nature of the employee's professed belief," such documentation "does not have to come from a clergy member or fellow congregant." EEOC Compliance Manual § 12-IV(A)(2) (Jan. 15, 2021); <u>see</u> <u>also</u> *Gray*, 717 F. Supp.3d at 447; *Shields*, 700 F. Supp.3d at 273. A letter from a clergyperson is not the only way to demonstrate that one holds a religious belief.  *U.S. Equal Emp. Opportunity Comm'n v. Ctr. One, LLC*, 2024 WL 379956, at *2 (3d Cir. Feb. 1, 2024); *Fallon v. Mercy Cath. Med. Ctr. of Se. Pennsylvania*, 877 F.3d 487, 493 (3d Cir. 2017).

The above undisputed Title VII violations show that Defendant imposed improper burdens on Dr. Auteri (and other Doylestown Health employees) who sought religious exemptions to the Mandate.  Doylestown Health's admitted Title VII violations should foreclose an undue hardship inquiry and preclude summary judgment.  <u>See</u> *Groff*, 600 U.S. at 473.

    **2.**    <u>**Title VII Violation:  Doylestown Health's Failure to Consider More than One Set of Accommodations as Required by Groff and Imposition of a Per Se Undue Hardship Standard for Dr. Auteri by Failing to Discuss ANY Accommodations.**</u>

The *Groff* Court held that employers who fail to consider more than one set of accommodations of a particular religious exemption request violate Title VII. *Groff*, 600 U.S. at 473. "Consideration of other options," not just the rejection of one particular possible accommodation, is required before an employer can claim an "undue hardship" in accommodating a religious exemption request. *Id.* An employer may also not avoid making an accommodation where the employer has reason to know, even if it is an "unsubstantiated suspicion," that an accommodation is needed. *Abercrombie & Fitch*, 575 U.S. at 773.

Doylestown Health's representatives testified that Doylestown Health effectively created a "per se" undue hardship standard for Dr. Auteri's request for a religious exemption in violation of Title VII as affirmed in *Groff*, failed and refused to discuss any accommodations with Dr. Auteri as required by *Groff*, and avoided making accommodations where Doylestown Health knew that Dr. Auteri required an accommodation but did not specifically ask for one in violation of *Abercrombie & Fitch*:

- Doylestown Health refused to discuss Dr. Auteri's exemption requests at all, despite having a set of accommodations that Doylestown Health had made for other patient-facing employees. Hebel Dep. at p. 40, l. 4 – p. 41, l. 1.

- Doylestown Health refused to discuss Dr. Auteri's First Exemption Requests and how to accommodate those requests because Dr. Auteri did not specifically ask for a particular accommodation in the First Exemption Requests. Hebel Dep. at p. 12, l. 7 – p. 13, l. 6.

- Vice President of Human Resources Ms. Hebel refused to discuss any form of accommodations with Dr. Auteri in response to the First Exemption Requests and/or the Second Exemption Request. Hebel Dep. at p. 13, l. 22 – p. 14, l. 4; p. 15, l. 24 – p. 16, l. 2; p. 16, l. 13 – p. 17, l. 17; p. 34, l. 24 – p. 35, l. 7.

- Vice President of Human Resources Ms. Hebel testified that she did not talk with Dr. Auteri about any possible reasonable accommodations of Dr. Auteri's Exemption Requests because what Dr. Auteri proposed was "not reasonable," and because Dr. Auteri did not propose the same "standard" accommodations which Doylestown Health developed. Hebel Dep. at p. 18, l. 1 – 17; p. 19, l. 12 – p. 20, l. 3.

- Ms. Hebel, as the Vice President of Human Resources, refused to propose Doylestown Health's "standard accommodations" to Dr. Auteri as an alternative after Dr. Auteri made the Exemption Requests.  Hebel Dep. at p. 21, l. 25 – p. 22, l. 5.

- Ms. Hebel testified that she did not talk with Dr. Auteri about accommodations because Doylestown Health only considered the same set of accommodations and Dr. Auteri did not propose that standard set of accommodations.   Hebel Dep. at p. 41, l. 3 – p. 43, l. 10.

- Doylestown Health made the "per se" determination that, because Dr. Auteri worked with vulnerable patients, Dr. Auteri could not be accommodated, but Ms. Hebel did not discuss with Dr. Auteri whether Dr. Auteri would accept relocation into another area of the hospital.  Hebel Dep. at p. 15, l. 3.  By contrast, other exempted employees who were "patient facing" were relocated to take care of allegedly "less vulnerable" patients.  Wortman Dep. at p. 104, l. 19 – 25; p. 105, l. 9-18; p. 107, l. 2-10.[6]

