**EXHIBIT "7"**
**Second Exemption Denial**



| | | |
|---|---|---|
| NEW YORK | | SHANGHAI |
| LONDON | | ATLANTA |
| SINGAPORE | | BALTIMORE |
| PHILADELPHIA | *FIRM and AFFILIATE OFFICES* | WILMINGTON |
| CHICAGO | | MIAMI |
| WASHINGTON, DC | | BOCA RATON |
| SAN FRANCISCO | CHRISTOPHER D. DURHAM | PITTSBURGH |
| SILICON VALLEY | DIRECT DIAL: +1 215 979 1510 | NEWARK |
| SAN DIEGO | PERSONAL FAX: +1 215 689 4915 | LAS VEGAS |
| LOS ANGELES | *E-MAIL:* cddurham@duanemorris.com | CHERRY HILL |
| BOSTON | | LAKE TAHOE |
| HOUSTON | *www.duanemorris.com* | MYANMAR |
| DALLAS | | |
| AUSTIN | | ALLIANCES IN MEXICO |
| HANOI | | AND SRI LANKA |
| HO CHI MINH CITY | | |

November 9, 2021

**CONFIDENTIAL**

**VIA E-MAIL**

Kimberly L. Russell, Esquire
Kaplin Stewart Meloff Reiter & Stein, P.C.
Union Meeting Corporate Center
910 Harvest Drive, Suite 200
Blue Bell, PA 19422
krussell@kaplaw.com

      Re:    **Doylestown Health System / Joseph S. Auteri, M.D.**

Dear Ms. Russell,

      As you are aware, this firm represents Doylestown Hospital and VIA Affiliates d/b/a Doylestown Health Physicians ("VIAA") (collectively, "DH") with regard to your client Joseph S. Auteri, M.D. ("Dr. Auteri"). We have reviewed your letter to Ms. Barbara Hebel dated October 22, 2021 (the "Letter"), which alleges that DH failed to provide Dr. Auteri with an exemption from DH's COVID-19 vaccine requirement for hospital staff in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act ("ADA") and the Pennsylvania Human Relations Act ("PHRA"), that VIAA breached Dr. Auteri's Employment Agreement, that DH "slandered" Dr. Auteri and that DH retaliated against Dr. Auteri for allegedly reporting harassment.

      As set forth in greater detail below, these allegations lack factual and legal merit. DH still hopes that Dr. Auteri will become fully vaccinated as soon as possible so that he can be reinstated and can return to work. However, in the event that Dr. Auteri elects not to receive the vaccine, VIAA will terminate his employment for cause.



Kimberly L. Russell, Esquire
November 9, 2021
Page 2

### I. Dr. Auteri Does Not Qualify for a Disability-Based Exemption from DH's COVID-19 Vaccine Requirement.

Dr. Auteri does not qualify for a disability-based exemption from DH's COVID-19 vaccine requirement because he has not provided documentation of a disability that prevents him from receiving a COVID-19 vaccine.[1]

Your Letter alleges that Dr. Auteri submitted a "valid request for medical exemption to DH's COVID-19 vaccine requirement on October 6, 2021." However, this request was based on Dr. Auteri's May 2021 COVID-19 infection, a positive antigen test in May 2021, and alleged recent antibody and T-Cell test. As you and your client are well aware, neither prior COVID-19 infection nor the presence of certain antibodies is a disability that provides a legal basis for an exemption from DH's COVID-19 vaccination requirement under the ADA or the PHRA. It is concerning that, as a physician, Dr. Auteri is asking DH to disregard CDC guidance, which recommends individuals receive the vaccine even if they have recently recovered from COVID-19.

You also contend that the October 21, 2021 letter from Dr. Auteri's physician, Dr. William Kracht, legally entitles Dr. Auteri to an exemption from DH's COVID-19 vaccine requirement. However, Dr. Kracht's letter, submitted to DH for the first time with your Letter, states only: "Based upon [Dr. Auteri's] current medical status and condition, I do not recommend COVID-19 vaccination." As I assume you are aware, a medical certification to support an accommodation request under the ADA must "specify the existence of an ADA disability and explain the need for reasonable accommodation."[2] Dr. Kracht's letter neither specifies the existence of a disability nor explains the need for accommodation. Rather, it vaguely references Dr. Auteri's "current medical status and condition" without providing any details regarding such "status" or "condition." Furthermore, Dr. Kracht's letter states only that he does "not recommend" vaccination – not that Dr. Auteri cannot receive a COVID-19 vaccine due to a disability. For these reasons, Dr. Kracht's October 21, 2021 letter also does not entitle Dr. Auteri to an exemption from DH's COVID-19 vaccination requirement.

