**EXHIBIT "12"**
**Deposition Transcript of Barbara Hebel taken on February 10, 2025**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


JOSEPH S. AUTERI, M.D.   :   No. 22-cv-03384
       Plaintiff,   :
              :
   vs.   :
              :
VIA AFFILIATES, d/b/a   :   JURY TRIAL
DOYLESTOWN HEALTH   :   DEMANDED
PHYSICIANS   :
       Defendant.   :


- - -

Monday, February 10, 2025

- - -


Deposition of BARBARA HEBEL,

taken pursuant to notice, at the law offices

of Kaplin Stewart Meloff Reiter & Stein,

P.C., 910 Harvest Drive, Blue Bell,

Pennsylvania, before Michele L. Murphy, a

Registered Professional Reporter and Notary

Public, on the above date, beginning at

approximately 9:33 a.m.

- - -

1    approximate two-year timeframe before October

2    of 2021 where an individual had made a

3    complaint about Dr. Auteri's conduct and he

4    showed you evidence that he had led that

5    individual employee to Christ?

6                    MR. DURHAM:  Objection.

7    BY MS. RUSSELL:

8        Q.   Do you recall that, Ms. Hebel?

9        A.   Can you rephrase the question?

10       Q.   Sure.  In the couple-year timeframe

11   before this October 2021 timeframe of the

12   letter that we're looking at, an employee in

13   Dr. Auteri's office made a complaint about

14   Dr. Auteri.  Do you recall that?

15       A.   Yes, I do.

16       Q.   And do you recall --

17                   MR. DURHAM:  Objection.

18   BY MS. RUSSELL:

19       Q.   -- in response to that complaint,

20   Dr. Auteri showed you certain materials which

21   referenced Dr. Auteri having led that woman to

22   Christ?

23       A.   I do not recall that.

24       Q.   Okay.  Do you have any reason to

25   believe that Dr. Auteri is not a christian?

```
1                    MR. DURHAM:  Objection.

2                    THE WITNESS:  I do not delve

3          into whether or not someone has a

4          significantly held belief about their

5          religion.

6    BY MS. RUSSELL:

7          Q.   So when you received this letter on

8    the letterhead similar to Page P-687 and 88,

9    you didn't require Dr. Auteri to give you any

10   information about whether his beliefs stated

11   in the letter were sincere about christian

12   faith; is that correct?

13                   MR. DURHAM:  Objection.

14                   THE WITNESS:  I did not ask him

15         anything about that.

16   BY MS. RUSSELL:

17         Q.   Did you have any discussions with

18   Dr. Auteri about how you could, "you" the

19   hospital, could accommodate Dr. Auteri's

20   request for an accommodation, an exemption and

21   accommodation on Pages P-687 and 88?

22                   MR. DURHAM:  Objection.

23                   THE WITNESS:  He did not

24         provide us with any request for

25         accommodations at this time.  We did not
```

Page 13

```
 1        determine whether anybody in the

 2        organization had a significantly held

 3        belief.  That was not for us to delve

 4        into, but rather could we accommodate

 5        their continued employment at Doylestown

 6        Hospital.

 7   BY MS. RUSSELL:

 8        Q.   Did you have a conversation with

 9   Dr. Auteri about how he could be accommodated

10   after you received the letter from Dr. Auteri

11   that we're discussing in October of 2021?

12                  MR. DURHAM:  Objection.

13                  THE WITNESS:  I did not have a

14        conversation, but, again, the

15        organization made sure that we did not

16        look at people's significantly held

17        beliefs and that we looked at whether or

18        not we could reasonably accommodate an

19        individual to continue to be employed and

20        not work in a vulnerable area.

21   BY MS. RUSSELL:

22        Q.   Did you have a conversation with

23   Dr. Auteri after you received this letter that

24   we are looking at replicated in P-687 and 88

25   about how to specifically accommodate
```

Page 14

1    Dr. Auteri?

2         A.   I did not have a --

3                   MR. DURHAM:  Objection.

4                   THE WITNESS:  -- conversation.

5    BY MS. RUSSELL:

6         Q.   Thank you.

7         A.   We specifically made sure we did not

8    look at people's religious beliefs.  We held

9    that -- we didn't look at whether a person had

10   a significant belief, and we made sure that

11   people could have accommodations and did not

12   work in a vulnerable area.

