**EXHIBIT "14"**
**Deposition Transcript of Steve Levy, M.D. taken on February 13, 2025**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOSEPH S. AUTERI, M.D.    :   No. 22-cv-03384
          Plaintiff,      :
                          :
    vs.                   :
                          :
VIA AFFILIATES, d/b/a     :   JURY TRIAL
DOYLESTOWN HEALTH         :   DEMANDED
PHYSICIANS                :
          Defendant.      :

- - -
Thursday, February 13, 2025
- - -

Deposition of SCOTT LEVY, M.D., taken pursuant to notice, at the law offices of Kaplin Stewart Meloff Reiter & Stein, P.C., 910 Harvest Drive, Blue Bell, Pennsylvania, before Michele L. Murphy, a Registered Professional Reporter and Notary Public, on the above date, beginning at approximately 9:34 a.m.

- - -

Page 12

1  specific action in response to her receipt of
2  this letter, D-151 and 152?
3      A.   I did not.
4      Q.   On or after the date of October 11,
5  2021, did you discuss any of the specific
6  provisions of this letter with Dr. Auteri?
7      A.   I did not.
8      Q.   On or after the date of October 11,
9  2021, did you have any written communications
10  with Dr. Auteri in which you discussed any
11 specific provisions of this letter?
12     A.   Is your question subsequent to
13 October 11th?
14     Q.   On or after October 11th.
15     A.   As I've testified previously, I did
16 not.
17     Q.   On or about October 11, 2021 or any
18 time prior thereto, did you know Dr. Auteri to
19 be a christian?
20     A.   I did.
21     Q.   On or before October 11, 2021, did
22 you at any time question the fact that
23 Dr. Auteri was a christian and held religious
24 beliefs?
25              MS. BASSANI:  Objection to

Page 13

```
 1      form.
 2              You can answer.
 3              THE WITNESS:  I did not.
 4   BY MS. RUSSELL:
 5      Q.   The next document that I'm going to
 6   show you, sir, begins at P-713.  Again, you
 7   can take a minute to familiarize yourself with
 8   the document.  You do not have to read it,
 9   although you are welcome to do so.
10      A.   (Witness complies.)
11      Q.   Are you ready to answer a question
12   about the document, sir?
13      A.   I am.
14      Q.   Can you tell me what this is,
15   please?  Again, it begins at Page P-713 and
16   ends at P-718.
17      A.   It appears to be a letter sent from
18   an attorney's office to Mrs. Hebel.
19      Q.   Okay.  Now, the date of this letter
20   that we see here beginning on P-713 is
21   October 22nd, 2021.  Do you see that?
22      A.   I do.
23      Q.   And so as I understand your prior
24   testimony, you did not speak with Dr. Auteri
25   after the date of this letter, October 22nd,
```

Page 42

```
 1   as weekly testing?
 2       A.   Universal testing of all employees?
 3       Q.   Vaccinated employees.
 4       A.   There was some employees who did get
 5   tested based on clinical situations, but there
 6   was no policy to routinely test all employees.
 7       Q.   My question is, was there a policy
 8   to routinely test vaccinated employees from
 9   the August through November 2021 timeframe?
10       A.   There was a policy to test
11   vaccinated employees routinely under specific
12   circumstances.
13       Q.   I'm going to ask again.  Was there a
14   policy to routinely, such as weekly, test all
15   vaccinated employees from August through
16   November of 2021?
17       A.   With the addition of the word "all"
18   that you just added, there was no policy to
19   routinely test all vaccinated employees during
20   that period of time.
21       Q.   Did Doylestown Health know exactly
22   how many employees had COVID on any given day
23   from August to November of 2021?
24       A.   We did.
25       Q.   How did Doylestown Health know that?
```

