**EXHIBIT "15"**
**Deposition Transcript of James Brexler taken on February 17, 2025**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


JOSEPH S. AUTERI, M.D.  :  No. 22-cv-03384
       Plaintiff,  :
                :
    vs.  :
                :
VIA AFFILIATES, d/b/a  :  JURY TRIAL
DOYLESTOWN HEALTH  :  DEMANDED
PHYSICIANS  :
       Defendant.  :


- - -
Monday, February 17, 2025
- - -


Deposition of JAMES BREXLER,
taken pursuant to notice, at the law offices
of Kaplin Stewart Meloff Reiter & Stein,
P.C., 910 Harvest Drive, Blue Bell,
Pennsylvania, before Michele L. Murphy, a
Registered Professional Reporter and Notary
Public, on the above date, beginning at
approximately 9:32 a.m.

- - -

Page 7

```
 1    Affiliates and Doylestown Hospital as
 2    Doylestown Health, unless I need to make a
 3    distinction for the purpose of a question.
 4              Is that acceptable to you, sir?
 5        A.   Yes, ma'am.
 6              MR. DURHAM:  I'm going to
 7         interpose an objection to that
 8         combination.
 9    BY MS. RUSSELL:
10        Q.   Describe your duties for me as the
11    President and CEO of Doylestown Health.
12        A.   I'm the chief executive over the
13    entire enterprise of Doylestown Health,
14    including the hospital, VIA Affiliates, and
15    all the subsidiaries of Doylestown Hospital.
16    I have the ultimate responsibility from a
17    manager point of view of the hospital and
18    report directly to the Board of Trustees.
19        Q.   So what is your exact title with
20    regard to VIA Affiliates?  Is that President?
21        A.   Yes, ma'am.
22        Q.   Okay.  And who reports directly to
23    you as the President of VIA Affiliates?
24        A.   I am the President of VIA
25    Affiliates.
```

Page 8

1        Q.    But I mean who reports to you

2    directly?  Since you are the President of VIA

3    Affiliates, who are your direct reports there?

4        A.    Scott Levy and Matt.

5                MR. DURHAM:  Are you referring

6        to currently?

7                THE WITNESS:  Mm-hmm.

8                COURT REPORTER:  Is that a yes?

9                THE WITNESS:  Yes.  I'm just

10        trying to place the organizational

11        structure of VIA Affiliates.

12                I might want to correct that.

13        I'm just trying to remember.  I think --

14        to be honest with you, I don't remember

15        whether or not Dr. Levy was the President

16        of the VIA Affiliates or I was the

17        President of VIA Affiliates, but it

18        reported to me as the CEO of Doylestown

19        Health.

20    BY MS. RUSSELL:

21        Q.    Is Dr. Levy currently employed?

22        A.    I don't know.  He's not employed by

23    Doylestown Hospital.

24        Q.    Okay.  When did Dr. Levy leave his

25    position at VIA Affiliates as you testified?

1      A.   He retired last summer.  I don't

2  remember the exact date.

3      Q.   Was Dr. Levy's e-mail address from

4  the period of July 2021 through January 2022

5  SLevy@dh.org?

6      A.   I believe so, yes.

7      Q.   Was Dr. Levy authorized to use that

8  e-mail during the term of Dr. Levy's

9  employment?

10                MR. DURHAM:  Objection.

11                THE WITNESS:  Yes.

12  BY MS. RUSSELL:

13      Q.   Was Dr. Levy disciplined for any

14  e-mails that Dr. Levy sent out from that

15  e-mail address from the time period of

16  March 2020 through the end of January 2022?

17                MR. DURHAM:  Objection.

18                THE WITNESS:  Not to my

19     knowledge.

20  BY MS. RUSSELL:

21      Q.   Was Dr. Levy told to rescind any

22  e-mails that Dr. Levy issued from that e-mail

23  address from the time period of March 2020

24  through the end of January 2022?

