**EXHIBIT "22"**
**Deposition Transcript of Alex Gorsky taken on May 13, 2025**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSEPH S. AUTERI, M.D. | : | No. 22-cv-03384 |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| VIA AFFILIATES, d/b/a | : | JURY TRIAL |
| DOYLESTOWN HEALTH | : | DEMANDED |
| PHYSICIANS | : | |
| Defendant. | : | |

\- - -

Tuesday, May 13, 2025

\- - -

Deposition of ALEX GORSKY, taken pursuant to notice, via videoconference, before Michele L. Murphy, a Registered Professional Reporter and Notary Public, on the above date, beginning at approximately 10:01 a.m.

\- - -

relationship outside of the hospital with him.

Q. Okay. So either you or Mr. Brexler both thought that maybe you could convince Dr. Auteri to take the vaccine because of your relationship with Dr. Auteri, correct?

MR. DURHAM: Objection.

THE WITNESS: I don't think it was a matter of convincing Joe. I think, you know, Joe is obviously a trained physician that would need to make his own decision. I think it was a matter of seeing if there was any other additional information or data that I could provide that might be helpful to him in his decision.

BY MS. RUSSELL:

Q. What other information or data did you give Dr. Auteri on the call?

A. Again, I don't remember specifically what we talked about regarding the -- probably the vaccine but just what we were seeing with COVID at that time.

Again, these were very different times, and people were quite fearful.

Q. Is it fair to say that if Dr. Auteri had taken the vax, you would consider that to be for the good of the heart program and that was part of why you were willing to talk to Dr. Auteri?

MR. DURHAM: Objection.

THE WITNESS: I think it would have been for the good of the hospital and the community more broadly.

BY MS. RUSSELL:

Q. How so?

A. Just as I said, so that the hospital was trying to do I feel what was in the best interest of the community, patients, and the staff at that time, and as he made his decision, I just wanted to make sure he had as much information and data as possible so that he could do it from the best informed basis.

Q. Are you aware that Dr. Auteri had requested a religious exemption and corresponding accommodations from his employer the day before you spoke with him?

MR. DURHAM: Objection.

THE WITNESS: I was not aware

of all of his negotiations or discussions back and forth with the hospital.

BY MS. RUSSELL:

Q. So Mr. Brexler didn't tell you that before you called Dr. Auteri?

A. Again, at a high level, I just remember Jim expressing that Joe had some concerns. The ones I remember most relate to -- related to this either again pre-dispositive test or incidents of COVID, and some discussions I note he obviously had some issues philosophically related to it, but that's all I remember.

Q. Did you discuss at all the fact that Dr. Auteri had made a request for a religious exemption and corresponding accommodations from the Doylestown Health mandate before you spoke with Dr. Auteri?

A. I don't remember that, no.

Q. By the time that you concluded your call with Dr. Auteri, did you have an understanding one way or another as to whether Dr. Auteri was in fact going to take the COVID-19 vaccine?

A. Again, from what I remember, I felt

that there was still uncertainty whether he would or not.

Q. Did you come out and ask him?

A. I don't remember. I think we went back and forth, but it was not my -- I didn't see it as my objective, as I remember, to come to a specific issue. Again, it was to make sure that he had as much information as possible to make his decision.

Q. So you said there was some uncertainty by the end of your call about what Dr. Auteri would do, but how long was your call?

A. I don't remember exactly.

Q. After you had the call with Dr. Auteri, did you go to any researchers at Johnson & Johnson and say in words or substance, hey, there's some uncertainty as to whether Dr. Auteri is going to take this, what could we do to accommodate Dr. Auteri if he won't take it? Did you do that in form or in substance?

MR. DURHAM: Objection.

THE WITNESS: No, not that I remember.

(Court Reporter read back as follows: "After you had the call with Dr. Auteri, did you go to any researchers at Johnson & Johnson and say in words or substance, hey, there's some uncertainty as to whether Dr. Auteri is going to take this, what could we do to accommodate Dr. Auteri if he won't take it? Did you do that in form or in substance?"

Answer: "No, not that I remember.")

BY MS. RUSSELL:

Q. So after this discussion, did you, Mr. Gorsky, undertake any investigation, whether with Johnson & Johnson or otherwise, as to how Dr. Auteri could be accommodated if he still was not going to take the vaccine?

MR. DURHAM: Objection.

THE WITNESS: No.

BY MS. RUSSELL:

Q. Did you offer to have Dr. Auteri talk to any researchers at Johnson & Johnson as to how Dr. Auteri's request for a religious exemption could be accommodated?

MR. DURHAM: Objection, lacks

foundation, among other things.

THE WITNESS: No. I think if I would have extended an offer to speak with anyone, it was to give factual information about the vaccines, not regarding anything having to do with a hospital policy or exemptions. Again, quite consistent with my earlier statements, it would have had to do with the data, the information regarding the vaccines themselves, and the broader impact on individuals, the community, caregivers, public health policy.

BY MS. RUSSELL:

Q. Well, Mr. Gorsky, as I told you earlier, Dr. Auteri did request a religious exemption to the vaccine, the Doylestown Health mandate, the day before you spoke with him, and you've testified that you were uncertain as to what Dr. Auteri was going to do by the end of your phone call. So my question is, what, if anything, did you do to help facilitate an accommodation should Dr. Auteri still decide not to take the COVID-19 vaccine? Did --