## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOSEPH S. AUTERI, M.D.** | : | |
| Plaintiff, | : | No. 2:22-cv-03384 |
| | : | |
| v. | : | |
| | : | |
| **VIA AFFILIATES, d/b/a** | : | |
| **DOYLESTOWN HEALTH** | : | |
| **PHYSICIANS** | : | |
| Defendant. | : | |

### SUR-REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

While this Court's rules and policies provide that Reply and Sur-Reply briefs should be filed only when absolutely necessary <u>and</u> only in circumstances where the parties wish to draw the Court's attention to controlling authority not previously cited, Defendant VIA Affiliates, d/b/a Doylestown Health Physicians (**"Doylestown Health"**) filed its Reply Brief without citing any new controlling authority. Instead, Doylestown Health circumvented that rule and filed a Reply relying upon *Slattery v. Main Line Health, Inc.* , No. 22-4994, 2025 WL 1758616 (E.D. Pa. June 25, 2025), a <u>non-precedential</u> decision issued AFTER Plaintiff Joseph S. Auteri, M.D.'s  Response brief was filed. Doylestown Health used this Court's Reply process not to cite new controlling authority, but rather as a vehicle under the guise of *Slattery* to make additional arguments against Dr. Auteri's opposition, despite the fact that *Slattery* is neither legally controlling nor factually analogous. Doylestown Health's Reply necessitates this Sur-Reply to address the non-controlling case upon which Doylestown Health now relies.  Dr. Auteri respectfully requests this Court's review and consideration of this Sur-Reply.

1

II.    **LEGAL ARGUMENT**

A.    **SLATTERY IMPROPERLY MAKES CREDIBILITY DETERMINATIONS ON SUMMARY JUDGMENT**

The United States Supreme Court, Third Circuit Court of Appeals, and this Court have consistently held that the presence of personal or scientific objections alongside religious beliefs does <u>not</u> nullify the religious basis for an accommodation request and are issues of credibility and fact to be determined at trial. *Slattery* does not follow that precedent and usurps the role of the factfinder. Doylestown Health similarly requests this court to ignore the factfinder's critical role long protected by the Courts.

In *Slattery*, the court determined that "based on the uncontroverted facts in the record, Plaintiff's request is scientific and/or medical in nature, not religious." 2025 WL 1758616, at 5. That conclusion represents exactly the type of credibility determination that courts must not make at summary judgment. As the Supreme Court held in *United States v. Seeger*, 380 U.S. 163, 185 (1965), "the threshold question of sincerity . . . is, of course, a question of fact." Similarly, this Court recently recognized in *Glover v. Children's Hospital of Philadelphia* that "whether the additional, nonreligious reasons cited by Plaintiff nullify the religious reasons he cited is a question of credibility for a jury to decide." 2024 WL 290421, at 10-11 (E.D. Pa. Jan. 25, 2024) (emphasis added).

The Seventh Circuit's analysis in *Passarella v. Aspirus, Inc.*, 108 F.4th 1005 (7th Cir. 2024), which Dr. Auteri cited in his opposition, further illuminates why *Slattery's* approach is problematic. *Passarella* held that Title VII protects religious accommodation requests that are based "at least in part" on religious beliefs, even when medical or scientific concerns are also present. *Id*. at 1009-1010. As *Passarella* explained, "a religious belief does not cease to be religious simply because the believer derives additional support from scientific or medical sources." *Id*. at 1010.

Doylestown Health argued strenuously in its motion that the Third Circuit's *Africa* test provides the controlling framework for determining whether beliefs qualify as religious but *Slattery* disregards that test. The *Slattery* court (which Doylestown Health called "nearly identical") never mentions, much less applies, the three-part *Africa* analysis. That omission is particularly glaring given that Doylestown Health itself brought *Africa* to this Court's attention as the <u>governing standard</u>.   A decision which fails to apply the very test Doylestown Health claims is controlling can hardly support Doylestown Health's position on summary judgment.