- Doylestown Health employees who took adverse action against Dr. Auteri all testified that they did not discuss at all the First Exemption Requests, Second Exemption Request, or how to accommodate Dr. Auteri's Exemption Requests with Dr. Auteri after Dr. Auteri made those Requests, all in violation of Title VII as held in Groff:   **Hebel** (reviewed Dr. Auteri's Exemption Requests): Hebel Dep. at p. 13, l. 22 – 14, l. 4; p. 15, l. 24 – p. 16, l. 2; p. 16, l. 13 – p. 17, l. 17; **Levy** (reviewed Dr. Auteri's Exemption Requests):  Levy Dep. at p. 139, l. 6 – p. 140, l. 7; p. 171, l. 12 – 18 (testified that "no one" at Doylestown Health talked with Dr. Auteri about possible accommodations)[7]; **Brexler** (Chief Executive Officer in charge of operations): Brexler Dep. at p. 56, l. 9-17 (no one had any discussions with Dr. Auteri about how to accommodate Dr. Auteri's Exemption Requests); p. 125, l. 7-11[8]; **Pernitsky** (Director of Medical Services who terminated Dr. Auteri's medical staff privileges):  Pernitsky Dep. at p. 81, l. 24 – p. 82, l. 7; p. 85, l. 9 – p. 86, l. 6 (suspended Dr. Auteri's medical staff privileges without taking into account Dr. Auteri's Exemption Requests)[9]; **Reiss** (Doylestown Health's General Counsel who terminated Dr. Auteri's employment):  Reiss Dep. at p. 17, l. 14-23; p. 22, l. 13-23; p. 24, l. 17 – p. 25, l. 9; p. 56, l. 6-10.[10]

---

[6] References are to the transcript of the deposition of Laura Wortman, cited pages of which are attached hereto as **Exhibit "13."**
[7] References are to the transcript of the deposition of Steve Levy, M.D., cited pages of which are attached hereto as **Exhibit "14."**
[8] References are to the transcript of the deposition of James Brexler, cited pages of which are attached hereto as **Exhibit "15."**
[9] References are to the transcript of the deposition of Elinor Pernitsky, cited pages of which are attached hereto as **Exhibit "16."**
[10] References are to the transcript of the deposition of John Reiss, Esquire, cited pages of which are attached hereto as **Exhibit "17."**

Had Doylestown Health engaged in <u>any</u> discussion to consider other options to accommodate Dr. Auteri, Doylestown Health may have been able to proffer an "undue hardship" argument, but Doylestown Health's admitted, blatant Title VII violations should foreclose an undue hardship inquiry and preclude summary judgment.  <u>See</u> *Groff*, 600 U.S. at 473.

**B.     <u>Doylestown Health Waived Any Challenge to the Sincerity of Dr. Auteri's Religious Beliefs and If Such a Challenge is Allowed, there are Disputed Material Facts and Credibility Issues to be Determined By the Fact-Finder at Trial.</u>**

Doylestown Health executive leaders Mr. Brexler (CEO) and Dr. Levy (Chief Medical Officer) both testified that they were aware that Dr. Auteri was a Christian and did not question the sincerity of Dr. Auteri's Christian beliefs.  As indicated in the following deposition testimony, Doylestown Health has waived the ability to challenge the sincerity of Dr. Auteri's Christian beliefs:

- Dr. Levy, Chief Medical Officer, testified that he knew that Dr. Auteri was religious and that to make major decisions regarding Dr. Auteri's life and career, Dr. Auteri had to "go home and pray to God and help work through the decision."  Levy Dep. at p. 180, l. 5-24.

- Dr. Levy testified that Dr. Levy knew that Dr. Auteri was a Christian and held Christian beliefs.  Levy Dep. at p. 12, l. 17 – p. 13, l. 3; p. 181, l. 1-3.

- James Brexler, Chief Executive Officer, testified that he knew that Dr. Auteri was a Christian and had sincere beliefs.  Brexler Dep. at p. 17, l. 12 -18.

Prior to the COVID-19 pandemic, Doylestown Health was aware that Dr. Auteri had led a coworker to Christ.  Dr. Auteri told Ms. Hebel, the Vice President of Human Resources, about Dr. Auteri's Christian witness to that co-worker while Ms. Hebel was investigating another employment claim involving the policies in Dr. Auteri's office.  Dr. Auteri produced cards from the co-worker where that co-worker referenced Dr. Auteri's involvement in leading the co-worker and her family to Christ, helping the co-worker find a particular Church to join, telling the co-

worker about Bible passages which the co-worker used in remarks at her brother's funeral, and thanking Dr. Auteri for Dr. Auteri's discussions with the co-worker about religion which led the co-worker to find and join Covenant Church, a Christian church.  P262-264.[11]

During discovery, Doylestown Health obtained a recording of Dr. Auteri's Christian testimony given at a men's conference at Dr. Auteri's church.  Auteri Dep. at p. 376, l. 3 – p. 377, l. 13.[12]

Doylestown Health cannot be heard to contest that Dr. Auteri is a Christian and that Dr. Auteri sincerely holds Dr. Auteri's Christian beliefs.  The record evidence is overwhelming and irrefutable.