---

[1] Your Letter also asserts that Dr. Auteri's failure to timely submit his medical and religious accommodation requests should not disqualify him from receiving an exemption. DH implemented the September 10, 2021 deadline for exemption requests to ensure that it could evaluate exemption requests in a timely manner, but evaluated late requests, including Dr. Auteri's, even after the deadline had passed.

[2] *See* EEOC, Enforcement Guidance on Disability-Related Inquiries and Medical Examinations of Employees under the ADA, https://www.eeoc.gov/laws/guidance/enforcement-guidance-disability-related-inquiries-and-medical-examinations-employees.

Kimberly L. Russell, Esquire
November 9, 2021
Page 3



## II. Accommodating Dr. Auteri's Request for a Religious Exemption from DH's COVID-19 Vaccine Requirement Would Impose an Undue Hardship on DH

Accommodating Dr. Auteri's request for a religious exemption from DH's COVID-19 vaccine requirement would impose an undue hardship on DH because allowing him to continue working in his position as he has requested would pose a significant and unacceptable risk to the health and safety of the extremely vulnerable heart patients whom Dr. Auteri treats.

For purposes of this letter and its evaluation of Dr. Auteri's request for a religious exemption, and consistent with its approach to nearly all employee requests requesting a religious exemption, DH does not question that Dr. Auteri's religious beliefs are sincerely held.[3] As such, for purposes of its evaluation of Dr. Auteri's request, DH assumes that Dr. Auteri is eligible for a religious *exemption* from the COVID-19 vaccine requirement.

However, *accommodating* Dr. Auteri by exempting him from the vaccine requirement and allowing him to continue treating heart patients (including performing heart surgery) as he has requested would impose an undue hardship on DH. DH's Medical Review Committee (the "Committee"), comprised of infection control specialists and physicians, evaluated the risks posed by the presence of unvaccinated employees at Doylestown Hospital, and concluded that permitting unvaccinated employees to continue working in certain departments or service lines with vulnerable patient populations, including the Heart Institute, would unacceptably jeopardize patient health and safety. For that reason, DH requires employees working with such vulnerable patient populations to be vaccinated, or, if they qualify for a medical or religious exemption, to transfer to a department or service line with a less vulnerable patient population as an accommodation and require them to follow enhanced safety measures, to the extent that a comparable position is available and the employee is qualified for the position. No unvaccinated DH employee has been permitted to continue working in a department or service line identified by the Committee as a particularly vulnerable patient population for whom the presence of unvaccinated providers would impose an unacceptable health and safety risk.

Dr. Auteri's cardiovascular patients are among the most vulnerable patients and are at higher risk of complications if they contract COVID-19. For that reason, the Committee concluded that *all* workers in the cardiovascular service line would need to be vaccinated or, if they qualify for a medical or religious exemption, transfer to a department or service line with less-vulnerable patients. As a very highly paid and specialized heart surgeon, there is no comparable position to which Dr. Auteri could be transferred, and allowing him to continue

---

[3] Dr. Auteri did not articulate a *religious* basis for his objection to DH's COVID-19 vaccine requirement until October 6, 2021, well after he already had voiced personal/political opposition to the COVID-19 vaccine requirement. By way of example only, in a September 15, 2021 meeting with Barbara Hebel to discuss DH's vaccination requirement, Dr. Auteri made no mention of his religious beliefs, but forcefully stated his belief that DH's COVID-19 vaccine requirement violated constitutional rights and that it was wrong not to allow employees to choose whether to receive a COVID-19 vaccine.

DuaneMorris

Kimberly L. Russell, Esquire
November 9, 2021
Page 4

working in the Heart Institute would impose an undue hardship on DH.  Therefore, DH concluded that it could not accommodate Dr. Auteri's religious exemption request and placed him on a 30-day unpaid leave of absence consistent with how it treated all other DH employees who were not eligible for an accommodation to the COVID-19 vaccine requirement.