13        Q.   Did you propose any specific

14   measures to Dr. Auteri related to Dr. Auteri's

15   specific exemption request?

16        A.   No, we did not, but Dr. Auteri

17   worked in an area that we could not make a

18   reasonable --

19        Q.   Ms. Hebel, there's now no question

20   pending.

21                   MR. DURHAM:  Excuse me.  She

22        can finish her answer.  Thank you very

23        much.

24                   MS. RUSSELL:  You can deal with

25        it on redirect.

Page 15

```
 1              MR. DURHAM:  Please go ahead
 2      and finish.
 3              THE WITNESS:  We did not look
 4      at anybody and say whether or not they
 5      had a significantly held belief.  We made
 6      sure that the individuals could work in a
 7      department that was not considered a
 8      vulnerable patient area.
 9              Dr. Auteri worked in those
10      areas, and we could not accommodate that
11      based upon his contract that he was a
12      highly skilled CT surgeon and that the
13      patients that he dealt with were
14      vulnerable patients.
15  BY MS. RUSSELL:
16      Q.   Did you discuss moving him somewhere
17  else?  Did you discuss with Dr. Auteri moving
18  Dr. Auteri someplace else within the hospital?
19      A.   No.  Several individuals had made
20  comments that Dr. Auteri would not be moved
21  and would not accept any accommodations.
22      Q.   Who were those individuals?
23      A.   Eleanor Wilson, John Mitchell.
24      Q.   Did you ask Dr. Auteri if he would
25  accept relocation somewhere else in the
```

1   hospital?  Did you do it?

2       A.   I did not.

3       Q.   Great.

4            Take a look at the document in front

5   of you.  I'm showing you a document that's,

6   again, bottom right corner P-713 through

7   P-718.  I just want to ask you a few specific

8   questions about it.  You're welcome to read

9   the whole thing, but please just let me know

10  when you're ready to answer a question.

11           (Brief pause.)

12      A.   Okay.

13      Q.   Okay.  Can you identify the document

14  in front of you that runs from P-713 to P-718?

15      A.   I believe this is the letter that

16  was sent by your office to the hospital,

17  specifically to me.

18      Q.   What did you do with this letter

19  after you received it?

20      A.   Provided a copy to counsel.

21      Q.   Who was the counsel?

22      A.   Duane Morris.

23      Q.   And who else did you send it to, if

24  anyone?

25      A.   I don't believe I gave it to anybody

1  else.  I talked to our CEO with regards to it.

2      Q.   Who is the CEO?

3      A.   James Brexler.

4      Q.   Did you have any discussions with

5  Dr. Auteri about this letter after you

6  received it?

7      A.   No, I did not.

8      Q.   Did you have any discussions with

9  Dr. Auteri about how you could accommodate his

10  request for an exemption after you received

11  this letter?

12              MR. DURHAM:  Objection.

13              THE WITNESS:  No, I did not

14      have a conversation with Dr. Auteri, but

15      the accommodation based upon what I could

16      determine, he could still not work in a

17      vulnerable area and provide patient care.

18  BY MS. RUSSELL:

19      Q.   Are you a doctor?

20      A.   I am not.

21      Q.   Do you have any public health

22  experience, certifications, anything of that

23  nature?

24              MR. DURHAM:  Objection.

25              THE WITNESS:  No, I do not.

Page 18

1    BY MS. RUSSELL:

2        Q.   Did you meet with Dr. Auteri, did

3    you e-mail him, did you have any specific

4    discussions with him about how he could be

5    accommodated?