Page 44

```
 1                THE WITNESS:  I can't possibly
 2      say that was the case or not.  There was
 3      no way I could know that.
 4  BY MS. RUSSELL:
 5      Q.   And you don't know it because you
 6  weren't testing on a routine basis for
 7  vaccinated employees, correct?
 8                MS. BASSANI:  Objection to
 9      form.
10                You can answer.
11                THE WITNESS:  If we -- if
12      there's no clinical reason to test, then
13      we would not know one's clinical
14      situation with any illness.
15  BY MS. RUSSELL:
16      Q.   So if someone wasn't showing
17  symptoms of COVID and they were vaccinated
18  from the August to November '21 timeframe, you
19  weren't testing them routinely, they had to be
20  showing symptoms, correct?
21      A.   That is correct.
22      Q.   Was Doylestown Health tracking
23  internal data, again in this August through
24  November '21 timeframe, regarding the
25  transmission of COVID by vaccinated employees
```

Page 139

1    accommodation in his situation.  It would

2    be inconsistent with the discussions of

3    the Medical Staff.

4  BY MS. RUSSELL:

5    Q.  Motion to strike.

6    On or after October 22nd of 2021,

7  did anyone on behalf of the Medical Staff, VIA

8  Affiliates, Doylestown Health, Doylestown

9  Hospital have any discussions with Dr. Auteri

10  about the testing protocol that he proposed,

11  how it could be altered so that it would be

12  known that Dr. Auteri did not have COVID?

13    MS. BASSANI:  Objection to

14    form.

15    You can answer.

16    THE WITNESS:  I could only

17    respond in that I wasn't aware of any

18    conversations that anyone had with the

19    framing that you just suggested.

20  BY MS. RUSSELL:

21    Q.  Are you aware of anyone who had any

22  discussions with Dr. Auteri on or after

23  October 22nd, 2021 about the accommodation

24  protocols that Dr. Auteri was requesting and

25  about how those protocols could be adjusted so

Page 140

```
 1   that Dr. Auteri could continue working?
 2              MS. BASSANI:  Objection to
 3      form.
 4              You can answer.
 5              THE WITNESS:  As I just
 6      suggested, I have no -- I'm not aware of
 7      any conversations as you just outlined.
 8   BY MS. RUSSELL:
 9      Q.   On October 22nd, 2021, is it fair to
10   say that there could be a vaccinated doctor
11   working at Doylestown Hospital who had
12   COVID-19 and was treating patients?
13      A.   Certainly that's a possibility.
14      Q.   So how is it that patients were
15   safer dealing with a vaccinated doctor who had
16   COVID versus Dr. Auteri who was unvaccinated
17   but tested negative for COVID that day?
18              MS. BASSANI:  Objection to
19      form.
20              You can answer.
21              THE WITNESS:  It's a very
22      important question.
23   BY MS. RUSSELL:
24      Q.   Motion to strike.
25           Answer the question.
```

Page 143

```
 1   absolutely correct, hence the reason for the
 2   population management, because the data
 3   suggested, not an individual basis, from
 4   population, statistically with a P value of
 5   greater than 99 percent, we could do our best
 6   to reduce transmission by vaccinating our
 7   staff.  There is nothing, including daily
 8   testing, that would reach that level of
 9   protection for our patients.  So absolutely.
10        Q.   So on any given day, there could be
11   surgeons and doctors treating patients who had
12   COVID?
13        A.   Absolutely.
14             MS. BASSANI:  Objection.
15   BY MS. RUSSELL:
16        Q.   And you were willing, the Medical
17   Staff at Doylestown Health, Doylestown
18   Hospital, VIA Affiliates, was willing to allow
19   COVID-positive medical providers to treat
20   staff but not Dr. Auteri, correct?
21             MS. BASSANI:  Objection to
22        form.
23             THE WITNESS:  No.  That's
24        not --
25   BY MS. RUSSELL:
```