25                MR. DURHAM:  Objection.

```
 1                    THE WITNESS:  Not to my
 2      knowledge.
 3   BY MS. RUSSELL:
 4        Q.   Do you know Barbara Hebel?
 5        A.   Yes.
 6        Q.   Who do you know Ms. Hebel to be?
 7        A.   She's my Vice President of Human
 8   Resources.
 9        Q.   Is Ms. Hebel a direct report to you,
10   sir?
11        A.   Yes, ma'am.
12        Q.   Was Ms. Hebel's e-mail address in
13   July 2021 through to the end of January 2022
14   BHebel@dh.org?
15        A.   Yes.
16        Q.   Was Ms. Hebel authorized to use that
17   e-mail address during the term of her
18   employment?
19        A.   Yes.
20        Q.   Was Ms. Hebel disciplined for any
21   e-mails that Ms. Hebel sent from that e-mail
22   address from the time period of March 2020
23   through the end of January 2022?
24                    MR. DURHAM:  Objection.
25                    THE WITNESS:  No.
```

1    BY MS. RUSSELL:

2        Q.    Was Ms. Hebel told to rescind any

3    e-mails that Ms. Hebel sent from that e-mail

4    address from the timeframe of March 2020

5    through the end of January 2022?

6                    MR. DURHAM:  Objection.

7                    THE WITNESS:  Not to my

8        knowledge.

9    BY MS. RUSSELL:

10       Q.    The duties that you described

11   earlier in your deposition, were those the

12   duties that you held from the timeframe of the

13   beginning of 2021 through the end of

14   January 2022?

15       A.    Would you clarify the duties I

16   described?

17       Q.    You testified as to certain duties

18   and responsibilities that you have in

19   connection with your employment.  Do you

20   recall that testimony?

21       A.    Yes.

22       Q.    Okay.  So my question to you is, did

23   you perform those same duties in the timeframe

24   of January 2020 through the end of

25   January 2022?

Page 17

 1   BY MS. RUSSELL:

 2       Q.   Did you ever receive a copy of this

 3   letter from Dr. Auteri?

 4       A.   I -- no.

 5       Q.   So after you received it, you still

 6   didn't have any communications with Dr. Auteri

 7   about it?

 8                 MR. DURHAM:  Objection; asked

 9        and answered.

10                 THE WITNESS:  No.

11   BY MS. RUSSELL:

12       Q.   Did you know Dr. Auteri to be a

13   christian?

14       A.   I believe that -- yes.

15       Q.   At any time did you question the

16   sincerity of Dr. Auteri's religious beliefs?

17                 MR. DURHAM:  Objection.

18                 THE WITNESS:  Never.

19   BY MS. RUSSELL:

20       Q.   The next document I'm showing you

21   begins at P-713.  Can you tell me what this

22   document is, sir?

23                 MR. DURHAM:  Take a minute to

24        review it if you need to, Jim.

25                 (Brief pause.)

```
 1    Dr. Foley issued this letter to Dr. Auteri?
 2                    MR. DURHAM:  Objection.
 3                    THE WITNESS:  To my knowledge,
 4        she had no discussion with anyone about
 5        requests for exemptions.  The medical
 6        staff had its own process for requesting
 7        exemptions separate from the hospital.
 8    BY MS. RUSSELL:
 9        Q.   To your knowledge, did anyone ever
10    have a discussion with Dr. Auteri about his
11    specific request for exemptions and request
12    for accommodations other than the two letters
13    that we've looked at here today, one from Ms.
14    Hebel and one from Mr. Durham of Duane Morris?
15                    MR. DURHAM:  Objection.
16                    THE WITNESS:  I'm not aware of
17        any.
18    BY MS. RUSSELL:
19        Q.   The next document is P-732.  Can you
20    tell me what this document is, please?
21        A.   This is notification to Dr. Auteri
22    from Ms. Pernitsky, who is the Director of
23    Medical Staff Services at the hospital,
24    indicating that his medical staff membership
25    and privileges have been terminated.
```

1        why he was talking to Dr. Auteri.