Even if the *Slattery* court's analysis followed controlling precedent, which it does not, Doylestown Health's attempt to conflate Dr. Auteri's exemption request with the plaintiff's request in *Slattery* as "nearly the exact same" fundamentally mischaracterizes the nature and scope of Dr. Auteri's deeply held religious convictions AND Dr. Auteri's role on the Medical Executive Committee:

- Dr. Auteri made medical and scientific objections to the Mandate in the context of Dr. Auteri's role as a member of the Medical Executive Committee, which Committee was debating the implementation of the Mandate, and Dr. Auteri expressed concerns about the potential effects of the Mandate based upon Dr. Auteri's fulfillment of his role as a cardiothoracic surgeon.  Dr. Auteri did not raise or address his Exemption Requests in those Medical Executive Committee meetings.  The *Slattery* plaintiff had no such role and Doylestown Health cannot refute that critical distinction.
- Unlike the plaintiff in *Slattery*, who offered minimal religious language in her exemption request, Dr. Auteri's request is grounded in a comprehensive theological framework which unquestionably satisfies the Third Circuit's *Africa* test that Doylestown Health invokes. Dr. Auteri's exemption request explicitly cites his reliance on Biblical Scripture, specifically citing 1 Corinthians 6:19-20 regarding the sanctity of the human body as a temple of the Holy Spirit given by God and bought with a price, and Dr. Auteri's invocation of the directive in Acts 5:29 establishing the mandate to "obey God rather than men." Dr. Auteri's request is consistent with Dr. Auteri's known deliberate spiritual discernment process involving prayer and fasting on multiple matters of importance in Dr. Auteri's life, including Dr. Auteri's decision to accept employment at Doylestown Health, about which former Doylestown Health Chief Medical Officer Dr. Levy was aware and so testified. Dr. Auteri's comprehensive system of religious beliefs stands in stark

contrast to *Slattery's* sparse religious references that the Court identified as scientific concerns "couched with religious language."

The *Slattery* court's rejection was based precisely on the absence of the theological depth and comprehensive religious framework that characterizes Dr. Auteri's request. For the Court's convenience, Dr. Auteri attaches a side-by-side compilation of the *Slattery* exemption request with the relevant portion Dr. Auteri's First Exemption Request as **Exhibit "1"** hereto. Where *Slattery* failed to articulate beliefs which "address fundamental and ultimate questions having to do with deep and imponderable matters" or demonstrate a belief system which is "comprehensive in nature" with "certain formal and external signs," Dr. Auteri's exemption request and other conduct satisfies all three prongs of the Africa analysis. The record is replete with overwhelming evidence of the formal and external signs of Dr. Auteri's sincere religious belief and his religious basis for the Exemption Requests.

Doylestown Health cannot simply point to alleged shared factual premises about vaccine mechanisms and claim equivalence between two different plaintiffs' fundamentally different requests. Dr. Auteri's comprehensive theological objection, rooted in Scripture and demonstrated through a lifetime of sincere Christian practice, represents precisely the type of genuine religious conviction that Title VII protects. Doylestown Health's effort to reduce Dr. Auteri's profound religious testimony to mere scientific skepticism ignores both the extensive theological foundation Dr. Auteri provided and the clear legal distinction between predominantly secular concerns dressed in religious language and authentically religious beliefs that reference factual understanding of the material world.

As Doylestown Health acknowledges, the *Slattery* court granted summary judgment expressly on the basis "that the medical exemption request was scientific rather than religious." If this Court finds even the possibility that a reasonable juror could conclude that Dr. Auteri's request

constitutes a genuine religious belief, then *Slattery* becomes entirely irrelevant because the foundational premise for that court's rejection is categorically different from the circumstances presented here. At a minimum, the comprehensive theological framework underlying Dr. Auteri's exemption request creates a genuine issue of material fact regarding the religious nature of Dr. Auteri's beliefs which precludes summary judgment and must be resolved by the finder of fact.