Doylestown Health's claim that Dr. Auteri's concern about the COVID-19 vaccines was medical and/or scientific is belied by the record and conflates Dr. Auteri's statements as member of the Medical Executive Committee (MEC) with Dr. Auteri's Exemption Requests setting forth his sincerely held religious beliefs.  Dr. Auteri testified that when he discussed medical concerns about COVID-19 vaccines he did so as member of MEC and that it was Dr. Auteri's job both as a member of that Committee and as a cardiothoracic surgeon to study effects of those vaccines on the heart, as Dr. Auteri's patients would be affected directly.  Dr. Auteri testified about his study of data regarding the vaccine's side effects on his cardiac surgery patients in his role as a member of the MEC and whether, in light of the studied data, recommending the COVID-19 vaccine was smart for patients, employees, and the community.  Auteri Dep. at p. 115-117, 119-120.  Dr. Auteri testified about his concerns regarding the data that he and others could not obtain regarding the safety and performance of the COVID-19 vaccines in connection with his role on the MEC.  Auteri

---

[11] References to documents marked with the prefix "P" are documents produced by Plaintiff in discovery and true and correct copies of which are attached collectively hereto as **Exhibit "18."**
[12] References are to the transcript of the deposition of Dr. Auteri, cited portions of which are attached hereto as **Exhibit "19."**

Dep. at p. 126-127. Dr. Auteri testified that his answers to questions about the COVID-19 vaccines and their side effects were related to his role on the MEC and had nothing to do with the Exemption Requests. Auteri Dep. at p. 131-132. Dr. Auteri testified about the following multiple concerns about the COVID-19 vaccines' safety, which Dr. Auteri shared with the Medical Executive Committee in Dr. Auteri's role as a member of that Committee:

o   Pericarditis;
o   Myocarditis;
o   Guillan-Barre´ syndrome;
o   Immunologic disorders; and
o   Unknown effect on pregnant women, particularly after Dr. Brenda Foley, the President of Doylestown Health's Medical Staff, told a pregnant staff member that the COVID-19 vaccines were safe for pregnant women to take, even in the third trimester of pregnancy, which Dr. Auteri knew to be wrong because Dr. Auteri read the 90 pages of trial data from one of the vaccines and knew that pregnant women were excluded from the vaccine studies.

Auteri Dep. at p. 140-141.

Even if Doylestown Health had not waived its right to challenge the sincerity of Dr. Auteri's religious concerns, any scientific or medical concerns which Dr. Auteri expressed about the COVID-19 vaccines were expressed as part of Dr. Auteri's job and his role as a member of the MEC as demonstrated by the above record evidence. At a bare minimum, any "mixed" concerns that Dr. Auteri expressed are a credibility issue, and Dr. Auteri's profession as a cardiothoracic surgeon makes it particularly understandable that Dr. Auteri would discuss the COVID-19 vaccines in a medical context separate from Dr. Auteri's personal exemption requests. Only part of Dr. Auteri's exemption request needs to be based upon Dr. Auteri's sincerely held religious beliefs in order to be entitled to Title VII protection. See *Passarella v. Aspirus, Inc.*, 108 F.4th 1005, 1009-1010 (7th Cir. 2024); *Glover v. The Children's Hospital of Philadelphia*, 2024 WL 290421 at *10-11.

Dr. Auteri stated clearly in the First Exemption Request that his Request was based upon Dr. Auteri's religious beliefs based upon the Biblical dictate in 1 Corinthians 6:19-20 that Dr. Auteri's body is a temple of the Holy Spirit, which Dr. Auteri has from God, and which was bought with a price (i.e. the sacrifice of Jesus Christ). Dr. Auteri quoted 1 Corinthians 6: 19-20: "Do you not know that your body is a temple of the Holy Spirit who is in you, whom you have from God, and that you are not your own? For you have been bought with a price: therefore glorify God in your body." Dr. Auteri also stated in the First Exemption Requests that when forced to choose between obeying man's rules or God's word, Dr. Auteri "must obey God and His Word." First Exemption Requests, D151-152. In so stating, Dr. Auteri referenced and invoked God's directive as affirmed by the Apostles in Acts 5:29: "But Peter and the apostles answered, 'We must obey God rather than men." Dr. Auteri's objection to the COVID-19 vaccines was not about the potential side effects or harm, but about the potential of those vaccines to alter Dr. Auteri's body as designed by God, which body was purchased with the price of Christ's sacrifice.

All of the available COVID-19 vaccines operated in a manner that raised Dr. Auteri's religious concerns, and Doylestown Health acknowledged this in the information Doylestown Health circulated to employees. In the "COVID-19 Vaccines FAQ's" prepared by Doylestown Health and circulated to employees, Doylestown Health acknowledges that the mRNA vaccines enter the body's cells to instruct them to produce a specific protein. D116. Doylestown Health acknowledges that the Johnson & Johnson vaccine utilizes an adenovirus, which "is able to enter a cell and cause the spike protein to be made." D116. Doylestown Health advised its employees that all of the vaccines entered the cells of the body, D116, and that is the very heart of Dr. Auteri's religious concern: that a material which enters the cells has the capability to interact with the DNA of the cell and alter the body. See First Exemption Requests, D151-152; Auteri Dep. at p. 440, l.

7 – p. 441, l. 7. Dr. Auteri also produced the expert report of Dr. Peter McCullough, which discussed the mechanism of action of all then-available COVID-19 vaccines, requiring entry into the body's cells and justifying Dr. Auteri's religious concerns.  McCullough report at Section II, a true and correct copy of which is attached hereto as **Exhibit "20."**  Dr. Auteri testified that he received the flu vaccine until it became mRNA-based, which further evidences that Dr. Auteri's concern is not about injury resulting from vaccines – Dr. Auteri was concerned about the alteration of his body as God designed it.  Auteri Dep. at p. 46, l. 21 – p. 47, l. 13.  Dr. Auteri also testified that he would have taken the Novavax COVID-19 vaccine, which was in development, had that been available, because that vaccine did not operate like an mRNA vaccine.  Auteri Dep. at p. 440, l. 7 – p. 441, l. 7.