Dr. Auteri, however, seeks special treatment to continue working in the Heart Institute as an unvaccinated provider, even though DH has not permitted unvaccinated employees to continue working in other departments or service lines with particularly vulnerable patient populations.[4]  In that regard, your Letter claims that DH could accommodate Dr. Auteri by providing him with an accommodation that no other DH employee has been granted: allowing him to continue working with extremely vulnerable patients if he submits to daily health screenings and weekly COVID-19 testing.[5]  You also assert that DH has an "exceedingly high burden to meet" to establish that it cannot grant a reasonable accommodation to an employee's religious beliefs because doing so would impose an undue hardship.  You are incorrect on both accounts.

By way of reminder, it has been well-established law for decades that an accommodation that imposes "more than a *de minimis* cost" on the operation of the employer's business constitutes an "undue hardship" for purposes of Title VII.  *See Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977).  The EEOC recently affirmed this longstanding principle of law in its COVID-19 guidance, reminded employers and the public that "jeopardizing security or health" is more than a minimal burden, and specified that whether an employee will have "close contact with other employees or members of the public (*especially medical vulnerable individuals*)" is a relevant consideration when evaluating whether a requested religious accommodation to the COVID-19 vaccine imposes an undue hardship on an employer."[6]  Here, the risk and consequences of unvaccinated providers exposing vulnerable cardio-vascular

---

[4] Indeed, in his September 15 meeting with Ms. Hebel, in support of his assertion that DH had the ability to grant his an exemption from the vaccination requirement, Dr. Auteri stated that he did not care whether DH had accommodated similarly situated employees and, pointing to the newly-constructed Heart Institute building outside the window of Ms. Hebel's office, reminded her that the building "was built by me."

[5] Notably, your Letter is the first time that Dr. Auteri has informed DH that he is willing to consider alternatives to the COVID-19 vaccine such as the daily health screens and weekly testing you propose.  Previously, Dr. Auteri stated that he would *not* follow enhanced safety precautions as an alternative to receiving the vaccine, including in an October 6, 2021 meeting with a group of DH doctors and nurses.

[6] *See* EEOC, What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws, https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws (emphasis added) (last accessed Nov. 8, 2021).



Kimberly L. Russell, Esquire
November 9, 2021
Page 5

patients to COVID-19 is substantial and in itself would impose an undue hardship on DH's commitment to patient safety.

Finally, your reliance on Dr. Levy's August 2021 acknowledgment that vaccinated individuals can transmit COVID-19, and an outdated pre-procedure testing policy from over ten months ago is misguided. While the currently available vaccines are not 100% effective at preventing infection, the CDC has been clear that "getting vaccinated is the best way to slow the spread of COVID-19 and to prevent infection by Delta or other variants"[7] and thus recommends COVID-19 vaccination for all health care providers. Not surprisingly, the Centers for Medicare and Medicaid Services ("CMS") recently published an interim final rule requiring such vaccination. Furthermore, "evidence is emerging that people get better protection by being fully vaccinated compared with having had COVID-19" and "unvaccinated people who already had COVID-19 are more than 2 times as likely than fully vaccinated people to get COVID-19 again."[8] As such, your reliance on these two statements serves only to underscore the baseless nature of your assertion that with his proposed accommodations Dr. Auteri would "pose[] less of a COVID-19 transmission risk than vaccinated personnel."

### III.   Dr. Auteri is in Breach of his Employment Agreement

DH's mission "is to continuously improve the quality of life and proactively advocate for the health and well-being of the individuals we serve." The vaccine is effective at preventing the spread of COVID-19, and patient safety is DH's top priority. As noted above, the CDC recommends that health care providers become vaccinated against COVID-19 and CMS recently published an interim final rule requiring such vaccination. DH has made the reasonable, good faith determination based on available medical evidence that it cannot fulfill its commitment to patient safety if its providers serving the most vulnerable patients are unvaccinated.

As stated in the letter from Barbara Hebel to Dr. Auteri dated October 13, 2021, Dr. Auteri's Employment Agreement with VIAA, as amended (the "Employment Agreement"), provides that VIAA may terminate his employment for cause immediately "[u]pon the . . . revocation, termination, suspension or limitation of Physician's privileges at any hospital or facility" (Section 9.2.2.3) and/or "[i]f VIAA or [Doylestown] Hospital determine, in good faith after a reasonable investigation, that . . . the safety of patients is jeopardized by his continued services." (Section 9.2.2.8).

---

[7] *See* CDC, The Possibility of COVID-19 after Vaccination: Breakthrough Infections, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/why-measure-effectiveness/breakthrough-cases.html (last accessed Nov. 1, 2021).

[8] *See* CDC, Frequently Asked Questions about COVID-19 Vaccination, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/faq.html (last accessed Nov. 1, 2021).