6                    MR. DURHAM:  Objection.

7                    THE WITNESS:  No, but in

8         accordance with this letter, Dr. Auteri

9         did not provide us with reasonable

10        accommodations.  We still had the

11        accommodations that everybody else was

12        adhering to, which included double

13        masking, twice testing, social

14        distancing, and also if they worked in

15        the vulnerable patient areas, we

16        reassigned those individuals.  None of

17        that was provided to us by Dr. Auteri.

18   BY MS. RUSSELL:

19        Q.   Ms. Hebel, please look at Page 2.

20        A.   (Witness complies.)

21        Q.   Do you see the heading that says

22   toward the middle of the page Dr. Auteri's

23   Request for Religious Exemption and Reasonable

24   Accommodation?  Do you see that?

25        A.   I do.

Page 19

 1      Q.   Was that in the letter when you

 2  received it?

 3      A.   Yes, it was.

 4      Q.   Down below there's a heading that

 5  says Dr. Auteri's Reasonable Accommodation

 6  Request.  Do you see that?  It goes from the

 7  bottom of 2 to Page 3.  Do you see that?

 8      A.   Yes, I do.

 9      Q.   Was that section in the letter when

10  you received it?

11      A.   It was.

12      Q.   Following your receipt of this

13  letter marked, again, P-713 to 718, did you

14  propose any specific measures to Dr. Auteri

15  that could be used to accommodate Dr. Auteri's

16  request for a religious exemption?

17              MR. DURHAM:  Objection.

18              THE WITNESS:  No, I did not.

19      Basically the exemptions that we had and

20      we had determined to be appropriate were

21      double masking, not working in a

22      vulnerable patient area, which Dr. Auteri

23      did work at in the Heart Institute, twice

24      weekly testing, social distancing.

25              He was asking for something

Page 20

```
 1        here that was not following those

 2        protocols and would be different than any

 3        other individual in the organization.

 4  BY MS. RUSSELL:

 5        Q.   Did you talk to Dr. Auteri after you

 6  received this letter that is in front of you

 7  and discuss those, quote, accommodations that

 8  you had per your testimony?

 9              MR. DURHAM:  Objection.

10              THE WITNESS:  I did not, but

11        previously other individuals had, and he

12        specifically told those other individuals

13        that he would not follow those

14        accommodations.

15  BY MS. RUSSELL:

16        Q.   Did they have the conversation with

17  Dr. Auteri after the date of this letter in

18  front of you?

19        A.   No, but previously he had told

20  people he would not follow any of the

21  accommodations, and this letter does not

22  adhere to the accommodations that we had set

23  forth.

24        Q.   Who are the people that he allegedly

25  spoke with previously that you're referring
```

1   to?

2       A.   Eleanor Wilson, John Mitchell, and

3   some of the doctors.

4       Q.   Do you have any information sitting

5   here today that any of those individuals whom

6   you just mentioned saw this exemption request

7   in front of you and had a discussion with

8   Dr. Auteri after the date of this letter to

9   discuss specific accommodations for

10  Dr. Auteri?

11              MR. DURHAM:  Objection.

12              THE WITNESS:  No.  However, he

13          would ask us then if we were doing what

14          he had requested would be different than

15          any other individual in this

16          organization, and we do not treat people

17          differently.  He needed to have double

18          testing, double face mask, could not work

19          in a vulnerable patient area, and

20          therefore -- and social distancing and

21          not eating in the cafeteria, and he had

22          already previously told people that he

23          would not do that.

24  BY MS. RUSSELL:

25      Q.   Did you discuss with Dr. Auteri

Page 22

1    social distancing and eating alone after he

2    submitted the two exemption requests we just

3    looked at?  Did you have that discussion with

4    Dr. Auteri?

5          A.   No, I did not.

6          Q.   Okay.  When you referred to the

7    accommodations we had and you just listed a

8    bunch of accommodations that you had, were

9    those accommodations that were the hospital's

10   set of accommodations for everyone who

11   requested an exemption?

12         A.   Yes, they were.

13         Q.   So there wasn't an individual

14   assessment, correct?  You had your set of

15   accommodations; is that fair?