**Royal Court Reporting**
**(215) 732-0655 www.rcrs.com**

Page 152

```
 1      A.    When you say "Dr. Auteri,"
 2   individuals like Dr. Auteri or specifically --
 3      Q.    No.  That's not my question.
 4   Dr. Auteri.  We're talking about Dr. Auteri's
 5   accommodation request.
 6      A.    Well, Dr. Auteri wasn't even working
 7   on October 22nd, so of course that data didn't
 8   exist.
 9      Q.    Prior to that date, from
10   October 11th, 2021 to October 22nd, 2021, did
11   Doylestown Health, Doylestown Hospital, VIA
12   Affiliates have any data showing that
13   Dr. Auteri was transmitting COVID at a greater
14   rate than a vaccinated care provider?
15      A.    Certainly not.
16      Q.    From August 6th of 2021 through
17   October 22nd of 2021, did Doylestown Health,
18   Doylestown Hospital, VIA Affiliates have any
19   information showing that Dr. Auteri was
20   transmitting COVID at a greater rate than a
21   vaccinated care provider?
22      A.    My pause is related to the fact that
23   the type of data you're suggesting doesn't
24   exist anywhere.  It's like asking with 100
25   percent confidence to predict something that's
```

Page 153

1  going to happen six months from now.  There's
2  no way of collecting that data for anybody at
3  any time on anybody.
4       Q.   So then when anybody would ask for
5  an exemption request, you had no idea whether
6  that individual was transmitting COVID at a
7  higher rate than somebody who was vaccinated,
8  because you don't have that data, do you?
9            MS. BASSANI:  Objection;
10       argumentative.  Let's take it down just a
11       bit.
12            THE WITNESS:  You're conflating
13       individuals from population.  All of the
14       decisions Doylestown made is not based on
15       an N of 1 with an individual.  It's based
16       on a population, and there is significant
17       certainty that from a population
18       viewpoint and any individual in that
19       viewpoint would behave the way the
20       population does.
21            So the answer to your question
22       is Doylestown had a strong level of
23       confidence that any individual who was
24       not vaccinated would be more likely to
25       transmit disease.  On an individual

Page 160

```
 1       I believe you're talking about antigen
 2       COVID testing.
 3              Having a positive test equates
 4       to disease.  Having a negative test
 5       doesn't demonstrate absence of disease.
 6  BY MS. RUSSELL:
 7       Q.   Great.  So then testing doesn't
 8  matter, does it?
 9              MS. BASSANI:  Objection to
10       form.
11              You can answer.
12              THE WITNESS:  I don't believe
13       that's what I indicated.  Testing is a
14       lead indicator for those individuals who
15       are representing symptoms, and there's a
16       strong sensitivity and specificity of
17       those individuals who have the testing.
18  BY MS. RUSSELL:
19       Q.   So testing doesn't necessarily tell
20  you whether somebody has COVID, right?
21       A.   Not in every instance, correct.
22       Q.   And somebody who is vaccinated may
23  have COVID, right?
24       A.   That's correct.
25       Q.   And somebody who is vaccinated may
```

Page 161

```
 1   have COVID and could be spreading the virus
 2   and they don't have symptoms, right?
 3       A.   That's a possibility.
 4       Q.   So no matter whether somebody is
 5   vaccinated or they're not vaccinated, they
 6   could have COVID on any given day and you
 7   wouldn't know it, right?
 8               MS. BASSANI:  Objection to
 9       form.
10               You can answer.
11               THE WITNESS:  That is
12       absolutely a possibility in an individual
13       case, certainly.
14   BY MS. RUSSELL:
15       Q.   Was the Johnson & Johnson vaccine
16   offered as part of a mandate in August of --
17   the mandate in August of '21?
18       A.   I believe we did have access to that
19   vaccine, and that was one of the vaccination
20   protocols that was considered acceptable.
21       Q.   At any time from March of 2020
22   through the date that you retired, did
23   Doylestown Health, Doylestown Hospital, or VIA
24   Affiliates receive any COVID relief funds
25   directly or indirectly from a government
```