2    BY MS. RUSSELL:

3        Q.   Did you ask Mr. Gorsky to speak with

4    Dr. Auteri?

5        A.   Yes, I did.

6        Q.   Why?

7        A.   I asked if he would be comfortable

8    doing that.

9        Q.   Why?

10       A.   Because, quite honestly, I wanted

11   our Chief of Cardiac Surgery to get the

12   vaccine and be able to continue to be the

13   Chief of Cardiac Surgery, and given the

14   position he was taking, it was going to be

15   nearly impossible for us to figure a way to

16   work through that.

17       Q.   When did you ask Mr. Gorsky to talk

18   to Dr. Auteri about Dr. Auteri's refusal to

19   take the vaccine?

20       A.   That would have likely been the

21   evening after the meeting that Dr. Auteri and

22   I had to discuss his concerns.

23       Q.   When was that meeting?

24       A.   I don't remember the exact date.

25   I'm sure it's documented somewhere.

1          Q.   Did you tell Mr. Gorsky all of those

2     other people's names who refused to take the

3     vaccine and ask Mr. Gorsky to call them?

4          A.   No, ma'am.

5                    MR. DURHAM:   Objection.

6     BY MS. RUSSELL:

7          Q.   So this was just specific to

8     Dr. Auteri, that you asked Mr. Gorsky to pick

9     up the phone and call Dr. Auteri and try to

10    get him to take the vax, correct?

11         A.   It was specific to Mr. Gorsky, who

12    Dr. Auteri and Mr. Gorsky knew each other very

13    well, were part of the development of the

14    Heart Center and was part of the funding

15    program, and was the head of the program that

16    invented the vaccine and the head of our

17    cardiac surgery program that was refusing at

18    that point to take the vaccine.  So it was a

19    very important call.  I felt that it was worth

20    calling Mr. Gorsky and asking if he would

21    be -- after I had asked Joe if he would be

22    open to talking to Mr. Gorsky, and he said he

23    would.  So I did it on follow-up of that

24    conversation with Dr. Auteri.

25         Q.   So it wasn't worth it to have

1    Mr. Gorsky call any of the other people who

2    were refusing to take the vaccine; is that

3    fair?

4                    MR. DURHAM:  Objection.

5                    THE WITNESS:  We have the

6         highest paid, most prominent surgeon, and

7         it felt like it was an appropriate issue

8         to ask that he have that conversation

9         with Dr. Auteri.  No, I would not have

10        Mr. Gorsky contact every employee in

11        Doylestown Health.

12   BY MS. RUSSELL:

13        Q.   Did I hear you to say that

14   Mr. Gorsky was a donor to the cardiac program

15   somehow?

16        A.   He was a donor --

17                   MR. DURHAM:  Objection.

18                   THE WITNESS:  He was a donor to

19        our One Vision Campaign, major donor,

20        which went to the cardiac -- to the whole

21        heart program.

22   BY MS. RUSSELL:

23        Q.   Major donor.  What do you mean by

24   that?

25        A.   Multiple millions of dollars.

```
 1      Q.   And so by the time that you were
 2  asking Mr. Gorsky to call Dr. Auteri, is it
 3  fair to say that Mr. Gorsky was already a,
 4  quote, major donor to the One Vision Campaign
 5  which funded the cardiac program?
 6              MR. DURHAM:  Objection.
 7              THE WITNESS:  Yes.
 8  BY MS. RUSSELL:
 9      Q.   Did VIA Affiliates, Doylestown
10  Hospital, or Doylestown Health offer
11  Dr. Auteri reinstatement at any time after
12  November 18, 2022?
13              MR. DURHAM:  Objection.
14              THE WITNESS:  Not to my
15      knowledge.
16  BY MS. RUSSELL:
17      Q.   As of January 2022, Doylestown
18  Health had implemented a testing program for
19  unvaccinated employees to be tested on a
20  regular basis, correct?
21              MR. DURHAM:  Objection.
22              THE WITNESS:  I'm not
23      specifically aware of that.  We probably
24      did, but I'm not -- I don't know
25      specifics about that.
```

Page 112

1   there is an e-mail from Dr. Levy dated

2   January 7th of 2022?

3        A.   Yes.

4        Q.   Do you see that e-mail?

5        A.   Yes.

6        Q.   And in this e-mail, Dr. Levy is

7   listing certain conditions under which

8   employees who had tested positive for COVID

9   could return to work at various times.  Do you

10  see that?