### B.    FACTUAL DISTINCTIONS FROM SLATTERY

In attempting to leverage *Slattery*, Defendant inadvertently shows a distinction which precludes summary judgment. In Slattery, footnote 4 reveals that the "plaintiff relied heavily on the opinions of two experts: Dr. Peter McCullough . . . and Dr. Akram Boutros," whose reports were excluded. (Def.'s Reply at 5). The Slattery court noted that because plaintiff "relied heavily" on those excluded expert reports in opposing summary judgment, the plaintiff failed to present adequate record evidence. 2025 WL 1758616, at 5.

Unlike in *Slattery*, Dr. Auteri's opposition is built upon admissions from Doylestown Health's own staff. For example, Dr. Levy admitted that vaccinated doctors could be treating patients while infected with COVID-19, that Doylestown Health was not testing vaccinated staff unless symptomatic, and that Doylestown Health had no data showing Dr. Auteri would transmit COVID-19 at a greater rate than vaccinated providers. Those admissions from Doylestown Health's own Chief Medical Officer create genuine factual disputes which preclude summary judgment.

Here, the record contains uncontroverted testimony from every single Doylestown Health decision-maker that they never discussed the Exemption Requests or proposed accommodations with Dr. Auteri. Not one decision maker engaged in the accommodation process *Groff* requires. The Vice President of Human Resources testified that other patient facing employees were given

exemptions and accommodations, but none were even discussed with Dr. Auteri. Doylestown Health presented no record evidence of undue hardship based upon the nature and size of Doylestown Health's operation; Doylestown Health simply applied a *per se* undue hardship standard to Dr. Auteri in violation of *Groff*. That complete failure to engage violates Title VII and distinguishes this case from *Slattery 's* sparse factual record.

The *Slattery* record also contains no evidence of the extraordinary pressure campaign which Doylestown Health directed solely at Dr. Auteri. Unlike any other employee, Dr. Auteri faced an "intervention" meeting, threats that refusing vaccination would end his career, attempts to make Dr. Auteri a vaccination "poster child," and direct pressure from the CEO of Johnson & Johnson at the specific request of Doylestown Health's Chief Executive Officer, because Dr. Auteri was Doylestown Health's "highest paid, most prominent" surgeon. That evidence of targeting and animus, completely absent from *Slattery*, supports that Doylestown Health's claimed safety concerns were pretextual. As the United States Supreme Court recognized, "hardships which are attributable to an employer's animosity toward religion . . . cannot be considered undue." *Groff*, 600 U.S. at 472

Perhaps most significantly, Doylestown Health's post-termination actions reveal the pretextual nature of Doylestown Health's "safety" rationale. Just six to eight weeks after terminating Dr. Auteri for refusing vaccination, Doylestown Health implemented the very testing protocols Dr. Auteri had proposed as part of his accommodation request. Even more remarkably, Doylestown Health began allowing COVID-positive employees to return to work <u>without</u> testing to determine whether those employees were infectious and capable of transmitting the COVID-19 virus. Those actions, occurring shortly after Dr. Auteri's termination, create a genuine factual

dispute about whether safety was Doylestown Health's true concern in denying the Exemption Requests.

Unlike *Slattery*, where the plaintiff "relied heavily" on excluded expert reports (2025 WL 1758616, at 5 n.4), Dr. Auteri's opposition is based on admissions from Doylestown Health's own witnesses, including Dr. Levy's admissions that: (1) vaccinated doctors infected with COVID-19 could be treating patients on any given day, (2) Doylestown Health was not testing vaccinated staff unless symptomatic, and (3) Doylestown Health had no data showing Dr. Auteri would transmit COVID-19 at a greater rate than vaccinated providers. Those admissions from Doylestown Health's then Chief Medical Officer create genuine factual disputes which preclude summary judgment.