The record evidence cited above more than satisfies the Third Circuit's *Africa* test (see Section IV.B.2 above, incorporated herein by reference) and Dr. Auteri's beliefs qualify as "religious" under Title VII.

- **Dr. Auteri's beliefs address fundamental and ultimate questions:**  As this Court recently recognized in *Glover v. The Children's Hospital of Philadelphia*, beliefs about Biblical interpretation and the religious significance of medical interventions address fundamental questions. 2025 WL 290421 at * 10.  Dr. Auteri's concern that the COVID-19 vaccines could alter his body as designed by God goes to the heart of fundamental theological questions about divine creation, the sanctity of God's design, and humanity's relationship with the Creator.  Dr. Auteri's reference to the Biblical standard of Acts 5:29, that Dr. Auteri must obey God rather than men, frames Dr. Auteri's conflict with the Mandate as an ultimate question of divine versus human authority. Those are precisely the type of "deep and imponderable matters" which *Africa* recognizes as religious.

- **Dr. Auteri's beliefs are comprehensive in nature:**  As *Glover* recognized, when beliefs stem from "teachings from the Bible" and connect to an individual's broader faith tradition, they are "not 'a number of isolated, unconnected ideas,' but rather stem from Plaintiff's reading of the Bible." *Glover*, 2025 WL 290421 at *10. Dr. Auteri's beliefs similarly flow from Biblical teachings and connect to fundamental Christian doctrines about creation, the sanctity of God's creation,

and obedience to God. Dr. Auteri's testimony that he took other vaccines, but not the COVID-19 vaccines which enter cells and could alter DNA, flows from Dr. Auteri's theological understanding of his body as the "temple of the Holy Spirit who is in you." That Dr. Auteri distinguishes between different types of medical interventions based on those interventions' mechanism of action demonstrates theological reasoning, not inconsistency. Auteri Dep. at p. 46, l. 21 – p. 47, l. 13. As Dr. Auteri testified, he would have taken a traditional vaccine like Novavax which does not enter cells (Auteri Dep. at p. 440, l. 7 – p. 441, l. 7), showing that Dr. Auteri's objection stems from specific religious concerns about bodily alteration, not general anti-vaccine sentiment.

- **Dr. Auteri's beliefs present formal and external signs:** Dr. Auteri's beliefs abundantly satisfy the third *Africa* factor requiring "formal and external signs" of religion, including "formal services, ceremonial functions, the existence of clergy, structure and organization, efforts at propagation, observation of holidays, and other manifestations associated with traditional religions." *Kennedy v. PEI-Genesis*, 719 F. Supp. 3d 412, 417 (E.D. Pa. 2024). Dr. Auteri gave formal Christian testimony at a men's conference at his church (Auteri Dep. at 376-377). Dr. Auteri engaged in evangelism by leading a coworker to faith (P262-264). Doylestown Health knew that Dr. Auteri regularly prays when making major decisions (Levy Dep. at p. 180). Defendant's own executives testified they knew Dr. Auteri was a devout Christian (Levy Dep. at p. 12-13; Brexler Dep. at p. 17).

While Defendant argues that Dr. Auteri's expression of concerns about the COVID-19 vaccines negates the religious nature of his beliefs, that argument fails as a matter of law. As *Glover* explicitly held, the fact that a plaintiff "also cites nonreligious reasons" does not defeat religious protection where the plaintiff also cites religious reasons. *Glover*, 2025 WL 290421 at *10. "Whether the additional, nonreligious reasons cited by Plaintiff nullify the religious reasons he cited is a question of credibility for a jury to decide" and is not appropriate for disposition on summary judgment. *Id.*

As discussed in Section IV.B.2 above, incorporated herein by reference, it is not the place of a Court to question the legitimacy of Dr. Auteri's religious beliefs about the COVID-19 vaccine under Title VII law. See *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1176, n. 3 (9th Cir. 2021)(citing *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018). To the extent that the sincerity of Dr. Auteri's religious belief must be resolved, that

question is a question of fact.  See *United States v. Seeger*, 380 U.S. 163, 185 (1965); *Glover*, 2025 WL 290421 at *10.  Even if a reasonable jury could find that Dr. Auteri's Exemption Requests incorporate both religious and secular reasons, those requests are entitled to Title VII protection as long as the requests are based at least in part on some aspect of Dr. Auteri's religious belief. See *Passarella v. Aspirus, Inc.*, 108 F.4th 1005, 1009-1010 (7th Cir. 2024).