DuaneMorris

Kimberly L. Russell, Esquire
November 9, 2021
Page 6

      Furthermore, Dr. Auteri's privileges at Doylestown Hospital have been suspended, which entitles VIAA to immediately terminate Dr. Auteri's employment for cause under Section 9.2.2.3 of the Employment Agreement. Allowing Dr. Auteri to continue treating extremely vulnerable heart patients while unvaccinated would, in DH's reasonable good faith judgment, jeopardize patient safety, and thus constitutes an additional basis for immediate termination of Dr. Auteri's employment for cause under Section 9.2.2.8 of the Employment Agreement.

      As set forth in Ms. Hebel's October 13, 2021 letter to Dr. Auteri, however, although VIAA has these grounds for cause to terminate Dr. Auteri's employment immediately, it elected not to do so as of October 13 (without prejudice to VIAA's right to terminate his employment for cause pursuant to Section 9.2.2.3, Section 9.2.2.8 or any other provision of the Employment Agreement), instead placing him on a 30-day unpaid leave of absence to allow him that time to become vaccinated in compliance with DH policy.

      Finally, because Dr. Auteri is not currently a member in good standing of the Active Medical Staff of Doylestown Hospital and is not conducting his medical practice in conformity with all policies, rules and regulations of VIAA and Doylestown Hospital (specifically, the COVID-19 vaccination requirement), he is in breach of Sections 2.1.8 and 2.1.9 of the Employment Agreement, and having been provided written notice of same by letters dated October 11 and October 13, 2021, VIAA may terminate his employment for cause at the conclusion of the applicable 30-day notice periods pursuant to Section 9.2.2.9 of the Employment Agreement.

### IV.    Dr. Auteri's Communications with Third Parties Regarding His Employment Status

      Your Letter contends that Ms. Hebel's statements in her October 13 letter that Dr. Auteri of has told third parties that his employment was terminated are "false statements" that are "without basis in fact." In support for this contention, you enclose a copy of an October 16 text message sent by Dr. Auteri only *after* he received Ms. Hebel's letter.

      However, Dr. Auteri himself told patients that he was being terminated from DH, as evidenced by his notes in patient medical records. By way of example only, Dr. Auteri wrote in two separate patients' medical records on October 11, 2021:

> F/u appt will be in 2 weeks upon discharge, and will be with Dr. Thomas as I am scheduled to be terminated from employment today at 5pm. Explained this to patient.

> *and*

> I had a long discussion with the patient and his wife last evening. Explained that care will be assumed by my colleague Dr. Thomas as my employment here at DH is scheduled to be terminated at 5pm today. Pt and wife understood.



Kimberly L. Russell, Esquire
November 9, 2021
Page 7

*Please promptly confirm in writing whether Dr. Auteri (a) did in fact tell patients that DH was terminating his employment, or (b) falsified patient medical records.*

As communicated in Ms. Hebel's October 13 letter, while Dr. Auteri is free to share his employment status with others[9], knowingly making false statements to third parties with whom DH has a business relationship potentially has the effect of interfering with DH's business relationships with those third parties. Again, DH expects, moving forward, that Dr. Auteri will communicate truthfully about the status of his employment. DH expressly reserves and does not waive its right to take legal action, including asserting claims of tortious interference, against Dr. Auteri based on his false statements to third parties regarding his employment status with DH.

**V.     DH Has Not "Slandered" Dr. Auteri**

Contrary to the assertion in your Letter, DH has not instructed staff in Dr. Auteri's office to advise patients that Dr. Auteri is on a "personal leave of absence." And even if it had, stating that Dr. Auteri is on a "personal leave of absence" would not constitute slander. Dr. Auteri is, in fact, on a leave of absence for personal reasons, *i.e.*, because he told DH that he would not receive a COVID-19 vaccine. Nonetheless, DH has reminded staff that they are not to disclose the reason for or nature of Dr. Auteri's absence.

Please let us know at your earliest convenience if Dr. Auteri would prefer that DH inform patients, colleagues and others who may inquire that he is on a leave of absence because he communicated to DH that he would not receive a COVID-19 vaccine.

**VI.    DH Has Not Unlawfully Retaliated Against Dr. Auteri**

Your Letter asserts that DH has retaliated against Dr. Auteri following an alleged report of harassment and a hostile work environment though, tellingly, you do not articulate the statutory basis for this allegation. There is no factual or legal basis for this claim.