16         A.   We established what those --

17               MR. DURHAM:  Objection.

18               Go ahead.  Sorry.

19               THE WITNESS:  That's okay.

20               We did establish what those

21        accommodations would be.  There was one

22        or two individuals who did not do the two

23        times testing because they only worked

24        occasionally within the hospital.  All

25        other individuals who had requested an

Page 27

 1  date of the letter that is in front of you is

 2  October 13th, 2021.  Do you see that?

 3      A.   Yes.

 4      Q.   So for that timeframe, October 11th

 5  through October 13th of 2021, did you have any

 6  discussions with Dr. Auteri about possibly

 7  reassigning him to another area of the

 8  hospital as an accommodation for his exemption

 9  request?

10              MR. DURHAM:  Objection.

11              THE WITNESS:  I did not have a

12       direct discussion with Dr. Auteri during

13       that time period.  However, his position

14       in the Heart Institute and the way his

15       contract was, we had to follow that

16       contract.  He could not work in the Heart

17       Institute.  That was a vulnerable patient

18       area, and that we had made a

19       determination or that the clinicians had

20       made a determination that no one who was

21       not vaccinated could work in, for the

22       protection of and the safety of the

23       patients and the associates, in that

24       department.

25  BY MS. RUSSELL:

Page 28

1     Q.   Who were the clinicians that made

2  the determination about who could work in

3  those areas you just testified to?

4     A.   They would be --

5               MR. DURHAM:  Objection.

6               THE WITNESS:  They would be our

7     Infection Prevention.  We used a whole

8     host of organizations to make these

9     determinations.

10  BY MS. RUSSELL:

11     Q.   Who is Infectious Prevention?  Who

12  was in that area?

13               MR. DURHAM:  Objection.

14               THE WITNESS:  Dr. Michael

15     Kimzey, Bridget McEnrue.

16  BY MS. RUSSELL:

17     Q.   Say that again.

18     A.   Bridget McEnrue.  They are our

19  Infection Prevention individuals.  And other

20  clinicians within the organization.

21     Q.   Who?

22     A.   Dr. Levy would have been in that

23  group.  And then also they took information

24  from HAP, Hospital Association of

25  Pennsylvania, the American Hospital

Page 34

1          MS. RUSSELL:  Can you read back

2     the question, please?

3              (Court Reporter read back as

4     follows:  "Did you use any data regarding

5     transmission of the virus in connection

6     with your drafting of the letter that you

7     see before you dated October 13th of

8     2021?")

9              MR. DURHAM:  Objection.

10   BY MS. RUSSELL:

11        Q.   Please answer the question.

12        A.   In my position, I did not track any

13   data.

14        Q.   I didn't ask you in this question if

15   you tracked it.  Did you use any data?  I

16   don't care who tracked it.  Did you use any

17   data regarding the transmission of the virus

18   from unvaccinated care providers to patients

19   in determining the letter or drafting the

20   letter dated October 13th of 2021?

21        A.   No.

22              MR. DURHAM:  Objection.

23   BY MS. RUSSELL:

24        Q.   After you received the exemption

25   requests from Dr. Auteri, which we saw

Page 35

1    reflected beginning at P-685 and the second

2    exemption request from Dr. Auteri starting at

3    P-713, did you engage in any process for

4    reviewing those requests with Dr. Auteri

5    directly?

6                    MR. DURHAM:  Objection.

7                    THE WITNESS:  No, I did not.

8    BY MS. RUSSELL:

9        Q.    And to clarify, when you received

10   the letters from Dr. Auteri and then from his

11   counsel, you were the Vice President of Human

12   Resources, correct?

13       A.    That is correct.

14       Q.    Who was the Vice President of the

15   Medical Staff in October and November of 2021?

16       A.    Dr. Scott Levy.

17       Q.    He was the Vice President of Medical

18   Staff?

19       A.    Yes, he was.

20       Q.    To your knowledge, did Dr. Levy

21   engage in any process for review of

22   Dr. Auteri's exemption request after he

23   submitted the first request to you on

24   October 11th of 2021?

25                    MR. DURHAM:  Objection.

Page 40

 1    in the first paragraph, is October 22nd, 2021.