Royal Court Reporting
(215) 732-0655 www.rcrs.com

```
                                                    Page 171
 1   BY MS. RUSSELL:
 2       Q.   Right.  So getting rid of Dr. Auteri
 3   was part of having the 100 percent compliance,
 4   right?
 5            MS. BASSANI:  Objection;
 6       misstates his testimony.
 7            THE WITNESS:  It's a
 8       hypothetical, and if Dr. Auteri stayed
 9       with an appropriate waiver, he would have
10       been -- equally you would have met that.
11   BY MS. RUSSELL:
12       Q.   But nobody talked to Dr. Auteri
13   after October 11, 2021 about his specific
14   accommodation request and how he could be
15   accommodated, as you said previously in your
16   testimony, correct?
17       A.   As far as my understanding, that's
18   correct.
19       Q.   And it's fair to say just by looking
20   at these documents in front of you that
21   Doylestown Health was using its 100 percent
22   compliance rate to promote Doylestown Health;
23   isn't that fair?
24            MS. BASSANI:  Objection to
25       form.
```

Page 177

```
 1     Q.   Nobody else?
 2     A.   That's correct.
 3     Q.   So other than anybody who may have
 4  overheard the conversation, no one else was
 5  present?
 6     A.   That's correct, and we were pretty
 7  careful being in a fairly quiet area of the
 8  hospital speaking relatively quietly.  So I
 9  don't think there's anybody --
10     Q.   You said a quiet area of the
11  hospital.  You mean the restaurant?
12     A.   Thank you.  Quiet area of the
13  restaurant.
14     Q.   All right.  In the October 10th,
15  2021 meeting, do you recall telling Dr. Auteri
16  that he would be fired if he didn't take the
17  vax by 4:59 p.m. the following day?
18     A.   I do.
19     Q.   In the meeting on October 10th of
20  2021, do you recall telling Dr. Auteri that if
21  he didn't take the vax, he'd be known as a
22  loser?
23     A.   I'm sorry.  Can I just clarify the
24  first, and I will certainly get to the second.
25          I believe telling him that he would
```

```
                                                        Page 180
 1    make a mistake that would hurt his career; is
 2    that your testimony?
 3              MS. BASSANI:  Objection;
 4        mischaracterizes his testimony.
 5              THE WITNESS:  Absolutely not.
 6        In all of my conversations with Joe,
 7        other than him mentioning back in 2006 or
 8        '07 -- and I was aware of his religious
 9        beliefs -- that he got a home and whether
10        he was going to take this job at
11        Doylestown or uplift his family from
12        Virginia and make this major decision, he
13        had to go home and pray to God and help
14        work through the decision, Joe and I
15        never in the months of COVID had any
16        discussion regarding religious beliefs,
17        religious waiver.  All of our dialogue
18        was strictly around the science and the
19        medical components, the risks of the
20        vaccine, the benefit of vaccine, the
21        population benefit.  We never had any
22        discussion about the religious component
23        and certainly not at that October 10th
24        meeting.
25    BY MS. RUSSELL:
```

Page 181

1  Q. So you knew in October of 2021 that
2  Dr. Auteri was a christian. Fair?
3  A. I did.
4  Q. And in October of 2021, you were
5  just telling him to take the vax or he'd be
6  known only for not taking the vax, right?
7        MS. BASSANI: Objection to
8     form.
9        You can answer.
10        THE WITNESS: That's not the
11     way I categorized the discussions at all.
12  BY MS. RUSSELL:
13  Q. Well, you gave me the long analogy
14  about --
15  A. It was --
16  Q. -- Bill Buckner.
17  A. It was not that you need to take the
18  vaccine or else be remembered for that. It's
19  somebody who is a man of science who is so
20  well respected.
21        I considered Joe and I friends
22  during this period of time. He would come to
23  my office every four weeks if we didn't see
24  each other, discuss various things. We had a
25  lot of similarities in our views about things,