11       A.   I do.

12       Q.   Was Dr. Auteri offered reinstatement

13  at any time in January of 2022 or thereafter

14  if Dr. Auteri would follow the testing

15  protocol that we just looked at?

16            MR. DURHAM:  Objection.

17            THE WITNESS:  I don't believe

18       so.

19  BY MS. RUSSELL:

20       Q.   Was Dr. Auteri offered reinstatement

21  at any time on or after January '22 if he

22  would follow the return-to-work protocol that

23  is outlined on P-247 and P-248?

24            MR. DURHAM:  Objection.

25            THE WITNESS:  I don't believe

1       so.

2   BY MS. RUSSELL:

3       Q.   Okay.  Please flip over and look at

4   Pages 302 and 303.  You will see on Pages 302

5   and 303 that there is an e-mail from Dr. Levy

6   sent on Wednesday, January 26, 2022 and talks

7   again about a return-to-work protocol where

8   employees who tested positive for COVID could

9   return to work under certain conditions.  Do

10  you see that?

11      A.   I do.

12      Q.   And under the heading that says

13  Symptoms and Testing Positive, this is at the

14  bottom of P-302, there is a bullet.  There's

15  bullet Day 0, Day 4, and Day 5.  Day 5 says

16  "symptoms improved, return without testing,"

17  and the word "without" is underlined.

18           Do you see that?

19      A.   Yes.

20      Q.   Does this reflect a return-to-work

21  policy that was in effect in January of 2022?

22                 MR. DURHAM:  Objection.

23                 THE WITNESS:  It appears to.

24  BY MS. RUSSELL:

25      Q.   Was Dr. Auteri offered reinstatement

1    at any time on or after January of 2022 if

2    Dr. Auteri followed this return-to-work

3    protocol?

4                    MR. DURHAM:  Objection.

5                    THE WITNESS:  I don't believe

6        so.

7    BY MS. RUSSELL:

8        Q.   Was Dr. Auteri offered reinstatement

9    to his employment at any time in 2022 under

10   any circumstances?

11       A.   I don't believe so.

12       Q.   Prior to October 11th of 2021, which

13   again is the date of the first exemption

14   request, do you recall having a conversation

15   with Dr. Auteri wherein you requested

16   Dr. Auteri after taking the vax to have a

17   conversation or conduct a meeting with nurses

18   to inform them that Dr. Auteri had studied the

19   data and taken the vax himself?

20       A.   No, ma'am.

21       Q.   Do you recall at any time saying to

22   Dr. Auteri that you wanted Dr. Auteri to talk

23   to a group of the nurses who were concerned

24   about taking the COVID-19 vaccine?

25       A.   I did not ask Dr. Auteri to do that.

1      Q.   Did you ever have any discussions

2  with Dr. Auteri about discussions that could

3  be had with nurses to help them address their

4  concerns about taking the COVID-19 vaccine?

5                  MR. DURHAM:  Objection.

6                  THE WITNESS:  I did indicate to

7        Dr. Auteri as the leader of the heart

8        program that if he -- as it had been

9        known generally that he was not

10       comfortable with the vaccine, should he

11       go forward and take the vaccine and feel

12       comfortable taking it, that that could be

13       a role -- it would be influential in

14       helping others maybe feel more

15       comfortable taking the vaccine in his

16       leadership role.

17  BY MS. RUSSELL:

18     Q.   When did you have that discussion

19  with Dr. Auteri?

20     A.   In the same meeting in my office

21  that I described earlier.

22     Q.   Okay.  And so that pre-dates the

23  first exemption request on October 11th of

24  2021, correct?

25     A.   I believe it does, yes.

Page 123

1     Q.   Let me repeat the question.

2         I just went through a timeline of

3  meetings that people had with Dr. Auteri to

4  try to get him to take the vaccine?

5     A.   Yes.

6     Q.   Did Doylestown Health take all of

7  those same steps with each and every other

8  staff member who refused to take the COVID-19

9  vaccine?

10     A.   Over that period of time --

11           MR. DURHAM:  Objection.

12           THE WITNESS:  -- we had

13     multiple meetings, multiple education

14     sessions, multiple small group sessions

15     with all the associates that had concern

16     about the vaccine to do the same effort

17     of educating them, giving them --

18     answering their questions, the Q&A that

19     you saw that you presented to me, all

20     part of an effort to educate people as to

21     the science and to the rationale around

22     why the vaccine was so important to

23     protecting our patients and each other.

24  BY MS. RUSSELL:

25     Q.   Did you meet with every staff member

1  who refused to take the vaccine to convince

2  them to take it?

3      A.   Absolutely not.

4      Q.   Did Dr. Guidera conduct an

5  intervention meeting with every other staff

6  member who refused to take the vaccine?

7              MR. DURHAM:  Objection.

8              THE WITNESS:  I don't -- no.

9  BY MS. RUSSELL:

10     Q.   Did Mr. Gorsky have a conversation

11 with every other staff member who refused to

12 take the vaccine to try to convince them to do

13 so?

14             MR. DURHAM:  Objection.

15             THE WITNESS:  No.

16 BY MS. RUSSELL:

17     Q.   Did Dr. Levy have a meeting with

18 every other staff member who refused to take

19 the vaccine to try to convince them to do so?

20     A.   Actually, in Dr. Levy's case, he

21 held Zoom call meetings, question-and-answer

22 sessions with every associate that was

23 available to us to answer questions and talk

24 to them.

25     Q.   When certain staff members refused

1   to take the vaccine, did Dr. Levy meet with

2   each of those staff members to try to convince

3   them to take the vaccine?

4        A.   No.

5                  MR. DURHAM:  Objection.

6   BY MS. RUSSELL:

7        Q.   After Dr. Auteri made his request

8   for an exemption, did you meet with Dr. Auteri

9   to discuss his exemption and accommodation

10  request?

11       A.   No, ma'am.

12       Q.   After Dr. Auteri made his exemption

13  request, did Dr. Guidera conduct an

14  intervention meeting to try to discuss

15  Dr. Auteri's exemption and accommodation

16  request?

17                 MR. DURHAM:  Objection.

18                 THE WITNESS:  I'm not aware of

19     that.

20  BY MS. RUSSELL:

21       Q.   After Dr. Auteri made the exemption

22  request, did Dr. Levy have another meeting

23  with Dr. Auteri to discuss his exemption and

24  accommodation request?

25       A.   I'm not aware of that.

1        Q.   After Dr. Auteri made his exemption

2    request and had his conversation with

3    Mr. Gorsky that you testified Mr. Gorsky

4    reported to you, did Mr. Gorsky have another

5    call with Dr. Auteri in which Mr. Gorsky

6    discussed Dr. Auteri's exemption request and

7    request for accommodation?

8                    MR. DURHAM:  Objection.

9                    THE WITNESS:  Not that I'm

10       aware of.

11   BY MS. RUSSELL:

12       Q.   After Dr. Auteri made his first

13   exemption request on October 11th of 2021, did

14   anyone take that request to the Infectious

15   Disease Committee or the Infection Control

16   Department, anyone who was operating in the

17   capacity of infectious disease or infection

18   control, and consult with them about

19   Dr. Auteri's specific exemption request?

20                    MR. DURHAM:  Objection.

21                    THE WITNESS:  I'm not aware of

22       that.

23   BY MS. RUSSELL:

24       Q.   Dr. Auteri made his second exemption

25   request on October 22nd of 2021.  Did anyone