C.    **THIS COURT'S DECISION IN GLOVER, NOT SLATTERY, PROVIDES THE APPLICABLE DECISION FRAMEWORK UNDER SUPREME COURT AND THIRD CIRCUIT STANDARDS**

Doylestown Health vacillates between arguing that Dr. Auteri merely "mentions God" to cloak secular objections and conceding in a footnote Doylestown Health does not doubt Dr. Auteri's sincere religiosity. Nonetheless, they go on to accuse Dr. Auteri of "convert[ing] medical beliefs into religious ones" by "mentioning God." Doylestown Health's inconsistency creates the very genuine issue of material fact which precludes summary judgment. Doylestown Health initially invoked the Africa test to determine whether Dr. Auteri's belief qualifies as "religious." When Dr. Auteri showed that the extensive record evidence demonstrates that Dr. Auteri's exemption request flows directly from his comprehensive Christian beliefs and sincere religious practice as the Africa test requires, Doylestown Health reverted to *Slattery* which ignores the Africa test and in which the Court made a factual determination as to the *Slattery* plaintiff's basis for belief. As this Court recently recognized in *Glover v. The Children's Hospital of Philadelphia*,

2024 WL 290421 (E.D. Pa. May 29, 2025), assessments as to whether any additional, nonreligious reasons for seeking accommodations "nullify" the religious bases for seeking the accommodation is a question of credibility for a jury to decide and not appropriate for disposition on summary judgment. *Glover*, 2024 WL 290421 at 10-11.

Doylestown Health further undermines its position by claiming Doylestown Health has not waived its ability to challenge whether Dr. Auteri's beliefs were religious while simultaneously conceding that they do not question whether he is a "follower of Christ," stating his "general religiosity is immaterial here." Yet Doylestown Health themselves obtained recordings of Dr. Auteri's Christian testimony at a men's conference, evidence of his evangelism activities, documentation of his Scripture-based counseling of colleagues, and proof that Dr. Auteri helped coworkers find churches. Having gathered extensive evidence of Dr. Auteri's sincere religious practice, Doylestown Health cannot now claim that his exemption request somehow exists in isolation from his comprehensive Christian worldview and documented religious convictions.

Doylestown Health's attempt to disregard *Glover*, on the grounds that it involved fetal cell concerns rather than mRNA technology only reinforces Dr. Auteri's position. If this Court refused to grant summary judgment in *Glover*, where the plaintiff's objections focused on the scientific composition of vaccines derived from fetal cells, then summary judgment is even less appropriate here where Dr. Auteri's exemption request is grounded in comprehensive theological doctrine and religious experience. As *Glover* explicitly held, the fact that a plaintiff "also cites nonreligious reasons" does not defeat religious protection where the plaintiff also cites religious reasons, and "whether the additional, nonreligious reasons cited by Plaintiff nullify the religious reasons he cited is a question of credibility for a jury to decide." *Glover*, 2025 WL 290421 at *10. *Glover*

follows binding precedent and correctly concludes that assessments regarding the interplay between religious and secular motivations cannot be resolved on summary judgment.

*Glover* provides far more comprehensive and relevant guidance than *Slattery* because *Glover* specifically addressed the Africa test, the McDonnell Douglas burden-shifting framework, involved a patient-facing healthcare role such as Dr. Auteri's, and addressed the question of undue hardship. Those are the precise legal standards which Doylestown Health invoked in Doylestown Health's pre-*Glover* Motion for Summary Judgment. Doylestown Health now seeks to disregard those standards when the *Glover* Court rejected a hospital employer's summary judgment motion under nearly identical circumstances involving a patient-facing healthcare worker's religious exemption request which specifically addresses undue hardship in its Title VII analysis.

While *Slattery* offered only a narrow analysis focused on the absence of religious content, *Glover* conducted the thorough "context-specific inquiry" which other judges of this Court have recognized as necessary prior to any assertion of undue hardship.  Glover's holding that sincerity of religious belief is a question of fact, combined with *Glover's* explicit recognition that mixed religious and secular motivations do <u>not</u> preclude Title VII protection, follows the controlling framework for analyzing Dr. Auteri's comprehensive religious exemption request.

*Glover* also addresses the undue hardship analysis at hand in its concluding sentences: "Despite this difference, Defendant maintains that exempting Plaintiff from its vaccine policy would have caused it undue hardship because Plaintiff worked a patient-facing job. Accordingly, there is a genuine dispute of material fact over whether granting Plaintiff an exemption to its vaccine mandate would have created undue hardship for Defendant. For the foregoing reasons, Defendant's Motion for Summary Judgment will be denied." *Id.* at *6 (E.D. Pa. May 29, 2025) *Glover* establishes that the question of undue hardship by accommodating patient-facing

healthcare workers constitutes an unequivocal genuine issue of material fact that must be resolved by a jury.

Continuing their attempt to "have it both ways" on the issue of the sincerity of Dr. Auteri's religious beliefs, Doylestown Health attempts to defend its contradictory statements by citing *Meinert v. Port Authority of Allegheny Cnty.,* No. 2:22-CV-01736-RJC, 2024 WL 4304559 (W.D. Pa. Sept. 26, 2024), for the proposition that prelitigation statements do not waive a defendant's right to challenge whether beliefs are religious. That argument fails on every level. Doylestown Health's reliance on *Meinert* actually undermines Doylestown Health's position, as the court denied summary judgment precisely because there were "genuine issues of material fact that prevent the Court from granting summary judgment on this issue." *Id.* at 5.

The *Meinert* court found disputed facts about whether the defendant actually had reserved its rights, noting that defendant had "presented evidence that it informed Plaintiffs, more than once in prelitigation statements, that Defendant was not waiving the right to require Plaintiffs to prove the sincerity of their religious beliefs at a later date." *Id.* Doylestown Health's position is deeply disingenuous, simultaneously claiming they never questioned Dr. Auteri's religious beliefs while reserving the right to argue those beliefs are not religious. Where Defendant's representatives testified that they "assumed" plaintiff's beliefs were religious during the accommodation process, yet now argue those same beliefs are "not religious as a matter of law," Doylestown Health has created the very type of disputed facts that *Meinert* held must be resolved by a jury.

Here, unlike in *Meinert* where clear reservations were made during the exemption process, Doylestown Health's claimed reservations were articulated by counsel after litigation commenced and contradict Doylestown Health's external communications during the exemption process.

Under the *Meinert* standard, genuine disputes of material fact about waiver preclude summary judgment and require resolution by a finder of fact at trial.

Plaintiff will not dwell on Doylestown Health's argument regarding the "concession" of *McDowell v. Bayhealth*, except to note that Dr. Auteri did not address *McDowell* because that case is irrelevant. Dr. Auteri has never claimed that mere references to bodies as God's temples should qualify as religious exemptions, nor has Dr. Auteri ever argued that vague temple references alone warrant Title VII protection. Doylestown Health's suggestion that failure to address inapplicable authority constitutes concession of a point never made is disingenuous at best, particularly when it attempts to reduce Dr. Auteri's comprehensive theological framework, Biblical citations, spiritual discernment process, and known devotion to his faith to superficial references in *McDowell*. Doylestown Health's suggestion that failure to address inapplicable authority equals concession of a point that Dr. Auteri never made borders on the absurd. Notably yet again, despite claiming not to doubt Dr. Auteri's sincere religious beliefs, Doylestown Health implies that Dr. Auteri does not have a sincere religious belief beyond "bodies are God's temples." Doylestown Health's continued denigration of Dr. Auteri's religious beliefs demonstrates religious animus and demonstrates that there apparently is a genuine issue of material fact as to the sincerity of Dr. Auteri's religious belief.

### D.    DOYLESTOWN HEALTH'S SLATTERY ANALYSIS FURTHER DEMONSTRATES THE EXISTENCE OF GENUINE ISSUES OF MATERIAL FACT PRECLUDING SUMMARY JUDGMENT

Doylestown Health's post-*Slattery* analysis presents a compilation of purported "undisputed" facts, claiming that "neither the McCullough Report nor the factual record supports the existence of any dispute" regarding Doylestown Health expert Dr. Salmon's conclusions. Dr. Auteri has not relied on the McCullough Report to 'escape summary judgment' as Doylestown Health suggests, particularly where Doylestown Health has not even attempted to refute any

specific fact or opinion in the McCullough Report.   Doylestown Health's post-*Slattery* analysis represents yet another disingenuous effort to conflate cases wherein excluded expert testimony was the central issue with this case, wherein the genuine issues of material fact arise from Doylestown Health's own admissions and conduct. Doylestown Health's analysis reflects either a fundamental confusion about the summary judgment standard or a deliberate attempt to reframe disputed expert opinions as undisputed material facts.   Doylestown Health does not address the specific and limited opinions of Dr. McCullough in this case and does not address the many admissions of Doylestown Health's representatives which are unique to this case.   Doylestown Health simply wants this Court to "follow" blindly and not evaluate this unique case and the very substantial factual record herein.

Doylestown Health has failed to address substantively almost every genuine issue of material fact identified by Dr. Auteri, including but not limited to: whether Dr. Auteri's beliefs were religious; whether Doylestown Health waived its right to dispute Dr. Auteri's sincere religious beliefs in Doylestown Health's prelitigation statements and representative's deposition testimony, whether Dr. Auteri's willingness to take the Novavax vaccine because it would not alter his body as a temple of God is evidence of his spiritual objection to the vaccine; the inferences from Doylestown Health's implementation of testing 6-8 weeks later; whether the "body as temple" religious beliefs encompasses DNA alteration concerns; whether the calculated intervention meeting showed clear religious animus; whether eliminating its chief cardiac surgeon during a pandemic created a safer environment for Doylestown Health's cardiac patients than implementing the Auteri Accommodations of testing and health screenings; whether patient safety was simply pretext for discrimination; whether allowing COVID-positive employees to return to work without testing is evidence of that pretext; whether a tested COVID-negative surgeon conducting surgery

in a controlled and sterile environment would create a safer environment than an untested COVID-positive surgeon conducting the same surgery; whether any other of the 95 employees who received exemptions faced an extraordinary pressure campaign involving intervention meetings, meetings with the CMO of the hospital threatening their careers, calls from the CEO of the hospital and the CEO of Johnson and Johnson; whether a reasonable jury could conclude that said pressure campaign is not the standard process but is rather a targeted discrimination campaign to coerce Dr. Auteri's compliance in abandoning his religious beliefs; Doylestown Health's failure to engage in the *Groff* accommodation evaluation process; and whether losing Doylestown Health's highest paid, most prominent surgeon would be less of a burden than the "undue hardship" of health screenings and testing (and whether the obvious answer to this is further evidence of pretext). Those are a mere sample of the factual disputes permeating this case and any refutations simply prove the fact-nature of these disputes.

Doylestown Health's assertion that the Johnson & Johnson (Janssen) vaccine "could not possibly have violated any belief about his DNA" is demonstrably false based on Doylestown Health's own materials. Doylestown Health's own Frequently Asked Questions document regarding the COVID-19 Vaccines, which Doylestown Health disseminated to Doylestown Health employees, explicitly acknowledges that the Johnson & Johnson vaccine "utilizes an adenovirus, which 'is able to enter a cell and cause the spike protein to be made,'" which is the same cellular entry and artificial protein production mechanism that formed the basis of Dr. Auteri's religious objection to all available COVID-19 vaccines. D116. The now-defunct Johnson & Johnson vaccine, which was subsequently withdrawn from the market for safety reasons, operated through a similar artificial cellular manipulation process that Dr. Auteri found religiously objectionable as an alteration of God's design for Dr. Auteri's body.

Doylestown Health's dismissal of Dr. Auteri's proposed accommodations further demonstrates the existence of material factual disputes. When Doylestown Health argues that Dr. Auteri's evidence regarding transmission by vaccinated employees "ignores the fact that vaccination reduces the likelihood of infection," Doylestown Health presents no record evidence of that alleged fact and fails to address Dr. Auteri's central point that daily health screenings and weekly testing would provide superior protection by conclusively identifying infected individuals before patient contact. While vaccination may reduce infection likelihood, Dr. Auteri's proposed testing protocol would virtually eliminate transmission risk by preventing Dr. Auteri or any COVID-positive individual from treating patients, whereas Doylestown Health's "vaccination only" policy would permit vaccinated but infected healthcare workers unknowingly to transmit the virus because of an absence of screening measures. Doylestown Health tacitly admitted the propriety of Dr. Auteri's Auteri Accommodations by implementing the same testing program that Dr. Auteri proposed six to eight weeks after Dr. Auteri's termination. While Doylestown Health's expert curiously ignores those facts and Doylestown Health's admissions, the fundamental disagreement about the relative effectiveness of different safety protocols creates precisely the type of genuine issue of material fact which precludes summary judgment.

Doylestown Health's desperate reliance on over a dozen cases from Oregon, California, Hawaii, and beyond cannot transform those genuine factual disputes into matters of law. Doylestown Health has not and cannot identify a single case anywhere in the world where an employee with religious exemption requests so thoroughly grounded in sincere, comprehensive religious beliefs was nonetheless subjected to such an extraordinary pressure campaign involving orchestrated interventions, career-ending threats, and coordinated pressure from both hospital leadership and multi-billion dollar pharmaceutical company CEOs. That is why *Slattery*, *Bushra*,

and every other case Doylestown Health disingenuously characterizes as "nearly identical" fails to provide any meaningful parallel.

### III.    <u>CONCLUSION</u>

Despite Dr. Auteri's identification of multiple genuine issues of material fact regarding the sincerity and religious nature of his beliefs, the absence of Doylestown Health's interactive process, and the dispute over Doylestown Health's claims of undue hardship, Doylestown Health simply asserts the absence of factual disputes without demonstrating that absence. Credibility determinations about whether Dr. Auteri used religious language to cloak secular objections, assessments of Dr. Auteri's sincerity, and evaluations of mixed religious and secular motivations are definitionally factual inquiries which cannot be resolved on summary judgment.

*Slattery* is neither binding precedent nor persuasive authority for this case. *Slattery* involved a sparse factual record, no evidence of interactive process discussions or the failure to conduct such discussions, and no evidence of discriminatory treatment. By contrast, this case presents detailed religious beliefs grounded in specific scripture, uncontroverted evidence of Title VII process violations, and extensive testimony from Doylestown Health's own witnesses which creates numerous genuine issues of material fact.

Plaintiff Dr. Auteri respectfully requests this Court to deny Defendant Doylestown Health's Motion for Summary Judgment.

Respectfully submitted,

**KAPLIN STEWART MELOFF REITER & STEIN, P.C.**

By: _____
Kimberly L. Russell, Esquire
Daniel M. Zachariah, Esquire
910 Harvest Drive
P.O. Box 3037
Blue Bell, PA  19422
(610) 941-2541 (phone)
krussell@kaplaw.com
dzachariah@kaplaw.com

**PACIFIC JUSTICE INSTITUTE**

By: */s/ Karyn L. White, Esquire* _____
Karyn L. White, Esquire
PA/NJ Office P.O. Box 276600
Sacramento, CA 95827
(609) 335-4833 (phone)
kwhite@pji.org

Attorneys for Plaintiff

**Dated:** July 11, 2025

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | | |
|---|---|---|---|
| **JOSEPH S. AUTERI, M.D.** | : | | |
| Plaintiff, | : | No. 2:22-cv-03384 | |
| | : | | |
| v. | : | | |
| | : | | |
| **VIA AFFILIATES, d/b/a** | : | | |
| **DOYLESTOWN HEALTH** | : | | |
| **PHYSICIANS** | : | | |
| Defendant. | : | | |

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing "Sur-Reply Memorandum of Law in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment," was caused to be sent electronically through the Court's ECF system to:

Christopher D. Durham, Esquire
Adam Brown, Esquire
Duane Morris LLP
30 South 17th Street
Philadelphia, PA  19103
Attorneys for Defendant

**KAPLIN STEWART MELOFF REITER & STEIN, P.C.**

By: _____
Kimberly L. Russell, Esquire
Daniel M. Zachariah, Esquire
910 Harvest Drive
P.O. Box 3037
Blue Bell, PA  19422
(610) 941-2541 (phone)
krussell@kaplaw.com
dzachariah@kaplaw.com

Karyn L. White, Esquire
PA/NJ Office P.O. Box 276600
Sacramento, CA 95827
(609) 335-4833 (phone)
kwhite@pji.org

Attorneys for Plaintiff

**Dated:** July 11, 2025