**C.    Multiple Disputed Issues of Material Fact Exist as to Whether Doylestown Health Can Prove That the Accommodation of Dr. Auteri's Religious Exemption Request Would Result in an Undue Hardship to Doylestown Health.**

First, Doylestown Health's Motion relies significantly on the decision in *Bushra v. Main Line Health, Inc.*, 2025 WL 1078135 (3d Cir. Apr. 10, 2025).  That reliance is misplaced because the facts in *Bushra* are clearly distinguishable from the facts herein.  Specifically, the *Bushra* Court found the defendant hospital's expert credible because *the plaintiff doctor did not present any evidence in rebuttal*.  *Id*. at *2.  The *Bushra* Court's ruling that unvaccinated healthcare workers, like a doctor who treated vulnerable patients in the hospital's emergency department, constituted an undue hardship to a hospital because it presented an increased risk of transmitting COVID-19 to others was based on the specific facts of the case: NO REBUTTAL EVIDENCE WAS PRESENTED.  In the instant action, Dr. Auteri has presented the expert testimony of Dr. Peter McCullough to rebut Defendant's expert's opinion that the COVID-19 vaccine was the "most effective" way to protect patients and staff from the virus.  Therefore, any reliance on *Bushra* is unwarranted.

Next, Doylestown Health's own conduct and admissions are fatal to Doylestown Health's claim that it has met its burden to show that an accommodation of Dr. Auteri's Exemption Requests would result in an undue hardship:

27

First, Doylestown Health admits that it knew that the COVID-19 vaccines did not stop transmission of the COVID-19 virus:

- Doylestown Health Infection Prevention representative McEnrue admitted that vaccinated persons could spread the COVID-19 virus on August 3, 2021, just days before Doylestown Health implemented the Mandate. D1078.

- Doylestown Health Chief Medical Officer Dr. Levy admitted in an email dated August 15, 2021, just days after the issuance of the Mandate, that the COVID-19 vaccines did not stop the transmission of the COVID-19 virus by vaccinated persons.  P265.

Second, Doylestown Health admits that its reliance on a "COVID-19 vaccine only" policy resulted in patient exposure to COVID-19 virus transmission from vaccinated care providers, including surgeons:

- Doylestown Health Chief Medical Officer Dr. Levy testified that it was possible that there could be a vaccinated doctor with COVID-19 treating patients (Levy Dep. at p. 140, l. 9-13).

- Dr. Levy admitted that on any given day, Doylestown Health could have vaccinated surgeons and doctors who were infected with COVID-19 treating patients (Levy Dep. at p. 143, l. 10-13).

- Dr. Levy testified that in November 2021, at the time of Dr. Auteri's termination, Doylestown Health did not routinely test all vaccinated employees to determine whether those employees were infected with COVID-19 (Levy Dep. at p. 42, l. 13-20).

- Dr. Levy testified that Doylestown Health was not testing vaccinated staff for COVID-19 infection unless that vaccinated staff member was showing symptoms (Levy Dep. at p. 44, l. 16-21; p. 136, l. 5-15).

- Dr. Levy testified that Doylestown Health could have a vaccinated care provider who was infected with COVID-19 and who could transmit the COVID-19 virus without showing any symptoms of illness (Levy Dep. at p. 160, l. 25 – p. 161, l. 3).

- Dr. Levy testified that an individual, whether vaccinated or unvaccinated against COVID-19, could be infected with the COVID-19 virus on any

given day and not know that the individual is infected (Levy Dep. at p. 161, l. 4-13).

- Dr. Levy testified that Doylestown Health did not have any data showing that Dr. Auteri was transmitting COVID-19 at a greater rate than a vaccinated care provider (Levy Dep. at p. 152, l. 9 – p. 153, l. 3).

Third, Doylestown Health admits that it made accommodations for other patient-facing employees, Wortman Dep. at pp. 104–107; however, no accommodations for Dr. Auteri's exemption requests were discussed with Dr. Auteri at all.  See Second Title VII Violation discussed in detail in Section V.A above, incorporated herein by reference.

Fourth, Doylestown Health admitted that COVID-19 testing was appropriate for employees who were exempted from COVID-19 vaccination, but Doylestown Health never offered that testing accommodation to Dr. Auteri:

- Scott Levy, the Chief Medical Officer of Doylestown Health, admitted on August 1, 2021, just days before the implementation of the Mandate, that "appropriate exemption for religious or medical requires 2x weekly testing," D1022.

- Barbara Hebel, the Vice President of Human Resources for Doylestown Health, testified that "twice daily" COVID-19 testing was part of Doylestown Health's "standard accommodations," but Doylestown Health never offered those accommodations to Dr. Auteri.  Hebel Dep. at p. 40, l. 4 – p. 41, l. 1.

Doylestown Health has an interest in protecting patient safety but merely reciting that interest does not establish undue hardship.  *Smith v. City of Atlantic* City, 2025 WL 1537927 at *7 (3d Cir. May 30, 2025)(vacating summary judgment where there was contradictory evidence of the employer's claimed undue hardship).  Taking into consideration the record facts as cited above, including but not limited to (1) Doylestown Health's knowledge that the COVID-19 vaccines did not stop transmission of the virus but Doylestown Health did not test vaccinated employees for the virus, (2) Doylestown Health's admission that it could have vaccinated surgeons operating while

29

Covid positive and capable of transmitting the virus, (3) Doylestown Health's admission that it did not know which vaccinated care providers had COVID-19 if they were not showing symptoms, (4) Doylestown Health's admission that it made accommodations for other unvaccinated patient facing employees, and (5) Doylestown Health's admission that twice weekly testing was available for other unvaccinated patient-facing care providers but not Dr. Auteri, there are a plethora of disputed material facts with respect to whether an accommodation of Dr. Auteri's Exemption Requests would impose an undue hardship.  See *Id.*  Doylestown Health is not entitled to summary judgment.

As discussed in detail in Section V.A above, incorporated herein by reference, Doylestown Health imposed a "per se undue hardship" standard for Dr. Auteri and never fulfilled its Title VII obligations to discuss potential accommodations with Dr. Auteri.[13]

The fact-finder must determine whether Doylestown Health has met Doylestown Health's burden to prove an undue hardship.  In addition to the admissions and credibility issues of Doylestown Health's representatives in their questionable management of patient safety in light of their knowledge about the inability of the COVID-19 vaccines to stop transmission of the virus, a genuine issue of material fact exists as to whether Dr. Auteri's proposed accommodations would have made Dr. Auteri more or less safe to provide patient care than vaccinated, untested surgeons. Dr. Auteri has presented the expert witness of report of Dr. Peter McCullough on the very specific issue of whether Dr. Auteri's proposed accommodations would have been safer for patients than the "COVID-19 vaccine only" protocol employed by Doylestown Health at the time of Dr. Auteri's termination, particularly in light of the transmissibility of the COVID-19 virus known at the time of Dr. Auteri's termination.  McCullough Report at Section II.  Doylestown Health has presented

---

[13] Defendant argues that any claim which Dr. Auteri has for "disparate impact" fails but Dr. Auteri did not raise such a claim.  Dr. Auteri's claim is for failure to accommodate under Title VII.

the expert witness report of Dr. Daniel Salmon, who claims that the "COVID-19 vaccine only" protocol of Doylestown Health was "most effective" for patient safety.  Dr. McCullough disputes this assertion.  McCullough Report at Section II.  Those competing expert witnesses should present their positions to the fact-finder and it should be left to the jury, as the fact-finder, to assess the expert witnesses' credibility and the weight to be given to those experts' opinions and conclusions.

The record evidence and the proffered expert witness evidence present disputed issues of material fact which require a jury to decide the issue of undue hardship, precluding summary judgment in Doylestown Health's favor.  See *Gray*, 717 F. Supp. 3d at 449.

### D.    Even If Doylestown Health Could Prove Undue Hardship, There are Genuine Issues of Material Fact Regarding Whether Doylestown Health's Claim of Undue Hardship is a Pretext.

Doylestown Health's motives in failing to grant Dr. Auteri an accommodation matter.  See *Abercrombie & Fitch*, 575 U.S. at 772.  If Doylestown Health's desire to avoid the prospective accommodation is a motivating factor in Dr. Auteri's decision, Doylestown Health violated Title VII."  *Id.*  If Doylestown Health's claimed "hardship" was attributable to Doylestown Health's animosity toward religion, even religion in general, or to accommodating religious practice in general, that hardship cannot be considered undue.  See *Groff*, 600 U.S. at 472.  To defeat the instant Motion, Dr. Auteri must only show that a fact-finder could conclude that discrimination was the real reason for Doylestown Health's actions.  See *Hedum v. Starbucks Corp.*, 546 F. Supp. 2d 1017, 1025 (D. Ore. 2008).

By showing Doylestown Health's lack of consistency in offering accommodations, ignoring the risk of transmission by failing to test vaccinated employees despite the known risk of virus transmission, and Doylestown Health's representatives' improper statements regarding religious beliefs and Doylestown Health's obligations to protect employees' religious beliefs,

Doylestown Health has placed its motives in failing to accommodate Dr. Auteri's religious exemption request very much in dispute. For summary judgment, the amount of evidence that a plaintiff must produce to show discriminatory motives of the employer is "very little." *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1134 (9th Cir. 2000). The record evidence in the instant matter shows that Dr. Auteri has produced far more than "very little" evidence: to the contrary, the record evidence indicates that Doylestown Health violated Title VII's prohibition against employers presenting employees with the quintessential discriminatory choice: "lose your faith and keep your job, or keep your faith and lose your job." *Keene v. City & Cty.. of San Francisco*, 2023 WL 3451687 at * 2 (9th Cir. May 15, 2023). The record evidence shows that the quintessential discriminatory choice was the only one Doylestown Health offered to Dr. Auteri, as discussed below.

Doylestown Health engaged in what can only be called a "pressure campaign" to coerce Dr. Auteri into foregoing his religious beliefs in favor of Doylestown Health's secular beliefs. Not one Doylestown Health representative talked to Dr. Auteri about how Doylestown Health could accommodate Dr. Auteri's Exemption Requests as discussed in Section V.A above, incorporated herein by reference. However, many Doylestown Health representatives took the time to simply pressure Dr. Auteri into taking the COVID-19 vaccine, as demonstrated below:

- Dr. Steven Guidera, a former Doylestown Health physician, testified that he organized and conducted what Dr. Guidera himself described as an "intervention" meeting between Dr. Auteri and multiple other Doylestown Health physicians in an effort to get Dr. Auteri to take the COVID-19 vaccine (Guidera Dep. at p. 41, et seq.).[14] Dr. Guidera testified as to what Doylestown Health representatives told Dr. Auteri in the intervention meeting: If Dr. Auteri did not get vaccinated, it would end Dr. Auteri's career at Doylestown Health (Guidera Dep. at p. 43, l. 6-10).

- The Doylestown Health representatives were trying to persuade Dr. Auteri to get vaccinated, rather than proposing other solutions (Guidera Dep. at pp. 49, 65).

---

[14] References are to the deposition transcript of Steven Guidera, cited portions of which are attached hereto as **Exhibit "21."**

- Dr. Guidera did not hold an intervention meeting for other doctors who did not want to get vaccinated, only Dr. Auteri (Guidera Dep. at p. 51).

- Dr. Guidera had approximately five Doylestown Health representatives attend to make a "final request" to Dr. Auteri to get vaccinated so that Dr. Auteri would not be terminated (Guidera Dep. at p. 41, l. 17 – p. 42, l. 5).

- In asking Doylestown Health representatives to attend the intervention meeting, Dr. Guidera told those representatives that he wanted to have an intervention where the representatives would "try to convince [Dr. Auteri] to get vaccinated so that he doesn't get terminated" and asked the representatives if they would attend that meeting (Guidera Dep. at p. 49, l. 14-21).

- Doylestown Health's Chief Medical Officer, Dr. Levy, requested a meeting with Dr. Auteri the day before Dr. Auteri was required to produce evidence of Dr. Auteri's vaccination. At that meeting Dr. Levy pressured Dr. Auteri to get vaccinated, did not discuss at all any possible accommodation of an exemption request, and Dr. Levy threatened Dr. Auteri's career and professional reputation if Dr. Auteri would not take the COVID-19 vaccine (Auteri Dep. at p. ; Levy Dep. at p. 177 – 179).

- Dr. Levy told Dr. Auteri on October 10, 2021, the day before Dr. Auteri made the First Exemption Requests, that Dr. Auteri would be fired at 4:59 p.m. the following day if Dr. Auteri did not take the COVID-19 vaccine (Levy Dep. at p. 177, l. 14-18).

- Dr. Auteri testified that Dr. Levy told Dr. Auteri that if Dr. Auteri did not take the COVID-19 vaccine, Doylestown Health would fire Dr. Auteri and Dr. Auteri would be known as a "loser" (Auteri Dep. at pp. 242-248).

- Doylestown Health's Chief Executive Officer, James Brexler, told Dr. Auteri that because it was "generally known" that Dr. Auteri was not comfortable with the COVID-19 vaccines, Dr. Auteri taking the COVID-19 vaccine would be "influential" in making others "feel more comfortable" about taking the vaccine (Brexler Dep. at p. 115, l. 1-21). Dr. Auteri testified that Mr. Brexler told Dr. Auteri that Mr. Brexler wanted Dr. Auteri to tell unvaccinated staff in a public meeting that Dr. Auteri was comfortable taking the COVID-19 vaccine, making Dr. Auteri feel like "the vax poster child" (Auteri Dep. at p. 289, l. 8-20).

- Mr. Brexler testified that he used the CEO of COVID-19 Vaccine manufacturer Johnson & Johnson and "major donor" to Doylestown Health's charitable foundation, Alex Gorsky, to convince Dr. Auteri to take the COVID-19 vaccine. (Brexler Dep. at p. 83, l. 1-16).

- Mr. Brexler testified that he wanted Dr. Auteri to take the COVID-19 vaccine and that because of the "position that [Dr. Auteri] was taking" regarding the vaccines, "it was going to be nearly impossible for us to figure a way to work through that." (Brexler Dep. at p. 83, l. 1-16)(emphasis added).

- Mr. Brexler testified that he asked Mr. Gorsky to call Dr. Auteri to try to get Dr. Auteri to take the COVID-19 vaccine did so because Dr. Auteri was the "highest paid, most prominent surgeon" and Mr. Gorsky was "major donor" to the One Vision capital campaign which went to the "whole heart program, to the total of "multiple millions of dollars" (Brexler Dep. at p. 106, l. 7 – p. 108, l. 7)(emphasis added).   Yet once Dr. Auteri made his Exemption Requests, Mr. Brexler never talked with Dr. Auteri about how to accommodate those Requests (Brexler Dep. at p. 7-11).

- Mr. Brexler testified that to his knowledge, no one at Doylestown Health consulted with the Infectious Disease Committee or the Infection Control Department to inquire about Dr. Auteri's specific Exemption Requests (Brexler Dep. at p. 126, l. 12-22).

- Mr. Brexler testified that no other employee was subjected to the pressure campaign to which Dr. Auteri was subjected:  Mr. Brexler did not meet with other employees who requested an exemption, no other employee faced an intervention meeting, no other employee had an individual meeting with the Chief Medical Officer to discuss taking the COVID-19 vaccine, and no other employee had the CEO of Johnson & Johnson call them to try to convince them to take the COVID-19 vaccine (Brexler Dep. at p. 123, l. 25 – p. 125, l. 4.

- Alex Gorsky, the then Chief Executive Officer of Johnson & Johnson, testified that he only attempted to provide Dr. Auteri with information about the COVID-19 vaccine, and never discussed how to accommodate any religious exemption request Dr. Auteri made.  Gorsky Dep. at p. 88, l. 3-16; p. 90, l. 20 – p. 91, l. 19.[15]  Mr. Gorsky offered information to Dr. Auteri about the COVID-19 vaccines but did not attempt to obtain information for Dr. Auteri on how to accommodate Dr. Auteri's exemption request. Gorsky Dep. at p. 92, l. 15-25; p. 95, l. 13-19; p. 95, l. 21 – p. 96, l. 13.

Approximately six to eight weeks after Dr. Auteri's termination, Doylestown Health implemented a testing program for unvaccinated staff, as requested by Dr. Auteri in the Second Exemption Requests, which became a standard practice at Doylestown Health.  P245-246.  Such a program demonstrates that Doylestown Health recognized the "COVID-19 vaccine only" policy

---

[15] References are to the transcript of the deposition of Alex Gorsky, cited portions of which are attached hereto as **Exhibit "22."**

was insufficient to protect the safety of patients and employees, yet Doylestown Health had refused to make that testing accommodation for Dr. Auteri just weeks earlier. Just six to eight weeks after Dr. Auteri's termination, Doylestown Health began permitting employees infected with the COVID-19 virus to return to work, even if still symptomatic but "improving," and to return "WITHOUT" testing (all caps in original). P. 247-248; P 302-303. Such a protocol of returning to work while infected with the COVID-19 virus and "WITHOUT" testing shows that all of Doylestown Health's claims of "patient safety" as the basis of Doylestown Health's alleged "undue hardship" are pretext: Doylestown Health permitted sick employees to work, regardless of COVID-19 vaccination status, and without a test to determine whether those employees were still capable of transmitting the COVID-19 virus. A reasonable jury certainly could review the above record evidence and determine that Doylestown Health's claims of "patient safety" as an undue hardship are a pretext. It will be for a jury to determine whether patient safety was the true reason for denying Dr. Auteri's exemption requests. Doylestown Health never offered Dr. Auteri reinstatement after it implemented those testing and return to work programs just six to eight weeks after Dr. Auteri's termination (Brexler Dep at p. 112, l. 12-18, p. 113, l. 25 – p. 114, l. 6).

Doylestown Health engaged in a pressure campaign to force Dr. Auteri to substitute Doylestown Health's secular beliefs for Dr. Auteri's religious beliefs, and Doylestown Health refused to discuss how to accommodate Dr. Auteri's religious exemption request as part of that pressure campaign. None of the individuals cited above discussed with Dr. Auteri how Doylestown Health could accommodate Dr. Auteri's request for a religious exemption and accommodation. The evidence establishes that there are numerous genuine issues of material fact, and it will be for a jury to determine whether Doylestown Health's claim of "undue burden" is a pretext. Doylestown Health is not entitled to summary judgment.

## VI.    <u>CONCLUSION</u>

For the above reasons, Plaintiff Dr. Auteri respectfully requests that this Court deny Defendant Doylestown Health's Motion for Summary Judgment.

Respectfully submitted,

**KAPLIN STEWART MELOFF REITER & STEIN, P.C.**

**By:** _____
Kimberly L. Russell, Esquire
Daniel M. Zachariah, Esquire
910 Harvest Drive
P.O. Box 3037
Blue Bell, PA  19422
(610) 941-2541 (phone)
krussell@kaplaw.com
dzachariah@kaplaw.com

**PACIFIC JUSTICE INSTITUTE**

**By:** */s/ Karyn L. White, Esquire* _____
Karyn L. White, Esquire
PA/NJ Office P.O. Box 276600
Sacramento, CA 95827
(609) 335-4833 (phone)
kwhite@pji.org

Attorneys for Plaintiff

**Dated:** June 12, 2025

36

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOSEPH S. AUTERI, M.D.** | : | |
| Plaintiff, | : | No. 2:22-cv-03384 |
| | : | |
| v. | : | |
| | : | |
| **VIA AFFILIATES, d/b/a** | : | |
| **DOYLESTOWN HEALTH** | : | |
| **PHYSICIANS** | : | |
| Defendant. | : | |

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing "Plaintiff's Response to Defendant's Motion for Summary Judgment," together with supporting Memorandum of Law, was caused to be sent electronically through the Court's ECF system to:

Christopher D. Durham, Esquire
Adam Brown, Esquire
Duane Morris LLP
30 South 17th Street
Philadelphia, PA  19103
Attorneys for Defendant

Respectfully submitted,
**KAPLIN STEWART MELOFF REITER & STEIN, P.C.**

By: _____
Kimberly L. Russell, Esquire
Daniel M. Zachariah, Esquire
910 Harvest Drive
P.O. Box 3037
Blue Bell, PA  19422
(610) 941-2541 (phone)
krussell@kaplaw.com
dzachariah@kaplaw.com

Karyn L. White, Esquire
Pacific Justice Institute
PA/NJ Office P.O. Box 276600
Sacramento, CA 95827
(609) 335-4833 (phone)
kwhite@pji.org

Attorneys for Plaintiff

**Dated:** June 12, 2025