The alleged "report of harassment and a hostile work environment" on which Dr. Auteri predicates his retaliation allegation is an email that Dr. Auteri sent to Dr. Levy on September 10, 2021, which you assert Ms. Hebel was copied on. As you did not attach this email to your Letter, I have done so here for ease of reference and in case you have not actually seen the email, as the unprotected nature of the email is self-evident. Dr. Auteri's September 10 email does not

---

[9] Your letter contends that "Dr. Auteri is permitted to communicate with employees and third parties about the terms and conditions of his employment and such communications are protected as a matter of law under the National Labor Relations Act." However, as a reminder, Dr. Auteri is a supervisor and thus not an "employee" entitled to the protections of the National Labor Relations Act ("NLRA"). *See* 29 U.S.C. § 152(3). There are some issues on which reasonable minds can differ. But, there is no question that the Medical Director of the Heart Institute and the Chief of Cardiovascular Surgery is not an employee covered by the NLRA.

reference harassment or a hostile work environment, does not state that Dr. Auteri is being subjected to unlawful treatment on the basis of protected group membership, and does not request that Ms. Hebel or DH investigate Dr. Levy's conduct. Rather, Dr. Auteri's email is little more than a personal objection to the way in which he contends that a fellow physician discussed COVID-19 vaccination with him, communicated directly to that physician as well as two hospital executives (including Ms. Hebel). This email does not constitute legally protected activity and DH did not have a legal obligation to initiate an investigation into one doctor's personal objection to the way in which another doctor spoke to him.

Your Letter alleges that following this report, DH "retaliated against Dr. Auteri by summarily denying Dr. Auteri's exemption requests, failing to grant Dr. Auteri a reasonable accommodation and without engaging in the interactive process as required by law, and suspending Dr. Auteri in breach of Dr. Auteri's Employment Agreement and violation of Dr. Auteri's civil rights." Even if Dr. Auteri's September 10 email was legally protected activity (which it is not), DH treated Dr. Auteri the same as every other employee who requested an exemption from the COVID-19 vaccine for a medical or religious reason. Dr. Auteri works in a service line identified by the Committee as having vulnerable patients who are at higher risk of complications if they contract COVID-19. Because of the highly specialized nature of his practice, there was no position outside of cardo-vascular surgery into which Dr. Auteri could be transferred. As a result, Dr. Auteri was placed on an unpaid leave of absence.

Your Letter also claims that Dr. Auteri submitted a letter to Ms. Hebel on October 16, 2021 documenting alleged harassment and retaliation. As an initial matter, even if such a letter was submitted as you allege, Dr. Auteri was placed on a leave of absence *five days prior* to the date of the letter, and as such there can be no causal connection between the letter and any alleged adverse action. Furthermore, DH did not receive any such letter until you emailed to me on October 27, 2021, at my request, an unsigned letter from Dr. Auteri to Ms. Hebel. I have asked you repeatedly to tell me how the unsigned letter allegedly was sent to Ms. Hebel and the date on which it was sent, and you have refused to provide this information, stating only that Dr. Auteri does not have evidence of how and when it was sent and received. If you are unable to provide this information, please have Dr. Auteri submit a sworn affidavit attesting to how and when he sent the unsigned letter dated October 16.

Regardless, now that DH is in receipt of Dr. Auteri's unsigned letter dated October 16, it has engaged a third-party investigator to investigate Dr. Auteri's allegations set forth in the unsigned letter.

### VII. Dr. Auteri's Obligation to Preserve Relevant Documents and Information

DH has taken steps to preserve potentially relevant documents and information relating to Dr. Auteri's allegations. We trust that Dr. Auteri likewise has preserved and will continue to preserve all documents and information potentially relevant to the allegations set forth in the Letter. For the avoidance of doubt, Dr. Auteri hereby is directed to preserve and not modify or

DuaneMorris

Kimberly L. Russell, Esquire
November 9, 2021
Page 9

destroy any and all communications and documents relating to the allegations in the Letter and Dr. Auteri's request for an exemption from DH's COVID-19 vaccination policy including, but not limited to, text messages, emails, letters, handwritten notes, phone messages, voicemails, communications on social media such as Facebook or Twitter, records of internet activity and website access, etc.

\* \* \* \* \* \* \*

Please contact me if you have any questions or would like to discuss this matter further.

Very truly yours,

Christopher D. Durham

CDD
Attachment

cc: Elisabeth Bassani, Esq.