 2    Do you see that?

 3        A.   Yes, I do.

 4        Q.   Okay.  So for the period from

 5    October 22nd, 2021 through the date of this

 6    letter, which is November 9th, 2021, did you

 7    have any discussions with Dr. Auteri about any

 8    specific accommodations that could be made for

 9    Dr. Auteri in response to his exemption

10    request?

11                MR. DURHAM:  Objection.

12                THE WITNESS:  No, I did not,

13          based upon the fact that his position as

14          the Chief of our Heart Institute would

15          require him to work in a vulnerable

16          patient area, which we could not

17          accommodate with those skill sets and

18          that he -- what he had proposed in his

19          letter -- in your letter, excuse me, was

20          that he would -- that it was not the same

21          type of accommodations.  So he would need

22          to have had twice daily testing, double

23          masking, social distancing, and not eat

24          in the cafeteria, which is what all other

25          associates who requested an exemption

```
 1      were following.
 2  BY MS. RUSSELL:
 3      Q.   After October 22nd, 2021 and on or
 4  before November 9th, 2021, did you discuss any
 5  of those accommodations, changes to protocol
 6  that you just mentioned to me, did you discuss
 7  any of those with Dr. Auteri?
 8      A.   No, I did not.  The accommodations
 9  were set in writing for all associates to --
10  who were requesting exemptions to know and
11  were advised of double masking, twice testing,
12  social distancing, and not eating in the
13  cafeteria.  We're not treating anybody any
14  differently.
15      Q.   So same thing for all associates,
16  right?  Anybody who is in a patient-facing
17  position, there you go, you have to do those
18  standard exemptions, right?  Is that fair?
19                MR. DURHAM:  Objection.
20                THE WITNESS:  No, it is not.
21  BY MS. RUSSELL:
22      Q.   Oh, why not?
23      A.   Because it's not all associates.
24  It's associates who requested an exemption,
25  whether it be medical or religious.
```

Page 42

```
 1        Q.   So any associate who asked for an

 2   exemption, straightforward checklist of those

 3   things, they had to meet those items that you

 4   just mentioned for me; is that correct?

 5                    MR. DURHAM:  Objection.

 6                    THE WITNESS:  So any associate

 7        when we sat down and had a conversation

 8        with them followed these accommodations

 9        that we put forth to them.  There was

10        one, maybe two individuals who we had the

11        conversation of only once testing because

12        they were not in the building more than

13        once a month.

14   BY MS. RUSSELL:

15        Q.   Did you sit down and have that same

16   conversation with Dr. Auteri, you, Ms. Hebel,

17   the Vice President of HR?  Did you sit down

18   and have that discussion with Dr. Auteri?

19        A.   No.

20                    MR. DURHAM:  Objection.

21                    THE WITNESS:  Because the

22        accommodations that he put forth did not

23        meet the accommodations that all other

24        associates who requested an exemption

25        were following.
```

1    BY MS. RUSSELL:

2        Q.    Did you sit down with Dr. Auteri

3    between October 22nd, 2021 and November 9th of

4    2021 and say in form or substance, hey,

5    Dr. Auteri, your proposed accommodations

6    doesn't meet this checklist?  Did you do that?

7                    MR. DURHAM:  Objection.

8                    THE WITNESS:  No, because,

9        again, he had already put a proposal out

10        that didn't meet those accommodations.

11   BY MS. RUSSELL:

12        Q.    Between October 22nd and

13   November 9th of 2021, did you discuss with

14   Dr. Auteri possible reassignment for

15   Dr. Auteri into another area of the hospital?

16                    MR. DURHAM:  Objection.

17                    THE WITNESS:  No, I did not,

18        because his contract specifically stated

19        that he would work in the Heart Institute

20        as a surgeon, and he could not continue

21        to be in that position because that area

22        had been deemed vulnerable patient

23        population.  Therefore, we could not meet

24        the contract.

25   BY MS. RUSSELL: